**EXHIBIT B**
**[Pages 1-9 and 41-44]**

# THIRD ANNUAL REPORT OF THE SETTLEMENT ADMINISTRATOR UNDER THE CONSENT JUDGMENTS WITH EDUCATION MANAGEMENT CORPORATION (EDMC) AS SUCCEEDED BY DREAM CENTER EDUCATION HOLDINGS

Thomas J. Perrelli
Settlement Administrator
Jenner & Block LLP
1099 New York Avenue, NW
Washington, DC 20001

October 1, 2017 – September 30, 2018

# EDMC – Third Settlement Administrator Report Outline

## I. INTRODUCTION

### A. Consent Judgment and Administrator

This is the Third Annual Report prepared by the Settlement Administrator in connection with the 2015 settlements between Education Management Corporation ("EDMC") and 39 individual states and the District of Columbia (collectively, "the Consent Judgment") to resolve consumer protection claims arising out of EDMC's recruitment and enrollment practices. It is also the first report that describes the company's operations and compliance efforts under entirely new management: In October 2017, EDMC sold substantially all of EDMC's assets to Dream Center Education Holdings, LLC ("DCEH"), an educational affiliate of the Dream Center Foundation ("Dream Center"),[1] a Los Angeles-based non-profit organization that provides a variety of social and religious services to individuals in difficult situations.

The Consent Judgment imposes a variety of terms that bound EDMC and that now bind DCEH.[2] Some of the terms required action in a compressed period of time, like the Consent Judgment's requirement that the company forgive the institutional debts of certain students within 90 days of the Consent Judgment's effective date.[3] Other requirements require the company to provide certain consumer protections for periods of seven years, like maintaining a call monitoring system,[4] or twenty years, like providing a single-page disclosure sheet that provides specified information to prospective students.[5]

The Consent Judgment specifies that the Administrator's term is to last three years,[6] but the Attorneys General may extend that term for up to two additional years if there is "a failure by [DCEH] to achieve and maintain substantial compliance with the substantive provisions of the Consent Judgment."[7] This Report is the Administrator's third and final report of the three-year term, and is based on the monitoring of calls recorded in the admissions process, reviews of marketing material, job data, and other materials, rounds of formal employee interviews in May and August 2018, ongoing discussions with compliance personnel, reviews by third-party consultants, participation in EDMC trainings, observations of team meetings, and mystery shops. At times during the course of this Consent Judgment, the Administrator has also received unsolicited information from individuals involved with the company or its schools, through the Administrator's website, complaints forwarded by State Attorneys General, and other channels, and the Administrator has investigated issues arising from that information.

---

[1] Dream Center Education Holdings, LLC, is the affiliate that acquired the schools in the transaction, which closed October 17, 2017.

[2] *See* Consent Judgment ¶ 134.

[3] Consent Judgment ¶ 120-21.

[4] Consent Judgment ¶ 95.

[5] Consent Judgment ¶¶ 56,-124.

[6] Consent Judgment ¶ 38.

[7] Consent Judgment ¶ 49.

### B. Summary of Findings

#### 1. The Transition to DCEH

As described in prior reports, the first year of the Consent Judgment was characterized by significant investment in compliance infrastructure and efforts at pushing that infrastructure and a revamped culture of compliance into the outer reaches of a large and diffuse organization. In the second year of the Consent Judgment, progress somewhat stagnated: EDMC was clearly struggling financially and preparing to be sold; while the company was largely able to maintain the status quo, it was unable to invest in new initiatives, and senior compliance personnel left in advance of a transition.

This third year has been dominated by a major shift in compliance culture and approach from DCEH and its new management. The Dream Center Foundation has described the new educational endeavor as an expansion of the services that the Foundation provides to individuals in transition, and consistent with that mission, is transitioning the schools from for-profit to non-profit status. That transition is being overseen a management team with a history of for-profit endeavors. DCEH leadership is clearly driven to save what they believe to be a business at serious risk of failure – one they believe to be worse off than they expected or were led to understand at the acquisition – and have found limited capital available to invest in its long-term compliance future.

With respect to the core issues of compliance at the heart of the Consent Judgment, the third year has been characterized by two distinct periods: a very rocky period in the first half of the year, raising new and troubling issues, followed by signs of improvement after a restructuring of the compliance team in August and September 2018. Had that significant change of direction not occurred, the Administrator has no doubt that the conclusions of this report would be dire. Since August, there have been positive signs of improvement, but the critical question is whether DCEH leadership will support continued compliance improvements going forward.

