<u>**Exhibit C**</u>

**Motion for Relief**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC, | ) | CASE NO. 1:19-CV-145 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| SOUTH UNIVERSITY OF OHIO, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION OF THE BUNCHER COMPANY (I) SEEKING TIMELY PAYMENT OF RENT; AND (II) GRANTING RELIEF FROM STAY

Pursuant to sections 362 and 365 of the Bankruptcy Code (11 U.S.C. § 101 *et seq*.), The Buncher Company ("Buncher"'), as landlord/lessor under the Lease Agreement, hereby moves the Court for the entry of an order (i) directing the Receiver to make timely payments of rental amounts due to Buncher under the Lease Agreement; and (ii) granting relief from the provision of the *Order Appointing Receiver* that enjoins any creditor, including landlords, from taking any action against any of the entities in receivership and any property which could be part of the receivership estate.[1] Buncher's support for the Motion is set forth in the accompanying Memorandum. A copy of the proposed order granting the requested relief is attached as **Exhibit A** to the Memorandum.

*[continued on next page]*

---

[1] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to such terms in the accompanying *Memorandum of Law in Support of the Motion of the Buncher Company (I) to Intervene; (II) Seeking the Timely Payment of Rent; and (III) Granting Relief from Stay* (the "Memorandum").

Dated: February __, 2019

Respectfully submitted,

/s/ Jared S. Roach
Eric A. Schaffer (admitted *pro hac vice*)
Jared S. Roach
REED SMITH LLP
Reed Smith Centre
225 Fifth Ave.
Pittsburgh, PA 15222
(412) 288-3131 (Telephone)
(412) 288-3063 (Facsimile)
eschaffer@reedsmith.com
jroach@reedsmith.com

*Attorneys for The Buncher Company*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC, | ) | CASE NO. 1:19-CV-145 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| SOUTH UNIVERSITY OF OHIO, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE BUNCHER
COMPANY (I) SEEKING TIMELY PAYMENT OF RENT;
AND (II) GRANTING RELIEF FROM STAY**

The Buncher Company ("Buncher"), by and through its attorneys, submits this

*Memorandum of Law in Support of the Motion of the Buncher Company (I) Seeking Timely*

*Payment of Rent; and (II) Granting Relief from Stay*, and respectfully states as follows:

## I. INTRODUCTION

Buncher files this Motion and supporting Memorandum because Dream Center Education

Holdings, LLC ("DCEH") and The Dream Center Foundation (the "Dream Center") have not made

payments under the Lease Agreement (as defined below) since November 2018 and are using the

Receivership Order to prevent Buncher from exercising its contractual rights and remedies.

Analogous and instructive bankruptcy law requires a debtor to make ongoing post-petition lease

payments. A debtor is not entitled to use and enjoy the benefits of the Leased Premises without

paying rent and other applicable charges. Such is the case here; Defendants cannot be permitted

to use the Leased Premises without paying to Buncher ongoing rental payments. Without

immediate payment, Buncher should be permitted to exercise its rights and remedies set forth in

the Lease Agreement to protect its interests.

## II. **BACKGROUND**

Buncher is a Pennsylvania corporation with its principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania. Buncher and DCEH are parties to that certain lease agreement dated September 30, 2005 (as amended and restated, the "Lease Agreement") pursuant to which Buncher leases the following premises to DCEH: (i) a portion of Penn Liberty Plaza I, 1250 Penn Avenue, Pittsburgh, PA 15222; and (ii) a portion of Penn Liberty Plaza II, 1400 and 1500 Penn Avenue, Pittsburgh, PA 15222 (together, the "Leased Premises"). The September 30, 2005 Agreement of Lease and Twelfth Amendment to the Agreement of Lease are attached hereto as **Exhibit B**.

At the Leased Premises, DCEH operates The Art Institute of Pittsburgh ("AIP"). The Leased Premises include the AIP's headquarters and administrative offices, as well as classrooms and space to conduct online courses. The monthly rent due to Buncher for the Leased Premises is $148,069.46. *Id.* pg. 3.

On January 18, 2019, the Plaintiff filed its *Emergency Motion for the Appointment of Receiver* [Docket No. 3]. Also on January 18, 2019, the United States District Court for the Northern District of Ohio (the "Court") entered the *Order Appointing Receiver* [Docket No. 8] (the "Receivership Order"). Buncher did not receive notice of the Emergency Motion or the terms of the Receivership Order.[1]

---

[1] Since the commencement of this proceeding, Buncher and the Receiver communicate regularly to avoid unnecessary litigation and reduce costs. Communications are ongoing, but Buncher cannot sit idly while DCEH and Dream Center use the Leased Premises without payment.

The Receiverhip Order provides, among other things, that creditors, including landlords, are enjoined from taking action against any of the entities in receivership and any property which could be part of the receivership estate. *See* Receivership Order ¶¶ 10, 11.

DCEH has failed to pay monthly rent for the months of December 2018, January 2019, and February 2019. DCEH also has failed to pay additional rental due under the Lease Agreement. The total amount owed to Buncher is $631,107.72, plus applicable late fees and interest as detailed in the Lease Agreement. *See* Lease Agreement ¶ 6. A Statement of Account is attached hereto as **Exhibit C**.

## III.     RELIEF REQUESTED

Under analogous insolvency law, DCEH and the Receiver are obligated to pay rent that accrues and is owed after the date of the Receivership Order, pursuant to 11 U.S.C. § 365(d)(3).

Buncher is also entitled to relief from the stay provided for in the Receivership Order. *Cf.* analogous provisions of the Bankruptcy Code, 11 U.S.C. § 362(d)(1) and (2). Buncher's interests in the Leased Premises are not adequately protected. DCEH has not made any payments to Buncher since November 2018, and Buncher is paying taxes, insurance coverage, and utility costs that are DCEH's obligation. Furthermore, DCEH has not shown any prospects for an effective reorganization.

Accordingly, for these reasons and for the other reasons discussed in this Memorandum, Buncher respectfully requests that the Court enter the proposed order, attached hereto as **Exhibit A** (the "Proposed Order"), (i) ordering DCEH to make timely rent payments going forward; and (ii) granting relief from the stay to enforce its remedies under applicable state law.

## IV. LAW AND DISCUSSION

### A.  The Court Should Apply Relevant Bankruptcy Law

A court of equity should "follow wherever practical" analogous insolvency law. Clark, 3 *Law of Receivers*, § 667.4 at 1215 and n. 447 (3d. 1959); *see also White v. Ewing*, 159 U.S. 36, 40 (1895) (Jurisdiction of court in receivership "does not materially differ from that of the district court in bankruptcy."). A source of analogous law is title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). "Bankruptcy law repeatedly borrow[s] principles from receivership law and vice versa. Thus, in some ways the two bodies of law evolved together . . ." *Janey v. Alguire*, 2014 WL 12654910, *3 (N.D. Tex. July 30, 2014). In *Janey*, the court looked to bankruptcy law to supplement existing federal equity receiver law and when that law was sparse. *Id.* at *4.[2]

The case law regarding relief from stay of an order appointing receiver is sparse because these orders rarely grant the benefit of a stay. Here, the Receivership Order grants a "stay" by enjoining creditors from taking any action against the receivership. Given the lack of case law concerning this unique circumstance, the Court should look to apply the Bankruptcy Code, including sections 362 and 365. In applying the Bankruptcy Code, the Court should (i) order DCEH to make timely rental payments and (ii) grant relief from the stay.

B. DCEH is Obligated to Pay Rent Under Section 365(d)(3) of the Bankruptcy Code

Section 365(d)(3) provides in relevant part:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any

---

[2] Courts often apply sections of the Bankruptcy Code in the context of federal receiverships. *See SEC v. Capital Consultants, LLC*, 397 F.2d 733, 745 (9th Cir. 2005) (considering equitable mootness doctrine from the bankruptcy context in receivership's interim distributions); *SEC v. Basic Energy & Affiliated Res.*, 273 F.3d 657, 665 (6th Cir. 2001) (considering "person aggrieved" doctrine from bankruptcy context in non-party litigant's standing to appeal receivership); *Unisys Fin. Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir. 1992) (referring to principles of bankruptcy law to determine whether a creditor had an enforceable security interest in the property of a receivership estate established under federal banking laws); *Fidelity Bank, Nat. Ass'n v. M.M. Group, Inc.*, 77 F.3d 880, 883 (6th Cir. 1996) ("[G]iven that a primary purpose of both receivership and bankruptcy proceedings is to promote the efficient and orderly administration of estates for the benefit of creditors, we find it appropriate and helpful to refer to the rules … in bankruptcy proceedings.").

unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3).

Section 365(d)(3) requires debtor-tenants to provide landlords of nonresidential real property full and timely payment for services due under an unexpired lease during the post-petition, pre-rejection period.  *Id*; *see also In re Pahr-Mor, Inc.*, 290 B.R. 319, 322 (Bankr. N.D. Ohio 2003).  The purpose of section 365(d) is to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." *Tully Constr. Co., Inc. v. Cannonsburg Envtl. Assocs., Ltd. (In re Cannonsburg Envtl. Assocs., Ltd.)*, 72 F.3d 1260, 1266 (6th Cir. 1996) (citations and quotations omitted).  Section 365(d)(3) "relieve[s] the burden placed on nonresidential real property lessors (or 'landlords') during the period between [the date] a tenant's bankruptcy petition [is filed] and assumption or rejection of a lease."  *Omni Partners, L.P. v. Pudgie's Dev. of NY, Inc. (In re Pudgie's Dev. of NY, Inc.)*, 239 B.R. 688, 692 (S.D.N.Y. 1999) (quotations omitted).

Here, the Lease Agreement (i) concerns nonresidential real property; (ii) has not expired; and (iii) has neither been assumed nor rejected by DCEH or the Receiver.  Under section 365(d)(3) of the Bankruptcy Code, Buncher is entitled to receive all monthly and additional rent payments due after the Court entered the Receivership Order, and the Court should order immediate payment thereof.  *See In re Revco D.S., Inc.*, 109 B.R. 264, 271 (Bankr. N.D. Ohio 1989) (ordering the immediate payment of rent in light of obligation pursuant to section 365(d)(3)).

C.  The Court Should Grant Relief from the Stay of the Receivership Order

*1. 11 U.S.C. § 362(d)(1)*

The Bankruptcy Code permits the Court to modify the automatic stay imposed by section 362 of the Bankruptcy Code.  Section 362(d) states in relevant part:

On request of a party in interest after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

    (1) for cause, including lack of adequate protection of an interest in property for such party in interest;

    (2) with respect to a stay of an act against property under subsection (a) of this section if –

        (A) the debtor does not have an equity in such property; and

        (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(1)-(2).

Cause, as used in section 362(d)(1), is not defined, leaving the Court to consider what constitutes cause based on the totality of the circumstances in each particular case. *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 737 (6th Cir. 1994); *see also In re Miller*, 513 Fed. Appx. 566, 575 (6th Cir. 2013). "'[C]ause' is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re Jeffers*, 572 B.R. 681, 684 (Bankr. N.D. Ohio 2017) (*citing In re River Estates*, 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003)).

Cause includes lack of adequate protection. *See* 11 U.S.C. § 362(d)(1). Adequate protection is not defined in the Bankruptcy Code, but Section 361 of the Bankruptcy Code provides several examples of adequate protection: a cash payment, an additional or replacement lien, or the indubitable equivalent of a secured creditor's interest. 11 U.S.C. § 361. Adequate protection may be provided after there is a judicial determination that a secured creditor's interest is not adequately protected. *In re Poissant*, 405 B.R. 267, 271-72 (Bankr. N.D. Ohio 2009) (*citing United Savs. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988)).

"That is, if the secured property is declining in value or if there is an impairment of the secured creditor's interest, then the creditor is entitled to adequate protection." *In re Poissant*, 405 B.R. at 271-72; *see also Timbers of Inwood Forest*, 484 U.S. at 370 (holding that a secured creditor's "interest in property is not adequately protected if the security is depreciating during the term of the stay"); *In re J & M Salupo Dev. Co.*, 388 B.R. 809, 812 (Bankr. N.D. Ohio 2008) ("Lack of adequate protection may be shown by an 'erosion of the creditor's position or of a threatened erosion.'") (citations omitted).

"The erosion may be shown through evidence of declining property values, the increasing amount of the secured debt through interest accruals or otherwise, the non-payment of taxes or other senior liens, failure to insure the property, failure to maintain the property, or other factors that may jeopardize the creditor's present position. It may be necessary to show a combination of these factors and/or to show that the circumstances as a whole are sufficient to jeopardize the creditor's interest in the property." *J & M Salupo Dev.*, 388 B.R. at 812; *see also Americredit Fin. Servs. v. Nichols (In re Nichols)*, 440 F.3d 850, 856 (6th Cir. 2006).

Cause exists to grant Buncher's Motion due to the fact that DCEH has: (i) not paid rent in three months; (ii) failed to pay applicable taxes; (ii) failed to pay certain operating expenses for the Leased Premises; and (iv) failed to pay utilities relating to the Leased Premises. Buncher has paid all of the foregoing out of pocket, yet DCEH continues to enjoy use of the Leased Premises, further eroding Buncher's collateral.

Accordingly, Buncher's interests are not adequately protected and the Court should grant its Motion.

2.  *11 U.S.C. § 362(d)(2)*

Relief from the stay also may be granted under section 362(d)(2) when a debtor does not have equity in the property and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2); *see also In re Shriver*, 33 B.R. 176, 186 (Bankr. N.D. Ohio 1983).

DCEH has not shown any prospects for an effective reorganization. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 375-76 (1988) ("[I]t is the burden of the debtor to establish that the collateral at issue is 'necessary to an effective reorganization.' What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means, as many lower courts, including the *en banc* court in this case, have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'") (citations omitted). In addition courts have held that when assets are being liquidated, collateral at issue is not necessary to an effective reorganization. *See J & M Salupo Dev.*, 388 B.R. at 812 ("[P]roperty is not necessary to a reorganization [when] the estate's assets are being liquidated . . ."). Here, there is no reorganization in prospect.

Accordingly, Buncher satisfies the requirements of section 362(d)(2) under the Bankruptcy Code to grant relief from stay, and the Court should grant Buncher's motion for relief from stay.

## V.    CONCLUSION

For the foregoing reasons, Buncher respectfully requests that this Court enter the Proposed Order (i) directing DCEH to make timely rent payments; (ii) granting Buncher relief from the stay; and (iii) granting such further relief to Buncher as is appropriate.

Dated: February ___, 2019

Respectfully submitted,

_/s/ Jared S. Roach_
Eric A. Schaffer (admitted _pro hac vice_)
Jared S. Roach
REED SMITH LLP
Reed Smith Centre
225 Fifth Ave.
Pittsburgh, PA 15222
(412) 288-3131 (Telephone)
(412) 288-3063 (Facsimile)
eschaffer@reedsmith.com
jroach@reedsmith.com

## Certificate of Service

In accordance with Section 14 of the Electronic Filing and Procedures Manual of the Northern District of Ohio and Federal Rule of Civil Procedure 5(b)(2)(E), a copy of the foregoing has been served through the Court's ECF filing system on all counsel of record on

February __, 2019

*/s/ Jared S. Roach*
Jared S. Roach
REED SMITH LLP

*Attorney for The Buncher Company*

# Exhibit A

## Proposed Order

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC, | ) | CASE NO. 1:19-CV-145 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| SOUTH UNIVERSITY OF OHIO, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER (I) REQUIRING DCEH TO MAKE TIMELY RENT PAYMENTS; AND (II) GRANTING RELIEF FROM STAY

This matter coming before the Court based on the *Motion of The Buncher Company (I) Seeking Timely Payment of Rent; and (II) Granting Relief from Stay* (the "Motion")[1]; it is HEREBY ORDERED THAT:

1.     The Motion is granted as set forth below.

2.     The Receiver is directed to, within two (2) days of the date of this Order, pay to The Buncher Company, all amounts due and owing under the Lease Agreement from the date of the entry of the Receivership Order.

3.     The Receiver shall remain current under the financial terms of the Lease Agreement so long as the Leased Premises are occupied by DCEH, the Receiver, and any affiliated entity.

4.     The Buncher Company is hereby granted relief from the stay set forth in the Receivership Order to proceed in accordance with and enforce any rights and remedies available to it under the Lease Agreement or applicable law.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Dated: _____, 2019

_____
THE HONORABLE THOMAS M. PARKER
UNITED STATES MAGISTRATE JUDGE

## Exhibit B

## Lease Agreement

## AGREEMENT OF LEASE

This Agreement of Lease (this "Lease") made as of September ⊃ᴜ·, 2005 by and between THE BUNCHER COMPANY ("Landlord"), a Pennsylvania corporation having a place of business in Allegheny County, Pennsylvania and THE ART INSTITUTE ONLINE, a division of THE ART INSTITUTES INTERNATIONAL, INC., also known as EDMC Online Higher Education ("Tenant"), a Pennsylvania corporation having its principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania.

WITNESSETH, that under and subject to the terms and conditions hereinafter set forth, Landlord hereby demises and leases unto Tenant and Tenant hereby hires and takes from Landlord (i) approximately 40,282 square feet of agreed upon rentable area located on the second floor of the Building (the "Office Area") shown as that area outlined in red on Exhibit B attached hereto and made a part hereof, and (ii) the right to use in common with others the Common Areas, as hereinafter defined (collectively the "Leased Premises"). The Leased Premises is located at 1400 Penn Avenue, City of Pittsburgh, Allegheny County, Pennsylvania in a portion of a building known as Penn Liberty Plaza II (the "Building"). The Building and the surrounding property shown outlined in green on Exhibit A attached hereto and made a part hereof are hereinafter called the "Property". In addition, Tenant shall have the right to such employee and customer parking as is described in the Parking Rider attached hereto.

1. TERM: To have and to hold the Leased Premises unto Tenant for a term of nine (9) years and eight (8) months commencing at 12:01 AM on November 1, 2005 (the "Commencement Date") and ending at 11:59 PM on June 30, 2015 subject, nevertheless, to the covenants and conditions set forth in this Lease which Landlord and Tenant respectively covenant and agree to keep and perform. Tenant may occupy portions of the Leased Premises approved by Landlord prior to the Commencement Date pursuant to Section 52 and subject to the terms and conditions of this Lease.

