**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**THE ENTITIES LISTED ON SCHEDULE A HERETO**
**("Sellers");**

**THE ENTITIES LISTED ON SCHEDULE B HERETO**
**("Buyers");**

**DREAM CENTER FOUNDATION**
**("Buyers' Representative");**

**and**

**EDUCATION MANAGEMENT II LLC**
**("Sellers' Representative")**

**Dated as of February 24, 2017**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS; RULES OF CONSTRUCTION** .................................................................1

1.1.  DEFINITIONS ............................................................................................................1
1.2.  RULES OF CONSTRUCTION ........................................................................................11

**ARTICLE II PURCHASE AND SALE OF PURCHASED ASSETS** ..................................................12

2.1.  PURCHASE AND SALE OF PURCHASED ASSETS ...........................................................12
2.2.  EXCLUDED ASSETS ...................................................................................................13
2.3.  LIABILITIES ..............................................................................................................14
2.4.  NON-ASSIGNABLE ASSETS .......................................................................................14

**ARTICLE III CLOSING; PURCHASE PRICE; POST-CLOSING ADJUSTMENTS** ........................15

3.1.  CLOSING ..................................................................................................................15
3.2.  CLOSING DELIVERIES AND ACTIONS ........................................................................15
3.3.  PAYMENT OF PURCHASE PRICE ................................................................................17
3.4.  PURCHASE PRICE ADJUSTMENTS ..............................................................................17
3.5.  ALLOCATION OF PURCHASE PRICE ...........................................................................19

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ...............................19

4.1.   ORGANIZATION AND GOOD STANDING .....................................................................19
4.2.   AUTHORITY .............................................................................................................19
4.3.   NO CONFLICTS; CONSENTS ......................................................................................20
4.4.   FINANCIAL STATEMENTS; ABSENCE OF UNDISCLOSED LIABILITIES ..........................20
4.5.   ABSENCE OF CHANGES .............................................................................................21
4.6.   MATERIAL CONTRACTS ............................................................................................21
4.7.   PURCHASED ASSETS .................................................................................................22
4.8.   REAL PROPERTY ......................................................................................................22
4.9.   INTELLECTUAL PROPERTY ........................................................................................23
4.10.  CURRICULUM ...........................................................................................................24
4.11.  LITIGATION ..............................................................................................................24
4.12.  COMPLIANCE WITH LAWS; GOVERNMENTAL APPROVALS ..........................................24
4.13.  EDUCATIONAL AGENCY COMPLIANCE ......................................................................25
4.14.  ENVIRONMENTAL MATTERS .....................................................................................28
4.15.  EMPLOYEE MATTERS ...............................................................................................28
4.16.  EMPLOYEE BENEFIT MATTERS .................................................................................29
4.17.  TAXES .....................................................................................................................30
4.18.  BROKERS .................................................................................................................30
4.19.  DISCLAIMER .............................................................................................................30

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER** ........................................................**31**

5.1.   ORGANIZATION AND GOOD STANDING ........................................................31
5.2.   AUTHORITY ........................................................................................31
5.3.   NO CONFLICTS; CONSENTS. ...................................................................32
5.4.   LITIGATION .......................................................................................32
5.5.   COMPLIANCE WITH EDUCATIONAL LAW MATTERS. ....................................32
5.6.   AVAILABILITY OF FUNDS; FINANCING .......................................................32
5.7.   SOLVENCY .......................................................................................33
5.8.   INDEPENDENT INVESTIGATION ...............................................................33
5.9.   BROKERS .........................................................................................33

**ARTICLE VI COVENANTS**.................................................................................**34**

6.1.    CONDUCT OF BUSINESS .......................................................................34
6.2.    REGULATORY AND OTHER APPROVALS ....................................................35
6.3.    ACCESS AND INFORMATION. .................................................................37
6.4.    CONFIDENTIALITY; PUBLICITY................................................................38
6.5.    BULK TRANSFER LAWS ........................................................................39
6.9.    TAX MATTERS...................................................................................43
6.10.   CONSENT; ASSIGNMENT OF AGREEMENTS................................................44
6.11.   DELIVERY OF INTERIM FINANCIAL STATEMENTS; ENROLLMENT AND ADMISSIONS STAFFING REPORTS............44
6.12.   POST-CLOSING DELIVERIES ...................................................................44
6.13.   FURTHER ASSURANCES ........................................................................44
6.14.   EXPENSES.........................................................................................44
6.15.   NO AFFILIATION; AMENDMENT OF SELLER NAMES.......................................45
6.16.   CONTACT WITH PERSONS REGARDING THE BUSINESS ...................................45
6.17.   CONSENT JUDGMENT COMPLIANCE ........................................................45
6.18.   LEASE OBLIGATIONS ...........................................................................45
6.19.   SURETY BONDS .................................................................................45
6.20.   RESTRUCTURING ................................................................................46
6.21.   TEXAS WORKFORCE COMMISSION PROVISIONS ..........................................46
6.22.   DCF AS BUYER; RESTRICTIONS ON DISTRIBUTIONS ......................................46
6.23.   FINANCING........................................................................................46
6.24.   EDMC SHAREHOLDER APPROVAL; BOARD OF TRUSTEES APPROVAL...................47
6.25.   THE ART INSTITUTE OF PHOENIX AND THE ART INSTITUTE OF FORT LAUDERDALE.....................48

**ARTICLE VII CONDITIONS PRECEDENT** .............................................................**48**

7.1.   CONDITIONS TO OBLIGATIONS OF EACH PARTY ..........................................48
7.2.   CONDITIONS TO OBLIGATIONS OF BUYERS ................................................48
7.3.   CONDITIONS TO OBLIGATIONS OF THE SELLERS...........................................49
7.4.   FRUSTRATION OF CLOSING CONDITIONS ...................................................49

US.109218815.18

**ARTICLE  VIII TERMINATION** ...............................................................................................50

8.1.    TERMINATION.................................................................................................................50
8.2.    EFFECT OF TERMINATION................................................................................................51
8.3.    TERMINATION FEE. .........................................................................................................51

**ARTICLE  IX INDEMNIFICATION** ...........................................................................................51

9.1.    INDEMNIFICATION BY THE SELLERS .................................................................................51
9.2.    INDEMNIFICATION BY BUYERS.........................................................................................52
9.3.    LIMITATIONS ..................................................................................................................52
9.4.    CERTAIN SURVIVAL PERIODS..........................................................................................54
9.5.    INDEMNIFICATION CLAIMS ..............................................................................................54
9.6.    THIRD-PARTY CLAIMS ....................................................................................................54
9.7.    ADJUSTMENT TO PURCHASE PRICE ..................................................................................55

**ARTICLE  X MISCELLANEOUS** ..............................................................................................55

10.1.    SEVERABILITY................................................................................................................55
10.2.    NOTICES .......................................................................................................................55
10.3.    ENTIRE AGREEMENT ......................................................................................................56
10.4.    COUNTERPARTS .............................................................................................................56
10.5.    SPECIFIC PERFORMANCE .................................................................................................56
10.6.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE; WAIVER OF JURY TRIAL. ...........57
10.7.    COSTS AND ATTORNEYS' FEES ........................................................................................58
10.8.    BINDING EFFECT ............................................................................................................58
10.9.    ASSIGNMENT .................................................................................................................58
10.10.    NO THIRD PARTY BENEFICIARIES.....................................................................................58
10.11.    AMENDMENT AND MODIFICATION; WAIVER .....................................................................58
10.12.    DISCLOSURE SCHEDULE..................................................................................................59
10.13.    SELLERS' REPRESENTATIVE.............................................................................................59
10.14.    BUYERS' REPRESENTATIVE..............................................................................................59

US.109218815.18

## <u>LIST OF SCHEDULES AND EXHIBITS</u>

Schedule A             Sellers
Schedule B             Buyers
Schedule C             Schools
Schedule 1.1(a)        Real Property Leases
Schedule 1.1(b)        Assumed Oral Contracts
Schedule 1.1(c)        Employment Agreements
Schedule 1.1(d)        Permitted Liens
Schedule 2.1(g)        Transferred Intellectual Property
Schedule 2.2(e)        Excluded Contracts
Schedule 2.2(g)        Excluded Intellectual Property
Schedule 2.2(k)        Specific Excluded Assets
Schedule 2.3(a)        Specific Assumed Liabilities
Schedule 3.4           Net Working Capital Statement
Disclosure Schedules
Schedule 5.3(b)        Buyer Governmental Approvals and Consents
Schedule 6.1           Pre-Closing Conduct of Business
Schedule 6.3           Pre-Closing Access Personnel
Schedule 6.16          Contact Persons
Schedule 6.18          Lease Obligations
Schedule 6.19          Surety Bonds
Schedule 7.1(e)        Required Consents
Schedule 7.1(f)        Additional Locations

Exhibit A              Form of Assignment and Assumption of Lease
Exhibit B              Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit C              Form of Intellectual Property Assignment Agreement
Exhibit D              Form of Employment Assignment Agreement
Exhibit E              Form of Transition Services Agreement
Exhibit F              Form of Curriculum License
Exhibit G              Form of Trademark Assignment
Exhibit H              Form of Trademark License

US.109218815.18

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This Amended and Restated Asset Purchase Agreement (this "Agreement") is made and entered into as of February 24, 2017 (the "Effective Date"), by and among (i) the entities listed on Schedule A (each, a "Seller" and collectively, the "Sellers"), (ii) each of the entities listed on Schedule B (each, a "Buyer" and collectively, the "Buyers"), (iii) Dream Center Foundation, a California nonprofit corporation ("DCF" or the Buyers' Representative"), and (iv) Education Management II LLC, a limited liability company organized under the laws of Delaware, in its capacity as the sellers' representative (the "Sellers' Representative").  The Sellers, Buyers, Buyers' Representative and the Sellers' Representative are each sometimes referred to herein as a "Party."  Capitalized terms used herein without definition have the meanings assigned in Article I.

### Recitals

A.      The Sellers are engaged in the business of operating the post-secondary educational institutions known as South University and Argosy University, as well as the post-secondary educational system known as The Art Institutes, at the locations set forth on Schedule C (collectively, the "Education Business").  The campuses of South University, Argosy University and The Art Institutes set forth on Schedule C may be referred to herein as, collectively, the "Schools" and, individually, as a "School."

B.      The Sellers, Buyers, Sellers' Representative and Buyers' Representative entered into that certain Asset Purchase Agreement, dated as of January 18, 2017 (the "Original Agreement" and the date of the Original Agreement, the "Original Effective Date"), for the sale, assignment, transfer, purchase and acceptance of the Purchased Assets, on the terms and subject to the conditions set forth in the Original Agreement.

C.      The Parties now desire to amend and restate the Original Agreement in its entirety to reflect certain changes to the Transactions as reflected herein.

D.      Pursuant to Section 10.11 of the Original Agreement, the Original Agreement may be amended by an instrument in writing signed by each of the Parties.

E.      The Sellers desire to sell, assign and transfer to Buyers, and Buyers desire to purchase and accept from the Sellers, substantially all of the assets used by the Sellers in the Business, on the terms and subject to the conditions of this Agreement, which amends, restates and supersedes the Original Agreement in its entirety such that the Original Agreement shall no longer be of any force or effect.

### Agreement

In consideration of the respective representations, warranties, covenants and agreements in this Agreement, the parties hereby agree as follows:

### ARTICLE  I
### DEFINITIONS; RULES OF CONSTRUCTION

1.1.      Definitions.

(a)      *Defined Terms*.  For purposes of this Agreement, the following terms shall have the following meanings:

"Accrediting Body" means any non-governmental entity, including institutional and specialized accrediting agencies, which engages in the granting or withholding of accreditation of postsecondary educational institutions or programs, in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions and schools, including ACICS, NWCCU, MSCHE, HLC, WASC and SACSCOC.

"ACICS" means the Accrediting Council for Independent Colleges and Schools.

"Affiliate" means, for any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such first Person, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise; provided that, for the avoidance of doubt, with respect to Sellers and the Sellers' Representative, Affiliates shall only include EDMC and its direct and indirect subsidiaries.

"Ancillary Agreements" means (i) the Assignments and Assumptions of Lease; (ii) the Bill of Sale, Assignment and Assumption Agreement; (iii) the Intellectual Property Assignment Agreement; (iv) the Employment Assignment Agreements; (v) the Transition Services Agreement; (vi) the Curriculum License Agreement; (vii) the Trademark Assignment; (viii) the Trademark License; and (ix) the other documents and instruments described in Section 3.2.

"Assignment and Assumption of Lease" means an assignment and assumption of lease, by and among the applicable Buyer and the applicable Sellers, dated as of the Closing Date, substantially in the form attached hereto as Exhibit A.

"Assumed Contracts" means all Real Property Leases set forth on Schedule 1.1(a) and all written Contracts relating to or used in the Business other than the Excluded Contracts set forth on Schedule 2.2(e) and all oral Contracts set forth on Schedule 1.1(b).

"Benefit Plan" means an "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other employee benefit plan, program, agreement or arrangement of any kind, whether written or oral, including any: stock option or ownership plan; stock appreciation rights plan; stock purchase plan; phantom stock plan; executive compensation plan; or arrangement regarding any vacation, holiday, sick leave, fringe benefit, welfare, educational assistance, pre-Tax premium or flexible spending account plan or life insurance.

"Bill of Sale, Assignment and Assumption Agreement" means the bill of sale, assignment and assumption agreement, by and among the Buyers and the Sellers, dated as of the Closing Date, substantially in the form attached hereto as Exhibit B.

"Books and Records" means books, records, files, documentation, manuals and other materials or similar information, including financial and accounting records; sales literature and promotional materials; price lists; student, prospective student and service provider lists; referral sources; and purchasing materials and records.

"Business" means the Education Business and the business of providing support services, including information technology, intellectual property and administrative services, to the Education Business and certain other post-secondary educational institutions owned by Sellers or their Affiliates.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

US.109218815.18

"Closing Net Working Capital" means Net Working Capital as of the Effective Time, calculated in accordance with the Net Working Capital Statement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Compliance Date" means July 1, 2014.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of October 17, 2016, by and between EDMC and DCF.

"Consent" means any consent, waiver, approval, permit, license, approval or authorization of, or registration, declaration or filing with, or notification to any Governmental Authority, Educational Agency or other Person.

"Consent Judgment" means the consent judgment that Sellers have negotiated and entered into with the Attorneys General of 39 states and the District of Columbia.

"Contract" means any written or oral agreement, lease, license, contract, note, mortgage, indenture or other obligation, commitment or instrument that is legally binding, including all amendments thereto.

"Curriculum License" means the curriculum license, by and among Buyers and the Sellers, dated as of the Closing Date, substantially in the form attached hereto as Exhibit F.

"Deferred Payments" means (i) the payment of $5 million *plus* (A) 50% of the amount of Pre-Signing Deal Expenses, *plus* (B) 50% of the amount of Post-Signing Deal Expenses paid by Sellers to Buyers to be paid on or prior to the Closing Date, to be paid on the six-month anniversary of the Closing Date and (ii) the payment of an amount equal to $5 million, *plus* (A) 50% of the amount of Pre-Signing Deal Expenses, *plus* (B) 50% of the amount of Post-Signing Deal Expenses paid by Sellers to Buyers to be paid on or prior to the Closing Date, to be paid one day after the 12-month anniversary of the Closing Date.

"Disclosure Schedule" means the Disclosure Schedule that has been prepared by the Sellers in accordance with Section 10.12 and delivered by the Sellers to Buyers concurrently with the execution and delivery of the Original Agreement.

"DOE" means the United States Department of Education.

"DOJ" means the United States Department of Justice.

"EDMC" means Education Management Corporation.

"Educational Agency" means any entity or organization, whether governmental, government chartered, tribal, private, or quasi-private, that engages in granting or withholding Educational Permits, administers financial assistance programs to or for students of, or otherwise regulates private postsecondary schools or programs in accordance with standards relating to the performance, operation, financial condition or academic standards of such schools and programs, including any Accrediting Body or State Educational Agency.

- 3 -

"Educational Law" means any federal, state, municipal, foreign or other law, regulation, order, or Accrediting Body binding standard, including the provisions of Title IV of the HEA and any regulations implementing it, issued or administered by, any Educational Agency.

"Educational Permit" means any license, permit, authorization, certification, accreditation or similar approval issued or required to be issued by an Educational Agency.

"Employee" means each employee, whether active or on approved leave, of the Sellers who are primarily devoted to the operation of the Business.

"Employment Agreements" means each of the Employment Agreements identified on Schedule 1.1(c).

"Employment Assignment Agreement" means an assignment to effect, at the Closing, (i) the assignment of each Employment Agreement listed on Schedule 1.1(c) from the applicable Seller to the applicable Buyer, and (ii) the assumption by such Buyer of all obligations thereunder to be performed after (and not arising out of any pre-Closing breach by Sellers) or accruing after the Closing, substantially in the form attached hereto as Exhibit D, provided that such assignment shall not apply to any Employment Agreement if, prior to the Closing, the applicable Buyer and the applicable Employee shall have entered into a new employment agreement superseding such Employment Agreement.

"Enforcement Limitation" means any applicable bankruptcy, reorganization, insolvency, moratorium or other similar Law affecting creditors' rights generally and principles governing the availability of equitable remedies.

"Environmental Law" means any applicable Law relating to pollution or protection of the environment, including any Law relating to any emission, discharge, release or possible release of any pollutant, contaminant, hazardous or toxic material, substance or waste into air, surface water, groundwater or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any pollutant, contaminant or hazardous or toxic material, substance or waste.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Net Working Capital Adjustment" equals the difference between (i) the Closing Net Working Capital, as estimated by the Sellers in good faith pursuant to Section 3.4(a), and (ii) $0. The Estimated Net Working Capital Adjustment shall be expressed as a positive amount if (i) is greater than (ii), and as a negative amount if (i) is less than (ii).

"Excluded Liabilities" means all Liabilities of the Sellers, other than the Assumed Liabilities.

"Final Net Working Capital Adjustment" equals the difference between (i) Closing Net Working Capital as finally determined pursuant to Section 3.4 and (ii) ($12,500,000). The Final Net Working Capital Adjustment shall be expressed as a positive amount if (i) is greater than (ii), and as a negative amount if (i) is less than (ii).

"Fundamental Representation" means any of the representations and warranties of the Sellers set forth in Sections 4.1, 4.2 or 4.7(a).

"FTC" means the United States Federal Trade Commission.

- 4 -

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time, consistently applied.

"Governmental Approval" means any Consent of, with or to any Governmental Authority.

"Governmental Authority" means any: (i) nation, state, county, city, district or other similar jurisdiction of any nature; (ii) federal, state, local or foreign government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, commission, bureau, instrumentality, department, official, entity, court or tribunal); (iv) multi-national organization or body; or (v) body or other Person entitled by applicable Law to exercise any arbitrative, administrative, executive, judicial, legislative, police, regulatory or Taxing authority or power, but excluding Educational Agencies.

"Hazardous Substances" means any chemicals, materials or substances regulated by any applicable Environmental Law.

"HEA" means the Higher Education Act of 1965, as amended.

"HLC" means the Higher Learning Commission.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Income Tax" means any Tax (other than sales, use, stamp, duty, value added, business, goods and services, property, transfer, recording, documentary, conveyancing or similar Tax) based upon or measured by gross or net receipts of gross or net income (including any Tax in the nature of minimum Taxes, Tax preference items and alternative minimum Taxes) and including any Liability arising pursuant to the application of Treasury Regulation Section 1.1502-6 or any similar provision of any applicable Law regarding any Tax.

"Indemnified Party" means a Buyer Indemnified Party or a Seller Indemnified Party, as applicable.

"Institution" means a group of one or more Schools that have been designated by DOE as an eligible institution and assigned a unique six-digit Office of Postsecondary Education Identification Number by the DOE, including all campuses, locations and other facilities of such Schools.

"Intellectual Property" means any trademark, service mark, trade name, trade dress, goodwill, patent, copyright, design, logo, formula, invention, concept, domain name, website, trade secret, know-how, confidential information, curriculum and curricular materials, mask work, product right, software, technology or other similar intangible asset of any nature, whether in use, under development or design or inactive (including any registration, application or renewal regarding any of the foregoing).

"Intellectual Property Assignment Agreement" means an assignment substantially in the form attached hereto as Exhibit C to effect the assignment of the registered Intellectual Property primarily used in the Business from Sellers and their Affiliates to the applicable Buyers at the Closing to the extent permissible.

"Knowledge" means, with respect to a particular fact or other matter, actual awareness of such fact or other matter or, with respect to an officer of any Person, the knowledge such officer would reasonably be expected to have in his or her capacity as an officer of such Person. The Buyers shall be deemed to have "Knowledge" of a particular fact or other matter only if Randy Barton, Brent Richardson, Matthew Barnett and/or Daniel Ovando has Knowledge of such fact or other matter The Sellers shall be

- 5 -

deemed to have "Knowledge" of a particular fact or other matter only if Mark A. McEachen, President and Chief Executive Officer; Mark E. Novad, Senior Vice President, Human Resources; Frank W, Jalufka, Senior Vice President and Chief Financial Officer; John T. South III, Chancellor of South University; Cynthia G. Baum, Chancellor of Argosy University; Claude H. Brown, III, Regional Vice President – The Art Institutes; Elden R. Monday, Regional Vice President – The Art Institutes; Terri N. Nelson, Vice President of Finance – The Art Institutes; David F. Work, Vice President of Finance – Argosy University;  John P. Papp, Vice President of Finance – South University; and/or Beth M. Henke (except with respect to any information known by her as a result of privileged communications) has Knowledge of such fact or other matter.

"Law" means any statute, law (including the common law), treaty, code, constitution, ordinance, rule, Order, ruling, judgment, injunction, decree, restriction or regulation of any Governmental Authority, but excluding Educational Laws.

"Letter of Intent" means the letter agreement between DCF and EDMC, dated December 3, 2016.

"Liability" means any liability or obligation of any kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"Lien" means any mortgage, pledge, hypothecation, right of others, security interest, encumbrance, easement, covenant, encroachment, burden, title defect, lien, right of first refusal or charge.

"Loss" means any and all Liabilities, damages, costs and expenses (including reasonable attorneys' fees and expenses).

"Material Adverse Effect" means any change, event, circumstance, condition or effect that is materially adverse to (a) the ability of Sellers or Buyers to consummate the Transactions, or (b) the financial condition, business or results of operations of the Business taken as a whole, including (i) the ability of a School to continue existing operations, or (ii) any decline of 20% or more of the EBITDA of the Business for any quarter of EDMC's fiscal year ending June 30, 2017 when compared to the forecasted EBITDA of the Business for such quarter provided to the Buyers' Representative in October 2016; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, a Material Adverse Effect for purposes of this clause (b) (except, in the case of clauses (A) through (D) below, to the extent such condition has had a materially disproportionate effect on the Business, taken as a whole, compared to other similar participants in the industries in which the Business conducts its business):  (A) changes in general economic conditions, or conditions in the industry in which the Business operates generally; (B) changes in applicable Law, Educational Law or accounting principles applicable to the Business or Sellers before or after the Original Effective Date, or the enforcement, implementation or interpretation thereof; (C) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (D) weather conditions, natural disasters, epidemics, pandemics, acts of God, acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (E) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the consent of or at the request of Buyers; (F) the announcement, pendency or completion of the Transactions (including the identity of Buyers), including losses or threatened losses of employees, customers or others having relationships with the Sellers and the Business (provided, however, that the exception in this clause (F) does not apply to Section 4.3); (G) any failure by the Business, other than as described in clause (b) above, to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of any such failures (subject to the other provisions of this definition) may be taken

into consideration in determining whether there has been or will be a Material Adverse Effect); (H) any existing event or condition with respect to which Buyers have Knowledge as of the date hereof, if Buyer's possession of such Knowledge is established by a preponderance of the evidence; or (I) any adverse event or condition with respect to the Business that is, in all material respects, cured or otherwise mitigated before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to the terms of this Agreement.

"MSCHE" means the Middle States Commission on Higher Education.

"Net Working Capital" means the difference between the current assets of the Business comprising the balance sheet line items set forth on Schedule 3.4 to the extent included in the Purchased Assets, less the current liabilities of the Business comprising the balance sheet line items set forth on Schedule 3.4 to the extent included in Assumed Liabilities, in each case, calculated in accordance with GAAP as applied by Sellers on the Interim Balance Sheet, as modified by the methodologies, practices and principles used to calculate Net Working Capital as set forth on Schedule 3.4 (without regard to any purchase accounting adjustments arising out of the Transactions).   Schedule 3.4 contains a sample calculation of Net Working Capital as if the Closing Date were June  30, 2016 with the use of information concerning the Business reported in  the audited financial statements of EDMC and its subsidiaries for the fiscal year ended June 30, 2016.

"Net Working Capital Statement" means a statement of Net Working Capital prepared in the manner and format of Schedule 3.4.

"NWCCU" means the Northwest Commission on Colleges and Universities.

"Open Source Software" means any software distributed under any license that requires that any other software incorporated into, derived from or distributed with such software (i) be disclosed, distributed or made available in source code form, (ii) be licensed for the purposes of preparing derivative works, or (iii) be licensed under terms that allow such other software to be reverse engineered (other than by operation of law).

"Order" means any award, decision, injunction (whether temporary, preliminary or permanent), judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course" means, with respect to a Person, the ordinary and usual course of normal day-to-day operations of such Person, consistent with such Person's past practice, as reflected in the financial results of the Business for the three months ended September 30, 2016, combined with the projected financial results for the Business for the period from September 30, 2016 through June 30, 2017, in the form previously provided to DCF.

"Organizational Documents" means, as applicable, the certificate of incorporation or formation, bylaws, limited liability company agreement or similar governing documents of an entity, as amended and/or restated from time to time.

"Owned Intellectual Property" means Intellectual Property owned by the Sellers and used primarily in connection with the Business, including the Registered Intellectual Property.

"Permitted Liens" means (i) any Liens set forth on Schedule 1.1(d); (ii) Liens for Taxes not yet due and payable or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Sellers in accordance with GAAP;

- 7 -

(iii) mechanics', workmen's, repairmen's, warehousemen's or other like Liens arising or incurred in the Ordinary Course for amounts that are not delinquent; (iv) original purchase price conditional sales contracts and equipment leases with Third Parties entered into in the Ordinary Course for which adequate accruals have been established in accordance with GAAP; or (v) with respect to the Real Property, easements, quasi-easements, restrictions, covenants, rights of way, zoning restrictions and other similar restrictions that do not materially impair the use of the Real Property as currently used by the Sellers.

"Person" means any natural person, firm, partnership, association, corporation, company, trust, business trust, other entity, or Governmental Authority.

"PPPA" means a provisional program participation agreement.

"Pre-Acquisition Review Response" means a written notice from the DOE following the DOE's review of the pre-acquisition review applications regarding the changes of ownership contemplated herein, which shall not indicate the existence of any material impediment to the issuance of a Temporary PPPA extending each Institution's certification to participate in the Title IV Programs promptly following the Closing and which shall not include, as a condition for issuing the Temporary PPPAs, any requirement for the posting of a letter of credit or that the Institutions be treated as for-profit institutions for purposes of DOE's "gainful employment" regulations.

"Pre-Signing Deal Expenses" means the aggregate amount of up to $250,000 paid or to be paid by Sellers and their Affiliates pursuant to Section 7 of the Letter of Intent to reimburse Buyers and their Affiliates for their out-of-pocket fees, costs or expenses directly related to the Transactions and paid to any Third Party for fees and expenses incurred for work performed up to and including the Effective Date.

"Proceedings" means any action, cause of action, claim, arbitration, charge, complaint, hearing, proceeding, litigation or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before, investigated by or otherwise involving, any Governmental Authority.

"Registered Intellectual Property" means any United States and foreign patents, patent applications, registered copyrights, registered trademarks, registered service marks, internet domain names and any other registered Intellectual Property that is owned by the Sellers or any Affiliates of the Sellers and primarily used in connection with the Business.

"Representatives" means, collectively, a party's accountants, financial advisors, counsel, consultants, employees and agents.

"SACSCOC" means the Southern Association of Colleges and Schools Commission on Colleges.

"State Educational Agency" means any state educational licensing body that provides a license or authorization necessary for a School to provide postsecondary education in that state.

"Superior Proposal" means an unsolicited, bona fide written Acquisition Proposal made prior to May 1, 2017 by a third party (other than any Person that, as of the Effective Date, holds greater than 10% of the outstanding equity interests in EDMC) which the EDMC board of directors determines in good faith, after consultation with EDMC's outside legal counsel and financial advisor, (i) would, if consummated, result in a transaction that is more favorable to Sellers from a financial point of view than the Transactions (after giving effect to all adjustments to the terms thereof which may be offered thereafter by Buyers) and (ii) is reasonably likely to be consummated on the terms proposed.

- 8 -

Notwithstanding the exclusion of owners of 10% or more of the outstanding equity interests in EDMC from the foregoing sentence, an Acquisition Proposal shall not be disqualified from satisfying the definition of "Superior Proposal" solely by virtue of such an equityholder providing financing to the eligible third party for purposes of the Acquisition Proposal and the transactions contemplated thereby.

"Tax" means any federal, state, provincial, local, foreign or other income, alternative, minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, withholding, estimated or other similar tax, duty or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not).

"Tax Return" means any return, report, declaration, form, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Temporary PPPA" means a temporary provisional program participation agreement.

"Third Party" means any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement.

"Title IV Programs" means the student financial aid programs administered by the DOE under Title IV of the HEA.

"Trademark Assignment" means an assignment of the trademarks included in the Purchased Assets from the Sellers or their applicable Affiliates to the applicable Buyers at the Closing, substantially in the form attached hereto as Exhibit G.

"Trademark License" means the trademark license, by and among Buyers and the Sellers, dated as of the Closing Date, substantially in the form attached hereto as Exhibit I.

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transferred Employees" means the Employees who accept an offer of employment by, and commence employment with, one of the Buyers in accordance with the terms of Section 6.5(a).

"Transition Services Agreement" means the transition services agreement by and among Sellers' Representative and Buyers and Buyers' Representative, dated as of the Closing Date, substantially in the form attached hereto as Exhibit E.

"Treasury Regulations" means the regulations prescribed pursuant to the Code.

"WASC" means the Senior College and University Commission of the Western Association of Schools and Colleges.

"Working Capital Line of Credit" means a working capital line of credit or revolving credit facility to be entered into by Buyers (other than DCF) as of the Closing Date that is in an amount

- 9 -

reasonably sufficient to meet the expected working capital needs of the Business as of the Closing Date, as determined from updated financial information provided by Sellers.

(b)     *Terms Defined Elsewhere in this Agreement*.     Capitalized terms defined in other provisions of this Agreement shall have the meanings specified therein.  Those terms include the following:

| Term | Section |
|---|---|
| Accounting Referee | 3.4(d) |
| Acquisition Proposal | 6.6(a) |
| Adjusting Payment | 3.4(f) |
| Agreement | Preamble |
| Annual Financial Statements | 4.4(a) |
| Assumed Liabilities | 2.3(a) |
| Business | Recitals |
| Buyer | Preamble |
| Buyer Calculation | 3.4(b) |
| Buyer Indemnified Party | 9.1 |
| Buyer Related Agreements | 5.2 |
| Cap | 9.3(b) |
| Claim Notice | 9.5 |
| Closing | 3.1 |
| Closing Cash Purchase Price | 3.3 |
| Closing Date | 3.1 |
| Commitment Letters | 5.6 |
| Covered Loss | 9.3(a) |
| Curriculum | 4.10(a) |
| Debt Commitment Letter | 5.6 |
| Debt Financing | 5.6 |
| Deductible | 9.3(a) |
| EDMC | 4.4(a) |
| Effective Date | Preamble |
| Effective Time | 3.1 |
| End Date | 8.1(b) |
| Equity Commitment Letter | 5.6 |
| Equity Financing | 5.6 |
| Excluded Assets | 2.2 |
| Excluded Contracts | 2.2(e) |
| Federal Bank Accounts | 2.1(n) |
| Financial Statements | 4.4(a) |
| Financing | 5.6 |
| Financing Agreement | 6.23 |
| Forward Looking Statements | 5.8 |
| Indemnifying Party | 9.3(b) |
| Interim Balance Sheet | 4.4(a) |
| Interim Balance Sheet Date | 4.4(a) |
| Interim Financial Statements | 4.4(a) |
| Lease Obligations | 6.18 |
| Leased Real Property | 4.8(a) |

- 10 -

| Term | Section |
|------|---------|
| Lender | 5.6 |
| LOI | 5.6 |
| Material Contracts | 4.6(b) |
| Note Payment | 9.3(g) |
| Non-Compete Period | 6.7(a) |
| Non-Transferred Senior Employees | 6.8(a) |
| Notice of Disagreement | 3.4(c) |
| Other Third-Party Claims | 9.6(b) |
| Original Agreement | Preamble |
| Original Effective Date | Preamble |
| Post-Signing Deal Expenses | 6.14 |
| Pre-Closing Notifications and Consents | 6.2 |
| Purchase Price | 3.3 |
| Purchased Assets | 2.1 |
| Real Property | 4.8(a) |
| Real Property Lease | 4.8(b) |
| Requisite Shareholder Vote | 4.2 |
| Schools | Recitals |
| Seller Calculation | 3.4(c) |
| Seller Indemnified Parties | 9.2 |
| Seller Related Agreements | 4.2 |
| Sellers | Preamble |
| Sellers' Representative | Preamble |
| Special Conditions and Terms | 6.23(c) |
| Student Financial Assistance Programs | 4.13(g)(1) |
| Subject Assets | 6.2(d) |
| Surety Bonds | 6.19 |
| Tax Benefits | 9.3(c) |
| Termination Fee | 8.3 |
| Third-Party Claim | 9.6 |
| Transfer Taxes | 6.9(b) |
| Transferred Intellectual Property | 2.1(g) |

1.2.    Rules of Construction.

(a)    *Elements of this Agreement; Schedules.*  When a reference is made in this Agreement to a Recital, an Article, a Section or a Schedule or Exhibit, such reference is to a Recital, Article or Section of, or a Schedule or Exhibit to, this Agreement, unless otherwise indicated. The words "hereof," "herein," "hereto," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement or Articles, Sections, Exhibits and Schedules of the Agreement unless otherwise expressly specified.  All Schedules and Exhibits attached to this Agreement and referred to herein are incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall have the meanings specified in this Agreement.  Article, Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of any provision of this Agreement.

