

March 8, 2019

Michael J. Frola, Director
Multi-Regional and Foreign Schools Participation Division
Federal Student Aid
U.S. Department of Education
830 First St. UCP, NE
Washington DC 20202

Re: Response to your letter of February 27, 2019

Dear Mr. Frola,

I write to correct a number of inaccuracies contained in your correspondence of February 27, 2019. I would like first to express my sincere disappointment that the U.S. Department of Education has steadfastly refused to work with me to promote the well-being of the students enrolled in the Argosy University system. When I was appointed Receiver of that system on January 18, I very much looked forward to partnering with the Department to find a way to complete the teach-outs for certain campuses and transfer other campuses to new owners who would be able to find success running the universities where Education Management Corporation and Dream Center Education Holdings did not. Instead, the Department has adopted a cold, and as was demonstrated in your letter, an outright antagonistic, approach. The people who will feel the strongest sting are the students who will lose the semester, and an unknown number of credit hours as they scramble to find new schools to continue their studies.

With that, I turn to the substance of your letter.

### Fiduciary Issues

You start your letter by describing what you describe as fiduciary lapses in Argosy's management of monies intended to be paid to students as stipends. Both the Department and I started hearing questions regarding stipend payments in late January. As the intensity of the questions increased, my staff started investigating the issue in more detail. It should be obvious to you, but it bears repeating, that there were no obvious signs indicating that pre-receivership management intended to make applications for reimbursement for stipends never actually paid to students, nor were there obvious signs that those misrepresentations were actually made and the "reimbursements" actually used to pay the operating expenses of the school system. What was obvious, however, was the fact that there was $5,478,482 in the Receivership Entities' accounts. None of those accounts were noted as holding accounts for student

2344 Canal Road, Cleveland, Ohio 44113-2535
216.771.0727 fax: 216.771.2450 www.DottoreCo.com

stipend money and there were no indications that any of the sums in the accounts should properly have been paid to students. For reasons that will become clear as the investigation continues, inappropriate reimbursement requests were made and satisfied.

It is important to note that I cleared with the Department the use of the $5.4 million in the Receivership Estate for operational expenses. And neither the Department nor I understood the nature of the pre-receivership misrepresentations when the Department advanced $2.8 million in early February and authorized me to use those funds to cover the schools' expenses.

You say, repeatedly, that I should have known about the pre-Receivership misrepresentations the moment I crossed the threshold. I can only presume you base that conclusion on your misunderstanding of my role before the receivership was established. I was retained by DCEH in October 2018. I was told the schools under the DCEH umbrella were in serious financial trouble and I was asked to do two principal things: (1) find potential purchasers for certain assets; and, (2) consider whether I would be able to better serve the schools as a receiver. I was not involved in the day-to-day operations of the schools, nor was any accounting information for the schools shared with me. I was not involved in any actual negotiations with Studio. My understanding of the schools' finances was limited to what I had been told: they were in serious financial distress. While I did attend meetings at DOE, those meetings were about the potential use of a receivership to restructure assets in a potential transaction with Eastern Gateway Community College. I was never made privy to the subsequent Studio transaction, let alone its details, until after that agreement was executed. By the time I was appointed Receiver, all of the DCEH senior management had resigned, and the last remaining officer/board member resigned shortly after I was appointed. There was no road-map of how things worked internally within DCEH, nor were there any explanations of the accounting system. As is typical in my work as a Receiver, I took over in my role and had to figure out how to continue the day-to-day operations and stabilize the schools so I could then turn to determining exactly how to maximize their value for the benefit of all stakeholders. Again, as is typical in my work as a Receiver, the first weeks were spent in "triage," whereby I and my staff tried to stabilize the operations, work with regulators and accrediting agencies, and inform the affected students that my goal was to ensure they continue their course of studies with as little interruption as possible.

In sum, I had no understanding of the pre-receivership misrepresentations to the Department, and I have been as transparent as possible in my dealings with you through the short tenure of the Receivership. We have reported our findings to the Department and the Court on a regular basis, and have been careful to update all concerned as we uncover new evidence from DCEH's complex systems.

