**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC,  ) | |
| Plaintiff,  ) | |
| v.  ) | Case No. 1:19-cv-145 |
| ) | |
| SOUTH UNIVERSITY  ) | JUDGE DAN AARON POLSTER |
| OF OHIO, LLC, *et al.*,  ) | MAGISTRATE JUDGE |
| Defendants.  ) | THOMAS M. PARKER |

**UNITED STATES' STATEMENT OF INTEREST CONCERNING ORDER TO SHOW
CAUSE WHY RECEIVERSHIP SHOULD NOT BE VACATED**

The United States respectfully submits this Statement of Interest, pursuant to 28 U.S.C. § 517,[1] to set forth its interests with respect to this matter and as regards orders entered by the Court on March 6 and March 8, 2019, including the Order to Show Cause (ECF No. 111) ("Show Cause Order") why the January 18, 2019 receivership order (ECF No. 8, as amended by ECF No. 14) ("Receivership Order") should not be vacated.[2]

---

[1] Title 28, Section 517 of the United States Code provides that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." The United States sets forth its interests in cases to which it is not a party when it deems it appropriate to do so, and sometimes courts invite the United States to participate in proceedings to which it is not a party by the filing of such Statements of Interest. The filing of a Statement of Interest pursuant to this authority does not constitute intervention by the United States or make the United States a party to the litigation.

[2] Those orders do not compel conduct of the Department of Education, which is not a party before the Court in this case. There are procedures by which information may be sought from federal agencies for purposes of litigation where the United States is not a party to the litigation. Notably, Congress has provided an avenue for obtaining information from federal officials in situations in which a federal agency is not a party. *See* 5 U.S.C. § 301 ("[T]he head

## **STATUTORY AND REGULATORY BACKGROUND**

Title IV of the Higher Education Act ("HEA") establishes federal student financial aid programs through which the government forwards student loan proceeds to eligible higher education institutions. *See* 20 U.S.C. § 1070(a). To be eligible, an institution must meet the HEA Title IV definition of "institution of higher education." *Id.* §§ 1001, 1002. To participate in Title IV programs, an institution must establish, *inter alia,* that it is authorized to operate in the state in which it is located; that it is accredited by a recognized accrediting agency; and that it is administratively capable and financially responsible. *See id.* § 1099c(a). To demonstrate financial responsibility, an institution must meet certain specified financial obligations and regulatory measures. *See* 34 C.F.R. §§ 668.171-668.173.

A school that wishes to participate in a Title IV program may enter into a program participation agreement with the United States Department of Education ("Education"). *See* 20 U.S.C. § 1094(a). Under the participation agreement, the institution is approved as a fiduciary to draw down its students' federal financial aid, which is then disbursed to the institution and to the students. *See* 34 C.F.R. § 668.82. To comply with the terms of their participation agreements,

---

of an executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers and property."). Pursuant to this statute, a federal agency may establish procedures for responding to non-party subpoenas or demands for testimony. And the Supreme Court has long recognized the authority of federal agencies to regulate the disclosure of information by their employees. *See United States ex rel. Touhy v. Ragen*, 340 US. 462 (1951). In *Touhy*, the Court held that a federal employee could not be held in contempt for refusing to produce subpoenaed documents, where his refusal was based on regulations prohibiting the disclosure of official information without prior authorization. *Id.* at 468. The Department of Education has promulgated *Touhy* regulations that specify the appropriate circumstances under which testimony may be obtained from its employees upon proper authorization. *See* 34 C.F.R. §§ 8.1-8.4. But those procedures have not been appropriately invoked or applied here for the purpose of obtaining testimony from the Department of Education in this proceeding.

school owners must comply with the eligibility requirements and adhere to the Title IV statute and associated regulations.

The decision to open schools, buy schools, sell schools, or close schools is within the independent business judgment of the school itself. Education does not control these decisions. But if a school closes or changes ownership, a program participation agreement automatically terminates. 34 C.F.R. § 668.14(g). The participation agreement also ends if an institution loses state approval, accreditation, or if the owner files for bankruptcy. *See* 20 U.S.C. §§ 1001, 1002, 1094; 34 C.F.R. § 600.40; 34 C.F.R. § 668.14; 34 C.F.R. § 668.26; 34 C.F.R. § 600.7(a)(2). If an institution's ownership changes and the new owner wishes to continue participating in federal student aid programs, the new owner must submit an application to Education demonstrating that the institution meets all applicable standards. *See* 34 C.F.R. § 600.20(g)-(h); 34 C.F.R. § 600.31(a).

