1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3      ------------------------------X
      DIGITAL MEDIA SOLUTIONS,    :   Case No. 1:19-cv-00145
4      LLC,                       :
                                  :   Cleveland, Ohio
5            Plaintiff,           :
                                  :   Monday, March 11, 2019
6         v.                      :   2:27 p.m.
                                  :
7      SOUTH UNIVERSITY OF OHIO,  :
      LLC, ET AL.,                :
8                                 :
             Defendants.          :
9      ------------------------------X

10

11        TRANSCRIPT OF SHOW CAUSE HEARING PROCEEDINGS

12        BEFORE THE HONORABLE DAN AARON POLSTER

13            UNITED STATES DISTRICT JUDGE

14                      And

15        BEFORE THE HONORABLE THOMAS M. PARKER

16          UNITED STATES MAGISTRATE JUDGE

17

18    Court Reporter:          Donnalee Cotone, RMR, CRR, CRC
                               Realtime Systems Administrator
19                             United States District Court
                               801 West Superior Avenue
20                             Court Reporters 7-189
                               Cleveland, Ohio 44113
21                             216-357-7078
                               donnalee_cotone@ohnd.uscourts.gov
22

23

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer-aided transcription.

1    APPEARANCES:

2

3     (**Participants listed are only those who spoke at hearing.**)

4

5    For Plaintiff Digital      **RICHARD S. GURBST, ESQ.**

6    Media Solutions, LLC:      Squire Patton Boggs, LLP

7                               4900 Key Tower

8                               127 Public Square

9                               Cleveland, Ohio 44114-1304

10                              216-479-8500

11                              richard.gurbst@squirepb.com

12

13   For Plaintiff/Intervenors **ERIC J. ROTHSCHILD, ESQ.**

14   Emmanuel Dunagan,          National Student Legal Defense

15   Jessica Muscari,           Network - Washington

16   Robert J. Infusino,        1015 15th Street, N.W., Suite 600

17   Stephanie Porreca:         Washington, DC 20085

18                              202-734-7495

19                              eric@nsldn.org

20                              - And -

21                              **RICHARD S. GURBST, ESQ.**

22                              (See above for address)

23

24

25

```
 1    APPEARANCES (Continued):

 2

 3    For Plaintiff/Intervenor   JAMES A. NEWTON, ESQ.

 4    Flagler Master Fund SPC    Morrison & Foerster LLP

 5    Ltd.:                      250 West 55th Street

 6                               New York, New York 10019-9601

 7                               212-468-8000

 8                               jnewton@mofo.com

 9

10    For Plaintiff/Intervenor   M. COLETTE GIBBONS, ESQ.

11    Studio Enterprise          Schottenstein, Zox & Dunn, Co., LPA

12    Manager, LLC:              US Bank Centre at Playhouse Square

13                               1350 Euclid Avenue, Suite 1400

14                               Cleveland, Ohio 44115

15                               216-621-6501 Ext. 227

16                               cgibbons@mcdonaldhopkins.com

17

18    For Plaintiff/Intervenor   JOHN J. ALTORELLI, ESQ.

19    Studio Enterprise          Aequum Law, LLC

20    Manager, LLC:              555 Madison Avenue

21                               New York, New York 10022

22                               (917) 664-6607

23                               john@aequumlaw.com

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3    For Plaintiff/Intervenor   RICHARD N. SELBY II, ESQ.

 4    Thomas J. Perrelli:        Dworken & Bernstein Co., L.P.A.

 5                               60 South Park Place

 6                               Painesville, Ohio 44077

 7                               440-352-3391

 8                               rselby@dworken-bernstein.com

 9

10    For Plaintiff/Intervenor   MARINA A. AWED

11    Pro Se Marina A. Awed:     P.O. Box 1278

12                               Tustin, California 92781

13                               310-749-9328

14                               mawed@stu.wsulaw.edu

15

16    For Plaintiff/Intervenor   INGRID A. BOHME, ESQ.

17    Dream Center South         Cohen & Grigsby, P.C.

18    University, LLC:           625 Liberty Avenue, 5th Floor

19                               Pittsburgh, Pennsylvania 15222-3152

20                               412-297-4900

21                               ibohme@cohenlaw.com

22

23

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3    For Plaintiff/Intervenor  KIRK W. ROESSLER, ESQ.

 4    Hemingway at Richmond,    Walter & Haverfield LLP

 5    LLC:                      The Tower at Erieview, Suite 3500

 6                              Cleveland, Ohio 44114

 7                              216-781-1212

 8                              kroessler@walterhav.com

 9

10    For Defendant South       ROBERT T. GLICKMAN, ESQ.

11    University of Ohio, LLC   McCarthy, Lebit, Crystal & Liffman

12    also known as DC  South   Co., LPA

13    University of Ohio LLC    101 West Prospect Avenue

14    doing business as         Suite 1800

15    South University:         Cleveland, Ohio 44115

16                              216-696-1422

17                              rtg@mccarthylebit.com

18

19

20

21

22

23

24

25
```

```
 1     APPEARANCES (Continued):

 2

 3     For Defendant DCEH          CHARLES A. NEMER, ESQ.

 4     Education Holdings, LLC:    ROBERT T. GLICKMAN, ESQ.

 5                                 McCarthy, Lebit, Crystal & Liffman

 6                                 Co., LPA

 7                                 101 West Prospect Avenue

 8                                 Suite 1800

 9                                 Cleveland, Ohio 44115

10                                 216-696-1422

11                                 can@mccarthylebit.com

12                                 rtg@mccarthylebit.com

13

14     For Defendant Argosy       ROBERT T. GLICKMAN, ESQ.

15                                 (See above for address)

16

17     For Intervenor Tech        (Via Telephonically)

18     Park 6, LLC:               JOSHUA D. MORSE, ESQ.

19                                 DLA Piper LLP

20                                 555 Mission Street, Suite 2400

21                                 San Francisco, California 94105-2933

22                                 415-836-2500

23                                 joshua.morse@dlapiper.com

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3    For Receiver Mark E.      JAMES W. EHRMAN, ESQ.

 4    Dottore, Dottore          MARY K. WHITMER, ESQ.

 5    Companies:                Whitmer & Ehrman LLC

 6                              2344 Canal Road, Suite 401

 7                              Cleveland, Ohio 44113-2535

 8                              216-771-5056

 9                              jwe@WEadvocate.net

10                              mkw@WEadvocate.net

11                              - And -

12                              ROBERT T. GLICKMAN, ESQ.

13                              (See above for address)

14                              CHARLES A. NEMER, ESQ.

15                              (See above for address)

16

17    For Interested Party      WILLIAM J. STAVOLE, ESQ.

18    3601 Sunflower LLC:        Tucker Ellis LLP

19                               950 Main Avenue

20                               Suite 1100

21                               Cleveland, Ohio 44113-7213

22                               216-592-5000

23                               william.stavole@tuckerellis.com

24

25
```

```
 1      APPEARANCES (Continued):

 2

 3      For Interested Party      (Via Telephonically)

 4      United States:            JONATHAN E. JACOBSON, ESQ.

 5                                U.S. Department of Justice

 6                                Civil Division

 7                                1100 L Street, N.W.

 8                                Washington, DC 20005

 9                                202-353-7971

10                                jonathan.e.jacobson@usdoj.gov

11

12

13      For the South Family      JOHN D. BECK, ESQ.

14      Trust:                    Hogan Lovells US LLP

15                                875 Third Avenue

16                                New York, New York 10022

17                                212-918-3000

18                                john.beck@hoganlovells.com

19

20

21

22

23

24

25
```

```
1    APPEARANCES (Continued):

2

3    ALSO PRESENT:

4

5    Mark E. Dottore          President, Dottore Companies, LLC

6

7    David S. Linscott        CPA, CIRA, Dottore Companies, LLC

8

9    Michael Frola            Director, Multi-Regional and Foreign

10   (Via Telephonically)     Schools Participation Division

11

12   Randall K. Barton        Attorney, Law Offices of Randall K.

13                            Barton, DCEH Chairman of the Board

14   Allison Edgerton         DCEH Assistant VP of Student

15                            Accounting

16

17

18

19

20

21

22

23

24

25
```

14:27:55

14:28:19

14:28:44

14:29:13

14:29:34

1   AFTERNOON SESSION, MONDAY, MARCH 11, 2019

2           (Proceedings commenced at 2:27 p.m.)

3                        - - -

4           DEPUTY CLERK:  All rise.

5           THE COURT:  All right.  Everyone can be

6   seated.

7       All right.  This is Case 1:19-cv-145, *Digital Media*

8   *Solutions versus South University of Ohio, et al.*

9       Judge Parker and I set this hearing, a show cause

10  hearing as to whether the receivership should be terminated.

11  There have been a number of motions filed urging that.

12      This receivership was created, I think, January 18th

13  or 19th, on an emergency motion that Digital Media Solutions

14  filed.

15      I was actually serving as a visiting Judge in Las

16  Cruces, New Mexico, at the time.  I had to deal with this in

17  between sentencing hearings with the help of Judge Boyko.

18  It was represented to me that if I did not act very quickly,

19  thousands of students would be deprived of their education,

20  with the results either the students would lose millions of

21  dollars, and/or the federal government would lose millions

22  of dollars in unsecured loans; that bankruptcy was not a

23  viable option because then, everything would collapse and

24  the students would be out and the money would be gone.

25      And that this was the only mechanism to provide what

1    was described to me as a teach-out, which is providing for

2    an orderly concluding of classes for the balance of the

3    semester.  And I was convinced that that was the best thing

4    to do, and so I authorized the receivership.

14:29:59  5        Now, there were a lot of things that weren't disclosed

6    to us.  Looking back, there were a lot of questions I should

7    have asked, but I can't do anything about the past.  I can

8    only focus on the present and what to do going forward.

9        So, obviously, we've got more people here than in my

14:30:26 10   opioid MDL.  I didn't think that was possible for one case.

11   So a whole lot of people are here.

12        I've asked representatives from the Department of

13   Education to be here because I had some questions.  They're

14   here.  I asked some officials from Dream Center to be

14:30:49 15   present because I may have some questions.  But I want to

16   start out with the receiver.

17        I want to know, are there any schools still open under

18   the receivership?

19        And if so, what are those schools, and what are the

14:31:05 20   plans?

21             MS. WHITMER:  All right.  So right now, the

22   law school is open --

23             THE COURT:  Right.  I was aware of that.

24             MS. WHITMER:  -- which is an Argosy school.

14:31:16 25   Las Vegas is open; that is an Art Institute school.  Those

1    are minor ones.

2         The thing that is of acute -- very important is that

3    DCEH, the receivership entity DCEH, supports all of the

4    computer operations, and all of the, as it is called,

14:31:48  5    noncore functions of South University, which has 10,000

6    students, and Arts Institute, which has about 5,000

7    students.

8         So they -- if something happens to DCEH, the 15,000

9    students that are in South University, 10,000, and Art

14:32:15  10   Institute, 5,000, will not be educated.

11              THE COURT:  All right.  And South University

12   and Arts Institute, they're not in the receivership,

13   correct?

14              MS. WHITMER:  That is correct.

14:32:31  15             MAGISTRATE JUDGE PARKER:  Which specific South

16   University campuses are open?

17              MS. WHITMER:  There are two teach-out campuses

18   that are in the receivership.  South of Ohio --

19              THE COURT:  Well, wait a minute.  I thought --

14:32:53  20   that was my first question, Ms. Whitmer, that -- what

21   schools in receivership are still open.  And you said the

22   law school, Argosy law school that's in California, and then

23   Las Vegas Art Institute.

24        And now you're saying some South University schools in

14:33:11  25   teach-out.  That means they must -- if they're in teach-out,

1    they're in receivership, right?

2              MS. WHITMER:  That is correct, Your Honor.

3    I'm sorry.

4              THE COURT:  All right.  Let's go back.

14:33:23  5       What schools in receivership are still open?

6         We got the law school in California, we've got an Art

7    Institute in Las Vegas, and there are two South University

8    schools?

9              MS. WHITMER:  South University, Novi,

14:33:39 10   Michigan.

11             THE COURT:  Novi, Michigan.  Okay.

12             MS. WHITMER:  And South University of Ohio in

13   Cleveland.

14             THE COURT:  Okay.  Let's stay with those four,

14:33:53 15   because, again, I -- the purpose of the receivership was to

16   enable a teach-out, right?

17        For most of the schools in the receivership, that's no

18   longer possible.  They're closed.  So we got four.

19        Now, let's start with these two South University

14:34:16 20   schools.

21        They're in teach-out.

22             MS. WHITMER:  They are in teach-out.

23             THE COURT:  And specifically, what's

24   happening?

14:34:21 25             MS. WHITMER:  The students are, I believe,

1    nursing students, and South University is paying for those

2    teach-outs.  So they are doing programming under South

3    University, and completing the educational programs of those

4    students.

14:34:46   5                    THE COURT:  And where is South -- I mean,

6    what's the cost here?

7                    MS. WHITMER:  I'm sorry, Your Honor.  I

8    don't --

9                    THE COURT:  What's the cost?

14:34:54  10                    MS. WHITMER:  I don't know.

11                    THE COURT:  How much does this cost, and where

12    is the money coming from?

13                    MS. WHITMER:  It's coming from South

14    University, which is not a receivership entity.

14:35:02  15                    THE COURT:  Well, I thought -- but the

16    schools --

17         So the money is coming from South University, which is

18    not a receivership entity, into two schools that are in

19    receivership?

14:35:17  20                    MS. WHITMER:  That is correct.

21                    THE COURT:  Well, they can continue to do it.

22         So South University is paying, and they're not in

23    receivership.  All right.

24         And the plans are to -- the semester ends when?

14:35:34  25    Sometime in May?

1           MS. WHITMER:  I do not know.

2       So when you teach-out -- you don't teach-out the

3   semester; you teach-out the program.  So what happens is,

4   you take -- so there's a transfer student -- when a school

14:35:55  5   ends, you can transfer the students.  And those students

6   transfer the way people used to transfer when we were in

7   school.  They had their credits transferred and they became

8   a student of the new university and they graduated from that

9   university.

14:36:11 10       Or when the students are well along in their academic

11  careers, hopefully you arrange for a teach-out so that the

12  student can complete the student's education at the older

13  institution and get a degree from that institution.

14      So even though many of our campuses closed, we are

14:36:34 15  negotiating teach-out agreements for our most vulnerable

16  students, which are the doctoral candidates, the master's

17  candidates.

18      And those two South entities, although, I have not

19  looked at the details of these particular teach-out

14:36:52 20  arrangements, South -- I believe Mr. Pap [sic] from South

21  University is here, and he may be better able to speak to

22  those teach-out plans.

23           THE COURT:  All right.  What is happening at

24  the Art Institute in Las Vegas?

14:37:13 25           MS. WHITMER:  So we are still negotiating a

1    transaction with Las Vegas -- the Las Vegas folks.  And

2    Mr. Nemer is here.  He is best able to speak to the details

3    of that transaction.

4              THE COURT:  Well, since we're on it, who wants

14:37:34   5    to speak to that?

6              MR. NEMER:  Your Honor, Charles Nemer.

7              THE COURT:  All right.

8              MR. NEMER:  Your Honor, I've had a number of

9    conversations with the purchasers, as well as counsel for

14:37:46  10    the purchaser.  They are ready to enter into a memorandum of

11    understanding along with a manage service agreement along

12    with the transition service agreement, which will allow --

13    the entity that would take it over is called Save the Arts

14    Institute of Las Vegas, Limited.  It is a Nevada limited

14:38:08  15    liability company.

16         My understanding is that they're trying to work out an

17    agreement with the landlord so that they can remain at that

18    location at the present time.  But they are ready to pay all

19    the expenses moving forward with regards to that campus,

14:38:30  20    Your Honor.

21              MR. DOTTORE:  Can I add to that, Your Honor?

22              THE COURT:  All right.

23              MR. DOTTORE:  Mark Dottore, the receiver.

24         The State of Nevada is also in partnership with these

14:38:44  25    same folks, as is the City of Las Vegas.  They have a plan

1    that I've seen to build another facility and use the

2    facility that they already have, if they can make a deal

3    with the landlord.

4         To prevent recidivism out of the prison system they

14:38:58 5    have there, to train people for the casinos and jobs that

6    aren't minimum wage, they're up -- working wages.  And also

7    to train the folks that belong to the restaurant workers

8    unions and that, to train there so that they can go on to

9    greater employment.  I think it's a great idea.  That's --

14:39:15 10              THE COURT:  Who is the landlord, and is the

11   landlord getting paid?

12              MR. DOTTORE:  Right now, the landlord is not

13   getting paid.  But from what I understand, the Save

14   Las Vegas folks offered to pay the landlord, even the back

14:39:28 15   rent over a period of -- the back rent over a slow period of

16   time, and the go-forward rent going forward from now.

17              THE COURT:  Well, part of the problem -- let

18   me just say, part of the problem is that it's come to our

19   attention that during the term of this receivership, schools

14:39:49 20   have been continuing to operate, and the landlords haven't

21   been getting paid.  All right?  I don't think that's fair or

22   appropriate.  It's got to stop.

23         So, I mean, one way or another, we got to either close

24   this place, someone has got to buy it, or if it's operating,

14:40:08 25   the landlord needs to get paid.

1          MR. DOTTORE:  It has, Your Honor.  Not to

2     interrupt you.  I'm sorry.

3          It has.  We have started to -- we have several

4     agreements with the landlords in this room to turn their

14:40:18   5     property back to them, take the assets out that we can

6     liquidate and use to pay other bills of the landlord, or

7     other creditors from the landlord.  And we've entered into

8     most of those agreements over the weekend.

