1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3    ------------------------------X
     Digital Media Solutions,      :  Case No. 1:19-cv-00145
4    LLC,                          :
                                   :  Cleveland, Ohio
5              Plaintiff,          :
                                   :  Monday, March 18, 2019
6         v.                       :  1:51 p.m.
                                   :
7    SOUTH UNIVERSITY OF OHIO,     :
     LLC, et al.,                  :
8                                  :
               Defendants.         :
9    ------------------------------X

10

11            TRANSCRIPT OF MOTION HEARING PROCEEDINGS

12            BEFORE THE HONORABLE DAN AARON POLSTER

13                 UNITED STATES DISTRICT JUDGE

14                            And

15            BEFORE THE HONORABLE THOMAS M. PARKER

16               UNITED STATES MAGISTRATE JUDGE

17

18   Court Reporter:          Donnalee Cotone, RMR, CRR, CRC
                              Realtime Systems Administrator
19                            United States District Court
                              801 West Superior Avenue
20                            Court Reporters 7-189
                              Cleveland, Ohio 44113
21                            216-357-7078
                              donnalee_cotone@ohnd.uscourts.gov
22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.

1    APPEARANCES:

2

3    For Plaintiff/Intervenor    **M. COLETTE GIBBONS, ESQ.**

4    Studio Enterprise           **MARIA G. CARR, ESQ.**

5    Manager, LLC:               McDonald Hopkins LLC

6                                600 Superior Avenue, East

7                                Suite 2100

8                                Cleveland, Ohio 44114

9                                216-348-5400

10                               cgibbons@mcdonaldhopkins.com

11                               mcarr@mcdonaldhopkins

12

13   For Plaintiff/Intervenor    **JOHN J. ALTORELLI, ESQ.**

14   Studio Enterprise           Aequum Law, LLC

15   Manager, LLC:               555 Madison Avenue

16                               New York, New York 10022

17                               (917) 664-6607

18                               john@aequumlaw.com

19

20

21

22

23

24

25

```
 1      APPEARANCES (Continued):

 2

 3      For Plaintiff/Intervenor    MORGAN J. HANSON, ESQ.

 4      Dream Center South          INGRID A. BOHME, ESQ.

 5      University, LLC:            Cohen & Grigsby, P.C.

 6                                  625 Liberty Avenue, 5th Floor

 7                                  Pittsburgh, Pennsylvania 15222-3152

 8                                  412-297-4900

 9                                  mhanson@cohenlaw.com

10                                  ibohme@cohenlaw.com

11

12      For Defendant South         ROBERT T. GLICKMAN, ESQ.

13      University of Ohio, LLC     McCarthy, Lebit, Crystal & Liffman

14      also known as DC  South     Co., LPA

15      University of Ohio LLC      101 West Prospect Avenue

16      doing business as           Suite 1800

17      South University:           Cleveland, Ohio 44115

18                                  216-696-1422

19                                  rtg@mccarthylebit.com

20

21

22

23

24

25
```

```
 1      APPEARANCES (Continued):

 2

 3      For Defendant DCEH         CHARLES A. NEMER, ESQ.

 4      Education Holdings, LLC:   ROBERT T. GLICKMAN, ESQ.

 5                                 NICHOLAS R. OLESKI, ESQ.

 6                                 McCarthy, Lebit, Crystal & Liffman

 7                                 Co., LPA

 8                                 101 West Prospect Avenue

 9                                 Suite 1800

10                                 Cleveland, Ohio 44115

11                                 216-696-1422

12                                 can@mccarthylebit.com

13                                 rtg@mccarthylebit.com

14                                 nro@mccarthylebit.com

15

16      For Defendant Argosy       ROBERT T. GLICKMAN, ESQ.

17                                 (See above for address)

18

19      For Intervenor Tech        (Via Telephonically)

20      Park 6, LLC:               JOSHUA D. MORSE, ESQ.

21                                 DLA Piper LLP

22                                 555 Mission Street, Suite 2400

23                                 San Francisco, California 94105-2933

24                                 415-836-2500

25                                 joshua.morse@dlapiper.com
```

```
 1    APPEARANCES (Continued):

 2

 3    For Receiver Mark E.      JAMES W. EHRMAN, ESQ.

 4    Dottore, Dottore          MARY K. WHITMER, ESQ.

 5    Companies:                Whitmer & Ehrman LLC

 6                              2344 Canal Road, Suite 401

 7                              Cleveland, Ohio 44113-2535

 8                              216-771-5056

 9                              jwe@WEadvocate.net

10                              mkw@WEadvocate.net

11                              - And -

12                              ROBERT T. GLICKMAN, ESQ.

13                              (See above for address)

14                              CHARLES A. NEMER, ESQ.

15                              (See above for address)

16

17    For Interested Party      (Via Telephonically)

18    United States:            JONATHAN E. JACOBSON, ESQ.

19                              U.S. Department of Justice

20                              Civil Division

21                              1100 L Street, N.W.

22                              Washington, DC 20005

23                              202-353-7971

24                              jonathan.e.jacobson@usdoj.gov

25
```

1    APPEARANCES (Continued):

2

3    ALSO PRESENT:

4

5    **Mark E. Dottore**          President, Dottore Companies, LLC

6

7    **John P. Papp**            CFO, Dream Center South University, LLC

8

9    ALSO PRESENT: (**Via Telephonically**)

10

11    **(Participants listed below are only those who spoke at**

12    **hearing.)**

13

14    **Michael Frola**           Director, Multi-Regional and Foreign

15                              Schools Participation Division

16

17    **Greg L. Bentley**         Attorney, Bentley & More, LLP,

18                              Alumni, Western State College of Law

19                              At Argosy

20

21    **William D. Shapiro**      Attorney, Law Offices of

22                              William D. Shapiro

23                              Alumni, Western State College of Law

24                              At Argosy

25

ALSO PRESENT (Continued): (**Via Telephonically**)


 (**Participants listed below are only those who spoke at

hearing.)**


**Aaron S. Applebaum**       Attorney, Saul Ewing Arnstein & Lehr

                             For: Benefit Administrative Systems


**Allen K. Easley**          Dean and Professor of Law,

                             Western State College of Law at Argosy


**Susan Keller**             Associate Dean and Professor of Law,

                             Western State College of Law at Argosy

1              AFTERNOON SESSION, MONDAY, MARCH 18, 2019

2                    (Proceedings commenced at 1:51 p.m.)

3                              - - -

4                    DEPUTY CLERK:  All rise.

13:51:16  5              THE COURT:  All right.  Good afternoon.

6         Please be seated.

7              All right.  We're back, again, on Case 1:19-cv-145,

8    *Digital Media Solutions, LLC versus South University of*

9    *Ohio, LLC*.

13:51:36 10              We had set this hearing for one purpose, to consider

11   the proposed settlement between the receiver and Studio.  A

12   motion was filed.  We gave time for objections.

13              There were several objections that were received.

14              One has been withdrawn.  Buncher Company has been

13:52:07 15   withdrawn.  And the others were really more by way of

16   reservations.

17              So at this point, are there any objections to this

18   settlement with Studio?

19              All right.  Well, then -- all right.

13:52:31 20              Yes, sir?

21                    MR. HANSON:  Yeah.  I wanted to get to the

22   microphone.

23              Your Honor, my name is Morgan Hanson.  And on behalf

24   of Dream Center South University, we do have a set of

13:52:40 25   pending objections that we'd like to --

1      THE COURT:  What are they?  I didn't really

2  understand them.

3          MR. HANSON:  Certainly.

4      Fundamentally, Your Honor, Dream Center South

13:52:52  5  University, which I'll just refer to as South University,

6  has one overriding interest in this total dispute.  And that

7  is that we, a non-receivership entity, is able to receive

8  the services from DCEH until such a time as we can

9  transition out of the system.

13:53:09 10      THE COURT:  Well, you'll receive them, but you

11  may have to pay more for them because there's not much money

12  coming in.  We're keeping this receivership open, sir.

13      The primary reason is so the non-receivership schools

14  and those students can use this IT platform.

13:53:27 15      Now, you may need to pay more for it because there's,

16  obviously, no money coming in from Argosy.  There's not a

17  lot of money coming in, period.

18      So you figure out how you're going to keep paying for

19  it.  We're keeping the receivership open until, you know,

13:53:45 20  there's some transition for this platform.

21          MR. HANSON:  Well, that's actually the issue

22  that we wanted to bring in front of the Court today, was the

23  issue of exactly how is this going to work going forward.

24          THE COURT:  Work it out with the receiver.

13:53:59 25  You pay enough to keep it going.  I don't know what the --

1          I mean, Mr. Dottore, how much a month does this

2     platform cost, ballpark?

3               MR. DOTTORE:  Your Honor, there are several

4     pieces of it that cost a couple of million dollars to run a

13:54:15  5     month.

6               THE COURT:  $2 million a month?

7               MR. DOTTORE:  I don't have the exact number in

8     front of me.  I wasn't prepared for that, Your Honor.

9          But the IT platform alone costs around $700,000 to

13:54:26  10    run.  Plus, you have other expenses, phones, rent, and --

11    excuse me, Your Honor -- phones, rent.  And you have these

12    contracts that provide the content for the platform to send

13    out to the students that all need to be worked out yet.

14              MS. WHITMER:  Your Honor, if I may.  This is

13:54:43  15    Mary Whitmer.

16         In my report, I think it is the third supplement to my

17    first report, there is a spreadsheet that shows the

18    go-forward estimate of what it would cost to maintain the

19    DCEH platform.

13:55:03  20              MR. HANSON:  And, Your Honor, I'd like to be

21    very clear.  We're not opposed for paying for our share of

22    the platform.  And we understand the fairly dire nature.

23              THE COURT:  Which is almost the whole thing

24    now, sir.  The other schools have closed.

13:55:16  25              MR. HANSON:  Well, there are two sets of

1    schools that remain viable, South University, and there's a

2    series of viable Art Institute schools.

3        And what has been happening at this point, and what

4    happened last week was, we paid 67.6 percent of the money

13:55:31  5    necessary to pay DCEH's payroll, and the Art Institute --

6    the viable Art Institute institutes paid the other,

7    basically, one third of it.

8        And we are comfortable going forward making those

9    payments to ensure that the services remain in place during

13:55:47  10    the transitional period.

11        Our concern with the settlement agreement is that the

12    settlement agreement does not at all reflect the reality of

13    what's actually happening here, because the settlement

14    agreement basically says that, Well, we should just keep

13:56:01  15    going forward with the TSA and the MSA agreement between

16    Studio and South University, and all will be well.

17        But all will not be well.  Because --

18            THE COURT:  Sir, all is not well.  All right?

19            MR. HANSON:  Not much is well.

13:56:14  20            THE COURT:  It never will be well.  This has

21    been -- well, I won't describe it.

