**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC, | ) | CASE NO. 1:19-CV-00145 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| SOUTH UNIVERSITY OF OHIO, LLC, *et al.*, | ) | |
| | ) | MAGISTRATE JUDGE THOMAS |
| Defendants. | ) | M. PARKER |
| | ) | |

**STUDIO ENTERPRISE MANAGER, LLC'S RESPONSE IN OPPOSITION TO THE
EMERGENCY MOTION OF THE RECEIVER FOR AN ORDER REQUIRING STUDIO
ENTERPRISE MANAGER, LLC AND JOHN J. ALTORELLI TO SHOW CAUSE WHY
THEY SHOULD NOT BE HELD IN CONTEMPT OF THIS COURT FOR THEIR
VIOLATIONS OF THE INJUNCTIONS CONTAINED IN THE AMENDED ORDER
<u>APPOINTING RECEIVER</u>**

## TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................... 4

A.    Mr. Altorelli Does Not Own, Control, or Serve as an Officer of Studio…………………..4

B.    The Receiver Continues to Frustrate the Purpose of the Receivership and Ignore the Court's Other Orders……………………………………………………………………6

C.    Each of Studio's Actions are Reasonable and Sanctioned by the Terms of the Reorganization Documents and Other Court Orders ........................................................ 10

II.   LAW AND ARGUMENT ................................................................................. 18

III.  CONCLUSION ................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Consol. Coal Co. v. Local Union No. 1784, United Mine Workers of Am.*, 514 F.2d 763 (6th Cir. 1975)…………………………………………………………………………………………..18

*Downey v. Clauder,* 30 F.3d 681, 686 (6th Cir. 1994)……………………………………………19

*Electrical Workers Pension Trust Fund of Local Union v. Gary's Elec. Service Co.,* 340 F.3d 373, 379 (6th Cir. 2003)…………………………………………………………………………18

*Gascho v. Global Fitness Holdings, LLC,* 875 F.3d 795, 799 (6th Cir. 2017)………………….18

*Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)……………………………………………20

*Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911)……………………………..18

*Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996)………………………....…18

*Hall v. Chamberlin,* No. 4:12CV0460, 2012 WL 539980, at *3 (N.D. Ohio Nov. 5, 2012)…….19

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967)…………………………………………………………………...18

*NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)……………………………18

Studio Enterprise Manager, LLC ("Studio") hereby files this Response in Opposition (the "Response") to the Emergency Motion of the Receiver for an Order Requiring Studio Enterprise Manager, LLC and John J. Altorelli To Show Cause Why They Should Not Be Held In Contempt of This Court For Their Violations of the Injunctions Contained in the Amended Order Appointing Receiver, Docket No. 252 (the "Contempt Motion"), filed by Mark E. Dottore, the receiver (the "Receiver"). In support of this Response, Studio respectfully states as follows:

The Contempt Motion against Studio is only the latest chapter in the Receiver's efforts to abuse the powers of the receivership at the expense of the students, the related university systems, and numerous contract counterparties, among others. Instead of attempting to cooperate with Studio, comply with the existing agreements that set forth a feasible reorganization plan, and work toward saving the remaining operational Receivership Entities (as defined in the Receivership Order) and the related universities systems, the Receiver continually chooses to use the receivership estate's limited resources to resort to bully other parties into compliance with his desires. The Receiver cannot show that either Studio or Mr. John Altorelli violated the Amended Order Appointing Receiver, Docket No. 150 (the "Receiver Order") by any evidence, yet alone the required clear and convincing evidence, and the Contempt Motion must be dismissed.

## I.  BACKGROUND

### A.  Mr. Altorelli Does Not Own, Control, or Serve as an Officer of Studio

Initially, Studio must clarify a critical factual issue. Although the Receiver claims that Mr. Altorelli is "a corporate officer" of Studio, is "the person who is in control of Studio," and has directed Studio to take certain actions, none of these allegations are true. Mr. Altorelli does not serve in any of these roles; he is simply outside counsel for Studio, and periodically contracts with Studio to provide legal services. Mr. Altorelli's familiarity with the Reorganization

Documents and Studio's business directly results from his months of effort on behalf of the three university systems and should not be mistaken for that of an employee, officer, owner, or person in control of Studio.  As the Receiver is aware, Mr. Bryan Newman serves as the Chief Executive Officer of Studio, and Mr. Newman makes all final decisions as to Studio's business. Accordingly, Mr. Newman – not Mr. Altorelli – has signed all documents on behalf of Studio and confirmed business decisions throughout the course of the receivership.  As will be amply demonstrated below, none of Mr. Altorelli, Mr. Newman or any other representative of Studio have taken any actions that could possibly be deemed in contempt of court.

