IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DIGITAL MEDIA SOLUTIONS, LLC,** | CASE NO.: 1:19-CV-145 |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE THOMAS M. PARKER |
| **SOUTH UNIVERSITY OF OHIO, LLC, et al.,** | |
| Defendants. | |

**MOTION FOR PRELIMINARY AND PERMANENT
INJUNCTIONS PURSUANT TO THE ALL-WRITS ACT**

Mark E. Dottore, the duly-appointed and acting receiver (the "**Receiver**" and the assets over which the Receiver is appointed, the "**Receivership**") for Dream Center Education Holdings, LLC ("**DCEH**"), respectfully moves the Court (this "**Motion**"), pursuant to the Court's authority under the All-Writs Act, 28 U.S.C. § 1651, for the entry of an order:

(a) permanently enjoining (the "**Permanent Injunction**") all persons or entities ("**Claimants**") from asserting, collecting or foreclosing upon any debt, claim, lien or other interest in, to or against the Receivership or the assets of the Receivership except pursuant to procedures and processes to be set forth by the Receiver and approved by the Court (the "**Claim Procedures**");

(b) temporarily and/or permanently enjoining (the "**Temporary/Permanent Injunction**") all hospitals, physicians, pharmacists and other health care providers, including their agents, employees, representatives and assigns (collectively the "**Providers**"), from commencing or continuing any judicial, administrative, enforcement or other proceeding, asserting any lien or providing negative reports to any credit rating or credit reporting entity (collectively, "**Collection Actions**") related to any debt or to any claim for payment for medical or health care services rendered to any participant, beneficiary or insured (any such person, a "**Beneficiary**") covered or intended to be covered by the Plan or the Second Plan (as hereinafter defined) or any health plan or insurance arrangement sponsored by, administered by or affiliated with the Plan of the Second Plan, or from threatening to take any Collection Actions against any Beneficiary with respect to a Covered Claim, until such time as the Receiver or any successor entity or fiduciary has first marshaled the DCEH assets and paid the

      Covered Claims of Providers, to the extent possible, from the DCEH's assets; and

(c) tolling any unexpired statute of limitation applicable to any Covered Claim (whether or not a Collection Action regarding the Covered Claim has been commenced) held by any Provider against any Beneficiary during the pendency of the Temporary/Permanent Injunction.

In support of this Motion the Receiver states as follows:

## FACTS

Dream Center Education Holdings, LLC ("**DCEH**") provided various benefits, including medical and prescription drug benefits (the "**Benefits**") to certain of its and its direct or indirect subsidiaries'employees, their dependents and some other covered individuals (collectively, the "**Plan Participants**"), pursuant to an employee welfare benefit plan (the "**Plan**") established under the Employee Retirement Income Security Act of 1974, as amended. 29 U.S.C. § 1001, *et seq*. ("**ERISA**"). The Benefits that DCEH made available to the Plan Participants were self-insured by DCEH, meaning that all Benefits obligations under the Plan are obligations of DCEH. Pursuant to a certain Master Services Agreement (the "**MSA**"), Aetna Life Insurance Company ("**Aetna**") provided claim administration services for the Plan.

While neither DCEH nor Aetna has been unable to identify an executed version of the MSA between Aetna and DCEH, the parties performed in accordance with the terms and conditions of the unexecuted MSA throughout their relationship. A true copy of the MSA is attached as Exhibit "1" to the Declaration of Kristen Miller [Dkt. No. 249]. Under the MSA, DCEH paid Aetna a monthly fee (the "**Fee**") for Aetna to provide claims administration services. As part of the Fee, Aetna processed claims from healthcare providers for Benefits obtained by the Plan Participants (the "**Claims**") and determined the amount approved for payment.

