EXHIBIT B

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| R. ALEXANDER ACOSTA,<br>Secretary of Labor,<br>United States Department of Labor,<br><br>Plaintiff,<br><br>AEU BENEFITS, LLC,<br>AEU HOLDINGS, LLC,<br>BLACK WOLF CONSULTING, INC.,<br>SD TRUST ADVISORS, LLC,<br>and the AEU HOLDINGS, LLC<br>EMPLOYEE BENEFIT PLAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CIVIL ACTION NO.**<br>**1:17-cv-07931-JHL-SMF** |

## ORDER GRANTING INDEPENDENT FIDUCIARY'S MOTION TO APPROVE PROPOSED ORDERLY PLAN OF LIQUIDATION INCLUDING ENTRY OF "ALL WRITS ACT" ORDER IN RELATION TO THAT PLAN OF LIQUIDATION

Before the Court is a motion filed April 13, 2018 (DE #140) by the Independent Fiduciary ("Independent Fiduciary's Motion") that seeks an order addressing two matters:

(1)     Approval of the Independent Fiduciary's Proposed Order Plan of Liquidation ("Liquidation Plan") and

(2)     Entry of an Order pursuant to 28 U.S.C. § 1651 ("All Writ Act") that would stay, enjoin and/or prohibit  any person or entity from claiming as against the assets of the Plans outside of the procedures and process set forth in the Liquidation Plan and for such protections to be maintained until the closure of the liquidation process or until further order of this Court.

1.     **Independent Fiduciary's Orderly Plan of Liquidation.**

The Court has reviewed the Independent Fiduciary's Liquidation Plan (DE #140) and approves it as the Liquidation Plan in this matter.  The Independent Fiduciary is instructed, upon entry of this Order, to prepare and file a Notice of Filing with its Liquidation Plan attached.

2.    **"All Writs Act" Order in Relation to the Orderly Plan of Liquidation.**

The Preliminary Injunction Order provides and/or envisions that the Independent Fiduciary will have sole and exclusive responsibility and authority to adjudicate and determine claims made by persons or entities as to the assets of the AEU Plan and the Participating Plans ["Plans"]. *See* DE #59 at ¶ 14e. through 14g. The Independent Fiduciary will do so through the establishment of a liquidation procedure set forth in the Liquidation Plan approved herein. That liquidation procedure will provide a centralized and fair system by which to receive, adjudicate and determine all the claims against the Plans. However, if claimants choose to ignore the procedures of the Liquidation Plan and rather choose to pursue claims against the assets of the Plans in a different forum, the centralized and equitable liquidation process approved by this Order (and as set forth and envisioned under the Preliminary Injunction Order) is frustrated.

Under 28 U.S.C. § 1651 ("All Writs Act"), a federal court may issue orders as may be necessary or appropriate to effectuate its orders and/or prevent frustration of its orders. *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977). For the reasons set forth in the Independent Fiduciary's Motion (DE #140) and based on the record set forth in this matter, the Court finds it appropriate to issue an order pursuant to the All Writs Act that would stay, enjoin or prohibit any person or entity from pursuing a claim against the assets of the Plans outside of the procedures and process set forth in the Liquidation Plan. Such is necessary in aid of the Court's jurisdiction to effectuate orders entered in this action (*see* DE #59 at ¶ 14e. through 14g.), to ensure that a centralized and equitable liquidation process (as ordered herein) is not frustrated and to prevent races by claimants to other forums in relation to claims lodged against the assets of the Plans. *See Cutler v. The 65 Security Plan*, 831 F. Supp. 1008 (E.D. N.Y. 1993) and *In re: Consolidated Welfare Fund ERISA Litigation*, 798 F. Supp. 125 (S.D. N.Y. 1992).

2

Accordingly, the Court grants the Independent Fiduciary Motion (DE #140) and orders as follows:

1. The Liquidation Plan (DE #140) is approved. Upon entry of this Order, the Independent Fiduciary will file an appropriate Notice of Filing attaching the approved Liquidation Plan;

2. Pursuant to 28 U.S.C. § 1651, all persons or entities having claims against the assets of the Plans are stayed, enjoined and otherwise prohibited from pursuit of those claims outside of the procedures set forth in the Liquidation Plan and said limitations are to apply through the pendency of the liquidation process or until further other do this Court; and

3. The Independent Fiduciary, immediately upon entry of this Order, will post a copy of the Order on the website being used by it in relation to this matter (www.receivermgmt.com/aeubenefitplan.htm).

It is so ORDERED this the 18th day of April , 2018.

HONORABLE JOAN H. LEFKOW
United States District Court Judge

Approved and Submitted for Entry,

_s/ Alan F. Curley_
Alan F. Curley
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com

J. Graham Matherne (*pro hac vice*)
Andrew J. Pulliam (*pro hac vice*)
WYATT, TARRANT & COMBS, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0020
gmatherne@wyattfirm.com
apulliam@wyattfirm.com

*Counsel to the Independent Fiduciary*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:16-CV-1735-D |
| VS. | § § | |
| CHRISTOPHER A. FAULKNER, et al., | § § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Nonparty Rothstein, Kass & Co., PLLC ("Rothstein Kass") moves the court to clarify

the scope of its September 25, 2017 order in this case (the "Stay Order"). The Stay Order,

in relevant part, stayed all civil litigation involving former officers and directors of Breitling

Energy Corporation ("BECC") "*sued for, or in connection with*, any action taken by them

while acting in such capacity . . . whether as *plaintiff*, defendant, . . . or otherwise." Stay

Order ¶ 32 (emphasis added). The principal question presented is whether the Stay Order

covers a state-court lawsuit brought by former directors and officers of BECC *as plaintiffs*

against Rothstein Kass for negligence and fraud in conducting an audit. Because the court

intended the Stay Order to reach such actions, it grants Rothstein Kass's motion and clarifies

that the state-court lawsuit is temporarily stayed under the Stay Order.

I

This is a civil enforcement action by plaintiff Securities and Exchange Commission ("SEC") against defendant Christopher A. Faulkner ("Faulkner") and other defendants, alleging that Faulkner orchestrated a massive fraud scheme by which he swindled investors out of millions of dollars over a multi-year period. This case is already the subject of a number of memorandum opinions and orders. *See, e.g., SEC v. Faulkner*, 2017 WL 4238705, at *1 (N.D. Tex. Sept. 25, 2017) (Fitzwater, J.). The court will therefore confine its discussion of the facts to those that are necessary to understand today's decision.[1]

In 2012, two private Texas corporations involved in Faulkner's alleged fraud scheme—Breitling Oil & Gas Corporation ("BOG") and Breitling Royalties Corporation ("BRC") (collectively, "Breitling")—began discussions with Bering Exploration, Inc. ("Bering"), a publicly-traded Texas corporation, about a possible reverse merger.[2] Breitling hired Rothstein Kass to audit its books in anticipation of the merger. While the audit was ongoing, the transaction went forward. The parties to the deal executed the reverse merger in December 2013, and the resulting publicly-traded entity—formerly known as

---

[1]These facts are largely taken from the fifth amended petition in the state-court action, which is included in Rothstein Kass's appendix. *See* 5th Am. Pet., *Jinsun, L.L.C. v. Rothstein, Kass & Co.*, No. CC-17-06249-C (Cty. Ct. at Law No. 3, Dall. Cty., Tex. July 24, 2018). They are provided for background and context.

[2]A reverse merger occurs when a private business merges into a publicly-traded shell company and thereby becomes, in effect, a public company. *See* Use of Form S-8, Form 8-K, and Form 20-F by Shell Companies, 70 Fed. Reg. 42,234, 42,234 (July 21, 2005). The transaction results in a single, publicly-traded entity that is controlled by the owners of the formerly private company. *See id.*

- 2 -

Bering—changed its name to BECC in January 2014. Rothstein Kass issued an unqualified audit opinion shortly thereafter. When the SEC filed the present lawsuit in 2016, it named BECC and BOG as defendants, alleging that the companies were integral parts of Faulkner's scheme to defraud investors. The court appointed a temporary receiver ("Receiver") over BECC and BOG, and issued the Stay Order, in September 2017.[3]

Just before the reverse merger, three individuals directly or indirectly owned a significant percentage of Bering's stock: J. Leonard Ivins ("Ivins"), Kevan Casey ("Casey"), and Steven M. Plumb ("Plumb"). Ivins and Plumb were both directors and officers of Bering. In November 2017 Ivins, Plumb, and the various companies through which Casey had indirectly owned Bering (collectively, the "*Jinsun* Plaintiffs" or "nonmovants") filed suit against Rothstein Kass in Texas state court. *See Jinsun, L.L.C. v. Rothstein, Kass & Co.*, No. CC-17-06249-C (Cty. Ct. at Law No. 3, Dall. Cty., Tex. filed Nov. 28, 2017) (the "*Jinsun* Action"). As that lawsuit now stands, the *Jinsun* Plaintiffs allege that Rothstein Kass knew or should have known about inconsistencies in Breitling's financial statements, both immediately before the reverse merger and shortly thereafter, and either failed to disclose them or intentionally concealed them. The *Jinsun* Plaintiffs allege that, were it not for

---

[3]The court issued a first amended order appointing receiver in September 2018 (the "Amended Order"), which supersedes the original Stay Order, but is—for the purposes of the present motion—identical to the Stay Order in wording and effect. The Amended Order's stay of litigation merely replaces the word "Defendants" with the word "Entities," to account for the inclusion of several nonparties in the receivership estate. *Compare* Amended Order ¶ 32, *with* Stay Order ¶ 32. The court will therefore refer only to the Stay Order throughout this memorandum opinion and order.

Rothstein Kass's actions and omissions, they would not have closed on, or would have

rescinded, the reverse merger, and thereby would have minimized their losses. They seek

relief on the basis of various state-law theories of negligence and fraud. Of significance for

purposes of Rothstein Kass's instant motion, one of the remedies they seek is the forfeiture

or disgorgement of all fees Breitling paid to Rothstein Kass in connection with the reverse

merger.

Rothstein Kass now moves for clarification that the Stay Order applies to the *Jinsun*

Action. In the alternative, Rothstein Kass seeks permission to conduct discovery from

BECC. The *Jinsun* Plaintiffs argue that the Stay Order does not apply to the *Jinsun* Action

and that the discovery would be unnecessary and inappropriate.

II

The court has wide discretion to fashion equitable remedies in the context of an SEC

civil enforcement action. *See SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994). It is

"axiomatic" that this discretion includes "broad authority to issue blanket stays of litigation

to preserve the property placed in receivership pursuant to SEC actions." *SEC v. Stanford*

*Int'l Bank Ltd.*, 424 Fed. Appx. 338, 340 (5th Cir. 2011) (per curiam); *accord Rishmague v.*

*Winter*, 616 Fed. Appx. 138, 139-40 (5th Cir. 2015); *Schauss v. Metals Depository Corp.*,

757 F.2d 649, 654 (5th Cir. 1985). "Such orders can serve as an important tool permitting

a district court to prevent dissipation of property or assets subject to multiple claims in

various locales." *Schauss*, 757 F.2d at 654. This power is not limited to enjoining suits

against entities that have been placed in receivership—at least where the stay order is

- 4 -

nonetheless necessary to protect receivership assets. *See SEC v. Kaleta*, 530 Fed. Appx. 360, 361-63 (5th Cir. 2013) (per curiam). The court will, of course, consider legal precedent, but because receivership cases are "highly fact-specific," "it is neither surprising nor dispositive [if] there is no case law directly controlling" whether the court can stay a particular litigation. *Id.* at 362.

## III

### A

Rothstein Kass and the *Jinsun* Plaintiffs largely focus their arguments on the language of the Stay Order, which stays all of the following types of proceedings:

> [a]ll civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Assets, wherever located; (c) the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

Stay Order ¶ 32. Rothstein Kass and the nonmovants agree that at least two of the *Jinsun* Plaintiffs—Ivins and Plumb—were officers and directors of Bering, which has since become the receivership defendant BECC.[4]

---

[4]The nonmovants emphasize that five of the seven *Jinsun* Plaintiffs were never officers or directors of BECC or Bering. These five plaintiffs—the companies through which

The *Jinsun* Plaintiffs argue that because the *Jinsun* Action is not *against* any former officers or directors of BECC, the Stay Order, by its express language, is inapplicable. In other words, they read the Stay Order to apply to "[a]ll civil legal proceedings . . . involving . . . any of [BECC's] past or present officers [or] directors . . . sued for, or [sued] in connection with, any action taken by them while acting in such capacity." *Id.* They further contend that staying the *Jinsun* Action would not serve the purpose of the Stay Order—and might, in fact, exceed the court's authority under the All Writs Act, 28 U.S.C. § 1651—because it does nothing to protect any receivership assets.[5]

Rothstein Kass asserts that the *Jinsun* Plaintiffs' reading of the Stay Order is inconsistent with other language in the order that expressly contemplates that directors and

_____

Casey owned Bering's stock—are entities rather than individuals. But the language of the Stay Order is not limited to lawsuits in which a *majority* of the plaintiffs are former directors or officers of a receivership defendant. Rather, it reaches "actions of any nature involving . . . *any* of the Receivership Defendants' past or present officers [or] directors . . . sued for, or in connection with, any action taken by them while acting in such capacity." Stay Order ¶ 32 (emphasis added).

[5]The *Jinsun* Plaintiffs also argue that their position is consistent with different stay orders this court has issued in past SEC receivership cases. Those stay orders were "unambiguously limited to suits against (1) parties before the court, and (2) receivership assets." Nonmovants' Resp. 6 (citing Order Appointing Receiver, *SEC v. ABC Viaticals, Inc.*, No. 3:06-CV-2136-P (N.D. Tex. Nov. 17, 2006) (Solis, J.). The nonmovants assume that changes in stay orders over time reflect changes in the SEC's template for such orders, thus shedding light on the meaning of the present Stay Order. In essence, they treat previous orders like earlier drafts of an ambiguous contract or statute, from which the intent of the drafters might be divined. But this argument is misguided. While the SEC does submit proposed orders in many receivership cases, and courts often adopt them, it is not the intent of the SEC that controls the scope of a court's order. Rather, it is the intent of the issuing court.

- 6 -

officers might be involved in a lawsuit *as plaintiffs*. Rothstein Kass reads the order to apply to "[a]ll civil legal proceedings . . . involving . . . any of [BECC's] past or present officers [or] directors . . . in connection with, any action taken by them while acting in such capacity . . . whether as plaintiff, defendant, . . . or otherwise." *Id.* Rothstein Kass points out that receivership assets *are* potentially at stake in the *Jinsun* Action because the relief sought in that case includes the disgorgement of funds that Breitling paid to Rothstein Kass—a claim that properly belongs to the receivership estate.[6]

### B

The court agrees with Rothstein Kass's interpretation of the Stay Order. The order is worded broadly to reach all litigation that might lead to the *ad hoc* depletion of receivership assets, including lawsuits like the *Jinsun* Action.

Preliminarily, the court has authority to stay the *Jinsun* Action. The outer limits of a district court's power to stay proceedings ancillary to an SEC receivership are not clearly defined. But, at the very least, a district court can stay other lawsuits to the extent necessary to protect receivership assets. *See Rishmague*, 616 Fed. Appx. at 139-40; *Kaleta*, 530 Fed. Appx. at 361-63; *Stanford Int'l Bank Ltd.*, 424 Fed. Appx. at 340-41; *Schauss*, 757 F.2d at 654. Such a stay does not exceed the court's statutory authority under the All Writs Act; to

---

[6]Rothstein Kass further notes that the *Jinsun* Plaintiffs have asserted a negligence claim, which is another claim that the Receiver could bring on behalf of the receivership estate. But Rothstein Kass does not explain why this claim—brought by the *Jinsun* Plaintiffs in their individual, rather than derivative, capacities—necessarily implicates receivership assets.

the contrary, "the district court has within its equity power the authority to protect its jurisdiction over a receivership estate through the All Writs Act, 28 U.S.C. § 1651, and through its injunctive powers." *SEC v. Parish*, 2010 WL 8347143, at *5 (D.S.C. Feb. 10, 2010) (quoting *Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 302 (4th Cir. 2001)), *amended by* 2010 WL 8347144, at *1 (D.S.C. Apr. 8, 2010).

The *Jinsun* Action falls within the scope of this authority because it involves potential receivership assets. The Receiver states in his most recent status report that he "is continuing his investigation and is conducting discovery regarding services provided to the Receivership Entities by legal and accounting professionals and others," and will "determine whether claw back actions are appropriate regarding professional fees and expenses paid by the Receivership entities." Oct. 10, 2018 Quarterly Status Report at 15. The *Jinsun* Plaintiffs seek, *inter alia*, the same remedy: the disgorgement of fees that Rothstein Kass received from Breitling in connection with the reverse merger.

