# EXHIBIT A

{3818947:}

## SECOND SETTLEMENT AGREEMENT

**THIS SECOND SETTLEMENT AGREEMENT** (this "Second Settlement Agreement") is made as of May 14, 2019 (the "Effective Date"), by and between Mark Dottore, not in his individual capacity but as receiver (the "Receiver") of the South University of Ohio LLC, Dream Center Education Holding LLC ("DCEH"), The DC Art Institute of Raleigh-Durham LLC, the DC Art Institute of Charlotte LLC, DC Art Institute of Charleston LLC, DC Art Institute of Washington, LLC, the Art Institute of Tennessee-Nashville LLC, AiTN Restaurant LLC, The Art Institute of Colorado LLC, DC Art Institute of Phoenix LLC, The Art Institute of Portland LLC, the Art Institute of Seattle LLC, the Art Institute of Pittsburgh, DC LLC, the Art Institute of Philadelphia, DC, LLC, DC Art Institute of Fort Lauderdale LLC, the Illinois Institute of Art LLC, the Art Institute of Michigan LLC, the Illinois Institute of Art at Schaumberg LLC, DC Art Institute of Phoenix, LLC and its direct subsidiaries the Art Institute of Las Vegas LLC ("AI Las Vegas"), the Art Institute of Indianapolis, LLC, and AiIN Restaurant LLC; Dream Center Argosy University of California LLC and its direct subsidiary Argosy Education Group LLC (together, "Argosy"), Dream Center Education Management LLC, and South University of Michigan LLC (DCEH collectively and together with all of the entities referenced above, other than the Receiver, the "Receivership Entities"), and Studio Enterprise Manager, LLC ("Studio" and together with the Receivership Entities and the Receiver, the "Parties").

## RECITALS

**WHEREAS,** certain of the Parties executed each of the following documents: a Framework Agreement (the "FWA"), a Master Bundled Services Agreement (the "BSA"), a Technology Licenses and Services Agreement (the "TLSA"), a Master Asset Purchase Agreement (the "APA"), a License Agreement (the "License"), and a Restrictive Covenant Agreement (the "Restrictive Covenant Agreement" and collectively with the FWA, BSA, TSLA, APA and License, the "Ai Transaction Documents"), a Master Services Agreement with each of South University, the Arts Institutes, and Argosy University (each as defined below) (collectively, the "MSAs"), a Transition Services and License Agreement with DCEH (the "TSA"), the Amended and Restated Framework Agreement (the "Amended FWA"), an Equity and Asset Purchase Agreement (the "EAPA"), the Omnibus Amendment No. 2 to Credit Documents (the "Bridge Loan"), and an Interim Framework Agreement (as amended, the "IFWA" and collectively with each of the MSAs, the Bridge Loan, the TSA, the Ai Transaction Documents, and the other transaction documents contemplated by the IFWA, the "Reorganization Documents");[1]

**WHEREAS,** the Reorganization Documents provided for the acquisition by Education Principle Foundation ("EPF") of Dream Center South University, LLC (collectively with all of its subsidiaries, "South University") and part of The Arts Institutes International LLC (collectively with all of its subsidiaries, the "Arts Institutes");

**WHEREAS**, on January 18, 2019, Digital Media Solutions LLC filed that certain complaint in the United States District Court for the Northern District of Ohio (the "Court")

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the applicable Reorganization Documents or Ai Transaction Documents.

captioned *Digital Media Solutions, LLC v. South University of Ohio, LLC, et al.*, Case No. 19-145 (the "Receivership Action"), requesting the appointment of a receiver for the Receivership Entities, and Mark Dottore was appointed as Receiver pursuant to that certain Order Appointing Receiver, which was amended by the Amended Order Appointing Receiver (Docket No. 150) (the "Receivership Order");

WHEREAS, on February 21, 2019, the Receiver filed that certain complaint in the Court in the case captioned *Mark Dottore, Receiver v. Studio Enterprise Manager, LLC, et al.*, Case No. 19-380 (the "Action"), asserting the following claims against Studio: equitable rescission, breach of contract, unjust enrichment, and a declaratory judgment declaring that the Receiver may reject certain reorganization documents (collectively, the "Declaratory Judgment Claims");

WHEREAS, the Action and the Declaratory Judgment Claims were settled pursuant to that certain settlement agreement between Studio, the Receiver, and EPF dated February 27, 2019 (as amended) (the "First Settlement Agreement"), which was approved by the Court on March 18, 2019;

WHEREAS, among other topics, the First Settlement Agreement provided that Studio would pay a settlement sum in full and complete payment of the TSA Fee for all of January and February 2019;

WHEREAS, in response to the Court's request, on March 26, 2019, Studio filed its detailed plan (Docket No. 206) (the "Separation Plan") for the extrication of ongoing campuses of South University and the Arts Institutes from DCEH's shared IT platform (the "Shared IT Platform"), and South University and the Arts Institutes unanimously endorsed the Separation Plan;

WHEREAS, on April 5, 2019, Studio provided the Receiver with a notice of termination of all TSA Services (other than the royalty-free license to use the hardware and software comprising the Shared IT Platform), and that termination notice became effective on May 5, 2019;

WHEREAS, the Receiver asserted that Studio did not pay certain amounts due for the TSA Fee accruing after March 1, 2019 and thereafter, and Studio disputed this claim (the "TSA Fee Claim");

WHEREAS, the Receiver claimed that certain funds intended to be sent by the United States Department of Veterans Affairs ("VA") to certain Receivership Entities were inadvertently deposited into an account owned and controlled by the Arts Institutes (the "VA Funds Claim");

WHEREAS, the Arts Institutes informed Studio that it has not received the full amount of funds it was due from the VA related to its 8 campuses because funds from the VA were commingled by DCEH and that DCEH has received, in the aggregate, funds from the VA in excess of the amount that it should have received for the Receivership Entities;

WHEREAS, in light of the impending termination of the Receivership, the Receiver has determined that the VA Funds Claim should be resolved between the VA and the Arts Institutes and that there is insufficient time for Receiver to be involved or have any obligation to intervene in the VA Funds Claim;

**WHEREAS**, the Receiver has claimed that DCEH is the owner of certain IP addresses that are registered in the name of the Arts Institutes with the American Registry for Internet Numbers (the "IP Address Claim");

**WHEREAS**, Studio and the Arts Institutes have provided the Receiver with documentary evidence they contend supports their claim that the Arts Institutes is the rightful owner of the IP address that are the subject to the IP Address Claim;

**WHEREAS**, throughout the course of the Receivership Action, the Receiver asserted certain claims against Studio, including but not limited to, contempt of court and breach of certain of the Reorganization Documents (collectively and together with the TSA Fee Claim, the VA Funds Claim, the IP Address Claim, the "Receiver Claims"), and Studio asserted certain claims against the Receiver regarding the Receiver's alleged breach of certain of the Reorganization Documents and the First Settlement Agreement (collectively, the "Studio Claims");

**WHEREAS**, on April 26, 2019, the Court issued an order terminating the Receivership Action (the "Termination Order") effective May 31, 2019;

**WHEREAS**, consistent with the Termination Order, Studio and the Receiver prepared a joint report documenting actions that they intend to take to wind-up the Receivership Action and to address the list of issues identified in the Receiver's Report Regarding Plan to Provide Ongoing Services to Universities (Docket No. 268) (the "Termination Report");

**WHEREAS**, the Termination Report contemplates that each of the Parties would complete a number of specific actions and enter into a global settlement and mutual release of claims, including the Receiver Claims and the Studio Claims, and Studio desired for these actions and releases to be documented in a formal global settlement agreement; and

**WHEREAS**, the Receiver and Studio, without admitting the validity of the Receiver Claims or the Studio Claims, have exchanged information, negotiated, and reached a settlement of the Receiver Claims and the Studio Claims upon the terms and conditions set forth in this Second Settlement Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby stipulated, consented to and agreed by and between the Parties as follows:

1.      Nothing in this Second Settlement Agreement shall be deemed an admission of any liability by Studio or the Receiver regarding any of the Receiver Claims or the Studio Claims, respectively.

2.      On the Effective Date, the Receiver shall (a) execute the amended sublease attached to the Termination Report (the "Sublease") for the Pittsburgh data center (the "Premises"), (b) file a withdrawal of his Opposition to Studio's Motion for an Order Requiring the Receiver to (i) Execute Sublease for the Pittsburgh Data Center; and (ii) Comply with the Terms of the Reorganization Documents and the Settlement Agreement (Docket No. 269); (c) file a motion with the Court to approve the Sublease and this Second Settlement Agreement on an expedited schedule with a request that the Court approve both no later than May 21, 2019, and (d) request that the Court include in the final termination order for the Receivership that

Studio, South University and the Arts Institutes will have continued access to the Shared IT Platform through September 30, 2019.

3.    From the date of approval of the Sublease by the Court (the "Commencement Date") until the earlier of (a) the date that the Court terminates the Receivership or (b) the termination or expiration of the Sublease (the "Termination Date"), Studio will assume responsibility for the Sublease and the Premises as set forth in the Sublease, including, but not limited, to all rent, utilities, facility costs, and vendor agreements identified in the Separation Plan, and Studio will pay such costs for the duration of the Sublease; provided, however, Studio shall not be responsible for any expenses incurred prior to the Commencement Date or that were paid by the Receiver.  From the Commencement Date until the Termination Date, Studio will maintain any existing security and data protection requirements for the Shared IT Platform that are in place as of the Commencement Date.

4.    From the Commencement Date until the Termination Date, Studio shall provide access to the Premises and the Shared IT Platform (and any hard-copy paper files at the Premises relevant to the Receivership Entities) to the Receiver (and his pre-approved list of personnel) upon request during normal business hours to access data relevant to the Receivership Entities, or for any other lawful and legitimate business purpose of the Receivership Entities approved by the Court.

5.    As long as Studio maintains control of the Shared IT Platform, it shall not delete any data relating to any of the Receivership Entities that is presently on the Shared IT Platform. Upon the expiration or termination of the Sublease, Studio shall vacate the Premises in accordance with the Sublease and turnover the Premises and the Shared IT Platform to DCEH, and Studio shall have no further obligation to maintain the Shared IT Platform or the data contained therein, unless Studio has purchased the Shared IT Platform from DCEH for the amount and subject to the conditions and rights set forth in the First Settlement Agreement, in which case Studio shall continue to preserve said data until the Termination Date.