The goal of the Consent Judgment no doubt was to bring about significant compliance reforms at EDMC that would last far beyond the term of the Settlement Administrator. There have been important changes that have eliminated or at least reduced the incidence of consumer protection issues that led the state Attorneys General to begin investigating in the first place. But the company is at an inflection point; there remains real uncertainty about whether the progress it has made will continue into the future or whether the company, under DECH's leadership, will backslide.

#### 2. Results

The change in management has brought several changes in results.

*Call monitoring.* First, there is one area in which the new management has not changed EDMC's prior results, and which is an unqualified success of the Consent Judgment: DCEH has maintained the call monitoring system required by the Consent Judgment, randomly listens to a meaningful number of calls to identify violations and training opportunities, and has, for the most part, eliminated the incidence of high-pressure, abusive, or deceptive sales tactics that characterized EDMC and the industry in the years prior to the Consent Judgment. With

occasional inaccuracies that are best described as isolated, admissions and financial services representatives are providing accurate, comprehensive information to the prospective students whom they are attempting to enroll.[8] The call monitoring system is a critical component of the compliance architecture, and the focus of the state Attorneys General on that system has paid significant dividends.

Other infrastructure investments required by the Consent Judgment have also been beneficial. Prospective students are in a position to make better-informed decisions as a result of the Single-Page Disclosure Sheets[9] and Electronic Financial Impact Portal[10] that EDMC and DCEH have made available. And early in the Consent Judgment, EDMC successfully implemented the institutional debt forgiveness program that the Consent Judgment required.[11]

Outside these areas, however, the third year of the Consent Judgment has raised new and problematic issues that could not easily be addressed through training, job aids, and modifications to policies and procedures. As discussed further below, the Administrator identified three incidents constituting substantial non-compliance with the Consent Judgment and requiring corrective action plans.

*Woz U.* In March 2018, DCEH's Art Institutes announced a partnership with a for-profit educational entity – also controlled by DCEH leadership – called Woz U. The partnership contemplated a 12-week, full-time, intensive software coding "boot camp" under the Woz U brand. From a Consent Judgment perspective, DCEH provided or endorsed misleading information to prospective students regarding the nature of the partnership (whether an Ai program or something else), the status that completers of the Woz U boot camp would obtain (whether "graduates" or something else), and the job placement successes that previous completers had enjoyed. Apart from the Consent Judgment, the arrangement raised questions about DCEH leadership's use of their new company's *non-profit* status to benefit their separate *for-profit* projects. Ultimately, DCEH agreed that it would not proceed with Woz U. It is now separately developing a different suite of "boot camp" offerings, developed entirely in-house.[12]

*Gainful Employment.* Department of Education regulations require that for-profit schools provide significantly more disclosures than non-profit schools, including clear and conspicuous warnings for degree programs that fail to meet minimum "Gainful Employment" requirements. While DCEH is organized as a non-profit entity for tax purposes, the Department of Education had not approved the transition to non-profit status for Department of Education regulatory purposes. Accordingly, DCEH should have been making all of the Gainful Employment disclosures – including clear warnings for programs that had failed – required of for-profit schools. While aware of its formal regulatory position as a for-profit school, DCEH elected to make the narrower disclosures required of non-profit schools. DCEH explained that it did so because the Department of Education had signaled that it *would* approve the transition to non-profit status, making enforcement against DCEH unlikely for making only the narrower

[8] More information regarding DCEH's call monitoring capabilities is available beginning on page 17, below.

[9] More information regarding the Single-Page Disclosure Sheets is available beginning on page 38, below.

[10] More information regarding the Electronic Financial Impact Portal is available beginning on page 58, below.

[11] More information regarding the institutional debt forgiveness program is available beginning on page 56, below.

[12] More information regarding the Woz U issue is available beginning on page 21, below.

disclosures during the transition. DCEH ultimately agreed to post all of the disclosures required of for-profit schools, pending a decision by the Department of Education.[13]

*Accreditation Disclosures.* On January 20, 2018, the Higher Learning Commission ("HLC") downgraded the status of the Illinois Institute of Art and the Art Institute of Colorado from "accredited" to "candidate" – a move that, in HLC practice, means that the schools were unaccredited. DCEH did not inform students that the schools had lost their accreditation for several months – during which time students registered for additional terms and incurred additional debts, for credits that were significantly less likely to transfer to other schools and towards a degree that was to have limited value. DCEH explained that it disagreed with and was appealing HLC's decision, and hoped to have the accreditation reinstated retroactive to January 20. Whatever conclusions are reached regarding DCEH's status under the Consent Judgment on other issues, DCEH should not be said to be in substantial compliance with the Consent Judgment until it completes the corrective actions necessary to resolve this issue.