2. COMPLETION: Except for Landlord's obligation to deliver the Leased Premises in its base building condition (the "Base Building Specifications") as shown on Exhibit E attached hereto and made a part hereof, Tenant shall take the Leased Premises in its present condition "as is".

Landlord hereby represents to Tenant that, to Landlord's best knowledge and belief as of the date hereof, the following shall be true and correct, failing which, Landlord shall be required to cure or commence to cure the same within thirty (30) days following Tenant's demand therefore:

(a) Landlord is not aware and has not received written notice of the violation of any Environmental Laws (hereinafter defined) with respect to the Property.

(b) All plumbing, electrical, mechanical and other systems and facilities

within or servicing the Property are in good working order, condition and repair, including, but not limited to, the heating, ventilation and air conditioning systems ("HVAC") and the elevators.

(c)     All structural components of the Property, including, but limited to, the roof, exterior walls, supporting columns and walls and foundation, are free from defect.

(d)     As of the date, which date shall be prior to the Commencement Date, Landlord shall permit Tenant to occupy the Leased Premises, the base building shall be in compliance with all applicable laws as applied to a building in base building condition.

3.     RENTAL: Tenant shall pay to Landlord as rental for the Leased Premises the following amounts at the following times:

A.     Beginning on the Commencement Date and on the first day of each calendar month thereafter to and including June 1, 2012 or beginning on the Beginning Date, if applicable, and on the first day of the next eighty (80) succeeding calendar months thereafter, Tenant shall pay to Landlord as monthly rental for the Leased Premises, the amount of $29,430.17.

B.     Beginning July 1, 2012 or on the eighty-first (81st) full calendar month of the term of this Lease and on the first day of each succeeding calendar month thereafter during the balance of the initial term of this Lease, Tenant shall pay to Landlord as monthly rental for the Leased Premises the product of the following calculation:

$30,211.50 multiplied by a fraction the numerator of which is the CPI in effect for June 2012 and the denominator of which is the CPI in effect for October 2005.

Notwithstanding the result of the above calculation, the monthly rental for the balance of the initial term shall not be less than $30,211.50.

The CPI, as referred to herein, means the Consumer Price Index for all Urban Consumers 1984=100 relating to the Pittsburgh Average for All Items or if no longer published such other CPI that would include the Pittsburgh region, as issued by the Bureau of Labor Statistics of the United States Department of Labor, or any successor to the function thereof. In the event of the conversion of the CPI to a different standard reference base or any other revision thereof, the determination hereunder shall be made with the use of such Bureau of Labor Statistics or successor to the functions thereof, or in the absence of the publication of such conversion factor, such formula or table as designated by Landlord and Tenant each acting in good faith.

The monthly rental as determined above shall be payable in advance, without demand, deduction or set off except as otherwise provided herein. All rentals and sums due as additional rental payable hereunder shall be paid to Landlord at 5600 Forward

2

Avenue, P. O. Box #81930, Pittsburgh, Pennsylvania 15217-0930 or at such other place or to such other party as may be designated by Landlord in writing or by wire transfer of funds pursuant to wiring instructions provided by Landlord to Tenant upon request. In the event the rent shall become overdue for a period of fifteen (15) days, a late charge in the amount of six percent (6%) of each overdue payment shall be paid by Tenant on demand for the purpose of defraying the expenses incident to handling such delinquent payment.

4. USE: Subject to the provisions of Section 8 and Section 9 of this Lease, Tenant shall have the right to access, use and occupy the Leased Premises twenty-four (24) hours per day, seven (7) days a week. Tenant shall have the exclusive right to use and occupy the Leased Premises for (a) any post secondary and/or graduate educational or training programs or courses offered by Tenant from time to time, its permitted subtenants and assigns, which may or may not culminate in the issuance of degrees, certificates, or diplomas, together with uses related and/or incidental thereto, including without limitation: (i) conducting classroom instruction, the operation of a book and/or supply store (including, without limitation, the sale of food items and personal goods, supplies and/or materials), food services, sales of supplies and materials, and other provision of goods and/or services, primarily for the use of the faculty, students and business invitees of Tenant, one or more galleries for the display of art work or relating to the general promotion of the school use then being made of the Premises; (ii) instruction or training programs or courses of limited duration which do not lead to a degree or other certification; (iii) correspondence or distance learning courses of study, whether or not leading to a degree or other certification (iv) a food lounge for students and faculty, including food and beverage vending machines, refrigerators, freezers and microwave oven for use with pre-prepared items; (v) long distance training; (vi) on-line courses; and (vii) programs for industrial design technology (industrial design), graphic arts, applied arts, computer animation, hospitality arts and multimedia design computer-based instruction for certificate programs, seminars or individual courses; (b) offices for admissions, administration and any general office purposes; and (c) business uses that provide services incidental to any of the foregoing permitted uses, provided such incidental business uses are otherwise lawful and in accordance with this Lease. In its use and occupancy of the Leased Premises, Tenant will comply with the Rules and Regulations attached hereto as Exhibit D and made a part hereof, provided that any conflicts between the provisions of the Rules and Regulations and the provisions of this Lease, the terms of this Lease shall control. Tenant will not use or occupy or suffer or permit the Leased Premises or any part thereof to be used or occupied (a) for any purpose contrary to law or the rules or regulations of any governmental authority having jurisdiction over the Leased Premises, (b) for any purpose which in the reasonable good faith judgment of Landlord is hazardous or detrimental to persons or property or (c) in any manner which might unreasonably interfere with or annoy other tenants or interfere with their businesses or those having business with them.

5. SIGNS: Tenant may install, maintain and remove at Tenant's own cost and expense (a) an appropriate sign identifying Tenant's business units on the portion of the exterior wall of the second floor of the Building serving Tenant's Leased Premises, and (b)

3

appropriate signage on the entrance door to the Leased Premises referring to Tenant's and its affiliates business or services operating in the Leased Premises; provided, however, that the size, type, location and method of attaching and removing said sign or signs shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord shall at its sole cost and expense place Tenant's name and its affiliates operating in the Leased Premises (not to exceed three (3) such affiliates) on the directory located in the lobby of the Building. Tenant shall comply with all applicable laws and governmental rules, regulations and restrictions covering the installation, if installed by Tenant, and usage of said signs. Tenant's right to install signs shall not restrict Landlord from granting other tenants in the Building the right to install and maintain tenant identification signs provided such signs shall not be installed on the portion of the exterior walls of the Building serving the Leased Premises.

6. AMERICANS WITH DISABILITIES ACT: Landlord hereby warrants that on the Commencement Date of this Lease, the base building improvements of the Leased Premises and the Common Areas will be in compliance in all material respects with Titles I & III of the Americans With Disabilities Act. Thereafter, Tenant at Tenant's sole cost and expense shall comply with all governmental laws and regulations relating to Tenant's particular manner of use of the Office Area and business conducted therein including without limitation compliance with laws relating to accessibility to, usability by and discrimination against disabled individuals. Landlord shall have no obligation to make any changes or alterations to the Common Areas that are peculiar to Tenant's particular manner of use of the Leased Premises unless such changes or alterations are required to comply with governmental laws and regulations relating to the Common Areas.

7. CONDITION OF PREMISES: Tenant acknowledges and agrees that, except as expressly set forth in this Lease, there have been no representations or warranties made by or on behalf of Landlord with respect to the condition of the Leased Premises or the Building or the suitability thereof for the conduct of Tenant's business.

8. LANDLORD'S FURNISHED SERVICES: Landlord agrees to provide to the Leased Premises for use by Tenant, its employees, customers and invitees, the following services at Landlord's expense, without liability upon Landlord for any failure to provide any such services unless resulting from the gross negligence or willful misconduct of Landlord, its agents, contractors or employees:

(A) Electric and lighting (available 24 hours a day 7 days a week, heat, ventilation and air-conditioning to the Leased Premises between the hours of 7:00 AM to 6:00 PM, Monday through Friday excluding the holidays of New Years' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, with sufficient capacity to maintain a reasonably comfortable office environment under normal business operations with the use of normal or reasonable business machines and equipment. Tenant shall pay to Landlord as additional rental for the use of the Leased Premises at times other than specified

4

above the rate of $35.00 per hour for charges for heating and cooling. Said hourly charge shall be subject to annual adjustment by Landlord based upon documentation provided by Landlord to substantiate said adjustment.

Notwithstanding the foregoing, in the event Tenant desires to install, operate and maintain supplemental HVAC system(s) in the Leased Premises, Tenant may install, at its sole cost and expense, such supplemental system(s) in accordance with the provisions of Section 14 hereof, and Landlord agrees to reasonably cooperate with Tenant in the installation of such work, provided that Tenant shall be responsible for all costs related to the operation and maintenance of such systems.

(B) Ordinary janitorial services Monday through Friday, excluding holidays. A copy of Landlord's cleaning specifications marked "Exhibit C" is attached hereto and made a part hereof.

(C) Subject to the provisions of Section 15 hereof, maintenance of the Leased Premises and the Common Areas in reasonably good repair.

(D) Lighting sufficient for the illumination of the exterior of the Building, the Common Areas, parking areas and driveways using standard fixtures of Landlord's choice.

(E) Sanitary sewerage, restroom facilities and city drinking water.

(F) Security service for the Common Areas of the Building from 4:00 PM to 8:00 AM, Monday through Friday and 24 hours per day on weekend and holidays.

(G) Snow removal when required in Landlord's reasonable judgment.

(H) Trash removal.

(I) Landscape maintenance.

Landlord shall not be obligated to furnish services to Tenant beyond those listed above, but it may do so upon reasonable request of Tenant and for a reasonable additional charge covering the actual cost incurred by Landlord for providing such service along with appropriate administrative charges not to exceed 7% of the cost of such service or services. In no event shall any failure by Landlord to furnish the services listed or any other services, regardless of cause, constitute an eviction of Tenant or termination of this Lease.

9. TENANT'S PROVISIONS: Tenant agrees to be responsible for:

(A) All charges, in the amount actually incurred by Landlord including monthly

5

electric service charges allocable to the use of any special equipment and lighting over Building Standard or allocable to the use of the Leased Premises at the times other than 7:00 AM to 6:00 PM, Monday through Friday (the "Non-Business Hours"), exclusive of holidays. Landlord reserves the right (i) to have a separate meter installed at Tenant's expense to register such usages or (ii) to obtain an estimate by a qualified engineer to determine the charges to be paid by Tenant. Unless Tenant has installed supplemental HVAC system(s), if Tenant desires to use the Leased Premises at times other than the times set forth above, Tenant shall notify Landlord during normal business hours at least four (4) hours prior to Tenant's anticipated use of the Leased Premises and such notification shall specify the times and dates of which Tenant desires to use the Leased Premises. Tenant shall pay to Landlord as additional rental for the use of the Leased Premises for Non-Business Hours the rate of $35.00 per hour for charges for heating and cooling unless Tenant has installed supplemental HVAC system(s) and is no longer using the HVAC system(s) supplied by Landlord during Non-Business Hours, said hourly charge shall be subject to annual adjustment by Landlord based upon documentation provided by Landlord to substantiate said adjustment.

(B) Any and all other charges and expenses occasioned by Tenant's occupancy of the Leased Premises and not specifically made Landlord's responsibility under the terms of this Lease.

10. TAXES & OPERATING EXPENSE: Tenant shall pay as additional rent within thirty (30) days of billing by Landlord, Tenant's allocable share as reasonably determined by Landlord of any increase in the Operating Expenses over the Base Year and any increase in the Real Estate Taxes over the Tax Base Year of the Building and/or Property allocable to the Leased Premises in accordance with the following provisions:

(A) Definitions: For purposes of the provisions of this Lease, the following terms shall have the following meanings:

(i) "Real Estate Taxes" shall include any form of assessment, including any special assessments, fees, charges or taxes imposed against the land area of the Property and the Building or in connection with the receipt of income or against rents from the Building or the Property (including taxes levied or assessed to the extent that the same shall be in lieu of, and/or in lieu of an increase in, any or all of a portion of any of the aforesaid taxes or assessments upon or against the Property and/or the Building). It is the intention of Landlord and Tenant that all new and increased assessments, taxes, fees, levies and charges not presently in effect which may hereafter be assessed and levied be included within this definition. Real Estate Taxes shall specifically not include Landlord's federal or state income, franchise, inheritance or estate taxes, unincorporated business tax, transfer, net income, gift tax, gross receipts, capital stock or capital levy.

6

(ii) "Operating Expense" shall include all expenses of any kind or nature with respect to the Building and that portion of all expenses of any kind or nature with respect to the Property equitably allocated by Landlord to the Building which Landlord shall incur in connection with the ownership, operation, maintenance, repair, replacement and security of the Property and/or the Building including, without limitation the cost and expenses to Landlord of the following: all building supplies; all utilities (including gas, water, electricity, heating, cable, lighting, air conditioning, ventilation and sewer); cost of repairing casualties within the deductible limits of the insurance on the Building; cost of casualty, liability and other insurance applicable to the Property and/or the Building or Landlord's personal property used in connection therewith; cost of janitorial service, general maintenance and repair of the Property and/or the Building, including the heating and air conditioning systems and structural components of the Property and/or the Building; cost of service or maintenance contracts for the operation, maintenance, repair, replacement or security of the Property and/or the Building; payroll expenses and other administrative expense related to the management of the Property and/or the Building and the maintenance of the books and records; landscaping, maintenance, repair and repaving of the parking areas on the Property; cost of trash, garbage, snow and ice removal; capital expenditures required by any governmental or regulatory authority, or for energy-related equipment or fire and safety equipment, which capital expenditures shall be amortized over the shorter of the useful life of such improvement or modification or the projected cost recovery period; capital expenses which result in cost savings to the extent of such savings.

Operating Expenses shall not include any of the following: depreciation of the Building or other said improvements; ground rent; legal expenses, salaries, taxes, benefits wages or other compensation paid to officers or executives of Landlord; the cost of repairs, replacements or other work occasioned by fire, wind storm or other casualty or by the exercise of eminent domain; except for a reasonable, ordinary and customary management fee not to exceed 5% of the stated base rents for the Building or other such fees, any overhead or profit increments to any subsidiary or affiliate of Landlord for services on or to the Building; any costs of Landlord's general overhead, including general and administrative expenses not pertaining directly to the Building; any costs or expenses for sculptures, paintings or other works of art, including costs incurred with respect to the purchase, ownership, leasing, repair or maintenance of such works of art; any otherwise includable costs of correction defects in the Building or equipment or replacing defective equipment to the extent such costs are covered by warranties or manufacturers, suppliers or contractors, or are otherwise borne by parties other than Landlord; all bad debt loss, rent loss or reserve for bad debt or rent loss; all costs and expenses associated with the operation of the business of the entity which constitutes Landlord as the same are distinguished from the costs of operation of the Building, including accounting and legal matters, costs of defending any lawsuits with any Landlord's mortgagee or other parties, costs of

7

selling, syndicating, financing, mortgaging and/or hypothecating any of Landlord's interest in the Building, costs of any disputes between Landlord and its employees (if any) not engaged in Building operation, disputes of Landlord with Building management, or fees or costs paid in connection with disputes where such employee provides services; replacement of any item or of a major component of any item and major repairs to such items, in lieu of replacement (but not maintenance) if the original item or a subsequent improvement to such item is to be capitalized under generally accepted accounting principles but said replacements of major components and major repairs shall be amortized in accordance with GAP and said amortization shall be included in Operating Expenses; any work or services performed by or on behalf of Landlord with respect to the Building prior to the Commencement Date; and any other cost or expense not specifically defined herein which, under generally accepted accounting principles consistently applied, would not be considered to be an operating expense of the Building or which is not reasonably and customary for similar class Building in Pittsburgh, Pennsylvania.

(iii) "Tax Base Year" shall mean the first twelve (12) calendar months from the Commencement Date of the term of this Lease .

(iv) "Base Year" shall mean the first twelve (12) calendar months from the Commencement Date of the term of this Lease.

(v) A "lease year" is defined as a twelve (12) month period beginning with the Commencement Date or any anniversary of the Commencement Date within the term of this Lease.

(B) Adjustment Mechanism: During each lease year following the lease year in which the term commences, Landlord shall have the right to require Tenant to, and Tenant shall, pay monthly to Landlord simultaneously with the payment of monthly rental an amount equal to one-twelfth (1/12) of the amount Landlord reasonably estimates at the beginning of each such lease year will be Tenant's allocable share of the increases in the Operating Expenses and/or the Real Estate Taxes for the ensuing lease year. As soon as practicable, but no later than ninety (90) days following the end of each lease year, Landlord shall submit to Tenant a statement supported by proper documentation setting forth the exact amount of Tenant's allocable share of the increase in Real Estate Taxes and the increase in Operating Expenses over the Base Year or the Tax Base Year and the difference, if any, between the amount actually owed by Tenant and the amount actually paid by Tenant in accordance with this Section 10. If Tenant owes Landlord the difference, Tenant shall pay the difference as additional rent within thirty (30) days of billing by Landlord. If Landlord owes Tenant the difference, Tenant shall receive a credit for such amount to be applied against Tenant's next ensuing monthly rental payments until such credit is exhausted or after the end of the term, Landlord shall promptly refund such amount. Tenant's covenant to pay Tenant's allocable share of the increases in Real Estate Taxes and Operating Expenses for the term of this Lease or any extension thereof shall

8

survive the expiration or early termination of this Lease.

At reasonable times and on reasonable notice, Tenant shall have the right, but not more frequently than once in any calendar year, to audit all of Landlord's (or Landlord's agent's) records pertaining to Operating Expenses and Real Estate Taxes with a representative of its choice. Any over billing discovered in the course of such audit shall be promptly refunded to Tenant within thirty (30) days of Landlord's receipt of a copy of the audit. In the event the overstatement of charges exceeds three percent (3%) of the sum previously billed to Tenant by audit, Landlord shall reimburse Tenant for all expenses related to said audit. In the event there is no overstatement of charges, Tenant shall reimburse Landlord for all expenses of Landlord relating to said audit. Landlord shall retain its records regarding Operating Expenses and Real Estate Taxes for a period of at least three (3) years following the final billing for the calendar year in question. The failure of Tenant to elect to examine Landlord's records pertaining to Operating Expenses or Real Estate Taxes within said three (3) years shall be deemed to be a waiver by Tenant with respect to such examination or auditing and the acceptance by Tenant of the annual statement for the particular calendar year to which the annual statement related.