- 11 -

(b)    *Interpretation of Agreement*.  The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(c)    *Other Rules of Construction*.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be understood to be followed by the words "without limitation." Unless otherwise specified in a particular case, the word "days" refers to calendar days.  Pronouns, including "he," "she" and "it," when used in reference to any Person, shall be deemed applicable to entities or individuals, male or female, as appropriate in any given case.  Standard variations on defined terms (such as the plural form of a term defined in the singular form and the past tense of a term defined in the present tense) shall be deemed to have meanings that correlate to the meanings of the defined terms.  With respect to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including."  The word "or" has the inclusive meaning represented by the phrase "and/or" unless the context otherwise requires.  A reference to any Person shall include such Person's successors and permitted assigns.

## ARTICLE  II
### PURCHASE AND SALE OF PURCHASED ASSETS

2.1.    Purchase and Sale of Purchased Assets.  Subject to the terms and conditions set forth herein, at the Closing, each of the Sellers will sell, assign and transfer to the applicable Buyer, and the applicable Buyer will purchase and accept from each of the Sellers, free and clear of all Liens other than Permitted Liens, all of the Sellers' right, title and interest in, to and under the properties, assets and rights of every nature, whether real, personal, tangible, intangible or otherwise, of the Sellers relating to or used in the Business (collectively, the "Purchased Assets"), other than the Excluded Assets, including the following to the extent relating to or used in the Business:

(a)    goodwill;

(b)    merchandise, supplies (including advertising and promotional materials) and other inventory;

(c)    accounts receivable (including any notes receivable, but excluding any intercompany notes receivable);

(d)    rights relating to prepayments, deferred charges, security deposits and similar items;

(e)    equipment, furnishings, fixtures and similar property, including computer and telecommunications hardware and software and information technology systems;

(f)    all leasehold improvements and other similar assets at or related to the Leased Real Property (subject to the terms of any related Real Property Lease);

(g)    the Intellectual Property owned by the Sellers or any of their Affiliates that is related to or used in the Business, including the Intellectual Property set forth on Schedule 2.1(g) (collectively, the "Transferred Intellectual Property");

(h)    rights under the Assumed Contracts;

(i)    items set forth as current assets on the balance sheet included in the Financial Statements;

- 12 -

(j)  Books and Records (provided that the Sellers shall have the right to retain, following the Closing, copies of any Books and Records to which the Sellers in good faith determine they are reasonably likely to need access for bona fide business or legal purposes);

(k)  Governmental Approvals, including pending applications therefor or renewals thereof, to the extent their transfer is permitted by Law;

(l)  all telephone numbers, facsimile numbers, e-mail addresses, postal addresses and postal boxes primarily related to the Business;

(m)  all of the outstanding equity interests of South University Research II LLC; and

(n)  to the extent consents can be obtained from the applicable banking institutions on terms reasonably acceptable to both parties and only relating to those Institutions included in the Business with respect to which all campuses included in such Institutions are Schools, the G5 Federal accounts (but not, for the avoidance of doubt, any bank accounts of any School or Institution) maintained by Sellers for receipt of Title IV funds by such Institutions ("Federal Bank Accounts").

The Bill of Sale, Assignment and Assumption Agreement will identify the applicable Buyer that will purchase the Purchased Assets from each Seller, and the Parties will identify the material fixed assets, Leased Real Property and related leaseholder improvements, registered Intellectual Property and Material Contracts that are Assumed Contracts to be acquired by each applicable Buyer in a schedule to be attached to the Bill of Sale, Assignment and Assumption Agreement.

2.2.  Excluded Assets.  Other than the Purchased Assets, Buyers expressly understand and agree that they are not purchasing or acquiring, and the Sellers are not selling or assigning, any other assets or properties of the Sellers, and all such other assets and properties will be excluded from the Purchased Assets (collectively, the "Excluded Assets").  Excluded Assets include the following assets and properties of the Sellers:

(a)  all minute books, stock ledgers, books of account, employee-related or employee benefit-related files or records, tax identification numbers, Tax Returns and Tax records, Organizational Documents and other documents and information relating to the organization and existence of the Sellers, and any other Books and Records which the Sellers are prohibited from disclosing or transferring to Buyer under applicable Law and are required by applicable Law to retain;

(b)  all cash, cash equivalents and securities of the Sellers, including any restricted cash related to any letter of credit obligations of the Sellers and their Affiliates;

(c)  all bank accounts, deposit accounts, investment accounts and similar accounts of the Sellers;

(d)  all rights to Tax refunds, credits or similar benefits relating to the ownership of the Purchased Assets or the operation of the Business before the Closing Date;

(e)  all of the Sellers' rights under the Contracts set forth on Schedule 2.2(e) (the "Excluded Contracts");

(f)  any Benefit Plan;

- 13 -

(g)      all Intellectual Property that is not used in or related to the Business and the Intellectual Property set forth on Schedule 2.2(g);

(h)      all insurance policies of the Sellers and insurance coverage thereunder, and any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date;

(i)      all rights of the Sellers under the Confidentiality Agreement, this Agreement and any Ancillary Agreement;

(j)      any claims relating to the Excluded Liabilities; and

(k)      the assets listed on Schedule 2.2(k).

2.3.    Liabilities.

(a)      *Assumed Liabilities.*  Subject to the terms and conditions set forth herein, the applicable Buyer will assume and agree to pay, perform and discharge only the following Liabilities of the Sellers (collectively, the "Assumed Liabilities"):

(i)      Liabilities scheduled to be performed or first incurred on or after the Closing under the terms of any Assumed Contract to the extent, but only to the extent, that such obligations do not arise or accrue as a result of any breach by Sellers prior to the Closing;

(ii)      Liabilities relating to executory purchase orders for products and services for the Business entered into by the Sellers in the Ordinary Course before the Closing and under which products and services have not been delivered or supplied as of the Closing Date;

(iii)      Liabilities with respect to trade payables of the Business;

(iv)      Liabilities set forth as current liabilities in Closing Net Working Capital;

(v)      Liabilities relating to unearned or deferred revenues, including advance payments and unearned tuition payments; and

(vi)      Any liabilities expressly listed in Schedule 2.3(a).

(b)      *Excluded Liabilities*.  Except for the Assumed Liabilities or as otherwise expressly provided herein, Buyers will not assume or be responsible for any other Liability of the Sellers, including the Excluded Liabilities and any Liabilities under the Consent Judgments that relate to the period before the Closing Date.

2.4.    Non-Assignable Assets.  Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 2.4, to the extent that the sale, transfer, assignment or delivery, or attempted sale, transfer, assignment or delivery, to each Buyer of any Purchased Asset for any one or more of the Institutions or Schools, would require the Consent of a Third Party (including any Governmental Authority or Educational Agency), and such Consent shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, transfer, assignment or delivery, or an attempted sale, transfer, assignment or delivery of such Asset; provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof.  To the extent the preceding sentence

- 14 -

applies in respect of an Assumed Contract, at Closing, the applicable Buyer will assume and agree to pay, perform and satisfy when due the Liabilities of the applicable Seller under such Assumed Contract (but not such Assumed Contract itself) to the extent that such Liabilities would otherwise be an Assumed Liability, and the rights and benefits of the applicable Seller under such Assumed Contract or resulting therefrom (but not such Assumed Contract itself), to the extent that such rights and benefits would otherwise be a Purchased Asset, will be sold, transferred and assigned to the applicable Buyer.  If the Parties, in their reasonable discretion, determine that a transition services agreement is necessary or desirable to reflect the arrangements in this Section 2.4 relating to Assumed Contracts, including any Real Property Leases, with respect to which Consent of a Third Party has not been received as of the Closing, the applicable Parties will enter into a transition services agreement, in form and substance reasonably acceptable to the Parties and their counsel, pursuant to which Sellers or their Affiliates would provide Buyers with the rights and benefits of the applicable Assumed Contracts, including use of any Leased Real Property subject to a Real Property Lease, and the applicable Buyers would assume and agree to pay, perform and satisfy when due the obligations and the Liabilities of the applicable Seller under such Assumed Contracts that first arise and accrue as of and after the Closing, but excluding any liabilities arising after the Closing as a result of any breach occurring prior thereto.  To the extent Federal Bank Accounts are not transferable to Buyers, Sellers shall take all actions reasonably required to assure that any Title IV funds received through DOE's G5 system after the Closing for any of the students of the Institutions included in the Business are timely returned to DOE and shall timely notify the Buyers concerning such fund transfers.  Following the Closing, each applicable Seller and each applicable Buyer shall use reasonable best efforts, and shall cooperate with each other, to obtain any such required Consent; provided, however, that neither any Seller nor any Buyer shall be required to pay any consideration therefor. Once such Consent is obtained, the applicable Seller shall sell, assign, transfer, convey and deliver to the applicable Buyer the relevant Purchased Asset to which such Consent relates for no additional consideration.

### ARTICLE  III
### CLOSING; PURCHASE PRICE; POST-CLOSING ADJUSTMENTS

3.1.    Closing.  On the terms and subject to the conditions set forth in this Agreement, the closing of the sale and purchase of the Purchased Assets (the "Closing") shall take place remotely via the exchange of documents and signatures on the first Business Day of the first month following the month in which all conditions set forth in Article VII (other than conditions that by their terms are to be satisfied at the Closing but subject to the satisfaction or waiver of such conditions) are satisfied or waived (to the extent permitted by Law), or on such other date as the Parties may agree to in writing (the "Closing Date").  The Closing will be effective as of 12:01 a.m. local time in Pittsburgh, Pennsylvania on the Closing Date (or, to the extent the Closing Date is not on the first day of the month in which Closing occurs, on the first day of such month) (the "Effective Time")  All actions to be taken and all documents to be executed or delivered at the Closing will be deemed to have been taken, executed and delivered simultaneously, and no action will be deemed taken and no document will be deemed executed or delivered until all have been taken, delivered and executed, except in each case to the extent otherwise stated in this Agreement or any such other document.

3.2.    Closing Deliveries and Actions.

(a)    Buyers' Deliveries.  At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Buyers other than DCF shall pay or cause to be paid the Closing Cash Purchase Price in accordance with Section 3.3 and shall deliver to the Sellers:

(i)    the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyers other than DCF;

(ii)     the Transition Services Agreement, duly executed by Buyers and Buyers' Representative;

(iii)     the Employment Assignment Agreement, duly executed by applicable Buyers other than DCF;

(iv)     the Intellectual Property Assignment Agreement, duly executed by Buyers other than DCF;

(v)     an Assignment and Assumption of Lease with respect to each Real Property Lease, together with any necessary transfer declarations or other filings, each duly executed by the applicable Buyer (other than DCF)  and, if necessary, with such Buyer's signature witnessed or notarized;

(vi)     the Curriculum License, duly executed by the applicable Buyers other than DCF;

(vii)     the Trademark License, duly executed by the applicable Buyers other than DCF;

(viii)     a certificate of good standing with respect to each Buyer;

(ix)     a certificate, dated the Closing Date, of an officer of each Buyer certifying as to the matters specified in Section 7.3(a) and Section 7.3(b) hereof and that a resolution was duly adopted by each Buyer's managers and member approving the Transactions contemplated by this Agreement; and

(x)     a subordination agreement, in form reasonably acceptable to Sellers and Lender, subordinating the Debt Financing to the Deferred Payments.

(b)     *Sellers' Deliveries*.  At the Closing, upon the terms and subject to the conditions set forth in this Agreement, the Sellers shall deliver to Buyers:

(i)     the Bill of Sale, Assignment and Assumption Agreement, duly executed by each of the Sellers;

(ii)     the Transition Services Agreement, duly executed by the Sellers' Representative and each of the applicable Sellers;

(iii)     the Trademark Assignment, duly executed by the appropriate Sellers or their applicable Affiliates;

(iv)     the Employment Assignment Agreement, duly executed by Sellers' Representative and each counterparty to an Employment Agreement;

(v)     the Intellectual Property Assignment Agreement, duly executed by Sellers;

(vi)     the Curriculum License, duly executed by the applicable Sellers;

(vii)     the Trademark License, duly executed by the applicable Sellers;

(viii)     an Assignment and Assumption of Lease with respect to each Real Property Lease, together with any necessary transfer declarations or other filings, duly executed by the appropriate Sellers and, if necessary, with such Sellers' signatures witnessed or notarized;

- 16 -

(ix)     customary lien release documentation reasonably satisfactory to Buyers' counsel relating to the termination of all Liens (other than Permitted Liens) related to the Purchased Assets;

(x)     a certificate of good standing with respect to each of the Sellers and Sellers' Representative;

(xi)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer in form and substance reasonably satisfactory to Buyers' counsel to effect the conveyance, transfer, assignment and delivery of the Purchased Assets;

(xii)     a FIRPTA certificate, dated as of the Closing Date, from each Seller, in form and substance reasonably acceptable to Buyer for purposes of satisfying Buyer's obligations under Treasury Regulation Section 1.1445-2(c)(3); and

(xiii)     a certificate, dated the Closing Date, of an officer of each Seller certifying as to the matters specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> hereof and that a resolution was duly adopted by each Seller's board of directors (or comparable body) approving the Transactions contemplated by this Agreement.

3.3.     <u>Payment of Purchase Price</u>.  In exchange for the Purchased Assets, Buyers (other than DCF) shall pay to Sellers the aggregate amount of $60 million, as adjusted pursuant to the terms of this Agreement (the "<u>Purchase Price</u>"), which shall be in the form of (a) the Closing Cash Purchase Price and (b) the Deferred Payments.  On the terms and subject to the conditions hereof, at the Closing, Buyers shall pay or cause to be paid to the Sellers an aggregate amount equal to the sum of (i) $50 million, *plus* (ii) the Estimated Net Working Capital Adjustment, which may be a positive or negative amount (the "<u>Closing Cash Purchase Price</u>").  The Closing Cash Purchase Price will be payable at the Closing by wire transfer of immediately available funds to accounts designated in writing by the Sellers' Representative to Buyers' Representative for the benefit of the Sellers no later than the Business Day immediately before the Closing Date. Each of the Deferred Payments will be payable when due by wire transfer of immediately available funds to accounts designated in writing by the Sellers' Representative to Buyers' Representative for the benefit of the Sellers no later than the Business Day immediately preceding the date such payment is to be made in accordance with this <u>Section 3.3</u>.  The Deferred Payments are joint and several obligations of the Buyers (other than DCF).

3.4.     <u>Purchase Price Adjustments</u>.

(a)     *Pre-Closing Calculations.*  At least fifteen Business Days prior to the Closing Date, Sellers' Representative shall deliver to the Buyers' Representative a certificate setting forth, in reasonable detail, the Sellers' good faith estimate of Closing Net Working Capital and the Sellers' good faith calculation of the Estimated Net Working Capital Adjustment, which shall be used to calculate the Closing Cash Purchase Price.  Such estimate shall be prepared in accordance with the Net Working Capital Statement and GAAP as used to prepare the Financial Statements, as modified in the Net Working Capital Statement.

(b)     *Post-Closing Calculation.*  As promptly as practicable, but no later than the date that is 60 days after the Closing Date, the Buyers' Representative will cause to be prepared and delivered to Sellers' Representative a certificate setting forth, in reasonable detail, Buyers' good faith calculation of Closing Net Working Capital (the "<u>Buyer Calculation</u>").  Such calculation shall be prepared in accordance with the Net Working Capital Statement and GAAP as used to prepare the Financial Statements, as modified in the Net Working Capital Statement.

- 17 -

(c)     *Notice of Disagreement.*  If the Sellers' Representative disagrees in good faith with the Buyer Calculation, the Sellers' Representative may, within 45 days after delivery of the Buyer Calculation, deliver a notice to Buyers' Representative that specifies, in reasonable detail, the Sellers' calculation of any disputed component of Closing Net Working Capital, and the Sellers' Representative's grounds for disagreement (the "<u>Seller Calculation</u>").  Any such notice of disagreement (a "<u>Notice of Disagreement</u>") shall specify those items or amounts as to which the Sellers' Representative disagrees, and the Sellers' Representative shall be deemed to have agreed with all other items and amounts contained in the Buyer Calculation.

(d)     *Reconciliation Process.*  If the Sellers' Representative delivers a Notice of Disagreement, the Buyers' Representative and the Sellers' Representative shall use reasonable best efforts, during the 30 days following such delivery, to reach agreement on the disputed items or amounts in order to determine the amount and value of Closing Net Working Capital, provided no such amount shall be less than the Buyer Calculation nor more than the Seller Calculation.  If the Buyers' Representative and the Sellers' Representative are unable to reach agreement during such period, either Buyers' Representative, on the one hand, or the Sellers' Representative, on the other hand, may refer the dispute to Grant Thornton LLP (the "<u>Accounting Referee</u>"), which shall be jointly retained by the Buyers' Representative and the Sellers' Representative, to resolve all disputed items or amounts and to calculate Closing Net Working Capital within 45 days.  In making such calculation, the Accounting Referee shall resolve only those items or amounts in the Buyer Calculation as to which the Sellers' Representative has disagreed and that remain unresolved.  The Accounting Referee may not allow a value greater than the greatest value for such item claimed by either party or smaller than the smallest value for such item claimed by either party.  The Accounting Referee shall deliver to the Buyers' Representative and the Sellers' Representative, as promptly as practicable, a report setting forth the resolution of all disputed items or amounts and the resulting calculation of Closing Net Working Capital.  Such report shall be final and binding upon the parties, absent manifest error.  The fees and expenses of the Accounting Referee incurred pursuant to this <u>Section 3.4(d)</u> shall be borne by the Sellers' Representative and the Buyers (other than DCF) in proportion to the final allocation made by such Accounting Referee of the disputed items weighted in relation to the claims made by the Sellers' Representative and the Buyers' Representative (after taking into account the different target Net Working Capital amounts), such that the prevailing party pays the lesser proportion of such fees and expenses.  For example, if the Sellers' Representative claims that the appropriate adjustments are $1,000 greater than the amount determined by the Buyers' Representative and if the Accounting Referee ultimately resolves the dispute by awarding to the Sellers' Representative $700 of the $1,000 contested amount, then the fees and expenses of the Accounting Referee will be allocated 70% (i.e., 700 ÷ 1,000) to the Buyers (other than DCF) and 30% (i.e., 300 ÷ 1,000) to the Sellers' Representative.

(e)     *Cooperation.*  The Buyers' Representative and the Sellers' Representative shall cooperate (and shall cause their Representatives to cooperate) in the calculation of Closing Net Working Capital and in the conduct of the reviews referred to in this <u>Section 3.4</u>, including making available, to the extent necessary, Books and Records, work papers and personnel, subject to customary confidentiality protections.

(f)     *Adjusting Payment.*  Upon final determination of the amount of each component of Closing Net Working Capital pursuant to this <u>Section 3.4</u>, the "<u>Adjusting Payment</u>" shall equal the difference between (i) the Final Net Working Capital Adjustment and (ii) the Estimated Net Working Capital Adjustment.  The Adjusting Payment shall be paid to Buyers (other than DCF) by the Sellers if (i) is less than (ii), and shall be paid by Buyers (other than DCF) to the Sellers if (i) is greater than (ii).  Such Adjusting Payment shall be made by wire transfer of immediately available funds, without interest, within 3 Business Days after the final determination of Closing Net Working Capital pursuant to this <u>Section 3.4</u>.

3.5.    Allocation of Purchase Price.  The Purchase Price, as adjusted pursuant to Section 3.4, shall be allocated among the Purchased Assets in accordance with Section 1060 of the Code and any comparable provisions of state, local or foreign Law, as appropriate.  Such allocation shall be set forth on a schedule prepared by the Sellers' Representative and delivered to the Buyers' Representative within 60 days after the Closing Date.  The Buyers' Representative shall have 30 days following delivery of the allocation schedule to give written notice to the Sellers' Representative that the Buyers' Representative disputes the allocation set forth on such schedule (which notice shall contain reasonable supporting details).  If the Sellers' Representative does not respond to the Buyers' Representative's notice within 30 days following delivery of such notice, the Sellers shall be deemed to have consented to the revised allocation as set forth by the Buyers' Representative.  If the Sellers' Representative timely provides written notice to the Buyers' Representative of the Sellers' Representative's disagreement with such schedule and the parties are unable to resolve such dispute within 30 days after such notice, then the Sellers and the Buyers shall utilize their own separate versions of the allocation for all purposes.  The allocation, if agreed upon by the Parties, shall be the final allocation for purposes of Section 1060 of the Code (the "Allocation").  If agreed, none of the Parties shall take any position on any Tax Return inconsistent with the Allocation and each of the Parties shall reflect the Allocation where relevant in all Tax filings, including IRS Form 8594.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth in the Disclosure Schedule, the Sellers jointly and severally represent and warrant, in each case, as of the Original Effective Date unless otherwise explicitly stated in this Agreement, as follows:

4.1.    Organization and Good Standing.  Each of the Sellers is duly organized, validly existing and in good standing under the Laws of its respective state of incorporation or organization (as set forth on Schedule A), with all requisite power and authority to conduct its business as now conducted and to own and lease its properties and assets.  Each of the Sellers is duly qualified or licensed to do business and is in good standing in each other jurisdiction in which the failure to be so duly qualified or licensed would reasonably be expected to have a Material Adverse Effect.

4.2.    Authority.  The Sellers have all requisite power and authority to execute and deliver this Agreement and each other agreement, instrument, certificate or document required to be executed and delivered by the Sellers pursuant hereto (collectively, the "Seller Related Agreements") and, with respect to EDMC, subject to the adoption of this Agreement and the Transactions by EDMC's shareholders in accordance with the Pennsylvania Associations Code and EDMC's Organizational Documents, to perform their obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Related Agreements by the Sellers, the performance of this Agreement and the Seller Related Agreements by the Sellers and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Sellers except for the approval of this Agreement and the Transactions by the shareholders of EDMC (the "Requisite Shareholder Vote") and the approval of this Agreement and the Transactions by the boards of trustees of the regionally accredited Institutions.  This Agreement and each of the Seller Related Agreements have been duly executed and delivered by the Sellers (or, in the case of any of the Seller Related Agreements to be executed and delivered after the Effective Date, will be executed and delivered) and constitute (or, in the case of any of the Seller Related Agreements executed after the Effective Date, will constitute) the valid and binding obligations of the Sellers (assuming due authorization, execution and delivery by the other parties hereto and thereto and receipt of the Requisite Shareholder Vote and the approval of the boards of trustees of the regionally accredited Institutions), enforceable against the Sellers in accordance with their respective terms, except as may be

- 19 -

limited by an Enforcement Limitation.  The EDMC board of directors, at a meeting duly called and held, has adopted, and not subsequently rescinded or modified in any way, resolutions (a) approving and declaring advisable this Agreement and the Transactions; (b) recommending that EDMC's shareholders approve this Agreement and the Transaction; and (c) directing that the approval of the Agreement and the Transactions be submitted, as promptly as practicable, to a vote or consent of the shareholders of EDMC.

4.3.    No Conflicts; Consents.

(a)    *No Conflicts*.  The execution and delivery of this Agreement and the Seller Related Agreements by the Sellers do not, and the performance of this Agreement and the Seller Related Agreements by the Sellers and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Organizational Documents of the Sellers, (ii) conflict with or violate any Law, Order or Educational Law applicable to the Sellers (provided that the Consents set forth on Schedule 4.3(b) are obtained) or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give rise to or create any right of any Third Party to accelerate, increase, terminate, modify or cancel any material right or material obligation in a manner adverse to the Business or result in the creation of any Lien, other than a Permitted Lien, on any of the Purchased Assets pursuant to any Material Contracts to which a Seller is a party or by which any of the Purchased Assets are bound, except where such a breach, violation, default, conflict or right has not had and is not reasonably likely to have a Material Adverse Effect or to materially impair Buyers' ability to operate the Business as a whole following the Closing in substantially the same manner as done by Sellers prior to the Closing.

(b)    *Consents*.  No Governmental Approval or other Consent is required to be obtained or made by the Sellers in connection with the Sellers' execution and delivery of this Agreement and the Seller Related Agreements or the consummation or performance of the Transactions by the Sellers, except (i) as required by the HSR Act; (ii) as set forth on Schedule 4.3(b); (iii) as may be necessary as a result of any facts or circumstances relating to Buyers or any of their  Affiliates; or (iv) any Consent that has not had and is not reasonably likely to have a Material Adverse Effect.

4.4.    Financial Statements; Absence of Undisclosed Liabilities.

(a)    The Sellers have delivered to Buyer the following financial statements for the Business (collectively, the "Financial Statements"):  (i) the audited consolidated balance sheets of EDMC and its subsidiaries as of June 30, 2015 and June 30, 2016 and the audited consolidated income statements and cash flow statements of EDMC and its subsidiaries for the fiscal years ended June 30, 2015 and June 30, 2016 (which include operations of institutions that are not part of the Business) (the "Annual Financial Statements"); (ii) the unaudited balance sheet of the Business (the "Interim Balance Sheet") as of September 30, 2016 (the "Interim Balance Sheet Date"); and (iii) the related unaudited income statement of the Business for the three-month period then ended (together with the Interim Balance Sheet, the "Interim Financial Statements").  The Financial Statements have been prepared in accordance with GAAP consistently applied and fairly present, in all material respects, the financial condition and results of operations of the Business for such period, except that the Interim Financial Statements are subject to normal year-end adjustments and do not include notes.  Notwithstanding anything to the contrary in this Agreement, Sellers make no representations or warranties with respect to the portions of the Annual Financial Statements that do not relate to the Business.

(b)    *Liabilities*.  There are no Liabilities related to the Business that are required to be recorded or reflected on a balance sheet under GAAP, except Liabilities (i) which are adequately reflected or reserved against in the Financial Statements; (ii) incurred in connection with the Transactions; (iii) that would not, individually or in the aggregate, materially impair the ownership or use of the properties and

- 20 -

assets related to the operation of the Business as currently conducted; (iv) which have been incurred in the Ordinary Course since the Interim Balance Sheet Date; (v) which are reflected in the calculation of Closing Net Working Capital; or (vi) which would not have a Material Adverse Effect.

4.5.   Absence of Changes.  Since the Interim Balance Sheet Date, (a) there has not been any Material Adverse Effect and (b) the Business has been operated in the Ordinary Course in all material respects.

4.6.   Material Contracts.

(a)   Schedule 4.6(a) lists, as of the Original Effective Date, (A) all Contracts to which a Seller is a party or by which any of the Purchased Assets is bound that limit the freedom of the Business to compete in any line of business or with any Person or in any area and which would so limit the freedom of the Business after the Closing in any material respect and (B) all of the following Contracts currently in effect (1) to which a Seller is a party (with respect to the Business) or by which any of the Purchased Assets is bound, (2) under which a Seller reasonably is expected to be required to pay or assume debts or obligations, in the aggregate, in excess of $250,000 in a twelve-month period or in excess of $500,000 in the aggregate for future obligations, for the purchase of services and/or goods or for the guarantee of the undertakings of others or the extension of loans or credit to others, and (3) which cannot be terminated without penalty on 90 days or less notice, including the following kinds of Contracts to the extent they meet the criteria described in clauses (B)(1)-(3) above:

(i)   any Contract with any Person for the provision of management or consulting services to the Sellers;

(ii)   any Contract with a sales representative, advertising agency or other Person engaged in sales or promotional activities for the Sellers, or any Contract to act as one of the foregoing on behalf of any Person;

(iii)   any lease or sublease agreements under which a Seller is the lessee or lessor of any material tangible personal property;

(iv)   any Contract pursuant to which a Seller has made or will make material loans or advances, or has or will have incurred debts or become a guarantor or surety or pledged its credit on or otherwise become responsible with respect to any undertaking of another (except for the negotiation or collection of negotiable instruments in transactions in the Ordinary Course);

(v)   any Contract providing for the creation of any Lien on the Purchased Assets (other than any Permitted Lien);

(vi)   any power of attorney or agency agreement with any Person pursuant to which such Person is granted the authority to act for or on behalf of a Seller with respect to the Business, except for customary powers of attorney associated with Intellectual Property registrations;

(vii)   any joint venture or partnership Contract relating to the Business; and

(viii)   any Contract with any Governmental Authority.

(b)   True, correct and complete copies of all written Contracts listed on Schedule 4.6(a) (together with the Real Property Leases, the "Material Contracts"), together with all modifications, waivers and amendments thereto, have been made available to Buyer.  Each of the Material Contracts is a

- 21 -

valid and binding obligation of the Sellers and, to the Knowledge of the Sellers, the other parties thereto, enforceable in accordance with its terms and in full force and effect, except as may be limited by an Enforcement Limitation.  There is not any existing material default or event of material default, or any event which, with or without notice or lapse of time or both, would constitute a material default under any Material Contract by the Sellers or, to the Knowledge of the Sellers, by any other party thereto.  The Sellers have not received any written notice of the intention of any party to terminate any such Material Contract.

4.7.  Purchased Assets.

(a)  The Sellers have good and valid title to, or otherwise have the right to use, each of the material Purchased Assets, in each case free and clear of any Liens (other than Permitted Liens).

(b)  Each item of tangible personal property included among the Purchased Assets is in good operating condition in all material respects, normal wear and tear excepted, and does not need any material maintenance or repair.

4.8.  Real Property.

(a)  Schedule 4.8(a) lists all real property leased by the Sellers and used primarily in connection with the Business (collectively, the "Leased Real Property" or the "Real Property")

(b)  Schedule 4.8(b) lists each Contract under which any Leased Real Property is leased or otherwise used or occupied by the Sellers (each such Contract, a "Real Property Lease") and all such Contracts are valid and binding obligations of the Sellers and, to the Knowledge of the Sellers, the other parties thereto, enforceable in accordance with their terms and in full force and effect, except as may be limited by an Enforcement Limitation.  The Sellers have not received any written notice from the landlord or lessor under any Real Property Lease claiming that any of the Sellers is in breach in any material respect of its obligations under such Real Property Lease.  To the Knowledge of Sellers, (i) no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute a breach or default of any material obligation of any Seller or landlord under the Real Property Leases, and (ii) no Seller has violated any zoning ordinances, parking covenants, easements and recorded conditions and other restrictions of record pertaining to the Leased Real Property.  The Sellers have not subleased or otherwise granted to any Person the right to use or occupy the Leased Real Property or any portion thereof.

(c)  To the Knowledge of Sellers, there are no contractual or legal restrictions that preclude or restrict in any material respect any Seller's ability to use the Leased Real Property for the purposes for which it is currently being used.  All existing water, sewer, steam, gas, electricity, telephone, cable, fiber optic cable, Internet access and other utilities currently used for the operation and maintenance of the Leased Real Property and the conduct of the Business thereon are in good and operable condition and repair, normal wear and tear excepted, and all related fees and other similar charges due and payable to date have been paid in full.

(d)  All improvements on the Leased Real Property constructed by or on behalf of any Seller were constructed in material compliance with all applicable Laws (including any building, planning or zoning Laws) affecting such Leased Real Property.

(e)  To the Knowledge of Sellers, there are no pending or threatened condemnation proceedings against all or any portion of the Leased Real Property.

- 22 -

4.9.    Intellectual Property.

(a)    Schedule 4.9(a) lists all Registered Intellectual Property.

(b)    Schedule 4.9(b) lists all Contracts in effect as of the Original Effective Date under which any Person has licensed, granted or conveyed to any Seller any right, title or interest in or to any Intellectual Property primarily used in connection with the Business other than any rights arising under "shrink-wrap," "click-through" or similar end user license agreements accompanying widely available off-the-shelf computer software products. The Sellers have not received any written notice of the intention of any party to terminate any Contract listed on Schedule 4.9(b), nor is there any existing material default or event of material default, or any event which, with or without notice or lapse of time or both, would constitute a material default under any such Contract by the Sellers or, to the Knowledge of the Sellers, by any other party thereto.

(c)    Schedule 4.9(c) lists all Contracts in effect as of the Original Effective Date under which any Seller has licensed, granted or conveyed to any Person any right, title or interest in or to any Intellectual Property primarily used in connection with the Business.  Between the Original Effective Date and the Effective Date, Sellers' Representative entered the following license agreements: (i) Intellectual Property License Agreement with The Art Institute of Vancouver, Inc., dated January 31, 2017, (ii) Curriculum License Agreement with The Art Institute of Vancouver, Inc., dated January 31, 2017, (iii) BMC Trademark License Agreement with Ross Education, LLC, dated January 31, 2017 and (iv) BMC Curriculum License Agreement with Ross Education, LLC, dated January 31, 2017.