{00020950-2 }

## Financial Responsibility

Your next conclusion is that Argosy does not meet the standards of financial responsibility. Your comments concerning my efforts to cut expenses are curious for a variety of reasons. As you correctly note, the Receivership Estate was "cash strapped" at the time I was appointed. Following my appointment, I learned that the total bi-weekly payroll for the Receivership Entities was in excess of $7 million. The first and most direct way to promote the schools' success was to cut that payroll. To that end, shortly after I was appointed, my staff and I started the difficult process of identifying employees whose services were no longer needed. We cut more than 1,700 staffing jobs in total, but we did not cut any faculty's teaching positions and we certainly did not drag professors out of their classrooms mid-lecture to fire them. If you would, please let me know who made that particular allegation as it is patently false. It is absolutely true that a number of the people we terminated served in dual roles: as administrators and as teachers. For those people, we terminated their administrative role and informed them they would continue to be paid to teach their courses through the end of those courses.

The staff reductions were a critical portion of the plan to make the schools financially viable. While you indicate I made an unqualified promise that no one would be fired, my representation to the Department was that I would try not to cut staff if at all possible. As it turned out, the failure to reduce the staff would have led to an immediate failure of the schools. The reductions in force were one of the principal tools used to keep the schools open through today.

Obviously, the reductions in force were difficult for all concerned. We certainly did not relish telling nearly two thousand people their services were no longer needed. That said, there was one particular termination made because the person demanded we fire her – repeatedly. Cynthia Baum, the Chancellor for Argosy and *ex officio* Board member, demanded not once or twice, but *seven times* that we fire her. Upon her seventh demand, we accommodated her request. We note now that any misrepresentations Argosy made regarding the student stipend reimbursement requests were made under her management.

Another cost-cutting measure was the removal of Studio from the Receivership Entities' financial structure. Studio's involvement seriously compromised the chance of success for the schools. As set forth in the Complaint I filed against Studio, it engineered a structure whereby the schools had to advance money to Studio, which it would hold for forty-five days before returning a portion to DCEH for providing the services Studio was contractually obligated to provide. In other words, and in the simplest terms, Studio served as a middle man who was able to use the Receivership Entities' money for 45 days and then skim a portion off in exchange for nothing. I was

{00020950-2}

aware, in broad terms, that Studio and DCEH had been talking, but I was not involved in any negotiations, or crafting the structure that was implemented. Since being appointed Receiver, I have come to learn that DCEH did not negotiate those terms either. Instead, Studio, DCEH's lenders, and the Department crafted the structure and then presented it to DCEH on December 20, 2018 as a "take it or lose all Title IV funding" proposition. Since it was the only way to keep the schools open another day, DCEH accepted the transaction as presented. The Studio transaction, however, ensured that Argosy and the other Receivership Entity campuses would have insufficient cash flow to continue operations and the successful termination of the contracts has served to allow the schools to remain operating a short while longer.

The Department has been quick to make accusations regarding the propriety of the cost-cutting measures I have employed, but has not offered any suggestions regarding what it would deem appropriate and sufficient measures to be used instead. By a similar token, the Department has been quick to malign the reductions in force, but we note that no Department members were there during those reductions – my staff and I were. We are therefore at a loss to understand the basis for your comments about the methods by which the reductions took place, or the "substantial and irreparable damage to the academic integrity of Argosy." My staff and I were unerringly professional through the entire difficult process and we'd conclude with the simple observation that the only person to curse during the process was Ms. Baum, who repeatedly demanded "Just [expletive] terminate me!"

## Administrative Issues

You complain that the information you requested I provide, and which I provided without delay, was "incomplete and/or inconsistent with other information provided by Argosy or with the Department's records." You fail, however, to indicate *why* or *how* the data is inconsistent or incomplete. What I can tell you is that we provided the data we could find in the DCEH network. We did not create the data or the systems used to organize and report that data. If you let me know what, in particular, you found troubling with the data, we would be in a position to address your concerns in a meaningful way.

## Conclusion

Despite my best efforts, it appears that the failure of the Argosy system was pre-determined before I was appointed Receiver. The result: thousands of students left with a wasted semester, student loans they will seek to rescind, and the need to find another school to accept them and allow them to continue their studies, with no help from the failing school or the Department, was avoidable. In fact, should the Department decide that it would be best to help these students move on with their educations, please know that I stand ready and willing to work with the Department in whatever manner I can to facilitate a positive outcome for the students.

Very Truly Yours,

Mark Dottore