In the event that an institution ceases operations or faces possible loss of its licensure, accreditation, or certification, the institution must, *inter alia*, submit a teach-out plan specifying how students will be able to complete their degrees. *See* 34 C.F.R. § 668.14(b)(31).[3]

---

[3] If a school closes, students who do not participate in a teach out or do not complete their program of study at another institution may be entitled to closed school loan discharges. 20 U.S.C. § 1087(c)(1); 34 C.F.R. § 685.214(a). Under Title IV, Education has a right to recover closed-school discharges from the closed institution. *See* 20 U.S.C. §§ 1087(c)(1) (requiring Secretary of Education to "pursue any claim available to [discharged borrower for student loan] against the institution") and 1087(c)(2) ("A borrower whose loan has been discharged pursuant to this subsection shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals."); 34 C.F.R. § 685.214(e)(1) (providing that upon Education's discharge of a borrower's loan, "the borrower is deemed to have assigned to and relinquished in favor of the Secretary [of Education] any right to a loan refund (up to the amount discharged) that the borrower (or student) may have by contract or applicable law with respect to the loan or the enrollment agreement for the program for which the loan was received, against the school"); *College of Visual Arts*, 2015 WL 6396241, at *8 (Dep't of Educ., Office of Hearings and Appeals, July 20, 2015) (holding, based on 20

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants South University of Ohio, LLC; DCEH Education Holdings, LLC; and Argosy Education Group, LLC (collectively, "Dream Center") own or operate higher education institutions that receive Title IV funds. ECF No. 1 ("Complaint" or "Compl.") ¶¶ 4-6, 37. On January 18, 2019, Plaintiff Digital Media Solutions, LLC ("DMS"), a trade creditor, alleged that Dream Center owes DMS approximately $250,000 for services DMS performed on Dream Center's behalf (principally, seeking out prospective students for Dream Center-affiliated schools). *Id.* ¶¶ 13-18. DMS claimed that Dream Center-affiliated schools were struggling economically and on the precipice of bankruptcy, and that appointment of a receiver would protect students and creditors by preserving value that exceeds what would be available in a bankruptcy. *Id.* ¶ 37. Along with the Complaint, DMS simultaneously filed an emergency motion seeking the appointment of a receiver to "protect thousands of students . . . as well as [DMS] and hundreds of other trade creditors." ECF No. 3 ("Motion to Appoint a Receiver"), at 12.

On the same day that DMS filed the Complaint and the Motion to Appoint a Receiver, Dream Center admitted to all of the material allegations therein, ECF No. 6 ("Answer") ¶¶ 1-4, and consented to appointment of a receiver. ECF No. 7. Also on January 18, 2019, the Court issued the Receivership Order, appointed a receiver, Mark Dottore ("Receiver"), and enjoined certain entities. *See* Receivership Order ¶¶ 1, 10-11. The Receivership Order authorized the Receiver "to take possession of and control of all of the real and personal property arising out of, or pertaining to" Dream Center "in a Receivership Estate," and further "enjoined and stayed" certain creditors "from commencing or continuing any action at law or suit or proceeding in

---

U.S.C. §§ 1087(c) and 1099c(e)(1)(B), that Education has a direct claim to recover closed-school discharges).

equity to foreclose any lien or enforce any claim against the Property, or its Books and Records or Property, or against the Receiver, in any court." Receivership Order ¶¶ 1-2, 10.

In a February 27, 2019 letter, Education denied a request from Argosy University ("Argosy") for approval of a change in ownership or structure resulting in a change of control. *See* Letter from Michael J. Frola, Director, Multi-Regional and Foreign Schools Participation Division, U.S. Department of Education, to Mark Dottore, Dottore Companies, and Randall K. Barton, Chairman, Dream Center Education Holdings (Feb. 27, 2019), *available at* https://studentaid.ed.gov/sa/sites/default/files/argosy-cio-denial-redacted.pdf (the "Denial Letter").  The Denial Letter states that "[s]ignificant funds were released by [Education] since mid-January, including after the Receiver was appointed, which should have been used to pay the existing unpaid credit balances [*i.e.*, 'student stipends'] owed to [Argosy] students." *Id.* at 4. In the Denial Letter, Education concluded that Argosy had not met required standards of financial responsibility or administrative capability. *Id.* at 2-6.