9          THE COURT:  Well, I mean, the point is, the

14:40:31  10     other building -- there are no schools.  So the schools are

11     closed.  The landlords can do whatever they want with their

12     buildings.

13          MR. DOTTORE:  Correct.

14          THE COURT:  But here is one where the school

14:40:43  15     is operating.  So -- all right.

16          Did someone want to speak to this Las Vegas school?

17          MR. MORSE:  Yes, Your Honor.

18          This is Joshua Morse from DLA Piper U.S. on behalf of

19     Tech Park 6, LLC.  We're one of the intervening landlords,

14:40:59  20     and the landlord for the Las Vegas Art Institute property.

21          I really appreciate you allowing me to appear by

22     telephone.  I know that's not your ordinary course.

23          THE COURT:  All right.

24          MR. MORSE:  We've done a number of things.

14:41:15  25     We've sought to intervene, and then also teed up a motion to

1   have the receiver expedite the decision about, you know,

2   assuming or assigning or rejecting our property, and then

3   also paying rent in the meantime.

4        We also joined in the -- filed a limited joinder with

14:41:37  5   respect to today's motion.

6        The reason that I'm appearing -- and even the receiver

7   just a moment ago, continued its false information, and has

8   presented this Court with false information.

9        On Sunday morning, I woke up to the receiver's -- a

14:41:53 10   new response, which was filed at Docket 134, which was

11   supported by a declaration filed by Mr. William Turbay, who,

12   apparently, is the principal of this Save the Arts Institute

13   of Las Vegas entity.

14        We were surprised to see an additional response since

14:42:14 15   the receiver had already opposed our joinder.  But then as

16   we read what was in the document, we were shocked to read

17   that the receiver was seeking to have our joinder

18   disregarded based on the materially false -- a materially

19   false and misleading declaration.  The falsities are in two

14:42:34 20   respects, which are outlined in our -- in our response filed

21   this morning.

22        Number one, no offer was ever conveyed to actually

23   assume the lease.

24        And number two, Mr. Turbay absolutely did not propose

14:42:48 25   to cure any arrearages over 24 months, as was stated in his

1    declaration.

2                    THE COURT:  Well, it's -- all right.  What's

3    happened in the past, I can't do anything about.  But --

4                    MR. MORSE:  Oh, I understand, Your Honor.

14:43:03   5                    THE COURT:  -- we're not going to have any

6    school operating without the landlord getting paid.  All

7    right?  That's going to end.  It shouldn't have been going

8    on.  It's going to end now.

9         So we got to decide what's going to happen with this

14:43:15  10    Art Institute.  If it's going to stay open, then the

11    landlord gets paid going forward.  If it's going to close,

12    it will close now.  If someone else is going to take it

13    over, they're going to take it over now.  So I don't care.

14                    MR. MORSE:  Yeah.  I understand completely,

14:43:32  15    Your Honor.

16         For, you know, whatever reason, this response that the

17    receiver filed, you know, purported to just convey

18    materially false information.  And I appear to correct the

19    record.

14:43:46  20         The issue is that this entity that is purporting to

21    potentially take over the location has no financial history,

22    has no, you know, financial wherewithal, has no access to

23    capital, has no ability to provide a security deposit, has

24    no ability to provide a guarantee.  Which led my client to

14:44:13  25    not be interested in extending -- or assuming the lease

1    through January of 2025, particularly when it was going to

2    be stiffed for nearly four months of rent, not including all

3    the fees associated with appearing and taking up issues

4    with, you know -- before this Court.

14:44:35  5             THE COURT:  All right.  Look, I've heard -- I

6    mean, I had grave reservations two months ago about this

7    Court taking over this case, appointing a receiver.  Again,

8    the past is history.  I'm dealing with the present.

9         And I should say that Judge Parker has spent an

14:44:57  10   inordinate amount of time overseeing this, because I,

11   obviously, didn't have the time to do it.  So I have

12   referred it to him, and he and his staff have done

13   incredible work.  But this is going to come to an end.  I

14   don't think it's a good use of our Court's resources.

14:45:17  15        So, all right.  Within a very short time, Las Vegas is

16   either going to be closed -- if it's going to be kept open,

17   the landlord has got to be paid.  If the school is going to

18   operated, then the landlord has got to be paid, or someone

19   else is going to buy it.

14:45:35  20        Now, Mr. Dottore, when do you want to bring this to a

21   conclusion, one way or the other?  Shut it down, pay the

22   landlord, and keep running it, or transfer it to someone

23   else.

24             MR. NEMER:  Your Honor, Charles Nemer.

14:45:50  25        Just to respond to some of the allegations made by

```
 1    Mr. Morse, and I take --
 2                THE COURT:  Who do you represent?
 3                MR. DOTTORE:  I represent DCH and the
 4    receiver.  I'm Charles Nemer from McCarthy, Lebit, Your
 5    Honor.
 6                THE COURT:  Well, is someone here for this new
 7    entity?  All right?  This has to be concluded, and I want to
 8    know what period of time do you want to either sell this,
 9    transfer this to another entity that's going to start paying
10    the bills, close it down, or you're proposing to keep
11    Las Vegas Art Institute open under some terms, which have to
12    include paying the landlord.
13        Mr. Dottore, what -- you tell me what you want.
14    What's a reasonable time?
15                MR. DOTTORE:  15 days, Your Honor.
16                THE COURT:  Well, I'll consider that when I
17    see what else is involved.
18                MR. MORSE:  Your Honor, this is Joshua Morse,
19    again.
20        Just to be clear, will the -- if we -- if the
21    receiver's request to continue in possession for the
22    premises for 15 days were granted, would that be premised on
23    the payment of the rent that has been accrued and unpaid
24    since the beginning of the receivership, or just from today
25    forward, through the expiration of those 15 days on a
```

1    pro --

2                    THE COURT:  It would be today forward,

3    because, quite frankly, I don't know what money the receiver

4    has and whose money it is.

14:47:28 5       Judge Parker asked some poignant questions last

6    Friday.  I had a little bit of time.  I was sitting in the

7    audience, and I didn't think Judge Parker got answers to his

8    questions.  I'll just leave it at that.

9                    MR. MORSE:  Just so the Court is aware, the

14:47:43 10   per diem amount of the rent is approximately $3,500.  And

11   that's detailed in our initial motion, which appears at

12   Docket Number 59.

13                   THE COURT:  All right.  Well, if I decide I'll

14   let the school stay open, the receiver will pay the $3,500 a

14:48:03 15   day rent.

16                   MR. MORSE:  Thank you so much, Your Honor.

17                   THE COURT:  That's an "if."

18       So it's my understanding that South University is

19   paying all the operating bills, including the rent, of Novi,

14:48:21 20   Michigan, and Cleveland.

21                   MS. WHITMER:  We understand they're paying for

22   the teach-outs.  As I understand the rent in Cleveland,

23   there is an agreement -- they are working with the -- with

24   the landlord to complete an agreement to return the

14:48:38 25   building.  I don't know --

1           THE COURT:  How can they return the building

2    if they're teaching the students?

3           MR. DOTTORE:  Your Honor, I'm diligently

4    working with Tri-C University to take the students -- to

14:48:50  5    take some classroom space so that South University can teach

6    the students out at Tri-C.

7        One of the deals that I'm trying to make with Tri-C

8    is, there's a bunch of nursing equipment that I would donate

9    to Tri-C for the classroom space.

14:49:08 10           THE COURT:  Well, all that is fine,

11    Mr. Dottore.  But if students are in some building, you've

12    got to be paying rent to that landlord.

13           MR. DOTTORE:  They're not going to be in the

14    building.  I made an arrangement with the landlord the other

14:49:22 15    day to be out of building.

16           THE COURT:  All right.  What about Novi,

17    Michigan?  Are students in the building?

18           MR. ROESSLER:  Your Honor, may I approach,

19    please.

14:49:30 20           THE COURT:  Yes.

21           MR. ROESSLER:  Hi, Your Honor.

22        Kirk Roessler from Walter Haverfield.  I represent

23    Hemingway at Richmond, LLC.  It is the landlord of the South

24    University campus in Cleveland, which I will refer to as

14:49:45 25    South University Cleveland to avoid any ambiguities with

1    respect to the other South University.

2        I just want to make it known to the Court that we have

3    not been paid any rent since the enactment of the

4    receivership.

14:49:58  5        We have had some discussions with the receiver and his

6    counsel over the past couple of days about a termination of

7    the lease and a surrender of the premises, and I think that

8    we are close to having that resolved.  But as of yet,

9    nothing has been --

14:50:18  10            THE COURT:  Well, I'm going to conclude this

11    now.  I mean, you're going to -- the rent is going to be

12    paid, if the school is using the building.  If the school is

13    not using the building, then they're out, and you can get

14    your property back, sir.  That's what I'm endeavoring to do.

14:50:32  15        Mr. Dottore said they're out.  All right?

16            MR. DOTTORE:  That's exactly what I said,

17    Your Honor.

18            THE COURT:  So there aren't any students.  You

19    can do what you want with your premises.  You can rent it to

14:50:43  20    someone else, sir.

21            MR. ROESSLER:  Thank you, Your Honor.

22            THE COURT:  All right.

23        All right.  And, again, what are we doing with the

24    premises in Michigan?

14:50:59  25        I mean, you got to either get -- if the student are

1       out, they're out, and you tell the landlord they got the

2       property.  If the students are in there, the landlord has to

3       get paid.

4                   MR. DOTTORE:  The same thing, Your Honor.  I'm

14:51:11 5       giving the property back to the landlord and finding another

6       space to put the students.

7                   THE COURT:  All right.

8                   MAGISTRATE JUDGE PARKER:  Who is the landlord

9       entity from Michigan?

14:51:21 10                  MR. DOTTORE:  One second, Your Honor.

11                  MS. WHITMER:  Who is it?

12                  MR. DOTTORE:  HEFCO.

13                  MS. WHITMER:  HEFCO?

14                  MR. DOTTORE:  HEFCO.

14:51:36 15                  MAGISTRATE JUDGE PARKER: H-E-F-C-O?

16                  THE COURT:  All right.  Well, tell them

17       they've --

18                  MS. WHITMER:  HEFCO, H-E-F-C-O, South

19       University, Novi campus.  41555 12 Mile Road.

14:51:51 20                  THE COURT:  All right.  Well, tell them

21       they've got their property back.  They can do whatever they

22       want with it.

23                  MS. WHITMER:  Your Honor, the agreements that

24       we've been making with landlords have asked them to give us

14:52:02 25       30 days to remove any property or any student records,

1    identifiable information from the premises.

2              THE COURT:  Well, that's up to them.  All

3    right?  You haven't been paying rent.  So they may or may

4    not -- I suggest if you got student records, you better get

14:52:19 5    those out.  Anything else, I don't know.  But you're

6    responsible for those records.

7         All right.  That leaves the law school.

8         What's the status about the -- with the law school?

9              MS. WHITMER:  I believe the law school was

14:52:32 10   talking to the landlord there.  We're trying to get two

11   weeks to get the semester far enough along so that the 3L

12   students and the other students can get credit for this

13   semester.  I, frankly, have lost track of where those

14   discussions are.

14:52:57 15             THE COURT:  Well --

16             MR. GLICKMAN:  Judge -- sorry -- Rob Glickman.

17             THE COURT:  Yes.

18             MR. GLICKMAN:  One of the representatives of

19   the secured lenders are here.  And in communications with

14:53:09 20   him over the last couple of days, it's my understanding that

21   he's actually extending -- he's actually extending

22   additional funds to allow for the students at the law school

23   to complete this term, which would allow the 3Ls to

24   graduate.

14:53:25 25        Also --

```
 1                    THE COURT:  Well, is someone here who can

 2       confirm that?

 3                    MR. NEWTON:  Your Honor, James Newton of

 4       Morrison & Foerster on behalf of Flagler, one of the lenders

 5       of DCEH.

 6                    THE COURT:  Which lender?

 7                    MR. NEWTON:  Flagler Master Fund, an

 8       intervening party.

 9                    THE COURT:  All right.

10                    MR. NEWTON:  Your Honor, we have been in

11       discussions with the receiver about paying the payroll to

12       keep the law school open.

13            We were under the impression that the school was in

14       discussions with the landlord to deal with that portion of

15       it.

16                    THE COURT:  Well, I'm just going to make sure

17       they get paid.

18            All right.  Look, so it looks like the law school is

19       going to stay open until -- through the semester?

20                    MR. GLICKMAN:  Yes, Judge.  However, there's a

21       settlement agreement pending before the Court that extends

22       to another party to the case, Studio, through either itself

23       or through its designee to acquire the law school.

24            At our last hearing, I asked Studio if it was still

25       interested.  They are here; so they can answer for
```

1    themselves.  They said they were.

2         And there's also a potential suitor that the receiver

3    was speaking with as well to keep the law school ongoing

4    into the future.

14:54:59  5              THE COURT:  I was going to ask about Studio.

6    I --

7         Yes, sir.

8         I need to know what's happening with this law school.

9    And I want to make sure if they're staying in a premises,

14:55:14 10   that the landlord is paid, and that there are funds to pay

11   the teachers.  So . . .

12             MR. NEWTON:  I can only speak -- on behalf of

13   the lender, I can only speak to the payroll that we've been

14   discussing --

14:55:29 15             THE COURT:  Okay.  So the secured creditor is

16   covering payroll for the semester?

17             MR. NEWTON:  For two payroll cycles,

18   Your Honor.

19             THE COURT:  Well, what is -- how long is a

14:55:39 20   payroll cycle?

21             MR. NEWTON:  Two weeks.

22             THE COURT:  So that would be four weeks?

23             MR. DOTTORE:  The law school, the 3Ls will be

24   complete by the end of that payroll -- those two payrolls.

14:55:54 25             MS. AWED:  Your Honor, may I approach.

1          THE COURT:  Well, what about the 1Ls and 2Ls?

2     I mean -- I mean, what about them?  I mean, you have 3Ls

3     who'll graduate, but you're going to drop the people in the

4     middle with a month left in the term?

14:56:10  5          MR. DOTTORE:  Everyone finishes their term.

6     Everyone will be -- so when they move to another law school,

7     if this other deal doesn't get consummated, they will be

8     right where they were.

9          MR. GLICKMAN:  In other words, Judge, not

14:56:27  10    "right where they were."  They will have completed their

11    term.  So they'll have credit --

12          THE COURT:  All right.

13          MR. GLICKMAN:  They'll receive credit.

14          THE COURT:  They will finish their term.  They

14:56:32  15    will finish their term.

16          MR. GLICKMAN:  Yes.

17          THE COURT:  All right.  That's what I wanted

18    to know.

19        All right.  Well, the landlord needs to be covered for

14:56:41  20    this month, too.  So I'll direct the receiver to pay the

21    landlord.

22        Who's the landlord?

23          MS. WHITMER:  The landlord is the last line on

24    our schedule, and it is CSU Fullerton.

14:56:59  25          THE COURT:  All right.  Well, if the school is

1    going to stay open for four more weeks, you got to pay them

2    for four weeks.

3                    MS. AWED:  May I be heard, Your Honor?

4                    THE COURT:  Yes.

14:57:18  5        You can identify yourself, please.

6                    MS. AWED:  My name is Maria Awed.  I'm the pro

7    se student intervenor from Western State College of Law.

8                    THE COURT:  Yes, ma'am.

9                    MS. AWED:  So Mr. Dottore stated that -- I met

14:57:36 10    with him on Saturday, and we discussed the law school.  And

11    during the meeting, he said that Michael Lau of Candlewood

12    Investing Group was going to be funding the payroll

13    expenses.  We heard today that someone else is funding the

14    expenses.

14:57:51 15        Further, his statement about the 3Ls being able to

16    graduate if we were open for four weeks longer is not true,

17    because it depends on how many units you have.  For example,

18    myself, I need 14 units this semester, and I'm enrolled in

19    16.  If we close early, I will not have enough units to

14:58:10 20    graduate.  It doesn't apply to everyone across the board.

21                    MR. GLICKMAN:  Judge, from --

22                    THE COURT:  No.

23                    MR. GLICKMAN:  I apologize.

24                    MS. AWED:  And Mr. Dottore also said that our

14:58:19 25    school is in discussions with the landlord, but that's also

1    not true.  My dean said that Mr. Dottore is the one who

2    would know any information about the landlords.  And he also

3    said during --

4                THE COURT:  I've ordered -- Mr. Dottore will

14:58:31  5    take care of the landlord.  I've ordered that.

6                MR. DOTTORE:  Your Honor, the information I

7    got about them finishing came strict right from the dean.

8                THE COURT:  Well, that's --

9                MR. DOTTORE:  And he's had a conversation with

14:58:40  10    the student and told her that.

11                THE COURT:  All right.  Well, the --

12                MR. GLICKMAN:  Judge, just to clarify one

13    thing, Mr. Lau is here.  He is affiliated with more than one

14    entity.  He's in the back of the entity.  He's this

14:58:51  15    gentleman's client representative.  So it's -- we didn't

16    identify a new lender and a new party.  We didn't realize

17    what funds --

18                THE COURT:  I've been satisfied that the

19    payroll will be covered for four weeks, and the landlord is

14:59:05  20    going to be paid.

21        Now, ma'am, you know, I don't -- I mean, the dean has

22    represented that this is sufficient time for everyone to get

23    credits to graduate.  So this is the first I'm -- first I'm

24    hearing of this.  So . . .