22        Now, I'm not quite sure what you're suggesting we do.

23        We're keeping the platform going.  The users will have

24    to pay for it, pay as you go.  I don't know how much that

13:56:30  25    is.  If you want the platform, you'll have to pay for it.

1         MR. HANSON:  And that's actually all we want.

2     But what we want is to be able to pay for the

3     platform, and then not have Studio hold DCEH in default

4     under the TSA because it's not being followed.  And we don't

13:56:46  5     want Studio to hold us in breach under the MSA because we're

6     not following that procedure, either.

7         We are paying directly for -- to DCEH and the receiver

8     to cover their cost.  We're paying our share.  All we want

9     is to be able to continue doing that, which the settlement

13:57:04 10     agreement does not address or allow.

11        And that's our objection to the settlement agreement.

12             THE COURT:  Well, I really don't understand

13     that.  I thought it does.

14        So --

13:57:11 15             MR. HANSON:  No.  It says that we should

16     continue to pay Studio the money.  And then Studio will

17     eventually, after 45 days, pay a portion of it over to DCEH,

18     which is not what's happening in reality.  And we don't want

19     that to continue, because if that continues, DCEH will

13:57:27 20     likely go under, and we won't be able to get our platform no

21     matter what we pay.

22             MR. DOTTORE:  Your Honor, can I explain this

23     for a minute in a simpler term?

24             THE COURT:  Yes, please.

13:57:38 25             MR. DOTTORE:  There's an agreement where South

1    University has to send their funds to Studio.  From what I

2    take, South does not want to send them to Studio.  They want

3    to send them directly to the receivership.

4         That's kind of it in a nutshell, Your Honor.

13:57:52  5         THE COURT:  Well, all our concern is to make

6    sure this platform stays for -- we said, four to six months,

7    until someone works out a transition.

8         Is there a reason the money goes to Studio?

9         I mean, I -- and if the money goes to Studio, I'll

13:58:12 10   order Studio to pay for the platform.  I don't --

11         MR. ALTORELLI:  Studio has already agreed to

12   do so, Your Honor.  These agreements are already in place.

13   They already work.  They just don't want to pay Studio's

14   fees.  That's what this issue really is all about.  So it's

13:58:27 15   nothing to do with this.  In fact, their costs are going to

16   come down.  They're going to be less than what is projected.

17         So this is not about their being at risk.  They are

18   not at risk.  All the bills have been paid.  They're still

19   up and running.  We've committed in the agreement, in the

13:58:40 20   settlement, to provide the services and to pay for those

21   services.  So there is no issue.

22         And, in fact, Your Honor, if they don't have the money

23   to pay under the existing agreements, they can defer it.

24   They cannot possibly have an objection.  This is just about

13:58:53 25   not wanting to pay, if they can.

1          MS. GIBBONS:  Your Honor, Colette Gibbons.

2          The only thing I would offer on behalf of Studio is

3     that this settlement agreement, hard fought, took us a day

4     to work through some very important details, covers a lot of

13:59:09  5     ground.

6          The transfer, the IT, is the primary thing that we

7     attempted to accomplish, and we're due to present a plan to

8     you by March 26th.  We'll have one to Mr. Dottore to look at

9     by the end of this week.

13:59:22  10     So I think there are other items in this settlement

11     agreement, which we want to see approved today, together

12     with our plan for the transfer, the IT that will happen, and

13     be submitted toward the end of the week.

14          THE COURT:  All right.  All right.

13:59:43  15     Based on the express representation that Studio is

16     going to maintain this platform --

17          And I'm hearing that from you, Ms. Gibbons.

18          -- because that's the whole premise of this, we're

19     going to overrule the objections and approve the agreement.

13:59:59  20     So Studio is ordered to maintain the platform.  All

21     right?  That's what the money is for.

22          MR. DOTTORE:  Your Honor, we're going to need

23     to have some sort of -- because the bills are not paid.

24     That's what the dispute between all of us is.  There's

14:00:12  25     telephone bills.  There's healthcare.  There's a bunch of

1    stuff that is not paid.

2              MR. ALTORELLI:  And, Your Honor --

3              THE COURT:  Why is not --

4              (Interruption by conference call.)

14:00:24  5              MR. ALTORELLI:  The schools aren't funding --

6    they're not funding the money.  So if they honor the

7    contracts, they'll send us the money, we'll pay the bills.

8    It's that simple, Your Honor.

9              MR. DOTTORE:  It's more -- I agree with

14:00:32 10   Mr. Altorelli, but it's too voluminous for that.  There's

11   $6 million in trailing healthcare fees.

12             MR. ALTORELLI:  That's not part of the I- --

13   shared IT, Your Honor.  So I don't know what we're going to

14   do about that.  That's a whole other issue.

14:00:44 15             MR. GLICKMAN:  Judge, Rob Glickman.

16        Just to be clear, that is -- what we're talking about

17   are expenses that came with the receivership that did not

18   accrue under the receivership.

19        The agreement that calls for the money to be paid for

14:00:54 20   Studio was entered into before the receiver was appointed.

21   And this settlement agreement amends that agreement.  I just

22   wanted the Court to understand the timeline here.

23        It wasn't the receiver's recommendation as part of the

24   settlement agreement that that's how the funds flowed.

14:01:09 25   That's how contractually the facts flowed when the receiver

1    was appointed on January 18th.

2                    THE COURT:  I know.  But you --

3                    MR. GLICKMAN:  This is the agreement under

4    the --

14:01:16  5                    THE COURT:  But you entered into this

6    settlement agreement.  You, obviously, think it's a good

7    thing to do.  You wanted us to approve it.

8                    MR. GLICKMAN:  Judge, like any settlement

9    agreement, it wasn't a victory, but it allowed the schools

14:01:29 10    to keep operating.  So, yes.

11                    THE COURT:  All right.  So it's a settlement

12    agreement.  But, obviously, you are recommending that we

13    approve it.

14        So --

14:01:36 15                    MR. HANSON:  Your Honor, can I just add one

16    question?  And I understand the objection has been

17    overruled.  I'm just worried about one particular issue so

18    we don't have to necessarily come back to you, which is that

19    the -- when we pay Studio, Studio has the right to hold the

14:01:48 20    money for 45 days.

21        And it's the holding of the money for the 45 days that

22    has caused DCEH to have these problems and not be able to

23    pay their bills, which has caused DCEH to come to us

24    directly and ask for money, which we have contributed to

14:02:05 25    them.

1          If we're going to pay Studio, as this Court orders,

2     that's fine.  I mean, we just want the platform.  If they

3     hold the money for 45 days, as they're contractually

4     obligated to, we're going to be right back here, again, with

14:02:17  5     DCEH saying that their system is going to collapse.

6          The second issue is, when we pay money --

7               THE COURT:  Well, let's address that.

8          I mean, you've got to pay the bills in a timely

9     fashion.  All right?  I don't -- you can't hold the money

14:02:30 10     and not pay the bills.  The whole point of this is to pay

11     the bills to keep that platform going.  If you're not going

12     to do that, we'll forget it, have them pay the receiver, and

13     the receiver will pay the bills.

14               MR. ALTORELLI:  Your Honor, again, people like

14:02:45 15     to say things that are not true.  So I will correct the

16     record.

17          They gave us the money -- we do have 45 days.  We've

18     not held it 45 days.  We've been paying the bills when

19     they're due.  The issue is -- and, by the way, they were

14:02:57 20     supposed to pay on March 1st.  They, the schools, have not.

21     Okay.  So there's nothing we can do to pay the bills.

22          The reason why there was a 45-delay lag was that DCH

23     has to provide the backup.  To this day, we don't have the

24     backup in order to pay the bills.  Hopefully we'll resolve

14:03:15 25     that.

1          At the end of the day, that was a protection mechanism

2     for the schools; and, in fact, it was working.  So when they

3     give us the invoices, we will pay them directly immediately.

4     There will be no holdup.

14:03:26    5          This is not about that.  This is not about the bills.

6     They don't want to pay Studio.  That's the deal.

7          They want out.  And they can do that, Your Honor.

8     There's a termination provision.  They're not wedded to us.

9     There's a 60-day termination provision.  They can cancel TSA

14:03:39   10     on 30-days' notice.  They can cancel the MSA on 60-days'

11     notice.

12          All these agreements built in every mechanism to

13     protect these schools.  They just don't want to do it.

14               MR. GLICKMAN:  Well, Your Honor, I believe if

14:03:50   15     we terminate the TSA, we have to make a payment of

16     $12 million to Studio, which is --

17               MR. DOTTORE:  That is correct.

18               MR. GLICKMAN:  -- which is not necessarily

19     going to help the students of South University remain part

14:03:58   20     as a viable entity.

21          The other -- our other issue with paying Studio --

22     just so we're putting it out there -- is Studio -- when we

23     pay the amount under the TSA --

24               THE COURT:  We have far more important things

14:04:11   25     to do.

1          MR. GLICKMAN:  Fair enough, Your Honor.

2          THE COURT:  All right?

3          MR. GLICKMAN:  Fair enough.

4          THE COURT:  I'm approving the agreement.  But

14:04:15  5  if I find that bills aren't being paid, we're going to have

6  some show-cause hearings.  All right?

7          MR. ALTORELLI:  We have no problem with that,

8  Your Honor.

9          THE COURT:  All right.

14:04:20  10          MR. ALTORELLI:  Give us the bills and the --

11  if Mr. Dottore gives us the bills, as soon they give us the

12  money, we'll pay them.

13          THE COURT:  All right.  Mr. Dottore, you get

14  them the bills.

14:04:23  15      The money is coming.  You get them the bills, and

16  they're going to be paid.  All right?

17          MR. DOTTORE:  Your Honor, they have the bills.

18  I'm not going to be -- let them just sit there and say that,

19  because this is what keeps happening and --

14:04:34  20          THE COURT:  They are ordered to pay the --

21  you've given them the bills?

22      What bills don't you have, sir?

23          MR. DOTTORE:  Your Honor --

24          MR. ALTORELLI:  Your Honor, we do not know the

14:04:41  25  exact numbers.  We have a pretty good idea.  We will get the

1    bills done with them.  We have an understanding what the

2    number is.

3         By the way, the schools have paid us zero this month.

4    So we're not holding anyone's money.  So if they want to

14:04:53  5    send the bills today, we'll send them on through to the

6    schools, and we'll pay them.

7              THE COURT:  Wait.  There's a certain operating

8    cost for the payroll.  You know what it is.  It's X dollars

9    a month to run the platform.