Although the Receiver dramatically claims that Mr. Altorelli should be held in contempt of court for his alleged individual actions, it is telling that the Receiver does not point to a single action by Mr. Altorelli that might be in violation of the Receiver Order at any point in the Contempt Motion.[1]  Instead, the Receiver generally claims – without any factual support – that Studio was making employment offers to Dream Center Education Holdings, LLC ("DCEH") employees "at the direction of Altorelli."  First and foremost, Mr. Altorelli neither made nor directed anyone to make employment offers to DCEH employees.  As explained below, to the extent that Studio made offers of employment to DCEH, Studio was specifically authorized to make such offers pursuant to the terms of the Reorganization Documents[2] and disclosed its

---

[1] Because the Receiver requests that Mr. Altorelli be held in contempt of court – but does not even allege any specific actions by Altorelli that violate the Receiver Order – Studio will dispense with addressing this specific request further.  Without including any specific allegations against Altorelli in his individual capacity in the Contempt Motion, the Receiver cannot meet his burden to show that Altorelli violated any court order.  Because Mr. Altorelli is not an officer of Studio, the Receiver's allegations against Studio cannot be imputed to Mr. Altorelli.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Reorganization Documents.  The Reorganization Documents include a Framework Agreement (the "FWA"), a Master Bundled Services Agreement (the "BSA"), a Technology Licenses and Services Agreement (the "TLSA"), a Master Asset Purchase Agreement (the "APA"), a License Agreement (the "License"), and a Restrictive Covenant Agreement (the "Restrictive Covenant Agreement" and collectively with the FWA, BSA, TSLA, APA and License, the "Ai Transaction Documents"), a Master Services Agreement with each of South University, the Arts Institutes, and Argosy University (each as defined below) (collectively, the "MSAs"), a Transition Services and License Agreement with DCEH (the "TSA"), the Amended and Restated Framework Agreement (the "Amended FWA"), an Equity and Asset Purchase Agreement (the "EAPA"), the Omnibus Amendment No. 2 to Credit Documents (the

intention to do so in the Separation Plan filed with the Court. *See* Studio's Separation Plan, Docket No. 206 (the "Separation Plan").  Further, such a general declaration cannot support the Receiver's request for a finding of contempt against Mr. Altorelli in his individual capacity – especially when the Receiver clearly does not even know what Mr. Altorelli's position is with respect to Studio or what actions he may or may not have taken.[3]

## B. The Receiver Continues to Frustrate the Purpose of the Receivership and Ignore the Court's Other Orders

Throughout the Contempt Motion, the Receiver posits that the Receiver Order gave him unabashed power to execute any actions concerning the Receivership Entities (as defined in the Receiver Order), the receivership property, and the employees at the Receivership Entities.  However, the Receiver ignores this Court's other orders directing the Receiver – and other parties – to take specific actions to work toward the mutual goals of the receivership: providing for teach-out periods and separating the shared IT Platform (the "IT Platform") from the ongoing Dream Center South University, LLC (collectively with all of its subsidiaries, "South University") and The Arts Institutes International, LLC (collectively with all of its subsidiaries, "the Arts Institutes") entities by September 2019.  The Receiver's consistent refusal to cooperate with numerous parties and ignore basic obligations of operating the Receivership Entities only further supports the Court's acknowledgment that even though it was originally represented that the receivership would "do more good than harm. . . [t]he reality of the receivership has been something quite different." *See* Order dated April 2, 2019, Docket No. 222.

---

"Bridge Loan"), and an Interim Framework Agreement (as amended, the "IFWA" and collectively with each of the MSAs, the Bridge Loan, the TSA, the Ai Transaction Documents, and the other transaction documents contemplated by the IFWA, the "Reorganization Documents").

[3] Notably, the Receiver also attempts to obtain injunctive relief that applies to all of Studio's agents, employees and even their counsel in the Contempt Motion, generally requesting that the Court issue an order "specifically enjoining Studio, Altorelli, and their agents, employees, and counsel from taking any action that in any way disturbs or interferes with the Receiver's management or control of any Receivership Property." (*See* Contempt Motion at p. 3).  Such broad relief is not consistent with the relief the Receiver requests elsewhere in the Contempt Motion, and Studio submits that the Court should disregard this inconsistent request to obtain an overbroad order.

In fact, as the Court noted in its March 28, 2019 order, it was the Receiver, not Studio, that "did not comply with the Court's order to submit a plan to deal with the IT Platform." *See* March 28, 2019 Order, Docket No. 213. When the Receiver did not submit a plan, the Court recognized that "a comprehensive plan is in place to separate these universities which has accounted for the complexities involved in separating the parties' use of the IT Platform. . . [and] it is unnecessary to order the parties to start from scratch in devising a new method for extricating the South University and the Art Institutes from the IT Platform." *See* March 28, 2019 Order, Docket No. 213. This "comprehensive plan" is documented in the Reorganization Documents, and the Receiver "bound himself to honor and abide by these existing agreements" by executing and obtaining court approval of the Court-approved settlement agreement (as amended), Docket No. 126 (the "Settlement Agreement") between Studio, the Receiver, and Education Principle Foundation ("EPF"). *See* Minutes of Proceeding and Order, Docket No. 190, and March 28, 2019 Order, Docket No. 213.

Further, the Court noted that Studio would need to begin executing on its plan immediately if it were to honor the terms of the Reorganization Documents and help effect separation of the Arts Institute and South University from the DCEH IT Platform. Specifically, the Court acknowledged that Studio would "begin hiring DCEH IT Platform related employees and other employees," and that "[Studio] will also be required to take other steps to comply with its contractual obligations."[4] *See* March 28, 2019 Order, Docket No. 213. Nevertheless, despite this Court's recognition that Studio's plan represented the only feasible path forward, the Receiver refused to engage with Studio and the Arts Institute (although he continued to talk with

---

[4] Studio notes that the Court provided the parties until April 11, 2019 to negotiate any changes to the parties' existing agreements that are necessary to effect Studio's Separation Plan. As detailed in Studio's First, Second, and Third Status Reports (Docket Nos. 229, 247, and 257, respectively), it is Studio's position that no amendments are necessary to the Reorganization Documents to affect the Separation Plan.