DCEH terminated the MSA effective December 31, 2018 ("**Termination Date**"). In addition, DCEH did not pay the December 2018 Fees owed to Aetna in

the amount of $110,872.06 nor did it pay any fees to Aetna after the Termination Date. ("**Unpaid Fees**"). Thereafter, Aetna received Claims from health care providers for services rendered prior to the Termination Date to be processed and paid, which as of April 3, 2019, are in the approximate amount of $5,980,083.56, which continue to increase ("**Runoff Claims**"). DCEH's has not paid any of the Runoff Claims because it is unable to do so. Because DCEH filed to pay Aetna for the Fee or fund the Claims, Aetna ceased all Claims processing.

After December 31, 2018, DCEH established a new ERISA employee welfare benefit plan (the "**Second Plan**") which provided the various Benefits to the Plan Participants. The Benefits under the Second Plan were also self-insured by DCEH. On or about December 19, 2018, DCEH entered into a Welfare Plan Services Agreement (the "**BAS Services Agreement**") with Benefit Administrative Systems ("**BAS**") pursuant to which BAS was to administer the Second Plan. Under the BAS Services Agreement, BAS was paid an administration fee, in part, to process claims from healthcare providers for Benefits obtained by the Plan Participants (the "**Second Plan Claims**")

DCEH did not pay BAS any fees that were due for administering the Second Plan (the "**BAS Fees**") under the BAS Services Agreement. The Receivership was completely without any means to pay the BAS Fees or the Second Plan Claims. Thereafter, BAS received Second Plan Claims from health care providers for services rendered to be processed and paid. BAS administered Second Plan Claims in the amount of $953,785.99. In

addition, as of April 18, 2019, there are additional Second Plan Claims that have been submitted for administration that are in the approximate amount of $7,252,982.72, and which continue to increase ("**Second Plan Runoff Claims**"). DCEH has not paid any of the Second Plan Claims or the Second Plan Runoff Claims because it is unable to do so. Because DCEH filed to pay BAS for the Fee or fund the Second Plan Claims, BAS ceased all Claims processing.

The Claims, the Runoff Claims, the Second Plan Claims and the Second Plan Runoff Claims (collectively, the "**Covered Claims**") continue to be due and owing to the Providers, who are expected to take Collection Actions. When the Providers commence Collection Actions on the Runoff Claims and the Second Plan Runoff Claims, they will attempt to collect on the maximum amount the Provider would charge for the healthcare service, undiscounted for agreed upon reductions generally applied through the claims administration process (the "**Undiscounted Rate**"). The Undiscounted Rate is akin to the asking price of a house or a car, and the Providers expect that patients will not pay that rate. However, if the patient does not have health care insurance, there is no claims administration process and the Undiscounted Rate is routinely used to collect from the Beneficiary.

Here, Aetna and BAS provided claims administration services for the Claims and the Second Plan Claims, but did not provide claims administration services for the Runoff Claims and the Second Plan Claims because DCEH did not pay Aetna and BAS. Consequently, all Collection Actions on those claims will be at the

Undiscounted Rate. The Department of Labor (the "**DOL**") has been adamant that the Receiver provide as much protection to all of the Beneficiaries as is possible under the circumstances. Therefore, the Receiver is requesting that the Court prevent the Collections Actions against the Beneficiaries on administered and unadministered claims pursuant to its authority under the All Writs Act 28 U.S.C. § 1651(a).

The Receiver is aware of the Court' recent Order stating that the receivership is to be terminated. Regardless of how long the Receivership lasts, while it lasts, the Receiver is requesting that the Court offer what protection is possible to the Beneficiaries. Upon the Receivership's termination, any assets not sold or disposed of will be returned to DCEH. DCEH will have no management authority over its assets unless DCEH's parent entity hires management or files a bankruptcy and requests a trustee. In the meantime, an injunction while the process of administering the claims and marshalling DCEH's assets is in play will greatly assist the former employees who are confronted with the reality of paying the Covered Claims.

## **LAW AND ARGUMENT**

This Court has authority under the All-Writs Act to issue both the Permanent Injunction and the Temporary/Permanent Injunction in aid of the Court's jurisdiction over the Receivership and DCEH's assets.