Obviously, Rothstein Kass cannot forfeit the same fees more than once. The purpose of disgorgement or forfeiture is "strip[ping] the defendant of a wrongful gain." *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) (alteration in original) (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. a (2011)); *see Happy Endings Dog Rescue v. Gregory*, 501 S.W.3d 287, 291 (Tex. App. 2016, pet. denied). If Rothstein Kass is forced to disgorge its fees in the *Jinsun* Action, it will possess no allegedly wrongful gain to disgorge to the Receiver. *Cf. In re Sherman*, 491 F.3d 948, 965 n.19 (9th Cir. 2007) (discussing similar limitation on disgorgement remedy under federal

- 8 -

securities laws); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) ("[O]nce ill-gotten gains have been disgorged to the SEC, there remains no unjust enrichment and, therefore, no basis for further disgorgement in a private action."). To preserve the Receiver's possible claim for fees to which Faulkner's investors might be justly entitled, this court can stay the *Jinsun* Action.

And the Stay Order, by its terms, reaches the *Jinsun* Action. The *Jinsun* Plaintiffs' reliance on the words "sued for" is perhaps understandable, but misplaced nonetheless. First, the Stay Order's scope is expanded by the "in connection with" language; the stay therefore applies to "[a]ll civil legal proceedings . . . involving . . . any of [BECC's] past or present officers [or] directors . . . in connection with, any action taken by them while acting in such capacity." Stay Order ¶ 32. Second, the Stay Order clearly contemplates that former directors and officers might be involved in lawsuits in a capacity other than as a defendant. It applies whether a former director or officer is a "plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise," and it states that all such lawsuits are stayed. *Id.* The *Jinsun* Plaintiffs seek relief as plaintiffs "in connection with" their actions as directors and officers of Bering, which is now the receivership defendant BECC. They allege that Rothstein Kass misled them into going through with an unwise transaction on Bering's behalf. Therefore, the *Jinsun* Action is within the scope of the Stay Order.

The *Jinsun* Action also qualifies as one "otherwise" "involving . . . the Receivership Defendants," Stay Order ¶ 32, because it "necessarily impacts the potential rights or property of the Receivership Defendant[s] and, through [them], the Receivership Estate," *SEC v.*

- 9 -

*Alleca*, 2015 WL 999888, at *3 (N.D. Ga. Mar. 5, 2015) (interpreting identical stay order). As noted above, the Receiver is considering pursuing disgorgement claims against entities that provided professional services to the ones in receivership.  Rothstein Kass qualifies as such an entity.  But if the *Jinsun* Plaintiffs succeed in disgorging Rothstein Kass's fees before the Receiver can file his own claim against the accounting firm, the Receiver's attempt to recover a potential receivership asset may be thwarted.  The *Jinsun* Action thus impacts the potential rights and property of the receivership defendants and the receivership estate.[7]

\* \* \*

For the reasons stated, the court grants Rothstein Kass's motion to clarify that the Stay Order reaches the *Jinsun* Action, and it clarifies that the *Jinsun* Action is stayed under the Stay Order pending further order of this court.  The clerk of court is directed to transmit a copy of this memorandum opinion and order to the County Clerk of Dallas County, Texas.

**SO ORDERED**.

October 24, 2018.

SIDNEY A. FITZWATER
SENIOR JUDGE

_____

[7]Because the court is granting Rothstein Kass's motion for clarification, it need not consider Rothstein Kass's request in the alternative for discovery from BECC.

FILE
2018 Oct-19 PM 0!
U.S. DISTRICT COL
N.D. OF ALAB/

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **EDUCATION CORPORATION OF AMERICA, et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | Civil Action Number |
| ) | **2:18-cv-01698-AKK** |
| **vs.** ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## ORDER GRANTING TEMPORARY INJUNCTIVE RELIEF

This matter is before the court on the Emergency Motion for the Appointment of a Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction (the "Motion")[1] filed by Plaintiffs Education Corporation of America, Virginia College, LLC, and New England College of Business and Finance, LLC (collectively, "ECA" or "Plaintiffs" or "Debtors"). The court, being fully advised in the premises and having jurisdiction in this matter; and upon consideration of the Declaration of Mike Ranchino of ECA, arguments from counsel at a hearing on October 18, 2018 to consider the relief sought in the Motion, and the Stipulated Order for Briefing and Hearing Among Plaintiffs and Defendants presented to the court; and after due deliberation and sufficient cause

---

[1] Capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

appearing for the relief sought in the Motion; the court **FINDS** and **CONCLUDES** that, in accordance with Rule 65 of the Federal Rules of Civil Procedure:

1. The court has subject matter jurisdiction under U.S. CONST., art. III, § 2 and 28 U.S.C. § 1331, because this action involves the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1001 et seq. and 34 C.F.R. § 600.31(a)(1). The HEA provides that federal courts have subject matter jurisdiction over actions against the United States Department of Education ("Department") and the Secretary of Education. *See* 28 U.S.C. § 1082(a)(2).

2. Venue is proper in this court under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events giving rise to this action took place in this judicial district and a substantial part of property that is the subject of the action is situated in this judicial district. Plaintiffs employ approximately 475 Alabama residents and their Alabama institutions have enrolled in excess of 1,200 active students.

3. The court finds good cause to grant the injunctive relief requested under the All Writs Act, 28 U.S.C. § 1651(a), as such relief is necessary and appropriate in aid of its jurisdiction over this action. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (noting that a court may issue an injunction under the Act and that "[s]uch writs may be directed to not only the immediate parties to a proceeding, but to 'persons who,

2

though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice") (citing *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977)).

4. The court also finds good cause to grant the temporary injunctive relief set forth in this Order because Plaintiffs have demonstrated that they will suffer irreparable injury if the injunction is not granted, and the injunction will further the public interest. *See Klay*, 376 F.3d at 1100 ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act . . . .") (citations omitted). In particular, the potential eviction of Plaintiffs' institutions from their physical campuses threatens to disrupt the educational programs of students nationwide and prevent the potential implementation of Plaintiffs' restructuring plan. *See* doc. 2-2 at 10.

5. In aid of its jurisdiction over assets which Plaintiffs seek to preserve in connection with this case, and in order to satisfactorily protect and effectuate this Order, the relief granted below must be effective in all federal and state jurisdictions.

Pursuant to the forgoing findings and conclusions, the Motion and the record before the court, good and sufficient cause appearing for the temporary injunctive

3

relief sought in the Motion, the court's inherent equitable powers, and 28 U.S.C. § 1651 (the "All Writs Act"):

**IT IS ORDERED, ADJUDGED, AND DECREED** that from the time and date of this Order, a stay of any actions by the landlord parties (including any successor or assigns) listed on Schedule 1 attached hereto and incorporated herein by reference asserting claims or other rights and remedies against Plaintiffs, any affiliate of Plaintiffs, and/or any actual or purported guarantor that has indemnity rights against any Plaintiff (whether any Plaintiff or affiliated entity is initially named in the suit or not), including enforcing, attaching or perfecting liens against property of Plaintiffs or any such guarantor, is in effect, enjoining:

(1)   The commencement or continuation, including the issuance, employment, or service of process, of a judicial, administrative, or other action or proceeding against Plaintiffs or any schools owned directly or indirectly by Plaintiffs that was or could have been commenced before the entry of this Order against the Plaintiffs that accrued before the entry of this Order;

(2)   The enforcement or levy against any Plaintiff or its assets of a judgment obtained before the entry of this Order;

4

(3)    Any act to obtain possession of, interfere with, or exercise control over any Plaintiff's assets;

(4)    Any act to create, perfect, or enforce any lien or claim against any Plaintiff's assets to the extent that the lien secures a claim against the Plaintiffs that accrued before the entry of this Order; or

(5)    Any act to collect, assess, or recover a claim against any Plaintiff that accrued before the entry of this Order.

**IT IS FURTHER ORDERED** that the temporary injunctive relief granted by this Order is effective in all federal and state jurisdictions.

**IT IS FURTHER ORDERED** that Plaintiffs shall provide notice and a copy of this Order to all affected parties by overnight courier and electronic mail within one (1) business day after the entry of this Order, and file a notice of compliance with the court by 5:00 p.m. on October 23, 2018.

The injunction ordered by the court in this Order is a temporary injunction; it expires on October 29, 2018 at 5:00 p.m. Central Time, unless extended by further order of the court. A hearing on Plaintiffs' request for, *inter alia,* a preliminary injunction and for the appointment of a receiver, as more particularly described in the Motion, shall be held on October 29, 2018 at 2:00 p.m. Central Time in Courtroom 4A of the Hugo L Black US Courthouse, 1729 5th Avenue North, Birmingham, AL before Judge Abdul K. Kallon. Any affected

5

party who is unable to attend and who wants to participate may do so by phone. Any such party must email the court by noon on October 29, 2018 at kallon_chambers@alnd.uscourts.gov so that the court can provide that party the call-in number for the hearing.

**DONE** the 19th day of October, 2018.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12

**R. ALEXANDER ACOSTA**, Secretary of
Labor, United States Department of Labor,

13
Plaintiff,

14
v.

15
**RIVERSTONE CAPITAL LLC, a**
16 **California limited liability corporation;**
**NEXGEN INSURANCE SERVICES**
17 **INCORPORATED, a California**
**corporation; NGI BROKERAGE**
18 **SERVICES, INC., a California**
**corporation; JAMES C. KELLY, an**
19 **individual; TRAVIS O. BUGLI, an**
**individual; ROBERT CLARKE, an**
20 **individual; ERIK MANQUEROS, an**
**individual.**

21
22
Defendants

23
24
25
26
27
28

Case No.: CV 19-778-MWF (MAAx)

**REDACTED CONSENT
JUDGMENT AND ORDER
ACKNOWLEDGING PLAN
TERMINATION AND SETTING
DATE FOR INDEPENDENT
FIDUCIARY TO SUBMIT
ORDERLY PLAN OF
LIQUIDATION**

Case 2:19-cv-00778-MWF-MAA   Document 41   Filed 03/13/19   Page 2 of 17   Page ID #:643

1      Plaintiff R. ALEXANDER ACOSTA, United States Secretary of Labor

2 ("Plaintiff" or the "Secretary"), pursuant to his authority under Sections 502(a)(2) and

3 (5) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

4 1132(a)(2) and (5), has filed a Complaint against Defendants RIVERSTONE CAPITAL

5 LLC, a California limited liability corporation ("Riverstone Capital"); NEXGEN

6 INSURANCE SERVICES INCORPORATED, a California corporation ("NexGen

7 Insurance"); NGI BROKERAGE SERVICES, INC., a California corporation ("NGI")

8 (corporate defendants collectively referred to as "Riverstone Corporate Defendants");

9 JAMES C. KELLY, an individual ("Kelly"); TRAVIS O. BUGLI, an individual

10 ("Bugli"); ROBERT CLARKE, an individual ("Clarke"), and ERIK MANQUEROS, an

11 individual ("Manqueros") (Kelly, Bugli, Clarke, and Manqueros collectively referred to

12 as "Individual Defendants") (Riverstone Corporate Defendants and Individual

13 Defendants collectively referred to as "Defendants").  The Secretary and Individual

14 Defendants (collectively referred to as the "Parties") have agreed to resolve the matters

15 in controversy in this civil action and consent to entry of this consent judgment

16 ("Judgment" or "Consent Judgment") in accordance herewith.

17    A. The Parties admit that the Court has jurisdiction over this action pursuant to

18       ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1) and that venue lies in the United

19       States District Court for the Central District of California, Western Division,

20       pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

21    B. The Secretary alleges that the Riverstone Corporate Defendants and Individual

22       Defendants Kelly, Bugli, and Clarke are or were fiduciaries to the Riverstone

23       Plan, a multiple employer welfare arrangement ("Riverstone MEWA"), that

24       provides medical benefits to employers and their employees through

25       approximately 112 employer clients with ERISA-covered participating plans

26       ("Participating Plans").

27    C. The Secretary further alleges the Riverstone Corporate Defendants and Individual

28       Defendants Kelly, Bugli, and Clarke violated Sections 403, 404, and 406 of

REDACTED CONSENT JUDGMENT AND ORDER

1

1      ERISA, 29 U.S.C. §§ 1103, 1104, and 1106, with respect to the Riverstone

2      MEWA and Participating Plans by, and as detailed more fully in the Complaint,

3      failing to hold plan assets in trust; engaging in self-dealing by paying themselves

4      out of plan assets and setting their own compensation; and failing to act prudently

5      by failing to pay processed health claims, failing to disclose to employers that the

6      Riverstone MEWA and Participating Plans were severely underfunded, and by

7      operating as a MEWA without a state license.

8   D. The Secretary has alleged that as a result of the aforementioned ERISA violations,

9      the Riverstone Corporate Defendants and Individual Defendants Kelly, Bugli, and

10     Clarke are jointly and severally liable for unpaid medical claims as detailed more

11     fully in the Complaint.

12   E. The Parties agree to entry of this Consent Judgment.  The Parties further agree

13     that this Consent Judgment shall fully settle all claims asserted by the Secretary in

14     the Complaint.

15   F. This Consent Judgment is intended to ensure that Plan participants' medical

16     claims are paid to the greatest extent possible under the circumstances.

17   G. Defendants each acknowledge receipt of the Complaint and hereby waive service

18     of process of the Summons and the Complaint.

19   H. The Parties expressly waive Findings of Fact and Conclusions of Law.

20   I. Defendants each admit that the Riverstone Plan is a MEWA.

21   J. Defendants each admit that Participating Plans in the Riverstone MEWA are

22     ERISA-covered plans.

23   K. The Secretary withdraws his claims against Defendant Erik Manqueros.

24   L. Defendant Kelly, Bugli, and Clarke each admit that by the actions referred to in

25     Paragraph C above, they violated Sections 403, 404, and 406 of ERISA, 29 U.S.C.

26     §§ 1103, 1104, and 1106.

27 IT IS HEREBY **ORDERED, ADJUDGED, AND DECREED** that:

28

REDACTED CONSENT JUDGMENT AND ORDER

2

1. Individual Defendants Kelly, Bugli, and Clarke are PERMANENTLY ENJOINED as fiduciaries, service providers, trustees, and administrators of the Riverstone MEWA and Participating Plans and Defendant Erik Manqueros is hereby DISMISSED from this action;

2. Receivership Management, Inc. ("Independent Fiduciary") shall continue to serve as independent fiduciary, successor Trustee and Plan Administrator to the Riverstone MEWA and Participating Plans, with plenary authority to administer said entities which includes, but is not limited to:

   a. Authority to exercise all fiduciary responsibilities relating to the Riverstone MEWA and Participating Plans;

   b. Authority to take, or continue to take, exclusive control of all plan assets of the Riverstone MEWA and the Participating Plans, including but not limited to bank accounts listed in the attached **Exhibit A** and any other accounts the Secretary has good cause to believe hold plan assets ("Plan Assets")[1];

   c. Authority to create a trust for the exclusive benefit of participants in the Riverstone MEWA and Participating Plans and move all Plan Assets into the trust as the Independent Fiduciary deems necessary;

   d. Authority to amend the documents governing the Riverstone MEWA;

---

[1] As used herein, Plan Assets shall mean any assets controlled by Defendants which are or were traceable to employer/employee payments made to any Defendant for the purpose of receiving health coverage or to participate in the Riverstone MEWA and any proceeds, assets or claims derived from those payments.  This shall include, but is not limited to, all premiums (also known as premium equivalents and contributions), paid by employers participating in the Riverstone MEWA that originated from employer accounts and were transferred to Riverstone (including, but not limited to, transfers to Riverstone's general corporate bank accounts ending in 5003, 5016, 4787), before they may have been transferred by Riverstone and/or its officials to any other accounts.