6.    If the Receiver reaches an agreement with a buyer for Western State College of Law and such agreement is approved by the Court prior to the Termination Date, Studio will negotiate in good faith with such buyer to enter into a transition services agreement substantially similar to the Save the Art TSA (as defined herein).  If requested by such buyer, Studio will also work with such buyer to transfer the school's data and all of Argosy's curriculum stored on the Shared IT Platform to such buyer; provided that Studio shall not be required to incur unreimbursed out-of-pocket costs and expenses in connection therewith.

7.    If the proposed transaction to sell AI Las Vegas to Save the Art Institute of Las Vegas Limited ("Save the Art") is approved by the Court prior to the Termination Date, Studio will negotiate in good faith with Save the Art to enter into the transition services agreement attached hereto as Exhibit A (the "Save the Art TSA").  If requested by Save the Art, Studio will also work with Save the Art to transfer the school's data and curriculum stored on the Shared IT Platform to Save the Art; provided that Studio shall not be required to incur unreimbursed out-of-pocket costs and expenses in connection therewith.

8.    The Parties acknowledge that, pursuant Section 3(e) of that certain Grant-Back License Agreement, dated as of January 7, 2019, between the Arts Institutes and DCEH, the trademark and tradename "The Art Institute of Las Vegas" may only be used by DCEH for a

period of 180 days after January 7, 2019 solely for the purpose of a teach-out of AI Las Vegas (and may only be used in a manner consistent with prior uses). However, for the sole purpose of transitioning AI Las Vegas to new ownership, the trademark/tradename may be used, if required by applicable law, regulatory or accreditation requirements, until and through such date as the buyer secures regulatory approval for the change of control of the campus (the "Change of Control") and further, the buyer may use the curriculum for a period of 3 years after the Change of Control, provided that such use of the trademark/tradename and curriculum shall be in a manner consistent with prior use and which does not cause harm to the brand and goodwill of the Arts Institutes. Further, other than the limited right to use granted above, DCEH may not transfer or assign the rights to such trademark/tradename or the curriculum to Save the Art or any other party. Consequently, the Receiver shall include a condition to the proposed transaction with Save the Art that prohibits the use of the trademark and tradename "The Art Institute of Las Vegas"; "AI"; "Art Institute" or any variation thereof or similar names and nomenclature by Save the Art or AI Las Vegas after the Change of Control or the curriculum after 3 years from the Change of Control.

9.      Upon the approval by the Court of this Second Settlement Agreement, Studio and CBCA (as defined herein) release their liens on (a) the furniture, fixtures, and equipment of the Receivership Entities, (b) any right of first refusal regarding the sale of any Receivership Entities or their assets, including the Western State College of Law, and (c) any Argosy curriculum, other that any curriculum related to the Arts Institutes campuses owned by Argosy. Upon the approval by the Court of this Second Settlement Agreement, Studio releases any liens on proceeds of any claims by DCEH or the Receiver against the directors and officers of the Receivership Entities and Education Management Corporation, including any insurance policies that cover such claims. Nothing in this paragraph 9 or in paragraph 17 shall serve to release Studio's claims on the accounts receivable, intellectual property or other assets Studio acquired under the Reorganization Documents.

10.     Studio will maintain the right to purchase the Shared IT Platform pursuant to the Reorganization Documents and the terms set forth in the First Settlement Agreement. Should Studio exercise the right to purchase the Shared IT Platform before the Termination Date, it will remain obligated to grant access to the data contained therein as contemplated herein through the Termination Date.

11.     The Arts Institutes will return to the Receiver on or before May 20, 2019, the sum of $112,462.48 (the "AI Las Vegas Funds"), which funds the VA intended to be sent to AI Las Vegas, but were inadvertently deposited into an account owned and controlled by the Arts Institutes.

12.     Upon the approval by the Court of this Second Settlement Agreement and subject to the Receiver's compliance with each of the other terms of this Agreement, Studio will further remit, within 2 business days after the entry of an order approving this Second Settlement Agreement, the sum of $750,000 to the Receiver to cover the Receiver's expenses for providing the Transition Services during the period from March 1, 2019 – May 5, 2019 (the "Settlement Sum"). The Parties acknowledge and agree that all of the Transition Services under the TSA (other than Studio's royalty-free license to use the Shared IT Platform) have been terminated effective as of May 5, 2019 and that, other than the Settlement Sum, the Receiver shall not be entitled to receive any TSA Fee or other amount from any of the Released Parties.

13.     The Settlement Sum constitutes full and complete settlement of all claims between the Parties, including any claims that were made or could have been made by the Receiver or the Receivership Parties against of any the Released Parties (as defined herein) under any of the Reorganization Documents or the First Settlement Agreement, or for the payment of any TSA Fee or any other amount other than the Settlement Sum.

14.     The Settlement Sum shall be paid by wire transfer to the Receiver as follows:

Chemical Bank
333 East Main Street
Midland, MI  48640

Mark E. Dottore, Receiver
Digital Media Solutions v. South University of Ohio, LLC
2344 Canal Rd.
Cleveland, OH  44113

Account #5394316000

Routing #072410013

15.     In addition to complying with the terms of this Second Settlement Agreement, the Parties shall continue to proceed under and abide by the provisions of the Reorganization Documents and the First Settlement Agreement after the Effective Date, including the turnover of the accounts receivable of the Arts Institutes to Studio, except that the Receiver and Receivership Entities shall have no further obligations to perform any services under the Reorganization Documents other than the turnover of the accounts receivable as described herein.

16.     Upon the Effective Date, subject to the provisions of this Second Settlement Agreement, and in consideration of the promises and undertakings of the Parties pursuant to this settlement, the Receiver and the Receivership Entities shall be deemed to have ABSOLUTELY AND IRREVOCABLY AND UNCONDITIONALLY FULLY AND FOREVER released, waived and discharged each of Studio, Colbeck Partners IV, LLC, a Delaware limited liability company ("Colbeck Partners"), CB CA Lending, LLC, Delaware limited liability company ("CBCA"), Studio Enterprise, LLC, a Delaware limited liability company ("Studio Enterprise" and, collectively and together with Studio, CBCA, Colbeck Partners, and Colbeck Foundation, the "Studio Parties"), EPF, South University and the Arts Institutes, and each of their respective past and present, direct and indirect equity holders, directors, members, managers, partners, affiliates, subsidiaries, officers, employees, attorneys (including John J. Altorelli, Aequum Law, LLC, Covington & Burling LLP and McDonald Hopkins LLC), agents, and representatives, and each of their respective heirs, executors, administrators, personal representatives, successors and assigns (collectively and together with the Studio Parties, the "Released Parties"), from any and all claims, demands, suits, causes of action, liabilities, obligations, judgments, orders, debts, liens, contracts, agreements, covenants and causes of action of every kind and nature, whether known or unknown, suspected or unsuspected, concealed or hidden, vested or contingent, in law or equity, existing by statute, common law, contract or otherwise in each case arising from, related to or in connection with any of the Receiver Claims, the Reorganization Documents or the First Settlement Agreement, including any claims that the Receiver or the Receivership

Entities made or could have made against any of the Released Parties prior to or during the Receivership Action, through Effective Date, which have existed, or do exist, against any of the Released Parties (collectively, the "<u>Receiver Released Claims</u>").

17.    Upon the Effective Date, subject to the provisions of this Second Settlement Agreement, and in consideration of the promises and undertakings of the Parties pursuant to this settlement, the Released Parties shall be deemed to have ABSOLUTELY AND IRREVOCABLY AND UNCONDITIONALLY FULLY AND FOREVER released, waived and discharged the Receivership Entities and the Receiver and, and each of the Receiver's past and present, partners, officers, employees, attorneys, agents, and representatives, and each of their respective heirs, executors, administrators, personal representatives, successors and assigns (collectively, the "<u>Receiver Released Parties</u>") from any and all claims, demands, suits, causes of action, liabilities, obligations, judgments, orders, debts, liens, contracts, agreements, covenants and causes of action of every kind and nature, whether known or unknown, suspected or unsuspected, concealed or hidden, vested or contingent, in law or equity, existing by statute, common law, contract or otherwise in each case arising from, related to or in connection with any of the Studio Claims, the Reorganization Documents or the First Settlement Agreement, including any claims that Studio made or could have made against the Receiver Released Parties during the Receivership Action, from the beginning of the Receivership Action until the Effective Date, which have existed, or do exist, against any of the Receiver Released Parties (collectively, the "<u>Studio Released Claims</u>"); <u>provided</u>, <u>however</u>, this release and the definition of Studio Released Claims shall not include (a) any rights and liens of CBCA under the Bridge Loan, (b) any rights and liens of Studio under the Reorganization Documents, including any of Studio's claims on the accounts receivable, intellectual property or other assets Studio has acquired under the Reorganization Documents, other than the liens and rights waived by Studio and CBCA in paragraph 9 above, (c) any rights of the Released Parties under the Reorganization Documents that accrued prior the Receivership Action or after the Effective Date (such as representations, warranties, indemnities, and other rights that by their terms are intended to survive any termination of the Reorganization Documents), the First Settlement Agreement or the Second Settlement Agreement.

18.    From and after the Effective Date, neither the Receiver nor any of the Receivership Entities shall (a) commence or in any manner seek relief against any of the Released Parties through any suit or proceeding based on any Receiver Released Claims or (b) take any action that would prevent or hinder South University, the Arts Institutes or Studio's right of access to and usage of the Shared IT Platform or otherwise assist the efforts of any third-party attempting to do so.

19.    From and after the Effective Date, no Released Party shall commence or in any manner seek relief against any of the Receiver Released Parties through any suit or proceeding based on any Studio Released Claims.

20.    The Parties understand that this Second Settlement Agreement is subject to Court approval.

21.    This Second Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same.

22.     The undersigned represent and warrant that they have full authority to execute this Second Settlement Agreement on behalf of their respective Party and have obtained all necessary approvals.

23.     This Second Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective assigns and successors, including trustees and receivers.  The Released Parties and the Receiver Released Parties are express third party beneficiaries of the provisions of this Agreement expressly intended for their benefit.

24.     The Parties agree that this Second Settlement Agreement shall be governed by Delaware law, and each of the Parties consents to the exclusive jurisdiction of the Court in the event there is any dispute about this Second Settlement Agreement.

25.     This Second Settlement Agreement may be signed and transmitted electronically or by facsimile, which shall be deemed to have the full force and effect of original ink signatures.

*[Remainder of page intentionally blank; signature page follows]*

**IN WITNESS THEREOF**, each Party to this Second Settlement Agreement has caused it to be executed on the Effective Date, intending it to be legally bound by the terms and conditions hereof.