While not itself a violation of the Consent Judgment, the "tone" that new DCEH management set upon arrival was also distinctly different from the tone set by the new management's predecessors. DCEH leadership indicated that under EDMC, Risk and Compliance had too much influence on the business. The newly installed officer called a key compliance team, the Business Practices Committee, the "Business *Prevention* Committee" – in a meeting with the committee itself. The CEO accused the compliance team of being "the place where everything goes to die." Employees who identified compliance questions and risks were not thanked, but accused of being obstructionist. The new tone was one that suggested compliance was a burden, not a critical element of the company's mission.[14]

Concerns about these issues have been a topic of significant discussion between DCEH leadership and the Administrator. Importantly, there have been signs of improvement in DCEH's compliance efforts over the final months of this review period. The company hired a new Senior Vice President of Compliance and Regulatory Affairs, reporting to the General Counsel and the Chief Academic Excellence Officer. The company has begun working more proactively to raise compliance issues. Where the company had initially, and implausibly, denied violating relevant requirements, DCEH has begun implementing corrective action plans. And the company's new Chief Marketing Officer has developed plans to dramatically reduce DCEH's reliance on some of the industry's more problematic recruiting tactics.

The change in tone and attention to compliance following the restructuring was necessary. But the unevenness of DCEH's commitment to compliance over the past year does not provide confidence that DCEH has truly turned the corner for the future. If the compliance team continues to operate as it has in the last few months and is given the freedom, authority, and support necessary to do its job, there is a basis for optimism.

---

[13] More information regarding the Gainful Employment issue is available beginning on page 26, below.

[14] Issues regarding tone are addressed throughout the report, including in a focused discussion beginning on page 11, below.

3. Concerns Looking Forward

As this third review period comes to a close, it is worth looking ahead. There are a number of areas in which DCEH's recent history suggests that backsliding is at least a possibility.

First, notwithstanding improvements in recent months, DCEH's commitment to a culture of compliance is uncertain. While DCEH hired a senior compliance manager, many of the challenges over the past year have been driven by senior leadership; even the strongest Risk and Compliance department cannot change a company whose employees doubt the leadership's commitment to compliance. Time will tell whether the compliance team receives the institutional support that it needs, whether leadership promotes additional initiatives that are flawed from a compliance perspective, whether the organization resists them, and how leadership responds.

Second, DCEH is still in the process of completing a corrective action plan that the Administrator required for violation of the Consent Judgment. As a result of DCEH's failure to advise students that certain schools had lost their accreditation on January 20, certain students stayed in the unaccredited schools, incurring additional debts to obtain credits that were less likely to transfer or a degree that was worth less than they expected. The Administrator has asked DCEH to prepare a corrective action plan to assist the affected students. While DCEH is appealing the accreditation decision at issue, and a decision is unlikely before the Administrator's term expires on December 31, 2018, DCEH is aware that the Administrator will expect it to provide and complete a corrective action plan if the appeal is unsuccessful.

Third, DCEH announced in July 2018 that for financial reasons, it would be closing thirty of its schools. The closures would affect about half of DCEH's total schools and about a quarter of its total enrollment, and would have significant consequences for students. As DCEH encourages students at these teach-out locations to enroll in other DCEH schools, it must provide accurate and materially complete information to students. In the initial steps of the closures, the Administrator has worked to ensure that DCEH informs students at these schools of the Department of Education's Closed School Discharge program, through which students at closed schools who meet certain criteria can apply to have their federal loans forgiven. DCEH is still working to inform students at some of these schools of the actual date on which their schools will close, which can be a key piece of information for students considering applying for a Closed School Discharge. As the teach-outs proceed, the accurate and complete communication required by the Consent Judgment will be important in helping these students make the choices that are best for them.

Fourth, the issue of DCEH and its non-profit status will continue to require scrutiny. The abandoned Woz U initiative would have involved DCEH, the non-profit, making payments to a for-profit entity controlled by DCEH's own leadership. Perhaps it was a sensible business or educational arrangement, but the rationale for it was by no means clear, and the legal and appearance issues of personal benefit to the management of the non-profit were cause for serious concern. While DCEH decided not to move forward with the Woz U initiative, DCEH also indicated that it would consider other arrangements going forward, some of which might include

contracting with for-profit entities for substantial services. Such efforts in the future would merit close scrutiny by the Dream Center Foundation, the DCEH Board, and the Attorneys General.