The terms of this Section 10 shall survive the expiration or termination of this Lease.

11. INSURANCE: During the term of the Lease, Tenant will at Tenant's sole cost and expense maintain with insurance companies reasonably satisfactory to Landlord commercial general liability and property damage insurance with respect to the Leased Premises with minimum limits of $1,000,000 with respect to the death or injury of one person and $2,000,000 with respect to the death or injury of two or more persons and $200,000 with respect to property damage. Such insurance coverage shall be endorsed to include the contractual liability assumed by Tenant under this Lease. All such policies shall provide that they may not be canceled or altered except upon thirty (30) days prior written notice to Landlord and Landlord shall be named as an additional insured. Tenant shall supply Landlord with a certificate evidencing this insurance prior to the commencement of this Lease.

In addition to the insurance requirements set forth in this Section 11 of this Lease, Tenant shall maintain during the term of this Lease or any extension thereof Worker's Compensation and employer's liability insurance at the statutory limits on its employees at the Leased Premises and shall indemnify and hold harmless Landlord from and against any and all expenses connected with claims made by Tenant's employees for injuries incurred at the Leased Premises unless due to the gross negligence or willful misconduct of Landlord.

Landlord will maintain insurance on the Building, exclusive of Tenant's improvements and property. Tenant will not do or permit anything to be done to or in the Leased Premises or the Building or the Property or bring or keep anything, therein or thereon which shall in any way increase the rate of fire or other insurance on the Building

9

or on the property of Landlord kept therein. Landlord shall have no responsibility or obligation to insure Tenant's property. If the Building is damaged by an insured casualty, Tenant shall be obligated for its allocable share of the deductible amount in the insurance coverage which deductible is currently $5,000.

Landlord will at Landlord's sole cost and expense maintain, with insurance companies licensed to do business in Pennsylvania, commercial general liability insurance with respect to the Leased Premises, the Building, the Property with minimum limits of $1,000,000.00 combined single limit with respect to bodily injury, death and property damage. Such insurance coverage shall be endorsed to include the contractual liability assumed by Landlord under this Lease. At Tenant's request, Landlord shall supply Tenant with a certificate evidencing this insurance prior to occupying the Leased Premises.

12. ASSIGNMENT, MORTGAGING AND SUBLETTING: Tenant shall not assign, mortgage or transfer this Lease or sublet the whole or any part of the Leased Premises or permit any other persons to occupy same without the prior written consent of Landlord, which consent will not be unreasonably withheld, conditioned, except as provided herein, or delayed. Landlord shall not unreasonably withhold such consent, provided however, Landlord may, as a condition to any such assignment or subletting other than to successors, affiliates and/or subsidiaries, require that any additional rental above the rental paid by Tenant at the time of such sublease or assignment, less any additional Tenant costs which are the responsibility of Tenant under the assignment or subletting and the amortization of all of Tenant's costs associated with any such subletting or assignment of all or any portion of the Leased Premises including all brokerage fees, legal fees, direct marketing fees and cost of improvements including demising or separating the subleased space verified to Landlord's reasonable satisfaction, shall be paid to Landlord. Any such assignment or subletting, even with the consent of Landlord, shall not relieve Tenant from liability for payment of rent or other sums herein provided or from the obligation to keep and be bound by the terms, conditions and covenants of this Lease. The acceptance by Landlord of rent from any other person shall not be deemed to be a waiver of any of the provisions of this Lease or to be a consent to the assignment of this Lease or subletting of the Leased Premises.

An assignment for the benefit of creditors or by operation of law shall not be effective to transfer any rights to an assignee without the prior written consent of the Landlord first having been obtained.

Notwithstanding any provision to the contrary contained in this Section 12 of this Lease, Tenant may without Landlord's consent, but without the release of Tenant from Tenant's liabilities and obligations under this Lease, assign this Lease or sublet the Leased Premises or any part thereof to any subsidiary or affiliate of Tenant or successor, provided Tenant notifies Landlord in writing of its intention to so assign or sublet and the use is consistent with the use under Section 4 of this Lease. For the purpose of this Section 12,

10

the terms "subsidiary" or "affiliate" shall be defined as any corporation or entity which controls Tenant, is controlled by Tenant or is under the common control with Tenant by the same parent corporation or other entity.

"Successor" is defined as any corporation or entity resulting from a merger or consolidation with Tenant or any corporation or entity succeeding to substantially all of the business and assets of Tenant. Further, if Tenant is a corporation or a partnership, or is a publicly traded company, as defined by applicable Federal securities laws, then, in any such event, any change of ownership resulting in a change of majority control from those persons and entities not having control will not be deemed an assignment or transfer requiring Landlord's consent.

13. FLOOR LOAD/DAMAGE: Tenant shall not place a load upon any floor in the Building, which exceeds the floor load per square foot (i.e., 125 pounds per square foot live load on the first floor) which such floor was designed to carry and which is allowed by law. Landlord reserves the right to reasonably prescribe the weight and position of all safes and heavy installations which Tenant wishes to place in the Leased Premises so as to properly distribute the weight.

Business machines and mechanical equipment belonging to Tenant which cause noise and/or vibration that may be transmitted to the structure of the Building or to any other leased space to such a degree as to be objectionable to Landlord or to any tenant in the Building as determined in the good faith judgment of Landlord shall be placed and maintained by the Tenant, at Tenant's expense, in settings of cord rubber or spring type noise and/or vibration eliminators sufficient to eliminate vibration and/or noise.

All damage to the Leased Premises or the Building caused by moving the property of Tenant into, or out of, the Building, and all damage done by Tenant, or the agents, employees and visitors of Tenant, shall be repaired by the Tenant at its expense. If Tenant shall fail to do so within a reasonable time after written notice to Tenant, then the Landlord shall have the right to make such repairs, alterations and replacements (structural, nonstructural or otherwise) and may charge Tenant for the costs thereof incurred by Landlord.

14. ALTERATIONS: After the completion of Tenant's Work (as defined herein), Tenant will not make or permit to be made any alterations, improvements or additions to the Leased Premises or any part thereof except by and with the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. All such alterations, improvements and additions to the Leased Premises shall be made in accordance with all applicable laws and upon the expiration or termination of this Lease shall be deemed to have attached to the freehold and to have become the property of Landlord and shall remain for the benefit of Landlord at the end of the term of this Lease or other expiration of this Lease, (unless at the time of Tenant's request for Landlord's approval, Tenant indicates that as a condition for approval Tenant will remove said

11

alterations, additions and improvements at the expiration of the term of this Lease and repair any damage occasioned by such removal), in as good order and condition as they were when installed, reasonable wear and damage by insured casualty, condemnation or matters which is the responsibility of Landlord excepted; provided however, if prior to the termination of this Lease, Landlord so directs by written notice to Tenant, Tenant shall prior to the end of the term of this Lease at Tenant's sole cost and expense remove the alterations, improvements and/or additions which were placed in the Leased Premises by Tenant and which are designated in said notice, and repair any damage occasioned by such removal and restore the Leased Premises to the condition in which they were prior to such alterations, improvements or additions, and in default thereof, Landlord may effect said removals and repairs at Tenant's expense. Notwithstanding the foregoing, Tenant acknowledges and agrees that in connection with obtaining consent to alterations after completion of Tenant's Work, Landlord may require that Tenant remove such alterations and restore the Building to its prior condition at the end of the Term, if such alterations consist of (x) alterations to the exterior of the Building, or (y) internal stairwells or other specialty type improvements of like kind and which do not constitute office improvements. Notwithstanding anything to the contrary contained herein, with respect to carpeting, wall covering and painting ("Cosmetic Alterations") and other alterations, additions, or improvements other than Cosmetic Alterations which (a) are nonstructural in nature (i.e., do not involve changes to the structural elements of the Building); (b) do not involve changes to the Building's systems, including, without limitation, the electrical, plumbing, and HVAC system; (d) do not involve changes to the Building exteriors or Common Areas [(a), (b) and (c) are hereinafter collectively referred to as "Nonstructural Changes"]; and (d) in the aggregate would not cost in excess of $10,000 (as such sum shall be increased on an annual basis pursuant to any increase in the Consumer Price Index for each year of this Lease) when added together with the cost of all other Nonstructural Changes (excluding Cosmetic Alterations) made during the prior 12-month period, Tenant need not obtain Landlord's prior written consent, but shall provide Landlord with prior written notice of the alteration, additions or improvements to be made. Landlord shall receive no fee during construction or move-in for profit, overhead, general conditions construction supervision, drawing review, freight elevator, parking or other miscellaneous costs, provided such alterations, improvements or additions do not affect any structural components of the Building in which event Landlord's fee shall not exceed 10% of the cost of such alterations, improvements or additions. Prior to the commencement of any alterations, Tenant shall file a waiver of lien agreement with the contractor in the Allegheny County Prothonotary's Office. In the event of making such alterations, improvements and additions as herein provided, Tenant further will indemnify and save harmless Landlord from all expense, liens, claims, damages or injuries to either persons or property arising out of, or resulting from the undertaking, making or removal of said alterations, additions and improvements, unless caused by the gross negligence or willful misconduct of Landlord, Landlord's agents, contractors or employees. Tenant shall not permit any liens to be filed against the Property or any part thereof arising out of any work performed or alleged to be performed by Tenant. If any lien shall be filed, Tenant shall have thirty (30) days after notice from Landlord to remove such lien or provide Landlord with satisfactory security or Landlord may discharge

12

same without investigation and Tenant shall pay the costs thereof.

15. REPAIRS: Tenant shall keep the Office Area and the fixtures and appurtenances therein in good order and condition and Tenant shall make all repairs and replacements to the Office Area which are not Landlord's obligation pursuant to any provisions of the Lease and shall do so in a good and workmanlike manner. To the extent Tenant does not make such repairs or replacements, Landlord may do so within a reasonable time after written notice to Tenant and charge Tenant for the costs thereof. Tenant shall commit no waste in or on the Leased Premises, the Building or the Property.

Landlord shall make all repairs and replacements necessary to maintain the structural elements of the Building, the plumbing, heating, air conditioning and electrical systems, elevators, exterior windows, parking and driveway surfaces lighting and the Common Areas. If any such repairs are occasioned by the negligence, misfeasance or malfeasance of Tenant, its employees, agents or invitee, Tenant shall promptly reimburse Landlord for the costs thereof upon written demand from Landlord. Landlord shall have no responsibility to repair or replace carpeting, to paint or otherwise redecorate or refurbish the Office Area, unless same are damaged as a result of the gross negligence or willful misconduct of Landlord, its agents, contractors or employees. Landlord shall have no obligations with respect to fixtures or other property installed by Tenant, unless same are damaged as a result of the gross negligence or willful misconduct of Landlord, its agents, contractors or employees.

16. INDEMNIFICATION: Tenant shall indemnify, hold harmless and defend Landlord from and against any and all costs, expense, liability, injuries (including death), losses, damages, suits, actions, fines, penalties, claims or demands of any kind which are asserted by or on behalf of any person or governmental authority, arising out of or in any way connected with, and Landlord shall not be liable to Tenant on account of:

(A) any failure by Tenant to perform any of the agreements, terms, covenant or conditions of this Lease required to be performed by Tenant;

(B) any failure by Tenant to comply with any statutes ordinances, regulations, or orders of any governmental authority;

(C) any accident, death or personal injury, or damage to property, which shall occur in or about the Leased Premises (other than the Common Areas), and which results from or is caused in whole or in part, by the use or occupancy of the Leased Premises by Tenant, its agents, employees or invitee, excepting damage or injury attributable to the gross negligence or willful misconduct of Landlord, its employees and agents; and

(D) any and all loss, liability, cost or expense in any way connected with any claim made by Tenant's employees for injury incurred in or about the Leased

13

Premises, unless same is attributable to the gross negligence or willful misconduct of Landlord, its employees, contractor or agents.

Tenant does hereby release and agree to hold harmless Landlord from and against any and all claims for damages to person or persons or property incurred by Tenant from acts of theft, burglary, vandalism or other acts committed by third persons against Tenant or Tenant's property or from fire or other casualty or any condition or defect in or about the Leased Premises or any part thereof or from any equipment or appurtenance therein or thereon, unless said damages or injuries are caused by the gross negligence or willful misconduct of Landlord, its employees and agents.

Landlord shall indemnify, hold harmless and defend Tenant from and against any and all costs, expense, including reasonable attorneys' fees, liability, injuries (including death), losses, damages, suits, actions, fines, penalties, claims or demands of any kind which are asserted by or on behalf of any person or governmental authority arising out of or in any way connected with, and Tenant shall not be liable to Landlord on account of (a) any failure by Landlord to perform any of the agreements, terms, covenants or condition of this Lease, as it applies to the Common Areas, required to be performed by Landlord, (b) any failure by Landlord to comply with any statutes, ordinances, regulations or orders of any governmental authority, and (c) any accident, death or personal injury or damage to property which shall occur on or about the Building (other than the Office Area), the Property (other than the Office Area) and/or the Common Areas therein or thereon unless caused by the gross negligence or willful misconduct of Tenant, its employees or agents.

17. TENANT'S PROPERTY: Except for the gross negligence or willful misconduct of Landlord, its employees and agents:

(A) All property of the Tenant, its employees, agents, or invitee on the Leased Premises or in the Building or on the Property shall be at the sole risk of the Tenant;

(B) Landlord shall not be liable for any accident, death or personal injury to any person or damage to property of Tenant, its employees, agents or invitee resulting from the use or operation or breakage of elevators, the heating, cooling, electrical or plumbing apparatus or the parking area unless caused by the gross negligence or willful misconduct of Landlord, its employees and agents;

(C) Landlord shall not be liable for damage to property from water, snow, frost, steam, fire, electricity, smoke or other causes. Landlord shall not be liable for nor shall this Lease be affected by conditions arising or resulting from construction on contiguous premises, unless due to the gross negligence or willful misconduct of Landlord, its employees and agents; and

(D) All fixtures, equipment and other property placed or installed in or on the

14

Leased Premises by Tenant and designed for and used in the conduct of Tenant's business in the Leased Premises, shall at all times be and remain the property of Tenant. Tenant shall, at Tenant's sole cost and expense, remove all such equipment, fixtures and other property from the Leased Premises prior to the termination of this Lease and Tenant shall, at Tenant's cost and expense, repair any and all damage to the Leased Premises caused or occasioned by the installation or removal of said fixtures, equipment or other property. Any and all such equipment, fixtures and other property which shall remain on the Leased Premises after the termination of this Lease, shall at Landlord's option be deemed abandoned by Tenant and become the sole property of Landlord, or may be removed by Landlord in which case Tenant shall pay or reimburse Landlord for the reasonable cost of such removal and of repairing any and all damage to the Leased Premises caused thereby.

18. ESTOPPEL CERTIFICATES: Tenant or Landlord shall, at any time and from time to time within twenty (20) days following written request from the other party , execute, acknowledge, and deliver to the other a written statement certifying that this Lease is in full force and effect and unmodified or, if modified, stating the nature of such modification, certifying the date to which the rent hereunder has been paid, and certifying that there are not, to Tenant's or Landlord's knowledge as the case may be, any uncured defaults on the part of Landlord or Tenant hereunder, or specifying such defaults if any are claimed, and such other information regarding the Lease and/or the Leased Premises as may be reasonably requested. Any such statement may be relied upon by any prospective lender, purchaser or mortgagee of all or any part of the Leased Premises, the Building or the Property. Tenant's failure to deliver such statement within said twenty (20) day period shall be conclusive upon Tenant that this Lease is in full force and effect and unmodified, and that there are no uncured defaults in Landlord's performance hereunder.

19. EQUIPMENT: Tenant shall not install or operate in the Leased Premises any electrically operated equipment or other machinery other than personal computers and processors and such other electrically operated office machines and equipment as are customarily used in modern offices, without first obtaining the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, Landlord may condition consent upon the payment by the Tenant of additional rent in the amount actually incurred by Landlord as compensation for excess consumption of electricity, HVAC and other costs as may be occasioned by the operation of said equipment or machinery. Tenant will not install any other equipment of any kind or nature whatsoever which will or may necessitate any changes, replacements or additions to or require the increased use of the water system, plumbing system, heating system, air conditioning system or the electrical system of the Leased Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld, conditioned or delayed except as provided in this Section.

20. COMMON AREA AND FACILITIES - BUILDING: As used herein the term

15

"Common Area" shall mean the parking areas, handicap ramp, entrances, driveways, stairs, elevators, vestibules, lobbies, atriums, restrooms, and other public portions of the Building and Property provided by Landlord for the common use of tenants, customers and other invitees.

21. SURRENDER: Tenant will deliver up and surrender to Landlord possession of the Leased Premises upon expiration of the term of this Lease or upon the earlier termination of this Lease, broom clean and in as good condition and repair as the same shall be at the commencement of the term of this Lease, ordinary wear and damage by casualty condemnation and matters for which Tenant is not responsible hereunder excepted.

22. ACCESS TO LEASED PREMISES: Tenant will permit Landlord or Landlord's agents to inspect or examine the Leased Premises at any reasonable time with prior reasonable notice from Landlord to Tenant and at a time which will not unreasonably interfere with Tenant's business or immediately in the case of an emergency and permit Landlord to make such repairs to the Leased Premises as Landlord may deem necessary for preservation of the Leased Premises and which Tenant has failed so to make without the same being construed as an eviction of Tenant in whole or in part, and the rent shall not abate while such repairs are being made and Landlord shall not be liable to Tenant for any loss or interruption of the business of Tenant while such repairs are being made unless such loss or interruption is caused by the gross negligence or willful misconduct of Landlord, its employees and agents.