(d)    Except for the license agreements identified in Schedule 4.9(b) or as listed in Schedule 4.9(d), the Sellers own (free and clear of all Liens, other than any Permitted Lien), or have the right to use without payment of any royalty, license fee or similar fee (other than with respect to any off-the-shelf software products) the Intellectual Property used by the Sellers in the operation of the Business.

(e)    (i)    Since January 1, 2014, the Sellers have not received written notice that any Registered Intellectual Property has been declared unenforceable or otherwise invalid by any Governmental Authority.

(ii)    The Sellers have not received any written charge, complaint, claim, demand or notice since the Compliance Date alleging that any use, sale or offer to sell any good or service of the Sellers infringes upon, misappropriates or violates any Intellectual Property right of any other Person, including any claim that the Sellers must license or refrain from using any Intellectual Property right of any other Person or any offer by any other Person to license any Intellectual Property right of any other Person to remedy such situation.

(iii)    To the Sellers' Knowledge, (A) the Sellers are not infringing upon, misappropriating or violating the Intellectual Property of any other Person in any material respect, and (B) no other Person is infringing upon, misappropriating or violating the Intellectual Property of the Sellers in any material respect.

(f)    Notwithstanding the foregoing, no representation or warranty is made in this Agreement regarding any infringement, misappropriation or violation upon, of, by or otherwise with respect to any (i) implied license of Intellectual Property or (ii) license for the use of any commercially available off-the-shelf software, provided that Sellers represent that, to the Knowledge of Sellers, no Seller has violated any express use or user limitations in any license agreement for such software.

- 23 -

US.109218815.18

(g)     The Sellers have not used, copied, incorporated or otherwise exploited any Open Source Software in such a way that requires the Sellers to disclose any Owned Intellectual Property (other than such Open Source Software and modifications thereto) or that has caused the Sellers to grant to any Third Party on or before the Original Effective Date any rights or immunities under any Owned Intellectual Property (other than with respect to such Open Source Software and modifications thereto).

(h)     This Section 4.9 contains the sole and exclusive representations and warranties of the Sellers with respect to any Intellectual Property matters, except for the curriculum matters separately addressed by Section 4.10.

4.10.   Curriculum.

(a)     The term "Curriculum" means the curriculum used in the educational programs of the Business in the form of computer programs or software, slide shows, texts, films, web site content, videos or any other form or media, including the following items: (i) course objectives, (ii) lesson plans, (iii) exams, (iv) class materials (including interactive or computer-aided materials), (v) faculty notes, (vi) course handouts, (vii) diagrams, (viii) syllabi, (ix) sample externship and placement materials, (x) clinical checklists, (xi) course and faculty evaluation materials, (xii) policy and procedure manuals, and (xiii) other related materials. The Curriculum shall also include:  (A) all copyrights, copyright applications, copyright registrations and trade secrets relating to the above-listed items and (B) all periodic updates or revisions to the Curriculum as developed.

(b)     Except as listed in Schedule 4.10(b), the Sellers own outright, and have good and marketable title or other rights to, the Curriculum primarily used in the Business free and clear of all Liens other than Permitted Liens.  No Employee or Affiliate of the Sellers or any other Person owns or has any interest, directly or indirectly, in any material part of the Curriculum.  The Sellers do not use any part of the Curriculum by consent of any other Person and are not required to and do not make any payments to others with respect thereto.  To the Sellers' Knowledge, no component of the Curriculum infringes or violates any copyright, patent, trade secret, trademark, service mark, registration or other proprietary right of any other Person and the Sellers' past and current use of any part of the Curriculum does not infringe upon or violate any such right.

4.11.   Litigation.  Except as set forth in Schedule 4.11, (a) there is no Proceeding currently pending nor, to the Sellers' Knowledge, threatened in writing against the Sellers (with respect to the Business), involving the Purchased Assets or relating to the Business or the Transactions and (b) no Seller (with respect to the Business) is party to, nor is the Business or any of the Purchased Assets the subject of, any Order.  All Proceedings involving the Purchased Assets or relating to the Business that have been settled since July 1, 2015 for an amount in excess of $250,000 are set forth on Schedule 4.11.

4.12.   Compliance with Laws; Governmental Approvals.

(a)     Sellers are in compliance in all material respects with applicable Law.  No written notice has been received by the Sellers from the Compliance Date to the Original Effective Date from any Governmental Authority alleging that the Sellers are not or were not in compliance in all material respects with any applicable Law that has not been remedied.

(b)     Except as disclosed on Schedule 4.12(b), Sellers possess all material Governmental Approvals required by applicable Law necessary for the operation of the Business in the Ordinary Course, all of which are in full force and effect.

- 24 -

(c)     Nothing in this <u>Section 4.12</u> shall be deemed to apply to compliance with (i) Laws and Educational Laws related to Educational Agencies and Educational Permits, which matters are addressed in <u>Section 4.13</u>, (ii) Environmental Laws, which matters are addressed in <u>Section 4.14</u>, (iii) Laws related to employment and employment practices, which matters are addressed in <u>Section 4.15</u>, (iv) Laws related to Benefit Plans, which matters are addressed in <u>Section 4.16</u>, and (v) Laws related to Taxes, which matters are addressed in <u>Section 4.17</u>.

4.13.     <u>Educational Agency Compliance</u>.

(a)     Since the Compliance Date, except as set forth in <u>Schedule 4.13(a)</u>, each Institution and the Schools have been operated in conformity in all material respects with all applicable Educational Laws.  <u>Schedule 4.13(a)</u> contains a listing of all Educational Permits currently in effect for each Institution and each of the Schools to the extent that such Educational Permits (i) are required for Title IV participation, (ii) constitute programmatic accreditations issued by an accrediting agency for the purpose of accrediting specific educational programs offered at the Schools, or (iii) are otherwise material to the operations of any School.  Each Institution and each of the Schools is and, since the Compliance Date has been, in compliance in all material respects with the terms and conditions of all such Educational Permits.  Since the Compliance Date, except as reflected in <u>Schedule 4.13(a)</u>, no Institution or School has been placed on probation, monitoring or warning status with any Educational Agency or been subject to any adverse action by any Educational Agency (including being directed to show cause why accreditation or other Educational Permit should not be revoked, withdrawn, conditioned, suspended or limited) to revoke, withdraw, deny, suspend, condition or limit accreditation, and there are no proceedings pending to revoke, suspend, limit, condition, restrict or withdraw any Educational Permit.

(b)     <u>Schedule 4.13(b)</u> contains a list of all DOE program reviews, final audit determinations, DOE Office of Inspector General audits and investigations, and DOJ investigations conducted at each Institution and each of the Schools since the Compliance Date.  No program review, audit determination, DOE Office of Inspector General audit nor investigation, or DOJ investigation remains pending or unresolved except as disclosed in <u>Schedule 4.13(b)</u>.

(c)     Neither any Institution nor any Affiliate of such Institution that has the power, by contract or ownership interest, to direct or cause the directions of the management of policies of such Institution, has filed for relief in bankruptcy or had entered against it an order for relief in bankruptcy.

(d)     Neither any Institution nor any owner or chief executive officer of such Institution has pled guilty to, pled nolo contendere to, or been found guilty of a crime involving the acquisition, use or expenditure of funds of any Title IV Program funds, or has been judicially determined to have committed fraud involving Title IV Program funds.

(e)     Except as set forth in <u>Schedule 4.13(e)</u>, none of Sellers or Sellers' Representative, nor any natural person that has exercised substantial control over any of the Institutions (as the term "substantial control" is defined in 34 C. F. R. § 668.174(c)(3)), or any member of such person's family (as the term "family" is defined in 34 C. F. R. § 668.174(c)(4)), alone or together, has exercised substantial control over another institution or third-party servicer (as that term is defined in 34 C. F. R. § 668.2) that owes a liability for a violation of a Title IV Program requirement which is not being paid pursuant to an agreement with DOE.

(f)     Except as set forth in <u>Schedule 4.13(f)</u>, to Sellers' Knowledge, there are no facts or circumstances concerning Sellers or Sellers' Representative or any of their Affiliates that would be reasonably likely to result, without regard to any facts or circumstances concerning Buyers, in the failure

- 25 -

of any Institution to obtain any Pre-Acquisition Review Response or Pre-Closing Notifications or Consents.

(g)     In addition, and without limiting the foregoing:

(i)     Section 4.13(g)(i) contains a complete listing of all governmental or private programs by which the Institutions currently award or administer student financial assistance to or on behalf of their students.

(ii)     Each educational program offered by the Institutions is, and since the Compliance Date has been, an eligible program in material compliance with the requirements of 34 C.F.R. § 668.8, and the Institutions at all times have properly measured the length of each such educational program in material compliance with applicable Educational Law.

(iii)     Except as disclosed on Schedule 4.13(g)(iii), since the Compliance Date, Sellers and the Institutions have materially complied with the requirements set forth at 20 U.S.C. § 1094(a)(20) and 34 C.F.R. § 668.14(b)(22).

(iv)     Except as disclosed on Schedule 4.13(g)(iv), since the Compliance Date, the Institutions have calculated and paid refunds and calculated dates of withdrawal and leaves of absence in material compliance with all applicable Educational Law applicable to the Institutions prior to the Closing Date.

(v)     Except as set forth on Schedule 4.13(g)(v), since the Compliance Date, the Institutions have not provided any portion of an educational program by correspondence, or admitted students who were incarcerated or had neither a high school diploma nor the recognized equivalent of a high school diploma.

(vi)     Since the Compliance Date, Sellers and the Institutions have complied in all material respects with federal and state Law regarding misrepresentation, including 34 C.F.R. § 668 Subpart F.

(vii)     Schedule 4.13(g)(vii) sets forth the financial responsibility composite scores of the Institutions for fiscal years 2015 and 2016. Except as set forth in Schedule 4.13(g)(vii), since the Compliance Date, no Educational Agency has required any of the Institutions to post a letter of credit or other form of surety for any reason, including any request for a letter of credit based on late refunds pursuant to 34 C.F.R. § 668.173, or required or requested that any of the Institutions process its Title IV Program funding under the reimbursement or heightened cash monitoring procedures set forth at 34 C.F.R. § 668.162.

(viii)     With respect to any location or facility that any Institution has closed or at which the Institution has ceased operating educational programs since the Compliance Date, the Institution has materially complied with Educational Law related to the closure or cessation of instruction at such location or facility, or with respect to any discontinued program, including without limitation requirements for teaching out students from such location, facility, or program.

(ix)     Since the Compliance Date, the Institutions have disclosed and timely reported to DOE, in material compliance with the applicable provisions of 34 C.F.R. Part 600: (i) the addition of any new educational programs or locations; and (ii) the correct ownership and control of the Institutions.

(x)    Since the Compliance Date, the Institutions have materially complied with the disclosure and reporting requirements related to gainful employment, as set forth at 34 C.F.R. § 668.6, as applicable for the relevant periods.

(xi)    Since the Compliance Date, Sellers and the Institutions have been in material compliance with the consumer disclosure requirements in 34 C.F.R. Part 668 Subpart D.

(xii)    Since the Compliance Date, Sellers and the Institutions have been in material compliance with Educational Law regarding privacy and safeguarding of consumer information, including the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99).

(xiii)    Since the Compliance Date, to the Knowledge of Sellers, the Institutions have maintained all material state authorizations related to their physical locations and their distance education programs and have complied in all material respects with all requirements of 34 C.F.R. § 600.9.

(xiv)    Since the Compliance Date, Sellers and the Institutions  have materially complied with (A) the requirements governing preferred lender relationships, private educational loans, and codes of conduct as set forth in 20 U.S.C. § 1094; and (B) applicable federal and state Law that relates to the extension of credit or that are otherwise applicable to any of the Schools' student loan programs, including, but not limited to, the Truth in Lending Act, Equal Credit Opportunity Act, and Fair Credit Reporting Act.

(xv)    Except as disclosed in Schedule 4.13(g)(xv), since the Compliance Date, to the Knowledge of Sellers, the Institutions have materially complied with the requirements of any Educational Agency concerning the proper and accurate calculation and timely reporting of student outcomes including, but not limited to, retention, completion and placement rates, graduate examination and professional licensure pass rates, and the methodology for calculating such rates.

(xvi)    Except as disclosed on Schedule 4.13(g)(xvi), since the Compliance Date, to the Knowledge of Sellers, the facilities, educational programs and related products and services provided by the Institutions have complied in all material respects with requirements of Education Law applicable to students with disabilities.

(xvii)    Except as disclosed on Schedule 4.13(g)(xvii), in all material respects, since the Compliance Date, to the Knowledge of Sellers, all employees of the Institutions that have engaged in student recruiting activities have maintained all material approvals to conduct such activities and the Institutions and any third party contractors engaged by them  have materially complied with all laws applicable to the recruitment of students.

(xviii)    To the Knowledge of Sellers, since the Compliance Date, Sellers and the Institutions have not employed in a capacity involving administration of funds under the Title IV Programs or the receipt of funds under the Title IV Programs, any individual who has been convicted of, or has pled nolo contendere or guilty to, a crime involving the acquisition, use or expenditure of federal, state or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of law involving federal, state or local government funds.

(xix)    For each of fiscal years 2015 and 2016, collectively, Seller have not received greater than ninety percent (90%) of their revenues from Title IV Programs, as calculated under 34 C.F.R. §§ 668.14 and 668.28 and reported to DOE.  Schedule 4.13(g)(xix) sets forth a correct and complete list

of the percentages of revenue that the Institutions received, collectively, from Title IV Programs for each such fiscal year, as calculated under 34 C.F.R. §§ 668.14 and 668.28 and reported to DOE.

(xx)     Schedule 4.13(g)(xx) contains a list of all current Contracts for the provision of educational instruction by Sellers or the Institutions or on behalf of Sellers or the Institutions by any other institution or organization of any sort.

(xxi)    Schedule 4.13(g)(xxi) sets forth a correct and complete list of the Institutions' official cohort default rates for loans administered under the Federal Family Education Loan Program or the Federal Direct Loan Program, as calculated by DOE pursuant to 34 C.F.R. Part 668, Subpart N, for the three most recently completed federal fiscal years for which such official rates have been published.

(xxii)   To the Knowledge of Sellers, no program at any Institution has received oral or written communication from any applicable licensing body stating that pass rates for graduates of such Institution on professional licensing examinations are unacceptable, nor has any applicable licensing body communicated its intent to Sellers to revoke the eligibility of graduates of any Institutions to take any such licensing examination.

(xxiii)  Sellers, for all existing academic programs of the Institutions, have provided Buyers with correct and complete information concerning all draft gainful employment debt to earnings rates issued by DOE and any challenge or appeal of any such rates pending as of the Original Effective Date.

(h)      This Section 4.13 contains the sole and exclusive representations and warranties of the Sellers with respect to any matters arising under any Educational Laws, Educational Agencies, and Educational Permits.

4.14.    Environmental Matters.  To the Sellers' Knowledge, the Sellers are in compliance in all material respects with all Environmental Laws applicable to the operations of the Business.  To the Sellers' Knowledge, the Sellers are in compliance in all material respects with all Governmental Approvals that are required pursuant to Environmental Laws for the operation of the Business as it is currently conducted.  Since the Compliance Date, the Sellers have not received any written notice or request for information from any Governmental Authority or other Person related to any actual or alleged material violations of Environmental Laws or any material Liabilities of the Sellers arising under Environmental Laws.  There is no Proceeding pending or, to the Sellers' Knowledge, threatened against the Sellers relating in any way to Environmental Laws as related to the Business, except for Proceedings that would not reasonably be expected to have a Material Adverse Effect.  To the Sellers' Knowledge, there have been no releases of Hazardous Substances on, at, under or migrating from the Real Property except for any releases that either do not constitute material violations of Environmental Laws and/or have been fully remedied.  True and complete copies of all Phase I and Phase II environmental site assessments related to the Real Property that are in the Sellers' possession or control have been made available to Buyer.  This Section 4.14 contains the sole and exclusive representations and warranties of the Sellers with respect to any matters arising under any Environmental Laws.

4.15.    Employee Matters.

(a)      *Compliance with Laws*.  Except for any non-compliance that would not reasonably be expected to have a Material Adverse Effect, the Sellers are in material compliance with all applicable Laws pertaining to employment and employment practices in the operation of the Business, including all applicable Laws pertaining to wages, hours, equal employment opportunity, discrimination on the

- 28 -

grounds of any class protected by applicable Law, workers' compensation and occupational health and safety.  Except as disclosed in Schedule 4.15(a), there are no Proceedings against the Sellers pending or, to the Sellers' Knowledge, threatened to be brought or filed, by or with any Governmental Authority or other Person in connection with the employment of any Employee or in connection with any current or former consultant or independent contractor of the Business, including any claim, complaint or grievance relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wages and hours or any other employment-related matter arising under applicable Laws.

(b)  *Employee Relations*.  Schedule 4.15(b) sets forth each collective bargaining or similar agreement with any labor organization to which any Seller is a party and any work rules or practices agreed to with any labor organization or employee association applicable to the Employees.  There is no unfair labor practice charge or complaint against the Sellers pending or, to the Sellers' Knowledge, threatened before the National Labor Relations Board or any comparable state, local or foreign agency, and there is no labor strike, dispute, slowdown, stoppage or lockout actually pending or, to the Sellers' Knowledge, threatened against or directly affecting the Sellers, and since the Compliance Date, there has not been any such action.

(c)  *I-9 Compliance.*  Each Seller has in its files a Form I-9 that is validly and properly completed in accordance with applicable Law for each employee of Sellers with respect to whom such form is required under applicable law.  No Seller has received notice or other communication from any Governmental Authority regarding any unresolved violation or alleged violation of any applicable Law relating to hiring, recruiting, employing of (or continuing to employ) anyone who is not legally authorized to work in the United States.

(d)  *Employee Restrictive Covenants*.  To the Knowledge of Sellers, none of the Employees are subject to any non-competition, non-disclosure, confidentiality, employment, consulting or similar agreements that inhibit such Employee's ability to satisfactorily perform services for any Seller in connection with the Business.

(e)  *Accrued Liabilities*.  Except for accruals disclosed on the Interim Balance Sheet, as of the Interim Balance Sheet Date, Sellers have no liabilities (i) for any bonus payments to any Employee or independent contractor (or any former employee or independent contractor) under any bonus plan or arrangement, (ii) for any workers' compensation benefits which have or may become payable as a result of events prior to Closing, or (iii) to any Employee or independent contractor (or any former Employee or independent contractor) related to compensation or for benefits accrued.

(f)  This Section 4.15 contains the sole and exclusive representations and warranties of the Sellers with respect to any matters arising under any Laws related to employment and employment practices.

4.16.  Employee Benefit Matters.

(a)  Schedule 4.16(a) sets forth a list of: (i) each material Benefit Plan that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers with respect to the Employees; and (ii) each employment, management consulting or similar agreement requiring payment by the Sellers (solely with respect to the Business) to an Employee of base annual salary in excess of $100,000 (which, for the avoidance of doubt, shall not include any agreement with an employee that is terminable at will).

(b)  Except as to such matters that have not had and would not have a Material Adverse Effect or as disclosed in Schedule 4.16(b): (i) any Benefit Plan that is maintained or otherwise contributed to, or

- 29 -

required to be maintained or contributed to, by or on behalf of the Sellers with respect to the Employees intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service (or is maintained on a pre-approved plan document that has received a favorable opinion letter or advisory letter issued by the Internal Revenue Service); and (ii) there are no pending or, to the Sellers' Knowledge, threatened claims against the Sellers involving any Benefit Plan that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers with respect to the Employees (other than claims for benefits in the normal course).

(c)     Except as disclosed in Schedule 4.16(c), the consummation of the Transactions shall not, either alone or in combination with another event: (i) entitle any current or former employee or officer of the Business to severance pay, unemployment compensation or any other payment for which Buyers would be responsible; or (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation due any such employee or officer for which Buyers would be responsible.

(d)     No Benefit Plan that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers with respect to the Employees is (i) subject to Title IV of ERISA or (ii) a "multiemployer plan" as defined in Section 4001(a)(3) and/or 3(37) of ERISA. No Affiliate of any Seller that would be treated as a single employer under Section 414 of the Code has participated in any multiemployer plan or any plan subject to Title IV of ERISA.

(e)     This Section 4.16 contains the sole and exclusive representations and warranties of the Sellers with respect to any matters arising under any Laws related to Benefit Plans.

4.17.     Taxes.  The Sellers have filed or caused to be filed on a timely basis all material Tax Returns that are or were required to be filed by or on behalf of the Sellers with respect to the Business, in each case pursuant to applicable Law.  The Sellers have properly paid (or caused to be paid) all Taxes owed that have or may have become due pursuant to such Tax Returns, except such Taxes, if any, as are being contested in good faith and as to which adequate reserves have been provided in the Financial Statements.  All other material Taxes that the Sellers are or were required by applicable Law to withhold, deduct or collect with respect to the Business have been duly withheld, deducted and collected by the Sellers and, to the extent required, have been paid to the proper Governmental Authority.  To the Sellers' Knowledge, no claim has been made in writing by any Governmental Authority in a jurisdiction where the Sellers do not file Tax Returns that the Sellers are or may be subject to Taxation by such jurisdiction with respect to the Business.  This Section 4.17 contains the sole and exclusive representations and warranties of the Sellers with respect to any matters arising under any Laws related to Taxes.

4.18.     Brokers.  Except as set forth in Schedule 4.18, no investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of the Sellers in connection with the Transactions, and no such Person is entitled to any fee or commission from Buyer or any of its Affiliates in connection with the Transactions.

4.19.     Disclaimer. EXCEPT AS SET FORTH IN THIS ARTICLE IV (AS MODIFIED BY THE DISCLOSURE SCHEDULE), NONE OF THE SELLERS, THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, GOVERNORS OR REPRESENTATIVES MAKE OR HAVE MADE, AND SELLERS DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR, ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE SELLERS, THEIR AFFILIATES OR THE BUSINESS. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  The Sellers make no representations or warranties to Buyers regarding any projection or forecast regarding future results or activities or the probable success

or profitability of the Business, provided, for avoidance of doubt, that the provisions of this Section 4.19 shall not be deemed to modify in any way the definition of Material Adverse Effect in Section 1.1(a) nor to authorize or immunize from liability any fraud (an element of which is intent) relating to any representations or warranties set forth in this Article IV or in the Disclosure Schedule that otherwise would be actionable under applicable Law as recognized in Section 9.3(g).

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyers represent and warrant, in each case, as of the Original Effective Date unless otherwise explicitly stated in this Agreement, as follows:

5.1. <u>Organization and Good Standing</u>. Each Buyer is duly organized as a nonprofit corporation or association, or as a single nonprofit member limited liability company of which Buyers' Representative is the sole member, in either case no part of the net earnings of which benefits any shareholder, member, or private individual, and is validly existing and in good standing under the Laws of the jurisdiction of its organization, with all requisite power and authority to conduct its business as now conducted and as proposed to be conducted after consummation of the Transactions and to own and lease its properties and assets. Each Buyer is duly qualified or licensed to do business and is in good standing in each other jurisdiction in which the failure to be so duly qualified or registered would reasonably be expected to have a material adverse effect on Buyer's ability to consummate the Transactions. Each Buyer either through a determination made by the Internal Revenue Service or by operation of law is a tax-exempt organization as described in section 501(c)(3) of the Code. Each Buyer is, or will be on or before no later than March 15, 2017: (a) a nonprofit corporation, association, or limited liability company under applicable state law no part of the net earnings of which benefits any shareholder, member, or private individual; (b) legally authorized to operate as a nonprofit business entity in the states in which it operates; and (c) a legally disregarded entity for tax-purposes that is included within the scope of the tax-exempt status of Buyers' Representative, or determined by the Internal Revenue Service to be tax-exempt as an organization described in section 501(c)(3) of the Code. Ownership of the Purchased Assets and operation of the Schools by Buyers will be directly in furtherance of the charitable and educational purposes of Buyers' Representative and Buyers and within the scope of their respective tax-exempt statuses.

5.2. <u>Authority</u>. Each Buyer has all requisite power and authority to execute and deliver this Agreement and each other agreement, instrument, certificate or document required to be executed and delivered by such Buyer pursuant hereto (collectively, the "<u>Buyer Related Agreements</u>"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Buyer of each Buyer Related Agreement to which it is a party, the performance by each Buyer of its respective obligations under each Buyer Related Agreement to which it is a party, and the consummation of the transactions contemplated hereby and thereby have been or will have been at the Closing duly authorized by all necessary action on the part of each Buyer. This Agreement and each Buyer Related Agreement have been duly executed and delivered by Buyer (or, in the case of any of the Buyer Related Agreements to be executed and delivered after the Effective Date, will be executed and delivered by the relevant Buyer) and constitute (or, in the case of any Buyer Related Agreement executed after the Effective Date, will constitute) the valid and binding obligations of the relevant Buyer (assuming due authorization, execution and delivery by the other parties hereto and thereto), enforceable against each Buyer that is party thereto in accordance with their respective terms, except as may be limited by an Enforcement Limitation.

US.109218815.18

5.3.    <u>No Conflicts; Consents</u>.

(a)    The execution and delivery of this Agreement and the Buyer Related Agreements by each Buyer does not, and the performance of this Agreement and the Buyer Related Agreements by each Buyer and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Organizational Documents of any Buyer; (ii) conflict with or violate any Law or Order applicable to any Buyer or by or to which any of its properties or assets is bound or subject; or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give rise to or create any right of any Person to accelerate, increase, terminate, modify or cancel any material right or material obligation under, any Contracts to which any Buyer is a party or by which any of its properties or assets is bound, except where such a breach, violation, default, conflict or right will not materially and adversely affect Buyer's ability to consummate the Transactions.

(b)    Except as contemplated by <u>Schedule 5.3(b)</u>, no Governmental Approval or other Consent is required to be obtained or made by any Buyer in connection with Buyers' execution and delivery of this Agreement and the Buyer Related Agreements or the consummation or performance of the transactions contemplated thereby by Buyers, except any Consent that will not materially and adversely affect Buyers' ability to consummate the Transactions.

5.4.    <u>Litigation</u>.  There is no Proceeding pending or, to Buyers' Knowledge, threatened against or affecting any Buyer.

5.5.    <u>Compliance with Educational Law Matters</u>.

(a)    No Buyer nor any natural person that will exercise substantial control over each Institution as a result of the Transactions (as the term "substantial control" is defined in 34 C. F. R. § 668.174(c)(3)), or member of such person's family (as the term "family" is defined in 34 C. F. R. § 668.174(c)(4)), alone or together, (i) exercises or exercised substantial control over another institution or third-party servicer (as that term is defined in 34 C. F. R. § 668.2) that owes a liability for a violation of a Title IV Program requirement or (ii) owes a liability for a violation of a Title IV Program requirement.

(b)    No Buyer nor any Affiliate of any Buyer that will have the power, by contract or ownership interest, to direct or cause the direction of management of policies of either Institution, has filed for relief in bankruptcy or had entered against it an order for relief in bankruptcy.

(c)    No Buyer, nor any such Buyer's owner or chief executive officer, has pled guilty to, pled nolo contendere to, or been found guilty of a crime involving the acquisition, use or expenditure of funds of any Title IV Program funds, or has been judicially determined to have committed fraud involving Title IV Program funds.

(d)    To Buyer's knowledge, there are no facts or circumstances concerning Buyer or any Affiliate of Buyer that would be reasonably likely to result in the failure of any Institution to obtain any Pre-Acquisition Review Response or Pre-Closing Notifications or Consents.

5.6.    <u>Availability of Funds; Financing</u>.  Prior to the execution of the Original Agreement, Buyers delivered to Sellers' Representative a true and complete copy of a non-binding letter of intent (the "<u>LOI</u>") pursuant to which Najafi Companies, LLC or its affiliates (the "<u>Lender</u>") agreed to provide certain financing to Buyers in connection with the Transactions.  As of the Effective Date, Buyers have delivered to Sellers' Representative (i) an executed debt commitment letter, in a form reasonably acceptable to

- 32 -

Sellers, from Lender (the "Debt Commitment Letter"), pursuant to which the Lender will provide financing to DCF in connection with the Transactions (the "Debt Financing"); and (ii) an executed equity commitment letter, in a form reasonable acceptable to Sellers, from DCF (the "Equity Commitment Letter" and, together with the Debt Commitment Letter, the "Commitment Letters"), pursuant to which DCF will provide equity financing to Buyers (other than DCF) in an amount equal to the amount provided to DCF pursuant to the Financing (the "Equity Financing" and, together with the Debt Financing, the "Financing").  The Financing will be sufficient for Buyers to consummate the Transactions and to perform their respective obligations under this Agreement. The obligations of the Lender under the Debt Commitment Letter are not subject to any condition other than those set forth in the Debt Commitment Letter, and the obligations of DCF under the Equity Commitment Letter are not subject to any condition other than receipt of the Debt Financing from Lender.  To the Knowledge of Buyers, there are no facts or circumstances existing or reasonably anticipated on the Effective Date that would reasonably be expected to (a) make the material assumptions or statements set forth in the Commitment Letters inaccurate, (b) cause the Commitment Letters to be ineffective or (c) preclude in any material respect the satisfaction of the conditions set forth in the Commitment Letters.  All commitment and other fees required to be paid under the Commitment Letters have been paid.  Buyers are not, and to the Knowledge of Buyers no other Party to the Commitment Letter is, in breach, violation, or default under the Commitment Letters (nor, to the Knowledge of Buyers, does there exist any condition which upon the passage of time or the giving of notice or both would cause such a breach, violation or default).

5.7.    Solvency.  Immediately after giving effect to the Closing and the Transactions, Buyers will be able to pay their debts as they become due and shall own property which has a fair market value greater than the amounts required to pay their debts (including a reasonable estimate of the amount of all contingent liabilities).  Immediately after giving effect to the Transactions, Buyers shall have adequate capital to carry on their business (including the Business).  No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud any of Buyers' current or future creditors.

5.8.    Independent Investigation.    Buyers have performed an independent investigation, examination, analysis and verification of the Business and the Sellers, including Buyers' own estimate of the value of the Business and the Purchased Assets.  All materials and information requested by Buyers through the Effective Date have been provided to Buyers to their reasonable satisfaction.  Buyers have had the opportunity to visit with the Sellers and their Representatives to discuss the foregoing matters.  In connection with such activities and investigations, Buyers have relied on their own financial, legal and other experts and advisors in arriving at their decision to execute, deliver and consummate this Agreement and the Transactions. Buyers and Buyer Representatives have received from Sellers or their Representatives certain estimates, budgets, forecasts, plans and financial projections (collectively, "Forward Looking Statements"), and Buyers are taking full responsibility for making their own evaluation of the adequacy and accuracy of all Forward Looking Statements (including the reasonableness of the assumptions underlying the Forward Looking Statements).  Buyers are not relying on any representations, warranties, omissions or covenants of the Sellers except as expressly set forth in this Agreement and the applicable schedules and any of the Seller Related Agreements executed and delivered to any Buyer pursuant to this Agreement, provided, for avoidance of doubt, that the provisions of this Section 5.8 shall not be deemed to modify in any way the definition of Material Adverse Effect in Section 1.1 (a) nor to authorize or immunize from liability any fraud (an element of which is intent) relating to any representations or warranties set forth in Article IV or the Disclosure Schedule that otherwise would be actionable under applicable Law as recognized in Section 9.3.

5.9.    Brokers.  No investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of any Buyer in connection with the Transactions, and no such Person is

- 33 -

entitled to any fee or commission from the Sellers or any of their Affiliates in connection with the Transactions.

## ARTICLE VI
### COVENANTS

6.1.  <u>Conduct of Business</u>.  Except for matters required by applicable Law or expressly permitted by this Agreement or as otherwise consented to in writing by the Buyers' Representative (which consent will not be unreasonably withheld, conditioned or delayed), from the Original Effective Date to the Closing Date (or until the earlier termination of this Agreement in accordance with <u>Section 8.1</u>), the Sellers shall conduct the Business in all material respects in the Ordinary Course and, to such extent, use reasonable best efforts to preserve intact their current business organization with respect to the Business and keep available the services of their officers and key Employees, and preserve  their existing business relationships with and the goodwill of students, suppliers, customers, and others having material business dealings with them.  In addition, and without limiting the generality of the foregoing, except for matters required by applicable Law or expressly contemplated by this Agreement, and except as set forth in <u>Schedule 6.1</u>, from the Original Effective Date to the Closing Date (or until the earlier termination of this Agreement in accordance with <u>Section 8.1</u>), the Sellers shall not do any of the following without the prior written consent of the Buyers' Representative (which consent will not be unreasonably withheld, conditioned or delayed):

(a)  amend any Organizational Documents of any Seller in a manner that would be material and adverse to the Business;

(b)  except in the Ordinary Course, make any purchase, sale or disposition of any Purchased Asset;

(c)  adopt a plan of liquidation, dissolution, merger, consolidation, statutory share exchange, restructuring, recapitalization or reorganization;

(d)  except in the Ordinary Course or as required by Law, (i) enter into or modify any employment, severance, termination or similar agreements or arrangements with any Employee at or above the senior management level, (ii) grant any salary increases to any Employee at or above the senior management level, or (iii) otherwise increase the compensation or benefits provided to any Employee at or above the senior management level;

(e)  grant any Lien on any of the Purchased Assets, other than any Permitted Lien;

(f)  settle or compromise any material Proceeding with respect to the Business or waive, release or assign any material rights, benefits or claims of the Sellers relating to any of the Purchased Assets;

(g)  allow any existing insurance policy providing liability coverage to any of the Institutions to lapse by failure to pay premiums when due or to otherwise perform thereunder;

(h)  fail to spend substantially all of the amounts budgeted for marketing purposes for the Business in accordance with the financial results of the Business for the three months ended September 30, 2016, combined with the projected financial results for the Business for the period from September 30, 2016 through June 30, 2017, in the form previously provided to DCF; or

(i)  enter into any Contract to do any of the foregoing.