As explained in the Denial Letter, subject to limited exceptions Education may not distribute additional federal student aid funds (including for student stipends) to affected Argosy institutions.

An associated announcement on Education's website explains that an Argosy student

> may be eligible for a 100-percent discharge of [his or her] Direct Loans, Federal Family Education Loan (FFEL) Program Loans, or Federal Perkins Loans . . . taken for [the student's school] program under either of the[] [following two] circumstances:
>
> - [The student's] school closed while [the student was] enrolled, and [the student] didn't complete [his or her] program because of the closure. If [the student was] on an approved leave of absence, [he or she is] considered to have been enrolled at the school.

5

- [The student's] school closed within 120 days after [he or she] withdrew.

*Important Information about Argosy University and The Art Institutes*, Federal Student Aid: An Office of the U.S. Department of Education (updated March 6, 2019), https://studentaid.ed.gov/sa/about/announcements/dream-center#credit-balance-refunds. This announcement provides further details about discharge of student obligations and other alternatives, including transfer.

## STATEMENT

## THE RECEIVERSHIP ORDER SHOULD BE VACATED

"The district court possesses a broad range of discretion in deciding whether or not to terminate an equity receivership." *SEC v. An-Car Oil Co.*, 604 F.2d 114, 119 (1st Cir. 1979); *see generally* 65 Am. Jur. 2d *Receivers* § 146 (Feb. 2019 update) ("The decision on whether to terminate a receivership turns on the facts and circumstances of each case."). "In determining whether to continue a receivership or discharge the receiver, the court will consider the rights and interests of all parties concerned" and "a receivership should be dismissed when the reason for the receivership ceases to exist." *Id.* "A receivership should not be the means of continuing an enterprise that does not show evident signs of working out for the benefit of the creditors." *Jones v. Vill. of Proctorville, Ohio*, 290 F.2d 49, 50 (6th Cir. 1961).

    **A.    DMC's and Dream Center's Pleadings Suggest the Absence of a Controversy, Without Which This Court Would Lack Subject Matter Jurisdiction**

The content and filing circumstances of DMS's Complaint (ECF No. 1) and Dream Center's Answer (ECF No. 6) suggest that an actual controversy between them may not exist. Except for inconsequential allegations in two of the Complaint's 39 paragraphs, Dream Center

6

admitted every allegation of the Complaint in its two-page Answer.[4] Moreover, Dream Center both answered the Complaint and consented to the motion seeking a receiver on the same day that the Complaint and motion were filed.

A plaintiff seeking "to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citation omitted). "[T]o be justiciable, a controversy 'must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop.'" *Stotts v. Pierson*, 976 F. Supp. 2d 948, 974 (S.D. Ohio 2013) (quoting *Hillard v. First Fin. Ins. Co.*, 968 F.2d 1214, 1992 WL 164998, at *2 (6th Cir. 1992) (unpublished)). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests"; it must be "real and substantial"; and it must "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and citation omitted). In addition, "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359; *see Nolan v. Boeing Co.*, 919 F.2d 1058, 1067 (5th Cir. 1990) (explaining that this section "is designed to prevent the litigation of claims in federal court by suitors who by sham,

---

[4] Dream Center denied for lack of information sufficient to form a belief that DMS "[was] founded by a team of lifelong athletes," Compl. ¶ 1, "specializes in helping its clients accelerate their growth by deploying diversified and data-driven digital media customer acquisition solutions," *id.*, and "is a Delaware limited liability company" whose members are three specified entities organized under Delaware law with principal places of business in New York and Toronto, Ontario. *Id.* ¶ 3.

pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts.").