14:59:20  25                MS. AWED:  It's because we would get two

1    thirds of the units we're enrolled in.  But everyone has a

2    different amount of units.  For some people, staying open

3    for four weeks will allow them to have enough units to

4    graduate.  But it doesn't apply to everyone.

14:59:30  5        I need 14 units, and I'm enrolled in 16.  If I get two

6    thirds of 16 units, that doesn't get me to the 14 units that

7    I need.

8                    THE COURT:  I can't -- you're going to have to

9    take that up with your dean, ma'am.  I -- he's represented

14:59:54 10   to Mr. Dottore and to the Court that this four weeks will

11   take care of the 3Ls.  So tell him to make it work.  All

12   right?

13                   MS. AWED:  Okay.  But we're going to be open

14   for four weeks?

15:00:05 15                  THE COURT:  Yes, you're open for four weeks.

16   And you tell him that he's represented to a federal court

17   that that's sufficient.  So he's got to make it work for

18   you.

19                   MS. AWED:  Okay.  Thank you, Your Honor.

15:00:16 20                  THE COURT:  If he's got a problem, he can

21   contact me.

22                   MS. AWED:  Thank you.

23                   THE COURT:  All right.  There's this pending

24   settlement with Studio, and there's a hearing next Monday as

15:00:45 25   to, you know -- there are a couple of objections or issues,

1    and I'm holding a hearing on this next Monday.

2         What will Studio be acquiring in that deal?

3              MS. GIBBONS:  Hi, Your Honor -- or good

4    afternoon, Your Honor.  Colette Gibbons for Studio.

15:01:02 5              THE COURT:  Yes, Ms. Gibbons.

6              MS. GIBBONS:  Your Honor, this is a settlement

7    between the receiver and Studio that reaffirms agreements

8    that were entered into in December that provided for Studio

9    to provide the backroom, noncore services to these

15:01:21 10   universities.

11        Studio is the owner of eight Art Institute -- or is

12   the service provider for eight Art Institute schools.

13   Studio is here today, Mr. Altorelli, to answer any questions

14   that the Court has.  But we are committed to keeping those

15:01:38 15   universities open.  And we need the cooperation of the

16   receiver and the use of the intellectual property that the

17   receiver is the owner of or has custody of in order to make

18   that happen.

19        Your Honor, Mr. Altorelli.

15:01:52 20             THE COURT:  Yes.

21             MR. ALTORELLI:  Thank you.

22        First, do you have any questions before I address, you

23   know, some of the issues that we can help with?  All we

24   really have is our role.

15:02:26 25             THE COURT:  Sir, what happens -- who is -- are

1      you acquiring the intellectual property platform that

2      Mr. Glickman talked about?

3                    MR. GLICKMAN:  Judge, I helped negotiate this.

4      If I could explain.

15:02:52  5                    THE COURT:  All right.

6                    MR. GLICKMAN:  What's happened was, Studio has

7      a servicing agreement with these schools.  It's to provide

8      services.  Studio doesn't provide services.  It does provide

9      them because it contracts with DCEH to do it.

15:03:07 10         We felt that Studio was in breach of our agreement.

11     To be fair, they felt that we were in breach of our

12     agreement.  And we negotiated a settlement that allows for

13     DCEH to be founded so it can continue to service the Art

14     Institute entities and the South entities, pursuant to the

15:03:26 15     terms of the contract with Studio.

16         However, it is the plan that this will only go on for

17     a finite period of time, and Studio will create -- excuse

18     me -- Art Institutes will create its own intellectual

19     property platform, and South will create its own

15:03:44 20     intellectual property platform.

21         But right now, all of that is run out of the DCH

22     facility, and it is hopelessly intertwined.

23                    THE COURT:  All right.  But we can't keep -- I

24     mean, my inclination is to end this today.  But it looks

15:03:59 25     like we got to extend it for some short period.  But it's

1    got to be short.

2         So when is this going to be done?  When are you going

3    to -- whatever, create your own IP and take this over.

4                   MR. GLICKMAN:  Well, one of the provisions of

15:04:13  5    the settlement agreement, actually, if the receivership

6    cannot provide the services, allows Studio to purchase the

7    DCEH intellectual property and facilities subject to its

8    lenders' claims.  And so if the receiver were to stop,

9    Studio has that option.  It is not a requirement in the

15:04:35 10    document, but it is an option.

11         And, frankly, if the electricity goes out in

12    Pittsburgh, both of these university systems fail.  And

13    just -- they no longer have contact.

14                   THE COURT:  I don't want that to happen.  All

15:04:51 15    right?  But I can't make people do anything.  All right?  So

16    it seems to me that the principal -- the principal remaining

17    asset is this . . .

18                   MR. GLICKMAN:  Very large building with lots

19    of computers in it.

15:05:11 20                   THE COURT:  Right.  That's it.  All right?

21    So --

22                   MS. WHITMER:  We call it the "computer

23    platform."

24                   THE COURT:  All right.  The computer platform

15:05:19 25    needs to be provided, or else a whole lot of institutions

1    that aren't in receivership will collapse immediately --

2                    MS. WHITMER:  Yes.

3                    THE COURT:  -- with devastating impact on the

4    students, and probably a lot of taxpayer money.

15:05:33 5                    MS. WHITMER:  Yes.

6                    THE COURT:  All right?  I don't want that to

7    happen.  But I want to set up a mechanism today for a quick

8    transfer of that, or creation by some other entity to do it,

9    because DCEH isn't long for operations.

15:05:47 10                    MR. GLICKMAN:  It's the only other

11   asset -- the only other significant asset to the estate is

12   potential litigation, claims that DCEH may have against --

13                    THE COURT:  Well, the bankruptcy court is

14   going to supervise that.  I'm not.  Okay?  This entity is

15:06:01 15   going to go into bankruptcy soon.  We all know that.  But I

16   don't want this -- that all these students in

17   non-receivership schools be a casualty.  So I want to

18   determine today how are we going to have an orderly

19   transition.

15:06:22 20       So what are we doing with this platform?  Does Studio

21   want to buy it now?

22                    MS. WHITMER:  Your Honor, could I make a

23   suggestion?

24                    THE COURT:  Yes, Ms. Whitmer.

15:06:35 25                    MS. WHITMER:  Our receivership really has been

1    so busy, and we can't give the Court immediate answers for

2    some of these questions.

3         Could you give us a period of time, a few days, to sit

4    down with AI and with South and determine how long they need

15:06:57  5    to build their own platforms, or transition us out of the

6    DCEH platform dilemma?  And if we could bring to you, based

7    upon IT -- you know, based upon a responsible, professional

8    accounting of how long it will take to transition the -- and

9    bring you a plan of how we're going to get out of the

15:07:25 10    entanglement of South and AI?

11              MR. ALTORELLI:  Your Honor, may I add

12    something to that?  Because we've actually worked on this

13    for 11 months.

14              THE COURT:  All right.  Again, the Court

15:07:40 15    wasn't apprised of all of this, you know, pending agreement

16    or anything with Studio when this receivership was created.

17    We, Judge Parker and I, only learned about this well after

18    the fact.

19              MR. ALTORELLI:  I know.  And it's very

15:07:55 20    unfortunate.  And I'm not going to brother recriminating

21    over who did what or however.

22         There's two schools that are still alive.  And if you

23    want to save them, someone should probably talk to the

24    people who spent 11 months figuring it out.  A lot of people

15:08:08 25    think they know, and they don't.

1          THE COURT:  These are these -- this is the

2     South University in Cleveland and South University --

3          MR. ALTORELLI:  No.  This is South University,

4     the entire South University, and the Arts Institutes.

15:08:18  5     They're not in receivership.

6          THE COURT:  All right.  Well, I'm trying to

7     save those.

8          MR. ALTORELLI:  I know you are, and we are

9     too.  We've been trying for 11 months.

15:08:25 10     We know what it will take to get these schools on

11    their own.  We put a detailed plan that we spent millions of

12    dollars to do with numerous professionals who actually know

13    how to do this stuff.  And that plan lasted 11 days before

14    we ended up in receivership.

15:08:44 15     Until that plan ended up in receivership, all three

16    schools managed to get on their own payroll -- not on their

17    own pay -- on their bank accounts, and get Title IV funding.

18    If that had not happened, they all would be closed now, not

19    just Argosy.

15:09:02 20     The plan for the IT -- which is all that really

21    remains now.  We can stop worrying about the rest -- it's

22    going to take four to six months to unwind.  There's 3,000

23    contracts.  There's a couple hundred people.  There's a huge

24    data center in Pittsburgh, 550 some odd servers.  You know,

15:09:18 25    it's not an easy lift.

1        Everyone in the world will tell you something; they

2   have no idea.  They didn't do the work.  We have.

3        And we're happy to have any other third-party

4   consultant come in, because we've hired a bunch, and tell

15:09:33  5   you different, but they won't.

6        So at the end of the day, that's what it's going to

7   take.  We're prepared to do it.  We have signed up to do it.

8   We spent millions of dollars preparing to do it.  And we

9   would love the opportunity to finish that plan, because

15:09:46 10   those two plans won't survive without it.  So we're here to

11   do that.

12             THE COURT:  Are those schools paying their

13   bills and paying their landlords?

14             MR. ALTORELLI:  They absolutely are.  As a

15:09:59 15   matter of fact, that's the only money that comes into this

16   receivership, is from South University and the Art

17   Institutes.  Without those two schools --

18             THE COURT:  Well, wait a minute.  I thought

19   that money -- those schools are not in the receivership?

15:10:08 20             MR. ALTORELLI:  No.  But they pay north of

21   $3 million, or somewhere around $3 million a month to the

22   receiver for the transition services.  It's all part of the

23   package.  Because they own the IT.  They have the people.

24   And until we can move the people at IT out of DCEH into the

15:10:25 25   respective universities or Studio, they -- we have no

1    choice.  The arrangement was set up as a subcontractor

2    arrangement because there was no choice.  It will take

3    months.

4        We're two months in, and we're behind schedule because

15:10:39  5    we're spending a lot of time fighting it and telling whose

6    got a better plan.

7        We do need to rejigger the plan now, because we have

8    one school that was supposed to be paying its fair share no

9    longer able to pay.  That's a big hole --

15:10:55 10                THE COURT:  I want to make sure.

11        All the salaries of teachers, the rent to landlord,

12    all the bills are being paid for those schools?

13                MR. ALTORELLI:  Yes, they are.  Rent,

14    contracts, landlords, all being paid.

15:11:11 15                MAGISTRATE JUDGE PARKER:  So from your

16    perspective, you indicated that things were on track to do

17    this separation of functions until the receivership got

18    started.

19        From your perspective, what would be the effect upon

15:11:22 20    your ability to continue that if the receivership were

21    terminated within the very near term?

22                MR. ALTORELLI:  It may actually be worse.  No

23    one is going to want to hear that.

24                MAGISTRATE JUDGE PARKER:  Can you explain

15:11:36 25    that?

```
 1              MR. ALTORELLI:  Excuse me?

 2              MAGISTRATE JUDGE PARKER:  Explain that.

 3              MR. ALTORELLI:  Well, because a Chapter 11,

 4    which no one may be able to fund, will turn into a

 5    Chapter 7.

 6              MAGISTRATE JUDGE PARKER:  Right.

 7              MR. ALTORELLI:  It will liquidate faster than

 8    four months, or they won't be able to pay the bills.  We

 9    need a counterparty on the other side to service us.  We'll

10    pay for it.  We need help.  I don't have the exact plan.

11    Give me a couple of days or a week and I will give you a

12    strategy.  We did it before.

13         Now that the plan was scuttled, I can figure this out.

14    We'll come out with another plan.  And it may involve a

15    Chapter 11 at some point, or 7.  It probably will.

16         But I would encourage the Court to give us a little

17    bit of time here to work with the parties who matter.  And

18    believe me, no one matters more than the students.  So I'm

19    telling you, they're at the top of the list.

20         We need to save these schools.  And with respect to

21    the law school, we're also willing to take the law school

22    on.  We're willing to take on other campuses.  We try to

23    save any campus that we can.  Some are too late.  But there

24    are two great universities that can be saved, and we'd like

25    the shot.
```

1    If you give us a little time, we'll work with --

2    THE COURT:  This law school, from what I've

3    read, is a well-functioning law school.  It has a pretty

4    decent California bar passage rate, which is the toughest

15:12:50  5    one in the country, and I would like to see it continue.  I

6    mean, we provided for four weeks, but --

7    MR. ALTORELLI:  Look, I personally will put

8    the funding together for the law school.  That's how I feel

9    about it.  So you have a willing party here.  We gave the

15:13:07 10    receiver another 30 days to market it, because he asked for

11    it.  We're willing to stay in there.  But we are ready to

12    take the law school.

13    THE COURT:  All right.

14    MR. DOTTORE:  Your Honor, part of the problem

15:13:16 15    is that once this agreement was put in place, South

16    University -- this was set up to split these three separate

17    entities, which was a great idea.  And I agree with

18    everything Mr. Altorelli just said.  It was supposed to be

19    three separate entities.

15:13:30 20    South University is also in conflict with -- they

21    don't want to be owned by or controlled by Studio.  That

22    wasn't me.  That was just -- that came up during the

23    receivership.  So they've got their own issues.  So all

24    three of these people, all I've been saying since the get-go

15:13:45 25    is, get a platform, and I will transfer the information.

1          South is not -- was not in a position to fund a

2     platform.  These platforms could cost millions of dollars.

3     AI, I know, or Studio, has begun to build a platform to

4     transfer it.  All I've asked this whole time was, build the

15:14:04  5     platform, and I'll transfer everything off.

6          When I got here, Your Honor, it was supposed to be

7     just South -- or I'm sorry -- the entities I had, and EDMC.

8     I was looking for someone to transfer --

9               MR. GLICKMAN:  DCEH.

15:14:20 10               MR. DOTTORE:  DCEH.  To transfer.

11          This is three problems old.  This is 11 years' worth

12     of debt consumption that everyone left.

13          The day the receivership started, AT&T was going to

14     shut the phones off.  There was $6 million in back payments.

15:14:37 15          Google, 9 million.

16          Other vendors had not been addressed or paid in up to

17     six months.

18          Rents weren't paid.  It wasn't like I got there and

19     decided not to pay the rents.

15:14:51 20          Then, I inherited this platform issue, and we've

21     worked that out.  The platform cannot be separated -- and I

22     agree with him -- in anything under six months.  People have

23     come in and said, Oh, we can get this off in four weeks.

24     The documents can get off in three weeks.

15:15:06 25          Once they have their own platforms, we can get the

1    stuff off the platform, and send them all off as independent

2    entities without a manage service agreement.

3                    THE COURT:  All right.  Well, I --

4                    MR. DOTTORE:  Again, I didn't ask for all

15:15:22  5    these people to pile onto this.  It was one thing that --

6                    THE COURT:  Well, I understand that,

7    Mr. Dottore.  But, candidly, I -- you know, we didn't know

8    any of this.  All right?  And if I had, I very well would

9    have done things differently.  All right?  But I can't

15:15:42 10   change what I did.  All I can do is decide what to do going

11   forward.

12        And if it -- if it -- you know, so long as all the

13   bills are being paid, then it's not a problem keeping the

14   receivership open.  The problem is, all we get is these, you

15:16:03 15   know, motions coming in that, We're not getting paid.  We're

16   not getting paid.  We're not getting paid.

17        And students coming in that, Our money has been -- you

18   know, our stipends are gone.

19        The Court's has been overwhelmed with that and

15:16:15 20   figuring out what to do.  So I'm putting an end to those

21   things.

22                    MS. BOHME:  Your Honor, may I address the

23   Court?

24                    THE COURT:  Yes.

15:16:24 25                    MS. BOHME:  Good afternoon, Your Honors.

1      My name is Ingrid Bohme, representing Dream Center

2  South University, LLC, which is a recent intervenor, and

3  it's the entity that a lot of people today have referred to

4  today as South University.

5      Dream Center South University, LLC, is the South

6  University system, which has a number of different campuses.

7  It is not a receivership entity; it is strictly an

8  intervenor.

9          THE COURT:  Well, yeah.  But if this entity

10  went into bankruptcy, that would be the end of you.

11          MS. BOHME:  Yes, exactly, Your Honor.  And

12  that's why I'm here today, to reiterate some of the points

13  that these gentleman and Ms. Whitmer have said earlier,

14  which is that there are 10,000 South University students at

15  this functional institution that require these IT assets and

16  services in order to remain in school.

17      And in addition to that, there's been some talk about

18  the teach-out schools, which South University, my client,

19  has taken on in order to assist those students through their

20  teach-out.

21      They also are reliant on the IT system.

22      There's been some talk about how long this would take

23  in order to transition.  And given how intertangled all of

24  these assets are -- and this is phone systems.  This is

25  e-mail systems.  This is access to Microsoft applications.

1   This is access to student information systems.  Online

2   learning platforms.  All of these many, many contracts and

3   many different layers of technology that the various

4   institutions had been using for years, now need to be broken

15:18:12 5   out.

6        And it's my understanding, from my client, that this

7   would take a fair amount of time.  I've heard four to six

8   months, at a minimum.

9        But South University is currently also engaged in

15:18:25 10   efforts to identify ways to move itself to a new platform.

11   And that is something that South University is diligently

12   working on, and it's going to be able to do that and to pay

13   to make that happen.

14        All we need is for a transitional period to ensure

15:18:44 15   that we have access to the services provided by DCEH at the

16   data center in Pittsburgh, Pennsylvania.

17        And this is necessary in order to make sure that we

18   don't have nine, ten more receivership or bankruptcy

19   entities in the near future.  And more than 10,000 students

15:19:05 20   at South University alone.  And people have spoken to Art

21   Institutes having -- the viable Art Institute schools having

22   the same issue.  And that brings our total above 15,000

23   students.