14:05:06 10              MR. DOTTORE:  Your Honor, we've sent over

11    several different spreadsheets of what stuff costs.  There's

12    also on- -- there was legacy costs that they didn't -- no

13    one stepped up, which was supposed to be done before I got

14    there.  None of the contracts were renegotiated.  Your stays

14:05:20 15    have kept the schools running, because the stays -- the

16    phone bill, 4 and a half million dollars.

17         AT&T has approached me and said, Will you pay on the

18    go forward?

19         I said, Yes, I will.

14:05:30 20         But no one has sat down and said -- I said, I need

21    money on the go-forward basis.

22         They have numbers.  I've sent spreadsheets.  I've sent

23    invoices.  I've sent them to South.  No one seems to come up

24    with the money to do it, though.

14:05:43 25              MR. HANSON:  Well, I'd just like the record to

1    reflect that South did pay -- South did pay the payroll last

2    Friday -- paid 66.7 percent of the payroll last Friday so

3    the DCEH people could be paid.  So that's where the -- you

4    know, we did -- we haven't not paid.  We just paid DCEH

14:05:59  5    directly.

6              MR. ALTORELLI:  Okay.  No one has paid

7    anything to Studio this month.  So we don't have any money.

8    These legacy bills are not covered by the TSA.  They are --

9              THE COURT:  I'm not worried about the legacy

14:06:06  10   bills.  I'm talking about --

11             MR. ALTORELLI:  Okay.  Your Honor --

12             THE REPORTER:  One at a time, please.

13             THE COURT:  I'm talking about operating.  All

14   right?

14:06:12  15        What order do you need from us?

16             MR. ALTORELLI:  I don't need anything.  We

17   have contracts.  We're ready to pay.  If they have the

18   bills, we'll pay them.  But they're not asking for payment

19   of the ongoing fees.  You heard what he said.  He wants to

14:06:24  20   cover legacy fees that were there before he got there.

21             MR. DOTTORE:  No, that's not what I said.

22             MR. ALTORELLI:  Well, I can tell you what the

23   payroll is --

24             THE REPORTER:  One at a time, please.

14:06:30  25             THE COURT:  I heard Mr. Dottore say --

1           MR. ALTORELLI:  I've got them right here.

2           THE COURT:  -- he needs the ongoing payroll

3   and utilities for operating this platform, right?

4           MR. DOTTORE:  That's exactly what I said,

14:06:38  5   Your Honor.

6           THE COURT:  All right.  Well, the Court is

7   ordering that those bills be funded by the schools.  All

8   right?

9           And if I find they're not being paid, there are going

14:06:51 10   to be people brought in here, and they may not leave the

11   courtroom.  All right?  And I'm being serious about that.

12   If I find that these bills aren't getting pay, we're going

13   to have a show-cause hearing, and you better bring your

14   toothbrushes.

14:07:07 15           So this is taking care of Documents 82, 85, and 118.

16           MR. HANSON:  Thank you, Your Honor.

17           THE COURT:  All right.  Then a whole raft of

18   other issues have surfaced that we need to address.

19           All right.  There's payroll for teachers who have been

14:07:52 20   teaching.  I mean, the whole purpose of this receivership

21   was to have an orderly transition phase-out, teach-out,

22   transfer, whatever.  And Mr. Dottore filed the report today,

23   at the Court's direction, discussing this.

24           Well, in my view, these teachers have been teaching

14:08:27 25   under Court supervision.  So they have to get paid.

1          MR. DOTTORE:  I agree with you, Your Honor.

2          THE COURT:  All right.  So we're going to

3     order that they be paid.

4          So there seems to be funds -- Mr. Dottore says there's

14:08:41  5     about almost 2.7 million in unpaid payroll, and --

6          MR. DOTTORE:  It's 2.49.  That's the first

7     statement, Your Honor.  And I have a plan to pay it.

8          The problem right now is that I have issues with the

9     federal priority standard -- or rule, because I get -- what

14:09:06  10    I did was, during this last week, I gathered -- the Bank of

11    America made the entire school leave the bank.

12         I have them in a local bank, Chemical Bank.  I opened

13    separate accounts and segregated, as in this listing, in all

14    those accounts.

14:09:25  15         I know that the Department of Education is going to

16    ask for 300-and-some thousand back in Pell -- I'm sorry.

17    It's either Pell money --

18          MS. WHITMER:  Perkins.

19          MR. DOTTORE:  In Perkins money.

14:09:36  20         So I have to track down -- I have the money, correct.

21    I have to find -- I have to track down where this money came

22    from so that I don't end up in a situation where I spent

23    money that the federal government is going to want back.

24          Even if that doesn't happen, I have another plan.  I'm

14:09:54  25    liquidating assets as quickly as possible that I will put

1    directly towards the payrolls.

2         I have an additional $500,000 coming back this week

3    from a deposit that was left with PNC Bank on credit cards.

4         I can put the payroll together, and I want to pay the

14:10:10  5    payroll, Your Honor.  I want to pay -- I want to release

6    $105,000 immediately to pay the student workers.  It has

7    nothing to do with stipends.  They were student workers.

8         Then I have another 45,000 that I want to take out of

9    the $500,000 to pay to the administration people.

14:10:23 10        Also, a --

11                 MS. WHITMER:  425,000.

12                 MR. DOTTORE:  425,000.

13        As set in my report to the Court, I have a plan to pay

14   all of them in full as rapidly as possible.  But I need to

14:10:37 15   find out where the money came from.

16                 THE COURT:  All right.  Obviously, if there's

17   Department of Education money, you got to return that to the

18   Department of Education money.  But to the extent -- I want

19   an orderly plan to pay these people who have been working --

14:10:55 20                 MR. DOTTORE:  Yes.  And I believe it's laid

21   out in this plan.

22        I'm sorry, Your Honor.  I didn't mean to interrupt.

23        It's laid out in my report regarding the status of

24   employee payment.

14:11:05 25                 MAGISTRATE JUDGE PARKER:  Can we get some

1    clarification on one thing?

2        Mr. Dottore, your report that you filed today

3    indicates that the receiver was unable to make payroll for

4    the two-week period March 1, scheduled to be paid March 8.

14:11:19  5        The Court has received, as you've seen, a series of

6    letters from employees at Argosy Twin Cities, all of whom

7    make reference to payroll that was due March 15.

8        Are we talking about the same payroll period?

9            MR. DOTTORE:  We're talking about the one

14:11:37 10  payroll that was due last Friday.  So it was the 15th.

11   You're correct, Your Honor.

12           MAGISTRATE JUDGE PARKER:  All right.  So where

13   your report indicates it was scheduled to be paid March 8,

14   it actually should have been March 15?

14:11:48 15          MS. WHITMER:  My understanding was, the

16   payroll was to be paid on March 8th, and that these are

17   amounts that ran through March -- I'm sorry.  I am

18   incorrect.

19               THE COURT:  Well, what about the work done --

14:11:59 20              MS. WHITMER:  I'm sorry, Your Honor.  I --

21               THE COURT:  -- from the 1st to the 15th?

22               MS. WHITMER:  I am a week off.

23               MR. DOTTORE:  The payroll was due Friday.

24               MS. WHITMER:  Yes.  I'm sorry.

14:12:07 25              THE COURT:  It was due the 15th?

1          MR. DOTTORE:  It was due the 15th.

2                THE COURT:  All right.

3          MR. DOTTORE:  We paid the law school payroll.

4                THE COURT:  All right.

14:12:14  5      Ms. Whitmer, was that for the period ending 3-8?

6          MS. WHITMER:  I'm sorry.  The -- I -- it's

7    been a --

8                THE COURT:  Understood.  I just want to --

9                MS. WHITMER:  Yes.

14:12:21  10            THE COURT:  That would be consistent with the

11   letters.

12                MS. WHITMER:  Yes.  I'll file a corrected

13   report.

14                THE COURT:  All right.

14:12:25  15            MS. WHITMER:  I'm sorry.  I tangled up in my

16   calendars.

17                THE COURT:  All right.  Okay.  That's not a

18   big problem.  It just was confusing.

19        So this is what the letters we've been getting.  So --

14:12:35  20   which makes sense because the schools closed on the 8th.

21                MR. DOTTORE:  Right.  And a lot of those

22   letters, Your Honors -- I'm sorry.  I should address both of

23   you.

24        Your Honors, a lot of those letters, it talks about

14:12:46  25   people that got laid off previous to me being there, and

1    that there was no compensation for PTO days or for days --

2    vacation days or there was no severance pay.

3         Well, you know, there was no way I would have agreed

4    to severance pay.  Apparently they did that in the past.

14:13:05  5    I'm just trying to --

6              THE COURT:  Well, I'm not -- we're talking

7    about people who have been working during the receivership

8    up until March 8th.

9              MR. DOTTORE:  Correct.

14:13:11  10             THE COURT:  So the receiver has represented he

11   is going to be paying those people promptly.

12        All right.  There was --

13             MAGISTRATE JUDGE PARKER:  Mr. Dottore, do you

14   have any feel for how long it will take to ascertain the

14:13:25  15   source of the funds so that you can know whether or not

16   within the 2.68 million you've accumulated, there is a

17   percent that will be due to the U.S. Government?

18        How much time?

19             MR. DOTTORE:  We're working diligently on

14:13:40  20   that.  I'm hoping that I have some idea within the week.

21        I also need to talk to the Department, because I was

22   called by -- my counsel was called by the Department of

23   Education's counsel and asked us if there was Pell -- it's

24   either Pell money or --

14:13:55  25             MS. WHITMER:  Perkins.

1          MR. DOTTORE:  -- or Perkins money that we are

2     holding.  I think we're holding -- it's in the report.  I

3     think we're holding 300-and-some thousand dollars of Perkins

4     money.

14:14:03  5          MS. WHITMER:  339 now.

6          MR. DOTTORE:  339,000.  I'm not 100 percent

7     sure if they're going to claim that money or not.  That's a

8     discussion I have to have.  And that will speed things up.

9          THE COURT:  All right.

14:14:16 10          MR. DOTTORE:  I am asking --

11          THE COURT:  On the first and second page of

12     your report, you said the unpaid Argosy payroll was

13     1.5 million, and the amount of unpaid payroll for the

14     excluded campuses is about a million.

14:14:29 15       What are the excluded campuses?

16          MS. WHITMER:  The excluded campuses are the AI

17     campuses that were not a part of Argosy.  And we know that

18     new AI, which is over at the other counsel table, is a

19     university that was formed and is sitting on top of this

14:14:52 20     platform.

21       In order to form that university, certain campuses

22     were left behind, and those became receivership entities.

23     Those AI excluded campuses include AI Pittsburgh and AI

24     Las Vegas, among others.

14:15:09 25          THE COURT:  Are these schools under the

1    receivership?