South University), and continued to work on his own separation plan, which he filed over two weeks after the Court's deadline.[5]  The Receiver cannot in good faith accuse Studio of violating the Receiver Order when he ignored the Court's specific instructions.

The Receiver continued to disregard the Court's instructions for the parties to negotiate any changes to the parties' existing agreements that are necessary to effect Studio's separation plan by April 11, 2019.  The Receiver refused to engage with Studio during that period until he sent his plan to Studio at 4:54 p.m. on April 10, 2019.  Upon review, Studio realized that the Receiver's plan was largely a similar version of Studio's Separation Plan, except for the additional millions that the Receiver sought to extract from South University and the Arts Institutes for his services.  The Receiver then requested a call the following morning to discuss his plan with Studio (knowing full well that it would be almost impossible for Studio to review and reconcile any differences between the Receiver's plan and Studio's Separation Plan and discuss those differences with the relevant parties prior the 4:00 p.m. deadline on April 11, 2019).  Nonetheless, Studio representatives worked through the night to prepare a detailed comparison of the plans, a copy of which was submitted to the Court in Studio's Third Status Report, Docket No. 257 (the "Comparison") so the relevant parties would have some basis to make an informed decision.

Because the Receiver had only requested a call with Stuido, Mr. Altorelli sent an email to Mary Whitmer, the Receiver's counsel, requesting that all relevant parties be included on the call so they could ask questions and evaluate the merits of the competing plans.  Mr. Altorelli's

---

[5] Studio engaged in discussion with the Receiver about his plan on April 11, 2019.  The results of that discussion, and Studio's detailed comparison of the Receiver's plan against Studio's Separation Plan, are incorporated herein by reference and filed on the docket as Studio Enterprise Manager, LLC's Third Status Report for the Extrication of the Ongoing Campuses of South University and The Arts Institutes Entities from the Dream Center Holdings, LLC's Shared IT Platform, Docket No. 257.

request from his email to Mary Whitmer at 11:18 a.m. on April 11, 2019 is included for reference below:

> In order to make the discussion productive, I propose we let representatives of Ai and South University review the comparison, allow them to propose questions to Studio and the Receiver so they have all of the relevant information they need to assess the merits, costs, risks and likelihood of success of the competing plans and then have them vote for one plan or the other.  If the Receiver's plan is preferred, South probably will need to get consent from the South Lenders which is why they should be invited.  If Ai and South University do not unanimously agree on one plan or the other, then we (and I am sure others) will report to the court how each party voted and leave it to the court to decide next steps.

Mary Whitmer responded by return email as follows:

> I think that having such a large group is unproductive.  We need to find out Studio's view of the plan.  ***We are already in discussions with South***.  (Emphasis added).

> You may have anyone you like on the call, but our view is that if the call is to be efficient, we need fewer, rather than more, people on the call.

Nevertheless, the call proceeded, with representatives from South University, the Arts Institute and the South Lenders participating.  Ms. Whitmer made it clear in her email response and on the call that she was not interested in discussing the differences in the plans with the relevant parties and only wanted Studio's response to the Receiver's plan.  Mr. Altorelli informed Ms. Whitmer that Studio had analyzed the Receiver's plan, understands its terms and has no questions, but that it was not up to Studio to choose which plan would serve the best interests of the relevant parties.  Mr. Altorelli provided an opportunity for South University and the Arts Intsitutes representatives to have an opportunity to discuss, ask questions and then decide which plan they preferred.  Both South University and the Arts Institutes indicated their preference for Studio's Separation Plan.  Even the Receiver's attempt to work with South University was not enough for South University to prefer the Receiver's plan over Studio's Separation Plan.

**C.**     **Each of Studio's Actions are Reasonable and Sanctioned by the Terms of the Reorganization Documents and Other Court Orders**

Despite the Receiver's attempt to wield the sword of the Receiver Order in the Contempt Motion, each of Studio's actions that the Receiver alleges are in violation of the Receiver Order are in fact specifically authorized by the terms of the Reorganization Documents.  The Receiver Order is not the only order that the parties – including the Receiver – must comply with during the receivership; as this Court noted, "[the Reorganization Documents] were acknowledged in a settlement agreement between Studio and the receiver, which agreement, as later amended, was recently approved by the Court." (See ECF Docs. 82, 85 and 118).  Specifically, Section 11 of the Settlement Agreement also requires the parties (including Studio, the Receiver, and EPF) to "abide by all other provisions of the Reorganization Documents."

**i.**     **Studio Is Authorized to Hire the Shared Compliance Employees**

Over the past few weeks, Studio has been working diligently to execute its Separation Plan, relieve the Receiver of significant costs to the estate, and maintain the viability of the Arts Institutes and South University.  The Receiver accuses Studio of "poaching" eight DCEH employees that were performing services related to compliance and monitoring (collectively, the "Shared Compliance Employees"), but Studio is specifically authorized to hire the Shared Compliance Employees pursuant to Section 4.12 of the Amended FWA.[6]  Specifically, this provision provides:

4.12  Offers of Employment.

At any time on or following the date hereof, Studio may, in its sole discretion, offer or cause one of its Subsidiaries to offer employment to any Business Employee (each such employee a "Studio Offeree"); *provided* that it is understood and agreed that Studio is not obligated to offer employment to any

---

[6] Studio quotes the entirety of this provision for the Court's ease of reference.  A copy of the full Amended FWA (and certain other Reorganization Documents) is filed on the docket of the case captioned *Dottore v. Studio Enterprise Manager, LLC, et al.*, Case No. 19-380 (See Docket No. 1, Exhibit C).