The All-Writs Act provides, in pertinent part, that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate

in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "A court may grant a writ under this act whenever it is 'calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it,' and not only when it is 'necessary' in the sense that the court could not otherwise physically discharge its…duties." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)). "Such writs may be directed to not only the immediate parties to a proceeding [before the court issuing the injunction], but to 'persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and…even those who have not taken any affirmative action to hinder justice.'" *Id.* (quoting *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977)).

### A. The Permanent Injunction Is Necessary and Appropriate in Aid of the Court's Jurisdiction over the Receivership

Here, the Permanent Injunction is necessary and appropriate because it will ensure that an efficient, centralized and orderly liquidation of the Receivership's (and following the termination of the Receivership, the DCEH) assets—and the equitable distribution of those assets in payment of Claims against the DCEH assets—is not frustrated by Claimants racing to other forums to assert Claims that may deplete the DCEH assets in a piecemeal fashion. *See, e.g.*, *Acosta v. AEU Benefits, LLC*, Case No. 1:17-cv-07931, Dkt. 146 at 2 (N.D. Ill. April 18, 2018);[1] *accord In re Johns Manville Corp.*, 27 F.3d 48, 48 (2d Cir. 1994) (holding that injunction under the All-Writs Act

---

[1] Copies of unpublished decisions cited herein are attached as Exhibit B.

{00021476-3 }                                    - 8 -

was necessary to "improve the financial viability of the Trust and treat all beneficiaries fairly" given the limited "*res*" within the court's jurisdiction); *In re Baldwin-United Corp.*, 770 F.2d 328, 336-37 (2d Cir. 1985) (explaining that an injunction under the All-Writs Act is especially appropriate "when federal courts have jurisdiction over a *res*" because the exercise of jurisdiction by another court over the *res* "necessarily impairs, and may defeat, the jurisdiction of the federal court"); *SEC v. United Fin. Group*, 576 F.2d 217, 221 n. 8 (9th Cir. 1978) ("The receivership court has broad equitable powers to prevent interference with the administration of the estate by blanket stay orders"); *SEC v. Faulkner*, Case No. 3:16-cv-1735-D, Dkt. 332 at 7-8 (N.D. Tex. Oct. 24, 2018) (holding that district courts have authority under the All-Writs Act to enjoin "other lawsuits to the extent necessary to protect receivership assets" from "*ad hoc* depletion"); *Educ. Corp. of Am. V. United States Dept. of Ed.*, Case No. 2:18-cv-01698-AKK, Dkt. 12 at 4-5 (N.D. Ala. Oct. 19, 2018) (enjoining, under the All-Writs Act, all suits, levies and liens against assets of company that operated private colleges outside of the receivership proceeding before the court); *Cutler v. The 65 Sec. Plan*, 831 F. Supp. 1008, 1013-14, 1024 (E.D.N.Y. 1993) ("The All–Writs Act authorizes a federal court to stay federal and state litigation against an insolvent welfare fund where the court's efforts to prevent further damage to members would be 'rendered meaningless' if creditors and members who have filed suit are able to obtain judgments against it"); *In re Consol. Welfare Fund "ERISA" Litig.*, 798 F. Supp. 125, 128 (S.D.N.Y. 1992) (explaining that staying state court actions against insolvent ERISA welfare fund pursuant to the All-Writs Act is akin

to the automatic stay in bankruptcy and functions to "protect the Fund's assets during this interim period").

### B. The Temporary Injunction Is Also Necessary and Appropriate in Aid of the Court's Jurisdiction over the Receivership

The Temporary/Permanent Injunction is also necessary and appropriate in aid of this Court's *in rem* jurisdiction over the Receivership and after the Receivership terminates, the DCEH assets. DCEH established the Plan and the Second Plan as a self-insured employee welfare plan to provide health benefit coverage to the Beneficiaries (*i.e.*, DCEH's employees and their dependents). *See* Decl. of Mark E. Dottore (attached as Exhibit A) at ¶¶ 1 and 8. As such, DCEH was responsible for funding the Plan with assets sufficient to pay Covered Claims. *Id.* at ¶ 2 and 8. Unfortunately, DCEH failed to adequately fund the Plan and the Receivership currently lacks sufficient cash to pay any Covered Claims. *Id.* at ¶¶ 5, 7, 10 and 12. The Receiver believes that DCEH possesses certain causes of action against third-parties that, if successfully pursued, could provide additional assets sufficient to pay the Covered Claims in whole or in part. *Id.* at ¶ 14. Finding the proper person to pursue those third-party claims and the pursuit of those causes of action, will take time. *Id.* at ¶ 15.