REDACTED CONSENT JUDGMENT AND ORDER

3

1        e.  Exclusive authority to appoint, replace and remove such administrators,

2            trustees, attorneys, employees, assigns, agents, and service providers as the

3            Independent Fiduciary shall, in the Independent Fiduciary's sole discretion,

4            determine are necessary to aid the Independent Fiduciary in the exercise of

5            the Independent Fiduciary's powers, duties, and responsibilities to the

6            Riverstone MEWA and Participating Plans;

7        f.  Authority to conduct an accounting of all medical claims and negotiate all

8            medical claims with providers and others as the Independent Fiduciary

9            deems necessary;

10       g.  Authority to adjudicate and pay or deny any and all claims submitted to the

11           Riverstone MEWA and Participating Plans;

12       h.  Authority to pursue recovery of monies owed and due to the Riverstone

13           MEWA and Participating Plans from any person obligated to make such

14           payments under the terms and conditions of the Riverstone MEWA and

15           Participating Plans;

16       i.  Authority to identify and pursue recovery of Riverstone MEWA and

17           Participating Plans' assets as well as any monies to which the Riverstone

18           MEWA or and Participating Plans have a right of recovery;

19       j.  Authority to identify and pursue claims on behalf of the Riverstone MEWA

20           and Participating Plans;

21       k.  Where a non-ERISA covered plan that participated in the Riverstone

22           MEWA requests in writing to participate in the Independent Fiduciary's

23           administration of the Riverstone MEWA and contractually commits to

24           abide by any Orders with respect to the Independent Fiduciary issued by

25           this Court, authority to administer the non-ERISA plan on behalf of the

26           participants and beneficiaries of such plans in a manner consistent with the

27           administration of the ERISA-covered plans as provided in this Judgment;

28           and

REDACTED CONSENT JUDGMENT AND ORDER

4

1.     l.  Except as provided herein, the authority to delegate to such administrators,
2.         trustees, attorneys, employees, assigns, agents, and service providers such
3.         fiduciary responsibilities as the Independent Fiduciary shall determine
4.         appropriate.  The Independent Fiduciary may not, however, delegate the
5.         authority to appoint, replace and remove such administrators, trustees,
6.         attorneys, employees, assigns, agents, and service providers or the
7.         responsibility to monitor the activities of the Riverstone MEWA and
8.         Participating Plans' trustees, attorneys, agents, and service providers.

9. 3. Under the Redacted Amended Temporary Restraining Order and Order Lifting
10. Seal entered on February 7, 2019 (Dkt. 22, ¶ 4(a)), the Independent Fiduciary had
11. the authority to design and implement a fair process for paying out covered-claims
12. to the extent feasible.  The Independent Fiduciary, based upon its investigation,
13. determined that the Riverstone MEWA and Participating Plans were not viable
14. going forward and thus not subject to rehabilitation.  The Independent Fiduciary
15. determined that the only means of designing and implementing a fair process for
16. paying out covered-claims, to the extent feasible, was to terminate the Riverstone
17. MEWA and Participating Plans and proceed to liquidation.  Accordingly, on
18. February 28, 2019, the Independent Fiduciary sent notice of plan termination to all
19. participating employer groups indicated in the records provided to the
20. Independent Fiduciary stating that as of 11:59 p.m. (Pacific Time) on March 8,
21. 2019, the Riverstone MEWA and Participating Plans would be terminated.  A
22. copy of the template of that notice of plan termination was filed, through Notice
23. of Filing, on February 28, 2019.  (Dkt. 27)  The Independent Fiduciary's
24. termination of the Riverstone MEWA and Participating Plans is not intended to
25. interfere with employers that have procured new coverage or relieve employers of
26. liability to the extent they have decided to stay self-funded. The Participating
27. Plans are only terminated to the extent that they exist solely to participate in the
28. Riverstone MEWA, and the Independent Fiduciary is not asserting jurisdiction

1    over those plans to the extent they offer benefits or have features that are outside
2    the Riverstone MEWA. Through this Order, the Court acknowledges the
3    Independent Fiduciary's action and authority to so terminate the Riverstone
4    MEWA and Participating Plans. The Parties do not object to the termination of
5    the Riverstone MEWA and Participating Plans. In furtherance of designing and
6    implementing a fair process for paying out covered-claims to the extent feasible,
7    the Independent Fiduciary is ORDERED to submit to the Court, on or before
8    **March 29, 2019**, a proposed orderly plan of liquidation for review and approval.
9    The Independent Fiduciary is authorized to pursue all legitimate claims the
10   Riverstone MEWA and Participating Plans may have against Defendants or any
11   third party which, in the Independent Fiduciary's judgment, are likely to result in
12   a meaningful recovery of assets to pay participant claims or costs of
13   administration. The Independent Fiduciary may pursue any claims which are
14   being pursued by, or have been pursued by, the Plaintiff in this action. This
15   Judgment and Order does not settle, waive, or release any claims that the
16   Independent Fiduciary may assert based on ERISA or any other law against
17   Defendants for past or present conduct, and the Independent Fiduciary is not
18   precluded from obtaining additional monetary relief on ERISA claims against the
19   Defendants or others notwithstanding any other provision of this Judgment and
20   Order;

21   4. The Independent Fiduciary shall have authority to pay itself reasonable and
22   necessary fees from the Riverstone MEWA and Participating Plans' assets and
23   pay the reasonable and necessary fees of service providers. The payment of
24   administrative expenses and all fees to the Independent Fiduciary, its assistants,
25   attorneys, accountants, actuaries and other necessary service providers are to be
26   considered priority administrative expenses of the Riverstone MEWA and
27   Participating Plans, superior to any other class of expense or obligation of the
28   Riverstone MEWA and Participating Plans; and the Independent Fiduciary's

REDACTED CONSENT JUDGMENT AND ORDER

1     second priority is to be the payment of legitimate claims to the greatest extent

2     feasible. Before causing Plan Assets to be used to pay compensation, fees or

3     expenses, the Independent Fiduciary shall provide written notice by filing with

4     this Court a Fee Notice supported by an itemized statement of work, consistent

5     with the Fee Rates set forth in the attached **Exhibit B**, and by serving a copy to

6     the Secretary. If no objection to the Fee Notice is filed by the Secretary within ten

7     (10) calendar days, such compensation, fees, and expenses shall be deemed

8     reasonable expenses;

9     5. The Independent Fiduciary may not be held personally responsible for any claims

10       against the Riverstone MEWA and Participating Plans which existed, arose,

11       matured or vested prior to the appointment of Receivership Management, Inc. on

12       February 7, 2019;

13     6. The Independent Fiduciary shall comply with all applicable rules and laws;

14     7. Individual Defendants Kelly, Bugli, and Clarke are enjoined from coercing,

15       intimidating, interfering with or attempting to coerce, intimidate, or interfere with

16       the Independent Fiduciary or with the agents, employees or representatives of the

17       Independent Fiduciary;

18     8. Individual Defendants Kelly, Bugli, and Clarke shall cooperate fully with the

19       Independent Fiduciary and/or its successors, agents, employees or representatives,

20       by among other things:

21         a. Delivering or otherwise making available to the Independent Fiduciary all

22           books, records, bank accounts, and documents of every nature relating in

23           any manner to the management and operation of the Riverstone MEWA and

24           Participating Plans;

25         b. Authorizing third parties in possession of documents or information

26           relevant to the Riverstone MEWA and Participating Plans' administration

27           and management to turn over such documents and information to the

28           Independent Fiduciary, including but not limited to the funds in the Exhibit

REDACTED CONSENT JUDGMENT AND ORDER

1              A accounts and Additional Riverstone Accounts referenced in Paragraph
2              10, below; and

3         c. Facilitating the transfer of possession and control of the assets of the
4           Riverstone MEWA and Participating Plans to the Independent Fiduciary.

5    9. Individual Defendants Bugli, Kelly, and Clarke are PERMANENTLY
6      ENJOINED from:

7         a. Exercising, or attempting to exercise, directly or indirectly, any
8           discretionary authority or control with respect to the management or
9           administration of any employee benefit plan or trust holding assets of
10          employee benefit plans subject to the coverage of ERISA, and from
11          providing any services, directly or indirectly, for compensation or otherwise
12          to any such employee benefit plan or trust holding the assets of such plans;

13        b. Serving or acting, directly or indirectly, for compensation or otherwise, as a
14          trustee, fiduciary, service provider, agent, consultant, or representative with
15          respect to any employee benefit plan subject to ERISA; and

16        c. Occupying any position that involves, directly or indirectly, decision
17          making authority with respect to, or custody or control of, the assets or
18          administration of any employee benefit plan subject to ERISA.

19   10. Within seven (7) business days of the date of entry of this Order, Individual
20      Defendants Bugli, Kelly, and Clarke shall provide to the Independent Fiduciary all
21      bank account numbers and financial institution information holding any assets of
22      the Riverstone MEWA and Participating Plans, and/or of the Riverstone
23      Corporate Defendants not already within the possession or control of the
24      Independent Fiduciary ("Additional Riverstone Accounts") and, within ten (10)
25      business days, shall transfer all assets in the Additional Riverstone Accounts to
26      the Independent Fiduciary for the purpose of paying covered medical claims and
27      necessary service providers to the greatest extent feasible.

28

REDACTED CONSENT JUDGMENT AND ORDER

8

Case 2:19-cv-00778-MWF-MAA   Document 41   Filed 03/13/19   Page 10 of 17   Page ID #:651

11. Individual Defendants Bugli, Kelly, and Clarke shall immediately terminate any contracts or agreements for services that they jointly and severally, have or have had with any entities relating to the Riverstone MEWA and Participating Plans and may not receive additional monies or compensation due under any such contracts or agreements for services;

12. Pursuant to the All Writs Act, 28 U.S.C. § 1651, all hospitals, physicians, pharmacists, and other health care providers ("Providers"), including their agents, employees, representatives, and assigns, are ENJOINED from commencing or continuing any judicial, administrative, enforcement, or other proceeding, asserting any lien, providing negative reports to any credit rating or credit reporting entity, and threatening to take any such action against any participant, beneficiary, or insured covered or intended to be covered by the Riverstone MEWA or Participating Plans, or any health plan or insurance arrangement sponsored by, administered by, or affiliated with the Riverstone MEWA or Participating Plans related to any debt or to any claim for payment for medical or health care services rendered to any such participant, beneficiary or insured. Because the Riverstone MEWA commingled the assets of the ERISA plans with the assets of non-ERISA plans, with the result that non-ERISA plan participants were harmed by Defendants' ERISA violations, the All Writs Act protection is further afforded to participants and beneficiaries that opt in to the Independent Fiduciary's administration of the Riverstone MEWA in accordance with Section 2(k) above;

13. Individual Defendants Kelly, Bugli, and Clarke expressly relinquish and forfeit any claim on the assets described in Paragraph 2(b), Paragraph 10, and Exhibit A. All such assets shall be deemed Plan Assets. To the extent Individual Defendants Kelly, Bugli, and Clarke personally guaranteed loans that were commingled with Plan Assets, they each relinquish all counterclaims or causes of actions against the Independent Fiduciary for refusing to repay such loans;

REDACTED CONSENT JUDGMENT AND ORDER

9

1    14. Although Individual Defendants Bugli, Kelly, and Clarke are jointly and severally
2        liable for millions of dollars in unpaid claims, the Secretary has reviewed detailed
3        affidavits on their income and assets submitted by each of them under penalty of
4        perjury and determined that Individual Defendants Bugli, Kelly, and Clarke do not
5        have sufficient assets to provide a meaningful recovery to the Riverstone MEWA
6        and Participating Plans at this time.  Accordingly, the Department is not seeking a
7        monetary judgment against these Defendants at this time, but reserves the right to
8        seek such a judgment at any time prior to the final disposition by the Independent
9        Fiduciary (or any successor) of all claims and issues relating to the Riverstone
10       MEWA and this Court's approval of the termination of the Independent
11       Fiduciary's (or any successor's) engagement in connection with the Riverstone
12       MEWA.

13   15. Individual Defendants Bugli, Kelly, and Clarke acknowledge that the Secretary
14       has received and relied upon their sworn affidavits on their financial condition
15       plus certain supporting documentation (collectively, "Individual Defendants'
16       Financial Statements") in concluding that Individual Defendants Bugli, Kelly, and
17       Clarke do not have sufficient assets to provide a meaningful recovery at this time.
18       Individual Defendants Bugli, Kelly, and Clarke agree that: (a) the Secretary may
19       permit any other government agency to review Individual Defendants' Financial
20       Statements, (b) Individual Defendants Bugli, Kelly, and Clarke will voluntarily
21       cooperate with the Secretary in any further investigation of Individual Defendants'
22       Financial Statements and financial condition, (c) within ten (10) days of the
23       signing of this Order, Individual Defendants will furnish the Secretary a full
24       accounting of any assets and income that they received in connection with the
25       Riverstone MEWA, and (d) Individual Defendants will not object to any inquiry
26       or request for information or documents made to third parties by the Secretary
27       regarding their income or assets or the information set forth in Individual
28       Defendants' Financial Statements.  Nothing in this Paragraph, however, shall be

REDACTED CONSENT JUDGMENT AND ORDER

1        construed as requiring the Secretary to show that Individual Defendants' Financial

2        Statements were inaccurate or incomplete as a precondition for pursuing monetary

3        claims against Individual Defendants, as set forth in Paragraph 14 above;

4     16.Individual Defendants each expressly waive any and all claims of any nature

5        which they may have against the Secretary, the United States Department of

6        Labor, or any of its officers, agents, attorneys, employees or representatives,

7        arising out of, or in connection with, the allegations contained in the Complaint on

8        file in this action, any other proceedings or investigation incident thereto, or based

9        on the Equal Access to Justice Act, as amended;

10    17.The Parties shall each bear their own costs, expenses, and attorney's fees incurred

11       in connection with any stage of this proceeding, including but not limited to

12       attorney's fees which may be available under the Equal Access to Justice Act, as

13       amended;

14    18.Nothing in this Consent Judgment and Order is binding on any governmental

15       agency other than the United States Department of Labor, Employee Benefits

16       Security Administration, in relation to the specific civil allegations set forth in this

17       Complaint, or on any private party (except as provided in Paragraph 12 above) not

18       named in this action;

19    19.Nothing in this Consent Judgment and Order is binding on any non-ERISA

20       covered plan that has participated in the Riverstone MEWA and has not requested

21       in writing to be a part of the Independent Fiduciary's process;

22    20.This Court retains jurisdiction of this action for purposes of enforcing compliance

23       with the terms of this Consent Judgment and Order;

24    21.By signing their names to this Consent Judgment and Order, the Parties each

25       represent that they are informed and understand the effect and purpose of this

26       Consent Judgment and Order;

27

28

REDACTED CONSENT JUDGMENT AND ORDER

22. Any person signing this Consent Judgment and Order on behalf of a party expressly acknowledges and represents that he or she has the authority to sign for, and legally bind, that party;

23. This Consent Judgment and Order may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same instrument.

The preliminary injunction hearing currently scheduled for Monday, March 11, 2019 at 3:00 p.m. is hereby VACATED.

The Court directs entry of this Consent Judgment and Order as a final order, pursuant to Federal Rule of Civil Procedure 58 and Local Rule 58-6.

IT IS SO ORDERED.

Dated: March 13, 2019

_____
The Hon. Michael W. Fitzgerald
United States District Judge

REDACTED CONSENT JUDGMENT AND ORDER

12

1   Entry of this Consent Judgment and Order is hereby consented to:

2

3   FOR PLAINTIFF:                       KATE S. O'SCANNLAIN
                                          Solicitor of Labor

4

5                                         JANET M. HEROLD
                                        Regional Solicitor

6

7                                         IAN H. ELIASOPH
                                        Counsel for ERISA

8

9   Dated: March 7, 2019                       */s/ Grace A. Kim*
                                          GRACE A. KIM

10                                         Senior Trial Attorney

11                                       Attorneys for Plaintiff Secretary of Labor

12

13   *\* The filing attorney hereby certifies that she has the signed originals and/or written confirmation to include electronic signatures for all signatories to this document available for inspection if requested.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

  <u>REDACTED</u> CONSENT JUDGMENT AND ORDER

FOR INDIVIDUAL DEFENDANTS:

Dated: March 7, 2019                    */s/ James Kelly*
                                       Defendant James Kelly


Dated: March 7, 2019                    */s/ Travis Bugli*
                                       Defendant Travis Bugli


Dated: March 7, 2019                    */s/ Robert Clarke*
                                       Defendant Robert Clarke


Dated: March 7, 2019                    */s/ Erik Manqueros*
                                       Defendant Erik Manqueros


FOR THE INDEPENDENT FIDUCIARY:

Dated: March 7, 2019                    */s/ Robert E. Moore, Jr.*

                                       Robert E. Moore, Jr.