**MARK DOTTORE, RECEIVER**

_____

MARK DOTTORE, not individually but solely in his capacity as Receiver of the Receivership Entities

**STUDIO ENTERPRISE MANAGER, LLC**

_____

By:  Bryan Newman
Title:  Chief Executive Officer

**As to the releases contained in Paragraphs 17 and 18 only:**

**JOHN J. ALTORELLI**

_____

By:  John J. Altorelli

**AEQUUM LAW**

_____

By:  John J. Altorelli
Title:  Managing Partner

**EDUCATION PRINCIPLE FOUNDATION**

_____

By:  Robin van Brokhorst
Title:  President

_[Signature Page to Second Settlement Agreement]_

**IN WITNESS THEREOF**, each Party to this Second Settlement Agreement has caused it to be executed on the Effective Date, intending it to be legally bound by the terms and conditions hereof.

**MARK DOTTORE, RECEIVER**

_____

MARK DOTTORE, not individually but solely in his capacity as Receiver of the Receivership Entities

**STUDIO ENTERPRISE MANAGER, LLC**

*Bryan Newman*
_____
By:  Bryan Newman
Title:  Chief Executive Officer

**As to the releases contained in Paragraphs 17 and 18 only:**

**JOHN J. ALTORELLI**

_____
By:  John J. Altorelli

**AEQUUM LAW**

_____
By:  John J. Altorelli
Title:  Managing Partner

**EDUCATION PRINCIPLE FOUNDATION**

_____
By:  Robin van Brokhorst
Title:  President

*[Signature Page to Second Settlement Agreement]*

**DREAM CENTER SOUTH UNIVERSITY, LLC**

_____
By:  Steven Yoho
Title:  Interim Chancellor

**THE ARTS INSTITUTES INTERNATIONAL LLC**

_Claude Brown_
_____
By:  Claude Brown
Title:  System President

**COLBECK PARTNERS IV, LLC**

_Morris Beyda_
_____
By:  Morris Beyda
Title:  Partner and COO

**CB CA LENDING, LLC**

_Morris Beyda_
_____
By:  Morris Beyda
Title:  Partner and COO

_[Signature Page to Second Settlement Agreement]_

**DREAM CENTER SOUTH UNIVERSITY, LLC**

By:  Steven Yoho
Title:  Interim Chancellor

**THE ARTS INSTITUTES INTERNATIONAL LLC**

By:  Claude Brown
Title:  System President

**COLBECK PARTNERS IV, LLC**

By:  Morris Beyda
Title:  Partner and COO

**CB CA LENDING, LLC**

By:  Morris Beyda
Title:  Partner and COO

**EXHIBIT A**

**Form of Transition Services Agreement**
**[attached]**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), is made and entered into as of May [_], 2019 (the "Effective Date") by and among STUDIO ENTERPRISE MANAGER, LLC, an Delaware limited liability company ("Studio"), and SAVE THE ART INSTITUTE OF LAS VEGAS LIMITED, a Nevada limited liability company, its designee or assignee ("Buyer").  Studio and Buyer may be referred to herein individually as a "Party" and collectively as the "Parties".

**WHEREAS**, Buyer has entered into a certain Managed Services Agreement (the "Managed Services Agreement"), dated as of the date hereof, with THE ART INSTITUTE OF LAS VEGAS, LLC, an Arizona not-for-profit limited liability company ("University"), for the campus located at 2350 Corporate Circle, Henderson, NV 89074;

**WHEREAS**, DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company ("DCEH"), by and through MARK E. DOTTORE (the "Receiver"), and Buyer entered into that certain Transition Services Agreement on March 28, 2019 (the "DCEH TSA");

**WHEREAS**, prior to the date hereof, the University is an Affiliate of DCEH and received certain services from DCEH;

**WHEREAS**, Buyer and its Affiliates will need the full right and ability to Use certain software and other Technology or to receive certain Transition Services;

**WHEREAS**, as a result of transactions between the DCEH and Studio, DCEH has determined that it will be unable to perform the Transition Services for Buyer pursuant to the DCEH TSA; and

**WHEREAS**, Buyer and the University desire to have Studio perform certain Transition Services in accordance with the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants, agreements and understandings herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE 1.
### Definitions

Capitalized terms that appear in this Agreement are used with the meanings set forth in Exhibit 1 (attached hereto and incorporated herein by reference), or otherwise where such term is first identified and set off by quotation marks.

{8097880: }

## ARTICLE 2.
## Transition Services

**2.1 Transition Services.**

(a)  <u>Transition Services</u>.  During the term of this Agreement, Studio agrees to provide, or to cause its Affiliates to provide, the certain transition services set forth on <u>Schedule A</u> attached hereto (the "<u>Transition Services</u>").  During the Term of this Agreement, upon thirty (30) days' prior written notice to Studio, Buyer may decrease any of the Transition Services being provided by Studio if and when Buyer determines that those Transition Services are no longer required or can be provided by the Buyer or its third party provided.

(b)  <u>Standard of Services</u>.  Studio agrees that it will use reasonable efforts to provide or cause to be provided the Transition Services in an ethical, professional, workmanlike manner and in all material respects in accordance with this Agreement, the Law and relevant evolving state of the industry standard.

**2.2 Transition Services Fees.**  In consideration of providing the Transition Services, Buyer shall pay or cause to be paid to Studio or its designee the monthly fees set forth on <u>Schedule A</u> (the "<u>TSA Fee</u>"), payable on the first (1st) day of each month of the Term; *provided* that, if the Effective Date is not the first (1st) of the month, then on the Effective Date, Buyer shall pay the TSA Fee for the period from the Effective Date through the last day of the calendar month. To the extent that Buyer decreases or eliminates any of the Transition Services pursuant to <u>Section 2.1(a)</u> hereof during the Term of this Agreement, the TSA Fee shall be adjusted accordingly and Buyer shall not be responsible to pay the portion of the TSA Fee for the Transition Services that are no longer provided by Studio.  For the avoidance of doubt, the TSA Fee shall be paid for each student enrolled in the University or in Buyer or its Affiliates (each, an "<u>Enrolled Student</u>") during the month in which the TSA Fee is payable and any reduction in TSA Fees as a result of a decrease in services pursuant to this <u>Section 2.2</u> shall be calculated by eliminating the per student charge therefor, as set forth in items 1 through 4 on <u>Schedule A</u>; *provided* that if the scope of services in any category (items 1 through 4 of <u>Schedule A</u>) is reduced but not eliminated, Studio shall determine the reduction in the per student charge related to such reduction in good faith.

## ARTICLE 3.
## Technology Services

**3.1 Agreement to Provide Existing Services.**  For so long Studio has access thereto, Studio shall provide the Buyer, at all times during the Term, with access to: (a) all of the services (the "<u>Shared IT Services</u>") that DCEH provides now to the University with respect to the Shared IT Systems, including access and Use of those Shared IT Systems set forth on <u>Exhibit 2</u> and (b) all of the services (the "<u>Other Third-Party IT Services</u>") that were provided by DCEH to the University with respect to Third-Party Materials other than Shared IT Systems, including access and Use of such Third-Party Materials, in each case ((a) and (b)).  The foregoing Shared IT Services shall be provided on the fee basis specified in the previously mentioned <u>Schedule A</u> hereto.  Other Third-Party IT Services are provided pursuant to Third-Party Agreement which Studio has entered into with third-party vendors.

**3.2 Certain Limitations on Services.** Buyer understands and agrees that certain of the Shared IT Services and Other Third-Party IT Services are provided by Studio as a result of DCEH and its Affiliates granting access to Studio. Studio shall not be responsible or liable for any breach of this Agreement as a result of DCEH or any other third-party vendor's failure to provide access to the Shared IT Services or Other Third-Party IT Services. It is expressly understood and agreed by Buyer and its Affiliates that the Shared IT Systems used in performing the Transition Services shall consist of three categories of agreements: (i) agreements for which Studio shall hold the position of an end user, (ii) agreements for which Studio shall have administrator rights; and (iii) agreements for which Studio shall have the right to request certain reports pursuant to a service level agreement or "SLA" in addition to the associated Shared IT Services, in each case ((i)-(iii)) consistent with the rights, access permissions and reports DCEH received as of the Effective Date. In no event shall the provision of the Transition Services require Studio to provide greater access rights than it has, or is permitted to grant, in accordance with the terms applicable to Studio's access to the Shared IT Services or Other Third-Party IT Services. In no event are the rights granted herein a license, sublicense, or grant of any interest in or right to, the Shared IT Services or Other Third-Party IT Services. Nothing in this Agreement shall require Studio or its Affiliates to (a) renew, extend, replace, or take assignment of any Third-Party Agreement or to acquire the Shared IT Services or any rights therein or (b) violate any Third-Party Agreement or other agreement or contract applicable to the Shared IT Services or Other Third-Party IT Services.

**3.3 Responsibility for Maintenance.** Subject to the acknowledgements contained herein, Studio is solely responsible for providing, maintaining, and supporting all infrastructure, personnel, Technology and other resources, and for obtaining any third-party licenses.

**3.4 Scheduled Maintenance.** Unless the Parties agree otherwise in writing, Studio will use commercially reasonable efforts to cause all maintenance, other than emergency maintenance, to be performed between the hours of 2 AM and 5 AM Eastern Time and with forty-eight (48) hours advance notice to Buyer. Without limiting any of Studio's other obligations under this Agreement, Studio may perform emergency maintenance outside of scheduled maintenance windows in the event such maintenance is reasonably and urgently required to protect the integrity, availability, safety, or security of any Technology Used by the Business. In the event that Studio determines that such emergency maintenance is required, Studio shall notify Buyer of such maintenance as soon as reasonably possible.

**3.5 Service Levels.**

    (a)    <u>Proprietary Technology</u>. With respect to Proprietary Technology, Studio will use commercially reasonable efforts to ensure that such Proprietary Technology continues to perform consistent with performance standards provided by DCEH prior to the Effective Date.

    (b)    <u>Third-Party Technology</u>. Without limiting Studio's other obligations under this Agreement, Studio shall use commercially reasonable efforts to ensure all Technology Used by the Business provided by third-parties other than Studio's Affiliates is available in accordance with the service levels set forth in the applicable agreement between Studio and such third parties.

## ARTICLE 4.
## Other Covenants of the Parties

**4.1 Consideration.**  Studio is entering into this Agreement in consideration for the amounts set forth in Schedule A, which shall be paid on the terms set forth herein and therein.