Fifth, while one of the DCEH Consent Judgment's successes has been the accuracy of the data and nature of the discussions that DCEH representatives provide prospective students, there are reasons to be vigilant going forward. With respect to the data, there are concerns in the company that DCEH is not adequately investing in its data reporting infrastructure, and over time, the information will become less accurate. With respect to the nature of the discussions that admissions representatives have with students, the Administrator has been encouraged by the Risk and Compliance team's shift towards random call monitoring over this review period, and would want to see call monitoring proceed at present levels or higher.

Sixth, DCEH has laid out a three-year goal of nearly eliminating its use of third-party lead generators. These vendors are difficult to monitor and have caused compliance challenges for DCEH, EDMC, and others in the industry for years. DCEH's new Chief Marketing Officer believes that reducing its reliance on these vendors will give the company better control over how its brand is perceived, and lead to better, more cost-effective marketing. It is also worth noting that at schools that have eliminated the use of third-party lead generators entirely, they have saved substantially on the large compliance infrastructure that that marketing channel requires. Reducing reliance would be beneficial from a compliance perspective – but it is worth noting that at the beginning of the Consent Judgment, EDMC also laid out a three-year plan along similar lines. Reducing such reliance is difficult.

## II. DCEH

### A. Consent Judgment Background

#### 1. EDMC and the Consent Judgment

At the time of the November 2015 Consent Judgment with the state Attorneys General, EDMC was one of the largest for-profit providers of post-secondary education in the country. Formerly a public company, EDMC had delisted from the NASDAQ in 2014, eighteen years after its first public offering. At the time of the Consent Judgment, EDMC claimed to manage 109 locations in 32 U.S. states and in Canada and serve over 90,000 students in its four separate brands, or systems: The Art Institutes (Ai), Argosy University, Brown Mackie College, and South University.

EDMC became the subject of several state investigations beginning in 2010. Over a two-and-a-half year period, EDMC received subpoenas from the Attorneys General of Florida, Kentucky, New York, Colorado, and Massachusetts.[15] The subpoenas were followed by requests for information from thirteen states in January 2014, with the Pennsylvania Attorney General's office serving as the states' principal point of contact.[16] Following more than a year of subsequent discussions, EDMC entered into a settlement with 39 states and the District of Columbia to resolve consumer protection claims arising out of its recruiting and enrollment

[15] *See* Education Management Corporation, Form 10-K (Oct. 14, 2014) at 36.
[16] *See* Education Management Corporation, Form 10-K (Oct. 14, 2014) at 36.

practices. The settlement was resolved through nearly identical consent judgments entered in the various states,[17] referred to in this Report as the Consent Judgment.

The Consent Judgment appointed an independent Settlement Administrator to monitor EDMC's compliance with the Consent Judgment's requirements and issue annual reports. The Consent Judgment imposes requirements on EDMC and, as discussed below, successor companies for varying number of years: seven years of maintaining a call recording system,[18] twenty years of most other requirements.[19]

#### 2. The Dream Center Transaction

At the beginning of this review period, EDMC closed a sale of substantially all of its assets to Dream Center Education Holdings, LLC ("DCEH"), an educational affiliate of the Dream Center Foundation ("Dream Center"),[20] a Los Angeles-based non-profit organization that provides a variety of social and religious services to individuals in difficult situations. DCEH announced that it would convert the EDMC schools into "community focused not-for-profit educational institutions" that, among other things, provide educational opportunities for Dream Center volunteers and the recipients of its services.[21] DCEH leadership has also discussed building a stronger connection between its programs and the private employers with whom DCEH hopes to place graduates, through redesigned academic offerings and partnerships with prospective employers.

That sale to DCEH is one part of an even longer period of transition. In the years since the Consent Judgment was entered, EDMC had sold or closed several of its schools, including the entire Brown Mackie system, and had been in the market for a purchaser for some period before the Dream Center announcement. From a compliance perspective, the period during this uncertainty meant that following significant initial investments at the Consent Judgment's beginning, there was little investment in proactive compliance initiatives and an otherwise effective compliance staff. This was the situation that DCEH faced when it acquired EDMC's assets.