Landlord shall have the right, upon notifying Tenant, to enter upon the Leased Premises at any reasonable time upon reasonable prior notice and from time-to-time during the term of this Lease for the purpose of exhibiting the same to prospective purchasers and for a period of one hundred eighty (180) days prior to the end of the term of this Lease for the purpose of showing the Leased Premises to prospective tenants.

23. CONDEMNATION: If the Leased Premises, the Building, the Property or any part thereof shall be taken or condemned either permanently or temporarily for any public use or purpose by any competent authority in condemnation or eminent domain proceedings, the entire compensation award therefor, both leasehold and reversion, shall belong to the Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its rights, title and interest in and to any such award. Tenant shall, however, be entitled to claim, prove and receive in such condemnation proceedings such award as may be allowed for leasehold improvements, fixtures and other equipment installed by Tenant, and for moving and business relocation costs but only if such awards shall be in addition to the award for the property taken in the proceedings.

If substantially all of the Building and/or Leased Premises shall be taken as aforesaid or if any such taking shall in the reasonable judgment of Landlord render the

16

Leased Premises or the Building substantially unfit for its intended use, then this Lease shall terminate and shall become null and void from the time possession thereof is required for public use, and from that day the parties hereto shall be released from all further obligations except for those previously accrued hereunder.

If only a portion of the Leased Premises, the Building and/or the Property shall be so taken or condemned, which taking shall not render the Leased Premises substantially unfit for its intended uses as set forth in Section 4 of this Lease, then Landlord at its own expense shall repair and restore the portion of the Leased Premises not affected by taking and this Lease shall continue in full force and effect except that the rental shall be equitably and proportionately reduced if the taking is of a portion of the Leased Premises.

Notwithstanding the foregoing provisions of this Section 23, if any portion of the Leased Premises or any material portion of the Building or the Property shall be taken as aforesaid during the last two (2) years of the term of this Lease, Landlord or Tenant may, within thirty (30) days after possession is required by the condemning authority, cancel and terminate this Lease by giving written notice to the other party, and if such notice is given, this Lease shall expire as of the date of such possession with the same effect as though that date was the date of the expiration of the term of this Lease. In such event, rental hereunder shall abate as of the date of such possession and Landlord shall be entitled to retain all proceeds resulting from such possession and Tenant, however, shall be entitled to, and Landlord shall refund to Tenant any unearned rent paid in advance, and Tenant shall expeditiously as is reasonable under the circumstances remove such of its property as it is required to remove under the provisions of Section 17 (D) hereof and shall surrender the Leased Premises to Landlord who may enter upon and repossess the same, and all further liability of Tenant and Landlord hereunder shall thereupon cease. If this Lease is not so canceled and terminated, the provisions of the foregoing Section 23 shall control.

24. DAMAGE OR DESTRUCTION: If, during the term of this Lease, the Building or the Leased Premises is so damaged or destroyed by casualty so as to render the same unfit for occupancy by Tenant for the purposes set forth in Section 4 of this Lease, and if such damage or destruction of the Leased Premises cannot in the sole reasonable judgment of Landlord be repaired, restored or rebuilt within six (6) months from the happening of such damage or destruction, then either party may terminate this Lease as of the date of such damage or destruction by giving the other party notice in writing with respect thereto within thirty (30) days from the date of such happening. In such case, rental hereunder shall abate as of the date of such damage or destruction, Landlord shall refund to Tenant any unearned rent paid in advance and Tenant shall as expeditiously as is reasonable under the circumstances remove such of its property as it is required to remove under the provisions of Section 17 (D) hereof and shall surrender the Leased Premises to Landlord who may enter upon and repossess the same, and all further liability of Tenant and Landlord shall thereupon cease.

17

If any such damage to or destruction of the Building or the Leased Premises can, in the sole reasonable judgment of Landlord, be repaired within a period of six (6) months after the happening thereof, Landlord shall repair, restore or rebuild the same with all reasonable dispatch, and this Lease shall not be affected in any manner, except that the liability of Tenant for rent shall be suspended for the period during which such repair, restoration or rebuilding is being made. However, if the damage or destruction is such as not to render the Leased Premises totally unfit for the occupancy by Tenant for the purposes set forth in Section 4 of this Lease, Landlord shall repair the Building or the Leased Premises with reasonable promptness and rentals hereunder shall abate pro rata to the extent that portions of the Leased Premises are not available for use by Tenant.

In either situation provided for above in this Section, Landlord shall be entitled to receive and retain all insurance proceeds from Landlord's policy resulting from such damage or destruction. If Tenant is required to vacate the Leased Premises during the period Landlord is making such repairs, restoration or rebuilding, Landlord shall make reasonable efforts to provide Tenant with alternate accommodations under terms and conditions mutually acceptable to the parties hereto provided, however, Landlord shall not be liable nor shall this Lease terminate if such accommodations are not available, however, Tenant's rent shall abate pro rata to the extent that portions of the Leased Premises or alternative space are not available for Tenant's use.

Notwithstanding the foregoing provisions of this Section 24, if the Building or the Leased Premises shall be destroyed or in the sole judgment of Landlord substantially damaged by insured casualty during the last two (2) years of the initial term or any Renewal Term of this Lease, Landlord or Tenant may, within thirty (30) days after the occurrence of such damage or destruction, cancel and terminate this Lease by giving written notice to the other party , and if such notice is given, this Lease shall expire as of the date of such destruction or damage with the same effect as though the date was the date of the expiration of the term of this Lease. In such event, rental hereunder shall abate as of the date of such damage or destruction and Landlord shall be entitled to retain all insurance proceeds resulting from such damage or destruction to Landlord's property, Landlord shall refund to Tenant any unearned rent paid in advance, and Tenant shall as expeditiously as is reasonable under the circumstances remove such of its property as it is required to remove under the provisions of Section 17 (D) hereof and shall surrender the Leased Premises to Landlord who may enter upon and repossess the same, and all further liability of Tenant and Landlord hereunder shall thereupon cease. If this Lease is not so canceled and terminated, the provisions of the foregoing paragraphs of this Section 24 shall control.

25. INTERRUPTION OF SERVICE: Landlord shall not be liable or responsible to Tenant for any loss or damage which Tenant, its agents or employees, may sustain by reason of any strike, lockout or other labor disturbance, civil commotion or act of God affecting the Landlord or the Building or any tenant therein.

18

26. WAIVER: No waiver of a default of Tenant hereunder shall be implied from any omission or delay on the part of Landlord to take any action on account of such default and no express waiver shall effect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waiver(s) by Landlord shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent to or approval by Landlord of any act by Tenant requiring Landlord's consent or approval shall not constitute a consent or approval of any subsequent similar act by Tenant. Each term and each provision of this Lease performable by Tenant shall be construed to be both a covenant and a condition. No action required or permitted to be taken by or on behalf of Landlord under the terms or provisions of this Lease shall be deemed to constitute an eviction or disturbance of Tenant's possession of the Leased Premises. The receipt by Landlord of a lesser amount than the rent due shall not be construed to be other than a payment on account of the rent due, nor shall any statement on Tenant's check or in an accompanying letter be deemed an accord and satisfaction.

27. DEFAULT AND REMEDIES: All rights and remedies of Landlord herein enumerated shall be cumulative, and none shall exclude any other rights or remedies allowed by law. Tenant covenants and agrees that if any of the following events of default occur, that is, if:

(A) Tenant shall fail, neglect or refuse to pay rent or any sums payable hereunder as rent at the time and in the amount as herein provided, or to pay any other monies agreed by it to be paid promptly when and as the same shall become due and payable under the terms hereof, and such non-payment shall continue for more than ten (10) days after written notice from Landlord of such failure; or

(B) Tenant shall abandon the Leased Premises or shall commit waste thereon; or

(C) Any execution be issued against a substantial part of Tenant's assets or bankruptcy, receivership or insolvency proceedings be instituted by or against Tenant and same is not dismissed within sixty (60) days after filing of such proceedings or an assignment made by Tenant for the benefit of creditors; or

(D) Tenant shall fail, neglect or refuse to keep and perform any of the other covenants, conditions, stipulations or agreements herein contained and covenanted and agreed to be kept and performed by it and any such failure, neglect or refusal shall continue for a period of more than thirty (30) days after notice thereof is given in writing to Tenant by Landlord; provided, however, that if the cause for giving such notice involves the making of repairs or other matters reasonably requiring a longer period of time than the period aforesaid, Tenant shall be deemed to have complied with such notice so long as it has commenced to comply with said notice within the period set forth in the notice and is diligently prosecuting compliance or has taken

19

the proper steps or proceedings under the circumstance to prevent the seizure, destruction, alteration or other interference with the Leased Premises by reason of noncompliance with the requirements of any law or ordinance or with the rules, regulations or directions of any governmental authority, as the case may be;

then in any of said events after written notice from Landlord to Tenant of Landlord's intention to accelerate rent and such non-payment shall continue for ninety (90) days, the remaining rental for the balance of the term of this Lease discounted to present value at the rate of 8% per annum shall at the option of Landlord at once become due and payable as if by the terms of the Lease it is all payable in advance, and the Tenant does hereby authorize and fully empower Landlord to cancel or annul this Lease at once and to re-enter and take possession of the Leased Premises immediately, without any previous notice of intention to re-enter, and to remove all persons and their property therefrom, and to use such assists in effecting and perfecting such removal of Tenant as may be necessary and advisable to recover at once first and exclusive possession of the Leased Premises, without being deemed guilty of any manner of trespass and without prejudice to any remedies which might otherwise be used by Landlord, in which event this Lease shall terminate.

Landlord may, however, at its option at any time and after such default or violation of condition or covenant, re-enter and take possession of the Leased Premises without such re-entry working a forfeiture of the rents to be paid and the covenants, agreements and conditions to be kept and performed by Tenant for the term of this Lease. In such event, Landlord shall have the right but not the obligation, to divide or subdivide the Leased Premises in any manner Landlord may determine and to lease or let the same or portions thereof for such periods of time and at such rentals and for such use and upon such covenants and conditions as Landlord may elect, applying the net rentals from such letting first to the payment of Landlord's expenses incurred in dispossessing Tenant and the cost and expense of maintaining the Leased Premises and making such improvements thereto as may be necessary in order to enable Landlord to re-let the same, and to the payment of any brokerage commissions or other necessary expenses of Landlord in connection with such re-letting. The balance, if any, shall be applied by Landlord from time to time on account of the payment due or payable by Tenant hereunder, with the right reserved to Landlord to bring such action or proceedings for the recovery of any actual deficits remaining unpaid as Landlord may deem desirable from time to time, without being obligated to await the end of the term for final determination of Tenant's account. Any balance remaining, however, after full payment and liquidation of Landlord's account as aforesaid shall be paid to Tenant, with the right reserved to Landlord at any time to give notice in writing to Tenant of Landlord's election to cancel and terminate this Lease and the simultaneous payment by Landlord to Tenant of any credit balance in Tenant's favor that may at the time be owing to Tenant shall constitute a final and effective cancellation and termination of this Lease and the obligation hereunder on the part of either party to the other. Landlord shall mitigate its damages in enforcing its rights hereunder.

20

28. HOLD OVER: If Tenant with the consent of Landlord shall remain in possession of the Leased Premises after the expiration of the term of this Lease, then Tenant shall be deemed a Tenant of the Leased Premises from month to month subject to all of the terms and provisions hereof except only as to the term of this Lease. If Tenant shall remain in possession of the Leased Premises after the expiration of the term of this Lease without the express written consent of Landlord, Tenant shall pay Landlord for each month or portion thereof that Tenant shall remain without Landlord's consent an amount equal to 1 1/2 times the amount of monthly rental and other amounts due as additional rental under this Lease, determined as of the last full month of the term hereunder. Tenant shall also pay all damages including consequential damages sustained by Landlord by reason of such failure to vacate and surrender the Leased Premises.

29. QUIET ENJOYMENT: If Tenant pays the rental and other charges herein provided, and performs all of the covenants and agreements herein stipulated to be performed on the Tenant's part, Tenant shall at all times during the term of this Lease have the peaceable and quiet enjoyment and possession of the Leased Premises without any manner of hindrance from Landlord or any persons lawfully claiming through Landlord, except as to any portion of the Leased Premises as may be taken under the power of eminent domain.

30. NOTICES: All notices, demands and requests which may be or are required to be given hereunder shall be given in writing and shall be deemed to have been duly given as of the date of delivery or refusal mailing if sent by postage prepaid, first class, United States registered or certified mail, return receipt requested or by reputable overnight carrier, to each of the parties at the following places, or to such other places as either party hereto may for itself designate in writing from time to time for the purpose of receiving notices hereunder:

To Landlord:                          To Tenant:

THE BUNCHER COMPANY                   THE ART INSTITUTES INTERNATIONAL, INC.
5600 Forward Avenue                   dba The Art Institute Online
P. O. Box #81930                      210 Sixth Avenue, Suite 3300
Pittsburgh, PA 15217-0930             Pittsburgh, PA 15222-2603
                                      Attn: President

                            cc:       Education Management Corporation
                                      210 Sixth Avenue, Suite 3300
                                      Pittsburgh, Pennsylvania 15222-2603
                                      Attn: Fred Steinberg, Esq.

                                      Education Management Corporation
                                      777 Middle River Drive
                                      Ft. Lauderdale, Florida 33304-3512

21

Attn: Mark Hodges

Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Attn: Angela J. Crowder, Esq.

31. BROKERAGE: Except as listed below, Landlord and Tenant hereby warrant to each other that no real estate broker has been involved in this transaction on its behalf and that no finder's fees or real estate commissions have been earned by any other third party. Tenant hereby agrees to indemnify Landlord and Landlord hereby agrees to indemnify Tenant for any liability or claims for commissions or fees arising from a breach of this warrant. The real estate broker involved is Cushman & Wakefield/Grant Street Associates, Inc. and any commissions or fees owed to Cushman & Wakefield/Grant Street Associates, Inc. will be paid by Landlord pursuant to that certain letter agreement dated September 26, 2005.

32. SECTION HEADINGS: Section headings used herein are for the purpose of convenience only and shall not be used in construing this Lease.

33. ENTIRE AGREEMENT: This Lease constitutes and contains the entire and only agreement between the parties and supersedes and cancels any and all pre-existing agreements and understandings between the parties, relating to the subject matter hereof. No representation, inducement, promise, condition or warranty not set forth herein has been made or relied upon by either party.

34. SUBORDINATION: Subject to the provisions of Section 35 below, this Lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect the Leased Premises, the Building and/or the Property and to all renewals, modifications, consolidations, replacements and no further instrument of subordination shall be required; however, in confirmation of such subordination Tenant shall execute promptly any certificate to that effect upon request by Landlord. Tenant hereby constitutes and appoints Landlord as Tenant's attorney-in-fact to execute any such certificate for and on behalf of Tenant, should Tenant fail to do so.

35. NON-DISTURBANCE: Landlord represents to Tenant that the Leased Premises is not subject to any mortgage or other encumbrances pursuant to which Tenant's leasehold interest could be foreclosed. If Landlord subsequently secures any indebtedness by a mortgage against the Leased Premises superior to this Lease, Landlord will use its best efforts to obtain a written non-disturbance agreement acceptable to Tenant in recordable form providing that so long as Tenant performs all of the terms, covenants and conditions of this Lease and agrees to attorn to the mortgagee, beneficiary of the deed of trust, purchaser at a foreclosure sales, prime lessor or fee owner, Tenant's rights under this Lease shall not be disturbed and shall remain in full force and effect for the term and

22

any renewal thereof, and Tenant shall not be named or joined by the holder of any mortgage or deed of trust in any action or proceeding to foreclose thereunder. If a non-disturbance agreement is not obtained, this Lease shall not be subordinate to any mortgage which may be obtained against the Leased Premises.

36. LIMITATION OF LANDLORD: Notwithstanding the provisions hereof, the term "Landlord" as used in this Lease means only the holder, for the time being, of Landlord's interest under this Lease; so that in the event of any transfer of title in the Leased Premises to a party assuming Landlord's obligations hereunder, Landlord shall be deemed without further agreement between the parties that such grantee, transferee or assignee has assumed and agreed to observe and perform all obligations of the Landlord hereunder arising during the period it is the holder of Landlord's interest hereunder.

37. FORCE MAJEURE: Landlord shall not be liable to Tenant and shall not be in default under this Lease in any manner by reason of delay in performance of any covenant or condition in this Lease, if any such delay is caused by present or future governmental regulations, restrictions, strikes, lockouts, unusual unavailability of materials or labor, severe adverse weather conditions, or by any other reason or reasons, whether similar or not to foregoing, which delays are beyond the reasonable control of Landlord, provided that Landlord shall use Landlord's best efforts to overcome the same.

38. GOVERNING LAW: This Lease shall be construed, governed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

39. SEPARABILITY: If any term or provisions of this Lease, or the application thereof to any party or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the full extent permitted by law.

40. CUMULATIVE REMEDIES: The specified remedies to which Landlord or Tenant may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means or redress to which Landlord or Tenant may be lawfully entitled in case of any breach by Landlord or Tenant to insist, in any one or more cases, upon the strict performance of any of the covenants of this Lease shall not be construed as a waiver of such covenant or relinquishment for the future. In addition to the other remedies in this Lease provided, Landlord or Tenant shall be entitled to restraint by injunction of the violation, or attempted or threatened violation, of any of the covenants, conditions or provisions of this Lease. Nothing in this Lease shall give either party the right to terminate this Lease except as otherwise specifically set forth in this Lease.

41. AMENDMENTS: This Lease may be amended modified, renewed, extended, canceled or terminated only by written instrument duly executed by both of the parties

23

hereto.

42. PROVISIONS CONSTRUED AS COVENANTS: All the provisions of this Lease, insofar as they are applicable to either or both of the parties hereto, shall be taken and construed as the covenant or covenants of such party or parties respectively to do or perform the thing or act specified or not to do the act or thing inhibited.

43. BINDING EFFECT: The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; subject, nevertheless, to the restrictions on assignment by Tenant as set forth in the Lease hereof and to the provisions of Section 14 hereof.