- 34 -

6.2.    Regulatory and Other Approvals.    Promptly after the execution of the Original Agreement, each Seller and each Buyer, respectively, shall use its reasonable best efforts to continue to make, obtain or cause to be made or obtained those Consents from Educational Agencies or Governmental Authorities designated as pre-Closing notifications or Consents on Schedules 4.3(b) and 5.3(b) (collectively, the "Pre-Closing Notifications and Consents") and all other necessary Consents from Third Parties. Sellers and Buyers will cause their Representatives to promptly and regularly advise each other concerning the occurrence and status of any discussions or other communications, whether oral or written, with any Educational Agency, Governmental Authority or other Third Party with respect to any Pre-Closing Notifications and Consents to be obtained by such party. Prior to Closing, neither party nor any of its Representatives shall contact any Educational Agency or Governmental Authority regarding a Pre-Closing Notification and Consent being obtained by the other party without prior approval and participation by the other party.

(a)    Promptly after the execution of the Original Agreement, Sellers shall, and Buyers shall continue to use all reasonable best efforts, including providing Buyer Representative's audited financial statements for the two most recently completed fiscal years, to assist Sellers to, file a pre-acquisition review application for each Institution with the DOE.  Buyers shall, if DOE requires Buyers to execute a TPPPA or any subsequent PPPA following Closing as a condition of not requiring a letter of credit, agree to execute such TPPPA or subsequent PPPA and such execution will not be a basis for objection to any Pre-Acquisition Review Response.  Sellers shall promptly and regularly advise Buyers concerning the occurrence and status of any discussions or other communications, whether oral or written, with DOE concerning the pre-acquisition review applications.

(b)    Subject to the terms and conditions herein provided, Buyers and Sellers shall use their respective reasonable best efforts to promptly take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under this Agreement and applicable Laws to consummate and make effective as promptly as practicable after the Original Effective Date the Transactions and the satisfaction of the conditions to Closing set forth in Article VII, including (i) preparing as promptly as practicable all necessary applications, notices, petitions, filings, ruling requests and other documents and to obtain as promptly as practicable all Governmental Approvals in order to consummate the Transactions and (ii) as promptly as practicable taking all steps as may be necessary to obtain all such Governmental Approvals.  In furtherance and not in limitation of the foregoing, Buyers and Sellers shall, if required, (A) make an appropriate and complete filing of a Notification and Report Form pursuant to the HSR Act with respect to the Transactions within 10 Business Days of the Effective Date, (B) make all other required filings pursuant to other applicable antitrust Laws with respect to the Transactions as promptly as practicable, and (C) not extend any waiting period under the HSR Act or any other applicable antitrust Law, nor enter into any agreement with the FTC or the DOJ or any other Governmental Authority not to consummate the Transactions, except with the prior written consent of the other party (which shall not be unreasonably withheld, conditioned or delayed).  If required, each Party shall supply as promptly as practicable any additional information or documentation that may be requested pursuant to the HSR Act or any other applicable Law and use its best efforts to take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act and any other applicable antitrust Law as soon as possible.

(c)    If required, Buyers and Sellers shall in connection with the actions referenced in Section 6.2(b) to obtain all Governmental Approvals for the Transactions under the HSR Act or any other applicable antitrust Law, each use its best efforts to (i) cooperate in all respects with each other in connection with any communication, filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other party and its counsel informed of any communication received by such party from, or given by such party to, the FTC, the DOJ or any other United States or other Governmental Authority and of any communication received

- 35 -

or given in connection with any proceeding by a private party, in each case regarding any of the Transactions; (iii) consult with each other in advance of any meeting or conference with the FTC, the DOJ or any other Governmental Authority or, in connection with any proceeding by a private party, with any other Person, and to the extent permitted by the FTC, the DOJ or such other Governmental Authority or other Person, give the other party and its counsel the opportunity to attend and participate in such meetings and conferences; and (iv) permit the other party and its counsel to review in advance any submission, filing or communication (and documents submitted therewith) intended to be given by it to the FTC, the DOJ or any other Governmental Authority; provided that materials may be redacted to remove references concerning the valuation of the businesses of Sellers.  Buyers and Sellers shall as each deems advisable and necessary, reasonably designate any competitively sensitive material to be provided to the other under this Section 6.2(c) as "Antitrust Counsel Only Material."  Such materials and the information contained therein shall be given only to the outside antitrust counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient unless express permission is obtained in advance from the source of the materials (Buyers or Sellers, as the case may be) or its legal counsel.

(d)     In furtherance and not in limitation of the covenants of the parties contained in Sections 6.2(b) and 6.2(c), Buyers shall, if required, use their best efforts to (i) avoid the entry of, or to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that would restrain, prevent or delay the Closing on or before the End Date, including defending through litigation on the merits any claim asserted in any court with respect to the Transactions by the FTC, the DOJ or any other applicable Governmental Authority or any private party; and (ii) avoid or eliminate each and every impediment under any applicable antitrust Law so as to enable the Closing to occur as soon as possible (and in any event no later than the End Date), including (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of any of the businesses, product lines or assets of Buyers or their Affiliates or the Sellers or their Affiliates (collectively, the "Subject Assets"), (y) otherwise taking or committing to take actions that after the Closing would limit Buyers' or their Affiliates' freedom of action with respect to, or its or their ability to operate and/or retain, one or more of the Subject Assets, and (z) agreeing to divest, sell, dispose of, hold separate, or otherwise take or commit to take any action that limits its freedom of action with respect to, or Buyers' or their Affiliates' freedom of action with respect to, or its or their ability to operate or retain, any of the Subject Assets; provided, however, that any action contemplated by clauses (x), (y) and (z) may be conditioned upon the consummation of the Transactions.  For the avoidance of doubt, notwithstanding anything to the contrary in Sections 6.2(b) and 6.2(c), Sellers shall not be obligated to take any of the actions described in clauses (x), (y) or (z) of the preceding sentence with respect to any of the Sellers or their investors or Affiliates, or any of their respective businesses or assets.  It shall not be deemed a failure to satisfy the conditions specified in Section 7.1(a) if, as a result of any suit brought by any Person or Governmental Authority challenging the Transactions as violating any applicable antitrust Law, a court enters or the applicable Governmental Authority makes an order or decree permitting the Transactions, but requiring that any of the Subject Assets be divested or held separate by Buyers, or that would otherwise limit an applicable Buyer's freedom of action with respect to, or their  ability to operate and retain, the Subject Assets.

(e)     Buyers agree to provide such security and assurances as to financial capability, resources and creditworthiness as may be reasonably requested by any Governmental Authority or other Third Party whose consent or approval is sought in connection with the Transactions.  Whether or not the Transactions are consummated, Buyers shall be responsible for all filing fees and payments to any Governmental Authority in order to obtain any consents, approvals or waivers pursuant to this Section 6.2.

(f)     Sellers and Buyers shall give notice to the other promptly upon becoming aware of (i) any notice or other communication from any Person alleging that the Consent of such Person is or may be required in connection with the Transactions; (ii) any notice or other communication from any Governmental Authority with respect to the Transactions; and (iii) any Proceedings or Educational Agency proceedings commenced or, to Sellers' Knowledge, threatened against, relating to or involving or otherwise affecting it that relate to the consummation of the Transactions.

6.3.    <u>Access and Information</u>.

(a)     *Pre-Closing Access & Cooperation*.  From the Original Effective Date through the Closing, so long as this Agreement remains in effect, the Sellers will afford Buyers, Buyers' Representative and their respective Representatives reasonable access, upon reasonable notice from Buyers, to the facilities, personnel and Books and Records of the Sellers for the opportunity for Buyers to investigate the Business and to conduct transitional planning and will furnish to Buyers, the Buyers' Representative and their respective Representatives such additional financial and operating data and other information relating to the Business as Buyers reasonably request; <u>provided</u>, <u>however</u>, that any such access or furnishing of information shall be:  (i) limited to such access and/or information as is reasonably required to prepare for the Closing and the transition to Buyers' ownership and operation of the Business; (ii) scheduled and coordinated through the Person(s) set forth on <u>Schedule 6.3</u>; and (iii) conducted at Buyers' expense, during normal business hours, under the supervision of the Sellers' or their Affiliates' personnel and in such a manner as not to interfere with the normal operations of the Business.  The Sellers shall not be required to disclose any information to Buyers if such disclosure would be reasonably likely to:  (A) jeopardize any attorney client or other legal privilege; or (B) contravene any applicable Law, Educational Law, fiduciary duty or binding agreement entered into prior to the Effective Date.  In accordance with this <u>Section 6.3(a)</u>, Sellers shall provide such reasonable cooperation and assistance as Buyers and their Representatives may request with respect to information for transitional planning for human resources, employee benefits, insurance, information technology and campus administration, provided that no such requests shall interfere with Sellers' operation of the Business nor may Buyers give any direction to any of Sellers' Employees with respect to performance of their responsibilities and duties.  Buyers will keep confidential, and Buyers will cause their Representatives to keep confidential, all confidential information that Buyers or any of their  Representatives receive from or on behalf of the Sellers in the course of the actions contemplated in this <u>Section 6.3(a)</u>, and Buyers will not, and Buyers will cause each of their  Representatives not to, use any of such confidential information except in connection with this Agreement and, if this Agreement is terminated for any reason whatsoever, will return to the Sellers all tangible embodiments (and all copies) of such confidential information (including all reports, analyses and other derivatives therefrom) that are in or under Buyers' or any of their Representatives' possession or control.

(b)     *Post-Closing Access*.  Throughout the six-year period after the Closing, subject to the reasonable confidentiality precautions of the party whose information is being accessed, each of Buyers and the Sellers will, during normal business hours and upon reasonable notice from any requesting party, at such requesting party's expense:  (i) cause such requesting party and such requesting party's Representatives to have reasonable access to the Books and Records of such party, and to the personnel responsible for preparing and maintaining such Books and Records, in each case to the extent reasonably necessary to:  (A) defend or pursue any Proceeding; (B) defend or pursue indemnification matters hereunder; (C) prepare or audit financial statements; (D) prepare or file Tax Returns; or (E) address Tax, accounting, financial or legal matters or respond to any investigation or other inquiry by or under the control of any Governmental Authority or Educational Agency; and (ii) permit such requesting party and such requesting party's Representatives to make copies of such Books and Records for the foregoing purposes.  If requested by a party, such requesting party will provide reasonable substantiation of such requesting party's purpose for such access to show that such access is for any of the foregoing purposes.

(c)     *Post-Closing Information Retention*.  At and after the Closing, the Sellers may retain copies of Books and Records for the Purchased Assets or the Business that are in the Sellers' possession or control (or the possession or control of any of its Affiliates), in each case for any purpose described in Section 6.3(b)(i).  Further, Buyers and Sellers agree to hold all the Books and Records for the Business existing on the Closing Date and not to destroy or dispose of any of such Books and Records for a period of six years from the Closing Date or such longer time as may be required by Law, and thereafter, if it desires to destroy or dispose of such Books and Records, to offer first in writing at least 60 days prior to such destruction or disposition to surrender them to Buyers or Sellers, as applicable.

6.4.    Confidentiality; Publicity.

(a)     *Confidentiality Agreement*.  The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time the Confidentiality Agreement shall terminate.  For a period of two years from and after the Closing, (i) Buyers and the Sellers shall, and shall cause their respective officers, directors, managers, governors, Representatives and Affiliates to, treat and hold as confidential, and not disclose to any Person, information related to the discussions and negotiations among the parties regarding this Agreement and the Transactions; (ii) Buyers shall, and shall cause its officers, directors, managers, governors, Representatives and Affiliates to, treat and hold as confidential, and not disclose to any Person, any confidential information which was obtained in connection with the Transactions relating to the Sellers (other than confidential information relating exclusively to the Business) and their Affiliates; and (iii) the Sellers shall, and shall cause their officers, directors, managers, governors, Representatives and Affiliates to, treat and hold as confidential, and not disclose to any Person, any confidential information (A) relating exclusively to the Business or (B) which was obtained in connection with the Transactions relating to Buyers and its Affiliates.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall continue in full force and effect.

(b)     *Public Announcements*.  Except as stated in this Section 6.4(b), each party will not, and each party will cause each of its Affiliates not to, make any public release or announcement regarding this Agreement or any of the Transactions without the prior written approval thereof of each other party (which, after the Closing, will not be unreasonably withheld, conditioned or delayed).  Buyers and the Sellers will cooperate with each other in issuing, promptly after the Closing, a joint press release that announces the Parties' entry into this Agreement and the Transactions generally.

(c)     *Certain Permitted Disclosures*.  Notwithstanding the foregoing, nothing in this Section 6.4 will prevent any of the following at any time:

(i)     a Party or any of its Affiliates disclosing any information to the extent required under applicable Law;

(ii)    a Party or any of its Affiliates sharing any information with or providing any information to Governmental Authorities, Educational Agencies or accrediting bodies to facilitate receipt of a Consent, Pre-Closing Notification and Consent, Pre-Acquisition Review Response, Educational Permit or accreditation;

(iii)   the Sellers informing other potential acquirers of the Business that a definitive agreement has been entered into;

(iv)    the Sellers communicating with any of their vendors, suppliers or other Persons on a need-to-know basis regarding the Transactions, including in connection with the solicitation and receipt of any Consents from such Persons;

(v)      a Party communicating to its direct or indirect stockholders, members or partners (as applicable);

(vi)      a Party or any of its Affiliates making a statement or disclosure (A) as part of its or any of its Affiliates' financial statements or Tax Returns or (B) to the extent reasonably necessary to enforce or comply with this Agreement; or

(vii)      a Party making a statement or disclosure to (A) such Party's (or any of its Affiliates') paid legal, accounting and financial advisers to the extent reasonably necessary for any such adviser to perform its paid legal, accounting and financial services, respectively, for such Party (or such Affiliate) or (B) any lender or prospective lender of such Party (or such Affiliate) to the extent reasonably required as part of such lending relationship; provided, however, that such Party will cause each Person to whom such statement or disclosure is made under this clause (vii) to keep confidential and not disclose to any other Person any information in such statement or disclosure.

6.5.      Bulk Transfer Laws.  Sellers and their Affiliates shall be responsible for compliance with the provisions of any "bulk sales law" or "bulk transfer law" or any similar laws of any jurisdiction which may be applicable to the sale of the Purchased Assets to any of the Buyers.

6.6      No Solicitation or Negotiation.

(a)      Except as permitted by Section 6.6(b), Sellers, Sellers' Representative and their Affiliates agree that between the Original Effective Date and the earlier of (a) the Closing and (b) the termination of this Agreement, they shall not (and shall direct their respective officers, trustees, directors, employees, representatives or agents (including counsel, accountants or other advisors) not to), directly or indirectly, without the prior written consent of Buyers and Buyers' Representative, (i) solicit, invite submission of or knowingly encourage proposals or offers from any Person (other than Buyers' Representative and its officers, directors, representatives and agents) relating to any acquisition or purchase of all or any material portion of the Business or the Purchased Assets or any equity interests in Sellers or Sellers' Representative, including with respect to any proposed recapitalization, merger or business combination involving the Business or any part of the Purchased Assets or the Institutions or any private or public offering of shares of the capital stock of or business combination involving Sellers, Sellers' Representative, the Business, the Purchased Assets or the Institutions (any of the foregoing, an "Acquisition Proposal"), (ii) participate in any substantive discussions or negotiations regarding an Acquisition Proposal with any Person (other than Buyers' Representative and its officers, directors, representatives and agents), (iii) enter into or consummate any Acquisition Proposal with any Person (other than with Buyers' Representative), (iv) furnish any information concerning the Business, the Purchased Assets or the Institutions, or afford access to the properties, books, or records of Sellers, to any Person that has made, or in connection with the making or solicitation of, an Acquisition Proposal (other than Buyers' Representative and its officers, directors, representatives and agents), or (v) otherwise directly or indirectly knowingly cooperate in any way with, assist or participate in, or facilitate or encourage any offer or attempt by any other Person to do any of the foregoing.  Sellers and Sellers' Representative represent that they have terminated (and have directed their Affiliates and their respective trustees, directors, employees, representatives and agents (including counsel, accountants and other advisors) to terminate) any and all discussions with third parties (other than Buyers' Representative and its officers, directors, representatives and agents) regarding any Acquisition Proposal.

(b)      If at any time on or after the date of this Agreement and prior to May 1, 2017, Sellers, Sellers' Representative, their Affiliates, or any of their representatives receives from a third party an unsolicited bona fide written Acquisition Proposal that has not been withdrawn, Sellers, Sellers' Representative, their Affiliates, or any of their representatives shall be permitted to communicate with

such third party solely to clarify the terms of such Acquisition Proposal. In addition, and notwithstanding the foregoing, nothing in Section 6.6(a) shall prohibit Sellers, Sellers' Representative or their Affiliates from furnishing nonpublic information regarding the Sellers or the Business to, or entering into discussions with, any Person in response to a written Acquisition Proposal that is submitted to any Seller or Sellers' Representative by such Person (and not withdrawn) if (i) none of Sellers, Sellers Representative or any of their Affiliates shall have breached in any material respect or taken any action inconsistent in any material respect with any of the provisions set forth in Section 6.6(a); (ii) the EDMC board of directors determines in good faith, (a) after consultation with EDMC's outside legal counsel and financial advisor, that such Acquisition Proposal is reasonably likely to constitute a Superior Proposal and (b) after consultation with EDMC's outside legal counsel, that the failure to take such action would be inconsistent with the EDMC board of directors' fiduciary duties under applicable Law; (iii) after receiving an executed confidentiality agreement in a customary form that is no less favorable to Sellers with respect to confidentiality than the Confidentiality Agreement and promptly after furnishing any such nonpublic information to, or entering into discussions with, such Person, the Sellers' Representative gives Buyers written notice of the Sellers' intention to furnish nonpublic information to, or enter into discussions with, such Person; and (iv) the Sellers' Representative furnishes such nonpublic information to Buyers' Representative within 24 hours after such nonpublic information is furnished to such Person (to the extent such nonpublic information has not been previously furnished or made available to Buyers). Before May 1, 2017, Sellers' Representative shall (1) promptly (and in any event within 24 hours) advise Buyers' Representative in writing of the receipt of any Acquisition Proposal that is made or submitted by any Person during such period, (2) provide to Buyers' Representative a reasonably detailed summary of the material terms and conditions thereof (but not the identity of the Person making such Acquisition Proposal) and copies of any written materials received from or on behalf of such Person relating to such Acquisition Proposal, (3) keep Buyers' Representative reasonably informed of any material developments, discussions or negotiations regarding such Acquisition Proposal (including any material modifications to the financial or other material terms and conditions of such Acquisition Proposal) on a prompt basis (and provide copies of any written materials received from or on behalf of such Person relating to such Acquisition Proposal) and (4) upon the request of Buyers' Representative, reasonably inform Buyers' Representative of the status of such Acquisition Proposal.

(c)     If at any time prior to May 1, 2017, Sellers receive an Alternative Proposal that the EDMC board of directors has determined in good faith, after consultation with EDMC's outside legal counsel and financial advisor, is a Superior Proposal (after giving effect to all of the revisions to the terms of this Agreement which may be offered by Buyer), the Sellers may terminate this Agreement in accordance with Section 8.1(d) to enter into a definitive agreement providing for the implementation of such Superior Proposal, if the EDMC board of directors has determined in good faith, after consultation with outside legal counsel, that the failure to terminate this Agreement would be inconsistent with its fiduciary duties under applicable Law; provided, however, that the Sellers' Representative will not terminate this Agreement pursuant to the foregoing clause, and any purported termination pursuant to the foregoing clause will be void and of no force or effect, unless within two Business Days of such termination the Sellers pay the Termination Fee and otherwise comply with the provisions of Section 8.1 and Section 8.3; and provided, further, that the Sellers' Representative may not terminate this Agreement pursuant to the foregoing clause unless (i) the Sellers' Representative shall have provided prior written notice to Buyers' Representative, at least three Business Days in advance, of EDMC's intention to take such action with respect to such Superior Proposal, which notice shall include the terms and conditions of such Superior Proposal and attach a copy of the most current draft of any written agreement relating to such Superior Proposal (it being understood and agreed that any amendment to any material term or condition of such Superior Proposal shall require a new written notice to Buyers' Representative and an additional three Business Day notice period), (ii) the Sellers' Representative shall have given Buyers' Representative three Business Days after Buyers' Representative's receipt of the written notice of such Superior Proposal to propose revisions to the terms of this Agreement or make another proposal and shall

have negotiated in good faith with Buyers' Representative with respect to such proposed revisions or other proposal, if any, and (iii) after considering the results of such negotiations and giving effect to such proposed revisions or other proposal, if any, the EDMC board of directors will have determined in good faith, after consultation with EDMC's outside legal counsel and financial advisor and taking into account the Termination Fee, that such Superior Proposal continues to meet the definition of "Superior Proposal" and, after consultation with EDMC's outside legal counsel, that the failure to terminate this Agreement would be inconsistent with the EDMC board of directors' fiduciary duties under applicable Law.

6.7    Non-Competition and Non-Solicitation.

(a)    *Non-Competition*.  In consideration of the Purchase Price and as a material inducement to Buyers and Buyers' Representative to enter into this Agreement and to pay the Purchase Price, during the period beginning on the Closing Date and ending on the date which is the three year anniversary date following the Closing Date (the "Non-Compete Period"), Sellers and Sellers' Representative shall not, and shall not permit any of their Affiliates to, engage (whether as an owner, operator, manager, employee, officer, director, consultant, advisor, representative or otherwise), directly or indirectly in the business of (i) owning or operating postsecondary educational institutions or (ii) owning any other provider of postsecondary educational programs that are substantially similar in scope and subject matter, content or learning outcome to programs that are offered by the Institutions, either online or at any campus facility that is within a one hundred (100) mile radius of any current location of the Institutions, provided that nothing in this Section 6.7 shall restrict the right of Sellers and Sellers' Representative to own and operate Institutions that are both (i) owned or operated by Sellers or Sellers' Representative's as of the date of this Agreement and (ii) are not listed on Schedule C.  Sellers and Sellers' Representative expressly acknowledge and agree that each and every restriction imposed by this Section 6.7 is reasonable with respect to subject matter, time period and geographical area.

(b)    *Non-Solicitation*.  Sellers and Sellers' Representative agree that, during the Non-Compete Period, they shall not, and shall not permit any of their Affiliates to, directly or indirectly contact, approach or solicit for the purpose of offering employment to or hiring (whether as an employee, consultant, agent, independent contractor or otherwise) or actually hire any Transferred Employee during the Non-Compete Period, without the prior written consent of Buyers' Representative or the applicable Buyer, provided that this will not apply to any general solicitation of employment not targeted towards the Transferred Employees nor to any Transferred Employee who responds to a general advertisement of employment.

(c)    *Remedy for Breach*.  Each party acknowledges and agrees that in the event of a breach of any of the provisions of this Section 6.7, the non-breaching party may be irreparably harmed and monetary damages shall not constitute a sufficient remedy.  Consequently, in the event of any such breach, the non-breaching party and/or its successors or permitted assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction to seek specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions of this Section 6.7, in each case without the requirement of posting a bond or proving actual damages (which requirements the breaching party shall waive).

(d)    *Enforcement*.  If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 6.7 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement

- 41 -

shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

6.8     _Employment Matters_.

(a)     *Employment*.  Effective as of the Closing Date, Buyers shall (or shall cause their Affiliates to) offer employment to each Employee, whether on active or inactive status, in each case in the same position and on substantially the same terms and conditions as provided to each such Employee immediately prior to the Closing, provided that, other than for those individuals listed on Schedule 1.1(c), Buyers, upon written notice to Sellers no later than 45 days to the Closing, may reasonably determine to not employ any Employees reporting directly to the CEO of EDMC ("Non-Transferred Senior Employees").  Effective as of the Closing Date, Buyers shall assume the Liabilities of the Sellers in respect of the Transferred Employees for accrued but unpaid salaries, wages, incentive compensation and any earned (but unused) paid vacation time, sick leave or similar time off accrued as of the Closing Date, to the extent such Liabilities that are required to be accrued as current liabilities in Net Working Capital pursuant to the Net Working Capital Statement are included in the Net Working Capital calculation; provided that Buyers shall also allow Transferred Employees, who have earned (but unused) vacation time or similar time off that is not required to be accrued in Net Working Capital pursuant to the Net Working Capital Statement, to use such vacation time or similar time off after Closing upon reasonable advance notice relative to their responsibilities and the demands of Buyers' operations. Sellers shall retain all compensation and benefit obligations for any Non-Transferred Senior Employees.

(b)     *Compensation and Benefits Comparability*.  Except as otherwise provided under the terms of any Benefit Plans that are maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers, or as otherwise specified in this Agreement, the Transferred Employees shall cease, effective as of the Closing Date, any active participation in (including eligibility to contribute to) and any benefit accrual under such Benefit Plans, and the Sellers and such Benefit Plans shall retain any liability or obligation with respect to benefits accrued or claims incurred by Transferred Employees prior to the Closing Date. Immediately following the Closing and continuing for a period of 12 months from the Closing Date, Buyers shall or shall cause their Affiliates to provide to the Transferred Employees who remain in the employment of Buyers or any of its Affiliates compensation and benefits (including severance and paid time off benefits) that, with respect to each such Transferred Employee, are substantially similar in the aggregate to those in effect for such Transferred Employee immediately prior to the Closing.

(c)     *WARN Act Liabilities*.  Buyers shall be solely responsible for any WARN Act notices or liabilities arising from or resulting from the termination by the Sellers of any Employees or the termination by Buyers of any Transferred Employees, and Sellers shall be solely responsible for any WARN Act notices or liabilities arising from or resulting from the termination by the Sellers of any employees other than the Transferred Employees after the Closing Date.

(d)     *Service Credit*.  To the extent possible within the terms of any Benefit Plan maintained by Buyers of their Affiliates (including pursuant to any amendment or reasonable contractual changes to any such Benefit Plan), Buyers shall, and shall cause their Affiliates to, recognize the prior service, compensation and seniority of, or recognized with respect to, each Transferred Employee as if such service had been performed with, and such compensation and seniority had been earned with, Buyers or its Affiliates for all purposes, including eligibility, vesting, service related level of benefits and benefit accrual under the Benefits Plans provided by Buyers to the Transferred Employees following the Closing, to the same extent such service, compensation and seniority is recognized by the Sellers or their Affiliates immediately prior to the Closing.

(e)      *Benefit Plans*.  Within five (5) Business Days of notice from Sellers with appropriate documentation, Buyers shall promptly reimburse Sellers for the cost of any Benefits paid by Sellers to any Employees in the month in which the Closing occurs.  To the extent possible within the terms of  any Benefit Plan maintained by Buyers or their  respective Affiliates in which Transferred Employees are eligible to participate after the Closing (including pursuant to any amendment or reasonable contractual changes to any such Benefit Plan), Buyers shall, and shall cause their Affiliates to:  (i) waive all limitations as to preexisting conditions and exclusions, actively at work requirements and any evidence of insurability with respect to participation and coverage requirements applicable to such Transferred Employee and his or her covered spouse or dependents to the extent such conditions and exclusions were satisfied or did not apply to such Transferred Employee under the Benefit Plans maintained by the Sellers or any of their Affiliates immediately prior to the Closing; and (ii) provide each Transferred Employee with credit for any co-payments and deductibles paid by such Transferred Employee and his or her covered spouse or dependents prior to the Closing in the plan year in which the Closing occurs in satisfying any analogous deductible or out-of-pocket requirements to the extent applicable under any such plan (provided that affected Transferred Employees provide an explanation of benefit form that supports such credit).  Effective as of the Closing, Buyers or their Affiliates shall assume all obligations to offer COBRA coverage under Code 4980B to any Transferred Employee (and their covered dependents) who is an "M&A qualified beneficiary" (as defined in Treasury Regulations 54.4980B-9) with respect to the Transactions.  A Transferred Employee on the United States payroll who was disabled as of the Closing Date shall be eligible to apply for long-term disability benefits under the Sellers' long-term disability insurance policy.

(f)      *Termination*.  Nothing in this <u>Section 6.6</u> restricts the right of Buyers to terminate the employment of any Transferred Employee after the Closing, provided any such termination is effected in accordance with applicable Law and the terms and conditions of this <u>Section 6.6</u>.

(g)      *Third Party Beneficiaries*.  Nothing in this <u>Section 6.6</u> shall create any third party beneficiary right in any Person (other than the Parties to this Agreement), including any Transferred Employee, any participant in any Benefit Plan, or any dependent or beneficiary thereof, or any right to continued employment with Buyers, the Sellers or any of their Affiliates.  Nothing in this <u>Section 6.6</u> shall constitute an amendment to any Benefit Plan or any other plan or arrangement covering any Transferred Employees.

6.9.    <u>Tax Matters</u>.

(a)      *General Requirements*.  The Sellers shall pay when due, or cause to be paid, all Income Taxes with respect to the Sellers or the Sellers' operation of the Business before the Closing Date. Buyers will pay when due, or cause to be paid, all other Taxes with respect to the Business, the Purchased Assets, Buyers or Buyers' operation of the Business for all Tax periods on or after the Closing Date, including any property Taxes payable, or relating to the period(whenever assessed).

(b)      *Transfer Taxes*.  The Sellers and Buyers shall cooperate in timely making all filings, returns, reports and forms as may be required in connection with transfer, sales, use, value added, registration, excise and other similar taxes, fees and duties imposed on the purchase and sale of the Purchased Assets ("<u>Transfer Taxes</u>").  The Sellers and Buyers, as appropriate, shall execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements relating to any such Transfer Taxes.  Sellers, on the one hand, and Buyers, on the other hand, each shall pay one-half of all Transfer Taxes; <u>provided</u>, <u>however</u>, that the Buyers and the Sellers shall use, and the Buyers and the Sellers shall cause each of their Affiliates to use, reasonable efforts to avail themselves of any available exemptions from any such Transfer Taxes, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such

- 43 -

exemption. Buyers shall, upon request, provide the Sellers with documentation that may be necessary to show that such Transfer Taxes were paid.

(c)  *Cooperation*.  Each Party will, and each Party will cause its applicable Affiliates to, cooperate in all reasonable respects with respect to Tax matters and provide one another with such information as is reasonably requested to enable the requesting Party to complete and file all Tax Returns it may be required to file (or cause to be filed) with respect to the Business, to respond to Tax audits, inquiries or other Tax Proceedings and to otherwise satisfy Tax requirements.

6.10.  Consent; Assignment of Agreements.  The Sellers shall use their reasonable best efforts prior to, and if necessary after, the Closing, to obtain at the earliest practicable date any Consent from a Third Party (other than a Governmental Authority or Educational Agency) to the Transactions required by any Assumed Contract which requires consent to assignment, without any conditions adverse to Buyers.

6.11.  Delivery of Interim Financial Statements; Enrollment and Admissions Staffing Reports. The Sellers' Representative will deliver to the Buyers' Representative, from and after the Original Effective Date through the Closing Date (a) within 15 Business Days after the last day of each calendar month that is not the end of a fiscal quarter, (i) the unaudited balance sheet of the Business as of the last day of each calendar month; (ii) the related income statement for each such calendar month; (iii) such other financial information for such month as is provided to management of EDMC; and (iv) the admissions staffing of the Business as of the last day of each calendar month; and (b) within 45 Business Days after the end of each fiscal quarter, (i) the unaudited balance sheet of the Business as of the last day of each fiscal quarter; (ii) the related income statement for each such fiscal quarter; (iii) such other financial information for such fiscal quarter as is provided to management of EDMC; and (iv) the admissions staffing of the Business as of the last day of each fiscal quarter.  Such unaudited balance sheets and income statements (i) shall be prepared in accordance with the books of account and other financial records of Sellers as they relate to the Institutions (which books and records shall be accurate and complete in all material respects), (ii) shall be prepared in accordance with U.S. GAAP (excepting footnote disclosures and year-end adjustments), and (iii) shall present fairly, in all material respects, the financial position and results of operations of the Business, as of the statement dates and for the periods indicated.

6.12.  Post-Closing Deliveries.  After the Closing, each Party will promptly deliver to the proper Party any mail or other communications, monies, checks or other instruments of payment received by such Party that belong to such other Party or to which such other Party is entitled.