In similar circumstances, where plaintiffs and defendants have brought prepackaged complaints, answers, and motions, courts have questioned their jurisdiction. In *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 619-20 (3d Cir. 1996), a large group of tort plaintiffs reached an agreement with tortfeasor defendants before both groups filed—on the same day—a complaint, answer, and joint motion seeking conditional class certification for purposes of obtaining judicial approval of a stipulated settlement. The court explained that the presentation of the suit and settlement "in one package" gave it "serious doubts" as to the "existence of justiciability and subject matter jurisdiction," but ultimately did not reach the issue because class certification was inappropriate in any event. *Id* at 617, 622-23; *see also Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 48 (1971) (holding that where "both litigants desire precisely the same result . . . . [t]here is . . . no case or controversy within the meaning of Art. III of the Constitution"); *Carlough v. Amchem Prods., Inc*., 834 F. Supp. 1437, 1462 (E.D. Pa. 1993) ("[I]f two litigants commence a suit with the same goals in mind, no controversy exists to give the district court jurisdiction." (internal quotation marks and citation omitted)).

Here, as explained above, no justiciable controversy appears to exist between the named parties in this litigation. The complaint, answer, motion seeking appointment of a receiver, and response to the motion seeking appointment of a receiver were filed on the same day. ECF Nos. 1, 2, 6, 7. DMS's motion seeking appointment of the receiver also contains identical language to a declaration Dream Center filed later the same day. *Compare*, *e.g.*, Motion to Appoint a Receiver, at 4 ("If allowed to proceed in an orderly fashion, the Universities will follow the teach-out protocols to end operations at the Teach-out Schools . . . ."), *with* ECF No. 7-1, at ¶ 12

8

(declaration in support of Dream Center's response to Motion to Appoint a Receiver) ("If allowed to proceed in an orderly fashion through receivership, the Universities will follow the teach-out protocols to end operations at the Teach-out Schools . . . ."). The parties to this litigation do not appear to be truly adverse, and, in the absence of a justiciable case or controversy, the Court lacks subject matter jurisdiction.

### B. Parties in Interest May Protect Their Respective Interests in Bankruptcy Proceedings

Remedies superior to the Receivership Order appear to be readily available to deal with the claims being litigated in this case, including the claims of Dream Center's students. As further explained below, the Congressionally-enacted Bankruptcy Code provides a simple structure under which the rights of Dream Center and its creditors could be pursued, and priority of creditors determined. This structure, carefully crafted by Congress, appears superior under the circumstances to continuation of the Receivership Order. And if parties in interest choose not to file a bankruptcy case, vacating the Receivership Order would free them to pursue their rights in individual actions in forums with jurisdiction over the disputes. That alternative also coheres with applicable law.

#### 1. Because Dream Center Is Financially Distressed, Bankruptcy Provides a Superior Alternative for Resolving the Competing Claims of DMS, Students and Other Creditors (Including Intervenors)

The Bankruptcy Code provides clear statutory guidance. As the Supreme Court recently explained, "[f]iling for [c]hapter 11 bankruptcy has several relevant legal consequences."

- First, an estate is created comprising all property of the debtor.
- Second, a fiduciary is installed to manage the estate in the interest of the creditors[, who] may operate the [debtor's] business, . . . and perform certain

- bankruptcy-related functions, such as seeking to recover for the estate preferential or fraudulent transfers made to other persons . . . .

- Third, an "automatic stay" of all collection proceedings against the debtor takes effect.

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978-79 (2017) ("*Jevic*") (citing, in sequence, 11 U.S.C. §§ 541(a)(1), 1106, 1107(a), 363(c)(1), 1108 and 362(a)). Chapter 11 of the Bankruptcy Code thus "strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008).

The Bankruptcy "Code also sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate." *Jevic*, 137 S. Ct. at 979; *see In re Mansfield Tire & Rubber Co.*, 942 F.2d 1055, 1059 (6th Cir. 1991); *see also* 11 U.S.C. § 507 (setting priorities among unsecured creditors). Bankruptcy courts are familiar with implementing this Congressionally-mandated payment prioritization.