24        It's a concern of ours, and I'm very glad that it's

15:19:20 25   being addressed here today.  I know we've raised it in our

1    intervention papers that were filed last week.  But the

2    significance of this, I don't think, can be understated.

3                    THE COURT:  All right.  Thank you.

4                    MR. GLICKMAN:  Judge, can I be heard on that?

15:19:36  5                    THE COURT:  Okay.

6                    MR. GLICKMAN:  Rob Glickman.

7        I just want to reiterate.  It's not only incredibly

8    important that South and AI are able to get onto their own

9    platforms.  But if they don't do it in a cooperative way --

15:19:54  10   for example, if somehow South got on a platform in four

11   months and AI didn't, or vice versa, the cost of operating

12   this Pittsburgh platform does not go down if we lose a bunch

13   of students.

14       It's -- I mean, it might go down a little, but it

15:20:11  15  wouldn't go down nearly enough.  So this platform transition

16  not only has to be done, it not only has to be done quickly,

17  but it has to be done cooperatively.  Because if one entity

18  is more expeditious than the other, it could bring down the

19  other.

15:20:27  20                   MAGISTRATE JUDGE PARKER:  Mr. Glickman, just

21  to follow up, on the Art Institute side of the ledger, is

22  the only remaining operational Art Institute the one in

23  Las Vegas?

24                    MR. GLICKMAN:  No, Judge.

15:20:39  25                   MAGISTRATE JUDGE PARKER:  Can we find out, is

1     the one in Charleston open?

2                    MS. WHITMER:  Yes.  The only one . . .

3                    MR. GLICKMAN:  I'm sorry.  Are you asking if

4     the only AI receivership entity is Las Vegas?

15:20:51 5                    MAGISTRATE JUDGE PARKER:  On the AI side.

6                    MR. GLICKMAN:  In the receivership, yes.  I

7     misunderstood your question.

8                    MAGISTRATE JUDGE PARKER:  All right.  So all

9     of the AI receivership entities are closed, except for

15:21:01 10    Las Vegas.

11                    MR. GLICKMAN:  This is more Ms. Whitmer's area

12    than mine.  So I'm going to defer to her.

13                    MS. WHITMER:  The law school and Las Vegas.

14                    MAGISTRATE JUDGE PARKER:  Law school is in

15:21:13 15    Argosy.  I'm talking about the AI school.

16                    MS. WHITMER:  The AI schools, there are three

17    excluded campuses.  They were Pittsburgh, which is closed,

18    Seattle, which is closed, and now, Las Vegas.

19          So, yes.  The answer to your question is yes, Las

15:21:26 20    Vegas is --

21                    MR. DOTTORE:  Judge Parker, Mark Dottore.

22          There were several other AIs that were closed before

23    we got there, though.

24                    MAGISTRATE JUDGE PARKER:  Understood.  We know

15:21:36 25    that now.

1          MS. WHITMER:  Your Honor -- Your Honors, we

2     did file in our supplemental reports, a schedule -- the

3     financial report, a schedule of the campuses going forward.

4          So it envisions -- and Mr. Linscott is here, the chief

5     financial officer of the receiver is here, and can discuss

6     that schedule.  And it shows that we can make the payments.

7     It shows that, you know, the payments -- the money will be

8     coming from, what I call, new South and new AI, which is

9     what South and AI looked like after the Studio deal.

10     So new South and new AI will make these payments, and

11     the data center can keep on going.  And we have run numbers

12     that indicate that the expenses and the revenue, we've got

13     it right sized now.

14          We've made a number of reductions in force, and we're

15     entering into new contracts and so forth so that this place

16     can run at the right number.

17          And Mr. Linscott is here if you have any questions

18     about that.

19          MAGISTRATE JUDGE PARKER:  I think the question

20     that Judge Polster has been trying to get at all day is,

21     whether there are current expenses for any still operating

22     schools that are not being paid, current operating expenses.

23     And we're being told that arrangements were being made to

24     cover landlord fees for any buildings where educational

25     activity is going on.

1       And we need to know whether people are going to come

2   back to the Court saying, I'm not being paid, or I'm not

3   being paid from this point forward.  And it sounds, from

4   what you're representing to us, that the answer to that

15:23:33  5   question is, everyone, you know, current operating building

6   is going to be -- or have their charges paid.

7                    MS. WHITMER:  That is correct.

8                    THE COURT:  All right.  Well, that has

9   been -- I had resolved that I was going to -- that going

15:23:47 10   forward, that was going to happen, or some major changes

11   would be made.

12       All right.

13                    MR. BECK:  Your Honor, may I be heard?

14                    THE COURT:  Yes.

15:23:59 15                    MR. BECK:  Your Honor, John Beck of Hogan

16   Lovells on behalf of the South Family Trust.

17                    THE COURT:  South Family Trust?  What is that,

18   sir?

19                    MR. BECK:  Yes, Your Honor.

15:24:08 20       So the South University used to be owned by the South

21   family until 1993.  And John South, who is in the courtroom

22   today, was its chancellor for 40 years.

23       I rise briefly -- I realize at the risk of adding more

24   complexity to the hearing today.  But I want to rise briefly

15:24:24 25   to address the IT platform issue, and just put --

          1    Your Honor, make you aware, and also make the receiver

          2    aware, that the South Family Trust is willing -- obviously,

          3    subject to working out the details -- to purchase the IT

          4    platform, and enter into servicing agreements to help

15:24:40  5    transition South to a more viable place, if the receiver is

          6    not able to do that.

          7         So I just rise to make Your Honor aware of that.

          8         Thank you.

          9              THE COURT:  Well, we've got Studio that's

15:24:54 10    willing -- that says they're doing it.

         11              MR. ALTORELLI:  Your Honor, that is a horrible

         12    idea, and I just want to go on the record.

         13         We've been through enough of this with people

         14    intervening to trying to break up, you know, a very thorough

15:25:07 15    and thoughtfully crafted play.

         16         They're not an owner.  They're not an operator.  They

         17    are interested in buying the school.  We're welcome to

         18    having them do so.  But right now, we need to get the two

         19    schools that need these services provided by the receiver.

15:25:23 20    And if the receiver doesn't want to do it, the two schools,

         21    with Studio's help, are willing to do it themselves.  They

         22    don't need another party.

         23              THE COURT:  I appreciate that offer.  But

         24    there is a -- there's a pending deal in place subject to

15:25:38 25    Court approval next Monday, to -- that Studio is going to be

1    doing that.

2                    MR. ALTORELLI:  Your Honor, that's not what it

3    says.  It says if they cannot provide the services, then we

4    have the option to purchase the assets.

15:25:51  5         I do not believe, and I don't think the receiver or

6    any party that knows anything about the IT would think that

7    it would be a good idea to take the IT out of DCEH.  The

8    cost will be enormous.  And if you turn off those 500

9    servers and try to turn them back on, they may not work.

15:26:09 10         It's a horrible idea, and we need to really be

11   careful.  This is -- we're stuck with a situation no one

12   likes.  I don't like it either.  But we've thought about

13   this very carefully for a long time.  They have to stay in

14   place.  We're prepared to pay them to stay in place.

15:26:26 15                   THE COURT:  All right.

16                   MR. ALTORELLI:  If they do that, and they

17   don't continue to attack our contracts and our services and

18   our ability to do so, I believe we can work this out and

19   keep two schools alive.

15:26:37 20         But we got to keep the rest of the world from coming

21   in and saying that they can do it better.  Because if they

22   want to do it better, then write a check that -- and take us

23   out for the $10 million that we've already spent, and fund

24   all these schools.  And there is no one coming to do that,

15:26:50 25   and that is the problem.  We've done it.

1          MR. GLICKMAN:  Judge, Rob Glickman.

2      That provision that you're looking at was really kind

3  of a -- it was put in by Mr. Altorelli and myself almost as

4  in the case of last resort --

15:27:03  5          MR. ALTORELLI:  It's just to make sure that if

6  you don't -- are not there, we can take it over.  I don't

7  want it.

8          MR. DOTTORE:  Your Honor, Mark -- Your Honors.

9  I'm sorry -- Mark Dottore.

15:27:11  10          THE COURT:  Yes.

11          MR. DOTTORE:  The system is extremely

12  antiquated, which is pretty funny when you figure it's only,

13  like, 12 years old.

14      So part of the problem is, these people that will move

15:27:21  15  off to these other systems, such as Studio and AI, will move

16  on to more efficient, smaller, faster systems than that is

17  provided.  There's 55 people alone it takes just to run this

18  IT, which is way too many people.

19          MR. ALTORELLI:  It was sized for a $2 billion

15:27:37  20  revenue business, 170,000 students, 60, 70 campuses.  Now,

21  it's running, 12, 18.  It's just the wrong tool, but we

22  don't have a choice.  I just implore people to stop fighting

23  about this stuff.  Let us run it for four or five months and

24  be done.

15:27:55  25          THE COURT:  All right.  Well, that's what

1    we're going to do.

2        It will run -- I mean, again, my problem was

3    continuing this receivership while current operating

4    expenses weren't being paid.  And that, to me, was not fair.

15:28:07  5    So we've ended that.

6            MR. ALTORELLI:  Your Honor, there's a couple

7    of pieces along with that, and I just want to point them

8    out.  Because if we're going to try to solve this, we should

9    try to solve it all.

15:28:17 10        We do need to work with the receiver, figure out what

11    the go-forward payroll is.  And there's been some payroll

12    that hasn't been paid.  And we need to really make sure we

13    have an understanding --

14            THE COURT:  Payroll for what, sir?

15:28:25 15            MR. ALTORELLI:  For DCEH.  That is where

16    the -- resides all these people.

17            THE COURT:  Well, the only payroll -- the only

18    payroll there is is this IT center, or whatever, right?

19            MR. GLICKMAN:  It has well over 100 employees,

15:28:38 20    Judge.

21            THE COURT:  Well, I thought you said it had 55

22    people?

23            MR. GLICKMAN:  No.  That's just to operate the

24    IT that we're talking about.

15:28:45 25            MR. DOTTORE:  Your Honor, there's folks that

1    Mr. Altorelli and I are trying to sort out right now.

2    There's people that the Government -- that you have to have

3    in place for the Department of Education for compliance,

4    Treasury.

15:28:56 5                THE COURT:  All right.

6                MR. DOTTORE:  So there's about 100 people.  55

7    of them are in IT alone.

8                THE COURT:  Well, again, that's what you've

9    got to figure out.  All right?  I mean, you know, the

15:29:09 10   people -- you need the people who you have to have to run

11   the program, and deal with the federal funds, which are

12   still coming in, because these schools are operating.  And

13   they haven't been put on -- the DOE is sending funds for

14   these schools; is that right?

15:29:31 15       They're providing, you know, Government-guaranteed

16   loans for students, correct?

17                MR. DOTTORE:  Yes, that would be correct.

18                THE COURT:  All right.  Well, then, obviously,

19   you need the people who know now to process that money and

15:29:40 20   make sure it's handled properly and we don't have a problem

21   like what we have, where --

22       I'm going to just -- I've got some questions for the

23   DOE people.  Trying to determine how it happened that

24   stipend money didn't go to the students.

15:29:56 25       All right.  So I think Judge Parker and I are

1    convinced that we need to keep this receivership in place

2    for four to six months so that either Studio will take over

3    this IT platform, or a new one will be built to support the

4    schools that -- I guess that Studio is going to be running.

15:30:29   5          MR. DOTTORE:  Well, to be clear, Your Honor,

6    South wants to be on their own.  Studio and AI want to be on

7    their own.

8          THE COURT:  Well, whatever.  Then South -- how

9    is South going to -- what platform is South going to have to

15:30:42  10    run their schools?  Are they going to build their own?

11          MR. DOTTORE:  I think their representative, I

12    believe, Your Honor -- Your Honors.  I'm sorry -- stood up

13    and said that they are working on a platform as we speak.

14          THE COURT:  All right.  Well, then, they need

15:30:51  15    to have their own platform to run their schools.

16          MR. ALTORELLI:  Your Honor, can I just -- so

17    look, it's very simple.  They can do whatever they want.

18    There's a 60-day termination provision in our agreement.

19    Anytime South wants us out, they can send us notice and

15:31:04  20    we're out.  So no one is locked to Studio.  It's a voluntary

21    arrangement.  Anybody who wants us out, just send us the

22    notice.

23          Until then, we tend to provide the services.  Because

24    we don't believe either of them could get off, despite their

15:31:20  25    own wishes to the contrary, for at least four to six months.

1                    THE COURT:  All right.

2                    MR. ROTHSCHILD:  Your Honor, may I be heard?

3                    THE COURT:  Yes.

4                    MR. ROTHSCHILD:  Eric Rothschild on behalf of

15:31:30  5    the student intervenor, Dunagan plaintiffs.

6         I think it was -- my understanding from Your Honor is

7    that you're ready for the receivership to enter.  Because

8    absent this platform issue, it really wasn't going to be

9    doing more good than harm.

15:31:45  10        This reason for having a receivership was not the

11   reason the receivership was asked for in the first place.

12   That doesn't make it unimportant, but it's not clear to me

13   what is different about the people employed by the receiver

14   versus the people at Studio, in terms of running an

15:32:01  15   operation with these 55 or 100 legacy employees; nor why

16   this same thing couldn't occur in bankruptcy as well as it

17   does for receivership.

18        And I guess there's a question here, then.  If it is

19   decided that the receiver is going to continue to manage

15:32:17  20   this platform for four or six months or longer, does that

21   mean that everything else is going -- and all the other

22   issues that I know Your Honor is aware of, including the

23   stipends and the consent judgment, are they all then going

24   to be continued to be managed by a receiver.

15:32:33  25        And, obviously, we've articulated some objections to

1    that.

2                    THE COURT:  No.  I'll probably have to put it

3    all to a bankruptcy court.  I'm not going to -- you know,

4    it's not for Judge Parker and I to be dealing with this.

15:32:45   5    I've got a few questions -- I've got some Department

6    of Education people.  I'd like someone to explain to me --

7    Well, before I forget, there was an emergency motion,

8    Mr. Dottore, that you filed for an order authorizing you to

9    enter into four articulation agreements with TCS Education

15:33:09  10    System.  And these are four Argosy schools that have closed

11    down, right?  They've closed?

12                    MS. WHITMER:  Yes.

13                    THE COURT:  They were in the receivership?

14                    MS. WHITMER:  So we have closed these Argosy

15:33:20  15    campuses.  In doing that closure, what we did was, we tried

16    to wind them down in an orderly fashion, as orderly as could

17    be done when there was a total lack of funds.

18    So we arranged for students to attend what is called

19    transfer fares.  Different schools put up tables and take

15:33:44  20    students on the campuses.

21    And then we are entering into partnership with other

22    parties who will take transfer students and who will

23    teach-out.  TCS is a school in Chicago.

24    These are transfer agreements that we would like to

15:34:01  25    enter.  We probably have another 15 different transfer

1   agreements to put on with the Court.  Partly so that we can

2   notify people watching the docket what their various options

3   are as students that are caught in the closure of Argosy

4   University.

15:34:22  5        So TCS also has indicated that they will offer

6   teach-out to the -- it's not a Ph.D.  It's a PSYD, a

7   psychology -- doctorate of clinical psychology -- so that

8   those students can complete -- the ones that are advanced

9   into their doctoral candidates can completed --

15:34:48  10           THE COURT:  All right.  What I'm trying -- I

11   mean, the motion says, Well, people have such and such time

12   to object --

13           MS. WHITMER:  Yes.

14           THE COURT:  -- until March -- the question is:

15:34:56  15   Aren't these things that have to be done immediately?

16        I mean, people need to know what school they're going

17   to go to.

18           MS. WHITMER:  Yes.

19           THE COURT:  And I'm not sure if -- I mean,

15:35:05  20   Judge Parker and I aren't telling anyone where to go to

21   school.  I mean, Argosy shut down.  These students have to

22   find somewhere else.

23        Do they need Court approval to go somewhere else?

24           MS. WHITMER:  If the Court does not want us to

15:35:19  25   put these on the record, that's fine.

1          THE COURT:  Well, I'm just trying to

2     understand, Ms. Whitmer.

3          MS. WHITMER:  All we're seeking is the

4     approval of the Court to enter into these contracts.  It's

15:35:29  5     really not an ordinary course item because, obviously, the

6     closure of a school is an extraordinary item.  So we are

7     putting in front of the Court those various transfer and

8     articulation agreements for the Court's own review, so that

9     you know what we're doing in trying to transition students

15:35:50  10     to other alternatives and to other universities.

11          MR. DOTTORE:  What they did, Your Honor --

12     Mark Dottore.

13          What they did, Your Honor, was, we went to transfer

14     partners that could match -- especially in this clinical

15:36:03  15     PSYD program, what it did was, these people are now moving

16     into internships, and they have things they need to do in

17     clinicals.  So what we did was, we went to a partner and had

18     them match as many matching credits as we could.

19          You're correct, Your Honors, you can not tell a

15:36:20  20     student where to go to school.  But if we made it as easy a

21     transition as possible.  And almost the majority of them

22     have accepted these deals.

23          THE COURT:  I think that's very good work of

24     the receiver.