2                      MR. GLICKMAN:  Yes.

3                      MR. DOTTORE:  Yes, Your Honor.

4                      MS. WHITMER:  Yes.

14:15:15  5          MR. DOTTORE:  And what happened was, during

6    the -- and this is why I anticipated having the payroll on

7    the 15th -- but when the Department shut off all the

8    additional funding, the two weeks that we continued on with

9    got students to graduation dates in Pittsburgh that were not

14:15:28  10   my responsibility.  I just had the assets, not the students.

11                     THE COURT:  All right.  So people will get

12   paid.

13                     MR. DOTTORE:  Yes.

14                     THE COURT:  There was a letter or claim we got

14:15:38  15   from a third-party TPA, Benefit Administrative Systems,

16   that -- their contract began January the 1st, so just

17   shortly before the receivership began, and they said they

18   haven't been paid.

19        Now, are they providing services?

14:15:57  20          MR. DOTTORE:  No, Your Honor.  Those were

21   services that -- there's three different tranches -- is that

22   a medical service company?  I'm not 100 percent sure.

23        Okay.  Thank you, Judge Parker.

24        Yeah.  There was a -- here's what -- there's a long,

14:16:09  25   complicated -- and I'll make it quick, because I know that's

1    how we have to do this.  They set up to self-insure

2    themselves.  It was the death knell the day they did it, not

3    on January 1st.  They set this up two years ago.

4        At one point, at the beginning of '18, they got a

14:16:28  5    second service provider that was supposed to save them a

6    million dollars a year.

7        At that point in time -- and here's how it worked:

8    Judge Polster and Judge Parker would pay $50 out of each

9    check into their -- into the healthcare.  The Dream Center

14:16:43 10    entity would pay out of pocket all the claims, such as the

11    prescription claims, up to a certain number.

12        The number was too high.  They could never get there.

13        So what they did was, there was all this trailing

14    liability.  So they kept giving money -- from what I've seen

14:17:01 15    so far, Your Honor -- this is the beginning of my seventh

16    week -- what they did was, they would pay X dollars a month

17    to try and keep the service going.

18        There were several contracts like this.  I'll stay on

19    this note.

14:17:12 20            THE COURT:  Well, let's -- I mean, I've got --

21    if --

22            MR. DOTTORE:  Yes.  They're not being paid.

23    And I am not --

24            THE REPORTER:  One at a time.

14:17:16 25            THE COURT:  If they are not providing

1    services, then I really don't care about them.

2                    MR. DOTTORE:  No.

3                    THE COURT:  They say they've been providing

4    services since January 1.  And I --

14:17:24  5                    MR. DOTTORE:  They may have before my tenure

6    or during it.  But I cut -- I stopped taking money out of

7    these peoples' payroll when I realized that their health

8    insurance was going to be cut.

9                    THE COURT:  Have you told these -- I mean --

14:17:34 10                    MR. DOTTORE:  Yes.

11                    THE COURT:  So this entity, Benefit

12    Administrative Systems, has not been providing services

13    since the receivership?

14                    MR. DOTTORE:  They may have from the 1st to

14:17:43 15    when I got there, but they're not now.

16                    THE COURT:  I mean, from January 1, they --

17    but since January 18th, they haven't been providing

18    services?

19                    MR. DOTTORE:  No.

14:17:51 20                    THE COURT:  All right.  Fine.  Then someone

21    should respond to them accordingly.

22                    MR. HANSON:  Your Honor --

23                    THE REPORTER:  To the microphone, please.

24                    MR. HANSON:  The same provider that is being

14:18:11 25    described here also provided services to the viable AI

1    entities and the viable South University entities.

2         So we just need to make sure that we coordinate with

3    the receiver that whatever notice is sent doesn't interfere

4    with that -- that thing ongoing.  We just wanted to note

14:18:26  5    that for the record.

6         Thank you.

7              THE COURT:  They may be providing services to

8    the other schools, but Mr. Dottore's represented that he

9    hasn't -- for the receivership entities, he has not been

14:18:38 10    utilizing this outfit's services since January 18.

11              MR. DOTTORE:  So South has written checks

12    directly to that entity.

13              THE COURT:  Well, that's fine.

14              MR. HANSON:  All right.

14:18:48 15              THE COURT:  If they're providing services to

16    South, you should be paying.

17              MR. HANSON:  And we are, Your Honor.

18         Thank you.

19              THE COURT:  Okay.  All right.  Well, that was

14:18:56 20    easy.

21              MR. APPLEBAUM:  Your Honor, could I be heard

22    on this matter?

23              THE COURT:  Who is this, please?

24              MR. APPLEBAUM:  This is Aaron Applebaum from

14:19:03 25    Saul Ewing Arnstein & Lehr.  We represent Benefit

1    Administrative Systems.

2                   THE COURT:  Well, all right.

3                   MR. APPLEBAUM:  Your Honor, we just wanted to

4    clarify something, because this is the first that we have

14:19:13  5    heard that the receiver does not expect us to be providing

6    services.

7         And, in fact, shortly after we learned of the

8    commencement of these receivership proceedings, we contacted

9    counsel for the receiver and asked for the receiver's

14:19:32 10    agreement to let us terminate the services agreement because

11    we were not being paid.  And we were told that the receiver

12    would not agree to that.

13         So -- and that's why we filed the intervention motion.

14    And that's why we have been preparing to file a motion for

14:19:47 15    relief from the receivership order to allow us to terminate,

16    because we have been providing services because --

17                   THE COURT:  Well, I'll give you the relief

18    now.  I mean, if Mr. Dottore is representing that he

19    has -- you haven't been providing any services to the

14:20:04 20    receivership entities.

21                   MR. DOTTORE:  I wouldn't have had the funds to

22    pay them.  And I believe he spoke to Mr. Ehrman, and that's

23    not what happened.

24                   THE COURT:  Well -- all right.

14:20:14 25         Sir, we will -- the contract between Benefit

 1    Administrative Systems and these receivership entities is

 2    terminated.

 3        You still have a contract with the South schools that

 4    are operating.  Okay?

14:20:30  5        Is that --

 6               MR. APPLEBAUM:  Your Honor, the only -- the

 7    other schools are not parties to our services agreement.

 8    The only party is DCEH.

 9               MR. DOTTORE:  The problem is, Your Honor, he's

14:20:42 10    right.  Everything is tied into DCEH.

11               THE COURT:  Well, I don't want to -- well,

12    then I can't terminate your contract, sir.  I can't give you

13    the relief you want.

14        So -- but Mr. Dottore doesn't owe you any money.

14:20:56 15    Those schools haven't been using your services.  The schools

16    that are using your services are paying you.

17               MR. DOTTORE:  Your Honor, I'll handle this.

18    I'll call the lawyer --

19               THE COURT:  So I think maybe you got to do a

14:21:08 20    novation so you get the contract, sir, with the entities

21    that are using your services.

22               MR. DOTTORE:  Your Honor, I'll talk to

23    the -- this afternoon I'll have my counsel contact him, and

24    we'll carve something out along those lines.

14:21:23 25        Thank you.

```
 1                   THE COURT:  Okay.  All right.

 2                   MR. APPLEBAUM:  Thank you.

 3                   THE COURT:  Thank you.

 4          All right.  Now, I want to take up the two things that

 5   are most important, which was the objective of the

 6   receivership.  And the only reason the Court undertook this

 7   and created the receivership was to help the students so

 8   that the students wouldn't lose -- thousands of students

 9   wouldn't lose a semester of work and credit, and the

10   taxpayers wouldn't lose millions and millions of dollars

11   that they had loaned for those services.

12          So we now have two schools, or two groups.  We'll

13   start with the law school.

14          We discussed the law school last week, and we had a

15   plan in place to provide for the graduation of the 3Ls --

16   roughly, 77 3Ls who were on track to graduate this summer.

17          We needed two payrolls.  Now it appears there's a

18   third one.

19          And, Mr. Dottore, am I correct, you found sufficient

20   funds to pay that third payroll?

21                   MR. DOTTORE:  Yes, Your Honor.

22                   THE COURT:  All right.  So it -- that payroll

23   will be paid.  And so those 77 students will be able to

24   graduate.

25          Now, that still leaves a whole lot of students who
```

1    will not have their semester concluded.  And I want to see

2    if we can provide at a minimum for that, and then possibly

3    for the continuation of this law school.

4         So I know that Studio had some interest, and now there

5    is another entity.  I believe those people are on the phone,

6    Attorneys Bentley and Shapiro, who are alumni of Western

7    State College of Law, who are interested in buying the law

8    school; is that right?

9              MR. DOTTORE:  Your Honor, that would be

10   correct.  And, actually, there's a third college that would

11   also like it.

12        The problem is -- and this is not the Department's

13   fault -- there's regulations that they need a number, and

14   it's called an OP ID [sic] number.

15             MS. WHITMER:  OPE.

16             MR. DOTTORE:  Okay.  There's a number that

17   they need.  I mess it up every time.  I'm sorry.

18        There's a number that they need to continue on as a

19   school.  If we can get that number, and I know it's an

20   arduous process, the school could continue.  Because the

21   only holdup is, under the circumstances right now, I can't

22   get the Title IV money to keep it operating.

23        The plan was -- before the Title IV money was cut off

24   was, it would live in the receivership while the

25   new -- whichever new entity -- was out looking -- was out

1    trying to get the ABA accreditors -- which they've been

2    great.  They've worked with us, and they'll do what they

3    need to do.

4        But we need the number so that they can draw down

14:24:25  5    Title IV money, because I can't right now.  If I was able to

6    draw Title IV money -- and I don't think you can order that.

7    I don't know -- to draw Title IV money just for that

8    specific university, we could make that go.

9            THE COURT:  Well, what we need to do -- we've

14:24:38 10    got some people from the Department of Education.  All

11    right?  I would like to save this law school, and I assume

12    the Department of Education would like to do so as well.

13        So assuming we've got a person or an entity that is

14    viable that wants to carry on this law school, how can we

14:24:58 15    quickly provide for Title IV funds to start again?

16        This won't be Argosy; they're gone.  Won't be Dream

17    Center; they're out.  This would be a wholly separate

18    operation.

19        So how can we -- how can we effectuate that?

14:25:17 20        I imagine from the Department of Education.

21            MR. DOTTORE:  Thank you.

22            MR. JACOBSON:  Your Honor, this is

23    Jonathan Jacobson on behalf of the United States.  I'm here

24    along with some folks from the Education Department, and

14:25:30 25    some other folks from Justice.  And the representative who

1    we've -- who we're producing today is Mike Frola.