Business Employee and any such offers of employment shall be on terms (including compensation and benefit terms) satisfactory to Studio and its Affiliates, in their sole discretion. The Dream Parties shall or shall cause their Affiliates to, terminate the employment of each Transferred Employee; *provided* that in connection with any such termination, the Dream Parties shall comply with all applicable Laws, including the WARN Act, and the Dream Parties and their Affiliates shall be solely responsible for the payment of any amounts due to such Transferred Employees, including as a result of any unpaid wages or bonus or other amounts owed by DCEH and the Dream Parties and any of their respective Subsidiaries to such Transferred Employees, but Studio agrees that Transferred Employees shall be allowed to transfer and use at Studio any Dream Party accrued and unused vacation or personal time off days, subject to their work schedule and with authorization from their immediate Studio supervisor. Any employee of DCEH or the Dream Parties or any of their respective Subsidiaries who (i) accepts such offer of employment, (ii) signs, and does not repudiate, such new employee documentation required by Studio, which may include an offer letter or employment agreement, confidentiality and restrictive agreement, and (iii) meets Studio's other requirements for new employees, including background checks, shall be a "Transferred Employee." Notwithstanding the foregoing, (a) in no event shall Studio or any of its Affiliates assume the obligations and liabilities of DCEH or the Dream Parties or any of their respective Subsidiaries with respect to any accrued and unpaid payroll, severance, bonus, or any other compensation or benefit for any Transferred Employee; and (b) nothing in this Agreement or any other Transaction Document shall limit the ability of Studio and its Affiliates to terminate any employee (including any Transferred Employee) at any time and for any or no reason. Nothing in this Section 4.12 or any other provision of this Agreement shall create any third-party beneficiary right in any Person other than the Parties to this Agreement, or any right to employment or continued employment or to a particular term or condition of employment with Studio or any of its Affiliates. Nothing in this Section 4.12 or any other provision of this Agreement (x) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement, or (y) shall limit the ability of Studio or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them. Notwithstanding the foregoing, during the South Indebtedness Period, (a) Studio may not solicit for employment any Business Employee who provides services exclusively to South University without the prior written consent of South, and (b) South shall be permitted to solicit for employment any Business Employee who provides services exclusively to South University and is not a "Dedicated Employee" as of the date hereof under the terms of the Transition Services and License Agreement.

Although the Receiver claims that Studio's hiring of the Shared Compliance Employees "has been deleterious to the Receivership," Studio submits that many of these employees would likely not have continued working for DCEH under the Receiver for much longer if they were

not hired by Studio.  In fact, more than a dozen employees have quit already and the Receiver fired five other employees.  It is the Receiver's own actions that have been deleterious to the Receivership.  As shown by the numerous other pleadings filed in this case regarding payroll and employee benefits (and the numerous calls and letters the Court has received from individuals and groups of employees), DCEH employees were not receiving healthcare benefits under the receivership and expressed concerns about their employment status under the Receiver.[7] Studio's hiring of the remaining eight Shared Compliance Employees stabilized their employment, allowed the employees to receive healthcare benefits, and relieved the Receiver of additional expenses for payroll and benefits for these employees.[8]  Interestingly, South University made offers of employment to the same Shared Compliance Employees and other Shared IT Employees (as defined in the Separation Plan); however, the Receiver has not filed a motion for contempt against South University for the same actions even though South University is prohibited from hiring such employees pursuant to Section 4.9(a) of the Amended FWA.  This is further evidence of the Receiver's obvious and unsuccessful efforts to scuttle Studio's good faith attempts to execute the Separation Plan that even South University now admits is in its best interests.  Accordingly, the Receiver's assertion that Studio has "thumbed its nose" at the Court's orders by hiring certain employees is nonsensical; Studio is simply exercising its rights pursuant the Reorganization Documents, which the Receiver himself agreed to abide by in the Settlement Agreement.  Therefore, the Receiver's additional requests that the Court should require Studio to (i) provide the names and contact information for the Contacted Employees (as defined in the

---

[7] In the Separation Plan, Studio originally identified nine Shared Compliance Employees who are needed to comply with the Settlement Agreement, but one already quit DCEH before Studio was able to hire the remaining eight Shared Compliance Employees.

[8] Studio notes that this Court ordered the Receiver to respond to all inquiries from past and present employees within 48 hours of receipt. (See April 2, 2019 Order, Docket No. 222), and to "notify the court immediately that he does not have the resources to proceed with the receivership" if he cannot meet these requirements.

Contempt Motion), (ii) give notice to the Contacted Employees that Studio violated the Receiver Order, and (iii) provide proof that Studio gave such notice to the Contacted Employees should also be summarily denied.

      ii.     **Studio's Negotiation and Presentation of the Sublease is in the Best Interest of the Receivership Estate**

Further, the Receiver claims that Studio's mere effort to negotiate and propose a sublease (the "Sublease") with the landlord for the Pittsburgh data center (the "Data Center") violates the Receiver Order.  However, Studio's efforts to work to assume significant obligations associated with the lease for the Data Center actually help the Receiver execute his duty to "negotiate, enter into and execute leases of any portion or part of the premises of the Real Property at rental rates and for terms of years consistent with those the market will bear, which he, in his business judgment concludes are in the best interest of the creditors of the Receivership Estate." *See* Receiver Order, Section 2(m).  Studio presented the Sublease for the Court's review and approval in its pending Motion for an Order Requiring the Receiver to (i) Execute Sublease for the Pittsburgh Data Center; and (ii) Comply with the Terms of the Reorganization Documents and the Settlement Agreement, Docket No. 230 (the "Sublease Motion"), and the Receiver has yet to oppose the Sublease Motion or present a better option for the Court's review and approval.