In the meantime, Covered Claims owed to Providers will go unpaid by the Plan and some Providers are likely to begin pursuit of Collection Actions against innocent Beneficiaries that incurred extensive medical expenses in reasonable reliance that those Covered Claims would be paid by the Plan. Issuance of the Temporary/Permanent Injunction to halt any such Collection Actions against the

Beneficiaries is necessary and appropriate in aid of this Court's jurisdiction over the Receivership (and subsequently over the DCEH assets) because it will promote the efficient, centralized and orderly liquidation of the Receivership's assets and the equitable distribution of those assets to Claimants.

In the absence of the Temporary/Permanent Injunction, the Receiver or his successor will likely be inundated as part of the Claims Procedure with a multitude of unnecessary claims filed by Beneficiaries seeking to hold DCEH's assets liable for Covered Claims. Those claims by Beneficiaries will no doubt be duplicative of similar claims filed by Providers as to the same Covered Claims. The Receiver or his successor will have to process and adjudicate each of the claims filed by the Beneficiaries. That will not be necessary if Providers are forced to first seek and receive payment on Covered Claims on an equitable *pro rata* basis from the Receivership or from the DCEH assets.

Furthermore, if Providers are permitted to simultaneously pursue recovery on Covered Claims against both the Receivership and Beneficiaries, the Receiver or his successor will then have to monitor the status of litigation by Providers against Beneficiaries in various courts around the country to ensure that Providers do not receive duplicative recoveries from the Receivership and also from the DCEH assets. And because the Plan is liable upon Covered Claims, it is possible that the Plan or the Receiver and/or his successor may be necessary parties in such suits by Providers and may be named in any such suits, requiring the Receiver or his successor to incur

additional costs to appear and defend the suit (even if only to assert the Permanent Injunction).

Likewise, even if Providers' suits against Beneficiaries on Covered Claims are permitted to proceed without participation by the Receiver or his successor, such suits would then carry the risk of increased liabilities to the Receivership or to DCEH. Given the Plan's liability on Covered Claims, Beneficiaries would likely be entitled to a claim against the Receivership or the DCEH assets with regard to any judgment obtained by a Provider against a Beneficiary on a Covered Claim. Yet the Beneficiaries may lack access to the information, resources and expertise necessary to effectively defend a Provider's suit on a Covered Claim and that lack of information, resources and expertise may lead to Providers obtaining judgments against Beneficiaries in amounts far in excess of what they otherwise would be if the Receiver or his successor and their retained professionals participate in the analysis, processing and defense of Providers' asserted Covered Claims.

Moreover, the proposed Temporary/Permanent Injunction is not prejudicial to Providers because the Receiver has also requested that this Court's order toll any applicable statute of limitations regarding Providers' claims against Beneficiaries related to Covered Claims until the expiration of the Temporary/Permanent Injunction. Thus, Providers ultimately will still be able to seek satisfaction from Beneficiaries of any deficiency left on a Covered Claim after the exhaustion of the Receivership's or DCEH's assets. This result is also equitable to the other potential creditors of the Beneficiaries. Since medical bills are often substantial and beyond

what many persons can afford to pay personally, some Beneficiaries may be forced into bankruptcy, where the Covered Claims against them becomes just one of many creditors' claims they cannot pay in full. Given the Plan's co-liability on Covered Claims, it is consistent with the doctrine of marshaling that Providers should, in fairness to the Beneficiaries' other creditors who have no alternative source of recovery, first seek satisfaction of Covered Claims from the Receivership or the DCEH assets before resorting to the assets of Beneficiaries. The Temporary Injunction promotes this equity as well.