                                       *President*
                                       Title
                                       For Receivership Management, Inc. as
                                       Court-appointed Independent Fiduciary
                                       over the Riverstone MEWA and
                                       Participating Plans

## Exhibit A to Consent Judgment

| Account Number | Account Holder | EIN/TIN |
|---|---|---|
| **Bank of America** | | |
| \*\*\*\*\*\*\*\*\*\*2604 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*4787 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*5029 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*5003 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*5016 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*1794 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*1781 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*2120 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*2117 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*1820 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*1833 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| \*\*\*\*\*\*\*\*\*\*1846 | Riverstone Capital LLC | \*\*\*\*\*\*7994 |
| | | |
| **Scotiabank and Trust (Cayman) Ltd.** | | |
| \*\*\*\*8543 | Riverstone Captive Strategies Ltd./ | \*\*\*\*\*\*9507 |
| \*\*\*\*0435 | Travis Bugli | |

REDACTED CONSENT JUDGMENT AND ORDER

15

1
2

### Exhibit B to Consent Judgment
### Effective April 1, 2018 Fee Schedule for Receivership Management, Inc.

3    Independent Fiduciary/Receiver $170 per hour

4
5    Claims processing administration
     ERISA Matters-Employee Benefit
6    Plan Administrator-Receiver
7    Operations $160 per hour

8    Accounting $130 per hour

9
10   Accounting Assistant $87 per hour

11   Data Analyst/Payment Processor $61 per hour

12   Medical Claims Processing, Retirement
13   Plan Distributions Processing,
14   and Paralegal Assistance $65 per hour

15   Information Tech Consultant $65 per hour

16   Overhead charges are included in the hourly rates shown above.
17

18   Office Expenses which can be specifically identified to a receivership (eg.
19   telephone, postage, copies etc.) are charged to the receivership as incurred.

20   Travel: Per Diem-$39.00 for meals and incidentals (first and last day of travel 75%
21   of per diem amount allowed). Per Diem paid only if overnight travel is required.

22   Transportation:
23   By private car: 50 cents per mile; By common carrier: Actual ticket cost at coach.

24
25   Lodging: Actual amount charged.

26
27
28

REDACTED CONSENT JUDGMENT AND ORDER

**U.S. Department of Labor**

Office of the Solicitor
201 Varick Street
New York, New York 10014



Reply to the Attention of:

SOL:LDB:db
(02)000401199
Tel. 212-337-2083

December 29, 2005

Hon. Joel A. Pisano
United States District Judge
United States District Court District of New Jersey
Martin Luther King, Jr. Federal Building
     And U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

Dear Judge Pisano:

Re:    Secretary of Labor v. New Jersey Licensed Beverage Association, Inc. et al.
       Civil Action No. 04-CV-5692

Enclosed for Your Honor's consideration, please find plaintiff's proposed Stipulation and Order which stays actions pertaining to the New Jersey Licensed Beverage Association Employee Welfare Benefit Plan, its fiduciaries and participants. Specifically, excluded from this Stipulation and Order is Midlantic Healthcare v. New Jersey Licensed Beverage Association, Inc., et al., Docket No. L 3921-04 Superior Court of New Jersey Law Division: Passaic County.

As set forth in the Stipulation and Order, the issue of the stay of Midlantic Healthcare is the subject of plaintiff's motion scheduled to be argued on February 15, 2006 along with the motion to strike Midlantic's jury demand.

The Stipulation and Order has been signed by Mr. Richard Zackin on behalf of the NJLBA defendants and Mr. Ronald Berutti on behalf of Midlantic defendants.

Pursuant to the parties' representation to United States Magistrate Judge Madeline Cox Arleo, we have mailed copies of this letter and the proposed Stipulation and Order to the

attorneys listed on the attached service sheet.

Sincerely,

Patricia M. Rodenhausen
Regional Solicitor

By: Louis De Bernardo
    Attorney

cc:    Hon. Madeline Cox Arleo
       Richard S. Zackin, Esq.
       Ronald A. Berutti, Esq.
       Thomas A. Croft, Esq.

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ELAINE L. CHAO, Secretary of Labor,       :
United States Department of Labor,

                                :

                     Plaintiff,         :        Civil Action
                                          File No.
            v.                :

                                  :        04-5692 (JAP)

NEW JERSEY LICENSED BEVERAGE
ASSOCIATION, INC.; MELVIN         :
GITLER; ROBERT SCERBO; PHIL CITTA;
WILLIAM CLEARY; ROBERT MARCIANI;   :
JOSEPH ARDIRE; RICHARD BELLSHOT;
JAMES HILL; MICHAEL MARSH;        :
LEWIS ROTHBART; FRANK ZANOTTI;
ANN SMULEWICZ; RANDY NORMAND;     :
MARY ROENICK, STEPHAN DI TOMASSO;
MIDLANTIC HEALTHCARE, INC.;       :
NEW JERSEY LICENSED BEVERAGE
ASSOCIATION EMPLOYEE WELFARE     :
BENEFIT PLAN;
                                  :
                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### STIPULATION AND ORDER

     WHEREAS, the above captioned action has been filed pursuant to
the Secretary of Labor's authority under Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and is
brought by the Secretary of Labor under ERISA §§ 502(a)(2) and (5),
29 U.S.C. §§ 1132(a)(2) and (5), to obtain relief for breaches of
fiduciary duty under ERISA § 409, to enjoin acts and practices
which violate the provisions of Title I of ERISA and to obtain
other appropriate equitable and injunctive relief to redress
violations and enforce the provisions of that Title; and

WHEREAS, the Secretary's complaint alleged that the defendant New Jersey Licensed Beverage Association Employee Welfare Benefit Plan ("the Plan") ceased operations in August, 2003 with an unpaid backlog of at least $6,110,323.97 in claims; and

WHEREAS, it appears that the Plan's liabilities are substantially greater than its assets; and

WHEREAS, numerous civil actions have been filed in state and federal courts by participants, beneficiaries, medical service providers and service providers against the Plan; and

WHEREAS, the Court deems it necessary to avoid, to the extent possible, any unnecessary drain of the Plan's assets that would result from litigation involving the Plan, its fiduciaries, participants and beneficiaries by reason of the Plan's insolvency; and

WHEREAS, the Court is vested with the authority to stay and enjoin certain actions in aid of its jurisdiction over this action, under the All Writs Act, 29 U.S.C. § 1651; and

IT IS HEREBY ORDERED that:

A.   Except as otherwise set forth herein all state and other federal court actions against the defendant New Jersey Licensed Beverage Association Employee Welfare Benefit Plan, their participants, beneficiaries or persons or entities alleged to be fiduciaries in the Plaintiff's complaint; any independent fiduciary the Court may appoint; Plaintiff Elaine L. Chao, Secretary of

2

Labor, for payment of monies for benefits due under the Plan, or for medical, hospital or other health charges incurred by participants for which the Plan, or for services provided to the Plan whether filed by or on behalf of health care providers, collection agencies, participants, beneficiaries, plan administrators, general agents, or others, are hereby stayed and enjoined pending the final disposition of this action, or until further order of this Court.

    B.   The following civil actions pending in the United States District Court for the District of New Jersey are stayed pending the final disposition of this action or until further order of this Court:

Professional Gastro Assoc. v. Kalavrouziotis, et al.
Civil Action No.: 04-242 (JAP)(MCA)

Hackensack University Medical v. Rafiollah Nazarzadeh, et al.
Civil Action No.: 04-2981 (JAP)(MCA)

Englewood Hospital & Medical Center v. Guliadis, et al.
Civil Action No.: 04-3570 (JAP)(MCA)

Thomas Jefferson University Hospital v. Thomas Kalarrovziotis, et al.
Civil Action No.: 05-2981 (JAP)(MCA)

Hackensack University Medical Center v. Thomas G. McStay, et al.
Civil Action No.: 05-174 (JAP)(MCA)

Union County Orthopedic Group v. Angela Aspromatis, et al.
Civil Action No.: 04-5181 (JAP)(MCA)

Stephen Freifeld, MD v. Miguel A. Gascon and Spanish Tavern, et al.
Civil Action No.: 04-5182 (JAP)(MCA)

Elaine LaRose, et al. v. New Jersey Licensed Beverage Association, Inc.
Civil Action No.:  05-173 (JAP)(MCA)

The Estate of William Heitzmann, et al. v. Healthchoice, et al.
Civil Action No.:  05-703 (JAP)(MCA)

St. Barnabas Medical Center v. Peter Vasilopoulos, et al.
Civil Action No.:  05-2947 (JAP)(MCA)

Virtua West Jersey Health System v. Athanas Kalavarouziot, et al.
Civil Action No.:  05-3192 (JAP)

William A. Robinson v. New Jersey Licensed Beverage Association, Inc., et al.
Civil Action No.:  05-1938 (JAP)(MCA)

Wayne Manor, Inc v. New Jersey License Beverage Association Employee Benefit Plan, et al.
Civil Action No.:  03-6246 (JWB)

Jayne Jaro v. New Jersey Licensed Beverage Association, et al.
Civil Action No.:  05-2238 (JAP)

Sa-Vit Collection Agency, et al. v. Philip and Joanna Garubo, et al. (4 matters)
Civil Action No.:  05-3993 (JAP)

Northern Jersey ENT Associates v. Elaine LaRose, et al.
Civil Action No.:  05-4178 (JAP)

ACB Receivables Management, Inc. v. Gholamabbas Taklif, et al.
Civil Action No.:  05-4179 (JAP)

Hospital and Doctors Service Bureau v. Esposito, et al.
Civil Action No.:  05-4957 (JAP)

Trustees of the University of Pennsylvania v. New Jersey Licensed Beverage Association et als.
United States District Court, Eastern District of Pennsylvania, Civil No. 03-3134 (CRW).

Hackensack Radiology Group, P.A. v. Gholamabbas Taklif and Linda Taklif, et al.
Civil Action No.: 05-5609 (DRD)(SDW)

C.   All health care, medical or service providers, collection agencies, plan participants or beneficiaries, or other persons having actual knowledge of this Order are enjoined from filing prosecuting or enforcing in any state or other federal court an action against the Plans, their participants, beneficiaries or fiduciaries thereof, or any independent fiduciary who may be appointed, or Plaintiff Elaine S. Chao, Secretary of Labor, for monies which constitute liabilities of or allowable charges against the Plan pending the final disposition of this action or until further order of this Court.

D.   All known creditors of the Plan or collection or credit reporting agencies and their agents are prohibited from making or continuing to make any adverse credit reports regarding participants or beneficiaries of the Plan for nonpayment of monies which constitute allowable charges against the Plan.

E.   Excluded from this Order are any actions, whether legal, equitable or administrative in nature, by the Secretary of Labor or any other federal governmental authority and any state or state authority or agency.

F.   Excluded from this Order is the New Jersey state court action entitled _Midlantic Healthcare v. New Jersey Licensed Beverage Association, Inc., et al._ Docket No. L 3921-04, Superior Court of New Jersey Law Division: Passaic County.   The Court's

determination as to whether to stay this state court action will be issued by the Court in its Order on plaintiff's motion to stay the action.

G.   By executing this stipulation the undersigned parties do not waive any arguments or rights with regard to the plaintiff's motion to stay the state court action <u>Midlantic Healthcare v. New Jersey Licensed Beverage Association, Inc., et al.</u>

DATED:   Newark, New Jersey
         December   , 2006
         Jan 5

                                   So Ordered:

                                   _____
                                   JOEL A. PISANO
                                   United States District Judge


So Stipulated:

Defendants New Jersey Licensed Beverage
Association, Inc., Melvin Gitler, Robert
Scerbo, William Cleary,
Robert Marciani, Joseph Ardire, Richard
Bellshot, James Hill, Michael Marsh,
Lewis Rothbart, Frank Zanotti, Ann
Smulewicz, Randy Normand and Mary Rodnick
New Jersey Licensed Beverage Association
Employee Benefit Plan


By: _____
    RICHARD S. ZACKIN
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.

6

Defendants Midlantic Healthcare, Inc. and
Stephan Di Tomasso

By: _____

    RONALD A. BERUTTI
    Weiner, Lesniak, LLP

HOWARD M. RADZELY
Solicitor of Labor

PATRICIA M. RODENHAUSEN
Regional Solicitor

LOUIS De BERNARDO
Attorney

U.S. Department of Labor,
Attorneys for Plaintiff.

## NEW JERSEY LICENSED BEVERAGE ASSOCIATION CASES

### SERVICE LIST

Richard S. Zackin, Esq.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, NJ 07102-5496
**Attorneys for New Jersey Licensed Beverage Association**
(Defendant in *Chao, Wayne Manor, LaRose, Heitzmann* and *Jaro*; Third-Party
Defendant/Fourth-Party Plaintiff in *Kalavrouziotis* (I, II & III), *Nazarzadeh, Guliadis, McStay,
Aspromatis, Gascon, Vasilopoulos, Garubo, LaRose (Northern Jersey ENT), Taklif* (I and II) and
*Esposito*)

Ronald A. Berutti, Esq.
Brad M. Weintraub, Esq.
Weiner Lesniak, LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054-0438
**Attorneys for Midlantic Healthcare, Inc.**
(Defendant in *Chao, Wayne Manor, Heitzmann* and *Jaro*; Third-Party Defendant in *Gascon
LaRose* and *Garubo*; Fourth-Party Defendant in *Kalavrouziotis, Nazarzadeh, Guliadis, McStay*
and *Aspromatis*)

Patrick B. Minter, Esq.
Loren L. Speziale, Esq.
Graham, Curtin & Sheridan
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962-1991
**Attorneys for Health Choice, Inc.**
(Third-Party Defendant in *Gascon*; Defendant in *Heitzmann*)

Adam M. Smith, Esq.                    Thomas A. Croft, Esq.
Coughlin Duffy                         127 Peachtree St. NE
350 Mount Kemble Avenue                707 Candler Bldg.
P.O. Box 1917                          Atlanta, GA 30303
Morristown, NJ 07962-1917
**Attorneys for Starline USA, LLC**
(Third-Party Defendant in *Chao* matter)

**Counsel for Other Litigants in Individual Cases**

1)   Wayne Manor, Inc v. New Jersey License Beverage Association Employee Benefit Plan,
     et al.
     Civil Action No.:  03-6246 (JWB)(GDH)

Martin P. Skolnick, Esq.
Law Offices of Pojanowski & Trawinski, P.C.
1439 Broad Street
Clifton, NJ 07013
**Attorneys for Plaintiff**

#918315 v1
104959-50901

2)    Professional Gastro Assoc. v. Kalavrouziotis, et al.
      Civil Action No.: 04-242 (JAP)(MCA)

Randy P. Catalano, Esq.
Sentry Office Plaza, Suite 100
216 Haddon Avenue
Westmont, NJ 08108
**Attorneys for Defendant/Third-Party Plaintiff**

Sherri Schweitzer, Esq.
Kearney & Associates
210 White Horse Pike
P.O. Box 279
Haddon Heights, NJ 08035
**Attorneys for Plaintiff**

3)    Hackensack University Medical v. Rafiollah Nazarzadeh, et al.
      Civil Action No.: 04-2981 (JAP)(MCA)

Dominick Presto, Esq.
18 Glen Road
Rutherford, NJ 07070
**Attorneys for Defendant/Third-Party Plaintiff**

Arnold L. Stadtmauer, Esq.
Celentano, Stadtmauer & Walentowicz, LLP
1035 Route 46 East
P.O. Box 2594
**Attorneys for Plaintiff**

3                                                    #918315 v1
                                                     104959-50901

4)    Englewood Hospital & Medical Center v. Guliadis, et al.
      Civil Action No.: 04-3570 (JAP)(MCA)

Gesthimani Guliadis (Pro Se)
1575 Ann Street
Fort Lee, NJ 07024
**Defendant/Third-Party Plaintiff**

Arnold L. Stadtmauer, Esq.
Celentano, Stadtmauer & Walentowicz, LLP
1035 Route 46 East
P.O. Box 2594
Clifton, NJ 07015-2594
**Attorneys for Plaintiff**

5)    Thomas Jefferson University Hospital v. Thomas Kalarrovziotis, et al.
      Civil Action No.: 05-2981 (JAP)(MCA)

Randy P. Catalano, Esq.
Sentry Office Plaza, Suite 100
216 Haddon Avenue
Westmont, NJ 08108
**Attorneys for Defendant/Third-Party Plaintiff**

Paul D. Aaronson, Esq.
Mattleman, Weinroth & Miller
401 Route 70 East, Suite 100
Cherry Hill, NJ 08034
**Attorneys for Plaintiff**

#918315 v1
104959-50901

6)     Hackensack University Medical Center v. Thomas G. McStay, et al.
       Civil Action No.: 05-174 (JAP)(MCA)

Thomas J. Moran, Jr., Esq.
Law Office of Thomas J. Moran, Jr.
16 Hemlock Drive
Paramus, NJ 07652
**Attorneys for Defendant/Third-Party Plaintiff**

Arnold L. Stadtmauer, Esq.
Celentano, Stadtmauer & Walentowicz, LLP
1035 Route 46 East
P.O. Box 2594
Clifton, NJ 07015-2594
**Attorneys for Plaintiff**

7)     Union County Orthopedic Group v. Angela Aspromatis, et al.
       Civil Action No.: 04-5181 (JAP)(MCA)