**4.2 Access to Assets and Properties; Enrollment Confirmation**.  During the Term, Buyer shall, and shall cause its Affiliates to, provide Studio and its Affiliates and their respective officers, directors, employees, agents, advisors and representatives with full use of, and full access to, such assets and properties of Buyer and its Affiliates as may be necessary or desirable for Studio to perform the Transition Services hereunder.  At least 10 Business Days prior to the start of each month of the Term, Buyer shall certify to Studio in writing the number of Enrolled Students for such month with respect to which the TSA Fee is payable to Studio and shall confirm that the number of Enrolled Students for which the TSA Fee prior month was not more than the number certified for such prior month.  Any inaccurancy in such certification shall be deemed a breach of this Agreement.

**4.3 Confidentiality.**  Each Party (the "Receiving Party") may use and disclose the other Party's (the "Disclosing Party") Confidential Information in order to exercise the Receiving Party's or its Affiliates' rights or perform its obligations under this Agreement, provided that the Receiving Party (a) only discloses such Confidential Information to its Representatives, (b) informs such Representatives of the confidential nature of such Confidential Information and (c) requires such Representatives to hold in confidence all such Confidential Information and to use it only for the purpose of exercising the Receiving Party's or the Receiving Party's Affiliates' rights or performing the Receiving Party's obligations under this Agreement.  The Receiving Party will use at least the same degree of care to protect the Disclosing Party's Confidential Information as the Receiving Party uses to protect the Receiving Party's own Confidential Information of like nature, but will use at least reasonable care.  A Receiving Party may disclose the Confidential Information of the Disclosing Party in response to a valid court order or other governmental action, provided that: (i) to the extent legally permissible, the Disclosing Party is notified in writing prior to disclosure of such Confidential Information and given reasonable opportunity to obtain a protective order and (ii) the Receiving Party assists in any attempt to limit or prevent the disclosure of such Confidential Information.

**4.4 Compliance with Laws.**  Each Party will comply with applicable Laws in performing its obligations under the Agreement.

## ARTICLE 5.
## Representations and Warranties

**5.1 Mutual Representations.**  Each Party represents, warrants and covenants to the other Parties that:

      (a)    Such Party has the full entity power, right and authority to enter into this Agreement and perform its obligations hereunder.

(b)      The execution of this Agreement by such Party and the performance by such Party of its obligations and duties hereunder does not conflict with any agreement to which such Party is a party or by which it is bound.

(c)      This Agreement is a binding obligation upon such Party and, when executed by both Parties, is enforceable against such Party in accordance with its terms.

## ARTICLE 6.
### Term;  Termination

**6.1 Term.**  Unless sooner terminated by mutual agreement of the Parties, the term of this Agreement begins on the Effective Date and will continue in effect until September 30, 2019; *provided* the Term of this Agreement may extended on a month-to-month basis with the prior written consent of Studio.

**6.2 Effect of Termination.**  Termination of this Agreement shall not relieve the Buyer of its obligation to pay any outstanding TSA Fees for services utilized by the Buyer from the Effective Date through the date of termination.  Article 7 of this Agreement shall survive any termination of this Agreement.

## ARTICLE 7.
### Indemnification; Miscellaneous

**7.1 Indemnification.**  Buyer will, and will cause its subsidiaries to, indemnify, defend, hold harmless and reimburse Studio and its Affiliates and their respective officers, directors, trustees, employees, equityholders, members, managers, agents, attorneys, representatives, permitted successors and permitted assigns, (each, including Studio, an "Studio Indemnitee") from and against any and all losses, liabilities, claims, suits, expenses or damages (including out-of-pocket expenses and the fees and expenses of counsel and other litigation costs and the cost of any preparation or investigation) of any kind or nature (collectively, "Losses") incurred, borne or suffered by any Studio Indemnitee including (without limitation) such Losses arising out of, resulting from or in connection with this Agreement or the performance of Studio's obligations under this Agreement, including (without limitation) any such Losses arising as a result of any demand, suit, action, investigation, allegation, complaint or any other proceeding asserted by any third party made, brought or asserted by any third party (including any claim brought against Studio by another Studio Indemnitee, and any claim brought by a governmental agency, entity or organization).  In connection with the foregoing, Buyer will promptly remit or pay to Studio any amounts which Studio certifies to Buyer in writing are payable to Studio or other Studio Indemnitees hereunder.  The reimbursement and indemnity obligations of Buyer under this Section 7.1 shall be in addition to any liability which Buyer may otherwise have, shall extend upon the same terms and conditions to any Studio Indemnitee, as the case may be, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of Buyer, Studio and any such Studio Indemnitee.

**7.2 Limited Liability.**  None of Studio, any of its Affiliates, successors or assigns nor their respective partners, members, stockholders, directors, officers, employees or agents (each a "Covered Person") shall be liable to Buyer or its Affiliates for any Losses arising out of or in connection with the performance of services contemplated by this Agreement, unless and then only

to the extent that such Loss is determined by a court in a final order from which no appeal can be taken, to have resulted solely from the willful misconduct on the part of such Covered Person. Studio makes no representations or warranties, express or implied, in respect of the services to be provided by any Covered Person.  Except as Studio may otherwise agree in writing on or after the date hereof: (a) each Covered Person shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly: (i) engage in the same or similar business activities or lines of business as Buyer and its Affiliates, (ii) do business with any client, customer, supplier, lender or investor of, to or in Buyer and its Affiliates and (iii) develop a strategic relationship with businesses that are and may be competitive or complementary with a Buyer and its Affiliates; and (b) no Covered Person shall be liable to Buyer or any of its Affiliates for breach of any duty (contractual or otherwise) by reason of any such activities or of such Covered Person's participation therein.  In no event will Studio be liable hereunder for any punitive, exemplary, indirect, special, incidental or consequential damages, including lost profits or savings, whether or not such damages are foreseeable.  No Covered Person is, and none shall ever be, liable to any creditor of Buyer or any of its Affiliates as a result of its provision of services hereunder.  Buyer acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, in no event shall any of Covered Person (other than Studio, subject to the limitations set forth herein) have any liability related to this Agreement or the transactions contemplated herein or therein, including by way of piercing the corporate, limited liability company or partnership veil or other similar theories of liability and Buyer hereby unconditionally and irrevocably releases such Covered Persons from any and all claims, causes of actions, damages, liabilities, whether known or unknown, now existing or hereinafter arising, in connection with, related to or arising or resulting from this Agreement and the Transition Services provided hereunder.  In no event shall the liability of Studio under, pursuant to or in connection with this Agreement or the Transition Services provided herein exceed the amounts paid to Studio by Buyer hereunder.

**7.3 No Third-Party Beneficiaries.**  The Parties do not intend, nor will any clause be interpreted, to create for any third party any obligations to or benefit from Studio or Buyer. Notwithstanding the foregoing, (a) each Studio Indemnitee and are express third party beneficiaries of <u>Section 7.1</u> and (b) each Covered Person is an express third-party beneficiary of <u>Section 7.2</u>.

**7.4 Waiver.**  Failure of either Party to insist on performance of any term or condition of this Agreement or to exercise any right or privilege hereunder will not be construed as a continuing or future waiver of such term, condition, right or privilege.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**7.5 Severability.**  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to affect the intent of the Parties hereto.  The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

**7.6 Counterparts.**  This Agreement, and any amendments thereto may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall

become effective when one or more counterparts have been signed by each of the Parties and delivered to the other party, it being understood that all Parties need not sign the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by E-mail of a .pdf attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

### 7.7 Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.

(a)    <u>Governing Law</u>.  This Agreement, and all Proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement and the Transaction Documents or the actions of the Parties hereto in the negotiation, administration, performance and enforcement hereof and thereof, shall be governed by and construed in accordance with the internal substantive Laws of the State of New York, without giving effect to any choice or conflict of Laws provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of York.

(b)    <u>Jurisdiction and Venue</u>.  Each of the Parties hereto submits to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York located in New York City, New York or, if such court shall not have jurisdiction, any state or federal court sitting in New York City, New York, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceedings may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum.  Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in <u>Section 7.9</u>, such service to become effective ten (10) days after such mailing.

(c)    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

**7.8 Assignment.**  Except as otherwise provided in this Agreement, neither Party will assign (by operation of law or otherwise) any right or obligation under this Agreement without the other Party's prior written consent, which shall not be unreasonably withheld.

**7.9 Notices.**  Any notice required to be given hereunder shall be sufficient if in  writing and sent by E-mail transmission (provided that any notice received by E-mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (local time of the recipient) shall be deemed to have been received at 9:00 a.m. (local time of the recipient) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 7.9</u>):

(a)   <u>if to Studio, to</u>:

> 1201 West 5th Street, Ste. T410
> Los Angeles, CA 90017
> E-mail: bryan@studioenterprise.com
> Attention: Bryan Newman, CEO
>
> <u>with copies (which shall not constitute notice) to</u>:
>
> Covington & Burling LLP
> 620 Eighth Avenue
> New York, NY 10018
> E-mail:  jpotash@cov.com; awollensack@cov.com
> Attention:  Jeffrey Potash and Amy Wollensack

(b)   <u>if to Buyer, to</u>:

> William A. Turbay
> 3017 West Charleston Boulevard, Suite
> 20E Las Vegas,  NV 89102
> E-mail: waturbay@gmail.com
> Attention: William A. Turbay
>
> <u>with copies (which shall not constitute notice) to</u>:
>
> Howard and Howard
> 3800 Howard Hughes Parkway, Suite 1000
> Las Vegas, NV 89169
> E-mail: gmullins@howardandhoward.com
> Attention: Gwen Rutar-Mullins, Esq

**7.10 Further Assurances.**  On or after the date of this Agreement, the Parties will execute and deliver or cause to be executed and delivered such further documents and take such further actions as may reasonably be required for the purposes of assuring and confirming the rights hereby created or granted hereunder or for otherwise facilitating the performance of the terms of the Agreement.

**7.11 Interpretation.** All headings herein are not to be considered in the construction or interpretation of any provision of this Agreement.  Throughout this Agreement, (a) nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable, (b) the words "includes" or "including" means "including without limitation" and are intended to introduce a non-exclusive set of examples, (c) the word "or" is not exclusive and (d) the words "hereof," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not any particular section or article in which such words appear. All references to "dollars" or "$" are to the lawful currency of the United States.  Unless "business days" are expressly specified, all references to "days" are to calendar days.  All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding

provisions of this Agreement.  This Agreement was drafted with the joint participation of both Parties and will be construed neither against nor in favor of either, but rather in accordance with the fair meaning thereof.  In the event of any apparent conflicts or inconsistencies between this Agreement and any schedules, exhibits or other attachments to it, to the extent possible such provisions will be interpreted so as to make them consistent, and if such is not possible, the provisions of this Agreement will prevail.

**7.12 No Joint Venture; Relationship of Parties.**  Nothing in this Agreement, expressed or implied, is intended to or shall constitute the Parties hereto partners or participants in a joint venture.