### B. DCEH

#### 1. New Management

With the change in ownership came a change in management. DCEH installed a new leadership team. Its new CEO, Brent Richardson, had previously served as chairman and chief executive officer at Grand Canyon University, where he oversaw the school's conversion from non-profit to for-profit status, and ultimately to an initial public offering, and has had roles in

[17] The various consent judgments all share identical requirements for the core provisions, although certain states also added additional provisions that apply specifically to that state. EDMC is implementing the Consent Judgment provisions in every state in which it operates, regardless of whether that state participated in the Consent Judgment.
[18] Consent Judgment ¶ 95.
[19] Consent Judgment ¶ 124.
[20] Dream Center Education Holdings, LLC, is the affiliate that acquired the schools in the transaction, which closed October 17, 2017.
[21] *See* Dream Center Foundation Press Release, "Education is the Key" (Mar. 3, 2017), *available at https://dreamcenter.org/about-us/foundation/*.

numerous for-profit education companies. His brother, Chris Richardson, became DCEH's General Counsel; Shelly Murphy, who had roles in other Richardson companies, became DCEH's Chief Officer, Regulatory and Government Affairs. The new leadership brought in other key managers who had worked with Richardson previously or who had other for-profit education experience.

The new management did not appoint a C-suite level officer who was focused on compliance issues, as the Administrator's Second Annual Report had recommended; instead, the company's compliance functions reported up to Murphy.

2. Non-Profit Status

A critical part of DCEH's vision for the network of schools was their conversion from for-profit to non-profit status. This change would be consistent with the purposes of the new company's owner, The Dream Center Foundation, and the Foundation's social and religious mission.

The change also has regulatory significance; as the Department of Education treats for-profit and non-profit schools differently. First, non-profit schools are not subject to the Department of Education's "90/10 rule," a mechanism that ensures that for-profit schools are receiving at least some level of market-based support. In short, the 90/10 rule requires for-profit colleges to receive at least 10% of their revenue from sources other than federal financial aid. Non-profit colleges are subject to no such restriction, and are permitted to cover all of their costs through reliance on federal financial aid provided for students. While there are financial trade-offs, the shift to non-profit status thus can be a significant benefit from a revenue perspective – particularly for schools that have had difficulty generating revenue from sources other than the federal government.

Second, the Department of Education has different disclosure requirements, particularly regarding the typical debt and earnings of program graduates, for for-profit and non-profit schools. The disclosures provide important information for prospective students, as programs that are subject to these Gainful Employment rules and that fail to meet minimum requirements must issue clear warnings to students and prospective students about their programs' failure.[22] The Gainful Employment regulations apply more broadly at for-profit schools; programs that would fail the Gainful Employment regulations and require disclosure at a for-profit school may not need to make that disclosure once a school becomes a non-profit.

For purposes of the Consent Judgment and compliance purposes, it is important to distinguish between DCEH's and its schools *tax status* and its *Department of Education regulatory status*. As a matter of tax law, DCEH has been organized as a non-profit entity under Section 501(c)(3) of the tax code since the time of the EDMC-DCEH transition. However, for Department of Education regulatory purposes, DCEH schools remain treated as *for-profit* institutions – notwithstanding DCEH's tax status – until the Department of Education specifically approves the transition to non-profit status. Until that Department of Education recognition, DCEH and its schools must comply with the various state and federal laws

[22] 34 C.F.R. § 668.410.

governing non-profit management – such as restrictions on using a non-profit to personally benefit the organization's management in certain prohibited ways – but is treated as a for-profit for purposes of the Department of Education's 90/10 and Gainful Employment rules. While DCEH believes that the Department has begun treating DCEH as a non-profit in certain important ways, the Department has also advised DCEH that it remains a for-profit institution for regulatory purposes until final approval is obtained.

#### 3. Organizational Changes

DCEH has faced ongoing financial pressures since taking over, and its management believes that the company was in a weaker position than they expected when they took the helm. In a year of organizational change, two changes had particular impact.

First, in April, DCEH engaged in a significant round of layoffs. While the layoffs affected other parts of the company more dramatically, employees with compliance responsibilities for the Business Practices Committee, state regulation, and Department of Education issues departed through the layoffs.

Second, in July 2018, DCEH announced the closing of 30 of its ground campuses, affecting all three brands but the Art Institute schools most heavily. The closures would affect about half of DCEH's total schools and about a quarter of its total enrollment. As discussed further below, the closures had significant consequences for the business, and dramatic consequences for students. The closures also put a focus on DCEH's ability to provide accurate, complete information to its students at the closing schools – students whom DCEH was also trying to recruit to attend other DCEH schools.

## III. EVALUATING DCEH'S COMPLIANCE EFFORTS

### A. Compliance Culture

While there were signs of improvement towards the end of the review period, most of the early signs from DCEH's new management were problematic.