44. HAZARDOUS SUBSTANCES: Tenant shall not cause, permit or allow any Hazardous Substance to be used, stored, generated, emitted, discharged, released or disposed of, on, in or from the Leased Premises by Tenant, Tenant's agents, employees, contractors, invitees or any other person or entity, except ordinary office and cleaning products and other products customarily and lawfully used by Tenant in the ordinary course of its business. Tenant shall comply with all Environmental Laws governing or relating to the generation, transportation, use, storage, emission, discharge, release, threatened release or disposal of any Hazardous Substance from, on or in the Leased Premises (hereinafter the "Contamination"). If Tenant causes, permits or allows the emission, discharge, release, threatened release or disposal of any Hazardous Substances from, on or in the Leased Premises, Tenant shall promptly, at its sole cost and expense, take any and all actions necessary to remediate and/or remove Contamination and to comply with the Environmental Laws.

Tenant shall defend, indemnify and hold Landlord harmless from and against all claims, damages, remedial or removal actions or obligations, fines, judgments, liens, penalties, costs, expenses, diminished property value, lost or diminished rental revenue, liabilities or losses of any kind asserted against, or suffered or incurred by Tenant and/or Landlord resulting directly or indirectly from the presence, generation, transportation, use, storage, emission, discharge, release, threatened release or disposal of Hazardous Substances on, in or from the Leased Premises except for Contamination (a) existing on the Leased Premises prior to the date of this Lease or (b) resulting from the generation, transportation, use, storage, emission, discharge, release or disposal of Hazardous Substances on, in or from the Leased Premises by Landlord or its employees, agents or authorized representatives or third parties not under the control of Tenant. Landlord shall be responsible for the remediation of any Contamination that may exist on the Leased Premises prior to the Commencement Date of this Lease or Contamination caused by Landlord. The provisions of the foregoing sentence shall survive the termination of this Lease.

As used herein, the term "Hazardous Substance" or "Hazardous Substances", shall mean any and all substances or materials which are defined as or listed as "hazardous

24

materials", or "toxic substances", "hazardous air pollutants", "toxic pollutants", "pollutants" and/or "contaminants" as those terms are used, defined or listed under any Environmental Laws. As used herein the term "Hazardous Substance" shall also include any petroleum product, including gasoline, diesel fuel, motor oil and waste oil.

As used herein the term "Environmental Laws" shall mean any federal, state or local law, statute, ordinance, rule, order, regulation, injunction, writ or decree now or hereafter existing which governs or otherwise relates to the generation, transportation, use, storage, emission, discharge, release including, without limitation, the Resource, Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, the Clean Air Act and the Clean Water Act.

Landlord hereby warrants that to the best of its actual knowledge and belief, the Leased Premises, the Building and the Property contains no Hazardous Substances (including without limitation asbestos) and is not in violation of any Environmental Laws.

46. OPTION TO RENEW:  Tenant shall have the right and option to extend the initial nine (9) years and eight (8) month term of this Lease for two (2) consecutive terms of five (5) years each (each a "Renewal Term") to commence immediately following the expiration of the initial term or the expiration of the first Renewal Term. Tenant may exercise its right for each Renewal Term only by delivering to Landlord written notice of Tenant's exercise of such right no less than one (1) year prior to the expiration of the initial term or the expiration of the first Renewal Term, if applicable and the terms and conditions of this Lease shall continue in full force and effect for each applicable Renewal Term except that the monthly rental for each Renewal Term shall be determined as follows:

The monthly rental for the Leased Premises for each Renewal Term shall be, in each case, the product of the monthly rental in effect at the end of the initial term multiplied by a fraction the numerator of which is the CPI in effect for June 2015 as to the first Renewal Term or June 2020 as to the second Renewal Term, if applicable, and the denominator of which shall be the CPI in effect for May 2012.

Notwithstanding the result of the above calculation, the monthly rental for each Renewal Term shall not be less than the monthly rental in effect during the last month of the initial term or the last month of the first Renewal Term, whichever is applicable.

The foregoing option and right to extend the term of this Lease for each Renewal Term as herein provided is subject to (i) Tenant's timely exercise of this option as herein provided, (ii) there being no Tenant default beyond the expiration of the applicable notice and cure periods at the time of the exercise of such option and at the commencement of any Renewal Term and (iii) The Art Institutes International, Inc., dba The Art Institute Online and/or its affiliates, itself being in full possession of the Leased Premises continuously for the last year prior to the expiration date of the initial term or the first

25

Renewal Term, if applicable, and at the commencement of the extant Renewal Term. If the above conditions are not satisfied, Landlord may, at its option, terminate this Lease as of the last day of the initial term of this Lease or the last day of the first Renewal Term, if applicable.

47. RIGHT OF FIRST OFFER: Landlord shall, prior to offering certain available space in those portions of the Building located on the first floor of Section A, and first and second floors of Section B of the Building shown cross-hatched in red on Exhibit A attached hereto or in portions of space on the third floor in a neighboring building known as Penn Liberty Plaza I (the "Expansion Space") to other third parties, first offer in writing to lease to Tenant such available space in increments of approximately 10,000 square feet not to exceed 40,000 square feet in the aggregate on terms and conditions Landlord is willing to accept. Tenant shall have ten (10) days (not including Saturdays, Sundays, and federal holidays) after the date of such offer to accept said offer. If Tenant rejects such offer or fails to respond to said offer within said ten (10) business day period, Landlord shall be free to lease the Expansion Space to other third parties on the terms offered to Tenant, and Tenant shall have no further rights to the Expansion Space on such terms for a period of six (6) months thereafter. If Landlord does not enter into a lease agreement with a third party within six months after making an offer to Tenant pursuant to this Section 47 or such new lease expires during the term of this Lease, then Tenant's right of first offer under this Section 47 shall be re-instituted and Landlord shall not enter into a lease with any third party for the Expansion Space without first offering in writing to lease the Expansion Space to Tenant in accordance with the procedure set forth above in this Section 47.

The parties hereto understand that Tenant's right to expand into Penn Liberty Plaza I is conditioned on Tenant first taking the available space in the Building.

During the term of this Lease as the same may be extended as provided herein, Landlord hereby covenants that Landlord shall not lease any space in the Building to any other third party for use as an on line school.

48. TENANT'S RIGHT OF EARLY TERMINATION: Tenant shall have the right and option to terminate this Lease and the term thereof at any time after June 30, 2011, subject to full compliance with the following conditions:

A. To exercise Tenant's right to terminate this Lease, Tenant shall notify Landlord in writing nine (9) months prior to the date Tenant desires to so terminate this Lease (the "Early Termination Date").

B. Tenant shall pay to Landlord as a fee for said early termination the amount of $375,000 payable 1/2 at the time of notice and 1/2 at the termination of this Lease as provided herein at the time of Tenant's notice to Landlord of its desire to terminate this Lease. Said fee shall be in addition to the rental due

26

under this Lease until the Early Termination Date.

If the conditions precedent are fully satisfied, this Lease and the term thereof shall expire on the last day of the ninth (9th) month following the date of said notice with the same force and effect as though such date was the scheduled expiration date of the term of this Lease.

49. CONDITION PRECEDENT: The parties hereto acknowledge that a portion of the Leased Premises is currently occupied by Allegheny Intermediate Unit ("AIU") under that certain Agreement of Lease dated May 22, 1998 (the "AIU Lease"). As a condition precedent to the effectiveness of this Lease, the AIU Lease and the term thereof shall have terminated and AIU shall have vacated and surrendered the Leased Premises on or prior to October 31, 2005, unless said date is extended by mutual agreement of the parties hereto, or at Tenant's option upon written notice to Landlord, (a) this Lease shall be null and void and neither party shall be liable to the other or (b) the Commencement Date of this Lease, but not the expiration date, shall be delayed from day to day until AIU has vacated and surrendered the Leased Premises to Landlord and the same has been delivered to Tenant in the condition required herein (the "Beginning Date") In the event AIU fails to vacate and surrender the Leased Premises by October 31, 2005 and Tenant has elected to extend the Commencement Date as provided above, Landlord shall use all commercially reasonable efforts to evict AIU. If AIU has not vacated and surrendered the Leased Premises to Landlord by December 31, 2005, this Lease shall be null and void and neither party hereto shall be liable to the other.

Notwithstanding the above, a portion of the Leased Premises is occupied by the Parking Authority of the City of Pittsburgh (the "Parking Authority") as a subtenant of AIU. The parties hereto understand and agree that the Parking Authority may occupy that portion of the Leased Premises until December 31, 2005. Landlord shall use its best efforts to terminate the Parking Authority's lease prior to December 31, 2005.

50. TENANT IMPROVEMENTS: The parties hereto understand and agree that Tenant will be installing and/or constructing substantial renovations to the Premises ("Tenant's Work") for the purpose of installing offices, class rooms, studios and related office facilities as more specifically set forth in Section 4 of this Lease. Tenant's Work shall be performed in such a manner so as not to unreasonably interfere with other tenants in the Building. Prior to the commencement of Tenant's Work, Tenant shall provide Landlord with plans and specifications describing Tenant's Work and other such information that Landlord may reasonably request to determine the scope of Tenant's Work. Tenant's Work shall be made at Tenant's sole cost, risk and expense and shall be completed in accordance with all applicable building codes, laws, rules and regulations. Prior to the commencement of construction of Tenant's Work, Landlord shall provide Tenant with a list of those non-office type improvements that appear on the plans and specifications that Tenant must remove pursuant to the terms of this Section 50 prior to the expiration date of this Lease as the same may be extended. Tenant shall at its sole cost, risk and expense

27

remove those items included in the list provided by Landlord and repair any damage to the Premises caused by said removal. All contracts for Tenant's Work shall be no lien contracts and Tenant's Work shall be under and subject to the provisions of Section 14 of this Lease.

Tenant's Work schedule must be approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed and Tenant's Work shall be conducted and constructed in such a manner so as not to unreasonably interfere with the operations of other tenants in the Building.

Activities on or about the roof by Tenant or its contractors shall be done in such a manner so as not to violate the roof warranty on Section A of the Building and with prior notice to Landlord. Any damage to the roof system resulting from Tenant's activities on the roof shall be repaired by Tenant at Tenant's sole cost and expense and Tenant shall maintain the roof warranty on Section A of the Building at its sole cost and expense with respect to activities by Tenant and its contractors.

51. SATELLITE DISH: Tenant shall have the right to install dishes, antennas and other equipment on the portion of the roof of the Building above the Leased Premises, at no additional charge during the term of this Lease, subject to Landlord's approval of the size, location, installation plans and roof protection methods, which shall not be unreasonably withheld, conditioned or delayed. Tenant shall be responsible for expenses associated with installation maintenance, operation, repair and removal of said items as well as any additional costs which Landlord incurs to reinforce the structural components of the Building to support such equipment, provided that Landlord shall notify Tenant of any requirement for such changes to the structural components of the Building at the time that Landlord gives consent to the Tenant's installation plans and Tenant then shall have the option to elect not to proceed with the installation of such equipment if Tenant does not wish to pay the cost of such changes to the structural components of the Building. Tenant shall exercise its rights and perform its obligation hereunder in such a manner as to protect the roof warranty and without interference with the then existing telecommunication of Landlord and other tenants of Landlord in the Building and in the immediate vicinity of the Building and in compliance with all applicable laws and building codes. Prior to the expiration date of the term of this Lease, Tenant shall at its sole cost and expense remove the dishes, antennas and other equipment and repair any damage caused by such removal and restore the roof of the Leased Premises to its original condition.

52. EARLY OCCUPANCY: Tenant has advised Landlord that prior to the Commencement Date of the term of this Lease, and as soon as AIU has surrendered and vacated the Leased Premises pursuant to Section 49 of this Lease, Tenant shall require the continual access to and use of the Leased Premises to construct Tenant's Work as defined herein in the Leased Premises. As soon as AIU has surrendered and vacated the Leased Premises, Landlord shall and does hereby grant Tenant the right and license, to occupy and use those portions of the Leased Premises for the purpose of constructing

28

Tenant's Work, so long as Tenant remains in compliance with its obligations under this Lease. Tenant's occupancy of the Leased Premises prior to the Commencement Date will be at its sole risk, cost and expense and Tenant shall conduct its operations in such a manner so as not to interfere with the operations of other tenants in the Building. The use of the Leased Premises shall be subject to the terms of this Lease except that Tenant shall not be obligated for the payment of rent and additional rent during such occupancy but shall nonetheless be responsible for any other reasonable additional expense reasonably incurred by Landlord as a direct result of such occupancy.

53. GUARANTY: Tenant, at or prior to the execution of this Lease and as a condition to Landlord's obligations hereunder, will cause Education Management Corporation to guaranty the payment of all Tenant's obligations under this Lease including Tenant's financial obligations for the payment of rent and additional rent.

The guaranty shall be on the form marked Exhibit G attached hereto and made a part hereof.

54. MISCELLANEOUS: A. During the Term, Landlord shall not permit any portion of the Building to be used for any of the following uses: massage parlor, a facility for the sale or display of pornographic material (as determined by community standards in Pittsburgh, Pennsylvania), any striptease or topless establishment, any so-called "head shop" or store that sells bongs, coke spoons, roach clips and/or other drug paraphernalia, pawn shop, check cashing business, or a bar, pub, lounge, nightclub, music hall or disco, or to an off-track betting facility or other gambling establishment, a flea market, an abortion clinic, any offensive use similar to any of the foregoing, or for an illegal use.

B. Except to the extent required pursuant to applicable law, regulation or court proceeding or reasonably required for the subletting of the Leased Premises or assignment of this Lease, either party shall make no public disclosure of the terms of this transaction without the prior written consent of the other party, except that Landlord may discuss the transaction in confidence with its investors, potential investors and/or joint ventures, lender or potential lender, attorneys, accountants, consultants, taxing authorities and employees, provided that each of the foregoing agree to comply with the provisions of this Section.

C. Landlord agrees to execute a Memorandum of Lease in the form attached hereto as Exhibit F evidencing Tenant's rights under this Lease and/or Tenant's use of the Leased Premises, provided prior to recording same, Tenant shall deliver to Landlord's Counsel a release of such Memorandum, in recordable form and reasonably satisfactory to Landlord, to be held in escrow by Landlord's Counsel and not released for recordation until

29

the termination of this Lease.

IN WITNESS WHEREOF, the parties intending to be legally bound have hereunto set their hands and seals the day and year first written above.

WITNESS the due execution hereof.

ATTEST:                                    THE BUNCHER COMPANY

(Corporate Seal)

ATTEST:                                    THE ART INSTITUTE ONLINE, a
                                           division of THE ART INSTITUTE
                                           INTERNATIONAL, INC., also known as
                                           EDMC ONLINE HIGHER EDUCATION

(Corporate Seal)

## PARKING RIDER

Tenant shall be entitled to the use of forty (40) parking spaces for use of its employees and business invitees, seven (7) spaces of which shall be reserved and located in the area shaded in orange on Exhibit A. The balance of the parking spaces, i.e., thirty-three (33) parking spaces, shall be located in existing surface parking lots owned or controlled by Landlord located in the immediate vicinity of the Building as designated by Landlord from time to time.

## GUARANTY

For good and valuable consideration, and in order to induce The Buncher Company to enter into an Agreement of Lease dated September 30, 2005 (the "Lease") with The Art Institute Online, a division of The Art Institutes International, Inc., also known as EDMC Online Higher Education ("Tenant") for property located in the City of Pittsburgh, Allegheny County, Pennsylvania as further described in the Lease, Education Management Corporation ("EMC") ("Guarantor"), a Pennsylvania corporation having its principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania, the parent corporation of Tenant hereby unconditionally and irrevocably guarantees to The Buncher Company:

(a)    The due and punctual payment in full (and not merely the collectibility) of all rent, additional rent and all other amounts due and payable by Tenant under the Lease.

Guarantor expressly agrees that Landlord may, in its sole and absolute discretion, without notice to or further consent of Guarantor and without in any way releasing, affecting, or impairing the obligations and liabilities of Guarantor hereunder:

(a)    Waive compliance with any of the terms of the Lease;

(b)    Grant extensions or renewals of the Lease and/or effect any release, compromise, or settlement in connection therewith.

If Tenant holds over beyond the term of the Lease, Guarantor's obligations hereunder shall extend and apply with respect to the payment of rent, additional rent or other sums due under the Lease.

This Guaranty and all of the terms hereof, shall be binding on Guarantor and the successors, and assigns of Guarantor.

WITNESS the due execution hereof intending to be legally bound, as of the date of the Lease.

ATTEST:                                          EDUCATION MANAGEMENT CORPORATION

_____          By: _____

                                                   Its: _____

## CERTIFICATE OF ASSISTANT SECRETARY

The undersigned, being the duly elected and qualified Assistant Secretary of The Art Institutes International, Inc., a Pennsylvania corporation (the "Corporation"), does hereby certify as follows:

1. Mark Hodges is the duly elected Senior Vice President, Real Estate & Facilities Development of the Corporation.

2. As Senior Vice President, Real Estate & Facilities Development, Mark Hodges is authorized, empowered and directed to take such actions as he may determine to be necessary, appropriate or desirable in connection with any lease agreement for the Corporation or its unincorporated division, The Art Institute Online, and to execute and deliver any lease agreement or document produced in connection with any lease agreement on behalf of the Corporation or The Art Institute Online.

IN WITNESS WHEREOF, I have hereunto set my hand and caused this certificate to be delivered on behalf of the Corporation as of the 14th day of October, 2005.

J. Devitt Kramer, Assistant Secretary

EXHIBIT____C____

PAGE____1____OF____4____

## EXHIBIT C

### CLEANING SPECIFICATIONS

#### Penn Liberty Plaza II

OFFICE AREAS

**SERVICES PERFORMED NIGHTLY:**

1.  Empty and damp wipe all waste receptacles, remove waste materials to a designated area. Install plastic lines in waste receptacles as required. Wash receptacles as necessary. All waste material shall be removed in a method that will not cause leaks or damage to floors or walls.

2.  Empty all Recycle containers at each work station and place Recycle reminder on desk of employees not complying with the program.