6.13.  Further Assurances.  Following the Closing, if any further action is necessary, proper or desirable to carry out any purpose of this Agreement, then each Party will take such further action (including the execution and delivery of further documents) as any other Party reasonably requests to carry out such purpose.  The foregoing will be at the expense of such requesting Party, except to the extent such requesting Party is entitled to indemnification therefor or to the extent this Agreement otherwise allocates such expense to any other Party.

6.14.  Expenses.  Except as otherwise provided herein, each party shall pay all of its own fees, costs and expenses incurred in connection with this Agreement and the Transactions, including the fees and disbursements of counsel, financial advisors, investment bankers, consultants, brokers and accountants, whether or not the Closing occurs.  Notwithstanding the foregoing, following the Original Effective Date, Sellers shall reimburse Buyers on a monthly basis for any reasonable out-of-pocket fees, costs or expenses incurred by any Buyers following the Original Effective Date and actually paid by any such Buyers to a Third Party that are directly related to the Transactions, in an amount not to exceed, in the aggregate, $250,000 (the "Post-Signing Deal Expenses").  The applicable Buyer or Buyers'

- 44 -

Representative shall provide Sellers with reasonably detailed documentation of each such Post-Signing Deal Expense prior to reimbursement.  At the Closing, the aggregate amount of Post-Signing Deal Expenses actually paid by Sellers to the applicable Buyer or Buyers' Representative, together with the Pre-Signing Deal Expenses, shall be added to the amount owed in the form of Deferred Payments.

6.15.  <u>No Affiliation; Amendment of Seller Names</u>.  As of the Closing, Buyers, on the one hand, and Sellers, on the other hand, each shall not, and shall cause each of their Affiliates not to, hold themselves out as having any affiliation with the other except to the extent provided for under any of the Ancillary Agreements. Within 120 days of the Closing, Sellers shall take all necessary action to formally amend their organizational names to not include any reference to any of the Institutions or Schools.

6.16.  <u>Contact with Persons Regarding the Business</u>.  Until the Closing Date, none of Buyers' Representative, Buyer, their Affiliates or their Representatives shall contact or communicate with the employees, students, suppliers, customers, licensors or landlords of the Business in connection with the Transactions or the operation of the Business without the prior written consent of the Sellers, and any such contacts or communications to which consent is granted shall be coordinated with the Person(s) set forth on <u>Schedule 6.16</u>.  For clarity, Buyers, their Affiliates and their Representatives shall not be precluded from contacting or communicating with any Person in the Ordinary Course for any purpose unrelated to the Business and the Transactions.

6.17.  <u>Consent Judgment Compliance</u>.  From and after the Closing, Buyers agree to comply with all obligations and conditions set forth in the Consent Judgment applicable to the Business and the Purchased Assets; provided that nothing in this <u>Section 6.17</u> shall cause Buyers to have any Liability with respect to pre-Closing obligations under the Consent Judgment.

6.18.  <u>Lease Obligations</u>.  Between the Original Effective Date and the Closing Date, the Sellers and Buyers shall, and each shall cause its or their respective Affiliates to, use its or their reasonable best efforts to cause each of the leases or lease guarantees set forth on <u>Schedule 6.18</u> (the "<u>Lease Obligations</u>") to be assigned from the Sellers or one of their Affiliates to Buyers other than DCF or one of their Affiliates on the terms set forth in such leases or lease guarantees; provided that any amendment to the Lease Obligations shall require the consent of the applicable Seller and the applicable Buyer. Following the Closing, Buyers other than DCF (a) shall not exercise any option under, or agree to any renewal, extension, expansion, amendment, modification or acceleration of, any of the terms of any of the Lease Obligations if such action would increase or extend the potential Liability of the Sellers or any of their Affiliates under the Lease Obligations; and (b) shall, and shall cause their Affiliates to, use their reasonable best efforts to cause the Sellers and their Affiliates not to have any Liability for the Lease Obligations.  In addition, Buyers other than DCF shall, and shall cause their Affiliates to, promptly pay all post-Closing expenses and costs relating to the Lease Obligations and promptly indemnify and hold harmless the Sellers and their Affiliates from and against any and all Losses incurred by the Sellers and their Affiliates under the Lease Obligations after the Closing for any obligations or liabilities arising thereunder following the Closing without regard to any limitations on indemnification set forth in <u>Article IX</u>.  Sellers shall give prompt written notice to Buyers' Representative and the applicable Buyer of any claims, demands, actions or suits made or brought against any of the Sellers by any landlord or lessor concerning the Lease Obligations.  Following any such notice, Sellers shall provide a reasonable opportunity for the applicable Buyer and Buyers' Representative to participate in the response to and defense of the same.

6.19.  <u>Surety Bonds</u>.  Upon the request of Buyers and if required by any Educational Agency or Governmental Authority in connection with the Transactions, solely to the extent that any Seller has an existing surety bond in place with such Educational Agency or Governmental Authority and solely in the amount of such existing surety bond (in each case as set forth on <u>Schedule 6.19</u>) (the "<u>Surety Bonds</u>"),

such Seller will leave such Surety Bond in place for up to six months after the Closing Date.  On or before the six-month anniversary of the Closing Date, the applicable Buyer shall enter into a new surety bond to replace the Surety Bond from the applicable Seller and shall assume all liabilities associated with the acquired School's state licensing and surety requirements.  Buyers shall use reasonable best efforts to use the same surety providers as are in use by the applicable Seller in obtaining such replacement Surety Bonds.  For the avoidance of doubt, if Buyers, at the request of any Educational Agency or Governmental Authority, assume any liabilities associated with any surety bond that arose prior to Closing, such assumption shall not alter the provisions of Article IX respecting the indemnification obligations of the Parties with respect to each other.

6.20.  Restructuring.  Between the Original Effective Date and the Closing Date, the Sellers shall, and shall cause their respective Affiliates to, take such actions as are necessary to obtain all Educational Agency approvals to re-designate and shall have re-designated, as additional locations of an Institution that is not part of the Business, those school locations set forth on Schedule 7.1(f) that are currently operating as locations of an Institution that is part of the Business.

6.21.  Texas Workforce Commission Provisions.  The Parties acknowledge that, effective upon consummation of the transactions contemplated by this Agreement and if required by the Texas Workforce Commission, (a) the Buyers will accept all student refund liabilities which may have arisen during the operation of any Schools regulated by the Texas Workforce Commission ("TWC Schools") by the Sellers or any other former owner, and (b) the Buyers will assume all liabilities, duties and obligations under the enrollment contracts between the students and the Sellers or the TWC Schools, as applicable, under which the Sellers or the TWC Schools are obligated on or after the Closing Date.  For avoidance of doubt, none of the provisions of this Section 6.21 shall be deemed to alter the provisions of Article IX concerning the rights and obligations of the Parties among and between each other.

6.22.  DCF as Buyer; Restrictions on Distributions.

(a)  DCF shall be a Buyer for all purposes under this Agreement other than in connection with (i) any post-Closing indemnification obligations of Buyers under Article IX, (ii) any obligations to make any Deferred Payments (provided that DCF causes the other Buyers to comply with Section 6.22(b)) and (iii) for any other matters as expressly provided in this Agreement.

(b)  Until the Deferred Payments are made in full, without the prior written consent of the Sellers' Representative, (i) Buyers (other than DCF) shall not distribute greater than $3 million to DCF in any 12-month period, and (ii) Buyers shall not make any payments to Lender or any of its Affiliates, other than interest payments with respect to the Debt Financing in an amount not to exceed $4 million in any 12-month period.

6.23.  Financing.

(a)  Buyers shall use their best efforts to finalize and consummate the Financing, and will not terminate any Commitment Letter or amend or waive any material provisions thereof without the prior written consent of the Sellers' Representative, which best efforts shall include (i) negotiating definitive agreements with respect to the Financing (the "Financing Agreements"); (ii) satisfying on a timely basis all conditions in the Commitment Letters and the Financing Agreements; (iii) enforcing their rights under the Commitment Letters and the Financing Agreements, including with respect to specific performance thereunder; and (iv) paying the portion of the Closing Purchase Price which is in excess of the amount of the Financing, if any, and all related fees and expenses in connection with this Agreement and the Transactions.

(b)     Buyers shall give the Sellers' Representative notice immediately following any breach or threatened breach, or any termination or threatened termination by any party, of the Commitment Letters or the Financing Agreements.  Buyers shall keep the Sellers' Representative informed on a reasonably current basis (and at any time upon the Sellers' Representative's reasonable request) in reasonable detail of the status of Buyers' efforts to arrange the Financing (or any alternative financing), including providing copies of all material documents to the Sellers' Representative.

(c)     Prior to the Closing, the Sellers shall, at the Buyers' Representative's sole cost and expense, take commercially reasonable actions as reasonably requested by the Buyers' Representative, that are within the Sellers' control, to satisfy the conditions precedent to the consummation of, and funding under, and in order to comply with the terms and conditions of, the Financing, as applicable, including promptly responding to requests for any information about the Purchased Assets and the Business required by Lender and granting reasonable access to (and copies of) Sellers' records and senior management as reasonably needed to complete the Financing Agreements; provided, however, that (i) Buyers shall only be required to pay any costs or expenses of Sellers in taking such actions if the Financing conditions and terms for which such actions are requested are different from and in addition to the conditions in Sections 7.1 and 7.3 ("Special Conditions and Terms"); (ii) such actions taken to meet any Special Conditions and Terms do not unreasonably interfere with the normal operations or employee relations of the Sellers; and (iii) the Sellers, in order to meet any Special Conditions and Terms, shall not be required to pay any commitment fee or other fee or payment to obtain consent or to incur any liability (other than reasonable out-of-pocket expenses subject to reimbursement by the Buyers' Representative) with respect to the Financing or any alternative financing.

6.24.   EDMC Shareholder Approval; Board of Trustees Approval.

(a)     As promptly as is reasonably practicable following the Effective Date, EDMC will solicit the Requisite Shareholder Vote, either through written consent or a special shareholders meeting.  Any materials provided to the EDMC shareholders before the Requisite Shareholder Vote is obtained will include the EDMC board of directors' recommendation that the shareholders approve this Agreement and the Transactions.

(b)     Buyers will provide, upon reasonable request of EDMC, all information concerning themselves and their Affiliates and such other matters as may be reasonably necessary or advisable in connection with the information provided to EDMC's shareholders.

(c)     Subject to the other provisions of this Agreement, EDMC will (i) take all action necessary in accordance with the Pennsylvania Associations Code and its Organizational Documents to obtain the Requisite Shareholder Vote, including to duly call, give notice of, convene and hold a special meeting of its shareholders for the purpose of voting upon a resolution authorizing the Transactions, if EDMC determines to hold a special shareholder meeting, and (ii) use all reasonable efforts to obtain the Requisite Shareholder Vote.

(d)     If EDMC obtains the Requisite Shareholder Vote pursuant to a written consent of its shareholders, EDMC will prepare and provide an information statement and notice of dissenters' rights to its shareholders in accordance with the Pennsylvania Associations Code and its Organizational Documents.

(e)     Within ten (10) Business Days following the Effective Date, Sellers shall obtain the approval of this Agreement and the Transactions by all boards of trustees required to approve this Agreement and the Transactions with respect to the regionally accredited Institutions subject to their oversight.

6.25.  <u>The Art Institute of Phoenix and The Art Institute of Fort Lauderdale</u>.  With respect to The Art Institute of Fort Lauderdale and The Art Institute of Phoenix (and its additional locations Indianapolis and Las Vegas), Sellers agree that they will use reasonable best efforts to (a) meet all DOE requirements set forth in the PPPA and Addendum submitted to DOE on December 20, 2016, and (b) secure, within the 18-month period established PPPA and Addendum, accreditation by another accrediting recognized by DOE, whether through the applicable Schools becoming approved branches of another currently accredited Institution or by obtaining accreditation from another accrediting agency recognized by DOE. Sellers shall provide updates to Buyers, no less frequently than monthly, on the status of the accreditation efforts.

**ARTICLE VII**
**CONDITIONS PRECEDENT**

7.1.  <u>Conditions to Obligations of Each Party</u>.  The obligations of the parties to consummate the Transactions shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

(a)  *No Orders*.  No Governmental Authority or Educational Agency shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise prohibiting the consummation of such Transactions.

(b)  *Approvals*.  All Pre-Closing Notifications and Consents marked with an asterisk (*) on <u>Schedule 4.3(b)</u> and <u>Schedule 5.3(b)</u>, including the pre-Closing approval of the Texas Workforce Commission if required, shall have been made or obtained.

(c)  *Pre-Acquisition Review Responses*.  The Sellers shall have received the Pre-Acquisition Review Responses and shall have furnished copies thereof to Buyer.

(d)  *Antitrust Approvals*.  The waiting period applicable to the Transactions under the HSR Act shall have expired or early termination or approval shall have been granted, if applicable.

(e)  *Required Consents*.  Buyers and the Sellers shall have obtained a written Consent from each of the Third Parties listed on <u>Schedule 7.1(e)</u>, each dated on or before the Closing Date and remaining in full force and effect as of the Closing Date, copies of which shall have been delivered to Buyers' Representative and Sellers' Representative.

(f)  *Re-Designation Approval*.  The Sellers shall have obtained all Educational Agency approvals to re-designate and shall have re-designated, as additional locations of an Institution that is not part of the Business, those school locations set forth on <u>Schedule 7.1(f)</u> that are currently operating as locations of an Institution that is part of the Business.

7.2.  <u>Conditions to Obligations of Buyers</u>. The obligations of Buyers to effect the Closing shall be subject to the fulfillment (or waiver by Buyer) on or prior to the Closing Date of the following conditions:

(a)  *Representations and Warranties*.  The representations and warranties of the Sellers contained in this Agreement (disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect) shall be true and correct on and as of the Closing Date as if made on and as of such date (other than representations and warranties that address matters only as of a certain date, which shall be true and correct as of such date; <u>provided</u> that for purposes of this <u>Section 7.2(a)</u>, the

- 48 -

reference to the Original Effective Date in the preamble to <u>Article IV</u> shall be ignored), except for any inaccuracy in any representation or warranty that, individually or in the aggregate with any other inaccuracy, has not had a Material Adverse Effect.

(b)  *Covenants*.  The Sellers shall have performed in all material respects the covenants and agreements contained in this Agreement required to be performed by the Sellers on or prior to the Closing Date.

(c)  *Working Capital Line of Credit*.  Buyers shall have established the Working Capital Line of Credit; <u>provided</u> that Buyers may not rely on this provision as a basis for not consummating the Closing or for terminating this Agreement if they have not used best efforts to obtain the required line of credit by the later of (i) June 1, 2017 or (ii) 30 days after the date on which Sellers provide to Buyers the financial results of the Business for the nine months ended March 31, 2017, combined with the projected financial results for the Business for the period from April 1, 2017 through June 30, 2017.

(d)  *Seller Related Agreements*.  Buyers shall have received the Seller Related Agreements, dated as of the Closing Date, duly executed by the applicable Sellers or the Sellers' Representative.

(e)  *Other Closing Deliveries*.  The Sellers shall have delivered (or caused to be delivered) to Buyers each of the other items contemplated to be so delivered by the Sellers under this Agreement, including each item listed in <u>Section 3.2(b)</u>.

(f)  *Material Adverse Effect*.  Between the Original Effective Date and the Closing Date, there shall have been no Material Adverse Effect.

7.3.  <u>Conditions to Obligations of the Sellers</u>.  The obligation of the Sellers to effect the Closing shall be subject to the fulfillment (or waiver by the Sellers), on or prior to the Closing Date, of the following conditions:

(a)  *Representations and Warranties*.  The representations and warranties of Buyers contained in this Agreement (disregarding all qualifications and exceptions contained therein relating to materiality) shall be true and correct on and as of the Closing Date as if made on and as of such date (other than representations and warranties that address matters only as of a certain date, which shall be true and correct as of such date; <u>provided</u> that for purposes of this <u>Section 7.3(a)</u>, the reference to the Original Effective Date in the preamble to <u>Article V</u> shall be ignored), except for any inaccuracy in any representation or warranty that, individually or in the aggregate with any other such inaccuracy, has not had a material and adverse effect on Buyers and does not materially and adversely affect Buyers' ability to consummate the Transactions.

(b)  *Covenants*.  Buyers shall have performed in all material respects their covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date.

(c)  *Buyer Related Agreements*.  The Sellers shall have received the Buyer Related Agreements, dated as of the Closing Date, duly executed by Buyers.

(d)  *Other Closing Deliveries*.  Buyers shall have delivered (or caused to be delivered) to the Sellers each of the other items contemplated to be so delivered by the applicable Buyer under this Agreement, including each item listed in <u>Section 3.2(a)</u>.

7.4.  <u>Frustration of Closing Conditions</u>.  Neither the Sellers, on the one hand, nor Buyers, on the other hand, may rely, either as a basis for not consummating the Closing or terminating this

- 49 -

Agreement, on the failure of any condition set forth in Sections 7.1, 7.2 or 7.3, as the case may be, to be satisfied if such failure was caused by such party's breach of any provision of this Agreement or failure to use its reasonable best efforts to consummate the Transactions, as required by and subject to Section 6.2.

## ARTICLE VIII
### TERMINATION

8.1.    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the written agreement of the Buyers' Representative and the Sellers' Representative;

(b)    by either the Buyers' Representative or the Sellers' Representative upon written notice to the other:

(i)    if the Closing shall not have occurred on or prior to December 5, 2017 (the "End Date"), unless the failure to consummate the Closing is the result of a breach of this Agreement by the party seeking to terminate this Agreement; or

(ii)    if any Governmental Authority issues an Order or takes any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and non-appealable; provided, that the party seeking to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall have used its reasonable best efforts to contest, appeal and remove such Order or action and shall not be in material violation of this Agreement;

(c)    by Buyers' Representative upon written notice to the Sellers' Representative:

(i)    if there has been a breach by the Sellers of any of their representations or warranties under this Agreement such that the condition in Section 7.2(a) will not be satisfied; provided, however, that if such breach is curable and can reasonably be expected to be cured by the End Date, then the right to terminate pursuant to this Section 8.1(c)(i) shall be suspended so long as reasonable, good faith efforts are being exerted to effect a cure;

(ii)    if the Sellers shall have breached any of their covenants or agreements contained in this Agreement such that the condition in Section 7.2(b) will not be satisfied; provided, however, that if such breach is curable and can reasonably be expected to be cured by the End Date, then the right to terminate pursuant to this Section 8.1(c)(ii) shall be suspended so long as reasonable, good faith efforts are being exerted to effect a cure; or

(d)    by the Sellers' Representative by written notice to the Buyers' Representative:

(i)    if there has been a breach by Buyers of any of their representations or warranties under this Agreement such that the condition in Section 7.3(a) will not be satisfied; provided, however, that if such breach is curable and can reasonably be expected to be cured by the End Date, then the right to terminate pursuant to this Section 8.1(d)(i) shall be suspended so long as reasonable, good faith efforts are being exerted to effect a cure;

(ii)    if Buyers shall have breached any of its covenants or agreements contained in this Agreement such that the condition in Section 7.3(b) will not be satisfied; provided, however, that if such breach is curable and can reasonably be expected to be cured by the End Date, then the right to terminate pursuant to this Section 8.1(d)(ii) shall be suspended so long as reasonable, good faith efforts are being exerted to effect a cure; or

(iii)     if Sellers have received a Superior Proposal, in accordance with <u>Section 6.6(b)</u> and complied with the provisions of <u>Section 6.6(c)</u>, <u>provided</u> that Sellers, within two Business Days after the date of termination of this Agreement, pay the Termination Fee to Buyers in accordance with the applicable provisions of <u>Section 8.3</u>.

8.2.    <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to the provisions of <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no further obligation on the part of Buyers or the Sellers (except as set forth in <u>Section 6.4</u> (Confidentiality; Publicity), <u>Section 6.14</u> (Expenses), <u>Article VIII</u> (Termination) and <u>Article X</u> (Miscellaneous), all of which shall survive the termination); <u>provided</u>, <u>however</u>, that nothing herein shall relieve any Party hereto from liability for its willful breach of this Agreement.

8.3.    <u>Termination Fee</u>.

(a)     Sellers shall pay to Buyers a termination fee of $3 million (the "<u>Termination Fee</u>") in the event that this Agreement is terminated (i) by Sellers' Representative pursuant to <u>Section 8.1(d)(iii)</u> or (ii) by either Buyers' Representative or Sellers' Representative pursuant to <u>Section 8.1(b)(i)</u>, so long as, (A) before the date of such termination, a Superior Proposal shall have been received and (B) within six months after the date of termination, Sellers or EDMC shall have entered into a definitive agreement for such Superior Proposal that is subsequently consummated; provided, however, that, for purposes of this <u>Section 8.3(a)(ii)</u>, a transaction shall not be deemed to have been the result of a "Superior Proposal" unless it results in the acquisition of more than 50% of the aggregate operations of the Sellers' Business.

(b)     Any fee due pursuant to <u>Section 8.3(a)(i)</u> shall be paid to DCF by wire transfer of immediately available funds within two Business Days after the date of termination of this Agreement. Any fee due pursuant to <u>Section 8.3(a)(ii)</u> shall be paid to DCF by wire transfer of immediately available funds within two Business Days after the date on which the last applicable event referenced therein occurs.

(c)     No more than one Termination Fee may be payable under this <u>Article 8</u>.  Buyers hereby agree that, upon any termination of this Agreement under circumstances in which Buyers are entitled to the Termination Fee under <u>Section 8.3(a)</u>, Buyers and their Affiliates are precluded from any other remedy against Sellers, at law or in equity or otherwise, and neither Buyers nor any of their Affiliates may seek to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against the Sellers or any of their respective directors, officers, employees, partners, managers, members, or stockholders in connection with this Agreement or the Transactions.

### ARTICLE IX
### INDEMNIFICATION

9.1.    <u>Indemnification by the Sellers</u>.  Subject to the requirements set forth in this <u>Article IX</u>, the Sellers shall jointly and severally indemnify and hold harmless Buyers and their Affiliates (and the officers, directors, managers, governors, equity holders, employees and agents of each of them) (collectively, the "<u>Buyer Indemnified Parties</u>" and individually, a "<u>Buyer Indemnified Party</u>") from and against any and all Losses arising, directly or indirectly, from or in connection with any:

(a)     breach of any representation or warranty (other than Fundamental Representations) made by the Sellers in this Agreement or in any Seller Related Agreement but only where Sellers have Knowledge of their breach of a representation or warranty but fail to disclose such Knowledge to Buyers in a reasonably timely manner;

- 51 -

(b)      breach of any Fundamental Representation;

(c)      any Excluded Liability;

(d)      breach or non-fulfillment of any covenant or other agreement made or to be performed by the Sellers in this Agreement or in any Seller Related Agreements; or

(e)      any Losses resulting from any claim, demand or suit asserted against at any time any of the Buyer Indemnified Parties by any EDMC shareholder regarding the Parties' execution of this Agreement and/or their consummation of the Transactions.

9.2.    Indemnification by Buyers.  Subject to the requirements set forth in this Article IX, Buyers (other than DCF) shall jointly and severally indemnify and hold harmless the Sellers and their Affiliates (and the officers, directors, managers, governors, equity holders, employees and agents of each of them) (collectively, the "Seller Indemnified Parties" and individually, a "Seller Indemnified Party") from and against any and all Losses arising, directly or indirectly, from or in connection with any:

(a)      breach of any representation or warranty made by Buyers in this Agreement or in any Buyer Related Agreement or the failure of any representation or warranty made by Buyers in this Agreement (other than representations and warranties that address matters only as of a certain date, which shall be true and correct as of such date) to be true at Closing as if given at Closing;

(b)      breach or non-fulfillment of any covenant or other agreement made or to be performed by Buyers in this Agreement or in any Buyer Related Agreement;

(c)      failure by Buyers to timely perform, pay and discharge the Assumed Liabilities; or

(d)      any Losses resulting from the ownership or use of the Purchased Assets or the operation of the Business after the Closing, other than any such Losses for which the Sellers are obligated to provide indemnification under Section 9.1 (or for which the Sellers would be so obligated but for the limitations in Section 9.3).

9.3.    Limitations.

(a)      *Deductible.*  A party otherwise liable for indemnification under this Article IX (an "Indemnifying Party") will not have any obligations under Sections 9.1(a), (c), (d), (d) or 9.2(a) unless or until the aggregate amount of Losses for which such Indemnifying Party is obligated thereunder exceeds $500,000 (the "Deductible") and then only for amounts greater than the Deductible.

(b)      *Cap.*  An Indemnifying Party's obligations under Sections 9.1(a), (c), (d), (e) or 9.2(a), in the aggregate, will not exceed an amount equal to $10 million until the six-month anniversary of the Closing, which amount will be reduced to $5 million during the period between the six-month anniversary of the Closing and the 12-month anniversary of the Closing (the "Cap").  Sellers' aggregate Liability for all Losses under this Agreement will not exceed an amount equal to the Purchase Price, as adjusted pursuant to the terms of this Agreement, actually received by Sellers.

(c)      *Third Party and Tax Benefits.*  The amount of any and all Losses payable under this Article IX shall be determined net of (i) any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party with respect to such Losses and (ii) any Tax benefit realized or reasonably expected to be realized as a result of the Loss by the Indemnified Party ("Tax Benefits").

(d)      *Mitigation*.  Each party will use its reasonable best efforts to mitigate (including by causing its Affiliates and each of its and its Affiliates' officers, directors, managers, governors, equity holders, employees and agents to use reasonable best efforts to mitigate) each Loss for which such party is or may become entitled to be indemnified hereunder, including (i) diligently pursuing and attempting to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses and diligently pursuing and attempting to obtain all Tax Benefits prior to seeking indemnification under this Agreement, (ii) incurring costs only to the minimum extent necessary to remedy any breach or remediate any other situation and (iii) refraining from encouraging or soliciting any Third-Party Claim.  An Indemnifying Party's indemnification obligations under this Article IX shall be reduced or eliminated to the extent (i) the Indemnified Party had a reasonable opportunity, but failed, in good faith to mitigate the Loss but only for such amount of reduction that such possible mitigation reasonably could be expected to have accomplished, (ii) the Loss arose from or was caused by actions taken or failed to be taken by any Indemnified Party after the Closing or (iii) the Loss was precipitated by any breach by the Indemnified Party of any provision of this Agreement.

(e)      *Damages*.  No Indemnifying Party shall have any indemnification obligations for special, consequential, incidental, indirect, exemplary or punitive damages, including any claims for Losses based upon lost revenues or profits, down time, reduction in value or loss of anticipated savings, or any Losses determined as a multiple of income, earnings, revenue or the like, except for any consequential Losses suffered by an Indemnified Party which, under applicable law and all relevant circumstances, were reasonably foreseeable to the Indemnifying Party prior to the occurrence of the actions or omissions giving rise to the consequential Losses.

(f)      *Offset Against Deferred Payments*.  If any Buyer Indemnified Party shall have incurred Losses for which it is entitled to be indemnified pursuant to Section 9.1, then subject to the limitations set forth in this Article IX, Buyers' sole recourse shall be to offset the amount of such Losses against the remaining amount of Deferred Payments.  If the Buyer Indemnified Party's entitlement to indemnification has not been finally established at the time such a Deferred Payment is due to be made but a Claim Notice has been delivered pursuant to Section 9.5, then Buyers shall have the right to deposit into an escrow account that is acceptable to the Sellers' Representative the amount of the indemnification claim from such Deferred Payment and, upon final resolution of such indemnification claim, Buyer shall have the right to receive the amount of any Losses for which it is entitled to be indemnified from the escrow account and shall cause the escrow agent to remit to Sellers the balance, if any, of the amount so held in escrow, without interest.

(g)      *Exclusive Remedies*.  From and after the Closing, the indemnification rights provided by this Article IX shall constitute the sole and exclusive remedy of the Indemnified Parties for any breach of representations, warranties, covenants or agreements contained in this Agreement, the Seller Related Agreements and the Buyer Related Agreements other than with respect to covenants or agreements that are required to be performed after the first anniversary of the Closing; provided, however, that nothing herein shall limit (i) any claim based on fraud (an element of which is intent) or (ii) any party's right to seek specific performance, injunctive relief or other equitable remedies.  In furtherance of the foregoing, to the maximum extent permitted by applicable Law, each party hereby waives and (if necessary to give effect to this Section 9.3(g)) will cause each of its Affiliates and each of its and its Affiliates' officers, directors, managers, governors, equity holders, employees and agents to waive, all claims, causes of action and other remedies with respect to such party against each other as a matter of Contract, equity, under or based upon any applicable Law or otherwise (including for rescission), except for claims asserted under and in accordance with the provisions of this Article IX or Section 10.5 or applicable Law on fraud (an element of which is intent).

- 53 -

9.4.     <u>Certain Survival Periods</u>.

(a)      *Survival of Representations and Warranties.*  Each representation or warranty in this Agreement or in any Ancillary Document will survive the execution and delivery of this Agreement and remain in force and effect until the first anniversary of the Closing, at which such time such representation and warranty will expire and terminate and no indemnification obligation will be associated therewith or based thereon.

(b)      *Survival of Representations and Warranties until Final Determination.*  Notwithstanding Section 9.4(a), for each claim of indemnification hereunder regarding a representation or warranty that is made before expiration of such representation or warranty, such claim and associated representation and warranty and right to indemnification (including any right to pursue such indemnification, including via any Proceeding) will not terminate before final determination and satisfaction of such claim.

(c)      *Survival of Covenants and Agreements.*  Each covenant and agreement (other than representations and warranties) in this Agreement or in any Ancillary Document that by its nature is required to be performed before the Closing or the first anniversary of the Closing, and all associated rights to indemnification (including any right to pursue such indemnification, including via any Proceeding), will survive the Closing and will continue in full force thereafter until the date that is 12 months after the Closing Date.  Each covenant and agreement (other than representations and warranties) in this Agreement or in any Ancillary Document that is required to be performed after the first anniversary of the Closing, and all associated rights to indemnification (including any right to pursue such indemnification, including via any Proceeding), will survive the first anniversary of the Closing and will continue in full force thereafter until the expiration of the applicable statute of limitations period relating to such covenant or agreement.

9.5.     <u>Indemnification Claims</u>.  Any claim for indemnification under this <u>Article IX</u> shall be brought and asserted by Buyers' Representative or the Sellers' Representative (on behalf of all affected Indemnified Parties) by promptly delivering written notice of such claim to the Indemnifying Party (the "<u>Claim Notice</u>").  The Claim Notice shall set forth, in reasonable detail, the facts and circumstances giving rise to such claim and the amount of Losses actually incurred and, to the extent the Losses have not yet been incurred, a good faith, non-binding estimate of the amount of Losses that are reasonably expected to be incurred.  In the event of any claim for indemnification against the Sellers, Buyers shall provide the Sellers, Sellers' Representative and their Representatives reasonable access to the Books and Records and employees of the Business in connection with the matters for which indemnification is sought to the extent the Sellers' Representative reasonably deems necessary in connection with its rights and obligations under this <u>Article IX</u>.

9.6.     <u>Third-Party Claims</u>.

(a)      In the event that an Indemnified Party receives written notice of the commencement of any Third Party claim or Proceeding or of the imposition of any penalty or assessment for which indemnity may be sought pursuant to this <u>Article IX</u> (a "<u>Third-Party Claim</u>"), and the Indemnified Party intends to seek indemnity pursuant to this <u>Article IX</u>, the Indemnified Party shall promptly (and in any event within 30 days) provide the Indemnifying Party with notice of such claim, Proceeding, penalty or assessment, to which the complaint or other papers commencing such Third-Party Claim shall be attached.  In the event of failure to give such notice in accordance with the timeframe specified above, the Indemnified Party's entitlement to indemnification hereunder in respect of such Third-Party Claim shall not be adversely affected except to the extent, if any, that the Indemnifying Party is actually prejudiced thereby.

- 54 -

(b)     With respect to any Third-Party Claims, the Indemnifying Party shall have the right, but not the obligation, to control the defense of such Third-Party Claim, including the right to settle such Third-Party Claim; provided that if any Third Party Claim reasonably may be expected to affect any of the Educational Permits for any of the Institutions, Buyers' Representative and the applicable Buyer(s) may control the defense of the Third Party Claims but shall permit the Indemnifying Party to participate in such defense and provided further that if any proposed settlement provides for relief other than the payment of money damages, the Indemnifying Party may settle such Third-Party Claim only with the consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed.  The Indemnified Party shall cooperate with the Indemnifying Party and its counsel in contesting any Third-Party Claim, including in making any counterclaim against the Person asserting the Third-Party Claim, or any cross complaint against any Person (other than the Indemnifying Party or any of its Affiliates).  The Indemnified Party may, at its sole cost and expense, retain separate counsel to participate in, but not control, any defense or settlement of any Third-Party Claim.

9.7.     Adjustment to Purchase Price.  Any amounts paid pursuant to this Article IX shall be considered an adjustment to the Purchase Price for Tax purposes to the extent allowed under applicable Law.  Buyers and the Sellers, and each of their respective Affiliates, shall prepare and file, and cause their Affiliates to prepare and file, Tax Returns consistent with the treatment described in the foregoing sentence.

## ARTICLE X
### MISCELLANEOUS

10.1.     Severability.  If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms and provisions of this Agreement, or remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party hereto.  Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the Transactions are consummated to the fullest extent possible.