The Receivership Order, while containing some paragraphs analogous to Bankruptcy Code provisions, does not provide an adequate substitute for a bankruptcy case. The Receivership Order, for example, does not address the priority in which creditors' claims will be paid. This point seems especially salient for Dream Center as a result of Argosy's loss of Title IV funds. The Receiver appears poised to attempt liquidation of the receivership estate's assets, and "[t]he proper forum for liquidation [is] . . . the bankruptcy court." *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436-38 (2d Cir. 1987). In *SEC*, the Second Circuit noted that through a receivership, the district court had "taken upon *itself* the burden of processing proof-of-claim forms filed by thousands of noteholders and other creditors, of setting priorities among classes of

10

creditors, and of administering sales of real property, all without the aid of either the experience of a bankruptcy judge or the guidance of the bankruptcy code." *Id.* at 438. These "functions undertaken by the district court . . . demonstrate the wisdom of not using a receivership as a substitute for bankruptcy." *Id.* at 437. Put simply, "[a] receivership is not a substitute for bankruptcy proceedings." *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04-CV-4971, 2005 WL 2205335, at *2 (E.D.N.Y. Sept. 9, 2005) (citing *id.*).

The Receivership Order also deprives Dream Center's creditors of other Bankruptcy Code protections. For example, under the Bankruptcy Code, a debtor would be required to schedule undisputed, non-contingent and liquidated creditors' claims, and generally, if not contested, these would be paid without creditor action to the extent the bankruptcy estate contained sufficient assets. *See* 11 U.S.C. § 502; Fed. Bankr. R. 3003(b). The Bankruptcy Code also permits creditors under specified conditions to commence involuntary bankruptcy cases. 11 U.S.C. § 303. By contrast, under the Receivership Order, Dream Center's creditors lack these protections. In these and many other ways, the Bankruptcy Code provides a forum for efficiently sorting out a financially troubled entity's debts and financial affairs, while accommodating the rights and interests of the entity's creditors. *See Thermo Credit, LLC v. DCA Servs., Inc.*, No. 17-4207, 2018 WL 5503337, at *8 (6th Cir. Oct. 29, 2018) (recognizing that a bankruptcy court is "the standard forum to resolve disputes between creditors").

This action's numerous intervention petitions confirm that bankruptcy offers a superior procedural vehicle for addressing creditor claims. *E.g.*, ECF Nos. 42, 45, 77, 88, 102. An orderly bankruptcy would eliminate the uncertainty expressed by creditors and other intervenors in this case about what rules apply to their claims. *See SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978) (recognizing that liquidation of a corporation in receivership "may more

11

properly be the subject of a bankruptcy proceeding," and that "the district court should, at an early stage in the liquidation, set forth in express terms the justification for retaining its equity jurisdiction, indicating why the exercise of its jurisdiction is preferable to a liquidation in bankruptcy court"; recognizing also that in "true bankruptcy, procedures are better geared for creditors and depositors to give them a day in court and protect their rights"); *In re Kreisers, Inc.*, 112 B.R. 996, 1000 (Bankr. D.S.D. 1990) ("Whether filed by a receiver or other entitled party, the bankruptcy court is equipped to accept debtors in receivership, just as the bankruptcy court is empowered to invalidate erroneous receiverships.").

One of the central reasons educational institutions prefer receivership to bankruptcy— protecting enrolled students in a Title IV-qualified school, *see* Motion to Appoint a Receiver, at pp. 2-3—no longer applies to Argosy because Education already has determined that these Dream Center entities are no longer qualified to receive Title IV funds. *See* Denial Letter. As DMS's motion seeking appointment of a receiver correctly explained, educational institutions petitioning for bankruptcy cease to be eligible to receive Title IV funding under the HEA. *See* 20 U.S.C. § 1002(a)(4)(A) ("An institution shall not be considered to meet the definition of an institution of higher education . . . if . . . the institution, or an affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management or policies of the institution, has filed for bankruptcy . . . ."). For this reason, educational institutions or their creditors sometimes seek instead to have a receiver appointed for them. *See, e.g.*, *Educ. Corp. of Am. v. United States Dep't of Educ.*, No. 18-CV-01698, 2018 WL 5786077, at *2 (N.D. Ala. Nov. 5, 2018) (noting that plaintiff "contends that it cannot seek protection by 'a traditional bankruptcy filing' from these lawsuits because, under the HEA, a bankruptcy filing disqualifies an institution from participating in Title IV funding programs"). But here, given that

Argosy schools are disqualified from receiving Title IV funds, there is no consequential distinction between receivership and bankruptcy, at least for purposes of Argosy.