15:36:32  25          I'm just saying, is this something that requires Court

1    approval?  And if so -- if some other school says, Look, you

2    know, we're willing to take Argosy students, and, you know,

3    apply the -- you know, the remainder of tuition, and it's

4    clear that the money being transferred -- I mean, that may

15:36:51  5    require court approval because you're transferring -- are

6    you transferring money that went from the Department of

7    Education to Argosy for tuition to these other institutions?

8              MS. WHITMER:  No.

9              MR. DOTTORE:  No, Your Honor.  They're going

15:37:07 10   on these other folks' Title IV money.  They have their own

11   Title IV.  They're going there.  They're taking those

12   students --

13             THE COURT:  Okay.  Well, I'm just trying to

14   determine why you think it needs our approval.

15:37:18 15            MS. WHITMER:  Your Honor, we -- I'm sorry.

16   I'm sorry -- we would be delighted not to put them of

17   record.  I mean, it would save -- you know, it would save

18   drafting, filing.

19             THE COURT:  Well, let me -- I've got

15:37:27 20   the -- this is out of my pay grade.  I've got someone from

21   the Department of Education.

22   A.      .

23        Is this something that requires Court approval?

24        I mean, if you tell me it does --

15:37:40 25            MR. FROLA:  Your Honor, this is Mike Frola

1    from the Department of Education.

2        Generally speaking, the teach-out arrangements are --

3    from an institution that closes is -- that is approved by

4    the accrediting agency and the state agencies.  And then, if

15:37:58  5    it requires that the student transfers, they become under

6    the new school, and they're responsible for that student.

7            THE COURT:  Well, that's what I thought.  It's

8    an educational matter, not a -- I mean, that's what it seems

9    to me.  It's -- the accrediting agencies would handle it.

15:38:16  10           MR. DOTTORE:  Your Honor, Mark Dottore.

11        From all the conversations we've had before we entered

12    into these agreements, we made sure that they had gone to

13    their accreditors and to the -- I think it's ACIS that does

14    the accreditation for this clinical psychology programs.

15:38:34  15        Mr. Ehrman has talked to the ABA in California, and

16    the ABA is -- I guess he could finish telling you what we've

17    done to make sure that that will work.

18            MR. EHRMAN:  Your Honor, James Ehrman, one of

19    the counsel for the receiver.

15:38:51  20           THE COURT:  Yes, Mr. Ehrman.

21           MR. EHRMAN:  I was on the phone with the dean

22    of the law school, and the point person for the American Bar

23    Association who accredits the law school.  And we were

24    working through the issues of how do we, you know, complete

15:39:07  25    the -- essentially, the semester for the law student.

1          As Ms. Awed said, ordinarily, it would take longer.

2     We're working with them to -- with the ABA to change the

3     requirements at the law school for number of hours in the

4     classroom so that these two pay cycles will be sufficient

15:39:26 5     for the 3Ls to graduate with full accreditation.

6          This is one of the things where it just goes on and

7     people have partial information and we do it.  But

8     that's --

9               THE COURT:  I'm just trying to save everyone a

15:39:40 10    lot of time and work in filings.  And I don't think that you

11    need anyone's approval -- that the school needs anyone's

12    approval to work out articulation agreements with other

13    institutions.

14               MR. EHRMAN:  And in that sense, Your Honor --

15:39:58 15    to finish up with the ABA, it's so that the Court knows so

16    that everyone is there.

17          In bankruptcy -- where I've spent most of my

18    life -- you do things out of what we call an abundance of

19    caution, because there are people in this room, there are

15:40:12 20    people on the phone who just object to everything because

21    it's in their pressure point to be able to do it.

22               THE COURT:  Well, I'm trying to go cut that

23    off, too.  All right?

24               MR. EHRMAN:  Yes.  Yes.

15:40:21 25               THE COURT:  I'm a bottom line person,

1    Mr. Ehrman.  And I don't think --

2                    MR. EHRMAN:  All right.  And we don't want the

3    Court to be surprised, either, Your Honor.

4                    THE COURT:  All right.  I'm determining that

15:40:29  5    Court approval is not needed for an articulation agreement.

6                    MR. DOTTORE:  Thank you, Your Honor.

7                    THE COURT:  So the receiver may -- so this

8    emergency motion, I'll just say it's denied as moot, because

9    Court approval is not needed for these articulation

15:40:44  10    agreements or any other.  And I hope you're able to

11    accomplish them for as many students as possible.

12                    MS. WHITMER:  Wonderful.  Thank you,

13    Your Honor.

14        We have 15 back at the office we can sign up today.

15:40:56  15                    THE COURT:  All right.  Now, I have -- the

16    people from the Department of Education, can you explain to

17    me, when Title IV funding comes to a school, how does it

18    work?  I mean, how does -- you've got money that covers

19    tuition, and you've got money that students are allowed a

15:41:22  20    stipend for living expenses.

21        I'd like someone to explain to me how the money flows

22    and what paperwork the school needs to provide and how the

23    money is supposed to be treated when it goes to the school.

24                    MR. JACOBSON:  Good afternoon, Your Honor.

15:41:37  25    This is Jonathan Jacobson.  I'm a trial attorney at the

```
 1          Department of Justice on behalf of the United States.

 2                    THE COURT:  Right.

 3                    MR. JACOBSON:  I'm here with a couple of other

 4          folks, including the assistant director of the corporate

15:41:49  5          financial litigation section, Lloyd Randolph.

 6              I'm also here with three representatives of the

 7          Education Department, one of whom you've already heard from.

 8                    THE COURT:  Right.

 9                    MR. JACOBSON:  Donna Mangold, Steve Finley,

15:42:01 10          and Michael Frola.

11                    THE COURT:  I very much appreciate DOJ's

12          participation at the Court's request, and the Department of

13          Education personnel, on very short notice.

14              Basically, I'm asking these questions because I don't

15:42:16 15          know.  And so I'd like to figure out -- I'm going to ask the

16          people who know because this is what you do.

17                    MR. JACOBSON:  Right, Your Honor.

18              And so Michael Frola, who is the director of the --

19                    MR. FROLA:  Multi-regional and foreign school

15:42:35 20          division.

21                    MR. JACOBSON:  -- of the Department of

22          Education is going to be able to answer at least some of the

23          questions.

24                    THE COURT:  And, I think, Mr. Frola, you're

15:42:43 25          the person who sent the February 27th letter to the
```

1    receiver --

2                    MR. FROLA:  Correct, Your Honor.

3                    THE COURT:  -- and the former officer

4    regarding the termination of funds for Argosy?

15:42:54  5                    MR. FROLA:  Correct, Your Honor.

6                    THE COURT:  Okay.  I'm just saying that

7    because some people in the room might not be aware of that.

8         Okay.  Can you just explain how the Title IV money

9    flow works?

15:43:06  10                    MR. FROLA:  Sure.

11        So Dream Center Education has been under what's been

12    called "heightened cash monitoring" since 2007 because of

13    the financial responsibility standards.

14                    THE COURT:  Right.

15:43:16  15                    MR. FROLA:  They haven't met their metrics.

16        So under that premise, since 2015, the method of

17    payment requires that they return -- if they draw money down

18    for a student, they have to -- before they draw that money

19    from the department, they have to pay that credit balance to

15:43:33  20    the student.  And then require the money --

21                    THE COURT:  I'm sorry.  Hold on it.  Slow

22    down.

23        Before --

24                    MR. FROLA:  Sure.

15:43:37  25                    THE COURT:  Before they draw money -- they've

```
 1   got to pay the student before they -- and then they've got

 2   to ask you -- "you" being DOE -- for reimbursement?

 3                   MR. FROLA:  Yes.

 4                   THE COURT:  All right.  And this is stipend

 5   money, tuition money, or both?

 6                   MR. FROLA:  It's both.

 7         So, for example, if the school says a student is -- so

 8   we borrowed and received grant money for $10,000, and

 9   tuition and fees were 8,000, that $2,000 difference is a

10   stipend.  And that money has to be reported on the student's

11   account card, and that 2,000 has to be paid to that student.

12   And then once that happens, then they can pull down that

13   money.

14                   THE COURT:  All right.  So this is the -- this

15   is the stipend differential, the difference between the

16   gross amount of the borrowing and the tuition that goes into

17   the student's stipend account?

18                   MR. FROLA:  Yes.  And that 2,000 is used for

19   living expenses, or whatever other needs the student needs

20   to survive on.

21                   THE COURT:  All right.  So the school has to

22   certify.  All right.

23         Student Polster, tuition is $10,000 -- tuition is

24   $10,000.  Student's borrowing $12,000.  The school has to

25   certify that they've given me the $2,000, and then they can
```

1    go to DOE and say, I've certified that I've given Student

2    Polster his $2,000 stipend; now, give me the $2,000, and

3    then you do that?

4                    MR. FROLA:  Yes, that's correct, Your Honor.

5                    THE COURT:  Okay.

6                    MR. FROLA:  And just to clarify, the schools

7    were operating under a Heightened Cash Monitoring 1, which

8    is a lesser oversight.

9                    THE COURT:  All right.

10                   MR. FROLA:  So they basically would

11   self-certify that they're doing that as part of the

12   regulations, and it requires administrative capability.  And

13   then under that, we released approximately, just for Argosy

14   University, about 9.2 million on January 15th, and

15   2.8 million at the -- on January 29th.

16        So some portion of that fund, as we just discussed,

17   would have been for stipends.

18        So -- and then at the end of January, of course,

19   we -- when we heard that there was a lot of issues, we put

20   the schools on Heightened Cash Monitoring 2, and we notified

21   the school in a letter.  And under that method, it's a

22   higher level of oversight.

23        And so what would happen there is not -- the students

24   would get paid still, first by the school, and then they

25   request reimbursement.  But for that process, they would

1    have to -- we would do a final analysis of the student

2    account, and verify that not only was the money paid to the

3    student, but they did everything else, the students were

4    eligible.  And that's a lot greater delay.

15:46:31  5        Since we've put the schools under Heightened Cash

6    Monitoring 2, they have not requested any funds from the

7    department.

8        And just to clarify, the certificate is not specific

9    as to the -- for the credit balances when they're under

15:46:50 10   Heightened Cash Monitoring 1.

11            MAGISTRATE JUDGE PARKER:  Was it only the

12   Argosy schools placed on HCM2, or all the DCEH entities?

13            MR. FROLA:  All the DCEH entities.

14            THE COURT:  So that includes the AI

15:47:02 15   International schools and the Dream Center South schools?

16            MR. FROLA:  No.  AI International -- the South

17   University and the three campuses that went with them.  The

18   AI schools have been operating under the Heightened Cash

19   Monitoring 1 method, and they have been meeting the

15:47:18 20   standards that we require of them and we have been paying on

21   them.

22            MAGISTRATE JUDGE PARKER:  All right.

23            THE COURT:  So Art and South have been okay,

24   but it was Argosy that wasn't?

15:47:34 25            MR. FROLA:  From our -- yes, Your Honor.

1          From our understanding, the stipends -- and we

2     received -- you know, when we first started hearing that

3     students were not receiving their stipends towards the end

4     of January, we reached out to the receiver.  He sent us the

15:47:50  5     documentation to show that there was approximately 16

6     million in unpaid stipends at that time.

7               THE COURT:  And, Mr. Dottore, you determined

8     that at the end of January?

9               MR. DOTTORE:  No, Your Honor.  No, Your Honor.

15:48:16 10               THE COURT:  All right.  Well, all right.

11          Mr. Fiola [sic], when do you say you heard from

12     Mr. Dottore that there was $16 million in unpaid stipends?

13               MR. FROLA:  I received a thing on

14     February the 7th, the documentation.  It not only provided

15:48:49 15     an overall chart, it actually gave us a student-by-student

16     listing.

17               THE COURT:  All right.

18          So, Mr. Dottore, that was February 7th?  I misspoke,

19     then.

15:48:58 20               MR. DOTTORE:  Yes, Your Honor.

21          We also sent a letter to the department which we also

22     filed in one of our reports with the Court.

23               THE COURT:  All right.  And the $16 million,

24     Mr. Dottore, in unpaid stipends, this was -- did you

15:49:14 25     determine for what period of time -- over what period of

1    time the money was received from DOE?

2                MR. DOTTORE:  I'm going to let my CFO speak to

3    that.  Because after we became alerted that the student

4    stipends weren't paid, before we sent the paperwork on, we

15:49:36  5    started to do an investigation.  And he did the

6    investigation.  That's Mr. Linscott.

7                THE COURT:  All right.

8                MR. LINSCOTT:  Dave Linscott from Dottore

9    Companies.

15:49:46 10                THE COURT:  Yes, Mr. Linscott.

11                MR. LINSCOTT:  When we arrived in Pittsburgh

12    after our appointment, we began to look at a cash flow

13    model, a business -- determining if the business was viable

14    to continue.

15:50:01 15        As we were putting together our cash flow models, we

16    started asking questions about, How does your revenue come

17    in?  When does the Title IV money come in?  Are we going to

18    have enough cash to make it through next week and the rest

19    of the semester?

15:50:20 20        And it was explained to us at that time, that there

21    were 28 to $30 million of funding available at the

22    department.

23        Of that 28 to 30 million, there was 13 to 16 million

24    of stipends that would have to be paid out of those funds.

15:50:42 25        So at that point in time, we associated this large

1    stipend balance to future funding requests.

2         We later, a couple of weeks later, as we continued to

3    investigate this, because the receiver was asking me, The

4    department says these stipends were already paid.  The

15:51:15 5    stipends were already paid.  Get to the bottom of it.

6         As I began to dig into that, we found out that the 13

7    million of outstanding stipends related to periods November,

8    December, January, pre-receiver, and that these amounts had

9    been growing for the past several months.

15:51:40 10              THE COURT:  So you're saying you found the $13

11    million of stipends that the schools had represented to DOE

12    as having been paid to students, in fact, were not paid to

13    students?

14              MR. LINSCOTT:  Yes.

15:52:06 15              THE COURT:  Were you able to determine where

16    the money went?

17              MR. LINSCOTT:  I have not tried to trace

18    dollars and perform a --

19              THE COURT:  Well, did it appear to go into the

15:52:23 20    school's operations?  Or did you find money going --

21              MR. LINSCOTT:  It appeared to go --

22              THE COURT:  -- you know, going, I'll say, out

23    to individuals or non-school entities?

24              MR. LINSCOTT:  One of our challenges was, the

15:52:38 25    financial reporting accounting group at the schools had left

1    at the end of December.  So there were no accounting people,

2    no financial reporting people in place when the receiver

3    arrived and was appointed.

4        Just -- and I haven't looked into this, but the money

15:53:03  5    went --

6                THE COURT:  All right.  So you couldn't tell?

7    You don't know where it went?

8                MR. LINSCOTT:  That's correct.

9                THE COURT:  All right.  You just know it

15:53:14 10    was -- that the school had represented to DOE that they had

11    paid it to the -- they had paid the stipends to the student,

12    which they're required to do.  The money came in from

13    DO -- it did come in then from DOE, but, in fact, the money

14    hadn't gone to the students?

15:53:33 15                MR. LINSCOTT:  Correct.

16                THE COURT:  All right.  And it was November,

17    December, and the first part of January before the

18    receivership.  All right.

19        All right.  Mr. Dottore, you told the DOE on --

15:53:54 20    Mr. Frola on February 7th, that there were 16 million in

21    unpaid stipends.

22        Is that the 13 million plus the 2.8 that came in

23    January 29th?  Or -- I'm just trying to get the discrepancy

24    between Mr. --

15:54:10 25                MR. DOTTORE:  At the time, I believed it was

1    $13 million.  I was told -- or to the best of our ability to

2    inform this.  You have to understand, Your Honor, we had to

3    go to people who were nonfinancial people to try and piece

4    this together.

15:54:25  5              MR. LINSCOTT:  Your Honor, the 13 million did

6    not include the stipends due to the law school students.  So

7    as we dug into this, the number kept growing because it

8    didn't include the law school, and that was another

9    3 million.

15:54:43  10              THE COURT:  Okay.  All right.  So you found

11   another 3 million that was owed to law schools?

12              MR. GLICKMAN:  Judge, Rob Glickman.

13        I don't mean to interrupt.

14        Dave Linscott is a CPA and a certified fraud examiner.

15:54:57  15   He's as diligent in this type of investigation as anyone

16   I've worked with.

17        I will tell you, this really is going to require a

18   deep-dive forensic accounting.  It's --

19              THE COURT:  Oh, I'm well aware of that.  I --

15:55:10  20   and I'll need to decide what to do.

21              MR. GLICKMAN:  I'm very nervous to try to tell

22   the Court one thing when we really haven't conducted a full

23   investigation.

24              THE COURT:  No.  I've got the information.

15:55:19  25        Mr. Linscott determined that representations had been

1      made that stipends had been paid.  Those representations

2      were made to DOE.  He determined that, in fact, the stipends

3      had not been paid.  He found $13 million, and then he found

4      another, roughly, $3 million in stipends that should have

15:55:38   5      gone to law students.  That's the 16 million that

6      Mr. Dottore reported.

7            All right.  We have present -- we've got Mr. Burton,

8      who is a -- I don't know who we have in person who were

9      former officers, employees of DCEH.

15:56:13  10            Who do we have present?

11                  MR. GLICKMAN:  Judge, Rob Glickman, again.

12            Randy Barton is here.

13            Before we move on to the next topic, we should point

14      out that we are doing everything to preserve the

15:56:26  15      information, and working with the Office of the Inspector

16      General to make sure that a full investigation can move

17      forward.

18                  THE COURT:  All right.  Thank you,

19      Mr. Glickman.  I assumed that was the case.

15:56:34  20            All right.  Mr. Barton, are you here?

21                  MR. BARTON:  Yes, Your Honors.

22                  THE COURT:  All right.  Mr. Barton, what was

23      your position at -- you were a director?