2                    THE COURT:  Right.

3                    MR. JACOBSON:  He's the same individual who

4    wrote the February 27th letter and spoke at last week's

14:25:44  5    hearing.  He is the director of the Education Department's

6    Multi-regional and Foreign Schools Participation Division.

7    He's here on extremely short notice.

8         As you know, Your Honor, we --

9                    THE COURT:  I very much appreciate this.  But

14:25:57 10    we're in crisis mode here, and I'm trying to -- I

11    would -- I'd like not to have this law school crater.  And

12    then millions of dollars of public funds are going to be

13    lost, too.  Because, of course, the students will be able to

14    get relief.  So all of this loss will be borne by the

14:26:18 15    taxpayers.

16         So how can -- assuming that you're satisfied with the

17    bona fides of the new owners and operators of the law

18    school, how can they get Title IV money flowing?

19                    MR. JACOBSON:  Your Honor, I'm going to have

14:26:34 20    Mr. Frola answer that question.

21                    THE COURT:  Okay.

22                    MR. FROLA:  Good afternoon, Your Honor.

23         So there's basically two paths here.  The first path

24    is the path that would be the easiest to consider would be

14:26:45 25    if a -- currently a Title IV participating institution were

1    to add the Argosy location of the law school under its Title

2    IV participation.

3         We've cancelled all the loans for Argosy and for the

4    law school, and they could repackage those loans and

14:27:02  5    continue to operate under a teach-out arrangement.  That

6    could result in the -- and ultimately becoming Title IV

7    eligible on its own.  That would have to go through a

8    court --

9              THE COURT:  So this would be some entity

14:27:14 10    that's already receiving Title IV.  And just tell me what --

11              MR. FROLA:  Correct.

12              THE COURT:  We want to add Western State Law

13    School.

14              MR. FROLA:  Yeah.

14:27:25 15              THE COURT:  All right.  I don't think we've

16    got that.

17              MR. FROLA:  Well, yeah.  That's the problem.

18         So the secondary option is, it could become a

19    standalone.  Because, as we said, Argosy owned as one OP ID

14:27:35 20    number, as Mr. Dottore said.  They only had one number.  All

21    the 27 locations were additional sites of the main, one

22    contract.

23         So when Argosy lost eligibility, it -- the law school,

24    in essence, even if it continued to operate, is not Title IV

14:27:54 25    eligible.  Nor, you know, as we discussed last time, where

1    they, you know, paying stipends and that matter, which is

2    what led to that determination.

3         So a standalone university, if a new entity were to

4    come in and to carve it out and acquire it as a standalone,

14:28:10  5    it would not be eligible for Title IV under regulations for

6    two years.

7                   MR. DOTTORE:  Your Honor, if I --

8                   UNIDENTIFIED VOICE:  Your Honor, this is --

9                   MR. DOTTORE:  -- if I may ask.

14:28:20  10         I have a school that still has Title IV availability.

11    It's the Las Vegas school.  If I could make that a partner,

12    I could --

13                   THE COURT:  Well, all right.

14         Mr. Frola, Mr. Dottore says that there's currently an

14:28:38  15    entity, the Las Vegas school, that's operating, that's

16    viable, that is receiving -- they weren't part of Argosy.

17    They're not -- they're receiving Title IV.  They must have a

18    separate OP ID number.

19                   MR. DOTTORE:  That is correct.  We haven't

14:28:56  20    asked for money for Las Vegas, but we will be asking for

21    money.

22                   THE COURT:  Right.  But they're in good

23    standing.

24         Potentially, could the law school be packaged with

14:29:05  25    that school as a vehicle for continued Title IV funding?

1      That would be -- it's a variation of your number one,

2  a current Title IV receiver adding the law school.

3              MR. DOTTORE:  At least until I get it

4  transferred to safer hands, Your Honor.

14:29:22  5              THE COURT:  I mean, at least as a temporary

6  vehicle.  Because I -- we've got students that are

7  panicking, and I really would like to keep this -- I'd like

8  to take care of --

9              MR. FROLA:  We understand that the law school

14:29:38  10  is not in a very strong position as well, given that their

11  eligibility is not -- it hasn't been ended, like we did for

12  Argosy.  However, under the parent organization, they're

13  still not in a position.

14      We would consider an application, if submitted to us.

14:30:00  15  But they would also have to get, you know, proper accreditor

16  and state approval.  And that's in a different jurisdiction,

17  I believe.

18              MR. DOTTORE:  Well, I believe I could get the

19  ABA, Your Honor.  Mr. Ehrman would be able to comment a

14:30:17  20  little bit better on that.

21              THE COURT:  Well, I think that may be a

22  short-term method.

23      Mr. Dottore, you should quickly pursue this, whether

24  you can -- what's this -- what's this entity?  Which school?

14:30:32  25              MR. DOTTORE:  Two of the entities that got

1    left to me were the Art Institute of Las Vegas, which has a

2    separate OP ID number, and the University -- or the Art

3    Institute of Pittsburgh, which we didn't have enough time to

4    finish that deal.  They had a separate OP ID number.

14:30:48  5        I was told, or suggested, that if I paid the stipends

6    on the Las Vegas, I could recoup the money, which is about

7    $85,000.  If I paid the stipends, I could then apply under

8    the Title IV to get the dollars that I put in to keep it

9    alive out -- back out.

14:31:04  10        Mr. Altorelli has already been kind enough to give

11   me -- or to say he would let me have the assets of that

12   school so that I could move on with the sale to these folks

13   in Las Vegas, which includes the State of Las -- the State

14   of Nevada.  I'm sorry.

14:31:18  15        So I know it's a shoestring, but this could work to

16   get it to where I could get it at a safe place.

17        That's why Mr. Altorelli, I believe, had to stop,

18   because there was no way to get Title IV for it.  If I get

19   Title IV, I can go back to the three purchase -- probably

14:31:33  20   including these two gentlemen on the phone, and move forward

21   with this.

22            THE COURT:  And then they could -- they

23   could -- all right.  There may be others.  I don't know.

24   The point is, it would have to be an orderly process.  But

14:31:47  25   then, they'd buying an entity that's getting Title IV funds.

1          I assume --

2                    DEAN EASLEY:  Your Honor?

3                    THE COURT:  Yes.

4                    DEAN EASLEY:  This is Allen Easley.  I'm the

14:31:56  5   dean at Western State.

6                    THE COURT:  Yes.

7                    DEAN EASLEY:  There is another entity out

8   there, another potential suitor that we're still in

9   discussion with, that does have its own OP EID number.

14:32:11 10        The problem is that we can't, as I understand it --

11   and maybe the person from the Department of Ed could correct

12   me on this, if I'm wrong.  But as I understand it, we can't

13   come under their OPE ID number until the sale is approved

14   and the sale closes.

14:32:33 15        And that can't happen until the American Bar

16   Association acquiesces in the change of ownership, which

17   could take several months.

18                    MR. DOTTORE:  That was my point, Your Honor --

19                    DEAN EASLEY:  So the --

14:32:43 20                    MR. DOTTORE:  -- is --

21                    DEAN EASLEY:  What happens --

22                    MR. DOTTORE:  -- we could bootstrap it through

23   to that.

24                    THE COURT:  Well, I -- well, Mr. Dottore, what

14:32:51 25   are you suggesting?

1          MR. DOTTORE:  That's what -- Dr. Easley and I

2     have spoken about this, and there's a -- there's a --

3          Are you talking about Mr. Ryan, Dean?

4          DEAN EASLEY:  Yes.

14:33:01  5          MR. DOTTORE:  Okay.

6          He could -- there's this transition period that we

7     could get through the process, if I had a way.  And maybe

8     this is the way:  Through Argosy -- I'm sorry -- through AI

9     Las Vegas.  Maybe there's a way that we can start that

14:33:13 10    process.  They could be drawing Title IV until we can get it

11    through.

12          I believe Mr. Ehrman has had several conversations

13    with the ABA.  They want to see this law school survive.

14    And I think that getting their approval is not going to be a

14:33:27 15    big stretch because of fine people like Dean Easley and the

16    people on the phone.  These people are passionate.

17          I'll just put it really simple.  This law school got

18    caught in three financial problems ago.  I don't know why

19    they got involved with the people they got involved with,

14:33:42 20    but they did.  They need relief to get out of this.

21          THE COURT:  Well, that's one of the -- this

22    receivership will be a success if we can save this law

23    school, in my view.

24          And if we can't, it won't be.

14:33:55 25          So I'd like to accomplish this.

1          So --

2                    MR. SHAPIRO:  Your Honor, this is

3     William Shapiro.

4          May I address the Court?

14:34:09  5                    THE COURT:  Yes, Mr. Shapiro.

6                    MR. SHAPIRO:  Yeah.  The purpose of myself and

7     Mr. Bentley to get involved is just to do exactly what the

8     Court just said, and that is, to save the school and make

9     sure that the students, at a bare minimum, finish the

14:34:22  10     semester.  We'll do everything, and we are doing everything

11     and anything we can to do that.

12          We simply want to make certain that there's ample

13     time.  And one of the issues of the agreement was, on

14     Paragraph 7, was that we only had until March 26th to

14:34:43  15     arrange for a suitor or a purchaser, including ourselves, to

16     come up with a feasible alternate or a proposal, an offer

17     for the school.

18          Now that the -- Studio has withdrawn, and it's not

19     feasible for them to do it, one of the things I think is

14:35:00  20     critical, is to get a greater -- a longer runway, a little

21     bit greater window of time.

22          And I think we have that now, particularly in light

23     of -- we have a -- maybe a -- if the Las Vegas school could

24     get the Title IV funding, pending the period of time that it

14:35:17  25     takes to get an onboard with Mr. Ryan or another suitor or

1    ourselves, it's--

2                    THE COURT:  All right.  Well, I've got a

3    question.  We have --

4        Mr. Dottore, you got another two weeks for funding for

14:35:35  5    the law school.

6        When does that end?  The new two weeks, additional two

7    weeks you got, through when?

8                    MR. DOTTORE:  Actually, I've got until -- I

9    forget the exact date.  The dean knows it.  It's April.

14:35:50  10                    MS. WHITMER:  I thought it was April 8th.

11                    MR. DOTTORE:  April 8th.

12                    DEAN EASLEY:  Well, the work period would

13    cover us through April 5th.

14                    THE COURT:  All right.

14:35:58  15                    DEAN EASLEY:  We -- like the rest of Argosy --

16    we get paid a week late.  So the actual payday would be

17    April 12th, but the pay period would be through April --

18                    THE COURT:  All right.

19                    DEAN EASLEY:  And that's far enough to allow

14:36:10  20    us to make sure that we can graduate the students who were

21    scheduled to graduate.