If the Receiver executes the Sublease, the Receiver will be relieved of the rent, utility and maintenance obligations for the Data Center (approximately $175,000 per month), including approximately $296,000 in past due payables accrued prior to the appointment of the Receiver, and freeing up significant cash flow for the Receiver to use in his wind-down activities.[9] Consequently, unless the Receiver can in good faith present a better option in his "business

---

[9] Studio notes that the Receiver has apparently paid a portion of the past due payables accrued after the appointment of the Receiver since Studio's filing of the Sublease Motion.  This behavior is consistent with the Receiver's course of dealing – he only pays landlords, vendors and other obligations when forced to do so by the Court or, most recently, apparently to frustrate the Separation Plan.

judgment," it appears that the Sublease is in "best interest of the creditors of the Receivership Estate." Studio should not be held in contempt of court for negotiating with a third party, attempting to assume obligations that are current expenses of the receivership estate (all of which were fully disclosed to the Court and all relevant parties prior to taking such actions), and presenting a feasible option to the Court for its review and approval. Studio did not avoid obtaining all required approvals. Studio has repeatedly sought the engagement of the Receiver without success and has sought the Court's approval for its actions even when such approval was not required under the Reorganization Documents. Everything that Studio has done has been fully disclosed and consistent with terms of the Reorganization Documents, the Settlement Agreement and all relevant orders of this Court. The Receiver clearly has not and apparently will not comply with the Reorganization Documents, the Settlement or the orders of this Court.

Although Studio will revisit this issue in more detail at any hearing on the Sublease Motion, Studio noticed one provision in the Receiver's Plan: he believes that the Sublease is a valuable asset of the Receivership, and he will attempt to extract more than the current rent from Studio. Studio will save more legal fees by pointing him to Section 16(a) of the Data Center lease, which provides that "any rent or additional rent received by Tenant from any assignee or subtenant of Tenant in excess of the rent or additional rent due and payable under this Lease shall belong to Landlord and Tenant shall pay said sums to Landlord contemporaneously with the other payments due under this Lease."

### iii. Studio May Access IT Information Pursuant to the Terms of the Reorganization Documents, and Studio Was Not Attempting to Steal Any Such Information

Finally, the Receiver accuses Studio of attempting to "abscond" with a series of IP addresses under DCEH control that are worth in excess of one million dollars. As has been the case since the inception of the receivership, the Receiver either fails to read and understand the

Reorganization Documents, ignores them completely or simply makes outrageous false statements without attempting to actually ascertain the facts.  As discussed below, under the express terms of the Reorganization Documents, Studio has full access rights to the IT Platform, and such access is required for Studio fulfill its obligations.

Although the Receiver fails to state with specificity which IP addresses it alleges that Studio is attempting to abscond with, Studio suspects that the IP addresses that the Receiver falsely accuses Studio of absconding are IP addresses which are actually owned by and registered in the name of the Arts Institutes.  They do not belong to DCEH.  At the moment, however, the IP addresses are being directed and accessed from the servers that are part of the IT Platform.  As with every other part of the Separation Plan, Studio has been assisting the Arts Institutes to migrate those IP addresses to the Arts Institutes' servers.  The IP addresses are extremely valuable assets of the Arts Institutes.  Therefore, contrary to the Receiver's spurious allegations, it is the Receiver (and presumably unwittingly the "quick-thinking DCEH employee") who are attempting to abscond with the valuable property of the Arts Institutes.  Studio will leave it to the Arts Institutes to address this issue with the appropriate authorities in the proper venue.

The Receiver's dramatic indictment further ignores the terms of the Amended FWA and certain other Reorganization Documents.   Section 4.3 of the Amended FWA specifically provides that DCEH representatives (now under the control of the Receiver) will provide Studio and its representatives with access to information, and specifically states:

4.3 Access to Information.

During the term of the applicable Managed Services Agreement with respect thereto or, with respect to DCEH, during the term that any Managed Services Agreement is in effect, each Dream Party shall afford Studio and its Representatives reasonable access during normal business hours, upon reasonable

advance notice, to the properties, books and records, senior management and other Representatives of such Dream Party, the Core Services, the Transition Services (as applicable) or any assets or properties used by the Specified Campuses, liabilities of the Specified Campuses, or employees who provide services to the Specified Campuses or students taking classes at the Specified Campuses; *provided*, *however*, that any Dream Party may restrict or otherwise prohibit access to any portion of any documents or information to the extent that (a) any applicable Law requires such Dream Party to restrict or otherwise prohibit access to such documents or information, (b) access to such documents or information would give rise to a material risk of waiving any attorney-client privilege, work product doctrine or other privilege applicable to such documents or information, or (c) access to a Contract to which such Dream Party is a party or otherwise bound would violate or cause a default under, or give a third-party the right terminate or accelerate the rights under, such Contract; *provided*, *further* that each Dream Party shall use reasonable efforts to cooperate with Studio to reach an acceptable solution to make such documents and information available in full. In the event that any Dream Party does not provide access or information in reliance on the preceding sentence, such Dream Party and its Affiliates shall use their reasonable best efforts to communicate the applicable information to Person requesting access thereto in a way that would not violate the applicable Law, Contract or obligation or to waive such a privilege. Any investigation conducted pursuant to the access contemplated by this Section 4.3 shall be conducted during normal business hours in a manner that does not unreasonably interfere with the conduct of the business of the Dream Parties.[10]