For all the above reasons, parallel litigation by Providers against Beneficiaries on Covered Claims outside this proceeding risk significant depletion and disruption of the limited Receivership *res*, or the limited DCEH assets to say nothing of the harsh results that would be wrought upon innocent Beneficiaries. For these reasons, federal courts have repeatedly used the All-Writs Act to enjoin suits by providers against ERISA plan beneficiaries on indistinguishable facts. *See Acosta v. Riverstone Capital, LLC*, Case No. 2:19-cv-00778, Dkt. No. 41 at 9 (C.D. Cal. March 13, 2019); *Chao v. New Jersey Licensed Beverage Assoc. Inc.*, Case No. 3:04-cv-05692, Dkt. 32 at 5 (D.N.J. Jan. 11, 2006); *Chao v. Graf*, Case No. 3:01-cv-00698, Doc. 30 at 27-28 (D. Nev. Feb. 1, 2002); *Herman v. Fidelity Group*, Case No. 98CV7683, Dkt. 74 (E.D.N.Y. Jan. 8, 1999);[2] *Cutler*, 831 F. Supp. at 1012, 1024; *see also General Motors Corp. v. Buha*, 623 F.2d 455, 458–59 (6th Cir. 1980) (holding that enjoining state proceedings

---

[2] The decision in *Herman*, Case No. 98CV7683, Dkt. 74, is not available via Pacer. The Receiver has ordered a copy of that decision from the United States District Court for the Eastern District of New York and will provide a copy of that decision to this Court upon receipt.

is expressly authorized by ERISA where state court actions will prevent the plan fiduciary from carrying out the fiduciary's responsibilities under ERISA). For the same reasons, this Court should issue the Temporary/Permanent Injunction.

## CONCLUSION

The issues confronting the Receiver with respect to the Plan and the Second Plan (the "**Plans**") are extremely complicated and of grave interest to both the Beneficiaries and the DOL. The Plans are complicated, and terminating them is even more complicated.[3] The DOL has begun an investigation into the Plans and issued a sweeping subpoena requesting documents that reach back into 2017. The DOL is determined to protect the interests of the Beneficiaries and has demanded that the Receiver join with the DOL in doing all that can be done for the Beneficiaries. For example, the DOL has demanded that notices be sent to employees and that the Plans be properly terminated.

In order to more fully comply with the urgent requests made by the DOL, and to provide the DOL with information demanded in its subpoena, the Receiver attempted to hire Baker Hostetler to provide expertise on employee benefits that he and his attorneys do not possess. The Receiver believes that there may be insurance available under an AIG Fiduciary Liability Insurance Edge Employee Benefit Plan Fiduciary Liability Policy issued by National Union Fire Insurance Company of

---

[3] For example, the many Beneficiaries have 401(k) plans in the unterminated DCEH 401(k) plan; it is unknown how this plan will fare after the termination of the Receivership.

Pittsburgh Pa. Once the Receivership is terminated, it will be more difficult for the DOL to take possession of the information it requires.

For the foregoing reasons, the Receiver submits that the Permanent Injunction and the Temporary/Permanent Injunction requested by this Motion are necessary and appropriate in aid of this Court's jurisdiction over the Receivership, and requests that the Court enter an order imposing such injunctions.

Dated: May 2, 2019  Respectfully submitted,

*/s/ Mary K. Whitmer*
Mary K. Whitmer (0018213)
James W. Ehrman (0011006)
Robert M. Stefancin (0047184)
WHITMER & EHRMAN LLC
2344 Canal Rd., Suite 401
Cleveland, OH 44114
Telephone: (216) 771-5056
Facsimile: (216) 771-2450
Email:  mkw@weadvocate.net
　　　　jwe@weadvocate.net
　　　　rms@weadvocate.net

*Attorneys for the Receiver*