Robert F. Spencer, Esq.
116 South Euclid Avenue
P.O. Box 369
Westfield, NJ 07091
**Attorneys for Defendant/Third-Party Plaintiff**

Philip Kahn, Esq.
Fein, Such, Kahn & Shepard, P.C.
7 Century Drive, Suite 201
Parsippany, NJ 07054
**Attorneys for Plaintiff**

5

8) Stephen Freifeld, MD v. Miguel A. Gascon and Spanish Tavern, et al.
   Civil Action No.: 04-5182 (JAP)(MCA)

| B. David Jarashow, Esq. | Jay R. Benenson, Esq. |
| Law Offices of B. David Jarashow, P.A. | Benenson & Scher |
| 744 Broad Street - Suite 1600 | 159 Millburn Avenue |
| Newark, NJ 07102 | Millburn, NJ 07041 |
| **Attorneys for Defendant/Third-Party Plaintiff** | |

Bart W. Lombardo, Esq.
Frieri Conroy & Lombardo
777 Walnut Avenue
Cranford, NJ 07016
**Attorneys for Plaintiff**

9) Elaine LaRose, et al. v. New Jersey Licensed Beverage Association, Inc.
   Civil Action No.: 05-173 (JAP)(MCA)

Thomas J. Moran, Jr., Esq.
Law Office of Thomas J. Moran, Jr.
16 Hemlock Drive
Paramus, NJ 07652
**Attorney for Plaintiffs**

10) The Estate of William Heitzmann, et al. v. Healthchoice, et al.
    Civil Action No.: 05-703 (JAP)(MCA)

Louis J. Santore, Esq.
Santore & Kenny
300 Harmon Meadow Boulevard
Secaucus, NJ 07094
**Attorneys for Plaintiffs**

4918315 v1
104959-50901

12)   St. Barnabas Medical Center v. Peter Vasilopoulos, et al.
      Civil Action No.: 05-2947 (JAP)(MCA)

Marc B. Kramer, Esq.                                    Douglas A. Kuber, Esq.
Law Offices of Marc B. Kramer, P.C.                     Kuber Law Group, P.C.
150 JFK Parkway, Suite 100                              575 Madison Avenue
Short Hills, NJ 07078                                   10th Floor
**Attorneys for Defendant/Third-Party Plaintiff**  New York, NY 10022

13)   Virtua West Jersey Health System v. Athanas Kalavarouziot, et al.
      Civil Action No.: 05-3192 (JAP)

Randy P. Catalano, Esq.
Sentry Office Plaza, Suite 100
216 Haddon Avenue
Westmont, NJ 08108
**Attorneys for Defendants/Third-Party Plaintiffs**

Laura A. Cochet, Esq.
Freeman & Mintz, P.A.
34 Tanner Street
Haddonfield, NJ 08033-2482
**Attorneys for Plaintiff**

7

14) William A. Robinson v. New Jersey Licensed Beverage Association, Inc., et al.
Civil Action No.: 05-1938 (JAP)(MCA)

C. Wayne Alford, Esq.
Alford & Kalil, P.A.
One Independent Drive, Suite 2400
Jacksonville, FL 32202
**Attorneys for Plaintiffs**

Kimberley A. Robbins, Esq.
Law Offices of Charles E. McKeon
633 North Franklin Street
Suite 400
Tampa, FL 33602-4427
**Attorneys for Defendant, NJLBA**

15) Jayne Jaro v. New Jersey Licensed Beverage Association, et al.
Civil Action No.: 05-2238 (JAP)(MCA)

Joseph R. Lang, Esq.
Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey
3131 Princeton Pike - 1B
Trenton, NJ 08648
**Attorneys for Plaintiff**

8

16)   Sa-Vit Collection Agency, et al. v. Philip and Joanna Garubo, et al.
      Civil Action No.: 05-3993 (JAP)

Philip A. Garubo, Jr., Esq.
Golden, Rothschild, Spagnola, Lundell, Levitt & Boylan, P.C.
1011 Route 22 West, Suite 300
P.O. Box 6881
Bridgewater, NJ 08807
**Attorneys for Defendants/Third-Party Plaintiffs**

Philip A. Kahn, Esq.
Fein, Such, Kahn & Shepard, P.C.
7 Century Drive, Suite 201
Parsippany, NJ 07054
**Attorneys for Plaintiffs**

David B. Watner, Esq.
1129 Bloomfield Ave., #208
West Caldwell, NJ 07006
**Attorney for Plaintiffs**

17)   Northern Jersey ENT Associates v. Elaine LaRose, et al.
      Civil Action No.: 05-4178 (JAP)(MCA)

Thomas J. Moran, Jr., Esq.
Law Office of Thomas J. Moran Jr.
16 Hemlock Drive
Paramus, NJ 07652
**Attorney for Defendant/Third-Party Plaintiff**

Gerard J. Felt, Esq.
Pressler & Pressler
16 Wing Drive, 2nd Floor
Cedar Knolls, NJ 07927
**Attorneys for Plaintiff**

18)   ACB Receivables Management, Inc. v. Gholamabbas Taklif, et al.
      Civil Action No.: 05-4179 (JAP)(MCA)

Dominick Presto, Esq.
18 Glen Road
Rutherford, NJ 07070
**Attorney for Defendants/Third-Party Plaintiffs**

William LaTourette, Esq.
Hubschman & Roman, P.C.

9

318 Bergen Boulevard
Palisades Park, NJ 07450
**Attorneys for Plaintiff**

19) <u>Hospital and Doctors Service Bureau v. Esposito, et al.</u>
   Civil Action No.: 05-4957 (JAP)(MCA)

Dennis R. McConnell, Esq.
McConnell, Lenard & Campbell, L.L.P.
4 Waterloo Road
P.O. Box 111
Stanhope, NJ 07874
**Attorneys for Defendants/Third-Party Plaintiffs**

Samuel J. Weinstein, Esq.
55 Washington Street
P.O. Box 636
East Orange, NJ 07019
**Attorney for Plaintiff**

10

20)  Hackensack Radiology Group, P.A. v. Gholamabbas Taklif and Linda Taklif, et al.
     Civil Action No.: 05-5609 (DRD)(SDW)

Dominick X. Presto, Esq.
18 Glen Road
Rutherford, NJ 07070
**Attorney for Defendants/Third Party Plaintiffs**

Michael Harrison, Esq.
3155 Route 10 East, Suite 214
Denville, NJ 07834
**Attorney for Plaintiff**

11

#918315 v1
104959-50901

21) Robert Ottinger

John L. Laskey, Esq.
Dilworth Paxson LLP
Libertyview - Suite 700
457 Haddonfield Road
P.O. Box 2570
Cherry Hill, NJ 08034

#918315 v1
104959-50901

FILED

02 FEB -1 PM 1:06

~~CE S. WILSON~~
CLERK
BY _Bertie Mansfield_
DEPUTY

U.S. DISTRICT COURT
DISTRICT OF NEVADA
ENTERED & SERVED

FEB - 1 2002

CLERK, U.S. DISTRICT COURT
BY _Bertie Mansfield_ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| ELAINE CHAO, Secretary of the United States Department of Labor | ) | CV-N-01-0698-DWH(RAM) |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES GRAF, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Before the court is the Secretary's motion for preliminary injunction[1] (#3) and defendants Employers Mutual, William Kokott, Nicholas E. Angelos, and American Benefit Society's opposition (#21). This court granted the Secretary's request for a temporary restraining order on December 13, 2001. A hearing concerning the preliminary injunction was held on January 8 & 17, 2002.[2] Also before the court is defendants Employers Mutual, Kokott, and Angelos' challenge in

---

[1] Citations to the following parts of the Secretary of Labor's Motion for Preliminary Injunction will be as follows: (1) Application for T.R.O. will be "T.R.O. App."; (2) Memorandum of Points and Authority in Support of Application will be "Mem. of P. & A."; (3) Declaration of Michael Zehr will be "Zehr Decl.¶ X"; and (4) Exhibits attached to Zehr's Declaration will be "Decl. Ex. X."

[2] Present at the hearing were William Scott and Paul Adair on behalf of the Secretary of Labor ("Secretary"), Mark Cullen and Beth Blechman on behalf of defendants Employers Mutual, William Kokott, Nicholas Angelos, and Stephen Kent on behalf of American Benefit Society. Defendants James Graf, Kari Hanson, Associated Agents of America, and Sierra Administration were not represented at the hearing. In addition, the entities owned by defendants Graf, Kokott, Angelos, and Hanson, namely Western Health Network, Colombia Health Network, WRK Investments, Graf Investments, and the sixteen Associations, were also not

1

_30_

1    open court to this court's subject matter jurisdiction. For the reasons discussed below, the court

2    finds it has subject matter jurisdiction and grants the Secretary's motion for preliminary injunction.

3    <center>**I. Factual Background**</center>

4         The Secretary of Labor ("Secretary") has brought this ERISA action for breach of various

5    fiduciary responsibilities and duties. The named defendants include Employers Mutual, the

6    organization that oversaw the management of the employee benefit plans; the sixteen Associations[3]

7    (collectively "the Associations") that created employee benefit plans for Association members to

8    join; the various service providers to the plans (namely, Colombia Health Network, Western Health

9    Network, WRK Investments, Graf Investments, Associated Agents of America, American Benefit

10    Society and Sierra Administration); and the individuals responsible for running Employers Mutual,

11    the Associations and certain service providers (namely, Graf, Kokott, Angelos and Hanson). The

12    Secretary alleges that the plans established by the Associations were employee welfare benefit plans

13    and the four individual defendants were fiduciaries who breached their duties and responsibilities

14    outlined in ERISA. The Secretary ultimately seeks permanent injunctive relief.

15         The following facts concerning the defendants and the employee welfare benefit plans

16    offered by the Associations were adduced from the motions and exhibits presented to the court as

17    well as from testimony at the hearing.[4]

18         Defendants Kokott and Angelos established Employers Mutual in Nevada on July 28, 2000.[5]

19    (Decl. Ex. 36.) Between December 27, 2000 and February 15, 2001, Kokott and Angelos also

20    _____

21    represented at the hearing. (1/8/02 Tr. at 2.)

22      [3] The "Associations" include the following defendants: American Association of Agriculture, Association of Automotive Dealers and Mechanics, Association of Barristers and Legal Aids, Communication

23    Trade Workers Association, Construction Trade Workers Association, American Coalition of Consumers, Association of Cosmetologists, Culinary and Food Services Workers Association, Association of Educators,

24    Association of Health Care Workers, National Alliance of Hospitality and Innkeepers, Association of Manufacturers and Wholesalers, Association of Real Estate Agents, Association of Retail Sellers, National

25    Association of Transportation Workers, and National Association of Independent Truckers.

26      [4] Since the parties only ordered the transcript to the first part of the hearing, any citations to the second day of the hearing will be only to the hearing in general.

27      [5] Employers Mutual was initially named ANKO, LLC in the Articles of Organization filed with the

28    Nevada Secretary of State. However, on September 8, 2000, ANKO was changed to Employers Mutual. (Decl. Ex. 36.)

<center>2</center>

1  established the sixteen Association defendants. (Decl. Ex. 8.) In all of these organizations, Kokott

2  and Angelos are named as the managing members. (Decl. Exs. 8 & 36.)

3  Around January 29, 2001, Angelos, on behalf of each of the Associations, executed identical

4  trust agreements with Employers Mutual. Kokott signed the agreements on behalf of Employers

5  Mutual. The agreements established ERISA-covered plans as well as trusts for each Association to

6  fund the plans effective September 1, 2000. Under the agreements, Employers Mutual is named the

7  "trustee" of the Association plans, and is to manage the plans. In performing these duties,

8  Employers Mutual is allowed to use 25% of premiums collected for its administrative expenses,

9  while the other 75% of premiums is to be used for claims. The agreement further provides that any

10  left over monies intended for claims at the end of the year are to be paid to Employers Mutual as

11  additional compensation. (Decl. Ex. 9.)

12  According to the Summary Plan Descriptions, each plan's purpose is to "protect its

13  Participants and their Dependents against certain catastrophic health expenses by providing

14  reimbursement for certain medical expenses described in this plan." (Decl. Ex. 10.) The plan further

15  provides that it is fully-funded and governed by ERISA, and that individuals are eligible to

16  participate in the Association Benefit Program if they are United States residents and either self-

17  employed, or a regular part-time or full-time employee of an employer who has chosen to sponsor

18  the individual's participation in an Association. (Decl. Ex. 10.) With the necessary organizations

19  and plans established, the defendants proceeded to set up shop and enroll participants.

20  Employers Mutual operates out of two offices, one in Glendale, California, and the other in

21  Canyon Lake, California. The Glendale office is responsible for customer service, such as reviewing

22  applications and distributing copies of summary plan descriptions. Until the entry of the T.R.O.,

23  defendant Angelos was in charge of the Glendale office. Angelos also operated his construction

24  company, Angelos Construction, out of this office without paying rent. The Canyon Lake office

25  handles the claims end and performs repricing of claims, certifying, pre-certifications, etc.

26  Defendant Graf was in charge of the Canyon Lake office until the T.R.O. was issued. (1/8/02 Tr. at

27  12:16-22.) Graf was named Vice President of Employers Mutual and signed agreement in that

28  capacity on behalf of Employers Mutual. (Decl. Ex. 3.) In addition, Graf was the primary contact

1   for some service providers. (Decl. Exs. 17, 18.)  According to Penny Forbes of defendant Sierra

2   Administration, Graf did the underwriting for the plans and made determinations of employer

3   group's eligibility. (Decl. Ex. 17.)  Defendant Kokott was in charge of the finances.  Defendant

4   Hanson was an employee of Employers Mutual and held herself out as the operations manager in

5   dealings on behalf of Employers Mutual. (*See, e.g.*, Exs. 17, 32.)  The defendants' monthly salaries

6   from Employers Mutual were as follows: Graf, $8,000.00; Kokott, $5,000.00; Hanson, $5,000.00;

7   and Angelos, 5,000.00 until October 2001 and then $6,500.00.  (1/17/02 Hrg. (Angelos' Testimony);

8   Decl. Ex. 39.)

9          In undertaking steps to enroll members, defendants set the premium rates and contracted with

10  agents to market the plans.  First, Graf, though not a licensed actuary and without formal training, set

11  the premium rates by averaging sample rates posted on the Internet and then reducing them to enable

12  Employers Mutual to compete with other providers.  (1/17/02 Hrg. (Graf's Testimony).)  Through

13  contracts with agents, namely defendants American Benefit Society and Associated Agents of

14  America, the agents agreed to market the plans for a commission.  Under their contracts, Associated

15  Agents was to receive 15%, while American Benefit Society received 7%. (Decl. Exs. 13, 14.)  As

16  of October 31, 2001, Associated Agents had received at least $959,574.00 in fees; and American

17  Benefit Society had received at least $418,000.00.  Based upon the eligibility requirements and

18  testimony of Al Cooke and Patricia Canter, it appears that the plans were marketed to employers

19  who then enrolled employees.  (1/17/02 Hrg; *see also* Decl. Exs. 10, 11.)  As a result of the

20  competitive rates and marketing, over 22,000 individuals were enrolled in plans. (Decl. Ex. 12.)

21          According to the Secretary's abstracts of defendants' bank statements, approximately

22  $15,000,000.00 in premiums had been received by October 31, 2001. (Decl. Ex. 1.)  According to

23  Kokott, premiums checks were sent to Resident Agents of Nevada who then forwarded them to the

24  Canyon Lake office.  From Canyon Lake, the checks were forwarded to Kokott at the Glendale

25  office and Kokott would deposit them into bank accounts he established for Employers Mutual.

26  (Decl. Ex. 3.)

27          Employers Mutual uses several regional and national provider networks, including defendant

28  Colombia Health Network, Inc. ("Colombia"). (Decl. Ex. 46.)  Colombia is owned by defendant

4

1  Hanson, and Hanson is also listed as President, Secretary, and Treasurer. Hanson incorporated

2  Colombia in Nevada on May 2, 2001 (Decl. Ex. 43.) While listed as a national provider network by

3  Employers Mutual, Colombia's status as a provider network was pending as of August 20, 2001.

4  The bank records indicate that Colombia was paid $830,395.00 between January and October 2001.

5  (Decl. Ex. 42.) Additionally, defendant Western Health Network ("Western") also received

6  payments and was characterized as a provider network. Western was established in Nevada by

7  Kokott on May 11, 2001 with Kokott and Angelos listed as the managing members. (Decl. Ex. 47.)

8  According to Kokott, Graf and Hanson were to set up contracts between Western and providers, but

9  Kokott never saw any contracts. Western did not have any employees, per Kokott. (Decl. Ex. 3.)

10  Western received $216,451.00 between January and October 2001. (Decl. Ex. 42.) Kokott admitted

11  he authorized the payments to Colombia and Western without reviewing any invoices to verify

12  services were actually rendered. (Decl. Ex. 3.) Employers Mutual also had a prescription service

13  provider, RxAmerica. According to Forbes of Sierra Administration, RxAmerica shut off all

14  participants' prescription cards due to nonpayment on October 3, 2001. Forbes estimates that

15  Employers Mutual owes RxAmerica approximately $900,000.00 in reimbursement for claims

16  incurred. (Decl. Ex. 17.)