**7.13 Title and Headings.**  The titles and captions in this Agreement are for reference purposes only, and shall not in any way define, limit, extend or describe the scope of this Agreement or otherwise affect the meaning or interpretation of this Agreement.

**7.14 Expenses.**  Except as may otherwise be expressly set forth herein, all fees and expenses incurred in connection with the authorization, preparation, negotiation, execution and performance of this Agreement and the potential consummation of the transactions contemplated hereby shall be the obligation of the respective party incurring such fees and expenses.

**7.15 Amendments.**  This Agreement, including any exhibits, appendices, schedules, or attachments hereto, may be amended or modified in whole or in part only by a writing signed and delivered by each of the Parties.

**7.16 Entire Agreement.**  The terms contained in this Agreement, and any schedules, appendices, exhibits or other attachments, which are incorporated (including any updated versions thereof) into the Agreement by this reference, constitute the entire agreement between the Parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written, with respect to the subject matter hereof.

*[**The remainder of this page is intentionally blank.  Signature pages follow.**]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

**STUDIO ENTERPRISE MANAGER, LLC**

By:_____
    Name: Bryan Newman
    Title: Chief Executive Officer

**SAVE THE ART INSTITUTE OF LAS VEGAS LIMITED**

By:_____
    Name: William A. Turbay
    Title: Manager

# EXHIBIT 1

## DEFINITIONS

"Affiliate" means, with respect to any Person, any other Person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with such other Person. For purposes of the immediately preceding sentence, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Business" means, collectively, the business of the University as it is currently conducted and as such University (or such University's designee, successor or assign) determine to conduct them in the future.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions located in New York, New York and Los Angeles, California are permitted or required by Law to remain closed.

"Confidential Information" means, with respect to a Disclosing Party, any confidential or proprietary information of such Disclosing Party or its Affiliates that is either marked as being "Confidential" or "Proprietary" or under the circumstances of disclosure should reasonably be considered as confidential or proprietary. Confidential Information of both Parties includes the terms (but not the existence) of this Agreement. Confidential Information does not include information that (a) is in or enters the public domain without breach of this Agreement through no fault of the Receiving Party; (b) the Receiving Party was lawfully in possession of without any obligation of confidentiality or nondisclosure prior to Receiving it from the Disclosing Party; (c) the Receiving Party can demonstrate was developed by the Receiving Party or its Affiliates independently and without use of or reference to the Disclosing Party's Confidential Information; or (d) the Receiving Party receives from a third Person without restriction on disclosure and without breach of a nondisclosure obligation.

"Law" means any applicable law, statute, treaty, constitution, principle of common law, ordinance, code, rule, regulation, Order or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any governmental authority, as amended, unless expressly specified otherwise herein.

"Person" means any individual, corporation, partnership, association, limited liability company, trust, estate or other similar business entity or organization, including a governmental authority.

"Proprietary Technology" means any Technology Used by the Business which is owned by, or developed by or on behalf of, DCEH, Studio or any of their respective Affiliates.

"Shared IT Systems" means Technology owned by DCEH, Studio or any of their respective Affiliates, and made available by Studio on a non-exclusive, restrictive access, shared service basis to the University, on the one hand, and any other university where such shared services are provided, on the other hand.

"Technology" means information technology, hardware and computer systems, including those relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of all data and information collected, generated, or used in the conduct of the Business.  Technology includes: (a) software, integrations, cloud services, databases, websites, domain names, applications, telecommunications solutions, other information technology infrastructure and assets, hardware and other information technology or communications equipment and (b) all related source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded and all documentation associated with the foregoing.

"Third-Party Agreement" means any contract between Studio or DCEH, on the one hand, and a third Person, on the other hand, pursuant to which such third Person agrees to provide or license any Third-Party Materials, and any Contracts for Third-Party Support.  Third-Party Agreements include those agreements listed on Exhibit 3.

"Third-Party Materials" means Technology Used by the Business which consists of Technology or other materials that are in each case owned or controlled by a Person other than Studio.

"Use" means to (a) access, load, execute, compile, manipulate, use, Process, store, purge, transmit, receive, display, copy, connect, communicate with, interface with, maintain, modify, adapt, translate, enhance and create derivative works, anywhere in the world and (b) make, have made, distribute, import and export, anywhere in the world.

**Exhibit 2**

**Shared IT Systems**

**Shared IT Systems:**

The following is a list of all Technology utilized by the University, which is not exclusive to it and which constitutes Shared IT Systems.  These Technologies are shared with other university systems:

| Name | Description |
|------|-------------|
| Workstation | Desktop or laptop computer system to display, access and manipulate data. DCEH will also provide the Studio Entities access to and the ability to Use any Workstations constituting Technology Used by the Business. |
| Wireless Controller | Data center device used to manage remote campus and CS wireless access points |
| Wireless | Wireless access points to allow wireless computers and approved personal devices to access the corporate, student or public internet. |
| Webspace | The Ai Parties are moving their student web space in-house to Amazon ec2 Direct Admin Console. Faculty and staff may need to create their own personal website within their own sub domain for educational purposes.  This is made possible by the Web Space System. |
| Waves Gold and Platinum+ Tunes+360 | Classroom Software - for audio editing and plugins |
| Wan Optimizations | Device used to improve performance between the remote campus and data center. |
| V-Ray Rendering Plugin for Maya | Classroom Software animation rendering |
| VPN Cisco | Software used to provide full network access to remote employees and contractors |
| Voyager/ OPAC | .net Library Tracking |
| Vormetric | Encryption and key management to protect PII data.  At rest encryption only. |
| Vordel | XML Gateway which provides SSO and web service security |
| VMWare - Fusion and Workstation | Virtualization software |
| VitalSource | Online Classroom |
| Visix Axis SW Maintenance | Visix display systems at the campuses |
| Video Conferencing | Conference room and personal video call services. |
| Vectorworks | Classroom Software for 3D design |
| User Access Request | Generic Configuration Item for tracking requests/issues with general User Access Request items |

{8097880: }

| | |
|---|---|
| USB Block | USB Block Exception Requests for staff. |
| UPS | Generic Configuration Item for tracking requests/issues with UPS devices within the Infrastructure |
| Universal Content Management (UCM) | Content Management System |
| Turnitin.com | Plagiarism checker for students. |
| Tripwire | Security and Audit Detection/Reporting |
| Trintech | 3rd party SAAS Reconciliation services for General Ledger |
| Trimble SketchUp Pro | Classroom Software |
| Transcript Request System (STS) | System used to manage transcript requests from students (both high school and college) |
| TrackIt Works | Equipment Cage Check-out application. |
| TOC (Transfer of Credits) | Provides a website for efficiently loading transfer credits into CampusVue |
| Tidal | Enterprise Scheduler |
| Thinkingstorm | On Demand tutoring provided to students via the online classroom. This is used by AIO, AI Ground Plus Students, AUO, and AUG. |
| Textbooks UI | Website that allows textbook information to be loaded into CampusVue in bulk. |
| Test Out | Online Courseware |
| Term Configuration Tool | Allows for customization of Term Descriptions and filtering of terms for the Student Financial Planning (SFP) tool |
| Telephony | Generic Configuration Item for tracking requests/issues with Telephony equipment within the Infrastructure |
| Telco Carrier | Public utility company that provides us with both data and voice services. AT&T, CenturyLink, XO are the most frequently used here. |
| Team Foundation Server | Team Foundation Server (TFS) - A Microsoft Source Code Management (SCM) and Project Tracking tool for software developers, which supports collaborative development of software within a team, and the tracking of changes to software source code revisions. |
| Tax Factory | Tax calculation and payroll tax compliance solutions |
| Symantec Validation and ID Protection Service (VIP) | Multifactor Authentication System |
| Symantec Endpoint Protection | Antivirus protection. |

| | |
|---|---|
| Symantec Data Loss Protection (DLP) | Safeguards intellectual property and ensures compliance by protecting sensitive data wherever it lives-on premises, in the cloud, or at the endpoints. |
| Switch | Generic Configuration Item for tracking requests/issues with Switches within the Network |
| Student Payment Application (SPA) | User interface used by staff at The Center to accept payments from students via the SecureNet iframe |
| Student Orientation | Courseware product utilizing Adapt (purchased by Fulcrum) for Orientation courses and expanding its use to other courses. |
| Student Financial Planning | Student Financial Planning (SFP) is a web-based solution that provides students a financial plan to demonstrate affordability for their respective program.  The application helps users provide financial plans for students. |
| Student Course Scheduling System (Student CSS) | Allows students to sign up for short courses |
| Student Body Flow (SBF) | Used by registrars to submit their student body flow reports to the CS finance group for disclosure purposes. |
| Stipend Generator | Data Transfer process and website allowing for data entry and transmission to Sallie Mae.  Sallie Mae cuts checks to students and issues a remittance file, which is loaded back into the SIS |
| Sterling | This is an automated process that pulls data from third Person vendors, secure FTP site and posts the student payments in CampusVue. |
| State Grants | Dynamic application used for generating State Grants data files |
| Staff Learning System | Brightspace staff LMS |
| Sourcefire IDS | Intrusion Detection System |
| Solidworks 3D CAD | Classroom Software for 3D modeling |
| Socrates | Front end application for faculty to apply to be a teacher at our schools. |
| SOA | platform providing data/integration services for my campus portal and other applications |
| SmartyStreets | Address validations tool |
| SiteCore | Content Management System for Marketing Websites |
| SIS Custom Applications Landing Page | List of links to all of the custom applications created and managed by the Student Information Systems team |
| SharePoint | For anything related to: go.dcedh.org; my.dcedh.org and go3.dcedh.org (which has SSRS and Bl) |
| SGUI (Student Group User Interface) | Website that allows advanced student group manipulations |
| SFA Custom Apps (Landing Page) | Student Financial Custom Applications landing page |