#### 1. Initial Structure

##### a. Initial Compliance Leadership

DCEH did not install a C-suite-level chief compliance officer. The Administrator had recommended such a hire in the Second Report, noting the void that had existed when EDMC's Chief Compliance Officer departed in May 2017:

> The company has now operated without its compliance and audit leadership for several months. Regardless of how capable the existing team may be, long-term vacancies in those positions have consequences. They leave the team less able to break through internal logjams and elevate issues for resolution, and more focused on maintaining existing initiatives than on making improvements proactively. Particularly following several months of uncertainty surrounding a potential

shopping has likewise uncovered no evidence of systematic failures to disclose the FYSKs in a compliant, clear and conspicuous manner.

It is worth noting that while DCEH representatives have presented the FYSK clearly, prospective students rarely ask any questions about these disclosures. Perhaps this is because the student previously read the FYSK when first presented during the application process. Alternatively, this may be an indication that the oral presentation of this detailed data, at a time when student is in the process of completing a variety of paperwork, does not result in the prospective students' full absorption of the information. That is, listening to the representative read this form and then checking a box confirming receipt becomes just another of several administrative steps to complete enrollment.

On the third issue, regarding the accuracy of FYSK information, a sampling of data contained in FYSKs during this review period suggests that they are accurate reflections of the relevant underlying data sources. Some of the data in the FYSK can be verified using publicly available sources: The length and cost of attendance figures that can be checked against academic catalogs and enrollment agreements; median earnings data can be checked against the Department of Education's gainful employment figures. The remaining data in the FYSK is drawn from DCEH's own internal databases, and in some cases is calculated with the help of a third-party vendor who disaggregates and re-aggregates data supplied by the Department at the institutional level. Reviews of information produced from DCEH databases found no variances in the FYSK from the underlying source information, but did note that the FYSK inaccurately described the median earnings of program graduates as "starting salaries" when in fact, those figures represent all earnings, not starting salaries. DCEH's compliance team recognized the inaccuracy, and amended the FYSKs, reverting to the original median earnings language without the additional "starting salary" qualifier.

Yet while the information appears accurate today, there is reason to be concerned regarding the FYSK and related disclosures in the future. At this point, the Compliance Reporting Team is relatively thinly staffed. This team, responsible for collecting, aggregating, and reporting much of the company's data for internal and external purposes, has shrunk over the past year. The Administrator is concerned that the company's ability to maintain current, reliable information in the database it uses for federal reporting purposes, and the database it uses for communications with regulators and accreditors, will degrade. These databases feed much of the information that populates the FYSK documents. As time passes, and as DCEH implements additional changes, those databases may become outdated; the data used in the FYSK – and data provided to regulators and accreditors – may become inaccurate.

### 6. Disclosure of Accreditation Status

Few attributes of an institution of higher education are more consequential for its students than whether the school is accredited. Accreditation by a Department of Education-approved accrediting body is a prerequisite for federal student aid funding. The accreditation status of an institution is also often a factor in whether a student is able to transfer credits from that institution when enrolling in another school. Given the importance of a school's accreditation status, the Consent Judgment prevents DCEH from making "express or implied false, deceptive, or misleading claims to Prospective Students with regard to the academic standing of its

programs and faculty including, but not limited to misrepresenting … the accreditation" status of its schools and programs.[103] This obligation was particularly important this year, as the accreditation status of some DCEH schools changed. Some of the changes were, while potentially significant, relatively incremental; other changes involved outright losses of accreditation.

a. Changes in Accreditation Status

When accreditation statuses change, the schools retained their accreditation but were placed on some level of disfavored or probationary status. The most important of these changes came in July, when the Middle States Commission on Higher Education ("Middle States") required DCEH's Art Institute of Pittsburgh, which encompasses the Art Institute network's online offerings, and its Art Institute of Philadelphia "to show cause … as to why its accreditation should not be withdrawn."[104] That directive put the schools on an official status of "Accredited on Show Cause"[105] and required them to demonstrate why they should remain accredited and prepare for Middle States to withdraw their accreditation. In less significant moves in this category, accreditors may have simply asked for additional information about an issue, placed a school on probation, or moved a school off of probation after gaining assurance that the school continued to meet the accreditor's requirements following its transition from EDMC to Dream Center.

Accreditors generally provide detailed guidance regarding how schools' written materials should describe the schools' accreditation status when subject to these various levels of action. Typically, the accreditor directs that the school or program may continue to call itself "accredited," but must also include specific language disclosing its status in its catalogs and related materials.