3.  Empty and damp wipe all ash trays; screen all sand urns nightly, and supply and replace sand as necessary.

4.  Vacuum all rugs and carpeted areas with vacuum approved by Tenant. Backsweep all plush carpeted areas.

5.  Vacuum under all furniture that can be moved (chairs, etc.)

6.  Spot clean carpet with product and method approved by Tenant.

7.  Hand dust and wipe clean with damp or treated cloth all office furniture, files, fixtures, window sills when necessary.

8.  Damp wipe and polish all glass furniture tops with glass cleaner product.

9.  Remove finger marks and smudges from all vertical surfaces including doors, door frames, around light switches, private entrance glass and partitions with general all purpose cleaner.

10. Wash clean all water fountains and water coolers using a non-abrasive cleaner on stainless, wipe with grain.

11. Sweep private stairways and emergency stairwells, and vacuum if carpeted. Areas around standpipes to be detailed.

12. Sweep or clean all uncarpeted floors using a method approved by Tenant. Buff floors to maintain a scuff-free high gloss as necessary.


PLEASE

INITIAL

EXHIBIT _____ C _____

PAGE _____ 2 _ OF _ 4 _

13.   Damp dust all telephones with anti-bacterial cleaner.

14.   Any areas designated as a vending area will be dusted and damp mopped nightly. Counter and sink surfaces to be wiped clean. Cleaning of tenant's dishes, coffee cups, etc. are not included in these specifications.

15.   All armchairs are to be properly placed under the desk and conference room tables as not to damage the arms of the chairs.

## SERVICES PERFORMED WEEKLY:

1.   Dust all picture frames, charts, and similar hangings.

2.   Dust all doors, door louvers and door frames.

3.   Dust all clothes closets, shelving and coat racks where possible.

## SERVICES PERFORMED MONTHLY:

1.   Dust all window blinds.

2.   Dust and clean all baseboards and carpet edges once a month or as required.

3.   Wax and buff resilient floor surfaces with product as approved by Tenant.

## SERVICES PERFORMED QUARTERLY:

1.   Strip and refinish all resilient floor surfaces.

2.   Dust all vertical surfaces such as walls, partitions, doors and other surfaces not reached in the nightly cleaning.

3.   Dust exterior of lighting fixtures quarterly and wash paracube and indirect/direct lenses as necessary.

4.   Dust all air conditioning louvers, grills, etc.

5.   Clean exterior and interior windows quarterly.

EXHIBIT ___C___

PAGE ___3___ OF ___4___

GENERAL NOTES:

Cleaning operations are to be scheduled so that an absolute minimum of lights are to be left on at all times. Upon completion of the cleaning, all lights must be turned off.

## RESTROOMS

### SERVICES PERFORMED NIGHTLY:

1.    Sweep, mop, rinse and dry floor.

2.    Clean all mirrors, bright work and enameled surfaces.

3.    Wash and disinfect all basins, urinals, and bowls using a non-abrasive cleaner to remove stains and clean underside of rim of urinals and bowls.

4.    Scrub all fixtures using a cleaner to remove all stains.

5.    Wash both sides of all toilet seats with soap and water to disinfect.

6.    Remove all graffiti from walls and partitions.

7.    Damp wipe, wash with disinfectant when necessary all partitions, tile walls, and outside surfaces of all dispensers, including soap dishes and receptacles.

8.    Empty and sanitize all receptacles and sanitary disposals; thoroughly clean and wash at least once a week.

9.    Fill toilet tissue, soap and sanitary napkin dispensers properly.

10.   Clean and polish flush-o-meters, piping, toilet seat hinges and other metal.

### SERVICES PERFORMED MONTHLY:

1.    Machine scrub the floors and base.

2.    Wash and polish all walls, partitions, tile walls, and enamel surfaces from trim to floor.

3.    Vacuum all louvers, ventilating grills and dust light fixtures.

4.    Strip and seal floors with product approved by Tenant.

3

EXHIBIT_____ C

PAGE_____ 4 OF 4

## BUILDING ENTRANCE, ELEVATOR LOBBIES, CORRIDORS AND ALL OTHER PUBLIC AREAS

### SERVICES PERFORMED NIGHTLY:

1.    Sweep, damp mop, and spray buff floors.

2.    Vacuum carpeted areas and rugs; spot remove stains.

3.    Spot clean all wall surfaces to remove all fingerprints and smudges. Dust ledges.

4.    Wipe down walls in elevator lobbies and polish as required with method and product as approved by Tenant.

5.    Clean lobby console, directory boards, and consoled equipment as required to maintain a clean appearance.

6.    Dust and polish all bright work.

7.    Clean all glass and bright work at entrances inside and outside of the building.

## BUILDING SERVICE AREAS

### SERVICES TO BE PERFORMED AS NOTED:

1.    Slop sink rooms, storage rooms, locker rooms, employee toilet rooms, and lunch rooms are to be kept neat, clean and orderly at all times. Walls, lockers, and floors shall be cleaned, washed, and/or waxed as required.

2.    Freight elevator areas are to be kept neat, clean and orderly at all times.

3.    Resilient floor surfaces in service corridors are to be dusted nightly.

4.    All wall surfaces in service corridors are to be dusted nightly.

5.    High dust or wash all electrical and air conditioning ceiling fixtures once a year.

6.    Loading dock and trash room area to be swept daily and floor areas hosed down as required. Wall surfaces are to cleaned weekly. Overhead equipment dusted yearly.

NOTE: All products and methods of cleaning and refinishing must be approved by Tenant.

## RULES AND REGULATIONS

The Rules and Regulations of the Building and such reasonable alterations and modifications thereof as may from time to time be changed, subject to thirty (30) days prior written notice by Landlord to Tenant and provided such do not conflict with the terms of this Lease or materially affect Tenant's use of the Leased Premises as set forth in section 4 of this Lease constitute material covenants and conditions and are hereby made a part of this Lease. In the event of any conflict between the provisions of these Rules and Regulations and the provisions of the Lease, the provisions of the Lease shall control. The following shall apply:

(a) Wherever in these Rules and Regulations the word "Tenant" is used, it shall be taken to apply to and include representatives, invitees, visitors, customers, clients, sub-lessees, contractors, and common carriers, and is to be deemed of such number and gender as the circumstances required.

(b) The streets, sidewalks, entrances, halls, passages, elevators, stairways and other common areas provided by Landlord shall not be obstructed by Tenant or used by it for any purpose other than for ingress and egress.

(c) If Tenant desires to install telephone or electric wires, the Landlord will direct where and how the same are to be placed. No wires shall be run in any part of the Building excepting by or under the direction of Landlord. The attaching of wires to the outside of the Building is absolutely prohibited.

(d) Toilet rooms, waterclosets and other water apparatus shall not be used for any purpose other than those for which they were constructed.

(e) Tenant shall not do anything in the Building or on the Property, or bring or keep anything therein or thereon which will in any way increase or tend to increase the risk of fire or the rate of fire insurance, or which shall conflict with the regulations of the fire department or the fire laws, or with any insurance policy on the Building or any part thereof, or which shall in any way conflict with any law, ordinance, rule or regulation affecting the occupancy and use of the Building or the Property, which are or may hereafter be enacted or promulgated by any public authority or by the Board of Fire Underwriters having jurisdiction over the Leased Premises.

(f) In order to insure proper use and care of the Leased Premises, Tenant shall not be permitted to:

1. Keep animals or birds on the Leased Premises;

2. Use the Leased Premises as sleeping apartments;

PLEASE

INITIAL  ____ / ____

3.    Allow any sign, coverings, advertisement or notice to be fixed to the Building, inside or outside, without Landlord's consent;

4.    Operate any equipment and/or engage in activities that creates loud noises or disturbances which creates a nuisance to other tenants in the Building;

5.    Mark or defile elevators, waterclosets, toilet rooms, walls, windows, doors or any part of the Building;

6.    Allow any article to be dropped from windows, skylights or stairways, elevators or light-wells of the Building;

7.    Cover or obstruct any window, skylight, door or transom that reflects light;

8.    Fasten any article, drill nails or screws into the floors or allow the same to be papered or otherwise covered or in any way marked or broken;

9.    Operate any manufacturing machinery within the Leased Premises, or manufacture any commodity or prepare or dispense foods or beverages in the Leased Premises without the written consent of Landlord;

10.   Interfere with the heating or cooling apparatus;

11.   Allow anyone but a janitor employed or approved by the Landlord to clean the Leased Premises, which approval will not be unreasonably withheld, conditioned or delayed;

12.   Leave the Leased Premises without locking exterior doors; turning off all office machines and extinguishing all lights where practical;

13.   Except for limited personal comfort, use any heating or air-conditioner devices other than those installed by Landlord unless approved by Landlord, which approval will not be unreasonably withheld, conditioned or delayed;

14.   Attach or permit to be attached additional locks or similar devices to any door, transom or window of the premises, change existing locks or the mechanism door thereof other than those provided by Landlord or approved by Landlord, which approval will not be unreasonably withheld, conditioned or delayed;

15. Give any person permission to go upon the roof of the Building;

16. Place door mats in public corridors without consent of Landlord;

(g) Intentionally Omitted; .

(h) Landlord shall not be responsible to Tenant for any non-observance of rules and regulations on the part of other tenants provided that Landlord uses reasonable efforts to enforce same.

(i) Landlord shall have the right to prohibit any advertising by Tenant which, in its reasonable opinion, tends to impair the reputation of the Building or its desirability as a building for offices, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

(j) Landlord shall have the right to reasonably designate the time and method whereby freight, furniture, safes, goods, merchandise and other heavy or bulky articles may be brought into, moved or taken from the Building and rooms.

(k) Landlord reserves the right to inspect the Leased Premises at any reasonable time upon twenty-four (24) hours' notice to Tenant and, in case of emergency, to enter the Leased Premises at any time.

(l) Tenant shall, upon termination or cancellation of this Lease, deliver to Landlord all keys, including keys to the toilet rooms.

(m) Landlord shall on notice to Tenant and upon the other conditions set forth above have the right to make such other and further reasonable rules and regulations as, in the reasonable judgment of Landlord, may from time to time be needful for the safety, care and cleanliness of the Building and for the preservation of good order therein.

(n) Landlord reserves the right to exclude the general public from the Building at other than normal business hours. All entrance doors in the Leased Premises shall be left locked by Tenant when the Leased Premises are not in use.

(o) The parking area adjacent to the Building shall at all times be subject to the exclusive control and management of Landlord and Landlord reserves the right to close temporarily any or all portions of said parking areas and to make such other and further reasonable rules and regulations as in the reasonable judgment of Landlord, may from time to time be needful for the safety, appearance, care and cleanliness of the parking areas and for the preservation of good order thereon. Landlord shall not be responsible for any violation of rules and regulations covering said areas by any other tenant.

## EXHIBIT E

### PENN LIBERTY PLAZA II

### BASE BUILDING SPECIFICATIONS FOR OFFICE AREA EXCEPT WHERE OTHERWISE NOTED AS OF THE DATE OF THE COMMENCEMENT OF THE LEASE OR POSSESSION BY TENANT

1.  Ceiling - Ceiling is suspended acoustical tile, 2' x 4' grid, U.S. Gypsum 345 tile, 7' 9" max-Mezzanine, 7' 11" max-Main office, 10' max - Large Meeting Rooms.

2.  Lighting - Fluorescent, parabolic, recessed fixtures to provide 50' candle ambient light at desk level in all work areas; equipment room, hallways, maintenance and service areas will be furnished with 50' candle ambient light at desk level.

3.  H.V.A.C. - Variable Air volume (VAV) System with a hot water boiler and heat coil in a mixing box, zone controlled. This system is designed to maintain between 70° F and 75° F on a year round basis. Rooftop H.V.A.C. units with main trunks for supply and return, flex duct to ceiling diffusers designed to provide twenty (20) CFM per person and one (1) ton per each 340 square feet of space leased. Air circulated shall pass through air filters with an efficient rating of a minimum 65% per ASHAE Std. 52-75.

4.  Fire Suppression System - Light hazard wet system with recessed heads 125 square feet per head coverage including main risers, main branch piping, laterals, and sprinkler heads throughout the Leased Premises.

5.  Restroom Facilities - Restrooms are constructed according to OSHA code based on BOMA standard occupancy ratios with handicap assist bars in one (1) unit, handicap basins and light switches. Walls are ceramic tile, stainless steel towel dispensers, soap dispensers, dual tissue holders, continuous mirrors over laminate tops with sinks.

6.  Doors - Pre-finished solid core birch doors with hollow metal frames are furnished in the stairwells. Each entrance has one (1) set of anodized double doors with side lights. Rear exit is two (2) 3' doors with panic hardware.

7.  Electrical - Service is 4160 volt to provide a maximum of 9 watts per net usable square foot. All electrical distribution by Tenant via under floor cellular ducts or columns. Tenant is responsible for electrical connections to Tenant's furniture systems.

8.  Handicap Provisions - Main entrance along Penn Avenue is equipped with a handicap ramp and the building is fully in compliance with the requirements of A.D.A. standard.

PLEASE
INITIAL ___ / ___

EXHIBIT___E___
PAGE___2___OF___2___

9.    Fire Towers - According to code.

10.   Conveyance Systems - One (1) 2,500 lb passenger elevator located at Atrium core.

11.   Loading Dock - The exterior dock platform can be utilized as a loading dock.

**EXHIBIT F**

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (the "Memorandum") is made this _____ day of _____, 200_, by and between THE BUNCHER COMPANY ("Landlord"), a Pennsylvania corporation having a place of business in Allegheny County, Pennsylvania and THE ART INSTITUTE ONLINE, a division of THE ART INSTITUTES INTERNATIONAL, INC., also known as EDMC Online Higher Education ("Tenant"), a Pennsylvania corporation having its principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania.

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a certain Agreement of Lease dated _____, 200_ covering property more particularly described in paragraph 5 below in this Memorandum; and

WHEREAS, Landlord and Tenant are desirous of entering into this Memorandum of Lease pursuant to the provisions of 21 P.S.§405.

NOW, THEREFORE, intending to be legally bound, Landlord and Tenant hereby set forth the following information with respect to the Lease:

1. The name of Landlord is "The Buncher Company."

2. The name of Tenant is "The Art institute Online"

3. The addresses set forth in the Agreement of Lease as addresses of the parties are:

> Landlord: The Buncher Company
> 5600 Forward Avenue
> P. O. Box #81930
> Pittsburgh, PA 15217-0930

> Tenant: The Art Institutes International, Inc.
> dba The Art Institute Online
> 210 Sixth Avenue, Suite 3300
> Pittsburgh, PA 15222-2603
> Attn: President

4. The Agreement of Lease is dated as of _____, 200_.

PLEASE

INITIAL _____

5.    The property that is the subject of the Lease is located in the 2nd Ward, City of Pittsburgh, Allegheny County, Pennsylvania and is generally outlined on Exhibit "A" attached hereto and made a part hereof.

6.    The Commencement Date of the Lease is _____, 200__.

7.    The original term of the Lease is nine (9) years and eight (8) months to expire on June 30, 2015.

8.    Under and pursuant to the terms of the Lease, Tenant has the right to extend the term of the Lease for two (2) successive additional terms of forty-eight (48) months each.

9.    This Memorandum is placed of record in order to comply with the terms of applicable Pennsylvania statutes. Nothing contained herein shall be deemed to amend, modify or change the terms of said Lease, and in the event of any conflict or inconsistency between this Memorandum and the terms of the Lease, the Lease shall govern and control.

WITNESS the due execution hereof as of the day and year first above written.

ATTEST:                                THE BUNCHER COMPANY,

By_____        By_____

Its_____        Its_____


(Corporate Seal)

ATTEST:                                THE ART INSTITUTE ONLINE

By_____        By_____

Its_____        Its_____

COMMONWEALTH OF PENNSYLVANIA    )
                               )    SS:
COUNTY OF ALLEGHENY            )

        On this _____ day of _____, 200_, before me, a Notary Public, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of The Buncher Company, a Pennsylvania corporation and that as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation as such officer.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                        _____
                             Notary Public

MY COMMISSION EXPIRES:

COMMONWEALTH OF PENNSYLVANIA    )
                               )    SS:
COUNTY OF ALLEGHENY            )

        On this _____ day of _____, 200_, before me, a Notary Public, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of The Art Institute Online, a Pennsylvania corporation and that as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation as such officer.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                        _____
                             Notary Public

MY COMMISSION EXPIRES:

## GUARANTY

For good and valuable consideration, and in order to induce The Buncher Company to enter into an Agreement of Lease dated _____(the "Lease") with The Art Institute Online, a division of The Art Institutes International, Inc., also known as EDMC Online Higher Education ("Tenant") for property located in the City of Pittsburgh, Allegheny County, Pennsylvania as further described in the Lease, Education Management Corporation ("EMC") ("Guarantor"), a Pennsylvania corporation having its principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania, the parent corporation of Tenant hereby unconditionally and irrevocably guarantees to The Buncher Company:

    (a)    The due and punctual payment in full (and not merely the collectibility) of all rent, additional rent and all other amounts due and payable by Tenant under the Lease.

Guarantor expressly agrees that Landlord may, in its sole and absolute discretion, without notice to or further consent of Guarantor and without in any way releasing, affecting, or impairing the obligations and liabilities of Guarantor hereunder:

    (a)    Waive compliance with any of the terms of the Lease;

    (b)    Grant extensions or renewals of the Lease and/or effect any release, compromise, or settlement in connection therewith.

If Tenant holds over beyond the term of the Lease, Guarantor's obligations hereunder shall extend and apply with respect to the payment of rent, additional rent or other sums due under the Lease.

This Guaranty and all of the terms hereof, shall be binding on Guarantor and the successors, and assigns of Guarantor.

WITNESS the due execution hereof intending to be legally bound, as of the date of the Lease.