10.2.     Notices.  All communications, notices and consents provided for herein shall be in writing and be given in person, by overnight courier or by mail, and shall become effective:  (a) on delivery if given in person; (b) one Business Day after delivery by overnight courier, facsimile or email (provided that notice is also sent by overnight courier or facsimile); or (c) four Business Days after being mailed, with proper postage and documentation, for first-class registered or certified mail, prepaid.  Notices shall be addressed as follows:

(A)     if to Buyers:

Dream Center Foundation
2301 Bellevue Avenue
Los Angeles, CA 90026
Attention: Randy Barton, Managing Director
Email: rbarton4953@gmail.com

with a copy (which shall not constitute notice) to:

- 55 -

Douthit Frets Rouse Gentile & Rhodes LLC
1100 Walnut, Suite 2900
Kansas City, MO 64106
Attention: Ronald L. Holt
Email: rholt@dfrglaw.com
Facsimile: (816) 292-7601

(B)     if to the Sellers or the Sellers' Representative:

Education Management Corporation
210 Sixth Avenue, 33rd Floor
Pittsburgh, PA  15222-2603
Attention:   General Counsel
Email:       devitt.kramer@edmc.edu
Facsimile:  (412) 995-7322

with a copy (which shall not constitute notice) to:

Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Attention:  W. Morgan Burns
            Jonathan L.H. Nygren
Email:      morgan.burns@FaegreBD.com
            jon.nygren@FaegreBD.com
Facsimile:  (612) 766-1600

or, in each case, at such other address as may be specified in writing to the other parties hereto.

10.3.    Entire Agreement.  This Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements, and the other instruments and agreements expressly contemplated by this Agreement collectively constitute the entire agreement among the parties and supersede any prior understanding, agreements or representations by or among the parties, including the Original Agreement, the Confidentiality Agreement and the Letter of Intent, written or oral, to the extent they relate in any way to the subject matter hereof.

10.4.    Counterparts.  This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  Delivery of an executed counterpart of this Agreement by facsimile or electronic transmission shall be effective to the fullest extent permitted by applicable Law.

10.5.    Specific Performance.  The Parties acknowledge that, in view of the uniqueness of the Business and the Transactions, each Party would not have an adequate remedy at Law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that the other Parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which they may be entitled at Law or in equity.  Each of Buyers and the Sellers hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by the other Parties and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened

- 56 -

breaches of, or to enforce compliance with, the covenants and obligations of each Party under this Agreement.  Any Party seeking an Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such Order.

10.6.    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.

(a)      This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by the laws of the State of Delaware, without giving effect to any choice or conflict of laws, provisions or rules that would cause the application of laws of any jurisdiction other than the State of Delaware.

(b)      Each of the Parties irrevocably consents and agrees that it will bring any action, suit or proceeding with respect to any matter arising under or related to this Agreement or any Ancillary Agreement or the subject matter hereof or thereof in the Court of Chancery of the State of Delaware (or, if jurisdiction is not available in such court, then in any federal court located in the State of Delaware), unless such Party, based on the good faith advice of its counsel, determines that such court may not exercise or have jurisdiction over the other Party or such matter or that a judgment rendered by such court may not be enforceable in the jurisdiction of organization of the other Party or a jurisdiction in which such other Party's offices or assets are located.  By executing and delivering this Agreement, the Parties irrevocably:  (i) accept generally and unconditionally the exclusive jurisdiction and venue of these courts; (ii) waive any objections which such Party may now or hereafter have to the laying of venue of any of the aforesaid actions arising out of or in connection with this Agreement brought in the courts referred to in clause (i) above and hereby further irrevocably waive and agree not to plead or claim in any such court that such action brought in any such court has been brought in an inconvenient forum; (iii) agree that service of all process in any such action in any such court may be made by registered or certified mail, return receipt requested, to such Party at its address provided in accordance with Section 10.2; and (iv) agree that service as provided in clause (iii) above is sufficient to confer personal jurisdiction over such Party in any such action in any such court, and otherwise constitutes effective and binding service in every respect.

(c)      TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS.  THE SCOPE OF THIS SECTION 10.6, AND THE WAIVERS CONTAINED HEREIN, ARE INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THE PARTIES ACKNOWLEDGE THAT THIS SECTION 10.6, AND THE WAIVERS CONTAINED HEREIN, ARE A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS TRANSACTION, AND THAT EACH HAS ALREADY RELIED ON THIS SECTION 10.6 AND THE WAIVERS CONTAINED HEREIN, IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THIS SECTION 10.6, AND THE WAIVERS CONTAINED HEREIN, IN THEIR RELATED FUTURE DEALINGS.  THE PARTIES FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS SECTION 10.6, AND THE WAIVERS CONTAINED HEREIN, WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING

- 57 -

CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

10.7.  Costs and Attorneys' Fees.  Subject to the limitations set forth herein, in the event that any Proceeding is instituted or threatened concerning or arising out of this Agreement, the prevailing party will recover from the unsuccessful party or parties all of such prevailing party's costs and reasonable attorneys' fees incurred in connection with each and every such Proceeding, including any and all appeals and petitions therefrom; provided that if a party prevails in part, and loses in part, in such Proceeding, the Governmental Authority presiding over such Proceeding will award a reimbursement of the costs and reasonable attorneys' fees incurred by such party on an equitable basis. For purposes hereof, a party will be deemed to have prevailed in any Proceeding described in the immediately preceding sentence if the non-prevailing party institutes  any such Proceeding and (a) such underlying claim(s) are subsequently  voluntarily dismissed, or (b) the prevailing party defeats any such claim(s) through an adjudicative ruling.

10.8.  Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

10.9.  Assignment.  No assignment shall be made by any party without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed (with reasonableness to be assessed with consideration of any Buyer jurisdictional and regulatory requirements).  No assignment shall relieve the assigning party of any of its obligations hereunder, provided that, after the Closing hereunder, any Buyer assignor shall no longer have any obligations hereunder if the assignment was made to another Buyer entity that receives an assignment of all of the rights of such Buyer assignor hereunder.  Subject to the foregoing, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

10.10.  No Third Party Beneficiaries.  Except as provided in Article IX, this Agreement is for the sole benefit of the parties hereto and their respective Affiliates and permitted assigns, and the Indemnified Parties, and nothing herein, express or implied, shall give or be construed to give to any other Person any legal or equitable rights hereunder.

10.11.  Amendment and Modification; Waiver.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto and in compliance with applicable Law.  Except as expressly set forth in this Agreement, no failure on the part of any party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.  No party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

10.12.  Disclosure Schedule.  The Disclosure Schedule is organized in sections that correspond to the sections of this Agreement.  Each disclosure in the Disclosure Schedule shall be in reference exclusively to (a) the corresponding Section of this Agreement and (b) any other section of this Agreement if the relevance of the disclosure to the other section would be reasonably apparent to a reasonable person who has no knowledge of the disclosed subject matter.  A disclosure in the Disclosure Schedule shall not constitute an admission that the matter disclosed is material for purposes of this Agreement or an admission of any sort for any purpose other than this Agreement.  Capitalized terms used in the Disclosure Schedule but not defined therein shall have the meanings ascribed to them in this Agreement.  Summaries of, or references to, actual documents in the Disclosure Schedule are qualified in their entirety by reference to such documents.

10.13.  Sellers' Representative.

(a)  The Sellers hereby appoint the Sellers' Representative as agent and attorney-in-fact for the Sellers and, from and after the Closing Date, irrevocably authorize the Sellers' Representative to act for each and all of the Sellers in all cases where this Agreement or any Ancillary Agreement calls for the action, determination, or decision of the Sellers.  The Sellers hereby authorize the Sellers' Representative to:  (i) receive all notices or documents given or to be given to the Sellers pursuant hereto or in connection herewith or therewith and to receive and accept services of legal process in connection with any Proceeding arising under this Agreement; (ii) execute and deliver amendments to this Agreement on behalf of the Sellers; (iii) engage counsel, accountants and other advisors, and incur other expenses in connection with this Agreement, any Ancillary Agreement or the Transactions, as the Sellers' Representative may in its sole discretion deem necessary or appropriate; and (iv) take such action as the Sellers' Representative may in its sole discretion deem necessary or appropriate in respect of: (w) waiving any inaccuracies in the representations or warranties of Buyers contained in this Agreement, any Ancillary Agreement or in any document delivered by Buyers pursuant hereto, (x) taking such other action as the Sellers' Representative is authorized to take under this Agreement, (y) receiving all documents or certificates and making all determinations, in its capacity as Sellers' Representative, required under this Agreement, and (z) all such actions as may be necessary to carry out the responsibilities of the Sellers' Representative contemplated by this Agreement, including the defense or settlement of any claims for which indemnification is sought pursuant to Article IX and any waiver of any obligation of Buyers.  A decision, act, consent or instruction of the Sellers' Representative will be final, binding and conclusive upon the Sellers, and Buyer may rely upon any decision, act, consent or instruction of the Sellers' Representative as being the decision, act, consent or instruction of the Sellers.

(b)  If the Sellers' Representative desires to resign as the Sellers' Representative, it will by written notice to the Sellers and Buyers appoint another Person as a successor Sellers' Representative.  The Sellers' Representative's resignation shall not be effective until a successor has accepted such appointment in writing.

(c)  The Sellers' Representative is acting solely in an agency capacity and will have no liability of any type for any action taken in the capacity of the Sellers' Representative in accordance with the terms of this Agreement or any Ancillary Agreement, including the compromise, settlement, payment, or defense of any claim (including expenses and costs associated therewith) under this Agreement or any Ancillary Agreement regardless of whether one or more of the Sellers is the claimant or the party against whom a claim is being made.

10.14.  Buyers' Representative.

(a)  The Buyers hereby appoint the Buyers' Representative as agent and attorney-in-fact for the Buyers and, from and after the Closing Date, irrevocably authorize the Buyers' Representative to act

for each and all of the Buyers in all cases where this Agreement or any Ancillary Agreement calls for the action, determination, or decision of the Buyers.  The Buyers hereby authorize the Buyers' Representative to:  (i) receive all notices or documents given or to be given to the Buyers pursuant hereto or in connection herewith or therewith and to receive and accept services of legal process in connection with any Proceeding arising under this Agreement; (ii) execute and deliver amendments to this Agreement on behalf of the Buyers; (iii) engage counsel, accountants and other advisors, and incur other expenses in connection with this Agreement, any Ancillary Agreement or the Transactions, as the Buyers' Representative may in its sole discretion deem necessary or appropriate; and (iv) take such action as the Buyers' Representative may in its sole discretion deem necessary or appropriate in respect of:  (w) waiving any inaccuracies in the representations or warranties of Sellers contained in this Agreement, any Ancillary Agreement or in any document delivered by Sellers pursuant hereto, (x) taking such other action as the Buyers' Representative is authorized to take under this Agreement, (y) receiving all documents or certificates and making all determinations, in its capacity as Buyers' Representative, required under this Agreement, and (z) all such actions as may be necessary to carry out the responsibilities of the Buyers' Representative contemplated by this Agreement, including the defense or settlement of any claims for which indemnification is sought pursuant to Article IX and any waiver of any obligation of Sellers.  A decision, act, consent or instruction of the Buyers' Representative will be final, binding and conclusive upon the Buyers, and Sellers may rely upon any decision, act, consent or instruction of the Buyers' Representative as being the decision, act, consent or instruction of the Buyers.

(b)  If the Buyers' Representative desires to resign as the Buyers' Representative, it will by written notice to the Buyers and Sellers to appoint another Person as a successor Buyers' Representative. The Buyers' Representative's resignation shall not be effective until a successor has accepted such appointment in writing.

(c)  The Buyers' Representative is acting solely in an agency capacity and will have no liability of any type for any action taken in the capacity of the Buyers' Representative in accordance with the terms of this Agreement or any Ancillary Agreement, including the compromise, settlement, payment, or defense of any claim (including expenses and costs associated therewith) under this Agreement or any Ancillary Agreement regardless of whether one or more of the Buyers is the claimant or the party against whom a claim is being made.

*[Remainder of Page Intentionally Blank;*
*Signatures to Follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

"Buyers' Representative"

**Dream Center Foundation**

By: _____
Name: Randall K. Barton
Title: Managing Director

"Buyers"

**Dream Center Foundation**

By: _____
Name: Randall K. Barton
Title: Managing Director

**Dream Center Education Holdings, LLC**

By: _____
Name: Randall K. Barton
Title: Manager

**Dream Center Education Management, LLC**

By: _____
Name: Randall K. Barton
Title: Manager

**The Art Institutes International, LLC**

By: _____
Name: Randall K. Barton
Title: Manager

**Dream Center South University, LLC**

By: _Randall K. Barton_
     Name: Randall K. Barton
     Title: Manager


**Dream Center Argosy University of California, LLC**

By: _Randall K. Barton_
     Name: Randall K. Barton
     Title: Manager

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

"Sellers' Representative"

**Education Management II LLC**

By: _Mark M. McEachen_

Name: Mark A. McEachen

Title: CEO and President

"Sellers"

**Education Management Corporation**

By: _Mark M. McEachen_

Name: Mark A. McEachen

Title: CEO and President

**Education Management II LLC**

By: _Mark M. McEachen_

Name: Mark A. McEachen

Title: CEO and President

**Education Finance III LLC**

By: _____

Name:

Title:

**Argosy University of California LLC**

By: _____

Name:

Title:

*Asset Purchase Agreement*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

<u>"Sellers' Representative"</u>

**Education Management II LLC**

By: _____
     Name:
     Title:

<u>"Sellers"</u>

**Education Management Corporation**

By: _____
     Name:
     Title:

**Education Management II LLC**

By: _____
     Name:
     Title:

**Education Finance III LLC**

By: _____
     Name: KRANL JALWKA
     Title: CFO

**Argosy University of California LLC**

By: _____
     Name:
     Title:

*Asset Purchase Agreement*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

"Sellers' Representative"

**Education Management II LLC**

By: _____
     Name:
     Title:

"Sellers"

**Education Management Corporation**

By: _____
     Name:
     Title:

**Education Management II LLC**

By: _____
     Name:
     Title:

**Education Finance III LLC**

By: _____
     Name:
     Title:

**Argosy University of California LLC**

By: _____
     Name: J. Devitt Kramer
     Title: Secretary

*Asset Purchase Agreement*

**Argosy Education Group, Inc.**

By: _____
Name:  J. Dentt Kramer
Title:  Secretary

**Western State University of Southern California**

By: _____
Name:  J. Dentt Kramer
Title:  Secretary

**AiCA-IE Restaurant, Inc.**

By: _____
Name:  J. Dentt Kramer
Title:  Secretary

**TAIC-San Diego, Inc.**

By: _____
Name:  J. Dentt Kramer
Title:  Secretary

**TAIC-San Francisco, Inc.**

By: _____
Name:  J. Dentt Kramer
Title:  Secretary

**The Art Institute of California-Hollywood, Inc.**

By: _____
Name:  J. Dentt Kramer
Title:  Secretary

*Asset Purchase Agreement*

**The Art Institute of California-Inland Empire, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of California-Orange County, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of California-Sacramento, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**South University, LLC**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**South University of Alabama, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**South University of Carolina, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

*Asset Purchase Agreement*

**South University of Florida, Inc.**

By: _____

Name: _J. Dewitt Kramer_

Title: _Secretary_

**South University of Michigan, LLC**

By: _____

Name: _J. Dewitt Kramer_

Title: _Secretary_

**South University of North Carolina LLC**

By: _____

Name: _J. Dewitt Kramer_

Title: _Secretary_

**South University of Ohio LLC**

By: _____

Name: _J. Dewitt Kramer_

Title: _Secretary_

**South University of Virginia, Inc.**

By: _____

Name: _J. Dewitt Kramer_

Title: _Secretary_

**South University Research II LLC**

By: _____

Name: _J. Dewitt Kramer_

Title: _Secretary_

**South Education – Texas LLC**

By: _____
Name: J. Dentt Kramer
Title: Secretary

**Higher Education Services II LLC**

By: _____
Name: J. Dentt Kramer
Title: Secretary

**The Art Institute of Charlotte, LLC**

By: _____
Name: J. Dentt Kramer
Title: Secretary

**The Art Institute of Raleigh-Durham, Inc.**

By: _____
Name: J. Dentt Kramer
Title: Secretary

**The Art Institute of Dallas, Inc.**

By: _____
Name: J. Dentt Kramer
Title: Secretary

**AiD Restaurant, Inc.**

By: _____
Name: J. Dentt Kramer
Title: Secretary

*Asset Purchase Agreement*

**AiH Restaurant, Inc.**

By: _____
    Name: J. Dentt Kramer
    Title: Secretary

**AiiN Restaurant LLC**

By: _____
    Name: J. Dentt Kramer
    Title: Secretary

**AiT Restaurant, Inc.**

By: _____
    Name: J. Dentt Kramer
    Title: Secretary

**AiTN Restaurant, Inc.**

By: _____
    Name: J. Dentt Kramer
    Title: Secretary

**Miami International University of Art & Design, Inc.**

By: _____
    Name: J. Dentt Kramer
    Title: Secretary

**The Art Institute of Atlanta, LLC**

By: _____
    Name: J. Dentt Kramer
    Title: Secretary

*Asset Purchase Agreement*

**The Art Institute of Austin, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Charleston, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Colorado, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Fort Lauderdale, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Houston, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Indianapolis, LLC**

By: _____
Name: J. Devitt Kramer
Title: Secretary

*Asset Purchase Agreement*

**The Art Institute of Las Vegas, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Michigan, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Philadelphia LLC**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Pittsburgh LLC**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of Portland, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

**The Art Institute of San Antonio, Inc.**

By: _____
Name: J. Devitt Kramer
Title: Secretary

*Asset Purchase Agreement*

The Art Institute of Seattle, Inc.

By: _____
Name: J. Devitt Kramer
Title: Secretary

The Art Institute of Tampa, Inc.

By: _____
Name: J. Devitt Kramer
Title: Secretary

The Art Institute of Tennessee-Nashville, Inc.

By: _____
Name: J. Devitt Kramer
Title: Secretary

The Art Institute of Virginia Beach LLC

By: _____
Name: J. Devitt Kramer
Title: Secretary

The Art Institute of Washington, Inc.

By: _____
Name: J. Devitt Kramer
Title: Secretary

The Art Institutes International II LLC

By: _____
Name: J. Devitt Kramer
Title: Secretary

*Asset Purchase Agreement*

**The Illinois Institute of Art at Schaumburg, Inc.**

By: _____

Name: J. Devitt Kramer

Title: Secretary

**The Illinois Institute of Art, Inc.**

By: _____

Name: J. Devitt Kramer

Title: Secretary

**The Institute of Post-Secondary Education, Inc.**

By: _____

Name: J. Devitt Kramer

Title: Secretary

*Asset Purchase Agreement*

**Schedule A**

**Sellers**

| Entity Name | Jurisdiction of Incorporation or Organization |
|---|---|
| Education Management Corporation | Delaware corporation |
| Education Management II LLC | Delaware limited liability company |
| Education Finance III LLC | Delaware limited liability company |
| Argosy University of California LLC | California limited liability company |
| Argosy Education Group, Inc. | Illinois corporation |
| Western State University of Southern California | California corporation |
| The University of Sarasota, Inc. | Florida corporation |
| AiCA-IE Restaurant, Inc. | California corporation |
| TAIC-San Diego, Inc. | California corporation |
| TAIC-San Francisco, Inc. | California corporation |
| The Art Institute of California-Hollywood, Inc. | California corporation |
| The Art Institute of California-Inland Empire, Inc. | California corporation |
| The Art Institute of California-Orange County, Inc. | California corporation |
| The Art Institute of California-Sacramento, Inc. | California corporation |
| South University, LLC | Georgia limited liability company |
| South University of Alabama, Inc. | Alabama corporation |
| South University of Carolina, Inc. | South Carolina corporation |
| South University of Florida, Inc. | Florida corporation |
| South University of Michigan, LLC | Michigan limited liability company |
| South University of North Carolina LLC | North Carolina limited liability company |
| South University of Ohio LLC | Ohio limited liability company |
| South University of Virginia, Inc. | Virginia corporation |
| South University Research II LLC | Georgia limited liability company |
| South Education – Texas LLC | Texas limited liability company |
| Higher Education Services II LLC | Georgia limited liability company |
| The Art Institute of Charlotte, LLC | North Carolina limited liability company |
| The Art Institute of Raleigh-Durham, Inc. | North Carolina corporation |
| The Art Institute of Dallas, Inc. | Texas corporation |
| AiD Restaurant, Inc. | Texas corporation |
| AiH Restaurant, Inc. | Texas corporation |
| AiiN Restaurant LLC | Indiana limited liability company |
| AiT Restaurant, Inc. | Florida corporation |
| AiTN Restaurant, Inc. | Tennessee corporation |
| Miami International University of Art & Design, Inc. | Florida corporation |
| The Art Institute of Atlanta, LLC | Georgia limited liability company |
| The Art Institute of Austin, Inc. | Texas corporation |
| The Art Institute of Charleston, Inc. | South Carolina corporation |
| The Art Institute of Colorado, Inc. | Colorado corporation |
| The Art Institute of Fort Lauderdale, Inc. | Florida corporation |
| The Art Institute of Houston, Inc. | Texas corporation |
| The Art Institute of Indianapolis, LLC | Indiana limited liability company |
| The Art Institute of Las Vegas, Inc. | Nevada corporation |
| The Art Institute of Michigan, Inc. | Michigan corporation |
| The Art Institute of Philadelphia LLC | Pennsylvania limited liability company |
| The Art Institute of Pittsburgh LLC | Pennsylvania limited liability company |
| The Art Institute of Portland, Inc. | Oregon corporation |
| The Art Institute of San Antonio, Inc. | Texas corporation |
| The Art Institute of Seattle, Inc. | Washington corporation |
| The Art Institute of Tampa, Inc. | Florida corporation |
| The Art Institute of Tennessee-Nashville, Inc. | Tennessee corporation |
| The Art Institute of Virginia Beach LLC | Virginia limited liability company |

A-1

| The Art Institute of Washington, Inc. | District of Columbia corporation |
| The Art Institutes International II LLC | Pennsylvania limited liability company |
| The Illinois Institute of Art at Schaumburg, Inc. | Illinois corporation |
| The Illinois Institute of Art, Inc. | Illinois corporation |
| The Institute of Post-Secondary Education, Inc. | Arizona corporation |

*Asset Purchase Agreement*

**Schedule B**

**<u>Buyers</u>**

| Entity Name | Jurisdiction of Incorporation or Organization |
|---|---|
| Dream Center Foundation | California nonprofit corporation |
| Dream Center Education Holdings, LLC | Arizona Nonprofit LLC |
| Dream Center Education Management, LLC | Arizona Nonprofit LLC |
| The Art Institutes International, LLC | Arizona Nonprofit LLC |
| Dream Center South University, LLC | Arizona Nonprofit LLC |
| Dream Center Argosy University of California, LLC | Arizona Nonprofit LLC |

C-1

**Schedule C**

**Schools**

| Location | Address | Defined Term |
|---|---|---|
| Argosy University, Phoenix | 2233 West Dunlap Avenue<br>Phoenix, AZ  85021 | "Argosy Phoenix" |
| Argosy University, Inland Empire | 3401 Centrelake Drive<br>Suite 200<br>Ontario, CA  91761 | "Argosy Inland Empire" |
| Argosy University, Los Angeles | 5230 Pacific Concourse Drive<br>Suite 200<br>Los Angeles, CA  90045 | "Argosy Los Angeles" |
| Argosy University, Orange County | 601 South Lewis Street<br>Orange, CA  92868 | "Argosy Orange County" |
| Argosy University, San Diego | 1615 Murray Canyon Road<br>Suite 100<br>San Diego, CA  92108 | "Argosy San Diego" |
| Argosy University, San Francisco Bay Area | 1005 Atlantic Avenue<br>Alameda, CA  94501 | "Argosy San Francisco" |
| Argosy University, Denver | 7600 E. Eastman Avenue<br>Denver, CO  80231 | "Argosy Denver" |
| Argosy University, Sarasota | 5250 17th Street<br>Sarasota, FL  34235 | "Argosy Sarasota" |
| Argosy University, Tampa | 1403 North Howard Avenue<br>Tampa, FL  33607 | "Argosy Tampa" |
| Argosy University, Atlanta | 980 Hammond Drive<br>Suite 100<br>Atlanta, GA  30328 | "Argosy Atlanta" |
| Argosy University, Hawaii | 400 ASB Tower<br>1001 Bishop Street<br>Suite 400<br>Honolulu, HI  96813 | "Argosy Hawaii" |
| Argosy University, Maui | The Wright Center<br>270 Hookahi Street<br>Suite 309<br>Wailuku, HI 96793 | "Argosy Maui" |
| Argosy University, Hilo | The Ironworks Building<br>1266 Kamehameha Highway<br>Suite A-7<br>Hilo, HI 96720 | "Argosy Hilo" |
| Argosy University, Chicago | 225 North Michigan Avenue<br>Suite 1300<br>Chicago, IL  60601 | "Argosy Chicago" |
| Argosy University, Schaumburg | 1000 N. Plaza Drive<br>Suite 234<br>Schaumburg, IL  60173 | "Argosy Schaumburg" |
| Argosy University, Twin Cities | 1515 Central Parkway<br>Eagan, MN  55121 | "Argosy Twin Cities" |

C-1

| Location | Address | Defined Term |
|---|---|---|
| Argosy University, Nashville | 100 Centerview Drive<br>Suite 225<br>Nashville, TN 37214 | "Argosy Nashville" |
| Argosy University, Dallas | 5001 Lyndon B. Johnson Freeway<br>Heritage Square<br>Farmers Branch, TX 75224 | "Argosy Dallas" |
| Argosy University, Salt Lake City | 121 Election Road<br>Suite 300<br>Draper, UT 84020 | "Argosy Salt Lake City" |
| Argosy University, Washington DC | 1550 Wilson Boulevard<br>Suite 600<br>Arlington, VA 22209 | "Argosy Washington DC" |
| Argosy University, Seattle | 2601-A Elliott Avenue<br>Seattle, WA 98121 | "Argosy Seattle" |
| Argosy University, Salt Lake City | 765 North 2200 West<br>Salt Lake City, UT 84116 | "Argosy Salt Lake City" |
| Argosy University, Chandler | 1255 South Spectrum Boulevard<br>Chandler, AZ 85286 | "Argosy Chandler" |
| Argosy University, Marietta | 1000 Halsey Avenue SE<br>Building 447<br>Marietta, GA 30060 | "Argosy Marietta" |
| Argosy University, Guam | 718 North Marine Corps Drive,<br>Upper Tumon<br>Guam | "Argosy Guam" |
| Argosy University, American Samoa | Pago Plaza<br>Pago Pago, American Samoa | "Argosy American Samoa" |
| Argosy University, American Samoa | Tradewinds Hotel<br>Pago Pago, American Samoa | "Argosy American Samoa" |
| Western State College of Law at Argosy University | 1 Banting,<br>Irvine, CA 92618-3601 | "Western State" |
| Miami International University of Art & Design | 1501 Biscayne Boulevard<br>Suite 100<br>Miami, FL 33132-1418 | "Miami A&D" |
| South University, Montgomery | 5355 Vaughn Road<br>Montgomery, AL 36116 | "South Montgomery" |
| South University, Orlando | 4901 Vineland Road<br>Suite 190<br>Orlando, FL 32811 | "South Orlando" |
| South University, Tampa | 4401 North Himes Avenue<br>Suite 175<br>Tampa, FL 33614-7095 | "South Tampa" |
| South University, West Palm Beach | University Centre<br>9801 Belvedere Road<br>Royal Palm Beach, FL 33411 | "South West Palm Beach" |
| South University, Atlanta | 6600 Peachtree Dunwoody Road NE<br>100 Embassy Row<br>Atlanta, GA 30328 | "South Atlanta" |

| Location | Address | Defined Term |
|---|---|---|
| South University, Savannah | 709 Mall Boulevard<br>Savannah, GA 31406-4805 | "South Savannah" |
| South University, Novi | 41555 Twelve Mile Road<br>Novi, MI 48377 | "South Novi" |
| South University, High Point | 3975 Premier Drive<br>High Point, NC 27265 | "South High Point" |
| South University, Cleveland | 4743 Richmond Road<br>Warrensville Heights, OH 44128 | "South Cleveland" |
| South University, Columbia | 9 Science Court<br>Columbia, SC 29203 | "South Columbia" |
| South University, Austin | 1220 W. Louis Henna Boulevard<br>Round Rock, TX 78681 | "South Austin" |
| South University, Richmond | 2151 Old Brick Road<br>Glen Allen, VA 23060 | "South Richmond" |
| South University, Virginia Beach | 301 Bendix Rd Suite 100<br>Virginia Beach, VA 23452 | "South Virginia Beach" |
| The Art Institute of Atlanta | 6600 Peachtree Dunwoody Rd, NE<br>100 Embassy Row<br>Atlanta, GA  30328-1649 | "Ai Atlanta" |
| The Art Institute of Austin | 101 W. Louis Henna Blvd<br>Austin, TX  78728 | "Ai Austin" |
| The Art Institute of California – San Diego, a campus of Argosy University | 7650 Mission Valley Road<br>San Diego, CA  92108-4423 | "Ai California-SD" |
| The Art Institute of California – San Francisco, a campus of Argosy University | Ten United Nations Plaza<br>San Francisco, CA  94102-4928 | "Ai California-SF" |
| The Art Institute of California – Hollywood, a campus of Argosy University | 5250 Lankershim Blvd.<br>N. Hollywood, CA  91601 | "Ai California-Hollywood" |
| The Art Institute of California-Inland Empire, a campus of Argosy University | 674 East Brier Drive<br>San Bernardino, CA  92408-2800 | "Ai California-Inland" |
| The Art Institute of California – Orange County, a campus of Argosy University | 3601 West Sunflower Avenue<br>Santa Ana, CA  92704-7931 | "Ai California-OC" |
| The Art Institute of California - Sacramento, a campus of Argosy University | 2850 Gateway Oaks Drive<br>Suite 100<br>Sacramento, CA  95833-4348 | "Ai California-Sacramento" |
| The Art Institute of Charleston | 24 North Market Street<br>Charleston, SC  29401-2623 | "Ai Charleston" |
| The Art Institute of Charlotte, a campus of South University | Three Lake Pointe Plaza<br>2110 Water Ridge Parkway<br>Charlotte, NC  28217-4536 | "Ai Charlotte" |
| The Art Institute of Colorado | 1200 Lincoln Street<br>Denver, CO  80203-2172 | "Ai Colorado" |
| The Art Institute of Dallas, a campus of South University | 8080 Park Lane<br>Suite 100<br>Dallas, TX  75231-5993 | "Ai Dallas" |

| Location | Address | Defined Term |
| --- | --- | --- |
| The Art Institute of Fort Lauderdale | 1799 S.E. 17th Street<br>Fort Lauderdale, FL  33316-3013 | "Ai Fort Lauderdale" |
| The Art Institute of Houston | 4140 Southwest Freeway<br>Houston, TX  77027-7319 | "Ai Houston" |
| The Art Institute of Indianapolis | 3500 Depauw Blvd<br>Suite 1010<br>Indianapolis, IN  46268-6124 | "Ai Indianapolis" |
| The Art Institute of Las Vegas | 2350 Corporate Circle<br>Henderson, NV  89074-7737 | "Ai Las Vegas" |
| The Art Institute of Michigan | 28175 Cabot Drive<br>Novi, MI  48377-2995 | "Ai Michigan" |
| The Art Institute of Philadelphia | 1622 Chestnut Street<br>Philadelphia, PA  19103-5119 | "Ai Philadelphia" |
| The Art Institute of Phoenix | 2233 West Dunlap Avenue<br>Phoenix, AZ  85021-2859 | "Ai Phoenix" |
| The Art Institute of Pittsburgh | 420 Boulevard of the Allies<br>Pittsburgh, PA  15219-1301 | "Ai Pittsburgh" |
| The Art Institute of Portland | 1122 N.W. Davis Street<br>Portland, OR  97209-2911 | "Ai Portland" |
| The Art Institute of Raleigh-Durham, a campus of South University | 410 Blackwell Street<br>Suite 200<br>Durham, NC  27701-3986 | "Ai Raleigh-Durham" |
| The Art Institute of San Antonio | 10000 IH-10 West<br>Suite 200<br>San Antonio, TX  78230-2242 | "Ai San Antonio" |
| The Art Institute of Seattle | 2323 Elliott Avenue<br>Seattle, WA  98121-1642 | "Ai Seattle" |
| The Art Institute of Tampa | Parkside at Tampa Bay Park<br>4401 North Himes Avenue Suite 150<br>Tampa, FL  33614-7086 | "Ai Tampa" |
| The Art Institute of Tennessee-Nashville | 100 Centerview Drive<br>Suite 250<br>Nashville, TN  37214-3439 | "Ai TN-Nashville" |
| The Art Institute of Virginia Beach | Two Columbus Center<br>4500 Main Street, Suite 100<br>Virginia Beach, VA  23462-3358 | "Ai Virginia Beach" |
| The Art Institute of Washington | 1820 North Fort Myer Drive<br>Arlington, VA  22209-1802 | "Ai Washington" |
| The Illinois Institute of Art at Schaumburg | 1000 N. Plaza Drive<br>Suite 100<br>Schaumburg, IL  60173-4990 | "IIA Schaumburg" |
| The Illinois Institute of Art | 350 N. Orleans Street<br>Suite 136-L<br>Chicago, IL  60654-1593 | "IIA" |

EXHIBIT A

**[FORM OF]**
**ASSIGNMENT AND ASSUMPTION OF LEASE**

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is entered into as of [●], 2017 (the "Effective Date"), by and between **[Insert Seller Entity]** ("Assignor"), and **[Insert Buyer Entity]** ("Assignee").