### 2. In Bankruptcy, an Orderly Disposition of Dream Center's Assets Could Occur to Make Payments Toward Creditors' Claims (Including Those of Students)

The Bankruptcy Code protects the rights of stakeholders and assures that similarly situated stakeholders receive similar treatment. In cases under Chapter 11, for example, reorganization plans may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests . . . ." 11 U.S.C. § 1123(b)(4). Plans also may "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected . . . ." 11 U.S.C. § 1123(b)(2). Even before a reorganization plan is confirmed, particular assets may be sold and the proceeds placed into the estate for later distribution. *See* 11 U.S.C. § 363. Non-residential leases are deemed rejected if not assumed within a defined period, and in the meantime, the debtor must perform under the leases. 11 U.S.C. § 365(d).

These statutory mechanisms have been used for resolving claims, including student claims, against financially troubled educational institutions dependent on HEA title IV funding. In *In re Corinthian Colleges, Inc.,* No. 15-10952 (Bankr. D. Del.), operators of a large network of for-profit post-secondary education schools had participated in Title IV grant and loan programs. Under their confirmed reorganization plan, certain estate assets were placed in a liquidation trust to pay specified claims and a separate trust was created for paying claims of their students and certain governmental claims. *In re Corinthian Colleges, Inc.,* No. 15-10952, Order Confirming Third Amended and Modified Combined Disclosure Statement and Chapter 11 Plan of Liquidation, ECF No. 913 (Bankr. D. Del. Aug. 28, 2015). Likewise, in *In re ITT Educational Services, Inc.*, No. 16-07207-JMC-7A (Bankr. S.D. Ind.), a large network of for-

13

profit schools operated nationwide is being liquidated under Bankruptcy Code chapter 7. Students filed a class action complaint against the schools' chapter 7 trustee, *Villalba et al v. ITT Educational Services, Inc. (In re ITT Educational Services, Inc.)*, No. 17-50003 (Bankr. S.D. Ind.), and the court approved the trustee's settlement under which these claims were allowed for $1.5 billion (subject to specified adjustments) and will be paid pro rata with other unsecured claims. *See In re ITT Educational Services, Inc.*, No. 16-07207, Final Order Granting Trustee's Motion for Authority To Enter Into Settlement Of Student Class Action, ECF No. 3079 (Bankr. S.D. Ind. Nov. 30, 2018).

In short, the Receivership Order should be vacated because bankruptcy provides a method superior to receivership for addressing debtors' and creditors' rights, especially in liquidation.

profit schools operated nationwide is being liquidated under Bankruptcy Code chapter 7. Students filed a class action complaint against the schools' chapter 7 trustee, *Villalba et al v. ITT Educational Services, Inc. (In re ITT Educational Services, Inc.)*, No. 17-50003 (Bankr. S.D. Ind.), and the court approved the trustee's settlement under which these claims were allowed for $1.5 billion (subject to specified adjustments) and will be paid pro rata with other unsecured claims. *See In re ITT Educational Services, Inc.*, No. 16-07207, Final Order Granting Trustee's Motion for Authority To Enter Into Settlement Of Student Class Action, ECF No. 3079 (Bankr. S.D. Ind. Nov. 30, 2018).

In short, the Receivership Order should be vacated because bankruptcy provides a method superior to receivership for addressing debtors' and creditors' rights, especially in liquidation.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the Receivership Order should be vacated.

March 11, 2019

        Respectfully submitted,

        JOSEPH H. HUNT
        Assistant Attorney General

        JUSTIN E. HERDMAN
        United States Attorney

        SUZANA K. KOCH
        Assistant United States Attorney

        /s/ Jonathan E. Jacobson
        RUTH A. HARVEY
        LLOYD H. RANDOLPH
        JONATHAN E. JACOBSON
        Ill. Bar. No. 6317721
        Attorneys
        United States Department of Justice
        P.O. Box 875, Ben Franklin Station
        Washington, D.C. 20044-0875
        Phone: (202) 353-7971
        Email: jonathan.e.jacobson@usdoj.gov

        Attorneys for the United States

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 11, 2019, I electronically filed the foregoing UNITED STATES' STATEMENT OF INTEREST CONCERNING ORDER TO SHOW CAUSE WHY RECEIVERSHIP SHOULD NOT BE VACATED with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ Jonathan E. Jacobson
Trial Attorney
U.S. Department of Justice