24                  MR. BARTON:  I was chairman of the board, yes,

15:56:58  25      sir.

```
 1              THE COURT:  All right.  And I looked at my

 2    notes.  You were on the phone call that I had when the

 3    receiver filed their emergency motion.  You were the -- what

 4    I'll call the client representative of DCEH.

 5         All right.  So you were the last chairman of the

 6    board.

 7         All right.  Did you have any of operating

 8    responsibilities at Dream Center?

 9              MR. BARTON:  No, sir.  I was involved some

10    with some of the fundraising and advancement work.  That

11    would have been my only operational activities.

12              THE COURT:  All right.  Well, do you know who

13    at Dream Center was responsible for certifying to the

14    Department of Education that student stipends had been paid?

15              MR. BARTON:  Our CFO was Chad Garret, and our

16    chief --

17              THE COURT:  What is his name?

18              MR. BARTON:  Chad Garret.

19              THE COURT:  Chad Garret?

20              MR. BARTON:  Yes.

21              THE COURT:  All right.

22              MR. BARTON:  And our chief operating officer

23    was John Crowley.

24         And then there would have been a number of others in

25    the financial aid areas who would have probably been doing
```

1    the actual certifications, but I would not know who those

2    would be.

3              THE COURT:  All right.  When did Mr. Garret

4    leave the employ of Dream Centers?

15:58:30  5              MR. BARTON:  He resigned on January 14th.

6              THE COURT:  And what about Mr. Crowley?

7              MR. BARTON:  He resigned on January 11th.

8              THE COURT:  All right.

9              MR. BARTON:  Your Honors, I'd like to clarify

15:59:02 10    one point on the credit balances.

11              THE COURT:  Yes.

12              MR. BARTON:  I think there's a little bit of

13    misunderstanding, although I'm not an expert in this.

14         The credit balances would include things other than

15:59:13 15    the stipends.  Credit balances could include scholarships.

16    Credit balances could include return of unearned tuition

17    because a student dropped a class, which would not the

18    equivalent of a stipend.

19         So the broad assumption that all of these are stipends

15:59:32 20    would -- although, it would be due on a student's account,

21    they're not all -- and there could be other sources of

22    scholarships and monies that would be posted on the student

23    account.  So I just wanted to clarify that for the record.

24              THE COURT:  Well, the scholarship money

15:59:52 25    wouldn't go to the student, would it?

1          MR. BARTON:  Yes.  It could, yes.  It could go

2      to the student, yeah, for a credit on their account.

3          THE COURT:  Well, but it would be a credit

4      against the tuition.  I mean, if the tuition was $10,000,

16:00:06  5      and a student received a $5,000 scholarship, some of the

6      $5,000 wouldn't go to the student, would it?

7          MR. BARTON:  Some of students would have

8      received stipends that would have been scholarship-type

9      stipends, not just against tuition.

16:00:25 10          Again, I'm not an expert, but I -- as you -- I just

11      wanted to set the record straight that it's not all strictly

12      stipends involved in the credits on the student's account.

13          THE COURT:  But the Department of Education

14      doesn't pay scholarships, do they?

16:00:41 15          MR. BARTON:  No.  It would have been monies

16      that was due on these student accounts for things other than

17      their federal Title IV draws for stipends.

18          THE COURT:  Well, we're only concerned about

19      the school, your schools, Dream Center --

16:00:53 20          MR. BARTON:  Right.

21          THE COURT:  -- was required to certify to the

22      Department of Education that they had paid student stipends

23      for living expenses.  And once they made that certification,

24      they received the money from the Department of Education.

16:01:10 25          And the accountants for Mr. Dottore have determined

1    that, roughly, $16 million that Dream Centers certified when

2    you were chairman, those certifications were false.

3                    MR. BARTON:  I understand that, sir.

4                    THE COURT:  15 million came in.  So this has

16:01:33  5    nothing to do with the school wants to give a scholarship to

6    students.  It has nothing to do with that.

7         The return of unearned tuition, again, that money

8    wouldn't go to a student, would it?

9                    MR. BARTON:  Some of it would be credited for

16:01:49 10    the student's ledger for their account, which would have

11    been included in that 16 million, is my understanding.  But,

12    again --

13                    MR. DOTTORE:  Your Honor, I think what he's

14    trying to say is that you get a credit.  It's not actual

16:01:58 15    cash.  You get a credit, like a number, that would look like

16    a stipend, but it was really just credit from either -- what

17    I've learned, Your Honor, is some of these people are

18    employed.

19         These are mostly older students.  They're not your

16:02:12 20    traditional right-out-of-high-school students, for the most

21    part.  So they work for an employer -- and I forget the

22    exact name of the one particular -- we'll just use Chevron,

23    for example.

24         They've worked for Chevron, and Chevron would give a

16:02:27 25    credit for them, or pay part of their tuition.

1          THE COURT:  So an employer gives -- say you

2    got a higher education program.  Employees have that.  They

3    say, All right.  We'll pay 50 percent of your tuition.  Or

4    find them out.  Okay.

16:02:41  5          MR. DOTTORE:  That's correct, Your Honor.

6          THE COURT:  Okay.  So that would go.  But,

7    again, the Department of Education doesn't care about that.

8    It's not their money.

9          MR. DOTTORE:  No.

16:02:49 10          THE COURT:  All right.  So that might --

11    obviously, that -- if it runs through the account, it would

12    show on the student's account.

13       I'm just worried about the stipends that are paid by

14    the Department of Education on funds that the student has

16:03:01 15    borrowed from the Department of Education.

16          MR. BARTON:  Right.

17          THE COURT:  So -- all right.

18       Mr. Barton, were you aware of any of this?

19          MR. BARTON:  No, sir.

16:03:14 20          THE COURT:  Have you asked -- have you tried

21    to find out how this happened under your watch?

22       Have you talked to anyone?

23       Have you asked anyone?

24          MR. BARTON:  I've talked to our CFO, our

16:03:26 25    former CFO a little bit, and I got a little explanation that

1      there were a number of different types of funds that were

2      being returned to the student accounts.  But I've not done

3      any independent investigation on it.

4                    THE COURT:  Well, did you ask Mr. Garret or

16:03:40  5      Mr. Crowley, you know, Why did you or someone certify to the

6      Department of Education that stipends had been paid when

7      they hadn't?

8                    MR. BARTON:  I've not talked with them about

9      that, sir.

16:03:52  10                    THE COURT:  Or have you asked them what

11      happened to the money, where it went?

12                    MR. BARTON:  If there were any deficits, the

13      money would have gone into the operation of the campuses.

14                    MR. DOTTORE:  Mr. Barton was not -- I'm sorry,

16:04:06  15      Your Honor.

16           Mr. Barton was not responsible for that particular

17      item.  It was the chancellor of the school, Cynthia Baum,

18      and two other people in the -- what we call -- or the

19      compliance department.  I forget the exact name.  They were

16:04:18  20      the ones that saw it and signed off on it and sent them up

21      to the department for review.

22                    MR. GLICKMAN:  Judge, I'm sorry to interrupt,

23      again.  Rob Glickman.

24           I'm not far enough along into this investigation to

16:04:32  25      say that that -- say who did what and who was at fault and

1    what anyone's mental state was at the time.  I'm not there.

2    We haven't done discovery.  Nobody has been under oath.  I

3    know what it looks like.  I just don't want to give the

4    Court the impression we've reached any type of final

16:04:52  5    determination.

6              THE COURT:  No one has reached any final

7    determination.  I'm just asking questions.  And I -- and I'm

8    asking questions because at least for the last two months,

9    this has all been under my watch.  And, candidly, there were

16:05:08  10   a whole lot of things that occurred shortly before the

11   receivership that the Court was not apprised of, and I would

12   have wanted to know.  And there may be some things going on.

13   I certainly wasn't aware that all of these people were gone.

14   So I'm asking some questions.

16:05:24  15       All right.  I guess, Mr. Barton, I accept the fact you

16   don't have any good answers, but that's the way it is.  You

17   were the chairman.

18       I think we've got Allison Edgerton here?  Maybe

19   Ms. Edgerton can share some light.

16:05:49  20             MS. EDGERTON:  Yes, Your Honor.

21             THE COURT:  Okay.  Ms. Edgerton, you were

22   formerly employed in the -- you were the compliance officer?

23             MS. EDGERTON:  No, sir.  I oversaw student

24   accounting.

16:06:00  25             THE COURT:  You oversaw student accounting.

1    Okay.

2            What was your formal position?

3                    MS. EDGERTON:  Assistant vice president of

4    student accounting.

16:06:07  5                    THE COURT:  Okay.

6            And when did you start at DCEH, and when did you

7    leave?

8                    MS. EDGERTON:  October of 2014 -- I'm sorry --

9    2012.  I've been there for 14-and-a-half years.

16:06:25 10                    THE COURT:  Well, wait a minute.  Let's go

11   back.

12           When did you leave?

13                    MS. EDGERTON:  I was officially terminated a

14   week ago, but came back in a capacity to help with teach-out

16:06:39 15   campuses.  So I'm not overseeing student accounting

16   currently.

17                    THE COURT:  All right.  So you were there up

18   until the beginning of March?

19                    MS. EDGERTON:  Correct.

16:06:47 20                    THE COURT:  All right.  Okay.

21           And you were there for how long?  Did you say 12

22   years?  14 years?

23                    MS. EDGERTON:  14-and-a-half years.

24                    THE COURT:  Okay.

16:07:02 25                    MS. EDGERTON:  Not in that capacity.

1    But . . .

2                    THE COURT:  All right.  When did you become

3    assistant VP of student accounting?

4                    MS. EDGERTON:  October of 2018.

16:07:17  5                    THE COURT:  All right.  Can you shed some

6    light as to how things worked with the certification of

7    student stipends, say, starting from October of 2018?

8         So that October, November, December, January.

9                    MS. EDGERTON:  Can you ask the question again?

16:07:39 10    I didn't hear you.

11                    THE COURT:  Is it correct that starting in

12    October of 2018, DCEH was required to certify to the

13    Department of Education that a student stipend had been

14    paid, and then after the certification, the Department of

16:07:58 15    Education would send the money to DCEH?

16                    MS. EDGERTON:  Yes.  What Mike Frola had said

17    on the phone was true, that we would self-certify through

18    our draw process, yes.

19                    THE COURT:  Okay.  Well, starting in -- what

16:08:14 20    was your job -- starting in October of 2018, what was your

21    responsibility in certifying or overseeing those

22    certifications?

23                    MS. EDGERTON:  I oversaw the department that

24    performed the draw process through G5.

16:08:33 25                    THE COURT:  All right.  Well, were the

1    certifications accurate?

2                    MS. EDGERTON:  To my knowledge.  Again, I

3    oversaw that department.  But, yes, I would imagine that

4    they were.

16:08:52  5                    THE COURT:  Well, you just heard that they

6    weren't.

7        Is this a surprise to you?

8        And, in fact --

9                    MS. EDGERTON:  Yes.

16:08:59  10                    THE COURT:  -- you were just -- you've been

11    working up until March 1st.

12        I mean, was it a surprise to you that --

13                    MS. EDGERTON:  Of course.  I have no knowledge

14    into what Mr. Linscott is talking about.

16:09:10  15                    THE COURT:  Well, who were the people who were

16    doing it under your direction?

17                    MS. EDGERTON:  He's talking about stipends.  I

18    mean, I can --

19                    THE COURT:  Well, you said you oversaw the

16:09:29  20    department that did the drawing and did the certification

21    and got the stipends.  All right?

22        You didn't -- I gather you didn't do the

23    certifications yourself?

24                    Someone did it under your oversight?

16:09:41  25                    MS. EDGERTON:  Correct.  That's the draw team.

1    We also have a student stipend team that actually posts

2    stipends.  So . . .

3                    THE COURT:  Well, ma'am, did you check to see

4    when those certifications were made, if the money had

16:09:56  5    actually been paid to the students?

6        Did you ever check?

7                    MS. EDGERTON:  Me, personally?  No.  No, I

8    didn't.  I had faith that my department was doing what they

9    were instructed to do.

16:10:07  10                    THE COURT:  And what?  Did you give them the

11    instructions that they were not to certify something to the

12    Department of Education unless -- until they had verified

13    that the money had been paid?

14                    MS. EDGERTON:  I don't think I understand your

16:10:24  15    question.

16                    THE COURT:  Well, why don't you explain to me

17    how you did your job, how you did your oversight.  Let's

18    start that way.

19                    MS. EDGERTON:  So I -- we also had some

16:10:45  20    transition in our process, that we went from HCM1, which was

21    through the end of December, into a different process at the

22    beginning of January, where the department was asking us for

23    different requirements in different --

24                    THE COURT:  I understand.

16:11:03  25        But under -- even without HCM1, all right, did the

1      process work -- you -- your school certified the Department

2      of Education, We've paid the stipends, and then you got the

3      money, right?

4           That's how the process worked, starting in October,

16:11:24  5      correct?

6                     MS. EDGERTON:  Correct.

7                     THE COURT:  All right.  Just explain to me

8      what you did on a day-to-day basis to determine if that was

9      happening, or that, in your belief, you believed it was

16:11:39 10      happening.

11           So what did you do to make sure it was happening?

12                     MS. EDGERTON:  I didn't follow up with my

13      department, you're right.

14                     THE COURT:  You didn't follow up at all?

16:11:56 15           Who told you that it was happening correctly?

16                     MS. EDGERTON:  My fiscal operations team did,

17      through our reporting process.  And we follow policies and

18      procedures to maintain that our restricted cash, we follow

19      up by requesting reports from BankMobile.

16:12:16 20           We get daily reports from our third-party vendor,

21      which is BankMobile.  We used our BankMobile reports to

22      determine that the stipend had been paid; not just paid to

23      the students' account, but had been issued to the students.

24           And that is the reporting process that we used to

16:12:38 25      ensure that the student stipend had been issued to the

1    student.  And if it had been issued to the student, cleared

2    through their ACH account by check after it had been issued

3    to the student, then that's how we ensure that, after it had

4    been issued to the student, then that student's disbursement

16:12:58  5    was cleared to draw through G5.

6        Having confidence in that process, then, that's how

7    I had confidence that the process was being carried out

8    accurately.

9                THE COURT:  Did you ever look at the

16:13:15  10    BankMobile third-party vendor reports?

11                MS. EDGERTON:  From time to time, yes.

12                THE COURT:  Did you ever compare a third-party

13    BankMobile report to the certifications that your people

14    were making to the DOE?

16:13:35  15                MS. EDGERTON:  Again, like I said, they're

16    self-certifying.  It's not an actual certification that they

17    make.  When they request the draw through G5, it's a

18    self-certification.

19                THE COURT:  Well, a self-certification means

16:13:51  20    that -- well, who signed the certification on behalf of DOE?

21                MS. EDGERTON:  They don't sign the

22    certification.  It's something that they click online.

23                THE COURT:  You mean, you --

24                MS. EDGERTON:  I'm sorry.  I don't have

16:14:08  25    detailed knowledge of this.  Is this something -- should

```
 1    I --

 2                    THE COURT:  Well, I don't know, ma'am.

 3                    MS. EDGERTON:  I feel like I'm being

 4    interrogated here.

 5                    THE COURT:  Well, you don't have to answer any

 6    questions.  But it appears -- it appears that under your

 7    watch, $16 million of student stipend money is gone.

 8                    MS. EDGERTON:  I don't believe that it was.

 9                    THE COURT:  Oh, good.

10          Well, where do you think it went?

11          So you think that -- that the money is there?

12          It doesn't seem to be in the student stipend accounts,

13    and the receiver hasn't found it.

14          Where do you think it is?

15                    MS. EDGERTON:  We didn't request the stipends.

16                    THE COURT:  So you didn't -- so the Department

17    of Education just sent it for nothing?

18          DCEH didn't request the stipends?

19                    MS. EDGERTON:  They did not request the

20    stipends from the department.  No, they did not.

21                    THE COURT:  Well, Mr. Frola, did you determine

22    why the Department of Education sent the money?

23          Didn't someone ask --

24                    MR. FROLA:  They self-certify, as we all

25    agree, that they draw down a certain amount of money.  And
```

16:14:13  5

16:14:31  10

16:14:48  15

16:15:08  20

16:15:33  25

1    as we talked about earlier, some portion of that is

2    attributed to the student as a stipend, if they borrow above

3    the cost of their education for tuition.

4        That money, as far as we know, was not paid.  And

16:15:50  5    that's what they attest to.

6            THE COURT:  Well, ma'am, you've described this

7    self-certification.  You click something online.  So someone

8    in your department clicked or, you know, went through the

9    program and said, We have paid the stipends.  Give us the

16:16:12  10   reimbursement.

11       And that's how the money came, right?

12           MS. EDGERTON:  Correct.  After the money comes

13   into the bank account, I don't have access to the bank

14   accounts.  I do not know what happens to the money after it

16:16:25  15   comes into our bank accounts.

16           THE COURT:  Right.  That isn't the problem.

17   The problem is on the first end, that the money wasn't paid

18   to the students in the first place.  You weren't allowed to

19   get the money from DOE until you had certified you had paid

16:16:39  20   it to the students.

21       I'm trying to find out who was in charge of looking at

22   the BankMobile reports to say, All right.  I see that

23   students Polster and Parker got their stipends, click.  We

24   got to get it back from DOE.

16:17:00  25           Who was supposed to look at the BankMobile reports to

1  verify that?

2          MS. EDGERTON:  Yes, sir.

3          THE COURT:  Well, who was supposed to do that?

4          MS. EDGERTON:  My fiscal team.

16:17:15  5          THE COURT:  All right.  If they didn't do it,

6  do you have any idea why they didn't do it?