22                    THE COURT:  Okay.  All right.

23        My question is -- my question is:  How much money is

24    necessary to keep the law school running, I would assume,

14:36:26  25    through sometime in May, to finish the semester for the rest

1      of the students?

2           In other words, we've taken care of -- the people who

3      are graduating, we've done some maneuvering, and they'll be

4      able to get their credits done by, I guess, April 5th.

14:36:45  5           But the rest won't.

6           Do you have a sense of how much money would be needed

7      to take this law school through the end of this semester?

8                     MR. DOTTORE:  Well, the good news, Your Honor,

9      is that when the law school lease was set up, there was a

14:36:59 10      couple of million dollar deposit put down on the lease.  So

11      the landlord is being paid through this deposit.

12                     THE COURT:  All right.  So we don't have to

13      worry about rent.

14           So we're talking about payroll, basically.

14:37:12 15                     MR. DOTTORE:  It's about a hundred and --

16                     MR. GLICKMAN:  -- Sixty.

17                     MR. DOTTORE:  -- sixty-some thousand dollars

18      every two weeks.

19                     THE COURT:  All right.

14:37:18 20           Dean, when does your semester end?

21                     DEAN EASLEY:  Well, the final exam period ends

22      on May 17th.  But then we need at least an additional week

23      beyond that.

24                     THE COURT:  All right.  I'm going to say the

14:37:32 25      end of May.  Let's just say -- what would be -- how much

1      money would it take?

2            And this is excluding rent.  The rent is covered.

3            So the payroll operating costs from April 5th through

4      the end of May, a little less than two months.

14:37:48  5            What are we talking about?

6                      MS. WHITMER:  Your Honor --

7                      DEAN EASLEY:  We're talking about, roughly,

8      the payroll period.  So if it's 160,000, it's $160,000 per

9      pay period, it would be that times four, which would be

14:38:04 10      640,000, roughly.

11                      MR. DOTTORE:  That's too high.  We've

12      got -- we've got two more payrolls after this.  We made one

13      of the payrolls.  Mr. Lau -- or I'm sorry.  Because I --

14      Flagler is going to pay the next payroll.  I'm putting the

14:38:22 15      money together to pay the third payroll.  So we need -- so

16      May.

17                      THE COURT:  Well, we've got -- what we're

18      talking about is the payrolls, April 26th, May 8th -- it

19      might only be three.  May -- then May 22nd.

14:38:57 20            Probably three and a half payrolls.  May 29th would do

21      it.

22            So with -- so I think it's really three and a half

23      payrolls.

24            So that's five hundred --

14:39:13 25                      MR. GLICKMAN:  -- eighty four thousand, Judge.

```
 1                    THE COURT:  Yeah.

 2                    MR. GLICKMAN:  I went with the $167,000

 3       number.

 4                    THE COURT:  Oh, 167,000.

 5             So what did you come up with for three and a half,

 6       Mr. Glickman?

 7                    MR. GLICKMAN:  $584,000.

 8                    THE COURT:  All right.  Roughly, $600,000 we

 9       got.

10                    MR. DOTTORE:  So not to promise this money --

11       the other money that I'm already using for payroll, -- if I

12       can sort out where this money has to go, I might have some

13       leeway, depending upon how that -- the money that has to go

14       back to the government lays out.

15                    THE COURT:  All right.  Well, if this

16       is -- you know -- all right.

17                    MR. MORSE:  Excuse me, Your Honor.

18             May I be heard?

19                    THE COURT:  Who is this, please?

20                    MR. MORSE:  Yes.  Your Honor, Joshua Morse on

21       behalf of Tech Park 6, LLC.  We're the landlord for the

22       Las Vegas entity.

23             As we're figuring out additional dollars that may need

24       to be required to pay in order to, you know, also keep the

25       Las Vegas entity viable, it's still unclear that there is a
```

1    viable, you know, purchaser for the Las Vegas property.

2         And we have received rent on a per diem basis, per

3    Your Honors' order, but only through yesterday.

4         So as we figure out --

5              THE COURT:  Well, you're going to get paid --

6    so long as the school is operating, you're going to be paid,

7    sir.  That was the court order, sir.

8              MR. DOTTORE:  Your Honor, I pay at the end of

9    the day, on a per diem basis.  The people from Saving

10   Las Vegas -- which is just a name.  I wish they would have

11   chosen something better -- have done a negotiation with the

12   landlord.

13        I don't know -- I was not privileged to the response

14   that the landlord gave back to the people at Saving

15   Las Vegas.  I'm going to Las Vegas this week to try and

16   consummate the balance of that deal.

17        But as it is, we're paying 3,500-and-some-odd dollars

18   a day, per diem, as we go along.

19        What I was told -- and I'm not sure because I'm not in

20   this part of the negotiation -- that there was some -- maybe

21   Mr. Nemer can speak to this.

22             MR. NEMER:  Your Honor, Charles Nemer,

23   McCarthy Lebit.

24        Your Honor, it's my understanding -- and I've been in

25   contact with Mr. Morse -- that the landlord provided a

1    response to the prospective buyers, LOI, for a lease

2    agreement.

3        We received an e-mail late this morning, Your Honor,

4    from counsel for the prospective buyer, that the terms of

14:41:34  5    the counterproposal from the landlord were favorable.  And

6    that she would be contacting the landlord to negotiate a

7    lease as it relates to that location, Your Honor.

8            THE COURT:  All right.  Well -- all right.  I

9    don't want on get sidetracked.

14:41:53  10        I am confident we can come up with $600,000 to keep

11    the law school -- to allow people to finish the semester.

12    So no one is going to lose a semester.

13        And that should provide, also, a runway to figure out

14    if someone else wants to buy the law school, take over the

14:42:15  15    law school, and keep it running for next year.  Hopefully

16    so.

17            MR. DOTTORE:  If you'll allow me, Your Honor.

18    There's one line item that I know for a fact I could

19    probably get without any problem.

14:42:27  20        At some point in time, the law school had a fundraiser

21    that garnered nearly $200,000.  I don't know what it was

22    segregated for, or what it's -- but in light of the fact, if

23    I can track this down quickly --

24        And I'll do it, Judge Parker, because I know timing is

14:42:43  25    an issue.

1        -- I will track it down.  If the law school would

2   allow me to use that $200,000, that would take a big chunk

3   of that payroll away.

4                   THE COURT:  Well, Dean, you're on the phone.

14:42:55  5            DEAN EASLEY:  Your Honor, this is

6   Allen Easley, again.

7                   THE COURT:  Yes.

8                   DEAN EASLEY:  I know (phone audio distorts)

9   those were donations made by alumni for student scholarship.

14:43:05 10            THE COURT:  Well, all right.  Well, if it was

11  restricted, I don't want to -- of course, if the law school

12  goes under, I guess you're going to have to give the money

13  back.

14        What?  Yes?

14:43:17 15            MR. BENTLEY:  Your Honor, this is

16  Greg Bentley.

17        May I be heard?

18                   THE COURT:  Yes.

19                   MR. BENTLEY:  We -- as far as for Mr. Shapiro

14:43:25 20  and I, I happen to be the chair of that fundraiser.  And we

21  clearly, as alumni, really appreciate the Court's desire to

22  save the school and let these students finish.

23        I think what would be helpful -- because Mr. Shapiro

24  and I were trying to get other suitors, including Mr. Ryan

14:43:43 25  and some other law schools that might be interested.  Just

1      some thoughts from my perspective on the $600,000.

2          I think, if it's possible, we would like if the Court

3      could just facilitate and allow us to get a meeting or

4      discussions with the Department of Ed.  You know, are there

14:43:59  5      ways to, perhaps, just release some funds right now through

6      an assignment outside of Argosy directly to Western State,

7      just to finish the semester?

8          And then arguably, the students are dying on the vine

9      financially.  They're just -- they're in the semester

14:44:15 10      without any money.

11          Is there a certain way that we can negotiate some type

12      of minimal funds for the students just to live to get

13      through the end of the semester?

14          And then, I would believe, that that might save the

14:44:28 15      state money or the government money because the semester or

16      the year would be completed.  And it would help save time

17      and give a chance find other suitors.

18          So that would be one thing to have discussions with

19      the Department.

14:44:38 20          You know, depending upon how the money was raised for

21      that fundraiser, I think any funds right now that can be

22      used to save the school, these students would understand.

23      And, you know, Mr. Shapiro and I and Dean Easley are

24      speaking with the leaders, and proud of those that came out

14:44:54 25      and appeared in your Court.

1          But really, what we need is time.  And if it can be

2     extended out, and we can work with Mr. Dottore and get --

3              THE COURT:  All right.  Well, I suggest -- if

4     you're head of the -- you know, if you want to repurpose

14:45:04   5     that $200,000, I would suggest it's a very good purpose for

6     it.  Because if we don't accomplish this, no one's going to

7     get any scholarships for this law school because there won't

8     be one.

9              MR. BENTLEY:  I agree.

14:45:15  10              THE COURT:  So they'll have to return the

11     money, or give it away, and it won't be used for law school

12     stipends or scholarships.

13          So -- all right.  We will come up with the $600,000,

14     in one way or another.  If it's got to -- it may come out of

14:45:32  15     the 1.5 million reserve.  I'll live with that.  If someone

16     wants to sue me, they can sue me.

17              DEAN EASLEY:  Your Honor, could I just --

18              THE COURT:  Yes.

19              DEAN EASLEY:  This is Allen Easley, again.

14:45:41  20          Could I just layer on one thing to what Greg Bentley

21     said?

22          And I really appreciate Greg and Bill being here to

23     support the law school.

24          But he mentioned the Department of Ed and the loan

14:45:53  25     money.  And right now, we're leaving about $2.4 million in

 1    tuition on the table, because we've been unable to pay out

 2    stipends to students that would result in releasing that

 3    money.

 4        So if there were a way that we could resolve the issue

 5    with the Department of Ed to regain our eligibility, then if

 6    we were to, you know, front the stipends -- what we owe the

 7    students -- what would come back to us would be

 8    2.4 million --

 9            THE COURT:  Well, sir -- Dean, the problem is

10    that -- and it was just explained to me by Mr. Frola -- that

11    you're tied in with Argosy.

12            DEAN EASLEY:  Right.

13            THE COURT:  And Argosy has more than three

14    strikes against it.  And that's why it lost its funding.  If

15    you were a standalone, we wouldn't have this problem.