Further, Section 3.1 of the TSA provides Studio with a license to use the Proprietary Technology (as defined in the TSA), and Section 3.5(c) of the TSA provides that Studio shall have general access to all other technology used by DCEH.[11]  Accordingly, a Studio employee's

---

[10] Studio notes that if the Receiver's concerns regarding access were related to the exceptions contained in this provision of the Amended FWA, the Receiver did not even attempt to "use reasonable efforts to cooperate with Studio to reach an acceptable solution to make such documents and information available in full;" instead, the Receiver immediately ran to this Court for relief and accused Studio of attempting to steal.

[11] Specifically, Section 3.5(c) of the TSA provides: "To the extent not covered by Sections 3.5(a) and Section 3.5(b), DCEH agrees to provide access to all other Technology Used by the Business as necessary for the Studio Entities to conduct the Business and hereby authorizes the Studio Entities to access and Use such Technology Used by the Business, consistent with how it is accessed and Used on the Effective Date (and, with respect to the Developed Technology, how it is Used after the Effective Date). It is expressly understood and agreed by Studio that such Technology Used by the Business shall consist of three categories of agreements: (i) agreements for which the Studio Entities shall hold the position of an end user, (ii) agreements for which the Studio Entities shall have administrator rights; and (iii) agreements for which the Studio Entities shall have the right to request certain reports pursuant to a service level agreement or "SLA" in addition to the associated Shared IT Services, in each case ((i)-(iii)) consistent with the rights, access permissions and reports DCEH receives on the Effective Date (and, with respect to Developed Technology, consistent with the rights, access permissions and reports received after the Effective Date). Without limiting DCEH's other obligations under this Agreement, DCEH shall provide to the Studio Entities all necessary passwords, network links, connections, assistance, hardware, and other items and

mere request for a user name and password related to the information technology that Studio has the contractual right to access should not result in a finding that Studio is in contempt of court – rather, Studio is simply trying to abide by the provisions of the Reorganization Documents, obtain relevant information, and effectively execute its separation plan for South University and the Arts Institutes.

Throughout the receivership, the Receiver continues to prevent Studio from performing its duties.  For example, as noted in Studio's second Status Report (Docket No. 247), the Receiver's recently terminated access rights to the IT Platform for the eight Shared Compliance Employees recently hired by Studio, effectively preventing South University and the Arts Institutes from complying with Consent Judgment.  Only after Studio described these efforts in the Second Status Report were the access rights for the Shared Compliance Employees restored. Likewise, the monitor of the Consent Judgment has already sought the assistance of the Court to force the Receiver to comply with the Consent Judgment.  This Court should not condone the Receiver's efforts to attempt to bully Studio with spurious contempt allegations as it endeavors to lawfully conduct its business and help keep the university systems viable.

---

materials necessary and sufficient to enable the Studio Entities to access and Use the Technology Used by the Business to the full extent permitted by this Agreement, promptly following the Studio Entities' request. Without limiting the foregoing, as soon as reasonably practicable following and in any case within thirty (30) days following the Effective Date of this Agreement, DCEH shall transfer to the Studio Entities full and  unencumbered access to and administrative rights with respect to all domain names and social media accounts used in, held for use  in, or necessary for the operation of the Business as it is currently conducted; *provided*, that the Parties together shall ensure that all links between any national Art Institute social media account and any social media account for Ai Pittsburgh and Ai Online have been deactivated and provided further that the Studio Entities shall comply with Section 2 of the Ai Grant Back License. To the extent not covered by Sections 3.5(a) and Section 3.5(b), DCEH shall ensure that, at all times during the Term following the delivery of or provision of access to Third-Party Materials, the Studio Entities have a copy of, or access to a copy of, a complete, fully Use-able copy of such Technology Used by the Business that is: (i) free of material defects, and (ii) to the extent applicable, executable and loadable, and which can be used for purposes of conducting or providing maintenance, support, hosting, integrations, Updates and other modifications (including by bug fixing), and otherwise to the full extent permitted by this Agreement."

## II.    LAW AND ARGUMENT

Both the Supreme Court and the Sixth Circuit recognize that "contempt is serious." *Gascho v. Global Fitness Holdings, LLC,* 875 F.3d 795, 799 (6th Cir. 2017), citing *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967) (describing a court's contempt power as a "potent weapon"); *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911) (the power "to punish for contempts" should not be used lightly). Therefore, "contempt is a measure of last, resort, not first resort." *Gascho*, 875 F.3d at 799 (6th Cir. 2017).

A movant requesting that another party be held in contempt of court carries a heavy burden, and the Receiver has not – and cannot – show that Studio's actions meet this burden. The Sixth Circuit requires a movant requesting an order of contempt to "produce clear and convincing evidence that shows that 'he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Electrical Workers Pension Trust Fund of Local Union v. Gary's Elec. Service Co.,* 340 F.3d 373, 379 (6th Cir. 2003), quoting *NLRB v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 591 (6th Cir. 1987). The requirement that the movant present clear and convincing evidence "is not a light burden and should not be confused with the less stringent [requirement of] proof by a preponderance of evidence." *Id.*, citing *Consol. Coal Co. v. Local Union No. 1784, United Mine Workers of Am.,* 514 F.2d 763 (6th Cir. 1975). Further, the requirement that a movant show that a litigant violated a "definite and specific" order guards against the "arbitrary exercise of the contempt power." *Gascho*, 875 F.3d at 799 (6th Cir. 2017). Sixth Circuit courts construe any ambiguity as to whether a court order is "definite and specific" in favor of the party charged with contempt. *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996).