17  Additionally, Employers Mutual hired defendants Graf Investments and WRK Investments to

18  provide investment services to the plans. Kokott established both of these organizations. (Decl. Ex.

19  41.) However, Kokott maintains that he established Graf Investments at Graf's request. (Decl. Ex.

20  3.) At the hearing, Graf testified he had nothing to do with Graf Investments. (1/17/02 Hrg.)

21  According, to Kokott, he and Graf each received approximately $225,000.00 from these

22  arrangements. (Decl. Ex. 3.) The Secretary's abstracts of defendants' bank records indicate that

23  WRK Investments and Graf Investments were paid $187,484.00 and $132,484.00, respectively,

24  between January and October 2001. (Decl. Ex. 42.) No contracts formalizing these agreements were

25  presented into evidence, and no information was introduced concerning the services these

26  organizations performed for the plans.

27  For claims processing, Employers Mutual hired defendant Sierra Administration ("Sierra").

28  Sierra worked for Employers Mutual from January 2001 until it terminated its services on October 3,

5

1   2001 for non-payment of a bill.  Sierra was responsible for maintaining certain plan records,

2   receiving and reviewing claims, adjudicating claims, customer service, maintaining eligibility

3   records, notifying plan sponsors of amounts required to pay claims, informing claimants of ineligible

4   claims, and generating various claims and COBRA reports.  (Decl. Ex. 17.)  According to the bank

5   record abstracts, Sierra was paid $416,295.00 between January and August 2001 for its services.

6   (Decl. Ex. 2.)

7        In October 2001, an actuary retained by Employers Mutual estimated there were

8   $4,500,000.00 in outstanding claims.  (Zehr Decl. ¶ 26).  Kokott estimates the figure is closer to

9   $6,500,000.00.  (Decl. Ex. 3.)  Through the transactions described above as well as additional entries

10  in bank records, the Secretary contends that defendants have diverted $2,500,000.00 of the almost

11  $15,000,000.00 in premiums collected to entities directly owned and controlled by them or for other

12  expenditures unrelated to payment of claims.  (Zehr Decl. ¶ 65.)  Overall, the Secretary alleges that

13  almost $6,000,000.00 of the collected premiums have been used for purposes other than payment of

14  claims and that Employers Mutual may have less than $2,000,000.00 in its accounts.  (*Id.* ¶¶ 4-5.)

15       Following an extensive investigation of Employers Mutual's operations, the Secretary filed

16  this suit on December 12, 2001 under 29 U.S.C. § 1132(a)(2) & (5) alleging that Graf, Kokott,

17  Angelos and Hanson breached their various fiduciary duties and responsibilities under ERISA.  The

18  Secretary is seeking permanent injunctive relief against all named defendants.  (Compl. (#2).)

19                              **II.  Analysis**

20  A.     **Subject Matter Jurisdiction**

21       A court's first step in an ERISA suit is to satisfy itself of its subject matter jurisdiction.

22  ERISA governs all employee benefit plans that are established or maintained by an employer

23  engaged in commerce or activities or industries affecting commerce or by employee organizations

24  representing employees who are engaged in commerce or activities or industries affecting commerce.

25  29 U.S.C. § 1003(a).[6]  Except as allowed under statute, ERISA supercedes any state laws that relate

26

27       [6] There are narrow exceptions to this rule with regard to government or church established plans, plans
28  established to comply with workers' rights laws, plans maintained outside the U.S. that pertain to nonresident
     aliens, and excess benefit plans that are unfunded.  29 U.S.C. § 1003(b).

                                     6

1  to employee benefit plans. *See* 29 U.S.C. § 1144.

2       Employee benefit plans include employee welfare benefit plans, employee pension benefit

3  plans, and plans that have the characteristics of both. 29 U.S.C. § 1002(3). Since this case does not

4  involve pension funds, the critical inquiry is whether an employee welfare benefit plan is involved to

5  establish this court's jurisdiction. The Secretary contends that subject matter jurisdiction exists by

6  virtue of the employee welfare benefit plans established by the employers who subscribed to the

7  Associations. According to the Secretary, the employers, by entering into an arrangement to secure

8  group health benefits, established a plan for employees to obtain health benefits and that these plans

9  are "employee welfare benefit plans." The Secretary further argues that the defendants were

10  fiduciaries to these plans and were required to meet their fiduciary responsibilities under ERISA.

11  The defendants maintain that there is no employee welfare benefit plan, and as such this court lacks

12  subject matter jurisdiction.

13       ERISA defines an "employee welfare benefit plan" to include

14       any plan, fund, or program ... established or maintained by an employer or by an
         employee organization, or by both, ... for the purpose of providing for its participants
15       or their beneficiaries, through the purchase of insurance or otherwise, (A) medical,
         surgical, or hospital care or benefits, or benefits in the event of sickness, accident,
16       disability, death or unemployment, or vacation benefits, apprenticeship or other
         training programs, or day care centers, scholarship funds, or prepaid legal services.
17
18  29 U.S.C. § 1002(1). Employer is defined as "any person acting directly as an employer, or

19  indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a

20  group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5).

21  Employee organization includes a variety of groups, including labor unions and employee

22  representation committees, where employees participate and its purpose is to represent employees in

23  matters incidental to employment relationships. 29 U.S.C. § 1002(4).

24       1.   **As a for-profit entrepreneurial enterprise, Employers Mutual and the
                 Associations are not employee welfare benefit plans.**

25       The defendants maintain that the proper inquiry in evaluating subject matter jurisdiction is

26  whether Employer's Mutual or the Associations established "employee welfare benefit plans." In

27  answering this question, the defendants say they do not because they recruited unrelated,

28  heterogenous employers to join with no preexisting relationship between them. As other courts have

1  recognized, multiple employer trusts are not employee welfare benefit plans because the trusts do not

2  fit within the statutory definition of "employer." *See, e.g., Moideen v. Gillespie*, 55 F.3d 1478,

3  1481-1482 (9th Cir. 1995) (determining that a trust was not an employer because its members lacked

4  a pre-existing organizational relationship); *MDPhysicians & Associates, Inc. v. State Bd. of Ins.*, 957

5  F.2d 178 (5th Cir. 1992) (holding that a multiple employer plan was not an employer since there was

6  no pre-existing relationship and the plan was not acting in the interest of subscribers).

7          In keeping with their traditional position on for-profit multiple employer benefit

8  arrangements, the Secretary agrees with defendants' conclusion. *See also Donovan v. Dillingham*,

9  688 F.2d 1367 (11th Cir. 1982) (explaining that the Secretary has joined numerous courts in

10  concluding that the actual multiple employer trusts are not employee welfare benefit plans).  Rather,

11  the Secretary maintains that subject matter jurisdiction exists because the employers in subscribing

12  to a trust's benefit plan established employee welfare benefit plans.

13          2.      **This court has subject matter jurisdiction by virtue of the employee welfare**
                    **benefit plans established by employers.**

14          ERISA's purpose is "to protect working men and women from abuses in the administration

15  and investment of private retirement plans and employee welfare plans." *Donovan*, 688 F.2d at 1370

16  (citing H.R. Rep. No. 93-533 (1974)).  In fulfilling this purpose, ERISA enumerates minimal

17  standards for vesting of benefits, funding of benefits, performing fiduciary responsibilities, reporting

18  to the government and disclosures to participants, and mandates that these standards apply to all

19  employee welfare benefit plans with limited exceptions. *Id.*  Accordingly, while a multiple employer

20  trust is not an employee welfare benefit plan, ERISA's fiduciary obligations still apply to the trust if

21  it is a fiduciary to employee welfare benefit plans established by others. *See id.* at 1375-1376

22  (holding that multiple employer welfare arrangements, while not themselves employee welfare

23  benefit plans under ERISA, may be subject to ERISA's fiduciary responsibilities if they are

24  fiduciaries to employee benefit plans established or maintained by others).

25          As noted above, a plan is an employee welfare benefit plan if it is: (1) plan, fund, program;

26  (2) established or maintained; (3) by an employer or by an employee organization, or by both, (4) for

27  the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death,

28

8

1   unemployment, or vacation benefits, apprenticeship or other training programs, day care centers,

2   scholarship funds, prepaid legal services or severance benefits; (5) to participants or their

3   beneficiaries. *See id.* at 1371. The existence of an employee benefit plan is determined by whether a

4   reasonable person, in considering all the surrounding facts and circumstances, would find that an

5   ERISA plan exists. *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 (1989).

6        A useful tool to gauge whether an employer established an employee benefit plan are the

7   Department of Labor's regulations interpreting ERISA. *See Crull v. Gem Ins. Co.*, 58 F.3d 1386,

8   1389-1390 (9th Cir. 1995). Pursuant to its regulations, the Department does not consider a plan to

9   be an employee benefit plan if: (1) the employer makes no contributions; (2) employee participation

10  in the program is completely voluntary; (3) the employer's sole functions with respect to the

11  program are, without endorsing the program, to permit the insurer to publicize the program to

12  employees, to collect premiums through payroll deductions or dues checkoffs and to remit them to

13  the insurer; and (4) the employer does not receive any consideration in the form of cash or otherwise

14  in connection with the program, other than reasonable compensation, excluding any profit, for

15  administrative services actually rendered in connection with payroll deductions or dues checkoffs.

16  29 C.F.R. § 2510.3-1(j). In relying on these regulations, prior courts have recognized that employers

17  "can establish an ERISA plan rather easily. Even if an employer does no more than arrange for a

18  'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who

19  makes no contributions on behalf of its employees." *Credit Managers Ass'n of S. Cal. v. Kennesaw*

20  *Life & Accident Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987) (citing to Dep't of Labor regulations).

21        In considering the purpose of ERISA in conjunction with the surrounding facts and

22  circumstances, it appears that the employers here established employee welfare benefit plans. First,

23  contrary to defendants' assertions, it appears that the plans were marketed to employers and required

24  employer participation. The application materials were directed to employers to complete and

25  employers had to affirm in their application that they joined an Association and were enrolling their

26  employees. (*See* Decl. Ex. 11.) Employees were only eligible once their employers sponsored them.

27  (Decl. Ex. 10 (summary plan description provisions regarding eligibility).) These actions indicate

28

9

1   that employers more likely endorsed the program than simply allowed defendants to publicize it to

2   employees.

3       Additionally, the testimony of Mrs. Canter, the accountant for Parker's Model T indicates

4   that Parker's Model T played a substantial role in securing health benefits for its employees.  As

5   Mrs. Canter related, she oversaw deductions from employee wages for premiums, and she monitored

6   the status of employee claims.  Similarly, Al Cook, the director of finance for Tripp Enterprises,

7   indicated that he selected Employers Mutual to provide health benefits to Tripp Enterprises'

8   employees, that Tripp Enterprises paid their employees' health insurance premiums, and that he

9   oversaw deductions from employee wages for insurance premiums for their dependents.  (1/17/02

10   Hrg. (testimony of Canter & Cook).)

11   **B.**     **Secretary's Motion for Preliminary Injunction**

12       **1.**     **Ninth Circuit Standard for Preliminary Injunction**

13       A preliminary injunction is "an extraordinary remedy, which should be granted only in

14   limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.

15   1989) (quoting *Frank's GMC Truck Center, Inc. v. G.M.C.*, 847 F.2d 100, 102 (3d Cir. 1988)).  This

16   remedy should only be granted where the merits of the case clearly favor one party over the other.

17   *See Remlinger v. Nevada*, 896 F.Supp. 1012, 1015 (D. Nev. 1995).  As the *Remlinger* court

18   explained

19       "The cases best suited to preliminary relief are those in which the important facts are
      undisputed, and the parties simply disagree about what the legal consequences are of

20       those facts.  The court in such a case can take the undisputed facts, apply the law to
      them, and fairly easily decide which party is likely to prevail."

21

22   *Id.*

23       A party seeking a preliminary injunction must fulfill one of two standards, described in the

24   Ninth Circuit as "traditional" and "alternative."  *See Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.

25   1987).  Under the traditional standard, a court may issue preliminary relief if it finds that (1) the

26   moving party will probably prevail on the merits; (2) the moving party will suffer irreparable injury

27   if the relief is denied; (3) the balance of the hardships favor the moving party; and (4) the public

28   interest favors granting relief.  *Id.*

1    Under the alternative standard, the moving party may meet its burden by demonstrating either

2  (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2)

3  that serious questions exist and the balance of hardships tips sharply in its favor. *See id.* This latter

4  formulation represents two points on the sliding scale in which the required degree of irreparable

5  harm increases as the probability of success decreases. *See Oakland Tribune, Inc. v. Chronicle*

6  *Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985).

7    The formulation is altered in actions brought by the government pursuant to a statute. *United*

8  *States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987). Specifically, where a

9  statute authorizes injunctive relief and the statutory conditions are satisfied, the agency authorized to

10  enforce the statute is not required to show irreparable injury. Rather, the court is to presume that the

11  government will suffer irreparable injury if their motion is denied. This lesser standard is consistent

12  with the notion that "the passage of the statute is itself an implied finding by Congress that violations

13  will harm the public." *Miller for and on Behalf of N.L.R.B. v. California Pac. Med. Ctr.*, 19 F.3d

14  449, 459 (9th Cir. 1994). However, where the government can only make a "colorful evidentiary

15  showing" of a violation, the court must also consider irreparable harm. *Id.*

16    Since ERISA provides for injunctive relief, this altered standard is appropriate if the

17  Secretary is able to establish a likelihood of prevailing on the merits. 29 U.S.C. § 1132(a)(5)

18  (authorizing Secretary of Labor to bring an action to enjoin any act or practice that violates ERISA

19  or seek any other appropriate equitable relief). As discussed below, the Secretary has made the

20  requisite showing of statutory violations and irreparable injury should appropriately be presumed.

21  Accordingly, the court finds that the Secretary satisfied the alternative standard and is entitled to

22  injunctive relief.

23    **2.    Success on the Merits**

24    To presume irreparable injury in a statutory enforcement action, the court need only find

25  some chance of probable success on the merits. *Odessa Union Warehouse Co-Op*, 833 F.2d at 176.

26  In that regard, the Secretary must show they are likely to succeed on the merits and not just a

27  "colorable evidentiary showing" of a violation. *United States v. Nutri-cology, Inc.*, 982 F.2d 394,

28  398 (9th Cir. 1992).

     **a.**    **Defendants Graf, Kokott, Angelos & Hanson are likely fiduciaries to the employee welfare benefit plans.**

Since the Secretary is alleging that defendants breached their various fiduciary responsibilities and duties, it must first be determined whether each of these defendants are likely fiduciaries as defined in ERISA. For purposes of ERISA, a fiduciary is anyone who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... [or] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) and (iii).

The Ninth Circuit liberally construes this definition. *See Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997). Determinations of whether a party is a fiduciary focus on the party's functional control and authority over a plan rather than how their duties are formally characterized. *CSA 401(K) Plan v. Pension Prof'ls, Inc.*, 195 F.3d 1135, 1138, (9th Cir. 1999). Moreover, in applying the definition, courts have distinguished the different levels of control required to establish fiduciary status: While a party is only a fiduciary if they have discretionary authority over the management and administration of a plan, a party who exerts any control over the management or disposition of plan assets is a fiduciary. *See IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421-1422 (9th Cir. 1997). *See also Patelco Credit Union v. Sahni*, 262 F.3d 897, 909 (9th Cir. 2001) (citing several cases). The right to write checks with plan funds is a clear demonstration of authority over plan assets. *IT Corp.*, 107 F.3d at 1421.

Accordingly, to determine whether defendants are fiduciaries, it must be determined whether employee welfare benefit plans and plan assets exist, and, if so, whether the defendants exercised the requisite control over these plans and assets. The first requirement is easily established since, as discussed above, the arrangements between employers with the Associations created employee welfare benefit plans. Employee wage deductions and employer contributions to fund the benefit programs are clearly plan assets.