| | |
|---|---|
| Service Now | Saas provider of IT Service Management. It will be used as Incident/Problem Tracking and Management, Knowledge Management, Change Management, and Service Requests. |
| SendWordNow | Emergency Notification System used to notify staff, faculty & students if an emergency situation occurs |
| Security Equipment | Generic Configuration Item for tracking requests/issues with Security Equipment within the Infrastructure |
| Security | All calls related to items the Security Team needs to be involved in. |
| Schedule Manager | Rebalances students in courses based on user selection. Helps the Center determine how many sections are needed for a course by term |
| Scanners | Generic Configuration Item for tracking requests/issues with Scanners |
| Router | Generic Configuration Item for tracking requests/issues with routers within the Network |
| RightFax | Centralized enterprise fax solution |
| RIC Process | Retail Installment Contract Process is an automated process that runs weekdays.  It goes out and gets a file from third Person vendors, Tuition Options, processes it, stores data in CVlnterface and updates data in CARS and CampusVue. |
| Rhino by McNeel | Classroom Software for 3D printing of Industrial design |
| Respondus | 3rd Party Course Management product that creates and manages exams - publishing directly with Brightspace |
| Rema Grad Team Application | Keeps track of Grad Team members and organizational relationships |
| RedHat | Linux OS for various DCEH servers |
| RACER | RACER stands for Regulatory Affairs & Compliance Electronic Records. It is an in-house web-based document repository that houses school accreditation documentation and data for the Regulatory Affairs department.  RACER is used by all CS Regulatory Affairs& Compliance department members as well as School Presidents and associated staff. |
| Qlikview | Data Warehouse Dashboard and Reporting |

| | |
|---|---|
| Public Key Infrastructure (PKI) | Microsoft CA Public Key. A public key infrastructure (PKI) consists of software and hardware elements that a trusted third Person can use to establish the integrity and ownership of a public key.  The trusted party, called a certification authority (CA), typically accomplishes this by issuing signed (encrypted) binary certificates that affirm the identity of the certificate subject and bind that identity to the public key contained in the certificate.  The CA signs the certificate by using its private key. It issues the corresponding public key to all interested parties in a self- signed CA certificate. |
| ProTools, ProTools HD, and Sibelius | Classroom Software for audio editing |
| ProofPoint | Email SPAM and A/V Gateway |
| Program Integrity | Program Integrity application provides the new program coordinators with the ability to map state restrictions to CampusVue program versions, as well as ability to create disclosures and disclaimers and Enrollment Agreements for regulatory and compliance purposes. |
| Program Course Management System (PCMS) | Program and course management for new courses; similar to Content Alert/Course Revision |
| Printers | Generic Configuration item to be used for Printer configuration/Issues |
| Presentation Technology | Technology used in the classroom environment or conference rooms to provide presentations. This includes Projectors, Conference lines, TVs, Switchers, Inputs, etc. |
| PlanView | Project Management Application |
| Pixologic Z Brush | Classroom Software Animation for 3D/2D texturing and painting |
| Performline | Speech Analytics Software |
| Password System (Center) | Manages passwords for all internal systems; except for those using AD |
| Palo Alto (Captive Portal) | System used to authenticate a user for Internet access on wired networks |
| Outlook | Microsoft Outlook is a personal information manager from Microsoft, available as a part of the Microsoft Office suite. Although often used mainly as an email application, it also includes a calendar, task manager, contact manager, note taking, journal, and web browsing. |

| | |
|---|---|
| OpenVoice | Citrix OpenVoice Conferencing is a reservation less audio-conferencing service that has a SOD-participant limit and is accessible via a toll-free number.  The service also offers recording, the ability to manage conference calls via an online console and integrates with Outlook for easier scheduling. |
| OpenAthens by EBSCO | Allows for identity and access management for students to seamlessly access e-resources.  The OpenAthens tool eliminates the EZProxy product for all brands. |
| Office365 - Skype | Collaborative functionality provided by the Office 365 Suite. This provides the ability to chat in live time with others using the Lyne Online system. |
| Office365 - Power Bl | Power Bl reports are developed and then published to 0365 Power Bl to be consumed by our customers.  There is also a process using a Gateway that will refresh the reports with updated data if a schedule is setup for the report. |
| Office365 - Outlook Online | Email functionality provided by the Office 365 Suite.  This relates to the Outlook email client and Exchange online technology |
| Office365 - OneDrive | Office 365 Storage area for any documents/data |
| Office365 - Office Pro Plus | This is the installation pack for the Office 365 client tools such as Outlook, Word, Excel, PowerPoint, etc. |
| Nexpose | Vulnerability Scanning System |
| Network | Generic Configuration Item for tracking requests/issues with Network devices within the Infrastructure |
| NetQOS | Network Node Manager |
| MyGroups | Tool that allows users to create/manage their own distribution groups. |
| MyCampusPortal | Student and Faculty Portal |
| MSBI Reports | Web based reporting tool for employees to get reporting data. |
| Movie Magic Scheduling | Classroom Software for video development |
| Movie Magic Budgeting | Classroom Software for video development |
| Mobile Phone | Mobile/Cellular devices |
| Microsoft Azure SQL | Cloud computing service created by Microsoft for building, testing, deploying, and managing applications and services |
| Media Composer | Classroom Software for video editing |
| Maxon Cinema 4D Studio Bundle | Classroom Software in game art 3D development |
| Marketing Websites | Marketing Web Sites |
| Lynda.com | Tutorials that are integrated into the online classroom. |
| Luxion Keyshot Pro Lab Pack | Classroom Software for 30 movement |

{8097880: }

| Load Balancer | Application load testing tool |
|---|---|
| Lawson | Asset Management, including human capital and finance system |
| Kronos | Time Management System |
| Komplete Suite | Classroom Software for audio instruction |
| iZotope Music Production Suite (Includes: RX, Ozone, Neutron, Nectar, VocalSmith, and Trash) | Classroom Software for audio production |
| lnGenius Software | Application that connects phone systems to CRMs - Microsoft Dynamics, ServiceNow - with features like screen pop & click-to-call. |
| Informatica | Data Integration and ETL |
| lnfor Expense Management | Travel & Entertainment Expense Vendor |
| lmperva | Database Access Management System |
| iModules  Alumni Community | The objective of the iModules Data Integration project is to design and implement an automated solution to facilitate the outbound and inbound data exchange with the new iModules Encompass platform for all Ed Systems except Western State. The outbound data will be used to create and update alumni records for pending graduates, graduates and students who are on externship/internship.  The inbound write-back will update student/graduate demographic information in the SIS. |
| lmageNow Upload Center | Allows documents to be uploaded without direct access of ImageNow |
| lmageNow | Document Imaging |
| Image Onsite | Bank of America Image Onsite |
| IDEA | Student rating of Instruction Survey's given to students to rate faculty effectiveness in a course.  Most of the IDEA surveys are distributed via paper form in the classroom and then sent to IDEA to process the answers.  Online does use a web system to do their surveys but the student/faculty/course information is manually uploaded by the EDW team. |
| IARM | IARM: The Identity Access and Role Management system. This system is used to create/terminate/re-hire employee accounts based on HR data |
| Hyperion | This application was developed for use by FA Advisors. Its use is to allow FA Planners to show new and continuing students costs, aid, and loan information over the length of their program of studies. |

| HVAC | Regarding the central Heating/Ventilation and Air Conditioning systems in the Data Center |
|---|---|
| HP Virtual User Generator (VuGen) | VuGen is also used for HP BSM. It records the scripts for Business Process Monitor (synthetic transactions). |
| HP uCMDB | Configuration Management Database, |
| HP Systems Insight Manager | System management tool designed to help manage HP servers. |
| HP SiteScope | Agent-less monitoring software focused on monitoring the availability and performance of distributed IT infrastructures, including Servers, Network devices and services, Applications and application components, operating systems and various IT enterprise components. |
| HP OpenView Performance Manager (OVPM) | Trace running performance manager |
| HP OpenView Operations Manager (OVOW) | System monitoring |
| HP Network Node Manager (NNM) | Software that helps unify fault, availability, and performance monitoring to improve network uptime and performance, and increase responsiveness to business needs |
| HP Device and Dependency Mapping | Organizes hardware and software assets across the enterprise. |
| HP Data Protector | Enterprise Backup Software |
| HP Business Service Management | manage the performance of enterprise applications, systems, networks and storage |
| HP Business Process Monitor (BPM) | software that uses synthetic transactions to identify performance issues before they affect web or mobile customers |
| HP ArcSight | ArcSight Logger, Enterprise Security Manager (ESM) and SmartConnectors.  Security log collection and alerting system. |
| Holds Automation | Automation for the Non-Payment and Re-entry Policy Hold processes for CampusVue |
| Harmony and Story Board by ToonBoom | Classroom Software for animation |
| Halogen | HR System that offers a talent management suite that reinforces and drives higher employee performance across all talent programs - whether that is performance management, learning and development, succession planning, recruiting and onboarding, or compensation |
| Grasshopper | This is a replacement Cl for Skype. This provides the ability to chat in live time with others using the Grasshopper. |
| Grad Team Affairs | Any tasks associated with the graduation team. |
| GoToMeeting | Video Conferencing |

| Gerber Accumark and Yunique PLM | Classroom Software for fashion design and product development |
| --- | --- |
| Genesys | A Telecom Solution that currently provides inbound routing for WCTs at OHE and Ai Ground |
| Foglight | Application monitoring solution that helps organizations monitor and control the performance of mission-critical enterprise applications. |
| Firewall | Device used to protect or separate network segments |
| Federal FA Repack Report Config | This application is used to configure Federal FA Repack Report parameters. |
| Faculty Session Prep | Used by Online Faculty to allow them to accept their courses as well as order any supplies (textbooks, software etc.) that they may need. |
| Faculty Course Import | It allows "The Center" faculty scheduling team to update CVue courses with the instructors that accept courses from invitations sent from the Course Scheduling Team.  It needs to be updated in CVue for reporting purposes. |
| EZ Proxy | Library System |
| Exchange | Microsoft Exchange is an e-mail messaging system from Microsoft that runs on Windows servers.  The server side is Microsoft Exchange Server and the featured client program is Microsoft Outlook, which includes contacts and calendaring. |
| Estimated Financial Impact Plan (EFIP) | The application sends student-specific financial data from CampusNexus Student to the CFPB via a student-specific url so that applicants can complete an exercise that shows them how much it will cost them to attend the school, how much they have to borrow to cover the costs that they can't pay out of pocket, and what it means for their  future. |
| Erwin Data Modeler | Erwin Modeling provides a collaborative data modeling environment to manage enterprise data through an intuitive, graphical interface. With a centralized view of key data definitions, you can leverage information as a strategic asset and more efficiently manage your data resources to save time and money. |
| Erwin Data Governance | Erwin Data Governance is a SAAS data governance tool that will be used to store our enterprise Business Glossary, Data Dictionary, Business Rules and the relationships of our data. This tool can also be used to govern all of the processes to maintain data quality and security. |
| Enterprise Mass Storage | Enterprise Storage |