Oral discussions with prospective students regarding these situations can be difficult, and receives relatively less guidance from accreditors than written materials. While it may remain true that a school remains accredited, it is also true that the school's accreditation may be in a precarious position. The nuances of the various statuses, as reflected in the 574-word paragraph from Middle States describing the showing that it expects from Ai-Pittsburgh, are complex, often outside the interest of the average prospective student, and may often be immaterial. The Administrator has thus instructed DCEH to ensure that its oral disclosures regarding accreditation status track the guidance provided for written disclosures by the accreditors themselves: In most cases, this will mean that when providing a broad overview, it is accurate to describe a school as accredited; when a more detailed or focused discussion is called for, DCEH must provide the nuanced caveat that the accreditor provides – whether directly, by pointing to

[103] Consent Judgment ¶ 81(b).

[104] Letter from Gary L. Wirt, Chair, Middle States Commission on Higher Education, to Dr. Elden Monday, Interim President, The Art Institute of Pittsburgh at 1 (July 19, 2018), *available at* https://www.msche.org/non-compliance-disclosure-statements/the-art-institute-of-pittsburgh/; Letter from Gary L. Wirt, Chair, Middle States Commission on Higher Education, to Robert A. Kane, President, The Art Institute of Philadelphia at 1 (July 19, 2018), *available at* https://www.msche.org/non-compliance-disclosure-statements/the-art-institute-of-philadelphia/.

[105] *See* https://www.msche.org/institution/0840/ (visited Sept. 1, 2018).

the more detailed website disclosure, or by arranging a discussion with staff who has more expertise on the accreditation issue.

b. Losses of Accreditation Status

The more significant development from an accreditation perspective came in January, when the Higher Learning Commission ("HLC") downgraded the status of the Illinois Institute of Art and the Art Institute of Colorado from "accredited" to "candidate" – a move that HLC describes as an "adverse action" it can take when it determines that the institution, among other things, "no longer meets all of the Criteria for Accreditation."[106] It is the only other status that HLC recognizes: either a school is accredited, or it is a candidate seeking to become accredited. In short, HLC stopped viewing the schools as "accredited" and started viewing them as unaccredited. The change in status occurred in connection with the transition from EDMC to DCEH.

That change on January 20 carried significant consequences for the students of those institutions – including consequences for their federal financial aid and their ability to transfer any credits they earned after January 20 to other schools. These consequences became more dramatic once DCEH announced in July that those schools would close – and thus that many of the students would *need* those credits to transfer to other schools.

The loss of accreditation – and the risk of losing accreditation – put students in a difficult position. When the Middle States Commission on Higher Learning issued its "Show Cause" notice, requiring Ai Pittsburgh to demonstrate that it still satisfied accreditation standards, the school eventually stopped accepting transfer students because it did not want to put students in an "unstable environment."[107] Yet current students who sought to pause their education, lest they accrue and pay for credits that would be of little value, had to finish their terms or face withdrawal penalties.[108] The accreditation problems put these students between a rock and a hard place, financially: Either stay in the course, and potentially waste that tuition if the accreditation is withdrawn, or withdraw from class, and pay the financial penalties associated with withdrawal.

Given these consequences that loss of accreditation status can have, HLC requires institutions that are moved from accredited to candidate status to

> notify … students, prospective students, and any other constituencies about the action in a timely manner not more than fourteen (14) days after receiving the action letter from the Commission; the notification must include information on how to contact the Commission for further information; the institution must also disclose this new status whenever it refers to its Commission affiliation.[109]

[106] HLC, Accredited to Candidate Status, Policy No. INST.E.50.010, available at http://download.hlcommission.org/policy/HLCPolicyBook_POL.pdf.
[107] Call Recording 48347923 (Sept. 24, 2018).
[108] Call Recording 48243262 (Sept. 11, 2018).
[109] HLC, Accredited to Candidate Status, Policy No. INST.E.50.010, available at http://download.hlcommission.org/policy/HLCPolicyBook_POL.pdf.

Simply put, when these schools lost their accreditation status, they were obligated to inform their students and prospective students within 14 days.

DCEH did not inform Illinois Institute of Art or Art Institute of Colorado students or prospective students that it had lost its accreditation. Instead, DCEH revised the accreditation statement on its website to expressly claim that the schools "remain accredited as a candidate school"[110]:

- **Institutional Accreditation**

  The Art Institute of Colorado is in transition during a change of ownership. We remain accredited as a candidate school seeking accreditation under new ownership and our new non-profit status. Our students remain eligible for Title IV. Higher Learning Commission (230 S. LaSalle Street, Suite 7-500, Chicago, IL 60604-1413, 1.800.621.7440, www.hlcommission.org/).