ATTEST:               EDUCATION MANAGEMENT CORPORATION

_____    By: _____

                      Its: _____

PLEASE INITIAL (i) /ACH

TWELFTH AMENDMENT TO AGREEMENT OF LEASE

MADE THIS _1st_ DAY OF _December_, 2018

BY AND BETWEEN

THE BUNCHER COMPANY, as Landlord, a Pennsylvania corporation having its principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania,

AND

DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona nonprofit limited liability company, successor-in-interest to EDUCATION MANAGEMENT II LLC, a Delaware limited liability company, successor-in-interest to EDUCATION MANAGEMENT LLC and to THE ART INSTITUTE ONLINE, a division of The Art Institutes International, Inc., also known as EDMC Online Higher Education, as Tenant, a Pennsylvania corporation, and having a place of business in the City of Pittsburgh, Allegheny County, Pennsylvania.

WHEREAS, the parties hereto entered into a certain Agreement of Lease dated September 30, 2005; as amended by First Amendment to Amended and Restated Agreement of Lease dated June 14, 2006; Second Amendment to Agreement of Lease dated August 1, 2006; Third Amendment to Agreement of Lease dated May 14, 2007; Fourth Amendment to Agreement of Lease dated June 9, 2008; Fifth Amendment to Agreement of Lease dated June 30, 2008; Letter Amendment dated July 10, 2008; Sixth Amendment to Agreement of Lease dated September 30, 2008; Letter Amendment dated November 5, 2008; Seventh Amendment to Agreement of Lease dated June 1, 2009; Eighth Amendment to Agreement of Lease dated October 12, 2009; Letter Amendment dated December 8, 2009; Letter Amendment dated April 12, 2010; Ninth Amendment to Agreement of Lease dated November 1, 2010; Tenth Amendment to Agreement of Lease dated April 23, 2013; Eleventh Amendment to Agreement of Lease dated November 1, 2016; and Letter Agreement dated June 23, 2017 (hereinafter collectively called the "Lease"), covering certain property in the buildings located at 1350, 1400 and 1500 Penn Avenue, 2nd Ward, City of Pittsburgh, Allegheny County, Pennsylvania, and called therein and herein the Leased Premises;

WHEREAS, the Leased Premises has been expanded and reduced on several occasions during the term of the Lease, as extended, leaving the Leased Premises as being currently comprised of 209,740 agreed-upon rentable square feet of space, of which 100,354 square feet is located Penn Liberty Plaza II (i.e., the Existing Leased Premises) and 109,386 agreed-upon rentable square feet of space is located in Penn Liberty Plaza I (i.e., the New Building Leased Premises);

WHEREAS, the term covering the Existing Leased Premises is scheduled to expire at the end of the Restated Term (i.e., November 30, 2018);

WHEREAS, the term covering certain portions of the New Building Leased Premises is also scheduled to expire at the end of the Restated Term, while the remaining portions, referred to in the Lease as the New Building Expanded Leased Premises and the New Building Expanded Option Space, are scheduled to expire at the end of the Expanded Term (i.e., December 31, 2019);

WHEREAS, all terms defined in the Lease and used herein shall have the same meaning herein as in the Lease unless otherwise provided herein; and

WHEREAS, the parties hereto further desire to amend the Lease to (i) reduce the Leased Premises by removing therefrom approximately 38,934 square feet of agreed-upon rentable feet of space (the "Revised Reduction Space") from the Existing Leased Premises; (ii) extend the term of the Lease as it applies to the Existing Leased Premises for two (2) additional years (the "Revised New Extended Term"); (iii) establish the monthly rental for the Revised New Extended Term; and (iv) insert additional provisions in the Lease to reflect the agreement of the parties.

NOW, THEREFORE, in consideration of the premises and intending to be legally bound, the parties hereto promise, covenant and agree that the Lease be and is hereby amended as follows:

1.    LEASED PREMISES: Paragraph 1 (LEASED PREMISES) and Exhibit A-11 of the Eleventh Amendment to Agreement of Lease dated November 1, 2016, are hereby deleted in their entirety and shall no longer have any force and effect.

2.    LEASED PREMISES:

A.    Effective November 30, 2018, the Existing Leased Premises shall be reduced by the Revised Reduction Space as shown shaded in green on Exhibit A-12 attached hereto and made a part hereof, and the Revised Reduction Space shall no longer be included in or be a part of the Existing Leased Premises and commencing on December 1, 2018,  after the removal of the Revised Reduction Space, the Existing Leased Premises shall consist of 61,420 agreed-upon rentable square feet of space as shown outlined in red on Exhibit A-12.

B.    Upon the expiration of the Restated Term, being November 30, 2018, the New Building Leased Premises shall be reduced by 57,201 agreed-upon rentable square feet of space as shown shaded in blue on Exhibit A-12.  Thereafter, the New Building Leased Premises shall be comprised of those portions referred to in the Lease as the New Building Expanded Leased Premises and the New Building Expanded Option Space, and the New Building Leased Premises shall consist of 52,185 agreed-upon rentable square feet of space as shown outlined in red on Exhibit A-12.

3.    TERM: Paragraph 2 (TERM) of the Eleventh Amendment to Agreement of Lease dated November 1, 2016, is hereby deleted in its entirety and shall no longer have any force and effect.

4.     TERM:   The term of the Lease as it applies to the Existing Leased Premises only shall be extended for the Revised New Extended Term to commence immediately following the expiration of the Restated Term, i.e., December 1, 2018.  The expiration date of the term of the Lease as it applies to the Existing Leased Premises only, as extended by the Revised New Extended Term, is hereby changed from November 30, 2018, to November 30, 2020.

5.     RENTAL:   Paragraph 4 (RENTAL) of the Eleventh Amendment to Agreement of Lease dated November 1, 2016, is hereby deleted in its entirety and shall no longer have any force and effect.

6.     RENTAL:  Tenant shall pay to Landlord as rental for the Leased Premises, the following amounts at the following times:

A.     As to the Existing Leased Premises, Tenant shall pay to Landlord the following amounts at the following times:

(i) Tenant shall continue to pay to Landlord on the first (1st) day of each calendar month until and including November 1, 2018, as monthly rental for the Existing Leased Premises, the amount of $99,518.88.

(ii) Beginning on December 1, 2018, and continuing on the first (1st) day of each succeeding calendar month thereafter during the Revised New Extended Term, Tenant shall pay to Landlord as monthly rental for the Existing Leased Premises, as reduced by the Revised Reduction Space, the amount of $78,054.58.

B.     As to the New Building Leased Premises, Tenant shall pay to Landlord the following amounts at the following times:

(i) Tenant shall continue to pay to Landlord on the first (1st) day of each calendar month until and including November 1, 2018, as monthly rental for the New Building Leased Premises, the amount of $147,474.57.

(ii) Beginning December 1, 2018, and continuing on the first (1st) day of each succeeding calendar month thereafter during the balance of the Expanded Term (i.e. December 31, 2019), Tenant shall pay to Landlord as monthly rental for the New Building Leased Premises (i.e., being comprised of the New Building Expanded Leased Premises and the New Building Expanded Option Space), the amount of $70,014.88.

The monthly rental as determined above shall be payable in advance, without demand, deduction or set off. All rentals and sums due as additional rental payable hereunder shall be paid to The Buncher Company at P.O. Box 768, Pittsburgh, PA 15230-0768 or at such other place or to such other party as may be designated by Landlord in writing.

If any installment of monthly rental or additional rental becomes overdue for a period in excess of ten (10) business days, Tenant shall pay a monthly late charge in the amount of six percent (6%) of such overdue amount or amounts. In addition, such unpaid amounts shall bear interest at a monthly rate equal to one and one-half percent (1½%) accruing from the due date to the date of payment thereof. Such late charge and interest shall constitute additional rental due and payable to Landlord by Tenant. The late charge and interest charge will be in addition to, and not in lieu of, any other remedy Landlord may have under the Lease. If there are accrued and unpaid rental amounts, all payments of monthly rental and additional rental shall be applied in such order as Landlord shall determine.

7.    NEW OPTION TO RENEW:  Sub-paragraph 6.A. (NEW OPTION TO RENEW) of the Eleventh Amendment to Agreement of Lease dated November 1, 2016, is hereby deleted in its entirety and shall no longer have any force and effect.

8.    PARKING FOR THE NEW EXISTING LEASED PREMISES:  Effective November 30, 2018, paragraph 7 (PARKING FOR THE NEW EXISTING LEASED PREMISES) and Exhibit B-11 of the Eleventh Amendment to Agreement of Lease dated November 1, 2016, are hereby deleted in their entirety and shall no longer have any force and effect.

9.    PARKING FOR THE EXISTING LEASED PREMISES:    Effective December 1, 2018, parking for the Existing Leased Premises, as reduced by the Revised Reduction Space, shall be reduced to sixty-two (62) parking spaces for use by Tenant, its employees and business invitees, eleven (11) spaces of which shall be reserved and located in the area shaded in orange on Exhibit B-12 attached hereto and made a part hereof. The balance of the parking spaces (i.e., fifty-one (51) parking spaces) shall be located in the 15th and Smallman Street lot.

Landlord shall not be responsible for any injury to any person or damage to any property as a result of or in connection with the use of said parking spaces by Tenant or its employees, unless caused by the gross negligence or willful misconduct of Landlord, its agents, contractors or employees.

10.    BROKER:  Except as provided below, Landlord and Tenant each hereby warrants to the other that no real estate broker has been involved in this transaction on its behalf and that no finder's fees or real estate commissions have been earned by any third party. Tenant hereby agrees to indemnify Landlord and Landlord hereby agrees to indemnify Tenant for any liability or claims for commissions or fees, including reasonable attorneys' fees and costs, arising from a breach of this warranty by it. The

only real estate broker involved in this transaction is Colliers International whose commission or fee with respect to this transaction shall be paid by Landlord in accordance with that certain letter to Mr. Edward Lawrence dated September 20, 2018.

11.    INSURANCE:

A.    In addition to the insurance provisions and requirements set forth in section 11 (INSURANCE) of the Agreement of Lease dated September 30, 2005, Tenant shall, at its sole cost and expense, maintain automobile liability insurance on all owned, hired and non-owned motor vehicles, which shall have a minimum limit of $2,000,000 with respect to any occurrence upon, in or about the Property.

B.    Section 11 (INSURANCE) of the Agreement of Lease dated September 30, 2005, is hereby amended to provide that the deductible portion of Landlord's insurance coverage has been changed from $5,000.00 to $10,000.00.

C.    Tenant may, at its option and sole cost and expense, purchase insurance to cover its personal property, business income, business interruption, extra expense or similar coverage.  In no event shall Landlord be liable for any damage to or loss of personal property or loss of income sustained by Tenant, whether or not it is insured, even if such loss is caused by the negligence of Landlord, its employees, officers, directors, or agents.

D.    By requiring insurance herein, Landlord does not represent that coverage and limits will necessarily be adequate to protect Tenant, and such coverage and limits shall not be deemed as a limitation on Tenant's liability under the indemnities granted to Landlord in the Lease.

12.    SURRENDER:  Section 21 (SURRENDER) of the Agreement of Lease dated September 30, 2005, is hereby supplemented to include the following:

Tenant hereby waives any notice now or hereafter required by law with respect to vacating the Leased Premises at the termination of any tenancy.

TENANT HEREBY EXPRESSLY WAIVES NOTICE TO VACATE THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, ANY NOTICE PROVIDED FOR UNDER THE PENNSYLVANIA LANDLORD AND TENANT ACT OF 1951, AS AMENDED, 68 Pa. C.S.A. §250.101 et seq.) AND AGREES THAT LANDLORD SHALL BE ENTITLED TO THE BENEFIT OF ALL PROVISIONS OF LAW RESPECTING THE SUMMARY RECOVERY OF POSSESSION OF THE LEASED PREMISES FROM A TENANT HOLDING OVER TO THE SAME EXTENT AS IF STATUTORY NOTICE HAD BEEN GIVEN.

13.    CONFESSION OF JUDGMENT:  THE FOLLOWING PARAGRAPHS SET FORTH WARRANTS OR AUTHORITY FOR AN ATTORNEY TO CONFESS JUDGMENT AGAINST TENANT IN THE EVENT OF A DEFAULT BY TENANT AS

DESCRIBED BELOW. IN GRANTING THESE WARRANTS OF ATTORNEY TO CONFESS JUDGMENT AGAINST TENANT, TENANT HEREBY KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY AND ON THE ADVICE OF SEPARATE COUNSEL OF TENANT, UNCONDITIONALLY WAIVES ANY AND ALL RIGHT THAT TENANT HAS OR MAY HAVE TO PRIOR NOTICE AND OPPORTUNITY FOR A HEARING UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA. USE OF THESE WARRANTS OF ATTORNEY SHALL NOT EXHAUST THE SAME OR THE POWER TO THEREAFTER CONFESS JUDGMENTS, AS A CONTINUING REMEDY, TO BE USED AS OFTEN AS IT MAY BE REQUIRED, AND NOTWITHSTANDING ANY LAW OR RULE TO THE CONTRARY, A REPRODUCED COPY OF THIS INSTRUMENT CERTIFIED BY AN ATTORNEY OF ANY COURT OF RECORD TO BE TRUE AND CORRECT SHALL BE SUFFICIENT EVIDENCE OF THE CONTENTS HEREOF FOR THE PURPOSES HEREINAFTER SET FORTH.

FOR VALUE RECEIVED AND FORTHWITH ON EVERY DEFAULT HEREUNDER OR ON ANY AND EVERY BREACH OF COVENANT HEREIN, TENANT HEREBY EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD WITHIN THE UNITED STATES OR ELSEWHERE TO APPEAR FOR TENANT AND WITH OR WITHOUT DECLARATION FILED, CONFESS JUDGMENT OR A SERIES OF JUDGMENTS AGAINST TENANT AND IN FAVOR OF LANDLORD, ITS SUCCESSORS OR ASSIGNS, AS OF ANY TERM FOR THE FULL SUM DUE BY REASON OF ANY DEFAULT HEREUNDER, INCLUDING UNPAID RENTAL FOR THE BALANCE OF THE TERM OF THE LEASE, TOGETHER WITH COSTS OF SUIT AND REASONABLE ATTORNEYS' FEES. TENANT FURTHER AUTHORIZES THE ISSUANCE OF WRITS OF EXECUTION AS LANDLORD MAY ELECT UPON ANY SUCH JUDGMENT OR JUDGMENTS, WITH RELEASE OF ALL ERRORS AND WITHOUT STAY OF EXECUTION AND INQUISITION, AND EXTENSION UPON ANY LEVY OF REAL ESTATE IS HEREBY WAIVED AND CONDEMNATION AGREED TO AND THE EXEMPTION OF ANY AND ALL PROPERTY FROM LEVY OR SALE BY VIRTUE OF ANY LAW NOW IN FORCE OR HEREINAFTER ENACTED IS ALSO EXPRESSLY WAIVED.

FOR THE PURPOSE OF OBTAINING POSSESSION OF THE LEASED PREMISES IN THE EVENT OF THE FAILURE OF TENANT TO VACATE THE LEASED PREMISES ON OR BEFORE THE EXPIRATION OF THE TERM OF THE LEASE, AS MAY BE EXTENDED, OR PRIOR TO THE EXPIRATION OF THE TERM OF THE LEASE IN THE EVENT OF DEFAULT, TENANT HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD WITHIN THE UNITED STATES OR ELSEWHERE, TO APPEAR FOR TENANT AND ALL PERSONS CLAIMING UNDER OR THROUGH TENANT, TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN AMICABLE ACTION IN EJECTMENT FOR POSSESSION OF THE LEASED PREMISES, AND/OR TO APPEAR FOR AND CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, AGAINST TENANT, AND AGAINST ALL PERSONS CLAIMING UNDER OR THROUGH TENANT IN FAVOR OF LANDLORD, FOR RECOVERY BY LANDLORD OF POSSESSION THEREOF,

TOGETHER WITH COSTS OF SUIT AND REASONABLE ATTORNEYS' FEES, FOR WHICH THE LEASE, OR A COPY THEREOF VERIFIED BY AFFIDAVIT, SHALL BE A SUFFICIENT WARRANT; AND THEREUPON A WRIT OF POSSESSION MAY IMMEDIATELY ISSUE FOR POSSESSION OF THE LEASED PREMISES, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER AND WITHOUT ANY STAY OF EXECUTION.

Sign Here:
DREAM CENTER EDUCATION HOLDINGS, LLC

By: _____
Name: _____CHAD_VCARRETT_____
Title: _____CEO_____

14.  NOTICES: Section 30 (NOTICES) of the Agreement of Lease dated September 30, 2005, is hereby deleted in its entirety and shall no longer have any force and effect.

15.  NOTICES: All notices, demands and requests which may be or are required to be given under the Lease shall be given in writing and shall be deemed to have been duly given as of the date sent (a) if mailed by postage prepaid, first class, United States registered or certified mail, return receipt requested, or (b) if deposited with receipt with Federal Express or other nationally recognized overnight courier. All notices, demands, and requests shall be sent to each of the parties at the following addresses, or to such other addresses as either party hereto may for itself designate in writing from time to time for the purpose of receiving notices hereunder:

LANDLORD:                          TENANT:

RENTAL PAYMENTS:                   INVOICES AND CORRESPONDENCE:
THE BUNCHER COMPANY                SHARED SERVICES - PITTSBURGH
P.O. Box 768                       1400 Penn Avenue
Pittsburgh, PA 15230-0768          Pittsburgh, PA 15222
                                   Attn: President

CORRESPONDENCE:                    COPY TO:
THE BUNCHER COMPANY                DREAM CENTER EDUCATION HOLDINGS, LLC
Penn Liberty Plaza I               615 McMichael Road
1300 Penn Avenue, Suite 300        Pittsburgh, PA 15205
Pittsburgh, PA 15222-4211          Attn: CFO

16.  LANDLORD'S EXCULPATORY: Anything contained in the Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and interests of the Landlord in the Leased Premises for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and

conditions of the Lease to be observed and/or performed by Landlord, and no other property or assets of Landlord or its stockholders, directors, officers, employees, or partners or their respective heirs, legal representatives, successors and assigns shall become subject to levy, execution, attachment or other enforcement procedures for the satisfaction of Tenant's remedies. The covenants, obligations and conditions on the part of Landlord under the Lease shall not be covenants, obligations and conditions of the partners comprising Landlord individually. Only the Leased Premises shall be subject to any liability of Landlord hereunder. No partner, whether individual, corporate, trust or partnership, and no stockholder, director, officer, or employee of Landlord shall be individually liable for breach of any covenant, obligation or condition of Landlord and no recourse shall be had against any assets of any of the foregoing persons or entities or payment of any sums due or enforcement of any other relief based upon any claim made under the Lease for breach of any of Landlord's covenants, obligations, or conditions, and Tenant does expressly release each such person and entity from any personal liability under the Lease. If the Leased Premises is transferred or conveyed, Landlord, its stockholders, directors, officers, employees or partners or their respective heirs, legal representatives, successors and assigns shall be relieved of all covenants and obligations under the Lease thereafter accruing and Tenant shall look to such transferee thereafter.