## RECITALS

A.      Assignor, Assignee, certain affiliates of Assignor, certain affiliates of Assignee, Education Management II LLC, a limited liability company organized under the laws of Delaware, in its capacity as the sellers' representative, and Dream Center Foundation, a California nonprofit corporation, in its capacity as the buyers' representative, have entered into that certain Asset Purchase Agreement, dated [●], 2017 (as amended, modified, or supplemented, the "Purchase Agreement"), pursuant to which, among other things, the Assignor has agreed to assign all of its right, title and interest in, and Assignee has agreed to assume all of Assignor's duties and obligations under, the Lease (as defined below) accruing and relating to periods on or after the Closing Date (as defined in the Purchase Agreement), subject to and upon the terms and conditions of the Purchase Agreement.

B.      Assignor is a party to that certain **[Insert Title of Lease Agreement, including any amendments]** dated as of **[Insert Date]**, by and between **[Insert Landlord]**, as Landlord, and Assignor, as Tenant, for premises at **[Insert Address]** (the "Lease"), a copy of which is attached hereto as Exhibit A.

C.      Assignor desires to assign its interest under the Lease to Assignee, and Assignee desires to assume all of Assignor's obligations under the Lease to the extent accruing or arising on or after the date hereof.

## AGREEMENT

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Assignment and Assumption.  Assignor hereby assigns and transfers its entire right, title and interest under the Lease to Assignee as of the Effective Date.  Assignee hereby accepts said assignment and transfer, assumes and agrees to perform all of the duties and obligations of Tenant under the Lease to the extent accruing or arising on or after the Effective Date and acknowledges and agrees that any guarantees on behalf of Assignor with respect to the Lease will be released and discharged.  Assignor shall remain responsible for, and agrees to indemnify Assignee for and with respect, to any and all duties and obligations of Tenant under the Lease to the extent occurring or arising prior to the Effective Date.

2.      Purchase Agreement.  This Assignment is subject to all the terms and conditions of the Purchase Agreement.  No provision of this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Purchase Agreement.  Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

3.      Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4. <u>Counterparts</u>.  This Assignment may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  Delivery of an executed counterpart of this Assignment by facsimile or electronic transmission shall be effective to the fullest extent permitted by applicable Law.

5. <u>Amendments</u>.  This Assignment may be amended, modified, superseded or canceled only by an instrument in writing signed by an officer of each of the parties hereto.

*[Signature Page Follows]*

543013.2
US.109379266.05

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Lease as of the date first set forth above.

"Assignor"

**[Insert Seller Entity]**

By: _____

     Name:

     Title:

"Assignee"

**[Insert Buyer Entity]**

By: _____

     Name:

     Title:

**[Obtained only if required under Lease]**
**CONSENT OF LANDLORD**

**[Insert Landlord]**, landlord under the "Lease" referred to in the foregoing Assignment and Assumption of Lease (the "Assignment") to which this Consent of Landlord (this "Consent") is attached, hereby agrees as follows:

1.       Landlord acknowledges notice of and hereby consents to the Assignment, and hereby acknowledges Assignee (as defined in the Assignment) to be the sole and lawful tenant under the Lease.

2.       Landlord agrees to release Assignor and its affiliates from any further liability or obligation under the Lease, or any guaranty or indemnity agreement related thereto, in respect of periods following the Closing, other than any liability or obligation arising prior to the Closing and not satisfied as of the Effective Date.

3.       Landlord certifies to Assignee that as of the Effective Date of the Assignment and this Consent: (i) the Lease is valid, binding and in full force and effect; (ii) a true and correct copy of the Lease, and all amendments thereto, is attached hereto and made a part hereof as Exhibit A; (iii) Landlord has not given Tenant any notice of default thereunder or commenced any action or given or received any notice for the purpose of terminating the Lease; (iv) all monetary obligations of Tenant which have accrued under the Lease to the date hereof have been fully performed by Tenant (v) to Landlord's knowledge, neither Landlord nor Assignor are in default under the Lease and there is no fact or circumstance, or set of facts or circumstances, which with the passage of time, the giving of notice or both, would constitute a default under the Lease by either of Landlord or Assignor; (vi) to Landlord's knowledge, no offsets, defenses or claims are presently available to Landlord or Tenant under the Lease; and (vii) immediately prior to the Assignment, Assignor was the sole tenant under the Lease.

4.       This Consent shall not waive any right of Landlord under the Lease to consent to further assignments or sublettings.

5.       This Consent satisfies all of the requirements of the Lease pertaining to notice to Landlord and/or Landlord's consent to the Assignment.

6.       Landlord acknowledges that this Consent of Landlord is being relied upon by Assignee in executing the Purchase Agreement and agrees that this Consent shall bind Landlord and its successors and assigns and inures to the benefit of the Assignee and its successors and assigns.

Executed this _____ day of _____, 2017, to be effective as of the Effective Date of the Assignment.

**LANDLORD**

**[Insert Landlord]**

By: _____
        Name:
        Title:

543013.2

**Exhibit A**

**<u>Lease</u>**

(Attached)

EXHIBIT B

[FORM OF]

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), is entered into as of [●], by and among the entities identified as Sellers on the signature pages hereto (collectively, the "Sellers") and the entities identified as Buyers on the signature page hereto (collectively, the "Buyers").  Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, dated as of [●], 2017 (as amended, the "Purchase Agreement"), among the Sellers, the Buyers, Education Management II LLC as Sellers' Representative and Dream Center Foundation, as Buyers' Representative.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, each party hereby agrees as follows:

1.      Transferred Assets.  The Sellers hereby sell, assign and transfer to the Buyers and their successors and assigns, and the Buyers hereby purchase and accept, free and clear of all Liens other than Permitted Liens, all of the Sellers' right, title and interest in and to the Purchased Assets (including without limitation Sellers' rights under all Assumed Contracts, including  student enrollment agreements, all "work for hire" agreements and all library agreements), to have and to hold the same pursuant to the terms of the Purchase Agreement.  The Sellers and the Buyers acknowledge and agree that the Sellers are not transferring and the Buyers are not acquiring the Excluded Assets.  Schedule A sets forth the applicable Buyer that will purchase the Purchased Assets from each applicable Seller, and identifies the material fixed assets, Leased Real Property and related leasehold improvements, registered Intellectual Property and Material Contracts that are Assumed Contracts that are acquired by each applicable Buyer.

2.      Assumed Liabilities.  The Sellers hereby sell, assign and transfer to the Buyers and their successors and assigns, and the Buyers hereby assume, and agree to pay, perform and discharge, all of Sellers' right, title and interest in and to the Assumed Liabilities, including, but not limited to, each Assumed Contract identified as being assumed with respect to each of the Buyers on Schedule A, pursuant to the terms of the Purchase Agreement; provided, that Buyers reserve the right, solely with respect to third parties, to contest and dispute, in good faith, payment of any such Assumed Liabilities. The Sellers and the Buyers acknowledge and agree that the Buyers do not accept and are not assuming nor are responsible for any of the Excluded Liabilities.

3.      Purchase Agreement.  This Agreement is the "Bill of Sale, Assignment and Assumption Agreement" referred to in the Purchase Agreement.  This Agreement is subject to all of the terms and conditions of the Purchase Agreement.  No provision of this Agreement shall be deemed to supersede, modify, replace, amend, rescind, waive, narrow or broaden any term or provision of the Purchase Agreement.  Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

4.      Further Assurances.  If any further action is necessary, proper or desirable to carry out any purpose of this Agreement, then each party shall take such further action (including the execution and delivery of further documents) as any other party reasonably requests to carry out such purpose.  The foregoing shall be at the expense of such requesting party, except to the extent such requesting party is entitled to indemnification therefor or to the extent the Purchase Agreement otherwise allocates such expense to any other party.

5. <u>Governing Law</u>. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, shall be governed by the laws of the State of Delaware, without giving effect to any choice or conflict of laws, provisions or rules that would cause the application of laws of any jurisdiction other than the State of Delaware. All disputes arising out of this Agreement shall be subject to Section 10.6 of the Purchase Agreement.

6. <u>Amendments</u>. This Agreement may be amended, modified, superseded or canceled only by an instrument in writing signed by an officer of each of the parties hereto.

7. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8. <u>No Implied Rights of Third Parties</u>. Nothing express or implied in this Agreement is intended to confer upon any Person, other than the parties hereto, or their respective successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

9. <u>Counterparts</u>. This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Delivery of an executed counterpart of this Agreement by facsimile or electronic transmission shall be effective to the fullest extent permitted by applicable Law.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale, Assignment and Assumption Agreement as of the date first set forth above.

"Buyers"

[_____]

By: _____
     Name:
     Title:

[_____]

By: _____
     Name:
     Title:

[_____]

By: _____
     Name:
     Title:

[_____]

By: _____
     Name:
     Title:

"Sellers"

**Education Management Corporation**

By: _____
     Name:
     Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**Education Management II LLC**

By: _____
    Name:
    Title:


**Education Finance III LLC**

By: _____
    Name:
    Title:


**Argosy University of California LLC**

By: _____
    Name:
    Title:


**Argosy Education Group, Inc.**

By: _____
    Name:
    Title:


**Western State University of Southern California**

By: _____
    Name:
    Title:


**AiCA-IE Restaurant, Inc.**

By: _____
    Name:
    Title:


*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**TAIC-San Diego, Inc.**

By: _____
    Name:
    Title:

**TAIC-San Francisco, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of California-Hollywood, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of California-Inland Empire, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of California-Orange County, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of California-Sacramento, Inc.**

By: _____
    Name:
    Title:

**South University, LLC**

By: _____
     Name:
     Title:

**South University of Alabama, Inc.**

By: _____
     Name:
     Title:

**South University of Carolina, Inc.**

By: _____
     Name:
     Title:

**South University of Florida, Inc.**

By: _____
     Name:
     Title:

**South University of Michigan, LLC**

By: _____
     Name:
     Title:

**South University of North Carolina LLC**

By: _____
     Name:
     Title:

**South University of Ohio LLC**

By: _____
    Name:
    Title:

**South University of Virginia, Inc.**

By: _____
    Name:
    Title:

**South University Research II LLC**

By: _____
    Name:
    Title:

**South Education – Texas LLC**

By: _____
    Name:
    Title:

**Higher Education Services II LLC**

By: _____
    Name:
    Title:

**The Art Institute of Charlotte, LLC**

By: _____
    Name:
    Title:

**The Art Institute of Raleigh-Durham, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Dallas, Inc.**

By: _____
    Name:
    Title:

**AiD Restaurant, Inc.**

By: _____
    Name:
    Title:

**AiH Restaurant, Inc.**

By: _____
    Name:
    Title:

**AiiN Restaurant LLC**

By: _____
    Name:
    Title:

**AiT Restaurant, Inc.**

By: _____
    Name:
    Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**AiTN Restaurant, Inc.**

By: _____
    Name:
    Title:

**Miami International University of Art & Design, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Atlanta, LLC**

By: _____
    Name:
    Title:

**The Art Institute of Austin, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Charleston, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Colorado, Inc.**

By: _____
    Name:
    Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**The Art Institute of Fort Lauderdale, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Houston, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Indianapolis, LLC**

By: _____
    Name:
    Title:

**The Art Institute of Las Vegas, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Michigan, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Philadelphia LLC**

By: _____
    Name:
    Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**The Art Institute of Pittsburgh LLC**

By: _____
    Name:
    Title:

**The Art Institute of Portland, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of San Antonio, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Seattle, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Tampa, Inc.**

By: _____
    Name:
    Title:

**The Art Institute of Tennessee-Nashville, Inc.**

By: _____
    Name:
    Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**The Art Institute of Virginia Beach LLC**

By: _____
    Name:
    Title:


**The Art Institute of Washington, Inc.**

By: _____
    Name:
    Title:


**The Art Institutes International II LLC**

By: _____
    Name:
    Title:


**The Illinois Institute of Art at Schaumburg, Inc.**

By: _____
    Name:
    Title:


**The Illinois Institute of Art, Inc.**

By: _____
    Name:
    Title:


**The Institute of Post-Secondary Education, Inc.**

By: _____
    Name:
    Title:


*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**EXHIBIT C**

**[FORM OF]**
**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "IP Assignment"), dated as of [_____], 2017 is made by Education Management II, LLC, a Delaware limited liability company ("Assignor"), in favor of [**Buyer Entity or Entities**] ("Assignee").

**WHEREAS**, Assignor, Assignee, certain affiliates of Assignor and certain affiliates of Assignee have entered into that certain Asset Purchase Agreement, dated [●], 2017 (as amended, modified, or supplemented, the "Purchase Agreement").

**WHEREAS**, Assignor and Assignee have agreed pursuant to the Purchase Agreement that Assignor will transfer certain intellectual property to the Assignee.

NOW THEREFORE, Assignor agrees as follows:

1.	Assignment. In consideration for the execution of the Purchase Agreement, the consummation of the transactions contemplated by the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby irrevocably conveys, transfers and assigns to Assignee, and Assignee hereby accepts, all of Assignor's right, title and interest in and to the following (the "Assigned IP"):

(a)	the trademark registrations and applications set forth in Schedule 1 hereto, together with the goodwill connected with the use of and symbolized thereby and all issuances, extensions and renewals thereof (the "Trademarks");

(b)	the copyright registrations, applications for registration and exclusive copyright licenses set forth in Schedule 2 hereto and all issuances, extensions and renewals thereof (the "Copyights");

(c)	the internet domain name registrations including all sub-domain names and extensions thereof and thereto set forth in Schedule 3 hereto (the "Domain Names");

(d)	all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world;

(e)	any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(f)      any and all claims and causes of action, with respect to any of the foregoing, whether accruing before, on and/or after the date hereof, including all rights to and claims for damages, restitution and injunctive and other legal and equitable relief for past, present and future infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.      Domain Names. Assignor does hereby instruct, authorize and direct any and all registrars thereof (including, but not limited to, the registrars listed on Schedule 3) to transfer the Domain Names to an account as directed by the Assignor.  Assignor agrees to cooperate with Assignee and to follow Assignee's reasonable instructions in order to effectuate the transfer of the Domain Name registrations in a timely manner, and Assignor or Assignee is hereby expressly permitted and authorized to provide a copy of this IP Assignment to any such registrar as necessary to accomplish such transfer.  Assignor further agrees that within five (5) business days after the parties execute this IP Assignment, Assignor shall commence transfer of ownership of the Domain Names to Assignee in accordance with the on-line procedures provided by the registrar of the Domain Names. Assignee shall cooperate with Assignor and provide information as necessary to Assignor to complete the ownership transfer.  Assignor shall provide written acknowledgement confirming completion of the transfer of ownership to Assignee of such Domain Name within ten (10) days of the date of this IP Assignment.

3.      Recordation and Further Actions. Assignor hereby authorizes the Commissioner for Trademarks and the Register of Copyrights and any other governmental officials of any country or countries foreign to the United States, to record and register this IP Assignment upon request by Assignee, it successors, assigns and legal representatives, or to such nominees as it may designate.  Assignor shall take such steps and actions following the date hereof, including the execution of any documents, files, registrations or other similar items, to ensure that the Assigned IP is properly assigned to Assignee, or any assignee or successor thereto.

4.      Assignor Covenant. Assignor hereby covenants that no assignment, sale, agreement or encumbrance will be made or entered into which would conflict with this IP Assignment.

5.      Counterparts. This IP Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this IP Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this IP Assignment.

7.      Successors and Assigns. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

8.      Governing Law. This IP Assignment and any claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this IP Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of Delaware, without giving effect to any choice or conflict of law provision or rule.

9.      <u>Submission to Jurisdiction</u>.  Any legal suit, action or proceeding arising out of or based upon this IP Assignment or the transactions contemplated hereby may be instituted solely in the federal courts of the United States of America or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  In the event there is any legal suit, action or proceeding arising out of or based upon this IP Assignment or the transactions contemplated hereby, then the prevailing party in such legal suit, action or proceeding (including any appellate proceeding) shall be entitled to recover its costs and reasonable attorney fees from the non-prevailing party.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor has duly executed and delivered this IP Assignment as of the date first above written.

**ASSIGNOR**

Education Management II, LLC

By:_____
Name:
Title:

**SCHEDULE 1**

**TRADEMARKS REGISTRATIONS AND TRADEMARK APPLICATIONS**

| Mark | Jurisdiction | Filing Date/ Application No. | Registration Date/ Registration No. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**SCHEDULE 2**

**COPYRIGHTS REGISTRATIONS AND APPLICATIONS**

| Title | Jurisdiction | Date of Registration | Registration No. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**SCHEDULE 3**

**DOMAIN NAMES**

| Domain Name | Country of Registration | Registrar | Status |
|---|---|---|---|
| | United States | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT D

## [FORM OF]
## EMPLOYMENT ASSIGNMENT AGREEMENT

THIS EMPLOYMENT ASSIGNMENT AGREEMENT (this "Assignment") is entered into as of [●], 2017 (the "Effective Date"), by and between **[Insert Seller Entity]** ("Assignor"), **[Insert Buyer Entity]** ("Assignee") and **[Insert Employee]** ("Employee").

## RECITALS

A.      Assignor, Assignee, certain affiliates of Assignor, certain affiliates of Assignee, Education Management II LLC, a limited liability company organized under the laws of Delaware, in its capacity as the sellers' representative, and Dream Center Foundation, a California nonprofit corporation, in its capacity as the buyers' representative, have entered into that certain Asset Purchase Agreement, dated [●], 2017 (as amended, modified, or supplemented, the "Purchase Agreement"), pursuant to which, among other things, the Assignor has agreed to assign all of its right, title and interest in, and Assignee has agreed to assume all of Assignor's duties and obligations under, the Employment Agreement (as defined below) accruing and relating to periods on or after the Closing Date (as defined in the Purchase Agreement), subject to and upon the terms and conditions of the Purchase Agreement.

B.      Assignor is a party to that certain **[Insert Title of Employment Agreement, including any amendments]** dated as of **[Insert Date]**, by and between **[Insert Employee]** and Assignor (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A.

C.      Assignor desires to assign its interest under the Employment Agreement to Assignee, Assignee desires to assume all of Assignor's obligations under the Employment Agreement to the extent accruing and relating to periods on or after the Closing Date (as defined in the Purchase Agreement), and Employee desires to continue employment with Assignee pursuant to the Employment Agreement following such assignment.

## AGREEMENT

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Assignment and Assumption.  Assignor hereby assigns and transfers its entire right, title and interest under the Employment Agreement to Assignee as of the Effective Date.  Assignee hereby accepts said assignment and transfer, and assumes and agrees to perform all of the duties and obligations of Employer under the Employment Agreement to the extent accruing and relating to periods on or after the Closing Date (as defined in the Purchase Agreement). Employee hereby acknowledges and consents to said assignment and transfer.

2.      Purchase Agreement.  This Assignment is subject to all the terms and conditions of the Purchase Agreement.  No provision of this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Purchase Agreement.  Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

3.      Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

US.109396076.05

4.      <u>Counterparts</u>.  This Assignment may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  Delivery of an executed counterpart of this Assignment by facsimile or electronic transmission shall be effective to the fullest extent permitted by applicable Law.

5.      <u>Amendments</u>.  This Assignment may be amended, modified, superseded or canceled only by an instrument in writing signed by an officer of each of the parties hereto.

6.      <u>No Implied Rights of Third Parties</u>.  Nothing express or implied in this Assignment is intended to confer upon any Person (as defined in the Purchase Agreement), other than the parties hereto, or their respective successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Assignment.

*[Signature Page Follows]*

US.109396076.05

IN WITNESS WHEREOF, the parties hereto have executed this Employment Assignment Agreement as of the date first set forth above.

"<u>Assignor</u>"

**[Insert Seller Entity]**

By: _____
      Name:
      Title:

"<u>Assignee</u>"

**[Insert Buyer Entity]**

By: _____
      Name:
      Title:

Assignment is Acknowledged and Agreed:

"<u>Employee</u>"

**[Employee]**

_____

**Exhibit A**

**Employment Agreement**

(Attached)

**EXHIBIT E**

[FORM OF]
**TRANSITION SERVICES AGREEMENT**

THIS TRANSITION SERVICES AGREEMENT dated as of __, 2016 (this "Agreement") is by and among [●], a [●], [●], a [●], [●], a [●] ("[_____]"), and Dream Center Foundation, a California non-profit corporation (together, the "Service Providers") and [Education Management II LLC] (the "Company") (each a "Party" and collectively, the "Parties").  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

**WITNESSETH:**

**WHEREAS,** the Service Providers, the sellers identified therein (the "Sellers"), the Company, as Sellers' Representative, and Dream Center Foundation, as Buyers' Representative, are parties to that certain Asset Purchase Agreement, dated as of __, 2017 (as such agreement may be amended, restated or otherwise modified from time to time, the "Purchase Agreement"), providing for the purchase by the Service Providers and certain of their Affiliates of substantially all of the assets of the Sellers (the "Transaction"); and

**WHEREAS,** in connection with the Transaction, the Parties intend for substantially all of the services currently provided by Sellers for themselves and for the Company to be transferred to the Service Providers, and in order to ensure an orderly wind down of the business of Sellers and their Affiliates, including the teach-out of certain post-secondary educational institutions retained by Sellers and their Affiliates following the completion of the Transaction (the "Retained Business"), the Service Providers have agreed to provide to the Company and its subsidiaries and Affiliates the services described on Schedule I hereto, as it may be amended from time to time pursuant to Section 1.2 or Section 4.1 hereof, beginning on the date hereof and continuing as set forth herein;

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained in the Purchase Agreement and in further consideration of the mutual covenants and agreements contained herein, the Parties agree, intending to be legally bound, as follows:

**ARTICLE 1**
**TRANSITION SERVICES TO BE PROVIDED**

1.1     Performance of Transition Services.

(a)     Subject to the terms and conditions set forth herein and on Schedule I, for each service listed on Schedule I (each, a "Transition Service" and collectively, the "Transition Services"), the Service Providers shall provide or cause to be provided to the Company or its subsidiaries or Affiliates as the recipient of such Transition Service, such Transition Service.  All of the Transition Services shall be for the sole use and benefit of the Company and its subsidiaries and Affiliates.

(b)     In each case as identified on Schedule I, the Service Providers shall provide the Transition Services to the Company and its subsidiaries and Affiliates for the Retained Business for a term commencing on the date hereof and ending, with respect to any Transition Services referred to on Schedule I, on the earlier of:  (i) the expiration of the maximum period for which Transition Service is to be provided as set forth on Schedule I in respect of such Transition Service; and (ii) the last date on

which such Transition Service is being performed by Company, unless the provision of such Transition Service or this Agreement is earlier terminated in accordance with <u>Section 4.1</u> hereof.

(c)     In each case as identified on <u>Schedule I</u>, the Service Providers shall provide the Transition Services in accordance with the terms and conditions for such Transition Services listed on <u>Schedule I</u>, if any, and in accordance with the standard of care set forth in <u>Section 3.1</u> hereof.

(d)     The Service Providers may use Affiliates or subcontractors to provide some or all of the Transition Services.  If a Service Provider delegates any of its responsibilities under this Agreement to any of its Affiliates or uses subcontractors in the performance thereof, then such Service Provider shall remain fully responsible for the actions and performance of such Affiliate or subcontractor to the extent such Service Provider would be responsible hereunder if performing such obligations itself and such Affiliate or subcontractor shall be deemed a Service Provider hereunder for purposes of defining its performance obligations and its relationship (and the relationship of its employees and representatives) with the Company and its subsidiaries and Affiliates.  If a Service Provider delegates any Transition Service provided hereunder to an Affiliate or a subcontractor, such Service Provider will be responsible for any additional costs of such Affiliate or subcontractor for such Transition Service.

(e)     All employees and representatives of each Service Provider shall be deemed for all purposes (including compensation and employee benefits) to be employees or representatives solely of such Service Provider and not to be employees, representatives or independent contractors of the Company or its subsidiaries or Affiliates.  In performing their respective duties hereunder, all such employees and representatives of the Service Providers shall be under the direction, control and supervision of the applicable Service Provider (and not of the Company and its subsidiaries and Affiliates) and each Service Provider shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of its employees and representatives, subject to compliance with the terms and provisions contained in this Agreement.

(f)     The Company shall, and shall cause its subsidiaries and Affiliates to, make available on a timely basis to each Service Provider all information requested by such Service Provider reasonably necessary to enable it to provide the Transition Services.  The Company shall, and shall cause its subsidiaries and Affiliates to, give each Service Provider reasonable access, during normal business hours and at such other times as are reasonably required, to the Company's premises, to the extent reasonably necessary to enable it to provide the Transition Services, and shall cooperate with each Service Provider and its employees and representatives in connection with the provision of Transition Services.  The Company makes no representation or warranty whatsoever with respect to the accuracy or completeness of information to be provided hereunder, provided that should Service Providers reasonably incur additional costs in providing any part of the Transition Services as a direct result of inaccuracy or incompleteness in the information provided by the Company or its subsidiaries or Affiliates ("<u>Additional Costs</u>"), the Company shall pay such Additional Costs to Service Providers pursuant to the provisions of Article 2 upon presentation of appropriate documentation.

(g)     For so long as any Service Provider is providing any Transition Service hereunder and for [twelve (12) months] thereafter, the Service Providers shall keep and maintain books and records of the Transition Services provided.  The Service Providers shall make such books and records available to any officer of, or other authorized person designated by, the Company for inspection and audit at reasonable times and on reasonable advance written request therefor.

1.2     <u>Additional Unspecified Services</u>.  During the Term of this Agreement, if a Party identifies a service that the Company or its subsidiaries or Affiliates reasonably need in order to continue the efficient continuation and wind-down of its operations, including the teach-outs, and such service was

not included in Schedule I, then the Service Providers shall, upon the request of the Company or its subsidiaries or Affiliates, provide such additional services (such additional services, the "Additional Services") on substantially similar terms as those applicable to the other Transition Services agreed to by the Service Providers. The Parties shall amend Schedule I in writing to include such Additional Services (including the agreed upon fees, if any, and termination date with respect to such services) and such Additional Services shall be deemed Transition Services hereunder, and accordingly, the Service Providers shall provide such Additional Services, or cause such Additional Services to be provided, in accordance with the terms and conditions of this Agreement. Should any such Additional Services requested by the Company relate to academic instruction for any course being offered by the Company at any of the postsecondary institutions included in the Retained Business, the parties will enter in any further agreement concerning such instruction as may be required by any Educational Law.

1.3     Systems Resources; Consents. The Service Providers, at their expense, shall obtain and maintain all necessary applications, software, systems, equipment and data, communications and internet links, connections and services necessary for the Service Providers to provide the Transition Services.

1.4     Insurance Coverage. Throughout the term of this Agreement, the Company shall maintain insurance coverages with respect to the operation of the Retained Business that are substantially similar to the coverages that the Company has maintained during the 12 month period prior to the effective date of this Agreement.

1.5     Compliance with Laws. The Service Providers shall provide the Transition Services in material compliance with applicable Laws and Educational Laws and shall obtain and maintain all material Consents or Educational Permits necessary to provide the Transition Services. The Company agrees to provide the Service Providers with such assistance and cooperation as they may reasonably request, including access to relevant information and records, with respect to obtaining and maintaining any required Consents or Educational Permits.

**ARTICLE 2**
**FEES**

2.1     Compensation for Transition Services. During the term of this Agreement, the Company: (i) will pay each Service Provider the actual salaries and wages paid to, and other employment costs of, the personnel performing such Transition Services (based on actual costs and before any indirect rates/burdens) pro-rated for the time actually and reasonably spent providing such Transition Services); and (ii) will reimburse each Service Provider for all reasonably documented and reasonably incurred out-of-pocket expenses, including other direct costs and travel (if approved in advance by the Company), incurred by such Service Provider (based on actual costs in accordance with the Service Provider's then-current provisional billing rates) in connection with the performance of the Transition Services.

2.2     Time of Payment. On a monthly basis, each Service Provider shall provide the Company an invoice of work performed: (i) showing the number of hours worked and specifying the nature of the Transition Services provided and containing or to be followed by such other supporting detail as the Company may from time to time reasonably request; and (ii) setting forth the applicable rate(s) therefor, which invoice shall be paid in full by the Company within 30 days after delivery thereof.

2.3     Payment Processing. All payments hereunder will be paid, in U.S. dollars, in cash, by wire transfer of immediately available funds to the account designated by the applicable Service Provider in writing; provided, that in the event that the Company in good faith disputes any invoiced item, the Service Provider and the Company shall seek to resolve such dispute expeditiously and in good faith. The Company will not withhold any payments to a Service Provider under this Agreement and the

Service Providers shall continue to provide the Transition Services while any good faith dispute is pending (with any required adjustment being made on subsequent invoices).

2.4     Taxes.  The Company shall pay all applicable sales, use or other Taxes incurred with respect to the sale, performance, provision or delivery of the Transition Services.  Such Taxes shall be in addition to the other payments or charges provided for in this Agreement.  If a Service Provider pays or incurs any Tax in respect of the performance, provision or delivery of any Transition Service, such Service Provider may include such amount in an invoice to the Company in respect of such Transition Service.

## ARTICLE 3
## STANDARD OF CARE

3.1     Standard of Care.  The Service Providers at all times shall perform the Transition Services with the same degree of care, skill and diligence with which the Service Providers perform similar services for themselves and generally consistent with past practices of the Company and its subsidiaries and Affiliates, including with respect to the type, quality and timeliness of such services.

3.2     Service Interruption and Restoration; *Force Majeure*.  No Party shall be deemed in default of this Agreement to the extent that any delay or failure in the performance of its obligations under this Agreement results from any cause beyond its reasonable control and without its fault or negligence, such as acts of God, acts of civil or military authority, embargoes, war, terrorism, riots, fires, explosions, earthquakes, floods or unusually severe weather conditions.  In the event of any such excused disruption or delay: (a) the non-performing Party promptly shall advise the other Parties of the circumstances causing the disruption or delay; (b) the non-performing Party shall use reasonable best efforts to overcome such circumstances and resume performance within a reasonable period of time; and (c) the time for performance shall be extended for a period equal to the time lost by reason of the delay.  In the event any Service Provider is excused from supplying any Transition Service in accordance with the terms of this paragraph, the Company and its subsidiaries and Affiliates shall be entitled to acquire such services from any substitute source, with any reasonable out-of-pocket expenses to be paid by the applicable Service Provider, for the period of, and to the extent reasonably necessitated by, such non-performance.  If, after the period of disability, the Service Provider is once again able to perform the Transition Services, Company may reinstate this Agreement with respect to such Service Provider's performance of such Transition Services upon written notice to such Service Provider.

## ARTICLE 4
## MISCELLANEOUS

4.1     Term and Termination.

(a)     Unless otherwise indicated on Schedule I attached hereto, the term of this Agreement shall begin on the date hereof and shall remain in full force and effect, unless sooner terminated pursuant to this Section 4.1 or Section 4.1(b), through twelve (12) months (the "Term"); provided, however, that the expiration of the Term shall not relieve any party of its obligations to perform any unfulfilled obligation hereunder.  Notwithstanding the foregoing, this Agreement may be extended upon mutual agreement, at mutually agreeable terms and conditions.

(b)     This Agreement may be terminated prior to the expiration of the Term by:  (i) the written consent of all of the Parties; or (ii) any Services Providers, on the one hand, or the Company on the other hand, in the event of a material breach by any Service Provider or by the Company, as applicable, of any material term of this Agreement upon written notice to the breaching Party specifying such breach in

reasonable detail, if such breach is not cured to the noticing Party's reasonable satisfaction within thirty (30) days after the defaulting Party's receipt of such written notice of such breach. Any termination under subsection (i) shall be effective on the last day of the calendar month in which such mutual consent was executed.

(c)     The Company may terminate its right to receive any Transition Service upon providing written notice to the applicable Service Provider of such partial termination setting forth the Transition Service(s) that the Company desires to terminate.

(d)     Except as otherwise indicated on <u>Schedule I</u> attached hereto, the termination of any portion of Transition Services shall be effective on the last day of the month in which the termination notice was received by the applicable Service Provider (the "<u>Termination Date</u>"). Such election to terminate any Transition Service(s) shall not relieve any Service Provider of its continuing duty to provide those Transition Services that have not been terminated.

(e)     The Company shall periodically inform the Service Providers of the progress of the teach-out plans being implemented by the Company at certain postsecondary institutions included in the Retained Business, and, reasonably in advance of the projected completion of instruction at each such institution, shall inform the Service Providers of the anticipated date by which their services will no longer be needed for such institution.

4.2     <u>Inconsistency</u>. To the extent that the terms of the Purchase Agreement are inconsistent with the terms of this Agreement, the terms of the Purchase Agreement shall control.