7          MS. EDGERTON:  No, sir.

8          THE COURT:  Am I correct that you did not

9  instruct them not to do it?

16:17:37  10          MS. EDGERTON:  No, sir.

11          MR. GURBST:  Your Honor, Richard Gurbst.

12      May I be heard?

13          THE COURT:  Yes, Mr. Gurbst.

14          MR. GURBST:  I know you don't mean for it to

16:17:46  15  be an interrogation, but it's sounding that way.  I don't

16  think it's the time or place.

17      And it's certainly believed that a person should have

18  a lawyer, if that's where we're going here, Your Honor.

19          THE COURT:  Well, I'm just -- that's fine.

16:17:58  20  I've asked my questions.  And I'm -- I was particularly

21  asking them because Ms. Edgerton continued to work up until

22  last week, all right, so it surprised me.

23      I sort of -- somehow, I thought you had left with all

24  the others in early January.

16:18:25  25      My last question is, are any of these people, your

1    fiscal team, ma'am, are they still there at DCEH, or are

2    they all gone?

3                    MS. EDGERTON:  No, they're still there.

4                    THE COURT:  Okay.  All right.  I would

16:18:53  5    strongly suggest that -- oh, Mr. Linscott.

6         Mr. Linscott, I suggest that you talk to these

7    people -- they're still there -- and ask them what happened.

8    All right?

9         I mean, I -- I'm sort of surprised.  I figured all

16:19:32 10    these people had gone, weren't there, but they're still

11    working, and they're still getting paid.

12         And, quite frankly, if -- they're working there and

13    getting paid under my supervision and Judge Parker's

14    supervision.  And if you think that they did something wrong

16:19:56 15    before, I want to make sure they're not doing something

16    wrong now.

17                    MR. LINSCOTT:  Yes, Your Honor.

18                    THE COURT:  Because that's on my watch.  So

19    that's an order, to figure out what -- talk to them, and ask

16:20:08 20    them some poignant questions.

21                    (Discussion held off the record.)

22                    THE COURT:  Well, good point.

23         Why don't you --

24                    MAGISTRATE JUDGE PARKER:  All right.

16:20:31 25         For Ms. Edgerton -- and you can answer from wherever

1    you went off to.

2          Ma'am, you've indicated that -- in response to

3    Judge Polster's questions, that there was, under your

4    management, something you described as a draw team, a

16:20:45 5    student stipend team, and then a fiscal ops team.

6          Are the draw and student stipend teams both subset of

7    fiscal ops?

8                     MS. EDGERTON:  No.  The draw team and the

9    fiscal ops team are the same team.

16:20:57 10                     MAGISTRATE JUDGE PARKER:  All right.  So it's

11    the same team.

12          And then student stipend, is that a separate group of

13    people?

14                     MS. EDGERTON:  It is.

16:21:00 15                     MAGISTRATE JUDGE PARKER:  Were they also under

16    your supervision?

17                     MS. EDGERTON:  Yes.

18                     MAGISTRATE JUDGE PARKER:  And the individuals

19    who are part of the student stipend team, to the best of

16:21:10 20    your knowledge, are they still employed?

21                     MS. EDGERTON:  Three of them.

22                     MAGISTRATE JUDGE PARKER:  Three of them.  All

23    right.

24          Now, Ms. Whitmer, the other day, in the hearing we had

16:21:21 25    Friday, you described a process by which you and/or the

1    receiver's counsel had come to some conclusions about the

2    alteration of financial records.

3        Have you spoken to these individuals that Ms. Edgerton

4    has referred to?

16:21:34 5                MS. WHITMER:  No, I had not.

6                MAGISTRATE JUDGE PARKER:  Do you have the

7    names of those people?

8        Who is on the student stipend team, for example, or

9    the fiscal ops team?

16:21:45 10               MS. WHITMER:  No, Your Honor.  We have not

11   completed a detailed investigation.

12               MAGISTRATE JUDGE PARKER:  All right.  You were

13   kind enough to provide the Court with one sample of one

14   student's account that showed monies being credited, credits

16:21:59 15   being backed out, payments being applied, payments being

16   backed out and so forth.

17       That was an example, as I took it, of information that

18   you had uncovered of this so-called alteration of records,

19   correct?

16:22:14 20               MS. WHITMER:  Yes.  The student sent -- the

21   individual student -- the name was redacted -- the student

22   sent that to me.  And I saw the credit account, and then the

23   bringing of that credit account balance to zero.  And then

24   the voiding of that entry because the student had not -- I

16:22:37 25   thought because the student had not received a stipend.

1              MAGISTRATE JUDGE PARKER:  The question I had

2      is, you presented to the Court as an example of what you had

3      reason to question concerning the handling of funds?

4              MS. WHITMER:  I presented it to the Court

16:22:50 5     because after I had listened to what the Department of

6      Education had told me, and after I listened to what was said

7      in the conference of February 20th, it was a corroboration

8      of what I understood the situation to be.

9              MAGISTRATE JUDGE PARKER:  All right.

16:23:09 10         So at least now we know from Ms. Edgerton, who the

11     categories of people are to speak to to get further

12     clarification of this handling of funds.

13         And most precisely, how it was that the -- whether it

14     was a self-certification or otherwise, how it was that the

16:23:26 15    DCEH represented to the United States Government that it was

16     entitled to receive Government funds.  That's what we want

17     to know.

18              MS. WHITMER:  Yes.  I didn't understand the

19     self-certification piece.  I thought they were actually

16:23:37 20    certifying by sending electronic documents.  Because

21     I -- that's how I understood it.  But . . .

22              MAGISTRATE JUDGE PARKER:  All right.  Thank

23     you.

24         Thank you, ma'am.

16:23:44 25              THE COURT:  Thank you, ma'am.

1          All right.  I think Judge Parker and I have asked the

2     questions we need to answer, and we have the information we

3     need.

4          There are a whole lot of folks here who have been

16:24:23 5     absorbing this.  Some of you have spoken.  Some of you

6     haven't.  I certainly don't want everyone here to speak.

7          But if there's anyone here who thinks they have

8     something -- something important to contribute on what we've

9     asked, I would certainly entertain you to speak.

16:24:51 10               MR. STAVOLE:  Your Honor, Bill Stavole on

11     behalf of 3601 Sunflower, LLC.  We're one of the landlords

12     out in California.

13          I know you spoke earlier about the landlords who

14     weren't getting paid, and that that was going to end.

16:25:07 15          All of the schools have been closed, except two, that

16     were in the receivership.  I just want to get clarification

17     that as of today, those premises are surrendered to the

18     landlords, and the stay is lifted as to those landlords so

19     that we can get our premises back.

16:25:20 20               MAGISTRATE JUDGE PARKER:  Which school is

21     yours?

22               THE COURT:  Which school is this, sir?

23               MR. STAVOLE:  This is one out -- it's in

24     Orange County.  It's an Argosy University school.  Which --

16:25:28 25               THE COURT:  Yeah.  My only concern is, if

```
 1            there are student records in there, sir --

 2                      MR. STAVOLE:  Correct.

 3                      THE COURT:  -- those need to be preserved.

 4                      MR. STAVOLE:  Correct.

 5                      THE COURT:  Because -- for obvious reasons.

 6                 Yeah, those properties have been surrendered.

 7                      MR. STAVOLE:  Thank you, Your Honor.

 8                      THE COURT:  I mean, Mr. Dottore, Mr. Glickman,

 9            I mean, I want to make sure that student records are

10            preserved and transmitted to the receiver.

11                 Is there any other important property there?

12                      MR. GLICKMAN:  Yeah.  In some instances, for

13            example, as Mr. Dottore described, at the school where

14            nursing was being taught, there are assets that we're using

15            to gift to another university so they'll teach-out those

16            nursing students.

17                      THE COURT:  Well, you need to make

18            arrangements to immediately -- you know it's not fair.

19            These landlords haven't been paid.

20                 Now, they're not going to be paid because their

21            schools aren't there, and they should be able to rent that

22            property to someone else.

23                      MR. GLICKMAN:  You've identified the most

24            important issue, however.  It's the student records issue.

25            We need to be able to access the site so we can at least get
```

1    the students' records and preserve them.

2              THE COURT:  Judge Parker is pointing out that

3    most of these records should be online, but maybe they

4    weren't.  So they need to be preserved.

16:26:48  5              MS. WHITMER:  Some of the records go back

6    years.  So -- and they are very voluminous.

7         In some cases, the state regulators will take them,

8    and we don't have to, you know, secure them --

9              THE COURT:  The point is, I don't want them

16:27:00 10    destroyed or lost.

11              MS. WHITMER:  We'll shake a leg, Your Honor.

12              THE COURT:  So I'd say to any landlord, you've

13    got to preserve student records, and in a safe place, until

14    the receiver gets them.  And if they're there -- I guess

16:27:16 15    Mr. Dottore, Ms. Whitmer, you know where there are valuable

16    assets somewhere else, you can talk to those landlords and

17    get that done.

18              MR. DOTTORE:  Right.  Some of the assets, Your

19    Honor, aren't owned by the receivership.  They're owned by

16:27:30 20    others.  Some are owned by the South entities; some are

21    owned by the AI entities.  But Mr. Altorelli and I have been

22    working together to give -- to either give the assets back.

23         But in the end, we're going to have to sort out who

24    owns what assets.  But I will get them out of the building.

16:27:44 25              THE COURT:  The main thing is to get them out

1    of the building so the landlord can rent the premises

2    somewhere else.  They are already out a lot of money.

3                    MR. DOTTORE:  I've already hired a company --

4                    THE COURT:  And that bothers me because that

16:27:54  5    was on my watch.  I'm making sure that that's over.

6                    MR. GLICKMAN:  Judge, we've entered into

7    several agreed orders with landlords that are on the docket

8    pending the Court approval that resolves the issue, at least

9    for those landlords.  It gives us a certain amount of time

16:28:09  10    to come get the information.

11                    THE COURT:  Well, if you get those to me,

12    we'll -- and any agreements you have, Mr. Glickman, we'll

13    enter immediately.  All right?  We'll enter those

14    immediately.

16:28:17  15                    MR. STAVOLE:  And, Your Honor, on behalf of

16    Sunflower, there is no agreement in place just yet.  There

17    is one being negotiated, but it is not in place yet.

18         And all we're asking is that if the Court indicates

19    that the premises are surrendered as of today, it allows the

16:28:30  20    landlord to regain their space.

21                    THE COURT:  All right.  The premises are

22    surrendered.

23         But, again, if there's something of value, you can't

24    just -- you know, got to preserve that, sir.

16:28:38  25                    MR. STAVOLE:  I understand.  All right.

1          Thank you, Your Honor.

2                    THE COURT:  Okay.

3                    MR. ROTHSCHILD:  Your Honor, Eric Rothschild

4     on behalf of the Dunagan plaintiffs.

16:28:47  5     I want to -- I'm still uncertain about what the scope

6     of the receivership will be going forward.  I understand

7     there's this important issue of the platform, but it's not

8     clear to me whether other responsibilities that DCH has, and

9     now, the receiver has, will be undertaken by this receiver.

16:29:04 10     And there are two issues:  One that we've spent a lot

11    of time on, the stipends, and another that we spent less

12    time on, the consent judgment, which I think are being

13    treated by the receiver as if they are part of the normal

14    collection of assets.  But these are actually obligations

16:29:22 15    which are exigent for the students who are trying to

16    complete their education.  So the stipends, we're very

17    familiar with.

18          The consent judgment involves an obligation that DCEH

19    has to students, like my clients, to remedy having been

16:29:39 20    misled about their education, that it was unaccredited, and

21    they need that remedy to complete their education, having

22    been cheated out of it.

23          And what we're hearing about, the stipends, which is

24    not --

16:29:56 25                    THE COURT:  Let's slow -- I mean, I

1       don't -- there isn't anything this receiver can do about

2       some misrepresentation, sir, that happened in the past about

3       accreditation.

4                        MR. ROTHSCHILD:  Well, the receiver, or DCEH,

16:30:09   5    which the receiver now is, has an obligation under a consent

6       judgment with States Attorneys' Generals to remedy that.

7       And so that's -- that is an existing and immediate

8       obligation to these students, which is necessary for them to

9       continue their education.

16:30:25  10        And I do feel like --

11                       THE COURT:  I don't understand.  I mean, these

12      schools are closed.  There are only a handful that are open.

13                       MR. ROTHSCHILD:  So, for example -- so, for

14      example, one -- and it wasn't done pursuant to the consent

16:30:42  15    judgment, but the DCEH promised those students who schools

16      were closed -- and this was actually -- they were closed

17      before the receivership -- DCEH promised that they would pay

18      them a tuition grant of $5,000.  And one of our clients is

19      actually waiting for that money.

16:30:58  20        That's not materially -- the stipend is a very unusual

21      issue, because it seems like funds were actually diverted.

22      But this is something that students were promised to

23      continue their education after the misrepresentation about

24      accreditation was exposed and the schools were closed.

16:31:18  25        And, again, with both that obligation and the stipend

1    obligation, what I'm hearing from the receiver is, you know,

2    We will get to that in good time.

3        And there's actually -- we've heard things from the

4    receiver that -- about what they've learned about the

16:31:36  5    stipend issue, which I feel like are not being run to

6    ground.

7        We heard in the last hearing that on February 20th,

8    they talked to employees who were involved in the altering

9    of the students' accounts, and they explained what happened.

16:31:50 10   And yet, we have not heard here, in this Court, what

11   happened or who directed it.

12       And I realize we can get to all of that in good time,

13   but these are issues that for students affected, are

14   exigent.  The money that was diverted from them is money

16:32:10 15   they need to continue --

16                THE COURT:  Sir, that's apparent.  And it's

17   not for me to trace where it went.

18       I'm assuming it went into operations.  And, you know,

19   there was obviously far more money -- the burn rate for

16:32:25 20   these operations was far more than they were bringing in.

21   And that's why we either needed a receiver or bankruptcy.

22                MR. ROTHSCHILD:  Well, Your Honor that's

23   what's been stated, are operational expenses.  And that may

24   be true.  But this money should have come into segregated,

16:32:42 25   identified accounts.

1          THE COURT:  Well, it didn't.  All right?  We

2   know that.  It didn't.

3      So I don't --

4          MR. ROTHSCHILD:  Well, I don't think that's

16:32:46  5   been represented, Your Honor, respectfully, that that money

6   should have been --

7          THE COURT:  It would still be there, and the

8   receiver would be able to pay the -- you know, restore the

9   stipend.

16:32:56 10          MR. ROTHSCHILD:  Or the money came into there

11   and then went out.  And if there are these segregated

12   accounts, then tracing where that money went is actually not

13   that difficult.

14      So either the answer is, there were no segregated

16:33:09 15   accounts, and we should know that or --

16          THE COURT:  All right.  Sir, I don't really

17   understand the import of what you're trying to ask me to do.

18          MR. ROTHSCHILD:  I think the issue, Your

19   Honors, is whether this receiver is going to continue with

16:33:22 20   responsibility over these issues.

21          THE COURT:  Well, I don't even know what these

22   issues for the consent judgments are.  I wasn't apprised of

23   any of this when the receivership was created.  And, quite

24   frankly, there isn't a lot I can do about it, that I can

16:33:36 25   see.

1          So what specifically are you suggesting that I

2     direct -- or Judge Parker and I direct the receiver to do?

3                    MR. ROTHSCHILD:  Your Honor, what I believe

4     I've heard today is that the receivership was going to

16:33:45  5     continue for a reason that wasn't even presented to the

6     Court when it started, which is, this understandably

7     important computer platform.

8          And I'm uncomfortable, given what has transpired --

9     this consent judgment being a good example -- that the

16:34:00 10     receiver had agreed with the states to let any court that he

11     applied to for receivership to know about, but didn't.  So

12     we had to do that, and now the settlement administrator for

13     the consent judgment has come in.

14          So these are the types of issues that are right now

16:34:17 15     under the stewardship of the receiver that we don't feel

16     like the receiver is attending to appropriately.

17                    THE COURT:  All right.  Sir, with all due

18     respect, it's just a lot of words.

19          Can you succinctly say what it is you want me to

16:34:29 20     direct the receiver to do?

21          If I can, I'll consider it.  If you can't, then let it

22     go.

23                    MR. ROTHSCHILD:  Your Honor, one of the

24     issues -- the issue that brought us together today was

16:34:38 25     whether the receiver should continue to administer --

1           THE COURT:  I've got no choice.  I've got to

2      continue the receiver.  We understand why, because if I

3      don't, then another 15,000 students are going to be in a

4      huge mess, and who knows how many millions of dollars of

16:34:52  5      public funds will be lost.

6           MR. ROTHSCHILD:  Well, I will sit down after

7      this.

8        But I'm not sure why this receiver, with his

9      complement of colleagues, is different or better than

16:35:02  10      Studio, who has agreed they would take it over for 2

11      million, or a bankruptcy trustee.

12        I'm not understanding the reason why that is going to

13      keep this receiver in office for six months, while these

14      other issues are, you know, we feel, not being appropriately

16:35:19  15      addressed.

16           MAGISTRATE JUDGE PARKER:  All right.

17      Mr. Rothschild, you appeared in my Court on Friday.  You and

18      I spoke at that point in time.  You made it clear that you

19      represent students who are at a school that closed in

16:35:31  20      December, a pre-receivership.  I understand that you have

21      criticisms of the receiver.

22        You have indicated to the Court that from your

23      perspective, the receiver has ongoing objections on the part

24      of DCEH to comply with these various state consent

16:35:48  25      judgments.