16            MR. DOTTORE:  I think what he's getting at,

17    Your Honor, is maybe, if I can -- I'll talk to Mr. Frola

18    tomorrow morning --

19            THE COURT:  All right.  There should be a way

20    to do this.  All right?  And I very much appreciate

21    the -- some creative thinking by the Department of

22    Education, because I'm also trying to save taxpayer money.

23        Because, of course, if this semester is lost, yes, the

24    students have lost their time and effort, but the taxpayers

25    will lose all the money because the students are going to be

1    able to get their loans written off.  All right?  So the

2    taxpayers are going to be out millions of dollars.  And I'd

3    rather not see that.  I'm one of them.

4         So I -- we're going to keep this law school operating

14:47:29  5    through the semester.  And I'd like people on the phone,

6    people in the room, to work with the Department of Education

7    and see what can be put together for next -- for next year.

8         So --

9              MR. BENTLEY:  Your Honor, Greg Bentley, again,

14:47:47 10    if I may?

11              THE COURT:  Yes.

12         Who is this?

13              MR. BENTLEY:  Greg Bentley, again, Your Honor.

14              THE COURT:  Yes, Mr. Bentley.

14:47:54 15              MR. BENTLEY:  Okay.  Thank you.

16         We would love to speak with the Department of

17    Education.  And we clearly understand their reluctance to

18    want to fund the money for a school that they don't trust.

19    And I think -- at least here in Orange County for Western

14:48:08 20    State -- we have good plans to keep it going.

21         I do believe that we've tried, and I personally tried

22    to make contact, and they're not rightfully speaking with me

23    directly.  If somehow this Court can at least maybe anoint

24    me into a committee to have authorization to speak with the

14:48:24 25    Department of Ed, that would help.

1    Because we're also -- for instance, Mr. Ryan and his

2    group would like to have communication.  And, you know,

3    absent consent from the various parties, the Department of

4    Ed is keeping it close to the vest, which we understand.

14:48:34  5    But we would like to be able to be involved in those

6    communications.

7         THE COURT:  Well, Mr. Frola, do you have a

8    problem speaking with Mr. Bentley, Mr. Shapiro, and anyone

9    else who wants to keep the law school running?

14:48:49 10         MR. FROLA:  Yeah.  Any requests for us to

11   consider any proposals should come through the receiver.

12         THE COURT:  All right.  Mr. Dottore raised his

13   hand.  So that's fine.

14        So I'm going to -- Mr. Dottore will be the catalyst to

14:49:03 15   put together people to talk to the Department of Education

16   to figure out a strategy to keep this law school in

17   operation.

18        And what I would like --

19         MS. WHITMER:  Your Honor, if I could make a

14:49:18 20   suggestion?

21         THE COURT:  Yes, Ms. Whitmer.

22         MS. WHITMER:  Could you give us seven days to

23   see --

24         THE COURT:  I'll give you more than that.  I

14:49:26 25   was going to suggest, you know, reporting to the Court in

1    two or three weeks as to what you've got.  All right?

2        Because there's now not quite such a crisis because

3    the school is going to stay -- the students are going to be

4    able to finish their semester.  They don't have to be

14:49:39  5    panicked.  And so . . .

6        In fact, I got a letter from a law student today.  She

7    wants me to tell her whether she should sign up and start

8    studying for the California bar.  She can do that because

9    she's going to graduate.  I didn't ask her if she's going to

14:49:57 10    graduate, but I assume she will.

11            MS. HUGHES:  She's not one of the 77.

12            THE COURT:  Well, then, I don't know.  I mean,

13    I -- well, she will be able to if -- well, how is she going

14    to take the bar if she doesn't graduate?

14:50:08 15            MR. DOTTORE:  Some of the 77, Your Honor --

16    and Dean Easley can correct me, please.

17        Some of the -- there's 77 that can be out in April.

18    There's an additional amount -- I don't know the exact

19    number -- that could be out at the end of May.

14:50:21 20        I think now that --

21            THE COURT:  There going to be -- there going

22    to -- anyone who can finish their work by the end of this

23    semester will -- is okay.  So if she's one of them, she can

24    do it.  We've taken care of that.

14:50:35 25            MR. DOTTORE:  So my lawyers don't go crazy

1    here, if I do end up going into any part of the 1.5, I know

2    they can't --

3                      THE COURT:  You need my -- I'll give the

4    order.

14:50:41  5              MR. DOTTORE:  I don't want -- okay.

6          Thank you very much.

7                      THE COURT:  I'll give the order.

8          But don't -- you need my order --

9                      MR. DOTTORE:  I will not touch it.

14:50:47  10              THE COURT:  -- and when I sign it, you're off

11    the hook.

12                      MR. DOTTORE:  Thank you.

13                      THE COURT:  Don't do what -- but it's got to

14    be a court order.

14:50:50  15              MR. DOTTORE:  Thank you.

16                      THE COURT:  Either me or Judge Parker.

17                      MR. BENTLEY:  Your Honor --

18                      THE COURT:  Yes.

19                      MR. BENTLEY -- Greg Bentley, again.

14:50:57  20              THE COURT:  Yes.

21                      MR. BENTLEY:  The students -- if I may.

22          The students need hope.  And the frustration and the

23    demise of the school, and studying, applying, and

24    transferring has really -- it's gutted them.

14:51:09  25          Is it possible for the Court to issue whatever it is

1    in its order that the school is ordered to remain open, and

2    the students can finish the semester, so they can now start

3    buckling down to study?

4                    THE COURT:  Well, sir, I don't think I can

14:51:25  5    order -- I mean, obviously, I can order anything, but -- I'm

6    not being facetious.

7        I can order anything until a higher court tells me I'm

8    out of line.  But --

9                    MR. DOTTORE:  I can't imagine --

14:51:39  10                    THE COURT:  -- I don't think I can -- I mean,

11    it's a free country.  All right?  You're not breaking a law

12    if you close.

13        It's a huge loss, but you're not violating the law if

14    you shut down, Dean.

14:51:49  15                    MR. DOTTORE:  Since we need --

16                    THE COURT:  I'm saying that we -- I have

17    guaranteed there will be funds to keep the school open

18    through the end of this semester.  So --

19                    MR. BENTLEY:  That's great.  And if they could

14:52:01  20    be placed in the order that comes out, that gives hope to

21    the --

22                    THE COURT:  I will put it in there that funds

23    will be provided to keep the school operating through the

24    end of this semester.

14:52:10  25                    MR. BENTLEY:  Perfect.

 1                        THE COURT:  And what I would like is --

 2                        MS. KELLER:  Your Honor --

 3                        THE COURT:  Yes?

 4                        MS. KELLER:  -- may I -- this is Susan Keller.

14:52:20  5        May I be heard?

 6                        THE COURT:  Yes.

 7        Ms. Keller, who are the representing?

 8                        MS. KELLER:  I am the associate dean at

 9        Western State College of Law.

14:52:28 10                        THE COURT:  Yes.

11                        MS. KELLER:  If in that order you could be

12        specific about the date that -- by which you mean the end of

13        semester.  I heard you say May 29th is the --

14                        THE COURT:  All right.  Through May 29th.

14:52:41 15                        MS. KELLER:  That would work.

16                        THE COURT:  All right.

17                        MS. KELLER:  And it is very valuable

18        for -- it's essential that our students be able to know,

19        almost immediately, whether the school is going to be able

14:53:00 20        to be open through the end of the semester.  And it sounds

21        like that is the definitive answer.

22                        THE COURT:  Well, I've ordered -- you can tell

23        people that there will be a court order that funds will be

24        provided through May the 29th so everyone can finish the

14:53:13 25        semester.  And what I would like is a report --

1          MS. KELLER:  And by funds available through

2     May 29th, I'm assuming that that's not the payroll date, but

3     that's the last day of work.

4          THE COURT:  Working day.

14:53:26  5          MS. KELLER:  Because we do need --

6          THE COURT:  Yeah.  Right.  I mean, obviously,

7     people are working through May 29th, so they'll be paid

8     through May 29th.  All right?

9          MS. KELLER:  Wonderful.

14:53:35 10          THE COURT:  I'm not pulling some sleight of

11     hand of doing that.  We don't operate that way.

12          MS. KELLER:  No.  No.

13          DEAN EASLEY:  Your Honor, this is

14     Allen Easley.  If I could just say one more thing on this.

14:53:45 15          First of all, I thank you, because I think this is

16     going to be a huge relief to those students who thought that

17     their last class was going to be March 22nd or April 5th,

18     whatever the date was.  To know that they can move forward

19     and finish the semester will make a huge difference to them.

14:54:06 20          THE COURT:  All right.

21          DEAN EASLEY:  On the issue of working with the

22     Department of Ed -- and you've asked the receiver to pull

23     that together -- the most viable purchaser, as far as I can

24     tell, is this individual, Barry Ryan, that we've been

14:54:24 25     talking about.  And the biggest stumbling block to his

1    committing is the program that had Title IV funds.

2         So if the receiver could arrange a meeting with

3    Barry Ryan and me and the Department of Ed and the receiver,

4    that would be really helpful.

14:54:46  5              THE COURT:  All right.  This is what I'm going

6    to do:  I'm going to -- already Mr. Dottore has agreed to be

7    the catalyst, the conduit, for these discussions with

8    prospective purchasers, operators of the law school, and the

9    Department of Education.

14:55:04 10        If I ask for a report by the first week of April, I

11   think that -- I'd like to move this forward.

12        So let's just say by noon, April 2nd, I'd like a

13   report of the receiver of those conversations.  And

14   hopefully there will be -- I'm just asking everyone to work

14:55:34 15   together and try and save this school.

16        All right.  The last thing I wanted to cover, there

17   was -- we received one or two letters from Dr. Harbaugh on

18   behalf of, roughly, 1,000 graduate students to -- requesting

19   a transitional teach-out for the classes --

14:55:51 20              (Interruption by conference call.)

21              THE COURT:  -- for clinical programs.

22        And the problem is, I have no idea of what the cost of

23   this is.  And I don't know if --

24        Is Dean Harbaugh on the phone?

14:56:09 25        Can he provide any information?

1          Does anyone know the answer to this?

2                  MR. DOTTORE:  Yes, Your Honor.

3                  THE COURT:  Yes, Mr. Dottore.

4                  MR. DOTTORE:  Mr. Harbaugh keeps writing

14:56:19  5   letters about things that should have been done.

6          Mr. Harbaugh, I want to remind everyone in the court,

7   was the president of the board of directors the whole time

8   all of this was --

9                  (Interruption by conference call.)

14:56:28 10                 MR. DOTTORE:  -- happening.

11         He was -- he and the dean of the school at the time

12   were signing off on all of these stipend draws that never

13   seemed to get.

14         So the fact that he's looking for transparency -- I've

14:56:39 15   given him more transparency in the seven weeks I've been

16   there than he's had the whole time.

17         To answer your question, Your Honors, about the cost

18   is, I'm not sure yet because I don't -- I have to make this

19   payroll.