Unfortunately, contempt proceedings appear to be the Receiver's chosen method of first resort.[12] Here, the Receiver's accusatory Contempt Motion against Studio and self-serving affidavits from DCEH employees do not meet the high burden of showing clear and convincing evidence that Studio should be held in contempt of court.  As explained in detail above, the Receiver has accused Studio of three actions that allegedly violate the Receiver Order: (i) hiring the Shared Compliance Employees; (ii) negotiating with the third-party landlord for the Sublease and offering to take over significant liabilities of the receivership estate; and (iii) asking – but not actually obtaining – a user name and password which would have allegedly allowed Studio to "abscond" with IP addresses.

The Receiver cannot cite to any "definite and specific" provision of the Receiver Order that specifically prohibits Studio from taking any of these actions, other than making general references to broad provisions of the Receiver Order that generally prohibit all parties from generally "interfering" with the Receivership Entities, the receivership Property (each as defined in the Receiver Order), or the acts of the Receiver. *See* Receiver Order ¶¶ 10, 11, and 17.  These general provisions are not "clear and specific commands" that can support a finding of contempt; the "contempt power is reserved for parties that knowingly violate clear and specific commands of the court." *Gascho*, 875 F.3d at 801 (6th Cir. 2017); *see, e.g., Downey v. Clauder,* 30 F.3d 681, 686 (6th Cir. 1994) (an order that did not "specif[y] a date" or command the contemnor "to act immediately" was not definite and specific"); *Hall v. Chamberlin,* No. 4:12CV0460, 2012 WL 539980, at *3 (N.D. Ohio Nov. 5, 2012) (rejecting a contempt motion where settlement

---

[12] Studio notes that the Contempt Motion is the second motion for contempt that the Receiver filed in one week. (See Emergency Motion to Show Cause Why Intervenor HGF L.P. Should Not be Held in Contempt of Court for Violating the Parties' Consent Order Surrendering Leased Premises to HGF L.P. and for Violating this Court's March 13, 2019 Minutes of Proceedings and Order, Docket No. 241).  The court summarily dismissed this motion, noting that the problems outlined in this motion "could have been resolved through a simple conversation between the involved parties," and the "parties should be able to reasonably cooperate with one another to work out their differences."

agreement was contingent and the contingencies had not yet occurred).  Moreover, the Reorganization Documents specifically authorize Studio to hire the Shared Compliance Employees and access certain IT information in accordance with the terms of the Reorganization Documents.  Further, there is no provision in the Receiver Order that enjoins two third-party, non-receivership entities from negotiating and presenting a feasible, realistic alternative to a current lease to the Receiver, as the landlord[13] for the Data Center and Studio have done by presenting the Sublease for the Data Center to the Receiver.  Accordingly, the Receiver cannot meet his burden to show that Studio violated the Receiver Order by clear and convincing evidence.

Even if this Court finds that the Receiver has met his burden of showing that Studio has violated the Receiver Order by clear and convincing evidence, this Court should refrain from finding that Studio is in contempt of court.  A party's showing of its inability to comply with a court's order is a complete defense to contempt proceedings.  *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998).  Due to the unusual circumstances of this case, it is not possible for Studio to strictly comply with the broad provisions in the Receiver Order prohibiting "interference" with the Receiver, the Receivership Entities, or the Property (each as defined in the Receivership Order).

As explained in detail in other pleadings before this Court, Studio is a service provider for the university systems, and it is contractually obligated to DCEH, the Arts Institutes, and South University to provide certain services pursuant to the Reorganization Documents.  Likewise, DCEH (and now the Receiver), together with the Arts Institutes and South University, also have certain obligations pursuant to the Reorganizations Documents.  Although the Receiver

---

[13] Studio notes that the Receiver has not filed a corresponding motion for contempt against the landlord for the Data Center for participating in this allegedly improper negotiation about the lease.

filed an action against Studio in February attempting to invalidate the Reorganization Documents, the parties promptly settled that dispute, negotiated the Settlement Agreement,[14] and sought Court approval of the Settlement Agreement.  The Court approved the Settlement Agreement (as amended) on March 18, 2019. *See* Minutes of Proceeding and Order, Docket No. 190. Notably, Section 11 of the Settlement Agreement also requires the parties (including Studio, the Receiver, and EPF) to "abide by all other provisions of the Reorganization Documents." This Court also later recognized that the Reorganization Documents represent "a comprehensive plan [that] is in place to separate these universities." *See* March 28, 2019 Order, Docket No. 213.