In evaluating the defendants' conduct with respect to the plans, all defendants are likely fiduciaries because it appears that they all exerted some control over plan assets, and some were also

12

1   involved in the management and administration of plans.  First, with regard to Graf, he conceded at

2   the hearing that he set the premium rates for the plans, and that he set defendant Hanson's rate of

3   compensation to be paid out of plan assets.  (1/17/02 Hrg.)  Additionally, it appears that Graf

4   negotiated his own salary that was also paid out of plan assets and signed an agreement on behalf of

5   Employers Mutual as Vice President with Spectrum Review Services to obtain pre-certification and

6   utilization review services.  (Decl. Ex. 38.)  These examples evidence Graf's significant control over

7   the plans and plan assets.  Similarly, Kokott's management and control over the plans and his

8   significant control over their assets is demonstrated by his status as a managing member of the

9   Associations and his admissions in an interview that he was issuing compensation checks to himself

10   as well as entities owned by him.  (Decl. Ex. 3.)  Angelos also appears to be a fiduciary as a

11   managing member of the Associations, and through his involvement at the Glendale office.  To

12   illustrate, as a managing member, Angelos executed trust agreements on behalf of all the

13   Associations that vested control of the plans and the plan assets in Employers Mutual.  (Decl. Ex. 9.)

14   As such, these transactions evidence Angelos' control over the disposition and management of plan

15   assets.  Finally, Hanson is likely a fiduciary since she has exerted discretionary control over the

16   management and administration of the plans.  For instance, she issued a memorandum, as director of

17   operations, assuring all association representatives that each participant's policy was fully funded

18   and insured.  (Decl. Ex. 32.)  Additionally, Hanson established Colombia as a preferred provider

19   network and arranged for Colombia to provide Employers Mutual with access to its preferred

20   provider network for compensation.  (Decl. Ex. 44.)

21          **b.     Graf, Kokott, Angelos & Hanson likely violated 29 U.S.C. § 1106(a)(1)(C)
                 -(D) & 29 U.S.C. § 1106(b)(1)-(3).**

22          In her first claim for relief, the Secretary alleges that Graf, Kokott, Angelos and Hanson

23   made several payments to themselves or entities owned and controlled by them in violation of 29

24   U.S.C. §§ 1106(a)(1)(C) & (D) and 1106(b)(1)-(3).

25          **i.     Alleged 29 U.S.C. 1106(b)(1)-(3) Violations**

26          Under 29 U.S.C. § 1106(b), fiduciaries are prohibited from: (1) dealing with plan assets to

27   benefit themselves; (2) representing parties with interests adverse to the plan or its participants or

28

13

1    beneficiaries in transactions concerning the plan; or (3) receiving any form of consideration from any

2    party dealing with the plan in a transaction involving its assets.

3         It is a per se violation of 29 U.S.C. § 1106(b) for a fiduciary to engage in any of these

4    transactions regardless of whether bad faith or the reasonableness of the transaction has been

5    demonstrated. *See Patelco Credit Union*, 262 F.3d at 911 (concluding that § 1106(b) creates a per se

6    ERISA violation and that the exemptions contained in 29 U.S.C. § 1108(b) do not apply to §

7    1106(b)).[7]

8         The Secretary alleges Graf, Kokott and Angelos violated § 1106(b)(1)-(3), and highlights

9    numerous transactions involving the defendants as examples of self-dealing. (Mem. of P. & A. (#3),

10   at 16-18.)  In short, the Secretary alleges that defendants set their own compensation and determined

11   their own expenses from plan assets, and used their discretionary authority and control to cause the

12   Associations and Employers Mutual to contract with each other and with Colombia, Western, WRK

13   Investments and Graf Investments, entities owned and controlled by these defendants.

14        It appears the Secretary will prevail on the merits of her 29 U.S.C. § 1106(b) claims.  Chiefly,

15   Kokott and Angelos hired Employers Mutual to manage the Associations' plans by entering into

16   trust agreements. (Decl. Ex. 9.)  Employers Mutual and the Associations are owned by Kokott and

17   Angelos. (Decl. Exs. 8, 36.)  Subsequent to this arrangement, Kokott and Angelos received

18   payments from Employers Mutual. (*See* Decl. Ex. 2.)  Angelos testified that he initially received

19   $5,000.00 each month from Empoyers Mutual and was given a raise in October 2001 to $6,500.00.

20   (1/17/02 Hrg.)

21        Additionally, Graf, Kokott and Angelos entered into contracts on behalf of the Associations

22   with Western and Colombia to acquire access to their provider networks.  Western is owned and

23   controlled by Angelos and Kokott. (Decl. Ex. 47.)  Graf testified Hanson owns Colombia and

24   Hanson is listed as Colombia's President, Secretary and Treasurer.  (1/17/02 Hrg.; Decl. Ex. 43.)

25

26        [7]While, under 29 U.S.C. § 1108(c)(2), a fiduciary is permitted to receive "reasonable compensation for

27   services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan," the Ninth Circuit also held in *Patelco Credit Union* that 29 U.S.C. § 1108(c) does not

28   apply if the fiduciary engaged in self-dealing to secure the payment to themselves. 262 F.3d at 911.  This is consistent with the regulations implementing ERISA. *See* 29 C.F.R. § 2550.408b-2.

1   According to the Secretary's abstracts of Employers Mutual checking statements, Western received

2   $216,451.00 and Colombia was paid $830,395.00. (Decl. Ex. 42.) It appears from the abstracts that,

3   despite receiving several payments for acting as a preferred provider network, Colombia's status as a

4   provider network for Employers Mutual was still pending as of August 20, 2001. (Decl. Ex. 46.)

5   Moreover, additional evidence indicates that Colombia and Western were paid despite not rendering

6   any services. As Kokott related in his interview, he did not know if Western had a provider network

7   because he had never seen a provider list for Western, nor did he see any contracts between Western

8   or any providers. Western also does not have any employees. Additionally, Kokott admitted that he

9   signed the checks to Western and Colombia without verifying that services were actually rendered.

10  (Decl. Ex. 3.) Since the defendants do not offer any explanation for these discrepancies, the

11  Secretary has likely established that Graf, Kokott, Angelos and Hanson engaged in self-dealing

12  through these arrangements between the Associations, Employers Mutual, Colombia, and Western.

13       Similarly, the fiduciary defendants hired WRK Investments and Graf Investments to perform

14  investment services for the plans. Both were established by Kokott and he is listed as the sole

15  managing member. (Decl. Ex. 41.) These two entities have received payments for unspecified

16  services. Kokott, in an interview, admitted that he and Graf, as of November 29, 2001, had each

17  received approximately $225,000.00 from the payments received by WRK Investments and Graf

18  Investments. (Decl. Ex. 3.)

19       Given that fiduciary self-dealing is a per se ERISA violation, it further appears that Graf,

20  Kokott, Angelos and Hanson violated ERISA's self-dealing provisions by writing checks from Trust

21  accounts to themselves and to other entities they control. (See Decl. Ex. 2 (listing the checks written

22  from the Bank of America and Cal Fed accounts between January and August 2001).) According to

23  Angelos, his construction company was allowed to use Employers Mutual offices rent free in

24  exchange for performing maintenance services. (1/17/02 Hrg.) However, Angelos failed to explain

25  the approximately $5,000.00 that his construction company received from Employers Mutual. (Decl.

26  Ex. 2.) Similarly, Kokott admitted that Employers Mutual hired his construction company, Pacific

27  Overland Construction, to perform repairs without ever requesting bids from competitors.

28  Additionally, the invoices submitted by Pacific Overland do not include itemized charges for the

1   costs of construction but only the expenses. (*See* Decl. Ex. 3.)  These transactions also likely

2   establish violations of 29 U.S.C. § 1106(b).  *See Patelco Credit Union*, 262 F.3d at 911 (finding the

3   fiduciary who determined his own administrative fees and collected them from the plan's funds

4   engaged in self-dealing prohibited by 29 U.S.C. § 1106(b)(1)).

5                    ii.     **Alleged 29 U.S.C. § 1106(a)(1)(C)-(D) Violations**

6           The Secretary also maintains that the transactions with Western, Colombia, WRK

7   Investments, and Graf Investments violated 29 U.S.C. § 1106(a)(1)(C) and (D).  These two

8   provisions prohibit fiduciaries to ERISA plans from being involved in transactions where he knows

9   or should know the transaction is a direct or indirect: (1) furnishing of goods, services, facilities

10  between the plan and a party in interest; or (2) transfer to, or use by, or for the benefit of, a party in

11  interest of any plan assets. 29 U.S.C. § 1106(a).  To demonstrate a violation, the Secretary must

12  show that the following is likely true: (1) the person receiving the goods or plan assets is a party in

13  interest; (2) plan assets are involved (in § 1106(a)(1)(C) claims); and (3) the fiduciary knew or

14  should have known the transaction involved the transfer or furnishing of plan assets.

15          First, ERISA includes the following individuals as "parties in interest" to an employee

16  benefit plan:

17          (A)     any fiduciary (including, but not limited to, any administrator, officer, trustee, or
                    custodian), counsel, or employee of such employee benefit plan;

18          (B)     a person providing services to such plan;
                    ...

19          (G)     a corporation, partnership, or trust or estate of which (or in which) 50 percent
                    or more of--

20                  (i) the combined voting power of all classes of stock entitled to vote or the total value
                    of shares of all classes of stock of such corporation,

21                  (ii) the capital interest or profits interest of such partnership, or
                    (iii) the beneficial interest of such trust or estate,

22                  is owned directly or indirectly, or held by persons described in subparagraph (A),
                    (B), (C), (D), or (E);

23
     29 U.S.C. § 1002(14).
24
            Colombia appears to be a party in interest because it provides services to the employee
25
     benefit plans and is a corporation which 50% or more is owned by Hanson, a person described above
26
     in (A) & (B).  29 U.S.C. § 1002(14)(B) & (G).  Similarly, WRK Investments, Graf Investments and
27
     Western are likely parties in interest because they provide services to the plans covered and are
28

                                               16

1  LLC's which 50% or more is owned by Kokott, a person described above in (A) & (B). *Id.* Second,

2  these transactions involved transfers of plan assets since they involved premium monies. Finally,

3  since it appears that the fiduciaries own and control these organizations, common sense dictates that

4  they knew or should have known that these were transfers of plan assets to parties in interest.

5  Accordingly, it is likely that the Secretary has also established a violation of 29 U.S.C. § 1106(a).[8]

6        The court has authority to require parties in interest to return any payments received through

7  a prohibited transaction. As discussed above, it appears that Colombia, Western, WRK Investments,

8  and Graf Investments participated in "prohibited transactions" by receiving excessive compensation

9  for providing minimal, if any, services in violation of 29 U.S.C. §§ 1106(a)(1), 1108(b). Because

10  these transactions likely violate ERISA, the court is authorized by 29 U.S.C. § 1132(a)(5) to issue

11  equitable relief, including restitution, "to redress such violation[s]." *Harris Trust & Sav. Bank v.*

12  *Salomon Smith Barney, Inc.*, 530 U.S. 238, 248-249 (2000) (explaining that the Secretary of Labor

13  may bring actions under 29 U.S.C. § 1132(a)(5) against non-fiduciaries involved in prohibited

14  transactions with fiduciaries); *Reich v. Stangl*, 73 F.3d 1027, 1031 (10th Cir. 1996) (holding that 29

15  U.S.C. § 1132(a)(5) allows Secretary to bring equitable action against parties in interest who

16  participated in prohibited transactions). The Ninth Circuit has reached a similar conclusion with

17  respect to 29 U.S.C. § 1132(a)(3), which contains language similar to 29 U.S.C. § 1132(a)(5), in

18  concluding that (a)(3) authorizes fiduciaries, participants and beneficiaries to bring actions in equity

19  against parties in interest that participated in prohibited transactions. *Nieto v. Ecker*, 845 F.2d 868,

20  873- 874 (9th Cir.1988). As the court explained, "[c]ourts may find it difficult or impossible to undo

21  such illegal transactions unless they have jurisdiction over all parties who allegedly participated in

22  them." *Nieto*, 845 F.2d at 874.

23          c.    **Graf, Kokott & Angelos likely violated 29 U.S.C. § 1106(a)(1)(C)-(D) by
      paying excessive compensation to parties in interest.**

24        The Secretary also asserts that Graf, Kokott and Angelos violated 29 U.S.C. § 1106(a)(1)(C)-

25

26  _____

27      [8]While 29 U.S.C. § 1108(b)(2) insulates transactions with parties in interest where the arrangements are
reasonable and necessary for the establishment and operation of the plan, it appears to the court that it does not

28  apply here since the purposes of these payments are unknown, the payments are large, and it appears that
minimal services, if any, were provided.

1  (D) by making excessive payments to other party in interest defendants, namely Associated Agents,
2  American Benefit Society and Hanson.

3          Under the above definition, it also appears that these organizations and Hanson are parties in
4  interest since Associated Agents and American Benefit Society provided marketing services to the
5  plans, and Hanson has already been determined to be a fiduciary. *See* 29 U.S.C. § 1002(14)(A)-(B).

6          As discussed above, ERISA prohibits transfers of plan assets or furnishing of goods or
7  services to parties in interest unless it is reasonable compensation for the rendering of necessary
8  services to the plan. *See* 29 U.S.C. § 1106(a)(1)(C)-(D); 29 U.S.C. § 1108(b)(2). The regulations
9  implementing ERISA highlight three elements for determining whether § 1108(b)(2) insulates a
10  transaction: (1) the service is necessary to the operation or establishment of a plan; (2) the service
11  was provided under a contract or other reasonable arrangement; and (3) the party in interest received
12  no more than reasonable compensation for the service. The regulations further instruct that a service
13  is necessary where it is appropriate and helpful to the plan in carrying out its purposes, 29 C.F.R. §
14  2550.408b-2, and that determining the reasonableness of compensation is a case specific inquiry that
15  requires consideration of all the relevant facts and circumstances. 29 C.F.R. § 2550.408c-2. The
16  defendants carry the burden to establish compensation was reasonable. *Moreland v. Behl*, 1996 WL
17  193843 (N.D. Cal. 1996). Accordingly, it must be determined whether the payments in question
18  represented reasonable compensation for services necessary to the operation or establishment of the
19  plan in light of these guidelines.

20          With regard to American Benefit Society and Associated Agents, the issue hinges on whether
21  they received excessive compensation. Their services appear to be necessary as they provided
22  marketing services pursuant to agreements with Employers Mutual and the Associations to market
23  the plans for a commission. (*See* Decl. Exs. 13, 14.) The marketing of the plans was appropriate and
24  helpful to the establishment of the plans. However, it does appear that the payments to them were
25  excessive. According to the Secretary's abstracts of defendants' bank records, Associated Agents
26  received $959,574.00, representing 21.86% of Employers Mutual's total expenditures, between
27  January and August 2001. (Decl. Ex. 2.) In addition, under its agreement with Employers Mutual,
28  American Benefit Society was to receive 7% of all premiums it collected. (Decl. Ex. 14 at ¶ 4 & fee

18

1  schedule.) To date, the Secretary estimates that American Benefit Society had collected

2  $2,711,593.00 in employer premiums. (*See* Decl. Ex. 1.) It appears from testimony at the hearing

3  that American Benefit Society received at least $400,000.00 in payments.[9] Defendants have offered

4  no evidence as to the reasonableness of these fees. Moreover, these payments seem excessive. In

5  accepting the Secretary's figures as true, it appears that of the approximate $15,000,000.00 in

6  premiums collected between January and October 2001, American Benefit Society and Associated

7  Agents received almost ten percent. (Decl. Exs. 1, 2.)

8        It also appears that the payments to Hanson likely violate 29 U.S.C. § 1106(a). Chiefly, it is

9  unknown what services she performed since there was no employment contract and no evidence has

10 been presented as to her job duties. According to the Secretary's abstracts of defendants' bank

11 records, Hanson received $107,951.00 between January and August 2001. (Decl. Ex. 2.) This

12 amount is more than double her listed salary. (*See* Decl. Ex. 39 (Employers Mutual Payroll Info. as

13 of July 1, 2001 (listing Hanson's salary as $5,000.00 per month).) For these reasons, the Secretary

14 has also likely established a violation as to the payments to Hanson.

15       As with the payments made to Colombia, Western, WRK Investments and Graf Investments,

16 should the court determine the payments to American Benefit Society, Associated Agents, and

17 Hanson constituted prohibited transactions, the court may authorize these parties to pay restitution.

18 29 U.S.C. § 1132(a)(5).