| Enterprise File Transfer | Enterprise file transfer system which ftp, pgp, or related data transfer of data between disparate systems such as data to/from external sources or between two internal sources. |
|---|---|
| Enterprise Data Warehouse (EDW) | Enterprise data repository which accepts data feeds from several of our operational systems and organizes the data for reporting and analysis. |
| Employee Portal | Related to Lawson ESS |
| elibrary | Online library available via respective portal for students and faculty. |
| eLearning Content | Identification of this CI should be done via the URL - www.thecampuscommon.com. If an  incorrect/missing content is  found on these pages, then have the appropriate team make the necessary updates.<br><br>The responsible team is not in IT and therefore not in ServiceNow. During business hours - "_CS Webmasters" and off hours or paging - "_CS elearning Content Page". |
| Education Collective by The Foundry (Nuke, CaraVR, Mada, Mari, and Katana) | Classroom Software for 3D rendering and effects |
| EdConnect | Department of Education application that is used to pull ISIR transaction files. |
| eBook | Used to upload eBook fees |
| Domain Name Service (DNS) [Classroom] | Domain Name Service |
| Domain Name Service (DNS) | Domain Name Service |
| DocuSign | DocuSign is a web-based application that allows staff to send documents to students to be signed electronically |
| Direct Loan Pell Reconciliation | Provides the interface to work on reconciliation cases for Direct loan and Pell loan.  Through the tidal process the DOE loan data in loaded in this app's DB (SISlnterface) and the app allows search, claim, reassign to supervisor, close and reporting functionalities to resolve the cases. |
| Digital Application | Online application for applicants to apply to come to school. Provides integration to CRM, CampusVue (eventually CARS), lmageNow, EchoSign, Program Integrity, RACER and SecureNet. |
| Degree Estimator | Degree Estimator is a web application used to calculate a potential student's estimated graduation date and estimated cost of an academic year. |

| | |
|---|---|
| Data Center | This will involve any issues with the management of the Data Center.  This includes the application used to track data center configurations - Aperture Vista Data Suite is software that helps manage activities with the Data Center (power, cooling, space allocation, cabling, etc.).  It is used primarily by the Data Center Manager; however, other staff members involved in related decision making are also users (Systems Administration, Network Provisioning & Support, and others).  The product is owned by the IT Operations team, specifically, the Data Center Manager. |
| Cycling MAX MSP Audio Plugin | Classroom Software |
| event | Service for high school students to take noncredit courses |
| Custom Authentication System (CAT) | AKA the Authentication Tool - Active Directory user access via Framework Authentication System that allows users to maintain specific applications within IT |
| Course Tracking System (CTS) | Provides ability to manage courses, textbooks, and degrees |
| Course Scheduling System (CSS) | System used by OHE to schedule facilitators to courses and terms, and for facilitators to accept/reject those assignments |
| Course Revision | Tracks Revisions for courses.  It is used to track the progress of course revisions through the QA process. |
| Course Listing | Displays Program and Course Information for our online ed systems. |
| Core Network | Generic Configuration Item for tracking requests/issues with the Core/Datacenter network configurations within the Infrastructure |
| Contract Management | Manages requests, to enter into or renew a contract with a vendor. Provides the requester with an intake form and routes the form through the appropriate approver groups, such as Sourcing, IFO, Legal, Contract Administration etc., until the request is either fully approved/executed or rejected.  The system also includes a document repository for storing contract correspondence and documents.  Was known as Worksite and Autonomy is the software company (owned by HP) |
| Content Alert | 3 copies of this system. One for each brand SuO, AuO, and AiO. System used by program development to QA proposed changes and/or revisions to courses.  Also includes a separate system for Alert admin. |

| | |
|---|---|
| Commonline | NSLP uses Commonline to streamline the electronic loan application process.  Commonline is used to transmit student loan applications to NSLP.  Commonline is a set of standard file formats and protocols for transmitting student loan applications. |
| Collections UI | Update Activities, Fund Sources and Student Account Statuses when a student's account is sent to an outside collection agency |
| CMS (Interwoven) | Content Management System |
| Citrix | Used when setting up a user with a Citrix account, problems with logging into Citrix, general Citrix questions (for example, how to access applications once logged in), and password resets. |
| Check Point Client Encryption | The Check Point Full Disk Encryption Software Blade provides automatic security for all information on endpoint hard drives, including user data, operating system files and temporary and erased files.  For maximum data protection, multi-factor pre-boot authentication ensures user identity, while encryption prevents data loss from theft. |
| Celemony Melodyne | Classroom Software |
| Career Center (CSO) | Career Services application to support the placement of students |
| Capture One Pro by PhaseOne | Classroom Software used in the digital Photography program |
| CampusVue Portal | Faculty and Student Portal that is part of the CampusVue application. NOT the MyCampus Portal. |
| CampusVue | CampusVue SIS by Campus Management Inc. |
| Campus Facilities | For power issues and other issues, the ITOC currently handles that need to be visible to other teams but handled by the ITOC use the ST\CT of Network Admin\Lan-Wired and (others). |
| Campaign Dialer | Provides business with opportunity to load and dial specific leads based on calling campaigns uploaded to the Dialer. |
| Call Copy | Uptivity (Call Copy) Call Recording Application. Takes screen scrape of activity during calls. |
| Call Compliance System | Used to track call monitoring issues across various functional areas |

| | |
|---|---|
| Calero (Call Detail Recording) | Installation of a new Telecommunications Expense Management (TEM) and Call Detail Report Application system to collect monthly telecom expenses and compare the internal collected data against the carrier provided data for allocation to the campuses. This comparison will help us to achieve greater accuracy on the allocation of the phone bills as well as provide better data to the effectiveness of other projects. The existing TEM and CDR systems do not have the ability to provide the granularity needed to report on data at this level and the data integrated into one Saas system (Calero). |
| BrightSpace | Learning Management System |
| Bridgestreet Housing | School-sponsored student housing application, placement and customer service/client management. |
| BMI (BROADCAST MUSIC INC) | Base Student Fee |
| Batch Add Activity UI | The Batch Add Activity UI is a tool that exists outside of CampusVue whereby the user can create batches of activities and insert student specific content/verbiage. The user has the ability to upload student data for this tool either using a spreadsheet that contains student specific identifying data (systudentID) along with specific content for each student, or by using an existing student group in CampusVue. This UI will use the same functionality that exists within CampusVue for adding activities, however, it will allow the user to do it in batches rather than per individual student. |
| AWS Core Infrastructure | Amazon Web Services |
| AwardSpring Scholarship Vendor | Assists students in finding scholarships by matching them up with scholarships that match their student data |
| Avaya | Telephone and communications |
| Autodesk AECS and AEMS (Includes, AutoCAD, Maya, 3DS Max, Revit, Inventor, and Smoke) | Classroom Software |
| Assist | Application that makes data updates for CampusVue, CARS, Lawson, MyGroups, UARF, MCP, and Student Apps |
| ASCAP | Music licensing agreement that DCEH has for music being played in common areas- Basic License Fee |
| Aruba Clear Pass | Network admission control |
| Applied Voice Speech Technology (AVST) | Enterprise voice mail system |
| Applicant Tracking System ATS | Deltek Applicant Tracking System aka HRSmart is an HR application used to by recruiters to track New Hire candidates |

{8097880: }

| Apple Logic Studio and Apple Remote Desktop | Classroom Software |
|---|---|
| Antares Auto-Tune | Classroom Software |
| Andersson Syntheyes | Classroom Software for movement tracking of animation and 3D game |
| Altiris (ACEM) | This application allows Desktop Services members to remotely install applications to user's PCs. |
| Allegorithmic Substance | Classroom Software |
| AIO Schedule (Current Schedule) | CurrentSchedule lists course schedules by department. For each course, it provides a seat availability snapshot from the AIPOD Course Schedule for CARS campuses.  Without this report, campuses using CARS don't know which course/sections have available seat |
| Aerialink | Aerialink will be utilized to facilitate the messages between and the student's wireless carriers. |
| Adobe ETLA Creative Cloud | Classroom Software |
| Active Directory Services (Classroom) | Directory Authentication and Authorization Service |
| Active Directory Services (Admin) | Directory Authentication and Authorization Service |
| Active Directory Federation Services (ADFS) | Maintenance Window: Sundays 2 a.m. -12 p.m.<br>Release windows: Wednesday night 9 p.m. - Thursday 6 a.m. |
| ACME SBC | Session Border Controller (SBC) used for external SIP connections to the Voice Network |
| A/V Studio Equipment | Relating to campus Audio/Visual Studio Equipment |
| 1098-T | Reg application from CMC to generate 1098-T data. |
| SDK for Unreal Tournament by EPIC Games | Classroom software for game development |
| Dragon Naturally Speaking by Kurzweil | Software used to provide accommodation help students with disabilities |
| Microsoft Office 2016 and earlier versions | Workstation software |
| Reason by Propellerhead | Classroom software for audio production |
| Red Giant | Classroom Software for video production |
| Unity Product Suite by Unity Technologies | Classroom software for game development |
| Vicon Blade by Vicon | Classroom software for motion capture |
| Camworks by Geometric Technologies | Classroom software for Industrial Design |
| Muster Render Engine | Classroom software for rendering of animation |
| ClickDimensions | Marketing Analytics |

| | |
|---|---|
| DoNotCall | DNC database/system |
| FYSK - Facts You Should Know | |
| JetSpring | Webchat |
| Master Web Database | Core Marketing Web site DataMart |
| Neustar / Decision Navigator | Marketing lead management |
| PossibleNow | |
| QuinStreet | Marketing lead management |
| CRM (Star Portal) | Customer Relationship Management |
| Cisco Secure Access Control Server (ACS) | The Cisco Secure Access Control Server (ACS) Solution Engine is a dedicated, rack-mountable appliance for network access policy control |

**EXHIBIT 3**
**Third-Party Agreements**

All contracts or agreements between DCEH or Studio, on the one hand, and a third Person, on the other hand, related to any Third-Party Materials or Third- Party Support, including (to the extent unexpired and to the extent, in the case of contracts or agreements with DCEH, that Studio has access thereto):

1.  Master Services Agreement between Calero Software, LLC and Education Management II, LLC, dated September 30, 2016.

2.  Digital Master Services Agreement between Hewlett Packard Enterprise Company and Education Management Corporation, dated October 10, 2007.

3.  Business Associate Agreement between Hewlett Packard Enterprise Company and Education Management II, LLC, dated February 25, 2016.

4.  Services and Solutions Agreement between Xerox Corporation and Education Management, LLC, dated May 29, 2012.

5.  Managed Services Agreement (70919118) between Xerox Corporation and Education Management, LLC, dated December 15, 2004, as amended by General Amendment, dated October 17, 2008.

6.  Software and Website Agreement between Tuition Options LLC and Education Finance II LLC, dated February 26, 2013.

7.  AWS Enterprise Customer Agreement between Amazon Web Services, Inc. and Education Management, LLC, dated April 23, 2013.