That revised accreditation statement was inaccurate and misleading, and obfuscated HLC's distinction between accredited institutions and candidates. DCEH argued that it disagreed with HLC's view that the schools' "candidate for accreditation" status meant they were unaccredited, but there is no ambiguity in HLC's view of what that status means.

Following discussions with the Administrator, DCEH removed the "remain accredited" language from the accreditation websites of the two schools[111]:

- **Institutional Accreditation**

  The Illinois Institute of Art is in transition during a change of ownership. We are a candidate school seeking accreditation under new ownership and our new non-profit status. Our students remain eligible for Title IV. Higher Learning Commission (230 S. LaSalle Street, Suite 7-500, Chicago, IL 60604-1413, 1.800.621.7440, www.hlcommission.org/).

That change occurred prior to June 29, 2018.

While the corrected language was necessary, it did not resolve the consequences that had arisen for students who either enrolled or decided to remain enrolled during the period of the misleading disclosure. Among other consequences, those students may have used limited financial resources to acquire credits that could not be transferred to other schools – a problem that was exacerbated dramatically when DCEH announced in July that it would be closing those schools, leaving many of those students dependent on the transferability of their credits to further their education.

The Administrator has requested a corrective action plan from DCEH to provide appropriate relief to students affected by the failure to disclose the HLC accreditation action. DCEH has begun identifying affected students. The completion of an appropriate corrective action plan on this issue is clearly a necessary prerequisite to being in substantial compliance with the Consent Judgment.

---

[110] *See* https://www.artinstitutes.edu/accreditation-and-licensing (visited May 1, 2018).

[111] *See* https://www.artinstitutes.edu/chicago/about/accreditation (visited June 29, 2018).

**TABLE OF CONTENTS**


I. **INTRODUCTION** .......... **1**

A. Consent Judgment and Administrator .......... 1
B. Summary of Findings .......... 2
1. The Transition to DCEH .......... 2
2. Results .......... 2
3. Concerns Looking Forward .......... 5

II. **DCEH** .......... **6**

A. Consent Judgment Background .......... 6
1. EDMC and the Consent Judgment .......... 6
2. The Dream Center Transaction .......... 7
B. DCEH .......... 7
1. New Management .......... 7
2. Non-Profit Status .......... 8
3. Organizational Changes .......... 9

III. **EVALUATING DCEH'S COMPLIANCE EFFORTS** .......... **9**

A. Compliance Culture .......... 9
1. Initial Structure .......... 9
a. Initial Compliance Leadership .......... 9
b. Staffing .......... 11
2. Initial Compliance Tone .......... 11
3. Compliance Restructuring and Recent Improvements .......... 13
B. DCEH's General Structures in Place to Implement Consent Judgment's Requirements .......... 14
1. Compliance Policies .......... 14
2. Training .......... 15
3. Business Practices Committee .......... 16
4. Call Monitoring, Voice Analytics, and Mystery Shops .......... 17
a. Background .......... 17
b. Issues Going Forward .......... 19
C. Non-Profit Status .......... 20
1. Woz U .......... 21
a. The Use of DCEH's Non-Profit Status .......... 24
b. Accuracy of Disclosures to Prospective Students .......... 24
c. Resolution and Issues of Concern .......... 26
2. Gainful Employment .......... 28
D. Ground Campus Closures and Potential for Loan Discharge .......... 31
E. Admissions and Financial Services .......... 35
1. Misrepresentations, Omissions, Unfair Practices, Abusive Recruiting Methods .......... 35
2. Parent to Campus .......... 36

3. Downplaying or Misstating Financial Aid Obligations....37
4. Licensure and Enrollment....38
a. Criminal History....38
b. Licensure....39
5. Single Page Disclosures and Statistics....39
6. Disclosure of Accreditation Status....41
a. Changes in Accreditation Status....42
b. Losses of Accreditation Status....43
7. VA Comparison Tool....45
8. Job Placement Data....45
a. The Role of Core Skills Determinations and Methodology to Date....46
b. The Revised Methodology....48
c. The Current Status....50
F. Marketing and Third-Party Vendors....50
1. Context....50
a. Industry Background....50
b. EDMC's Efforts....52
2. DCEH's Efforts....53
a. Structural Changes....53
b. DCEH's Performance....53
3. Future Plans....54
G. Withdrawal Policies....56
H. Student Finance....57
1. Institutional Debt Forgiveness....57
2. Implementation of Electronic Financial Impact Portal (EFIP)....59
3. Debt Collection....60

**IV. CONCLUSIONS AND RECOMMENDATIONS....61**