17. ANTI-TERRORISM DISCLOSURE:

A. Tenant certifies that to the best of Tenant's knowledge and belief:

(i). Tenant is not in violation of any Anti-Terrorism Law, as defined herein;

(ii). Tenant is not, as of the date hereof:

(a). conducting any business or engaging in any transaction or dealing with any Prohibited Person, as defined herein, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, as defined herein;

(b). dealing in or otherwise engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of any Prohibited Person;

(iii). Tenant is not engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of

evading or avoiding, or attempts to violate any of the prohibitions set forth in any Anti-Terrorism Law; and

(iv). neither Tenant nor any of its officers, directors, shareholders or members, as applicable, is a Prohibited Person.

B.    Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorneys' fees and costs) arising from or related to any breach of the foregoing certification.

C.    If at any time any of these representations becomes false, then it shall be considered a material default under the Lease.

As used herein, "Anti-Terrorism Law" is defined as any law relating to terrorism, anti-terrorism, money-laundering or anti-money laundering activities, including without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1985, Executive Order No. 13224, and Title 3 of the USA Patriot Act, as extended by the USA Freedom Act, and any regulations promulgated under any of them.  As used herein "Executive Order No. 13224" is defined as Executive Order No. 13224 on Terrorist Financing effective September 24, 2001, and relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism", as may be amended from time to time. "Prohibited Person" is defined as (i) a person or entity that is listed in the Annex to Executive Order No. 13224, or a person or entity owned or controlled by an entity that is listed in the Annex to Executive Order No. 13224; (ii) a person or entity with whom Landlord is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; or (iii) a person or entity that is named as a "specially designated nation and blocked person" on the most current list published by the U.S. Treasury Department  Office  of  Foreign  Assets  Control  at  its  official  website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other official publication of such list.  "USA Patriot Act" is defined as the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56), as may be amended from time to time.

18.    AUTHORIZATION:  Tenant and Landlord each hereby represent and warrant that it has full authority to enter into, deliver, and perform its obligations hereunder; that the individual executing this Twelfth Amendment to Agreement of Lease on behalf of such party has full authority to legally bind such party; that nothing herein conflicts with either of the party's governing documents or any of its commitments or obligations; and that no consent or approval of any third party is required to perform its obligations hereunder.

19. MISCELLANEOUS:

A. At the time of execution of this Twelfth Amendment to Agreement of Lease, to their best knowledge and belief, neither Landlord nor Tenant has any claims or demands against the other and there are no offsets or defenses to the terms and conditions of the Lease.

B. The Lease and this Twelfth Amendment to Agreement of Lease shall be construed as one document and all the terms and conditions of this Twelfth Amendment to Agreement of Lease shall be incorporated by reference in the Lease.

C. Subject to the provisions of sub-section 54.C. (MISCELLANEOUS) of the Agreement of Lease dated September 30, 2005, if requested by Tenant, Landlord shall promptly join in a memorandum prepared by Tenant (and reasonably acceptable to both parties) evidencing Tenant's rights under the Lease, as modified herein.

D. Landlord hereby confirms its representation set forth in section 35 (NON-DISTURBANCE) of the Agreement of Lease dated September 30, 2005, with respect to no existing mortgages or other encumbrances.

20. NO OTHER MODIFICATIONS: Except as amended and supplemented hereby, all terms and conditions of the Lease shall remain in full force and effect, and are hereby ratified by Landlord and Tenant.

[SIGNATURES FOLLOW ON THE NEXT PAGE]

IN WITNESS WHEREOF the parties hereto intending to be legally bound have hereunto set their hands and seals the day and year first above written.

ATTEST:

By: _Joseph M Jackovic_
Joseph M. Jackovic
Executive Vice President and
General Counsel

(Corporate Seal)

THE BUNCHER COMPANY

By: _Balestrieri_
Thomas J. Balestrieri
President/CEO

WITNESS:

By: _Robert Constantino_
Name: Robert Constantino
Title: V.P. Controller

DREAM CENTER EDUCATION HOLDINGS, LLC, Successor-in-interest to EDUCATION MANAGEMENT II LLC, Successor-in-interest to EDUCATION MANAGEMENT LLC and to THE ART INSTITUTE ONLINE, a division of The Art Institutes International, Inc., also known as EDMC Online Higher Education

By: _____
Name: CHAD GARRETT
Title: CFO



SECOND FLOOR PLAN

FIRST FLOOR PLAN

INITIALS

LANDLORD: _____

TENANT: _____

Buncher

LOCATION: PENN LIBERTY PLAZA 2
1400-1600 PENN AVENUE
2nd YARD, PITTSBURGH PA

PROPOSED FIRST AND SECOND FLOOR PLANS

| SCALE | DRAWN | CHKD. | DRAWING NUMBER | REV. |
|-------|-------|-------|----------------|------|
| 1" = 16' | KB | | PLP.EXK-ED.HC-48 | |
| DATES | 10/15/15 | | | |

| REV. | DESCRIPTION | MADE | CHKD. |
|------|-------------|------|-------|
| A | | | |
| B | | | |
| C | | | |
| D | | | |

EXHIBIT: A-12

PAGE: 1 OF 2



SECOND FLOOR PLAN

FIRST FLOOR PLAN

Buncher

LOCATION: PENN LIBERTY PLAZA 1
PENN AVENUE BTWN 13TH & 14TH STREETS
PITTSBURGH, PENNSYLVANIA

FIRST & SECOND FLOOR PLANS
PROPOSED COHC TENANT SPACE

| SCALE | DRAWN/ CHKD. | DRAWING NUMBER | REV. |
|---|---|---|---|
| 1"=40' | MO | PLP1EX12-A-1 | |
| | DATES | (EDMG) | |

| REV. | DESCRIPTION | MADE | CHKD. |
|---|---|---|---|
| D | | | |
| C | | | |
| B | | | |
| A | | | |

EXHIBIT: __A-12__

PAGE: __2__ OF __2__

CONSTRUCTION NORTH

14th Street
60' R/O/W

FIRE CONNECTION

Liberty Avenue

2' PLANTING STRIP

Penn Avenue

FIRE CONNECTION

FIRE WALK

PROPERTY LINE

48' R/O/W

16th Street

16th Street

60' R/O/W

SITE PLAN

EXHIBIT: B-12

PAGE: 1 OF 1

PLEASE INITIAL

Buncher

Penn Liberty Plaza 2
1600-1605 Penn Avenue
2nd Ward, Pittsburgh PA

LOCATION:

REV. | DESCRIPTION | MADE | CHKD.

SITE PLAN SHOWING RESERVED PARKING

TENANT DWG

SCALE | DRAWN | CHKD. | DRAWING NUMBER | REV.

PLP12EX-C-6 | A

DATE:

SITE PLAN SHOWING RESERVED PARKING — TENANT DWG

\\A\DRAWING FILES\Strip District\Penn Liberty Plaza 2\First Floor Overall Building\Buncher\Site\Exhibits\2018 EDM\C\PLP2EX-C-6 Rev A.dwg, PLP12EX-C-6, 12/5/2018 8:12:16 AM

# ACKNOWLEDGMENT

COUNTY OF ALLEGHENY          )
                            )     ss:
COMMONWEALTH OF PENNSYLVANIA )

On this _30TH_ day of _NOVEMBER_, 2018, before me, a Notary Public, personally appeared _CHAD GARRETT_, who acknowledged [himself/herself] to be the _CFO_ of DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona nonprofit limited liability company, and that [he/she] as such _CFO_ being authorized to do so, executed the foregoing Twelfth Amendment to Agreement of Lease, including, but not limited to, paragraph 13 (CONFESSION OF JUDGMENT) for the purposes therein contained by signing in the name of corporation by [himself/herself] as _CFO_.

WITNESS my hand and official seal the day and year aforesaid.

_Robert M. Kennedy_
Notary Public

My Commission Expires: _11-14-2021_

Commonwealth of Pennsylvania - Notary Seal
Robert M. Kennedy, Notary Public
Allegheny County
My commission expires November 14, 2021
Commission number 1280308
Member, Pennsylvania Association of Notaries

{B0009074.7}

## Exhibit C

## Statement of Account



# STATEMENT

**The Buncher Company**
P O BOX 768
PITTSBURGH PA   15230-0768

Amount Paid: _____

(412) 422-9900

DREAM CENTER EDUCATION HOLDINGS LLC

Payment Terms:  NET UPON RECEIPT

| Document No. | Date | Code | Description | Amount | Balance |
|---|---|---|---|---|---|
| 10000870000000000054 | 12/1/2018 | SLS | DECEMBER 2018 RENT | $70,014.88 | $70,014.88 |
| 10000870000000000055 | 1/1/2019 | SLS | JANUARY 2019 RENT | $70,014.88 | $140,029.76 |
| 10000870000000000056 | 2/1/2019 | SLS | FEBRUARY 2019 RENT | $70,014.88 | $210,044.64 |

Amount Due:     $210,044.64

| Current | 31 - 45 Days | 46 - 60 Days | 61 and Over |
|---|---|---|---|
| $140,029.76 | $0.00 | $0.00 | $70,014.88 |

Codes:
| | | | | | | |
|---|---|---|---|---|---|---|
| SLS | = Sales / Invoices | FIN | = Finance Charges | CR | = Credit Memos |
| SCH | = Scheduled Payments | SVC | = Service / Repairs | RTN | = Returns |
| DR | = Debit Memos | WRN | = Warranties | PMT | = Payments |



# STATEMENT

**The Buncher Company**
P O BOX 768
PITTSBURGH PA   15230-0768

(412) 422-9900

DREAM CENTER EDUCATION HOLDINGS LLC

Amount Paid: _____

Payment Terms:  NET UPON RECEIPT

| Document No. | Date | Code | Description | Amount | Balance |
|---|---|---|---|---|---|
| 10000880000000000054 | 12/1/2018 | SLS | DECEMBER 2018 RENT | $78,054.58 | $78,054.58 |
| 10000880000000000055 | 1/1/2019 | SLS | JANUARY 2019 RENT | $78,054.58 | $156,109.16 |
| 10000880000000000056 | 2/1/2019 | SLS | FEBRUARY 2019 RENT | $78,054.58 | $234,163.74 |

Amount Due:        $234,163.74

| Current | 31 - 45 Days | 46 - 60 Days | 61 and Over |
|---|---|---|---|
| $156,109.16 | $0.00 | $0.00 | $78,054.58 |

Codes:
| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SLS | = | Sales / Invoices | FIN | = | Finance Charges | CR | = Credit Memos |
| SCH | = | Scheduled Payments | SVC | = | Service / Repairs | RTN | = Returns |
| DR | = | Debit Memos | WRN | = | Warranties | PMT | = Payments |



# STATEMENT

**The Buncher Company**
P O BOX 768
PITTSBURGH PA   15230-0768

(412) 422-9900

Amount Paid: _____

DREAM CENTER EDUCATION HOLDINGS LLC
ATTN: LEASE ADMIN-1501-A
1400 PENN AVENUE
PITTSBURGH PA   15222

Payment Terms:  NET UPON RECEIPT

| Document No. | Date | Code | Description | Amount | Balance |
|---|---|---|---|---|---|
| 263586 | 11/19/2018 | SLS | BE#2291-18 ADDT'L HVAC OCT 18 | $4,200.00 | $4,200.00 |
| 263741 | 12/6/2018 | SLS | BE#2294-18 ADDT'L HVAC NOV 18 | $3,640.00 | $7,840.00 |
| 263999 | 12/27/2018 | SLS | BE#2312-18 ADDT'L HVAC DEC 18 | $2,135.00 | $9,975.00 |
| 264407 | 2/1/2019 | SLS | 2019 CITY/SCHOOL RE TAXES | $460.21 | $10,435.21 |

Amount Due:      $10,435.21

| Current | 31 - 45 Days | 46 - 60 Days | 61 and Over |
|---|---|---|---|
| $460.21 | $2,135.00 | $3,640.00 | $4,200.00 |

Codes:
| SLS | = | Sales / Invoices | FIN | = | Finance Charges | CR | = | Credit Memos |
|---|---|---|---|---|---|---|---|---|
| SCH | = | Scheduled Payments | SVC | = | Service / Repairs | RTN | = | Returns |
| DR | = | Debit Memos | WRN | = | Warranties | PMT | = | Payments |



# S T A T E M E N T

**The Buncher Company**
P O BOX 768
PITTSBURGH PA   15230-0768

Amount Paid: _____

(412) 422-9900

DREAM CENTER EDUCATION HOLDINGS LLC

ATTN: LEASE ADMIN-1501-A
1400 PENN AVENUE
PITTSBURGH PA   15222

Payment Terms:  NET UPON RECEIPT

| Document No. | Date | Code | Description | Amount | Balance |
|---|---|---|---|---|---|
| 263587 | 11/19/2018 | SLS | BE#2292-18 ADDT'L HVAC OCT 18 | $4,200.00 | $4,200.00 |
| 263742 | 12/6/2018 | SLS | BE#2295-18 ADDT'L HVAC NOV 18 | $3,640.00 | $7,840.00 |
| 264000 | 12/27/2018 | SLS | BE#2313-18 ADDT'L HVAC DEC 18 | $2,135.00 | $9,975.00 |
| 264401 | 1/31/2019 | SLS | OP EXP 11/1/17-10/31/18 | $117,861.00 | $127,836.00 |
| 264408 | 2/1/2019 | SLS | 2019 CITY/SCHOOL RE TAXES | $877.64 | $128,713.64 |

Amount Due:          $128,713.64

| Current | 31 - 45 Days | 46 - 60 Days | 61 and Over |
|---|---|---|---|
| $118,738.64 | $2,135.00 | $3,640.00 | $4,200.00 |

| Codes: | SLS | = | Sales / Invoices | | FIN | = | Finance Charges | | CR | = | Credit Memos |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SCH | = | Scheduled Payments | | SVC | = | Service / Repairs | | RTN | = | Returns |
| | DR | = | Debit Memos | | WRH | = | Warranties | | PMT | = | Payments |



# STATEMENT

**The Buncher Company**
P O BOX 768
PITTSBURGH PA   15230-0768

(412) 422-9900

Amount Paid: _____

DREAM CENTER EDUCATION HOLDINGS LLC

ATTN: LEASE ADMIN-1501-A
1400 PENN AVENUE
PITTSBURGH PA   15222

Payment Terms:  NET UPON RECEIPT

| Document No. | Date | Code | Description | Amount | Balance |
|---|---|---|---|---|---|
| 263383 | 10/30/2018 | SLS | OPERATING EXP 8/1/17-7/31/18 | $25,289.00 | $25,289.00 |

Amount Due:        $25,289.00

| Current | 31 - 45 Days | 46 - 60 Days | 61 and Over |
|---|---|---|---|
| $0.00 | $0.00 | $0.00 | $25,289.00 |

Codes:
| | | | | | | |
|---|---|---|---|---|---|---|
| SLS | = | Sales / Invoices | FIN | = Finance Charges | CR | = Credit Memos |
| SCH | = | Scheduled Payments | SVC | = Service / Repairs | RTN | = Returns |
| DR | = | Debit Memos | WRN | = Warranties | PMT | = Payments |



# STATEMENT

Page: 1/1
Date: 2/1/2019
Account: DREAMPLPI

**The Buncher Company**
P O BOX 768
PITTSBURGH PA   15230-0768

Amount Paid: _____

(412) 422-9900

DREAM CENTER EDUCATION HOLDINGS LLC

Payment Terms:  NET UPON RECEIPT

ATTN-LEASE ADMIN-1501-A
1400 PENN AVENUE
PITTSBURGH PA   15222

| Document No. | Date | Code | Description | Amount | Balance |
|---|---|---|---|---|---|
| 263384 | 10/30/2018 | SLS | LIEBERT ELEC 9/11/18-10/10/18 | $1,194.08 | $1,194.08 |
| 263534 | 11/8/2018 | SLS | LIEBERT ELEC 10/4/18-10/31/18 | $173.39 | $1,367.47 |
| 263588 | 11/19/2018 | SLS | LIEBERT ELEC 10/10/18-11/11/18 | $959.94 | $2,327.41 |
| 263894 | 12/17/2018 | SLS | LIEBERT ELEC 10/31/18-12/2/18 | $131.14 | $2,458.55 |
| 264159 | 1/14/2019 | SLS | LIEBERT ELEC12/2/18-1/2/19 | $79.01 | $2,537.56 |
| 264251 | 1/18/2019 | SLS | LIEBERT ELEC 11/11/18-12/10/18 | $903.78 | $3,441.34 |
| 264252 | 1/18/2019 | SLS | LIEBERT ELEC 12/10/18-1/9/19 | $1,003.86 | $4,445.20 |
| 264405 | 2/1/2019 | SLS | 2019 CITY/SCHOOL RE TAXES | $9,712.01 | $14,157.21 |
| 264406 | 2/1/2019 | SLS | 2019 CITY/SCHOOL RE TAXES | $8,304.28 | $22,461.49 |

Amount Due:     $22,461.49

| Current | 31 - 45 Days | 46 - 60 Days | 61 and Over |
|---|---|---|---|
| $20,002.94 | $131.14 | $0.00 | $2,327.41 |

Codes:  SLS = Sales / Invoices     FIN = Finance Charges    CR = Credit Memos
        SCH = Scheduled Payments   SVC = Service / Repairs   RTN = Returns
        DR = Debit Memos           WRN = Warranties          PMT = Payments