4.3     <u>Relationship of Parties</u>. In providing the Transition Services, the Service Providers are acting as and shall be considered independent contractors. Nothing contained herein shall be deemed or construed by the Parties or any other Person as creating the relationship of principal and agent, partnership, joint employers or joint venture between the Company and any Service Provider. No Party has the right or authority pursuant to this Agreement to enter into any contract, warranty, guarantee or other undertaking in the name or for the account of any other Party, or to assume or create any liability of any kind, express or implied, on behalf of another Party, or to bind another Party in any manner whatsoever, or to hold itself out as having any right, power or authority to create any liability on behalf of another Party or to bind another Party in any manner whatsoever (except as to any actions taken at the express written request and direction of a Party).

4.4     <u>Remedies; Specific Performance</u>. The Parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise breached, irreparable harm would occur, no adequate remedy at Law would exist and damages would be difficult to determine, and the Party or Parties not in breach shall, except as expressly provided in this Agreement, be entitled to the remedy of specific performance (without posting a bond or other security) and to exercise all other rights granted by Law. Except as otherwise provided in this Agreement, all such rights and remedies shall be cumulative and non-exclusive, and may be exercised singularly or concurrently. One or more successive actions may be brought, either in the same action or in separate actions, as often as is deemed advisable, until all of the obligations to such Person are paid and performed in full.

4.5     <u>Dispute Resolution</u>.

(a)     Except as otherwise specifically provided in this Agreement, and prior to the commencement of any legal proceedings, the procedures set forth in this Section will govern dispute resolution in the event that the Company claims that the services to be performed do not meet the standards stipulated herein or any other alleged breach of this Agreement (a "<u>Dispute</u>"). Each Party shall

designate a relationship manager (who initially shall be [_____] with respect to the Service Providers and [____] with respect to the Company), and any Disputes shall first be brought by the complaining Party to the relationship managers of the other Party.  If the Dispute has not been resolved within five (5) Business Days, the complaining Party may escalate the Dispute to the Chief Executive Officer or Chief Financial Officer of the other Party (or their designees) by delivering to the other Party a written notice of the referral (a "<u>Dispute Escalation Notice</u>").  Following receipt of a Dispute Escalation Notice, each of the Parties will cause their respective officer or designee to negotiate in good faith to resolve the Dispute.   If such officers or designees are unable to resolve the Dispute within ten (10) Business Days after the date of the Dispute Escalation Notice, the complaining Party will have the right to begin mediation in accordance with Section 4.5(b) below.  The Parties agree that all discussions, negotiations and other information exchanged between the Parties during the foregoing escalation proceedings or those in Section 4.5(b) below will be without prejudice to the legal position of a Party in any subsequent legal action.

(b)     If the Dispute has not been resolved by the negotiation procedures as provided in Section 4.5(a) above within ten (10) Business Days after delivery of the Dispute Escalation Notice, or if the Parties failed to meet within ten (10) Business Days after delivery, the Parties will endeavor to settle the Dispute by presenting the dispute to a mutually agreed upon mediating body to administer mediation of the Dispute.  If the Dispute is not resolved in mediation (or if the Parties are unable to agree on a mediator pursuant to the proviso in the immediately preceding sentence), each Party will have the right to commence litigation.

4.6     <u>Entire Agreement; Amendment</u>.  This Agreement (including <u>Schedule I</u> hereto), together with the Purchase Agreement and the Ancillary Agreements, constitutes the entire understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.  This Agreement may be amended, or any provision of this Agreement may be waived, upon the approval, in writing, executed by the Parties.  No course of dealing between or among the Parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such Party under or by reason of this Agreement.

4.7     <u>Headings</u>.  The article, section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

4.8     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts which, taken together, shall constitute the whole agreement.  Executed signatures to this Agreement may be delivered by any standard electronic means and any such electronically delivered signatures shall be construed as manually executed signatures.

4.9     <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.  The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement and <u>Schedule I</u> hereto, shall be deemed to be followed by the words "without limitation."

4.10     <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be

illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

4.11    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein, and shall be delivered to each of the other Parties. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given: (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) upon receipt of confirmation of receipt if sent by facsimile transmission; or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to the Service Providers:



If to the Company:



Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section.

4.12    Choice of Law; Jurisdiction and Venue.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than Delaware.

(b)    All litigation arising out of this Agreement shall be subject to Section 10.6 of the Purchase Agreement.

(c)    To the extent that a Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, such Party hereby irrevocably waives such immunity in respect of its obligations pursuant to this Agreement.

4.13    No Third Party Beneficiaries.    This Agreement is for the sole benefit of the parties hereto and their respective Affiliates and permitted assigns, and nothing herein, expressed or implied, shall give or be construed to give to any other Person any legal or equitable rights hereunder.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** each of the Parties has caused this Transition Services Agreement to be signed by its respective officer thereunto duly authorized, all as of the date first written above.

**Dream Center Foundation**

By: _____
     Name:
     Title:


[_____]

By: _____
     Name:
     Title:


[_____]

By: _____
     Name:
     Title:


[_____]

By: _____
     Name:
     Title:


**Education Management II LLC**

By: _____
     Name:
     Title:

**Schedule I to**
**Transition Services Agreement**

| Description of Service | Expected Time Period |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**EXHIBIT F**

**[FORM OF]**
**CURRICULUM LICENSE AGREEMENT**

This Curriculum License Agreement ("Agreement") is made and entered into as of _____, 2017 (the "Effective Date") by and between [_____],a [●] having a principal place of business at [●] ("Licensor"), and [Education Management II LLC], a Delaware limited liability company having a principal place of business at 210 Sixth Avenue, Pittsburgh, PA 15222-2603 ("Licensee").

**RECITALS**

A. Pursuant to that certain Asset Purchase Agreement, dated as of [_____], 2017 (the "Purchase Agreement"), Licensor and certain of its affiliates, have purchased substantially all of the assets of certain of Licensee's Affiliates.

B. Before consummation of the transactions contemplated by the Purchase Agreement, Licensee, through its subsidiaries and affiliates, operated the post-secondary educational institutions known as South University and Argosy University, as well as the post-secondary educational system known as The Art Institutes, locations throughout the United States, using the Curriculum (as defined below) in such operations.

C. After the Closing (as defined in the Purchase Agreement), Licensee and its subsidiaries and affiliates will continue to operate certain post-secondary institutions that will be in teach-out (the "Business").

D. Licensor and Licensee have agreed pursuant to the Purchase Agreement that Licensor will grant Licensee a royalty free, non-transferable license to the Curriculum for the purpose of allowing Licensee to continue the Business until the teach-out of all post-secondary institutions retained by Licenses and its subsidiaries and Affiliates is complete.

**AGREEMENT**

In consideration of these premises and of the mutual promises set forth below, the Parties to this Agreement agree as follows:

**ARTICLE 1**
**DEFINITIONS**

For the purposes of this Agreement, the terms defined in this Article will have the meaning specified and will be applicable both to the singular and plural forms. Any defined terms used but not defined in this Agreement shall have the same meaning as provided for in the Purchase Agreement.

1.1 "**Curriculum**" means the curriculum used in the educational programs of the Business as of the Effective Date in the form of computer programs or software, slide shows, texts, films, web site content, videos or any other form or media, including the following items: (1) course objectives, (2) lesson plans, (3) exams, (4) class materials (including interactive or

US.109397783.03

computer-aided materials), (5) faculty notes, (6) course handouts, (7) diagrams, (8) syllabi, (9) sample externship and placement materials, (10) clinical checklists, (11) course and faculty evaluation materials, (12) policy and procedure manuals and (13) other related materials. Curriculum shall also include all copyrights, copyright applications, copyright registrations and trade secrets relating to the above-listed items.

1.2     "**Intellectual Property**" means any patent, copyright, design, formula, invention, concept, trade secret, know-how, confidential information, mask work, product right, software, technology or other similar intangible asset of any nature, whether in use, under development or design or inactive (including any registration, application or renewal regarding any of the foregoing).  For the purposes of this Agreement, Intellectual Property shall not include any trademark, service mark, trade name, trade dress, goodwill, logo, domain name or website.

1.3     "**Party**" or **"Parties"** means the Licensee or Licensor as applicable.

## ARTICLE 2
## Term

2.1     **Term**.  This Agreement binds the Parties from the Effective Date and shall remain in effect for so long as Licensee or any other Seller or their Affiliates is required to provide teach-out services to students enrolled in its or their educational programs as of the Effective Date.

2.2     **Breach**.  In the event that either Party is in material breach of any provision of this Agreement, the non-breaching Party may provide written notice of such breach and establish a reasonable period of time, not less than 30 days, in which the breaching Party must remedy such breach.  If the breaching Party fails to cure the breach within the established period, the non-breaching Party may: (a) seek injunctive relief solely with respect to the breaching activity; and (b) seek monetary damages.  In no event will either Party seek termination of this Agreement as a remedy for any breach of the Agreement.  No waiver by a Party of any breach in one or more instances will constitute a waiver of the Party's right to terminate this Agreement in a subsequent instance.

## ARTICLE 3
## LICENSE GRANTS

3.1     **Licenses**.  Licensor hereby grants and Licensee hereby accepts a non-exclusive, non-transferable, irrevocable, fully paid, royalty free license and right to use, copy, modify, distribute, publicly display and/or publicly perform the Curriculum and to teach the Curriculum solely for the purpose described in Section 3.2.

3.2     **Purpose; Limitation of Use**.  Licensee may only use the Curriculum as required to provide teach-out services to students enrolled in its or any of its subsidiaries' educational programs offered as of the Effective Date.

**ARTICLE 4**
**OWNERSHIP OF INTELLECTUAL PROPERTY**

4.1     **Licensor Owns**.  Licensor will own all right, title and interest in the Intellectual Property in the Curriculum as it exists as of the Effective Date, and any modifications made to the Curriculum by Licensor after the Effective Date.

4.2     **Licensee Owns**.  Licensee will own all right, title and interest in and to any Intellectual Property in modifications made to the Curriculum by Licensee after the Effective Date; *provided, however*, that for any modifications, improvements, or derivative works made to the Curriculum by Licensee after the Effective Date, Licensee shall not sell, assign, license, or otherwise transfer the modifications, improvements, or derivative works made to the Curriculum, or Intellectual Property related thereto, for any purpose other than as described in Section 3.2.

**ARTICLE 5**
**WARRANTIES**

5.1     **No Conflicting Agreements**.  No Party will, during the term of this Agreement, enter into any agreement, commitment or obligation in conflict with its obligations under this Agreement.

**ARTICLE 6**
**DISCLAIMERS**

Licensor and the Licensee expressly agree to the following provisions which underlie their positions upon entering this Agreement.

6.1     **Limitation of Warranties**.  EXCEPT AS OTHERWISE EXPLICITLY SET FORTH HEREIN, EACH PARTY EXPRESSLY DISCLAIMS TO THE OTHER PARTY ANY EXPRESS OR IMPLIED WARRANTY, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARISING OUT OF ITS PERFORMANCE OR ATTEMPTED DEVELOPMENT OF A CURRICULUM OR SERVICE PURSUANT TO THIS AGREEMENT.

6.2     **Limitation of Liabilities**.  EACH PARTY WILL ONLY BE LIABLE TO THE OTHER FOR DIRECT OR ACTUAL DAMAGES AND NOT INDIRECT, CONSEQUENTIAL OR SPECIAL DAMAGES RESULTING FROM OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TERMINATION OF THIS AGREEMENT, OR ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF BREACH OF THIS AGREEMENT.  This limitation applies regardless of whether such damages are sought based on breach of contract, negligence or any other legal theory.

6.3     **Limited Injunctive Relief**.  The Parties acknowledge that the license grant under this Agreement is irrevocable (except as provided for in Section 3.2) and Licensor hereby agrees not to seek injunctive relief that would in any way limit the ability of the Licensee to use the Curriculum as described herein.

-3-

**ARTICLE 7**
**CHOICE OF LAW**

7.1     This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of laws, provisions or rules that would cause the application of laws of any jurisdiction other than the State of Delaware.

**ARTICLE 8**
**MISCELLANEOUS**

8.1     **Notices**.  All notices or reports will be delivered personally or by registered or certified mail, postage prepaid, to the addresses of the Parties set forth in the preamble hereto. Notices will be effective upon receipt if personally delivered, or on the third business day following the date of mailing.  Any change of address of a Party will be promptly communicated in writing to the other Party.

8.2     **Return/Destruction of Curriculum Materials**. Within thirty (30) days of the end of the Term, Licensee shall either return to Licensor, or deliver to Licensor a written certification of the destruction of, all printed and digital copies of the Curriculum, except to the extent it is necessary for Licensee to retain a digital copy of any part of the Curriculum materials solely for archival purposes to comply with requirements of Laws or Educational Laws.

8.3     **Assignment**.

        (a)     Licensee may not assign or otherwise transfer, by operation of law, sale (asset, stock or merger) or otherwise, this Agreement or any of its rights under this Agreement without the prior written consent of the Licensor, other than in connection with the sale or transfer (whether by asset sale, stock sale or merger) of any post-secondary institution included in the Business that remains in teach-out, for which Licensor's prior written consent will not be required provided that Licensor shall be given written notice no later than fifteen (15) Business Days prior to any such assignment and shall be furnished with a draft of the assignment provisions by which Licensee plans to convey its rights and obligations under this Agreement and, provided further that such assignment provisions shall obligate the transferee to abide by all of the provisions of this Agreement and shall grant Licensor all rights and remedies against such transferee that Licensor has under this Agreement against Licensee.

        (b)     This Agreement is binding on and will inure to the benefit of the Parties and their permitted successors and assigns.  Any assignment other than that sanctioned by this Agreement is null and void.

8.4     **Force Majeure**.  If the performance of this Agreement or any obligations under this Agreement, except the making of required payments, is prevented, restricted or interfered with by reason of fire, flood, explosion or other casualty, accident or act of God; strikes or labor disturbances; war, whether declared or not, or other violence; sabotage; any law, order, proclamation, regulation, ordinance, demand or requirement of any government agency; or any other event beyond the reasonable control of the Parties, the affected Party, upon giving prompt notice to the other Party, will be excused from such performance to the extent of such prevention, restriction or interference.  The affected Party will use its reasonable efforts to avoid or remove such cause of non-performance or to limit the impact of the event on such Party's performance and will continue performance with the utmost dispatch whenever such causes are removed.

-4-

8.5     **Entire Agreement**.  This Agreement sets forth the entire agreement between the Parties and supersedes all previous agreements and understandings, whether oral or written, between the Parties with respect to the subject matter of this Agreement.

8.6     **Amendment**.  This Agreement may not be modified, amended or discharged except as expressly stated in this Agreement or by a written agreement signed by an authorized representative of each Party.

8.7     **Severability**.  The provisions of this Agreement will be deemed severable.  If any provision in this Agreement will be found or be held to be invalid or unenforceable in any jurisdiction in which this Agreement is performed, then the meaning of that provision will be construed, to the extent feasible, to render the provision enforceable, and if no feasible interpretation would save such provision, it will be severed from the remainder of this Agreement which will remain in full force and effect unless the provisions that are invalid or unenforceable substantially impair the value of the entire Agreement to either Party.  In such event, the Parties will use their respective reasonable efforts to negotiate a substitute, valid and enforceable provision which most nearly puts into effect the Parties' intent in entering into this Agreement.

8.8     **Waiver**.  No waiver of any term, provision or condition of this Agreement whether by conduct or otherwise in any one or more instances will be deemed to be or construed as a further or continuing waiver of any such term, provision or condition or of any other term, provision or condition of this Agreement.

8.9     **Relationship of Parties**.  Each of the Parties hereto is an independent contractor and nothing herein will be deemed to constitute the relationship of partners, joint venturers nor of principal and agent between the Parties hereto.

8.10    **Succession**.  This Agreement will bind the Parties, their successors, trustees and permitted assigns.

8.11    **Authority**.  Each Party has the full right, power, and authority to execute and deliver this Agreement and to perform its terms.  The execution and delivery of this Agreement and the consummation of the transactions required by this Agreement will not violate or conflict with any charter provision or bylaw of either Party or any of its Affiliates.  Each Party has taken all required corporate actions to approve and adopt this Agreement.  This Agreement is enforceable against each Party according to its terms, subject to bankruptcy, insolvency and other laws relating to or affecting creditors' rights and to general equity principles.  Each Party represents and warrants that the person or persons executing this Agreement on its behalf are duly authorized and empowered to do so.

8.12    **Counsel**.  The Parties and their respective counsel have negotiated this Agreement.  This Agreement will be interpreted fairly in accordance with its terms and without any strict construction in favor of or against either Party.

8.13    **Headings**.  The article and section headings in this Agreement are inserted for convenience only and will not constitute a part hereof.

[The remainder of this page is intentionally blank.  Signature page follows.]

IN WITNESS WHEREOF, the Parties, through their respective duly authorized officers, have executed this Agreement to be effective as of the Effective Date first above written.

**Licensee**
**[Education Management II LLC]**

By: _____

Title: _____

Date: _____

**Licensor**
[_____]

By: _____

Title: _____

Date: _____

US.109397783.03

**EXHIBIT G**

**[FORM OF]**
**TRADEMARK ASSIGNMENT**

This TRADEMARK ASSIGNMENT (this "Trademark Assignment"), dated as of [_____], 2017 is made by Education Management II, LLC, a Delaware limited liability company ("Assignor"), in favor of [**Buyer Entity or Entities**] ("Assignee").

**WHEREAS**, Assignor, Assignee, certain affiliates of Assignor and certain affiliates of Assignee have entered into that certain Asset Purchase Agreement, dated [●], 2017 (as amended, modified, or supplemented, the "Purchase Agreement").

**WHEREAS**, Assignor and Assignee have agreed pursuant to the Purchase Agreement that Assignor will transfer certain trademarks to the Assignee.

NOW THEREFORE, Assignor agrees as follows:

1.      Assignment. In consideration for the execution of the Purchase Agreement, the consummation of the transactions contemplated by the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby irrevocably conveys, transfers and assigns to Assignee, and Assignee hereby accepts, all of Assignor's right, title and interest in and to the trademark registrations and applications set forth in Schedule 1 hereto, together with the goodwill connected with the use of and symbolized thereby and all issuances, extensions and renewals thereof (the "Trademarks");.

2.      Recordation and Further Actions. Assignor hereby authorizes the Commissioner for Trademarks and any other governmental officials of any country or countries foreign to the United States, to record and register this Trademark Assignment upon request by Assignee, it successors, assigns and legal representatives, or to such nominees as it may designate.  Assignor shall take such steps and actions following the date hereof, including the execution of any documents, files, registrations or other similar items, to ensure that the Trademarks are properly assigned to Assignee, or any assignee or successor thereto.

4.      Assignor Covenant.  Assignor hereby covenants that no assignment, sale, agreement or encumbrance will be made or entered into which would conflict with this Trademark Assignment.

5.      Counterparts. This Trademark Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Trademark Assignment delivered by facsimile, e-mail or other means of electronic

transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Trademark Assignment.

7.     Successors and Assigns. This Trademark Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

8.     Governing Law. This Trademark Assignment and any claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this Trademark Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of Delaware, without giving effect to any choice or conflict of law provision or rule.

9.     Submission to Jurisdiction.  Any legal suit, action or proceeding arising out of or based upon this Trademark Assignment or the transactions contemplated hereby may be instituted solely in the federal courts of the United States of America or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  In the event there is any legal suit, action or proceeding arising out of or based upon this Trademark Assignment or the transactions contemplated hereby, then the prevailing party in such legal suit, action or proceeding (including any appellate proceeding) shall be entitled to recover its costs and reasonable attorney fees from the non-prevailing party.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor has duly executed and delivered this Trademark Assignment as of the date first above written.

**ASSIGNOR**

Education Management II, LLC

By:_____
Name:
Title:

**SCHEDULE 1**

**TRADEMARKS REGISTRATIONS AND TRADEMARK APPLICATIONS**

| Mark | Jurisdiction | Filing Date/ Application No. | Registration Date/ Registration No. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**[FORM OF]**
**TRADEMARK LICENSE AGREEMENT**

THIS TRADEMARK LICENSE AGREEMENT (this "<u>Agreement</u>") is entered into as of [●], 2017 (the "<u>Effective Date</u>"), by and between [●], a [●] organized under the laws of [●], [●], a [●] organized under the laws of [●], [●], a [●] organized under the laws of [●] and Dream Center Foundation, a California nonprofit corporation ("<u>Licensors</u>"), and Education Management II LLC, a limited liability company organized under the laws of Delaware ( "<u>Licensee</u>").  Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, dated as of [●], 2017 (the "<u>Purchase Agreement</u>"), by and among Licensors, Licensee and the sellers identified therein (the "<u>Sellers</u>").

**RECITALS**

A.      Pursuant to the Purchase Agreement, Licensors have agreed to purchase and accept from the Sellers, and the Sellers have agreed to sell, assign and transfer to Licensors, substantially all of the assets used by the Sellers in the Business (as defined in the Purchase Agreement).

B.      The trademarks and trade name set forth on <u>Exhibit A</u> hereto (collectively, the "<u>Marks</u>"), being purchased by Licensors from the Sellers, are necessary to permit Licensee and its Affiliates to conduct their ongoing business of teaching out certain post-secondary educational institutions (the "<u>Retained Business</u>").

C.      Licensors have agreed to grant Licensee and its subsidiaries and Affiliates an irrevocable, limited, non-transferable, royalty-free license to use the Marks, subject to the terms and provisions of this Agreement, and Licensee wishes to receive such a license.

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**ARTICLE 1**
**LICENSE GRANT**

1.1      Subject to the terms of this Agreement, Licensors, on behalf of themselves and their affiliates, hereby grant to Licensee and its subsidiaries and Affiliates term-limited, non-transferable, paid-up and royalty-free licenses to use the Marks in connection with the continued operations of the Retained Business (the "<u>Field of Use</u>").  For the avoidance of doubt, pursuant to the foregoing license grant, Licensee shall have the right to use the Marks in the Field of Use and to adopt and commence using new marks (but excluding other marks owned by Licensors or confusingly similar to other marks owned by Licensors), provided such adoption and use is made solely in the Field of Use.  For the further avoidance of doubt, the "Field of Use" shall include, and pursuant to the foregoing license grant Licensee and its subsidiaries shall have, the right to use the Marks in all forms and manners and for all purposes and activities that are materially consistent with their usage of the Marks during the twelve (12) months prior

to the closing date under the Purchase Agreement except for any activities relating to recruitment of new students (the "Current Standard").

1.2     Notwithstanding anything to the contrary herein, this Agreement shall expire upon the date that is twenty-four (24) months from the Effective Date.

## ARTICLE 2
## STANDARD TRADEMARK USAGE

2.1     Licensee will not use the Marks in any manner that would jeopardize the validity or legal status of the Marks and will conform its usage of the Marks to standard trademark usage, including, but not limited to, using the trademark symbols ®, ™, and $^{SM}$ where appropriate, in each case solely to the extent required by the Current Standard.

2.2     If usage of a Mark deviates from the Current Standard in such a manner that is not in compliance in all material respects with this Agreement, Licensors will give written notice to Licensee describing in reasonable detail any such noncompliance within a reasonable period of time after becoming aware thereof.  In such event, Licensee shall make reasonable changes to the usage of the applicable Mark within a reasonable period of time to cure any such noncompliance.

2.3     Licensee shall use the Marks only in the form and manner contemplated by this Agreement.

2.4     Other than as set forth herein, Licensee shall not use or register in any country any mark or Internet domain name that is confusingly similar to any of the Marks.

## ARTICLE 3
## QUALITY CONTROL

3.1     Services sold or marketed by Licensee after the date of this Agreement that use any of the Marks (collectively "Services" and individually, a "Service") will be reputable and of good quality, as required by the Current Standard.  If a Service deviates from the Current Standard in such a manner that is not in compliance with such standard, Licensors will give written notice to Licensee describing in reasonable detail any such noncompliance within a reasonable period of time after becoming aware thereof.  Licensee shall make reasonable changes following receipt of such notice to cure any such noncompliance.  Licensee shall comply with all applicable laws and regulations and obtain all appropriate government approvals pertaining to the Services, including, but not limited to, the regulations pertaining to and applicable labeling regulations, in each case to the extent required by the Current Standard.

## ARTICLE 4
## OWNERSHIP OF THE MARKS

4.1     Licensee hereby acknowledges that, as of the Effective Date, the Marks are and will remain the sole property of Licensors and that Licensee, as of the Effective Date, has and will hereby acquire no ownership rights whatsoever in any of the Marks.  Licensee will not contest the validity or ownership by Licensors of the Marks.  Licensee hereby agrees that any expanded trademark rights that may arise due to Licensee's exploitation of the Marks pursuant to this Agreement will inure solely to the benefit of Licensors, and Licensee's grant herein will include any such expanded rights for the duration of this Agreement.

2

## ARTICLE 5
## MAINTENANCE OF REGISTRATIONS AND PROSECUTION AND FILING OF NEW APPLICATIONS

5.1     Licensors shall, at Licensors' sole cost and expense, use commercially reasonable efforts to maintain the current registrations and prosecute to registration any currently pending applications for the Marks. If Licensors breach the foregoing covenant or decline to maintain the current registrations or prosecute to registration any currently pending applications for the Marks, Licensee may, at Licensee's sole cost and expense, maintain and prosecute said registrations and applications.

5.2     In connection with the parties' rights and obligations under <u>Section 5.1</u>, upon request by the party filing, prosecuting and/or maintaining an application or registration, the other party shall provide, upon request, all necessary assistance and take all necessary actions in connection with such filing, maintenance and prosecution and shall execute any documents reasonably required by the requesting party or supply the requesting party with any specimens of use or other materials reasonably necessary to maintain or obtain registration of the Marks in connection with the Field of Use.

## ARTICLE 6
## INFRINGEMENT

6.1     Each party will notify the others of any violation of rights pertaining to any of the Marks that comes to such party's attention.  The parties shall cooperate in good faith on request as reasonably necessary to protect the Marks.

6.2     With respect to any apparent infringement, dilution or other unauthorized uses of the Marks within the Field of Use, Licensors shall have the sole right and discretion, at their cost and expense, to initiate and control any enforcement action, legal claim or proceeding to obtain relief and to take such other action as they deem necessary or desirable to protect their rights in the Marks in issue.  At the request and expense of Licensors, Licensee shall cooperate in any reasonable enforcement effort which Licensors may elect to take to protect and defend the Marks within the Field of Use.  Licensors will retain all sums recovered from such actions or proceeding.

6.3     If any party is a named defendant on any action arising out of this Agreement and/or in any way related to any of the Marks (other than actions between the parties and/or their successors and/or assigns), the other parties agree to cooperate in such litigation to the extent required under the law at the expense of the party named as defendant.  The non-named parties assume no financial obligations for fees, costs, expenses or damages associated with such defensive litigation.

## ARTICLE 7
## TERM AND TERMINATION

7.1     Unless the parties otherwise mutually agree to terminate this Agreement, this Agreement binds the parties from the Effective Date and shall remain in effect until the expiration of the licenses hereunder.

7.2     If Licensors, on the one hand, or Licensee, on the other hand, is in material breach of any provision of this Agreement, the non-breaching party may provide written notice of such breach and establish a reasonable period of time, not less than thirty (30) days, in which the breaching party must remedy such breach.  If the breaching party fails to cure the breach within the established period, the non-breaching party may: (i) subject to <u>Section 8.3</u>, seek injunctive relief solely with respect to the breaching

3

activity; and (ii) seek monetary damages. No waiver by a party of any breach in one or more instances will constitute a waiver of the party's right to terminate this Agreement in a subsequent instance.

## ARTICLE 8
## DISCLAIMERS; RIGHTS; BANKRUPTCY

8.1     **Limitation of Warranties.**  EXCEPT AS OTHERWISE EXPLICITLY SET FORTH HEREIN, AND WITHOUT LIMITING ANY REPRESENTATIONS OR WARRANTIES UNDER THE PURCHASE AGREEMENT, EACH PARTY EXPRESSLY DISCLAIMS TO THE OTHER PARTY ANY EXPRESS OR IMPLIED WARRANTY, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARISING OUT OF ITS PERFORMANCE OF THIS AGREEMENT.

8.2     **Limitation of Liabilities.**  EACH PARTY WILL ONLY BE LIABLE TO THE OTHER FOR DIRECT OR ACTUAL DAMAGES AND NOT INDIRECT, CONSEQUENTIAL OR SPECIAL DAMAGES RESULTING FROM OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TERMINATION OF THIS AGREEMENT, OR ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF BREACH OF THIS AGREEMENT.  This limitation applies regardless of whether such damages are sought based on breach of contract, negligence or any other legal theory.

8.3     **Limited Injunctive Relief.**  The parties acknowledge that the license granted under this Agreement is pursuant to a division of the assets of Licensee.  As a result, the license grant under this Agreement is irrevocable and Licensors hereby agree not to seek injunctive relief that would in any way limit the ability of the Licensee to exercise the licenses granted herein.

8.4     **Bankruptcy.**  All rights and licenses granted under or pursuant to this Agreement by Licensors or their affiliates are, and shall otherwise be deemed to be for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code (including rights and licenses to the Marks).  The parties further agree that, in the event of a rejection of this Agreement by any Licensor in any bankruptcy proceeding by or against such Licensor under the U.S. Bankruptcy Code, if Licensee elects to retain its rights under this Agreement pursuant to Section 365(n)(1)(B), then: (a) the Licensee shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such Intellectual Property and all embodiments thereof, as such rights existed on the date Licensor's bankruptcy proceeding commenced, which embodiments, if not already in the possession of the Licensee, shall be delivered to it upon its written request therefor, and (b) the Licensors shall not interfere with the Licensee's rights to Intellectual Property and all embodiments thereof, and shall assist and not interfere with the Licensee in obtaining Intellectual Property and all embodiments thereof from another entity.  The term "embodiments" of Intellectual Property includes all tangible, electronic or other embodiments of rights and licenses hereunder, including all Marks and rights therein and thereto.

## ARTICLE 9
## ASSIGNMENT

9.1     No party may assign or otherwise transfer, by operation of law, sale (asset, stock or merger) or otherwise, this Agreement or any of its rights under this Agreement without the prior written consent of the other parties, which consent will not be unreasonably withheld, conditioned or delayed, <u>provided</u> that this Agreement is freely assignable in whole or in part by any party to the parents, subsidiaries, or affiliates of such party, or to successors to all or a controlling interest in the business of such party, or to a purchaser of all, substantially all or a portion of the assets or the stock of such party, in each case so long as such person or entity agrees in writing (which writing must be provided to the other

4

parties) to be bound by the terms and conditions of this Agreement.  For purposes of this <u>Article 9</u>, an assignment by Licensors of a Mark shall be considered an assignment of this Agreement and shall be subject to all licenses granted and other terms and conditions hereunder.

9.2     This Agreement is binding on and will inure to the benefit of the parties and their permitted successors and assigns.  Any assignment other than that sanctioned by this Agreement is null and void.

## ARTICLE 10
## MISCELLANEOUS

10.1     <u>Notices</u>.  All communications, notices and consents provided for herein shall be given in accordance with Section 10.2 of the Purchase Agreement.  A party may change the address to which such notices and other communications are to be given by giving each other party notice in the manner described in Section 10.2 of the Purchase Agreement.

10.2     <u>Enforceability</u>.  If any provision of this Agreement is or becomes or is deemed invalid, illegal or unenforceable under the applicable laws or regulations of any applicable jurisdiction, either such provision will be deemed amended to conform to such laws or regulations without materially altering the intention of the parties or it will be stricken and the remainder of this Agreement will remain in full force and effect.

10.3     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.  This Agreement may not be amended or modified in any respect except by written instruments signed by the parties.

10.4     <u>Captions</u>.  Captions and section and article headings are used for convenience of reference only and are not part of this Agreement and may not be used in construing it.

10.5     <u>Governing Law</u>.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, shall be governed by the laws of the State of Delaware, without giving effect to any choice or conflict of laws, provisions or rules that would cause the application of laws of any jurisdiction other than the State of Delaware.  All disputes arising out of this Agreement shall be subject to Section 10.6 of the Purchase Agreement.

10.6     <u>Counterparts</u>.  This Agreement may be executed in counterparts, and delivered by electronic mail with scan or attachment signature, all of which when so executed and delivered shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  Each counterpart may consist of a number of copies hereof or thereof each signed by less than all, but together signed by all, of the parties.  An electronic or other copy of a signature shall be deemed an original for purposes of this Agreement.

10.7     <u>Severability</u>.  In the event that any provision of this Agreement will be declared by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable, the validity, legality, and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby.

10.8     <u>Survivability</u>.  Any rights or obligations of the parties in this Agreement which, by their nature, should survive termination of this Agreement will survive any such termination.

*[Signature Page Follows]*

5

IN WITNESS WHEREOF, the parties hereto have executed this Trademark License Agreement on the day and year set forth above.

"Licensors"

**Dream Center Foundation**

By: _____
     Name:
     Title:

[_____]

By: _____
     Name:
     Title:

[_____]

By: _____
     Name:
     Title:

[_____]

By: _____
     Name:
     Title:

"Licensee"

**Education Management II LLC**

By: _____
     Name:
     Title:

*Trademark License Agreement*

**<u>Exhibit A</u>**

<u>Marks</u>

[To come]