1        As was pointed out in Court Friday, when you were

2   there, this receiver is only now compiling information on

3   exactly what those obligations are.

4        Mr. Ehrman said to me Friday that he's digging into

16:36:02  5   that topic.  It's a complicated topic.  There are

6   representatives, Mr. Selby and Mr. Keating, here on behalf

7   of one of the State Attorney General cases.  Perhaps, they

8   could comment.

9        But beyond saying in a generic fashion, that as long

16:36:18 10   as the receiver is in command of DCEH, the receiver's

11   obligated to comply with consent judgments, I don't know

12   what more we can say to you.

13        You've indicated that one of your clients -- one of

14   your four clients believes he's entitled to $5,000 under a

16:36:34 15   corrective action plan that you believe is the obligation of

16   the receiver.

17        So our advice to you at this point is not to ask for

18   an order of the Court, but to interact with the receiver to

19   see about getting those funds, if funds are available.

16:36:48 20        But beyond that, you've got a noncertified class of

21   people that you seek to represent and no other claims.  So I

22   question whether your clients have standing to even ask the

23   Court to begin to enter those kinds of orders.

24        So I appreciate you being here.  You're obviously an

16:37:04 25   articulate representative for your clients.  You're doing a

1  good job doing so.  But it's pretty clear where the

2  direction of this hearing is going.

3        And I should clarify that in the very motion for the

4  appointment of a receiver, it was represented to the Court

16:37:16  5  that one of the problems the receiver had was dealing with

6  this combined administration of all these entities.

7        And when the Studio lawsuit got filed, it was further

8  represented to the Court that some of the difficulty in

9  dealing with Studio was the fact that there's this combined

16:37:34 10  administration of these universities, the very thing we've

11  been talking about today.  That's the only reason this

12  receivership is continuing on past today.

13        So thanks for being here.

14                    MR. ROTHSCHILD:  Thank you, Your Honor.

16:37:49 15                    MAGISTRATE JUDGE PARKER:  Is there someone for

16  Intervenor Tom Perrelli that wishes to address the Court?

17                    MR. SELBY:  Yes, Your Honor.  Ric Selby.

18        Your Honor, Ric Selby.

19                    MAGISTRATE JUDGE PARKER:  If you could, just

16:38:08 20  indicate what Perrelli's position is.  And there have been

21  questions asked to the Court regarding this ongoing

22  obligation of the receiver on behalf of DCEH to comply with

23  terms of consent judgments.

24        We've not been furnished with consent judgments.  We

16:38:24 25  don't know the detail of those obligations.

1          MR. SELBY:  Your Honor, we filed a motion to

2    intervene several weeks ago, and the consent judgment is

3    attached to that as an exhibit.

4          MAGISTRATE JUDGE PARKER:  All right.  For one

16:38:36  5    of the states?

6          MR. SELBY:  No.  For all of them.

7       So there was an action brought in Kentucky on behalf

8    of 40 different Attorney Generals dealing with the conduct

9    of Dream Center's predecessor.  That resulted in a

16:38:52 10    settlement on a consent judgment.  Tom Perrelli was the

11    settlement administrator of that.

12       Under that settlement, there were ongoing obligations

13    regarding whoever was running and operating these schools to

14    not engage in fraudulent or misleading conduct with the

16:39:13 15    students.  That was the subject of that original action.

16       As it relates to this particular matter, there are a

17    number of reasons why we at least wanted to have a seat at

18    the table.

19       With respect to schools that were going to continue to

16:39:32 20    operate, obviously, you know, they need to be under the same

21    rules as they were before this.

22       But as schools are being sold, and as they're being

23    shut down, their obligations under the consent judgment with

24    respect to schools that are sold, there are provisions that

16:39:51 25    under certain circumstances, predecessors are going to be

1    bound by this consent judgment.

2        And likewise, when schools are closed, there are

3    communications that are made to the students.  Under

4    Department of Education rules, when a school closes, there

16:40:12  5    are opportunities for students to apply to have their

6    student loans forgiven.  And there's a program to do that.

7    Part of if these schools are closed, that that's being

8    communicated.

9        I know Brian Hauck, who we've been dealing with, has

16:40:30 10    been dealing with the receiver.  Our understanding is that

11    those communications are being made in the way -- and we

12    don't have any current concerns with what is being

13    communicated to those students.

14        However, there are -- prior to the receivership being

16:40:46 15    put into place, there were two schools, the Art Institute of

16    Illinois, and the Art Institute of Colorado, that had

17    accreditation issues, and there were -- the students were

18    not -- it was not communicated to the students that the

19    accreditation has ended.

16:41:08 20        As a result of that, there was a procedure under the

21    settlement -- the consent judgment with DCEH, the entity in

22    receivership, that when there were violations, that you

23    would work out a remedy for that violation.

24        There were ongoing communications.  The last

16:41:29 25    communication from DCEH before the receiver was put into

1    place was that they were going to refund 3.07 million, I

2    believe it was, to those students as a result of those

3    accreditations.  And that's an obligation of DCEH.

4        We've been communicating with the receiver regarding

16:41:48  5    that.  Obviously, we have an interest that those students

6    are paid.  You know, we would argue that to the extent this

7    money came in through some type of fraudulent means, that it

8    should be held in constructive trust for these students.

9        But, in any event, how that gets paid out is probably

16:42:10  10    a preliminary matter.  But we do -- we've asserted that

11    interest.

12        And we also -- the stipend interest, to the extent

13    that communications were paid to student, that comes under

14    our purview.

16:42:22  15             THE COURT:  All right.  Thank you.

16        Look, it should be abundantly clear to everyone that

17    there will be a voluntary or involuntary bankruptcy when

18    this receivership ends.  And so a lot of these issues are

19    going to have to be -- they'll be claimed in the bankruptcy

16:42:40  20    case.

21             MR. SELBY:  We understand.  We just wanted --

22             THE COURT:  But I think -- look, I want to

23    make sure if there are any ongoing obligations in a consent

24    decree that apply to an ongoing university, that needs to be

16:42:55  25    complied with, and the receiver will do it.

1      If this is dealing with something that happened in the

2    past, or the school is closed, there isn't much that can be

3    done at this point.

4            MR. SELBY:  We understand that.  And we've had

16:43:06  5    those communications with the receiver.

6      I think the indications we've gotten from everybody is

7    that they are communicating the appropriate things to those

8    successor schools and to the students.  And, obviously, if

9    we hear differently -- but all of that is in our motion to

16:43:20 10    intervene, which I don't believe has been ruled on yet.

11      So I bring that to your attention.

12            THE COURT:  Okay.

13            MR. SELBY:  All right.  Thank you, Your Honor.

14            THE COURT:  All right.  Anyone else?

16:43:38 15            MR. ALTORELLI:  Yes, Your Honor.

16      Since it seems like we were the one that maybe

17    persuaded you to keep the receivership, I just want to point

18    out a couple of things that would helpful to you in that

19    process.

16:43:53 20      We had three separate deals that haven't been honored

21    since we began.  We had a deal to acquire the AI institutes.

22    That didn't happen.  We then, at the behest of the

23    parties --

24            THE COURT:  You got a settlement now.  And I

16:44:09 25    want to address --

1        MR. ALTORELLI:  I just want to point out --

2        THE COURT:  I mean, I will address that.  The

3   hearing is scheduled for a week from today.

4        MR. ALTORELLI:  Yes.

16:44:17  5      I just want to point out, though, none of the

6   agreements that we've ever signed has been honored.  So if

7   the settlement is not honored, we'll be back here, right,

8   and you'll, then, probably want to do a Chapter 11.

9        So I just want to be clear that we're ready, willing,

16:44:28  10  and able, but we can't control the other parties.  So I was

11  just saying that --

12        THE COURT:  The agreement, it's with the

13  receiver.  As long as the receiver is there, it's going to

14  be complied with.

16:44:38  15        MR. ALTORELLI:  Okay.

16        THE COURT:  That's how --

17        MR. ALTORELLI:  We'll reserve on that, then.

18  I hope so.

19        THE COURT:  Well, I mean, that's the whole

16:44:43  20  point of this.  And there have been a couple of objections

21  filed.  The receiver will be responding to that.  And I'll

22  have a hearing next Monday, and we'll rule on it.

23        MR. ALTORELLI:  Fair enough.

24        MS. AWED:  Your Honor, student intervenor.  I

16:45:10  25  actually want to ask Michael Frola a question.

114

1          THE COURT:  Okay.

2          MS. AWED:  In early January, the lawsuit --

3          MR. JACOBSON:  I'm sorry.  This is

4    Jonathan Jacobson.  I'm Mr. Frola's attorney in this

16:45:26  5    hearing, and I'm speaking on behalf of the United States.

6      Mr. Flora has been produced voluntarily here to -- you

7    know, to answer limited questions of the Court.  To the

8    extent that an intervenor or a party to the litigation would

9    like to seek testimony from Mr. Flora as a nonparty to the

16:45:44  10    litigation, you would have to go through our Touhy

11    regulations.

12          THE COURT:  Good luck with that.  You'll

13    get a -- that's an editorial comment.

14      You'll get a good legal education to add to the good

16:45:58  15    one you're now getting.

16          MS. AWED:  Thank you.

17          THE COURT:  All right?

18          MS. AWED:  And I wanted to clarify about the

19    two pay cycles.

16:46:03  20      When do they start and end?  When does the month --

21          THE COURT:  Good question.  I thought, ma'am,

22    that they're -- good point.

23      When -- the two pay cycles, when do they start?

24          MR. DOTTORE:  One is coming up, and then

16:46:16  25    there's one two weeks from that.

1              MS. AWED:  Can I get dates, please, because I

2       don't --

3              THE COURT:  Yeah.

4              MR. LINSCOTT:  The next payday is this coming

16:46:25  5       Friday.

6              THE COURT:  So it covers this Friday, and then

7       two weeks from this Friday?

8          Or is that -- that's only two weeks and three days.

9       That's a short four weeks.  So --

16:46:44 10             MR. LINSCOTT:  So the payroll that's being

11      paid Friday for a pay period that ended last Friday.  So two

12      pay cycles would be this Friday, and then two weeks from

13      this Friday.

14             MS. AWED:  But the pay cycles are two weeks'

16:47:00 15      long at our school.

16             THE COURT:  Well, that's what we've got.  So

17      we got Friday, the 15th, that's this Friday, and Friday,

18      March 29th.

19         Are those the two pay cycles?

16:47:13 20         Well, Studio is going to be running the school.  So

21      they -- you know, they're going to be running it.  So it's

22      been represented, ma'am, that that will keep the schools

23      open through the end of the March, and that's sufficient for

24      everyone to graduate and get their credits.

16:47:30 25             MR. DOTTORE:  Actually, Your Honor, if Studio

1    takes it, it would run -- continue --

2             THE COURT:  Well, understood, Mr. Dottore.

3    But in case they don't, I mean, the idea, and what was

4    important to me was, to make sure that these law students

16:47:44  5    get their credits and -- at least for this year.

6         I know, you know --

7             MR. GLICKMAN:  Judge, if Mr. Altorelli will

8    confirm, we'll put a motion on the record, along with an

9    exhibit, asset purchase agreement, to convey the law school

16:47:59 10    to Studio or its designee during the period of time these

11    pay cycles are going on.

12             THE COURT:  All right.  That will be very

13    good.  We'll grant it.  No one is going to object to that.

14             MS. AWED:  I just have one last question

16:48:14 15    regarding the student stipends -- or, actually, a comment.

16             THE COURT:  Yes.

17             MS. AWED:  You were saying that we would just

18    have to get our student stipends in the bankruptcy court?

19         Like, there's no chance of us getting them anymore?

16:48:27 20    We just have to wait for everything to --

21             THE COURT:  Ma'am, I don't -- the receiver

22    doesn't know what happened to the money.  All right?

23         They may be able to find out by questioning some of

24    the people we've suggested they question.

16:48:42 25             MS. AWED:  Okay.

1          THE COURT:  If they have the money, they have

2     the money.  But the money does not seem to be there.  So

3     maybe you got to pursue it in bankruptcy.

4          MS. AWED:  I thought that Ms. Whitmer said at

16:48:57  5     the Friday hearing, that there was 1.5 million of student

6     stipends available.  I'm not sure if I remember correctly.

7          THE COURT:  I think she said there's

8     1.5 million in the receiver's accounts.

9        Ms. Whitmer, Judge Parker asked if she knew whether

16:49:10 10     any of that was student stipend money, and I think she said

11     not.  If it turns out that any of the money that the

12     receiver has is student stipend money, that money will go to

13     the students.

14          MAGISTRATE JUDGE PARKER:  Well, they have to

16:49:26 15     make a decision on which of the students get --

16          THE COURT:  But they have to determine which

17     of the students.  Or maybe do it on a pro rata basis.

18          MS. AWED:  Well, there's not many left now.

19          MS. WHITMER:  Your Honor, I --

16:49:35 20          THE COURT:  So I don't know the answer to any

21     of that.

22          MS. WHITMER:  With regard to that million and

23     a half, I believe that it is subject to equitable tracing so

24     that -- and the rules of that are -- you know, they're in

16:49:49 25     the law.

1    One of the things that's interesting about the student

2    stipend money is that the department advanced it not as

3    stupid stipend money, but as a reimbursement.  So that, you

4    know, I don't believe --

16:50:03  5            THE COURT:  Yeah.  It was a reimbursement to

6    the school.

7            MS. WHITMER:  Correct.

8            THE COURT:  A representation that the school

9    had paid the money to the students.

16:50:11 10           MS. WHITMER:  Correct.

11           THE COURT:  So it's not technically student

12   stipend money.  It was designed to go into the operating

13   account to reimburse the school for what it represented had

14   been paid to the students.

16:50:22 15       So legally, I don't know what -- so --

16           MS. WHITMER:  So that million and a half is

17   frozen, and -- until we determine who it should be paid to.

18           THE COURT:  Right.

19       It's -- that's the correct answer, and that's the

16:50:37 20  correct response, ma'am, to your question.

21           MS. AWED:  Okay.  Thank you.

22           THE COURT:  It's frozen --

23           MS. AWED:  Thank you, Your Honor.

24           THE COURT:  -- upon further order of the

16:50:44 25  Court.

1    Okay. Well, again, I appreciate everyone appearing

2    today. We're going to continue the receivership. We made

3    certain changes to make sure that no premises will be

4    occupied without payment to the landlord. And so we've got

16:51:06  5    a -- up to 15 days for Art Institute --

6               MS. WHITMER: Las Vegas.

7               THE COURT: -- Las Vegas. Right. LV. Thank

8    you.

9    Art Institute Las Vegas. To have some resolution of

16:51:28  10   Art Institute Las Vegas, and the Court will be advised. And

11   they'll be paying, roughly, the $3,500-a-day rent. And

12   we'll get further advice on that.

13   We have worked things out -- law school is worked out.

14   And --

16:51:58  15              MS. AWED: Your Honor, I'm sorry. I actually

16   have one more question.

17              THE COURT: Well, let me complete this.

18   Well, we've determined that South University is paying

19   the rent for -- is it Novi, Michigan, and Cleveland. So

16:52:21  20   that's taken care of.

21              MR. GLICKMAN: No. Judge, South University is

22   conducting the teach-outs at different facilities. So those

23   are --

24              THE COURT: All right. So no rent is being

16:52:33  25   paid, right. So no rent is being paid, and those premises

1       are vacated.  So the only premises -- the only premises

2       that's being occupied are Las Vegas, and we're taking care

3       of that with daily rent, and the law school, and that's

4       being covered.

16:52:48  5       And we're going to keep the receivership in place, not

6       indefinitely, but for a limited duration, and I'm going to

7       say not to exceed six months, for some transition of the

8       platform.  Either a new one, or someone taking it over so

9       that those schools can continue to operate, and the students

16:53:16 10      aren't comprised.

11      Right.  And I would like the -- I would like the

12      receiver to give the -- file with the Court a plan, detailed

13      plan for that transition, just so we know what's going to

14      happen over that period, and who is going to do what.

16:53:40 15      And, of course, we have the hearing next Monday, at

16      1:30, on the Studio -- motion to approve the Studio

17      agreement.

18                  MR. DOTTORE:  Is that with you, Your Honor, or

19      Judge Parker?

16:53:58 20                  THE COURT:  I think both of us.  We make a

21      pretty good team.  Judge Parker reminds me of all the things

22      that I've forgotten.  So I need that.

23      Okay.  Thank you for everyone's appearance, and the

24      hearing is adjourned.

16:54:15 25      Well, one short question.

1          MS. AWED:  Marina Awed, student intervenor.

2      You said that they have to pay the landlords while

3  those schools continue to operate.

4      What about when the school has, like, backpay?

16:54:34  5          MS. WHITMER:  I'm sorry.  What about --

6          MS. AWED:  If the school --

7          THE COURT:  I'm not giving any orders with

8  back rent, ma'am.  I can't worry about the past.

9          MS. AWED:  Okay.  I was just wondering.

16:54:43  10      Thank you.

11          THE COURT:  My obligation is to make sure that

12  no landlord continues to provide facilities without getting

13  paid.

14          MS. AWED:  Okay.  Thank you, Your Honor.

16:54:51  15          THE COURT:  Okay.  We're adjourned.

16      Thank you.

17                          - - -

18          (Proceedings adjourned at 4:54 p.m.)

19                  **C E R T I F I C A T E**

20

21      I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24  */s/ Donnalee Cotone          14th of March, 2019*
    DONNALEE COTONE, RMR, CRR, CRC                    DATE

25  Realtime Systems Administrator