14:56:50 20         The thing he's not stating there -- and I have several

21   letters --

22                  (Interruption by conference call.)

23                  MR. DOTTORE:  -- to prove this -- most of the

24   students have already been transferred.

14:56:56 25         Now, I'm sure that the Department of Education and

1     some other accrediting agency has a reason that these people

2     have to be there to distribute whatever the records are.

3          I have retained, at the receivership's cost, a woman

4     that helps do the teach-outs, set where they go, and the

14:57:14  5     transfer students.

6          I've also been told by -- I have 15 different schools

7     that can take the undergraduates and the online.  I have

8     four schools that are taking the doctoral programs.  Most of

9     them happily.

14:57:30  10          For example, the one in Florida is taking the

11     students -- not only are they taking the students,

12     Your Honor, pretty much at a parallel path, where there's no

13     loss of credit hours, they've also taken the faculty.

14          So several of the faculty that have not been paid have

14:57:43  15     already been rehired by the other people that I've made

16     transfers for.  I don't understand what he's talking about.

17               THE COURT:  All right.  Well, I'm not sure,

18     either.

19          I think what I'm going to ask you to do, Mr. Dottore,

14:57:54  20     is to talk to Mr. Harbaugh, determine if some group of

21     students are somehow falling through the cracks and are in

22     danger of losing their semester and their clinical work or

23     whatever, and how much money would be involved to patch

24     those cracks so they can be transferred.  All right?

14:58:13  25               MR. DOTTORE:  I will find out from our inhouse

1    people at Dream Center.  And I'm sure that Mr. Papp will be

2    able to help me with some of that.

3                THE COURT:  All right.  And get a report to

4    us --

14:58:21  5                MR. DOTTORE:  Not monetarily.

6                THE COURT:  Yeah.

7        Get a report to us by this -- the same thing, noon,

8    April 2nd, or sooner, but no later than April 2nd.

9        So it's whether -- he talked about a thousand -- the

14:58:36 10   last letter, I believe he mentioned, roughly, a thousand

11   students are in danger of losing out.  And --

12               MR. DOTTORE:  That could be, Your Honor.

13       I don't know the exact number.

14       But I can tell you that, for example, South

14:58:48 15   University --

16               (Interruption by conference call.)

17               MR. DOTTORE:  South University has been very

18   helpful in transferring students.  Set up a 30 percent

19   discount for the students that were at Argosy to transfer to

14:58:59 20   South, and have made it somewhat seamless.  They are not my

21   only option.

22       I am not telling students, under any circumstances,

23   they can only go to South.  I've set that same arrangement

24   up with 12 other universities.

14:59:13 25       Chicago is taking -- there's a university in Chicago

1    that's taken the PsyD program.  That's what Mr. Harbaugh --

2    or Dr. Harbaugh is most worried about.

3         I've also got a school in Tampa that took all the

4    Tampa students, and are available to take some of the

14:59:26  5    Chicago students that the transfer wasn't good to the -- I

6    forget the name of the school -- forgive me -- that was

7    taking them.

8                   THE COURT:  All right.  Well, again, I don't

9    know -- I'm not privy to all the details or what the facts

14:59:38 10    are.  But I -- again, the purpose of the receivership was to

11    provide teach-offs, run-outs, whatever, so that people --

12    students wouldn't lose a semester.

13         So find out from Mr. Harbaugh if there are any

14    students in peril of losing -- graduate students losing a

15:00:00 15    semester.  And, if so, what additional services are needed,

16    and how much will it cost.

17         And if it's -- you know, if it's a modest amount,

18    we're going to authorize it as part of the million and a

19    half to take care of them.  I'll do it.

15:00:13 20                   MR. DOTTORE:  Thank you, Your Honor.

21                   THE COURT:  And if there's something you find

22    out you need real fast, on an emergency basis, get it to us,

23    and we'll do it.  We'll authorize it.

24                   MR. DOTTORE:  Thank you, Your Honor.

15:00:23 25                   THE COURT:  Okay.  I think that takes care of

1     my agenda.

2          I appreciate everyone --

3               MR. BENTLEY:  Your Honor, one last thing.

4     Greg Bentley, if it's okay, again.  I apologize.

15:00:31  5               THE COURT:  Okay.

6               MR. BENTLEY:  With respect to Paragraph 7 of

7     the settlement -- and maybe this is something that's

8     directed to Mr. Dottore -- could we extend the time period?

9     Because when we're meeting with possible suitors, the

15:00:45 10     March 26th date is just weighing on people.

11          Perhaps, could that be extended to maybe the beginning

12     of May or mid-May so we can, you know, bide more time?

13               MR. GLICKMAN:  Judge, Rob Glickman.

14          Paragraph 7 effectively gives Studio the right to

15:00:59 15     acquire the university after a 30-day period where the

16     receiver hoped to negotiate with other purchasers.

17          Studio has indicated in a pleading to the Court --

18               THE COURT:  Yeah.  Studio essentially said,

19     We're not doing it.

15:01:12 20          So I --

21               MR. ALTORELLI:  That's not quite true, Your

22     Honor.

23          We said we couldn't do it because of the Title IV with

24     the Department.  We've notified.

15:01:17 25          We're fine with extending it.  And we, actually, are

1    still interested in trying to help.  We don't see a path

2    forward yet.  We've heard a lot of good things today.

3         And, by the way, you only addressed 20 percent of the

4    issues.  I don't want to depress people, so I won't.

15:01:30  5         But we'll happily extend the date.  No problem.

6              THE COURT:  All right.  Well, we'll extend the

7    date.

8              MR. ALTORELLI:  Put another 30 days.

9              THE COURT:  Yeah.  Let's extend it 30 days,

15:01:40 10   until the end of April.  We'll make it April 26th.

11             MR. BENTLEY:  Thank you, Your Honor.

12             THE COURT:  If it needs to be extended more --

13   but we'll extend the 3-26 to 4-26.

14        And we'll have a report from Mr. Dottore, April 2nd,

15:01:52 15   on how things are going.

16             MR. BENTLEY:  Perfect.

17             THE COURT:  Okay.  All right.

18        Again, I want to thank everyone who is here, the

19   people on the phone.  There's a lot of very hard work going.

15:02:04 20   This is incredibly complicated.

21             MR. GLICKMAN:  Judge, can I be heard on one

22   more thing?

23        This is Rob Glickman, again, for the people on the

24   phone.

15:02:13 25        I just don't want people to be overly optimistic.

1    We've had two situations with two campuses where we had

2    interested suitors.  They actually offered to pay all of the

3    back stipend money, including pre-receivership, and take

4    over these schools as ongoing entities.  And in each

15:02:33  5    instance, couldn't get approval.

6        So it's -- there has been a tremendous amount of work,

7    but there's also lot of frustration there, too.  And I just

8    don't want --

9            THE COURT:  Well, why weren't they -- they

15:02:44  10    don't get approval from what?  The Department of Education

11    or what?

12            MR. GLICKMAN:  Yes.

13            THE COURT:  Well, Mr. Frola, I'm not sure what

14    the circumstances are, and I'm not blaming anyone, but I'm

15:02:55  15    going to strongly urge the Department to be flexible in its

16    approach so that if there's a chance to at least preserve

17    the law -- preserve this law school, that you do it.

18        Is that a reasonable request?

19            MR. FROLA:  Yes, Your Honor.  It's a

15:03:15  20    reasonable request.

21        I would just like to say that we have not been

22    forwarded any formal proposals on any actions for new

23    entities taking over locations.

24            MR. GLICKMAN:  Judge, I can give an example.

15:03:26  25            THE COURT:  All right.  Yes, Mr. Glickman.

1          MR. GLICKMAN:  Yeah.

2          The gentleman, Mike Parik (phonetic), who is

3     representing Eastern Gateway Community College, related to

4     me that he had those very discussions on terms with the --

15:03:41  5     with Under Secretary Jones, and he was simply told it was

6     too late.  And that's why he didn't submit a formal

7     proposal.

8                    MAGISTRATE JUDGE PARKER:  Was that to operate

9     underneath an Argosy entity?

15:03:53 10                    MR. GLICKMAN:  No.  This is AI Pittsburgh.

11                    MR. DOTTORE:  Which had its own OP ID number.

12                    MR. GLICKMAN:  Which did have its own OP ID

13     number.

14                    THE COURT:  Well, I don't know why --

15:03:59 15          Mr. Frola, do you know anything about that situation?

16                    MR. FROLA:  As he just stated, we never

17     received a formal proposal.

18                    THE COURT:  Well, I don't know what that --

19     that sounds like to be --

15:04:14 20          Maybe you didn't get one because he was told it

21     wouldn't -- there's no point.  You won't consider it.

22          So --

23                    MR. FROLA:  I can't speak for the

24     Secretary Jones on that.  I wasn't at the -- on that call.

15:04:26 25                    THE COURT:  Well -- all right.  You're the --

1          MR. FROLA:  But my office would evaluate the

2    proposal.

3          THE COURT:  You're the point person.

4      All right.  Mr. Frola is the point person.  So the

15:04:33  5    discussions should be with him.  And I -- you know, I think

6    everyone would like to keep this law school operating, if

7    there's reasonable people to take it over.

8      So --

9          MR. DOTTORE:  Your Honor, The State of Nevada

15:04:48 10    would also like the Art Institute of Las Vegas to stay open.

11    So it's equal.  And I'm making headway on both points.

12          THE COURT:  All right.  Well, who are you

13    talking to on Art Institute of Las Vegas?

14      Are you talking to Mr. Frola?

15:05:02 15      He's the person who has been participating in these

16    discussions.  So I suggest we go through him.

17          MR. DOTTORE:  We've started that, and he's

18    been very helpful.

19          THE COURT:  All right.  Well, he's the point

15:05:14 20    person for these discussions.

21          MR. SHAPIRO:  Your Honor, this is

22    William Shapiro.

23      We are very optimistic, and we're hopeful.  And the

24    Court's ruling today is going to greatly assist its suitors.

15:05:25 25    Coming up with this additional time is a great assist.

1              THE COURT:  All right.

2              MR. SHAPIRO:  And on behalf of the students, I

3    want to thank you.

4              THE COURT:  All right.  You're very welcome.

15:05:33  5    Thank you for your help.

6          All right.  We are adjourned, then.

7          Thank you very much.

8              DEPUTY CLERK:  All rise.

9                      - - -

          (Proceedings adjourned at 3:05 p.m.)


                    **C E R T I F I C A T E**


          I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


     */s/ Donnalee Cotone          19th of March, 2019*
     DONNALEE COTONE, RMR, CRR, CRC            DATE
     Realtime Systems Administrator