Depending on the whims of the Receiver from day to day, the Receiver may view certain obligations in the Reorganization Documents as "interfering" with the broad injunctions in the Receiver Order.  However, the Receiver himself agreed to abide by the terms of the Reorganization Documents in executing the Settlement Agreement, and the Court approved the Settlement Agreement after notice and a hearing.  Therefore, because Studio is a contractually-

---

[14] Studio also notes that the Settlement Agreement contained a release by the Receiver and the Receivership Entities relating to the Reorganization Documents. Studio reserves all of its rights as to whether the Contempt Motion and the Receiver's allegations against Studio and Mr. Altorelli violate the terms of that release. Specifically the Release stated: "[u]pon the Effective Date of this Settlement Agreement, subject to the provisions of this Settlement Agreement, and in consideration of the promises and undertakings of the Parties pursuant to this settlement, the Receiver and the Receivership Entities shall be deemed to have ABSOLUTELY AND IRREVOCABLY AND UNCONDITIONALLY FULLY AND FOREVER released, waived and discharged each of Studio, EPF, Colbeck Partners IV, LLC, a Delaware limited liability company ("Colbeck Partners"), CBCA Lending, LLC, Delaware limited liability company ("CBCA"), Studio Enterprise, LLC, a Delaware limited liability company ("Studio Enterprise" and together with Studio, EPF, CBCA, Colbeck Partners, and Colbeck Foundation, the "Studio Parties"), and each of their respective past and present, direct and indirect equity holders, directors, members, managers, partners, affiliates, subsidiaries, officers, employees, attorneys, agents, and representatives, and each of their respective heirs, executors, administrators, personal representatives, successors and assigns (collectively and together with the Studio Parties, the "Studio Released Parties") from any and all claims, demands, suits, causes of action, liabilities, obligations, judgments, orders, debts, liens, contracts, agreements, covenants and causes of action of every kind and nature, whether known or unknown, suspected or unsuspected, concealed or hidden, vested or contingent, in law or equity, existing by statute, common law, contract or otherwise in each case arising from, related to or in connection with any of the Reorganization Documents, including any claims that the Receiver or the Receivership Entities made or could have made against any of the Studio Released Parties in the Action, which have existed, may exist or do exist, or may in the future arise or exist against any of the Released Parties  (collectively, the "Receiver Released Claims")." *See* Settlement Agreement, ¶ 14.

obligated counterparty pursuant to the Reorganization Documents, it is necessary for Studio to engage in business with the Receiver to duly comply with the terms of the Reorganization Documents.  As this Court has recognized, Studio is a critical service provider which must play a crucial part in the process of extricating the ongoing South University and Arts Institute entities from the DCEH shared IT Platform.  If this Court were to order Studio from "taking any action that in any way disturbs or interferes with the Receiver's management or control of any Receivership Property," as the Receiver requests, the remaining Receivership Entities (as defined in the Receivership Order) would certainly not survive, and the viability of South University and Arts Institutes would be critically threatened.  Therefore, the parties must continue to do business with one another until the goal of separating the ongoing Arts Institute and South University entities is complete.  This Court should not find Studio in contempt of Court for merely attempting to comply with the Reorganization Documents, execute a separation plan, and help the university systems move forward.

## IV.    <u>CONCLUSION</u>

If the Receiver truly desired for this Court to hold every party that allegedly "interferes" with the Receivership Entities, the Property (each as defined in the Receivership Order), or the Receiver himself in any way in contempt of court, the Receiver could theoretically file motions for contempt proceedings nearly every day if a party does not follow the Receiver's wishes.  If this Court sanctions this practice, the Receiver could abuse the power of the Receiver Order to obtain submission from every party who takes some action – or even proposes some action – that does not align with the Receiver's whims.  As this Court has acknowledged on numerous occasions, it is concerning that the receivership may be doing "more harm than good,"[15] and the

---

[15] *See* Order to Show Cause, Docket No. 111, and Order Concerning Employee Funded Benefits and Employee Concerns, Docket No. 222.

Receiver's penchant for using contempt proceedings to bully other parties into compliance is neither productive nor an effective use of the receivership estate's limited financial resources. Therefore, for all of the reasons stated herein, Studio respectfully requests that this Court deny the Receiver's Contempt Motion in full.

*[Remainder of page intentionally blank; signature page follows]*

April 15, 2019                           Respectfully submitted,

                                         /s/ *M. Colette Gibbons*
                                         M. Colette Gibbons (0003095)
                                         Scott N. Opincar (0064027)
                                         Maria G. Carr (0092412)
                                         Adam C. Smith (0087720)
                                         MCDONALD HOPKINS LLC
                                         600 Superior Ave., E., Ste. 2100
                                         Cleveland, OH 44114
                                         T: (216) 348-5400
                                         F: (216) 348-5474
                                         Email: cgibbons@mcdonaldhopkins.com
                                         sopincar@mcdonaldhopkins.com
                                         mcarr@mcdonaldhopkins.com
                                         asmith@mcdonaldhopkins.com

                                         -and-

                                         Dianne F. Coffino (admitted *pro hac vice*)
                                         Martin E. Beeler (admitted *pro hac vice*)
                                         Gabriella B. Zahn-Bielski (admitted *pro hac vice*)
                                         COVINGTON & BURLING LLP
                                         The New York Times Building
                                         620 Eighth Avenue
                                         New York, NY 10018
                                         Telephone: (212) 841-1000
                                         Facsimile: (212) 841-1010
                                         Email: dcoffino@cov.com
                                         mbeeler@cov.com
                                         gzahnbielski@cov.com

                                         *Co-Counsel for Studio Enterprise Manager, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, a copy of the foregoing Studio Enterprise Manager, LLC's Response in Opposition to the Emergency Motion of the Receiver for an Order Requiring Studio Enterprise Manager, LLC and John J. Altorelli To Show Cause Why They Should Not Be Held In Contempt of This Court For Their Violations of the Injunctions Contained in the Amended Order Appointing Receiver was filed electronically.  Notice of this filing will be sent to all parties by the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *M. Colette Gibbons*
M. Colette Gibbons (0003095)