19       **d.    Graf, Kokott, & Angelos likely violated 29 U.S.C. § 1104(a)(1)(A)-(B).**

20       The Secretary further alleges that Graf, Kokott and Angelos by engaging in these prohibited

21 transactions as well as other conduct breached their fiduciary duties under ERISA. In its prudent

22 standard of care requirement, ERISA imposes several specific duties, including: (1) requiring

23 fiduciaries to act exclusively for the benefit of participants and beneficiaries and limit administrative

24 expenses (29 U.S.C. § 1104(a)(1)(A)); and (2) requiring fiduciaries to act "with the care, skill,

25

26       [9]This observation is based upon Thomas Dillon's testimony that American Benefit Society had returned
27 $418,000.00 in fees paid by Employers Mutual. (1/8/02 Tr. 33:10-13.) While the Secretary alleges that
American Benefit Society received over $500,000.00 in fees, the evidence presented by the Secretary does not
28 support this. Additionally, at one point in his declaration, Zehr states that the amounts received by American
Benefit Society are unknown. (Decl. ¶ 63.)

1  prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

2  capacity and familiar with such matters would use in the conduct of an enterprise of a like character

3  and with like aims" (29 U.S.C. § 1104(a)(1)(B)).

4       The first duty has been described as the "exclusive purpose" rule and places an exacting

5  standard on fiduciaries. As the statute indicates, the fiduciary is to act exclusively in the interest and

6  purpose of providing benefits and defraying administrative expenses. The Ninth Circuit liberally

7  construes this duty to protect participants and beneficiaries. *Board of Trustees of Airconditioning &*

8  *Refrigeration Indus. Health & Welfare Trust Fund v. J.R.D. Mechanical Services, Inc.*, 99 F.Supp.2d

9  1115, 1122 (C.D. Cal. 1999).

10       The second duty of prudence includes the requirement that the fiduciaries make thorough

11  investigations and fully consider transactions before entering into them. *Howard v. Shay*, 100 F.3d

12  1484, 1488 (9th Cir. 1996); *Donovan v. Mazzola*, 716 F.2d 1226, 1231-1232 (9th Cir. 1983).

13  ERISA's legislative history further instructs courts to interpret the rule in light of "'the special nature

14  and purpose of employee benefit plans.'" *Id.* at 1231 (quoting H.R. Rep. No. 93-1280 (1974).)

15       Based upon the prior violations already discussed, it appears the Secretary is also likely to

16  prevail on this claim since a finding of fiduciary self-dealing also establishes a breach of fiduciary

17  duties. *Patelco Credit Union*, 262 F.3d at 911. Thus, since the alleged violations are likely true, it

18  appears that Graf, Kokott, and Angelos have violated their fiduciary duties outlined in 29 U.S.C. §

19  1104(a)(1)(A)-(B) through their self-dealing.

20       Since the Secretary has shown a likelihood of prevailing on the merits, irreparable injury is

21  presumed. *Miller for and on behalf of N.L.R.B.*, 19 F.3d at 459. Accordingly, the court finds the

22  Secretary is entitled to preliminary relief.

23                                         **III. Conclusion**

24       **IT IS ORDERED** that the Secretary's motion for preliminary injunction (#3) be

25  **GRANTED.**

26       **IT IS FURTHER ORDERED** that:

27       1.    All assets of Defendants James Lee Graf ("Graf"), William Kokott ("Kokott"),

28          Nicholas Angelos ("Angelos"), Kari Hanson ("Hanson"), Colombia Health Network,

1   Inc., Western Health Network, Inc., Employers Mutual, LLC, American Association

2   of Agriculture, Association of Automotive Dealers and Mechanics, Association of

3   Barristers and Legal Aids, Communication Trade Workers Association, Construction

4   Trade Workers Association, American Coalition of Consumers, Association of

5   Cosmetologists, Culinary and Food Services Workers Association, Association of

6   Educators, Association of Health Care Workers, National Alliance of Hospitality and

7   Innkeepers, Association of Manufacturers and Wholesalers, Association of Real

8   Estate Agents, Association of Retail Sellers, National Association of Transportation

9   Workers, and National Association of Independent Truckers, (referred to collectively

10  as the "Associations") including all accounts wherever located which contain their

11  assets, be and hereby are frozen and Defendants, their officers, directors, fiduciaries,

12  agents, employees, service providers, depositories, banks, accountants, attorneys, and

13  any other party acting in concert with or at the direction of any Defendant be and

14  hereby are enjoined from expending transferring, encumbering, hypothecating,

15  secreting or otherwise disposing of any Defendants' assets, except as ordered by this

16  Court or its duly appointed receiver or Independent Fiduciary.  The bank accounts

17  frozen include, but are not limited to, California Federal Bank account numbers 893-

18  4221980; 893-4203988; 893-4207708; 893-4203996; 893-4207716; 893-4217988;

19  893-4207526; 893-4218994; 893-4207583; 893-4221998; 893-42079674; 893-

20  4221972; 893-4207666; 893-4217996; 893-4207534; 893-4219950; 893-4207591;

21  893-4218952; 893-4207542; 893-4218960; 893-4207559; 893-4219968; 893-

22  4207682; 893-4217970; 893-4207617; 893-4218986; 893-4207567; 893-4218978;

23  893-4207575; 893-4222954; 893-4207609; 893-4224968; and 893-4207690; Bank of

24  America, N.A. account numbers 004961861669; 004961861656; 004961861643; and

25  004961861685; City National Bank account numbers 0411957985 and 0411958434;

26  and, Bancfirst Bank (Oklahoma City, Oklahoma) account number 4005054522;

27  2.   Defendants James Graf, William Kokott, Nicholas Angelos, and Kari Hanson and any

28  companies or entities they own or control, including Defendant in this action, are

21

1    removed from any position they may currenlty hold with respect to Employers

2    Mutual, LLC, the Associations, and the Employers Mutual Plans, and are enjoined

3    from exercising any authority or control with respect to said entities, and from

4    providing any services to or receiving any compensation from them except as ordered

5    by this Court;

6    3.    Defendant James Graf, William Kokott, Nicholas Angelos, and Kari Hanson are

7    enjoined from, directly or indirectly, accepting or soliciting any person, employer, or

8    group thereof for participation in any plan or arrangement offering employee benefits

9    covered by ERISA;

10    4.    Defendants James Graf, William Kokott, Nicholas Angelos, and Kari Hanson are

11    ordered to provide this Court, the Secretary of Labor's counsel, and the Independent

12    Fiduciary with the name, account number, and location of their personal bank

13    accounts and any other accounts containing their assets within five (5) business days

14    of the entry of this Order and are further ordered to make an accounting to the

15    Secretary and the Independent Fiduciary of all personal monies in excess of $100.00

16    (one hundred dollars) expended or personal assets transferred between December 13,

17    2001, and the entry of this Order;

18    5.    All Defendants and their agents, employees, service providers, depositories, banks,

19    accountants, attorneys, and any other person or entity with actual notice of this Order

20    are enjoined to preserve, secure, and produce to the Independent Fiduciary upon his

21    request, all books, records, and documents which relate to the administration and

22    operation of Employers Mutual, LLC, the Associations, the Employers Mutual Plans,

23    and their assets and to comply in good faith with the terms of this Order;

24    6.    Thomas A. Dillon shall continue to serve as the Court's receiver or Independent

25    fiduciary of Employers Mutual, LLC, the Associations, and the Employers Mutual

26    Plans with plenary authority to administer said entities and, if necessary, to

27    implement their orderly termination.  The Independent Fiduciary shall collect,

28    marshal, and administer the assets of Employers Mutual, LLC, the Associations, and

1    the Employers Mutual Plans, including those sums owing and payable to them,

2    process the Employers Mutual Plans' unadjudicated claims and pay those which are

3    found to be legitimate, identify all creditors of the entities and the amount of their

4    claims, and take such further actions with respect to said entities which may be

5    appropriate. The Independent Fiduciary shall exercise full authority and control with

6    respect to the management or disposition of the assets of the Employers Mutual Plans

7    and other entities, including authority over all accounts frozen pursuant to any Order

8    of this Court;

9    7.   All Defendants are enjoined from coercing, intimidating, interfering with or

10    attempting to coerce, intimidate, or interfere with the Independent Fiduciary or with

11    the agents, employees or representative of the Independent Fiduciary and are ordered

12    to cooperate fully with the Independent Fiduciary or his successors, agents,

13    employees or representative. Rule 19(a) Defendant Sierra Administration, Inc., is to

14    cooperate fully with the Independent Fiduciary and make available to him upon

15    demand all books, records, data, claims files, financial records and other documents

16    within its possession or under its control which relate, directly or indirectly, to the

17    Employers Mutual Plans, their administration or their assets;

18    8.   All Defendants are to deliver or otherwise make available to the Independent

19    Fiduciary all books, records, bank accounts, and documents of every nature relating in

20    any manner to the management and operation of the Employers Mutual Plans and the

21    other entities under the receivership of the Independent Fiduciary;

22    9.   The Independent Fiduciary has the authority to determine whether Employers Mutual,

23    the Associations, and the Employers Mutual Plans can continue as viable entities and,

24    if so, the Independent Fiduciary is to prepare and present to the Court an appropriate

25    plan of reorganization. If not, the Independent Fiduciary is to terminate the Employers

26    Mutual Plans, marshal the assets of Employers Mutual, the Associations, and the

27    Employers Mutual Plans and implement an orderly plan of liquidation. In either case,

28    the Independent Fiduciary is authorized to pursue all legitimate claims Employers

23

1         Mutual, the Associations, and the Employers Mutual Plans may have against

2         Defendants or third parties which, in his judgment, are likely to result in a meaningful

3         recovery of assets to pay participant claims or costs of administration. The

4         Independent Fiduciary's authority includes the authority to seek relief in this Court

5         under the All Writs Act, 28 U.S.C. § 1651, to obtain quasi-bankruptcy protection for

6         the Employers Mutual Plans if appropriate. The Independent Fiduciary need not

7         pursue claims which are being pursued by the Plaintiff in this action;

8    10.   The Independent Fiduciary in the performance of his duties may retain such

9         assistance as he may require, including attorneys, accountants, actuaries, and other

10        service providers;

11   11.   The payment of administrative expenses and all fees to the Independent Fiduciary, his

12        assistants, attorneys, accountants, actuaries and other necessary service providers are

13        to be considered priority administrative expenses of the Employers Mutual Plans and

14        its related entities, superior to any other class of expense or obligation of the

15        Employers Mutual Plans or its related entities and the Independent Fiduciary's second

16        priority is to be the payment of legitimate claims;

17   12.   The Independent Fiduciary may not be held personally responsible for any claims

18        against the Employers Mutual Plans or the related entities which existed, arose,

19        matured or vested prior to the appointment of the Independent Fiduciary;

20   13.   The Independent Fiduciary is to comply with all applicable rules and laws;

21   14.   The Independent Fiduciary is to maintain the bond obtained pursuant to ERISA §

22        412, 29 U.S.C. § 1112;

23   15.   The Independent Fiduciary shall be subject to such orders as the Court may direct,

24        including the filing of interim and final reports. Upon application and appropriate

25        documentation, the Independent Fiduciary shall receive monthly such reasonable

26        compensation as the Court may from time to time approve, in addition to

27        reimbursement of reasonable expenses actually incurred in the performance of his

28        duties;

16. The Independent Fiduciary shall provide such funds to the Defendants James Graf, William Kokott, Nicholas Angelos, and Kari Hanson as are necessary to pay reasonable living expenses and reasonable attorneys' fees. Such funds may only come from the requesting Defendant's personal assets. No assets of the Employers Mutual Plans may be used for these purposes. Any Defendant who requires a partial release of the assets frozen by the Court for the purpose of living expenses and/or legal representation shall file with the Court a statement of their anticipated monthly expenses. Such monies shall be released by the Independent Fiduciary to said Defendant and from same's personal accounts within ten (10) working days unless objected to by the Secretary or the Independent Fiduciary. Any objection shall be resolved by the Court;

17. All Defendants shall cooperate fully with the Independent Fiduciary or his successors, and with the agents, employees or representatives of the Independent Fiduciary and to deliver or otherwise make available to the Independent Ficuiary all books, records, bank accounts, and documents of every nature relating in any manner to the management and operation of Employers Mutual;

18. Defendants James Graf, William Kokott, Nicholas Angelos, and Kari Hanson are enjoined from:

   a. Exercising, or attempting to exercise, directly or indirectly, any discretionary authority or control with respect to the management or administration of Employers Mutual, the Associations, and the Employers Mutual Plans, or, except as expressly provided by this Court, any other employee benefit plan or Trust holding assets of employee benefit plans subject to the coverage of ERISA, and from providing any services, directly or indirectly, for compensation or otherwise to any such employee benefit plan or Trust holding the assets of such plans unless specifically authorized by this Court;

   b. Serving or acting, directly or indirectly, for compensation or otherwise, as a trustee, fiduciary, service provider, agent, consultant, or representative with

25

respect to any employee benefit plan subject to ERISA; and

    c.    Occupying any position that involves, directly or indirectly, decision making authority with respect to, or custody or control of, the assets or administration of any employee benefit plan subject to ERISA;

19.    Defendants James Graf, William Kokott, Nicholas Angelos, and Kari Hanson shall immediately terminate any contracts or agreements for services that they jointly and severally, have or have had with Employers Mutual, or any of its officers, agents, employees, or representatives acting on behalf of Employers Mutual, and may not receive additional monies or compensation due under any such contracts or agreements for services and any other claims they may have against Employers Mutual and the Associations;

20.    Any and all state and federal civil proceeding against Defendants Employers Mutual, LLC, the Associations, James Graf, William R. Kokott, Nicholas E. Angelos, Kari Hanson, WRK Investments, Graf Investments, Colombia Health Network, and Western Health Network, concerning Employers Mutual, LLC, the Associations, or the Employers Mutual Plans which have been or will be commenced are stayed except said stay:

    a.    Does not prevent any state or state agency from seeking non-monetary injunctive relife against any Defendant (excluding Employers Mutual and the Associations) or from seeking a reocvery from any Defendant (excluding Employers Mutual and the Associations) for payment of claims incurred in their respective states or freezing or otherwise seizing any Defendant's assets in aid of the Independent Fiduciary, provided that such recovery for payment of claims or assets are given to the Independent Fiduciary;

    b.    Does not prevent any state or state agency from bringing an enforcement action against any Defendant (excluding Employers Mutual and the Associations) for non-monetary relief, including, but not limited to, an action for suspension or revocation of a license, an action to bar or limit any

1   Defendant from engaging in any regulated activity, or an action to prohibit

2   any Defendant from assisting the sale of, offer, or sale of any health care

3   coverage (including coverage denominated as governed by ERISA);

4   c.   Does not prevent any state or state agency from bringing an enforcement

5   action against any Defendant (excluding Employers Mutual and the

6   Associations) for any penalty or forfeiture imposed for a violation of state law,

7   provided that either: (1) any money collected as penalties or forfeitures is

8   given to the Independent Fiduciary to be used for purposes consistent with this

9   Order, or (2) collection of any judgment or assessment for penalties or

10   forfeitures is deferred until the final conclusion of this case and the full

11   collection of any judgment against such defendant in this case;

12   d.   Does not prevent the Independent Fiduciary from bringing and maintaining

13   any legal action of any kind against any Defendant or any other person

14   pursuant to his authority under this Order, and;

15   e.   Does not prevent plaintiffs in *First Coast Premier Group, et al v. Employers*

16   *Mutual, LLC*, Case No. 01-07998 CA (Fla. Cir. Ct. filed Dec. 13, 2001), from

17   notifying participants in the Employers Mutual Plans that they may pay their

18   premiums into the escrow account pursuant to the Temporary Injunction

19   issued in that case on Dec. 6, 2001, and does not prevent the participants from

20   paying such premiums into the escrow account, provided that plaintiffs give

21   all money paid into the escrow account to the Independent Fiduciary to be

22   used for purposes consistent with this Order, including the payment of a

23   reasonable fee to the escrow agent for services rendered in managing the

24   escrow account;

25   21.   All hospitals, physicians, pharmacists, and other health care providers ("Providers"),

26   including their agents, employees, representatives, and assigns, are enjoined from

27   commencing or continuing any judicial, administrative, enforcement, or other

28   proceeding, asserting any lien, providing negative reports to any credit rating or credit

27

1   reporting entity, and threatening to take any such action against any participant,

2   beneficiary, or insured covered or intended to be covered by Employers Mutual, LLC,

3   any Employers Mutual Association, or any health plan or insurance arrangement

4   sponsored by, administered by, or affiliated with Employers Mutual, LLC or any

5   Employers Mutual Association related to any debt or to any claim for payment for

6   medical or health care services rendered to any such participant, beneficiary or

7   insured;

8   22.   The Court retains such jurisdiction over the parties hereto as may be necessary for

9   enforcement of this Order;

10  23.   This Order shall remain in effect until the final resolution of this case, including any

11  appeals.

12  IT IS SO ORDERED.

13  DATED: This _____ day of FEBRUARY, 2002.

14

15  _____

16  UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28