8.  CampusCare Software Support Agreement between Campus Management Corp. and Education Management II, LLC, dated April 30, 2004, as amended by the Second Addendum, dated January 1, 2014, and the Third Addendum, dated June 2, 2016.

9.  Professional Service Agreement between Campus Management Corp. and Education Management, LLC, dated April 30, 2004.

10. Software License Agreement between Campus Management Corp. and Education Management, LLC, dated April 30, 2004, as amended by Addendum, dated March 14, 2014.

11. Master Agreement between D2L Ltd. and EDMC II, dated September 23, 2014.

12. Perpetual license for Oracle Database software.

13. Agreement between Perceptive Software, LLC (nil/a Lexmark Enterprise Software, LLC) and Education Management, LLC, dated June 30, 2011.

{8097880: }

14.    Subscription License and Services Agreements between Infor (US) Inc. and Education Management, LLC, dated December 21, 2012.

15.    Platform Version Change Requirements Agreement between Infor (US) Inc., Business Software Inc. and Education Management, LLC, dated December 21, 2012.

16.    Non-Exclusive License Agreement between Infor (US) Inc. and Education Management II, LLC, dated March 23, 1992, as amended by Addendum, dated November 7, 2016.

17.    Non-Exclusive License Agreement between Infor (US) Inc. and Education Management II, LLC, dated December 1995.

18.    Master Services Agreement between Infor (US) Inc. and Education Management II, LLC, dated August 17, 2005.

19.    Business Associate Agreement between Infor (US) Inc. and Education Management II, LLC, dated August 20, 2010.

20.    Subscription License and Services Agreement between Infor (US) Inc. Education Management Corporation, dated December 21, 2012.

21.    Software Customer Agreement between Lawson Group and Education Management, LLC, dated March 23, 1992.

22.    Master Services Agreement between Lawson Software Americas, Inc. and Education Management, LLC, dated August 17, 2005, as amended by Addendum, dated August 24, 2010.

23.    Software Services Agreement for Web-Based Training between Infor (US) Inc. and Education Management II, LLC.

24.    License to Use Information Software between Informatica Corporation and Education Management, LLC, dated December 30, 2008, as amended by First Amendment, dated June 25, 2010.

25.    Software License Agreement between Informatica Corporation and Education Management, LLC, dated September 29, 2011.

26.    FastTrack for Dynamic 365 Microsoft Fast Track Services Agreement between Microsoft Corporation and Education Management II, LLC, dated May 17, 2017.

27.    All other relevant agreements in the data room, as of January 1, 2018, including those listed on Attachment 1 to this Exhibit 6.

**Schedule A**
**Transition Services and Rates**

**Transition Services and TSA Rates:**

1.  <u>Financial Information Systems Services - $1.29/Student/Month</u>

    - UARF/incidents submittals and approvals for all Finance Systems
    - Workflow modifications and daily support for the various systems within finance
    - Lawson Maintenance, support and monthly close activities which includes the security of finance employees, ongoing inquiries, monthly closing activities of all subsystems, system configuration, system monitoring
    - ProLease Maintenance which includes pulling and preparing monthly rent uploads, month end close process and all maintenance
    - Reporting out of all finance systems
    - Peard uploads and support which includes pulling bi-weekly statement, preparing payment for AP and providing detail and tie out and month end close activities
    - T&E expense management
    - Management and administration for the Square system which includes all set up, user training and configuration
    - Month end and quarter end support which includes the migration of all exports from **SIS** systems, imaging accruals, system updates
    - Miscellaneous support/projects/testing/interaction between finance, PR, HR and IT. Varies from month to month
    - Vendor Maintenance and support along which includes procure to pay support for requisitions
    - PO's and matching

2.  <u>State Licensing Services - $2.04/Student/Month</u>

    a.  Annual Reporting Requirements
    b.  Annual License Renewals
    c.  New Licensure Applications
    d.  Teach Out Notifications
    e.  Teach Out Filing Requirements
    f.  Change of Ownership
    g.  Quarterly Reporting (including financials)
    h.  New Program Applications
    i.  Program Modifications
    j.  Quarterly ACICS Schools Requirements to State
    k.  Student Complaints - States
    l.  State Research, questions, follow up
    m.  BPC review time
    n.  Internal grants (research)
    o.  Catalog reviews

p.  Document retention
q.  Enrollment agreements (review, state changes)
r.  Program integrity
s.  Bonds - initial requests, distributions, cancellations
t.  Tuition and Fee changes
u.  Check requests and procurement
v.  Re-entry exception requests
w.  State Disclosures
x.  Catalog Review
y.  Mid Accreditation Review
z.  Mock Visits
aa. Self-Study Review

3.  <u>Central Student Financial Services *(not* CENTER) - $8.49/Student/Month</u>

- Annual Compliance Audits
- Close out audits
- State grant audits
- VA visits and audits
- Federal reporting requirements
- Federal surveys
- Annual student consumer information updates
- Campus security and fire safety tracking and reporting
- Closed school notifications and reporting
- DUNS and SAM updates
- Federal Program Reviews (if campus selected by Department of Ed) - program reviews are by OPEID and would include any campus associated with the OP ID within the last 2 to 3 award years
- Federal reporting for ACICS campuses
- 90/10 annual audit requirements
- Federal Electronic applications
- BPC
- Default Management
- Perkins Liquidation - Close outs
- Perkins Liquidation - Ongoing
- Policies and procedures
- Forms
- Regular Compliance Calls - FA Specialist, VA, CFA, Student Accounting, Weekly Occurrences
- Campus Based Funding, FISAP Audits, Etc.
- Federal research, regulatory review new federal updates, state review and research
- Campus support-general questions & guidance
- Campus Monitoring Reports - ANA, Attendance
- CFPB Complaints
- Student Complaints
- IPEDS
- Fisk Reporting
- Career Services Reporting

- VA Reporting
- Accreditors Reporting
- Call Recording
- Call Analytics
- Mystery Shopping
- Training Reporting
- Internal reporting and scorecards
- Consent Judgment Reporting and Management
- Ad hoc reporting
- State Grant, Military Survey reporting
- GE Disclosure
- EFIP
- Admission Scripts
- Student Body Flow
- Online Percentage Audit
- GSM Analysis and data mapping
- Persistence and Retention
- Ai Linkage Report
- Financial Aid reporting
- Admissions data
- Directing/loading data to Data Warehouse for reporting

4. <u>Information Technology - $51.70/Student/Month</u>

- Data Center
- Active Directory Services
- Application Server Work
- Avaya
- Call Copy
- Change Management
- Citrix
- Core Network
- Database Services
- Domain Name Service (DNS)
- Informatica
- ITOC Monitoring
- Network
- Project Management
- Security
- Telephony
- VMWare
- *AN* Studio Party Equipment
- Aerialink
- AIO Schedule (Current Schedule)
- Applied Voice Speech Technology (AVST)
- Assist
- AWS Core Infrastructure
- Bridgestreet Housing

- Calero (Call Detail Recording)
- Call Compliance System
- CampusVue Portal
- Check Point Client Encryption
- Clarity
- CMS (Interwoven)
- Content Alert
- Contract Management
- Corporate Facilities
- Course Listing
- Course Revision
- Course Scheduling System (CSS)
- DataBase Inventory
- Database Performance Monitoring
- Decision Navigator
- Direct Loan Pell Reconciliation
- DocuSign
- eBook
- EdConnect
- eLibrary
- Employee Portal
- Enterprise File Transfer
- Enterprise Mass Storage
- Enterprise Message Bus
- Estimated Financial Impact Plan (EFIP)
- ExamSoft
- EZ Proxy Faculty Course Import
- Faculty Session Prep
- Firewall
- Foglight
- GoToMeeting
- Holds Automation
- HP ArcSight
- HP Business Process Monitor (BPM)
- HP Business Service Management
- HP Data Protector
- HP Network Node Manager (NNM)
- HP OpenView Operations Manager (OVOW)
- HP SiteScope
- HP Systems Insight Manager
- HP Virtual User Generator (VuGen)
- HVAC
- Image Onsite
- ImageNow Upload Center
- iModules Alumni Community
- Imperva
- IP Control
- Kronos

- Load Balancer
- MHC Document Express
- MiniTab Registration
- Mobile (MCP)
- Mobile Phone
- MSBI Reports
- MyGroups
- NetQOS
- Nexpose
- Office365 - Lyne Online
- Office365 - Office Pro Plus
- Office365 - OneDrive
- Office365 - Outlook Online
- OneSource
- OpenVoice
- Outlook
- Password System (Center)
- Presentation Technology
- Printers
- Program Course Management System (PCMS)
- ProofPoint
- Public Key Infrastructure (PKI)
- Rema Grad Team Application
- RIC Process
- Router
- Satellite
- Scanners
- Schedule Manager
- SecureNet (SN)
- Security Equipment
- SendWordNow
- ShareKnowledge
- ShowMgr
- SimMan
- SiteCore
- SOA
- Socrates
- Software
- Solar Winds
- State Grants
- Stipend Generator
- Student Body Flow (SBF)
- Student Course Scheduling System (Student CSS)
- Student Orientation
- Student Payment Application (SPA)
- Subversion
- Switch
- Symantec Data Loss Protection (DLP)

Schedule A-5

- Symantec Endpoint Protection
- Symantec Validation & ID Protection Service (VIP)
- System Center Configuration Manager (SCCM)
- System Galaxy
- TargetVision
- Tax Factory
- Team Foundation Server
- Telco Carrier
- Textbooks UI
- Third Party Collections UI (TPC)
- TOC (Transfer of Credits)
- Transcript Request System (STS)
- Tripwire
- UPS
- Visix
- Vordel
- Vormetric
- Voyager/OPAC
- VPN Cisco
- WASP (Point of Sales)
- WebCTRL
- Wireless
- Wireless Controller
- Exchange
- Hyperion
- IARM
- ImageNow
- Lawson
- Lyne
- Other Services
- Planview
- RightFax
- ServiceNow
- SharePoint
- Tidal
- User Access Request
- Video Conferencing
- Workstation
- Administrative Computing Services
- Altiris
- Audit
- BizTalk
- Brightspace
- Campaign Dialer
- Campus Facilities
- CampusVue
- Career Center
- Classroom Computer Services

- CRM
- Digital Application
- eCollege
- eLeads
- Enterprise Data Warehouse (EDW)
- Genesys
- Marketing Websites
- Microsoft BI Tools
- My Campus Portal
- Qlikview
- RACER
- Student Financial Planning
- Universal Content Management (UCM)
- Webspace