EXHIBIT A

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of July 23, 2019 ("Effective Date"), by and between Westcliff Management Group, a California corporation, d/b/a Westcliff University ("Buyer"), and Dream Center Argosy University of California, LLC, a California limited liability company, by and through Mark E. Dottore, Receiver (hereinafter referred to "Seller" or "Argosy"), appointed by the United States District Court for the Northern District of Ohio, Eastern Division (the "Court").  Buyer and Seller may be referred to in this Agreement individually as a "Party" and collectively, as the "Parties."

### RECITALS:

A.      Seller operates a law school under the name Western State College of Law at Argosy University, located at 1 Banting Drive, Irvine, CA 92618 ("Premises") (OPE ID 021799-37) (the "School").

B.      Pursuant to that certain Order Appointing Receiver (the "Appointment Order") entered on January 18, 2019, by the Court in Case No. 1:19-cv-145, Mark E. Dottore ("Receiver") was appointed receiver of Seller and its direct subsidiaries.

C.      The indirect owner of all of the interests in Argosy is The Dream Center Foundation, A California Nonprofit Corporation, a California nonprofit public benefit corporation described in Section 501(c)(3) of the Internal Revenue Code.

D.      Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the assets relating to the School, on the terms and conditions set forth in this Agreement (the "Transaction").

In consideration for the representations and mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

The terms set forth in this ARTICLE I have the following meanings when used in this Agreement:

"ABA" means the American Bar Association.

"Actions" or "Proceedings" means any claim, action, cause of action, suit, demand, inquiry, proceeding, audit, hearing, subpoena, investigation, charge, notice of violation, citation, summons, litigation or suit (of any nature, whether civil, criminal, administrative, regulatory, judicial or investigative, whether formal or informal, whether public or private, whether at law or in equity) commenced, brought, conducted or heard by or before, or otherwise involving, any

Governmental Authority or Educational Agency, or any other arbitration, mediation or similar proceeding.

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control," including the terms "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of at least fifty percent (50%) of the voting securities, by contract or otherwise, including the ability to elect a majority of the members of the governing board of such Person.

"Applicable Law" means any law, statute, regulation, rule, ordinance, order, judgment, decision, or decree by any Governmental Authority applicable to Seller, Buyer, Argosy, the Purchased Assets or the School.

"Argosy Curriculum" means all data on the Brightspace learning environment platform which is owned or licensed by Seller other than the School Curriculum and used in any educational programs (including all concentrations or subfields of study within each program) of Seller other than for the School, including all such data used in connection with the education programs set forth on Schedule II attached hereto.

"Assumed Contracts" means all enrollment agreements and those contracts listed on Schedule I attached hereto.

"Assumed Liabilities" means all liabilities of the School arising or to be performed after the Closing under the Assumed Contracts (but not related to matters, facts, circumstances or liabilities existing at, prior to or as a consequence of (i) Closing or (ii) the Teach-out Commencement Period).

"Bill of Sale" means that bill of sale and assignment to be executed by Seller and Buyer, in the form attached as Exhibit A.

"BPPE" means the California Bureau for Private Postsecondary Education.

"Business Records" means all books, records, systems and documents of Seller relating solely to the Purchased Assets, Assumed Liabilities or the operation of the School prior the Closing, including all financial and accounting records, human resources, student and tuition records, agreements, lists (including current student and prospective student lists), electronic systems and related information.

"Closing" has the meaning given that term in Section 6.1 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means any information concerning the School that is not already generally available to the public.

"DEAC" means Distance Education Accrediting Commission.

2

"Educational Agency" means any entity or organization, whether governmental, government chartered, private, or quasi-private, that engages in granting or withholding Educational Approvals for, or administers Student Financial Assistance to or for students of, or otherwise regulates private post-secondary schools in accordance with standards relating to the performance, operation, financial condition, or academic standards of such schools, including, without limitation, BPPE, WSCUC, ABA, DEAC, the USDE, SEVP and any student loan guaranty agency.

"Educational Approval" means any license, permit, authorization, program participation agreement, certification, accreditation, or similar approval issued or required to be issued by an Educational Agency to the School subject to the oversight of such Educational Agency, including any such approval (a) for the School to operate and offer its educational programs in all jurisdictions in which it operates, including all jurisdictions where it offers educational programs online or through other distance education delivery methods, (b) for the School to participate in any program of Student Financial Assistance, and (c) for graduates of the School to be eligible to obtain certification or licensure, or take any examinations to obtain such certification or licensure, for any program for which the School has represented to students or prospective students that such program will enable students to obtain such certification or licensure, but excluding any license, permit, authorization, certification or similar approval issued to the School or any employee of the School on an individual basis.

"Educational Consent" means any approval, authorization or consent by any Educational Agency, or any notification to be made by the parties to an Educational Agency, with regard to the Transaction, whether pre-Closing or post-Closing, which is necessary under Applicable Law in order to obtain an Educational Approval or to maintain or continue any Educational Approval presently held by the School or Buyer, as set forth in Exhibit D.

"Educational Law" means any applicable federal, state, municipal, foreign or other law, regulation, order or accrediting body standard, policy or procedure, including without limitation the provisions of Title IV and any regulations implementing or relating thereto, issued or administered by, or related to, any Educational Agency or any program of Student Financial Assistance.

"Excluded Assets" means:

(1)     all bank accounts of Seller or the School;

(2)     all rights to receive mail and other communications addressed to Seller relating to any of the Excluded Assets or Excluded Liabilities;

(3)     all company records of Seller, including minute books and Organizational Documents;

(4)     all personnel and other records Argosy is required by Applicable Law to retain;

(5)     all contracts and agreements, whether written or oral, to which Seller is a party other than the Assumed Contracts;

(6)     any capital stock or other equity or ownership interests of any Person held by Argosy;

(7)     the School's OPE ID 021799-37; and

(8)     any assets of Seller not used or held for use by the School, other than a copy of the Argosy Curriculum.

"Excluded Liabilities" has the meaning given that term in <u>Section 2.2</u>.

"Governmental Authority" shall mean any Educational Agency or any federal, state or local government or any court, administrative agency or commission, tribunal, arbitrator, authority, official, or agency, domestic or foreign.

"HEA" means the Higher Education Act of 1965, as amended, and the regulations promulgated under it.

"Intellectual Property" means all (i) trademarks, service marks, trade dress, trade names, school names (past and present), brands, slogans, logos, Internet domain names, websites, social media accounts, corporate names, translations, adaptations, derivations, and combinations of the above, and all applications, registrations, and renewals in connection therewith, together with all of the goodwill associated with the foregoing, (ii) copyrights and works of authorship (whether or not copyrightable), and moral rights, and all applications, registrations, and renewals, (iii) computer software (including source code and object code, data, databases and documentation thereof), (iv) trade secrets and other confidential or proprietary information, know-how, processes, methods and techniques, research and development information, industry analyses, drawings, specifications, designs, plans, proposals, industrial models, technical data, financial and accounting data, business and marketing plans and customer and supplier lists and related information, and (v) copies and tangible embodiments of any of the above, in whatever form or medium, including, but not limited to, such Intellectual Property set forth on Schedule III attached hereto.

"Intellectual Property Assignment and Assumption Agreement" means that intellectual property assignment and assumption agreement to be executed by Buyer and Seller, in the form attached as <u>Exhibit B</u>.

"IT Assets" means software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned by Seller and located solely at the School, other than any such devises, hardware, technology, communications systems, network infrastructure and/or computer software that are located, maintained on or part of the Shared IT Platform.

"Knowledge of Seller" means the knowledge of Receiver, Allen Easley and Stacy Hang after reasonable inquiry and diligence with respect to the matters in question.

"Liability" means any liability (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, and whether due, or to become due), including any liability for Taxes.

"License" means any permit, license, contract, agreement, Educational Approval, authorization or other obligation issued by any Governmental Authority related to the School to which Argosy is a party or by which Argosy, the School or the Purchased Assets are bound.

"Lien" has the meaning given that term in Section 3.3 of this Agreement.

"Material Adverse Effect" means a material adverse effect on (i) the School or Purchased Assets, or (ii) the ability of Seller to consummate the Transaction or to perform its material obligations under this Agreement.

"Ordinary Course of Business" means the ordinary course of the operation of the School consistent with past custom and practice.

"Organizational Documents" means any charter, certificate of formation, articles of organization, articles of incorporation, certificate of incorporation, declaration of partnership, articles of association, code of regulations, bylaws, operating agreement, limited liability company agreement, partnership agreement or similar formation or governing documents and instruments.

"Person" means an individual, corporation, limited liability company, partnership, trust, unincorporated association or any other entity or organization.

"Post-Closing Educational Consents" means those Educational Consents that, pursuant to applicable Educational Law, must be effectuated or obtained after the Closing, as identified as Post-Closing Educational Consents on Exhibit D.

"Pre-Closing Educational Consents" means those Educational Consents that, pursuant to applicable Educational Law, must be effectuated or obtained prior to the Closing, as identified as Pre-Closing Educational Consents on Exhibit D.

"Purchased Assets" means (i) all right, title and interest in all tangible and intangible assets, other than Excluded Assets, of Argosy used or held solely for use by the School, including, without limitation, inventory, supplies, equipment, tangible personal property, fixed assets, Business Records (excluding Excluded Assets), School Curriculum, work-product, Assumed Contracts, fixtures, leasehold improvements, equipment, prepaid expenses, licenses, advertising material, insurance proceeds, permits, Licenses, goodwill, the use of all names under which Argosy does or has done business related to the School, IT Assets, all Argosy's Intellectual Property used or held for use by the School wherever located and existing as of Closing, and (ii) a copy of the Argosy Curriculum.

"Real Property" means all parcels and tracts of land, together with all buildings, structures, fixtures and improvements located thereon (including those under construction), and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of such land, including all easements appurtenant to and for the benefit of such land, and all

rights existing in and to any streets, alleys, passages and other rights-of-way included thereon or adjacent thereto (before or after vacation thereof) and vaults beneath any such streets.

"Sale Order" means the final, non-appealable order, substantially in the form attached hereto as <u>Exhibit C</u>, from the Court (i) authorizing Seller to sell, and confirming the sale of, the Purchased Assets to Buyer, free and clear of all Liens and Liabilities other than Assumed Liabilities, on the terms and conditions of this Agreement (as may from time to time be amended as provided herein), (b) confirming that the agreements entered into in November 2015 between Education Management Corporation and 39 state attorneys general and the District of Columbia do not apply to the School or the Purchased Assets following Closing, (c) deeming Buyer to have purchased the Purchased Assets in good faith, (d) authorizing and directing Seller to execute, upon request by Buyer in good faith, one or more assignments in form, substance, and number reasonably acceptable to Seller and Buyer, evidencing the conveyance of the Purchased Assets to Buyer, and (e) including a specific injunction prohibiting all creditors of Seller from asserting against Buyer any claims arising from debts owed by Seller, including successor liability claims, and that all such obligations shall remain Seller's liability.

"School Curriculum" means all curricula owned or licensed by Seller and used or held for use in any educational programs of the School, including, but not limited to, the Juris Doctor and Master of Law in Compliance, in the form of computer programs or software, slide shows, texts, films, web site content, audio, videos or any other form or media, including the following items: (1) course objectives, (2) lesson plans, (3) exams, (4) class materials (including any interactive or computer-aided materials), (5) faculty notes, (6) course handouts, (7) diagrams, (8) syllabi, (9) sample externship and placement materials, (10) clinical checklists, (11) course and faculty evaluation materials, (12) policy and procedure manuals, and (13) other related materials. The School Curriculum includes all copyrights, copyright applications, copyright registrations and trade secrets to the extent incorporated in the above-listed items and to the extent owned or licensed by Argosy and used in any educational programs of the School, including, but not limited to, the Juris Doctor and Master of Law in Compliance.

"SEVP" means the U.S. Department of Homeland Security, Student Exchange Visitor Program.

"Shared IT Platform" means any technology whether it be hardware, software or otherwise owned by Dream Center Education Holdings, LLC ("DCEH") and currently subleased to Studio Enterprise Manager, LLC ("Studio") pursuant to a sublease agreement approved by the Court, which stores and maintains data, including, without limitation student and financial data, relevant to and for operation of various universities, including the School.

"Straddle Period" means a Tax period starting prior to the Closing Date and ending on or after the Closing Date.

"Student Financial Assistance" means any form of financial assistance, grants or loans provided to any student pursuant to (i) the Title IV Programs and any other program authorized by the HEA and administered by the USDE, (ii) any educational assistance program for military servicemembers and families administered by the U.S. Department of Defense and the military service branches thereof, (iii) any educational assistance program for veterans administered by

the U.S. Department of Veterans Affairs and the designated state approving agencies for the supervision of such programs, and (iv) any state-sponsored postsecondary grant or loan program.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment, and including any amendment thereof, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection or payment of any Taxes.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental customs, duties, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, capital gain, transfer, registration, transportation, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition to the Tax, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Teach-Out Agreement" means that certain Agreement for Educational Services signed on June 6, 2019, by and between Buyer and Seller, pursuant to which Buyer agreed to teach-out the current students of the School so that currently-enrolled students of the School would be able to complete their programs of study in accordance with policies respecting good academic standing and satisfactory academic progress as set forth more fully therein.

"Teach-Out Commencement Period" means that period commencing on the "Effective Date" as such term is defined in the Teach-Out Agreement and ending at Closing.

"Title IV Program" means any program of student financial assistance administered pursuant to Chapter 28, Subchapter IV of the HEA, and any amendments or successor statutes to it.

"Transition Services Agreement" has the meaning set forth in <u>Section 5.11</u>.

"USDE" means the United States Department of Education.

"USDE Letter of Credit" means a letter of credit in favor of the USDE to establish the School's financial responsibility under or satisfy the requirements of 34 C.F.R. Section 668 Subparts B or L, or for any other reason, whether posted by Argosy or Buyer.

"USDE Pre-Acquisition Review Notice" means the written notice from the USDE following the USDE's full review of pre-acquisition review application regarding the Transaction, which (i) shall indicate that the USDE is not aware of any material adverse conditions that might preclude final approval of the Transaction; (ii) shall not indicate any material impediment to the uninterrupted continuation of Title IV Program funds for the School under Buyer's institutional accreditation; and (iii) indicate that, following the Closing, the USDE will add the School to Buyer's PPA and OPE ID upon terms that shall not be materially adverse to Buyer; provided, however, that the following shall be deemed to be materially adverse to Buyer or a material impediment: (a) any requirement for the posting a USDE Letter of Credit by

the School or Buyer, (b) restrictions on the School's ability to add new educational programs or locations, (c) restrictions or caps on enrollments at the School, (d) imposition on or assumption by Buyer of any trailing Title IV Liabilities of the School, (e) imposition on or assumption by Buyer or the School of any Liabilities for closed school discharges granted to students of the School, or (f) imposition on or assumption by Buyer or the School of any Liabilities for group or individual borrower defense claims.

"WSCUC" means the WASC Senior College and University Commission.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS AND ASSUMPTION OF LIABILITIES.

2.1     Purchase and Sale.  Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Liens, the Purchased Assets, in exchange for the Purchase Price.

2.2     Liabilities.  Except for the Assumed Liabilities, Buyer shall not assume, and shall have no liability for, any Liabilities, obligations or commitments of Seller, Argosy or the School of any kind, character or description, whether accrued, absolute, contingent or otherwise, it being understood that Buyer is expressly disclaiming any express or implied assumption of any Liabilities other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), each of which shall be retained and timely discharged by Seller pursuant to the Sale Order.  Regardless of whether any other Liabilities of Seller, Argosy or the School may be disclosed to Buyer or whether Buyer may have actual knowledge of the same, Buyer shall not assume, or in any way be liable or responsible for the Excluded Liabilities.

2.3     Purchase Price.  As consideration for the sale of the Purchased Assets, Buyer shall pay to Seller a purchase price of One Dollars ($1.00) (the "Purchase Price"), payable in cash by wire transfer or other immediately available funds at Closing.

## ARTICLE III
## REPRESENTATIONS OF SELLER

In order to induce Buyer to enter into this Agreement, Seller represents and warrants as follows:

3.1     Existence and Good Standing of Argosy.

(a)     Argosy is a limited liability company validly existing and in good standing under the laws of the State of California and is qualified to conduct business in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require qualification.

(b)     Argosy has full power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the contracts to which it is party.

3.2     <u>Authorization and Binding Obligation</u>.  Pursuant to the Appointment Order, Seller has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument and/or certificate contemplated by this Agreement to be executed or delivered by Seller and to consummate the Transaction and perform his obligations hereunder and thereunder, subject to the entry of the Sale Order.

3.3     <u>Title to Purchased Assets</u>.  Seller has good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, and subject to the entry of the Sale Order, Seller can deliver good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all encumbrances, liens, claims, charges, mortgages, pledges or security interests of any kind or nature (collectively, "Liens").  Pursuant to the entry of the Sale Order, none of the Purchased Assets are, nor shall be, subject to Liens. The Purchased Assets shall be conveyed to the Buyer free and clear of Liens. The Purchased Assets constitute all properties and assets necessary to operate the School as currently operated.

3.4     <u>Real Property</u>.  Seller does not own any Real Property used by or held for use by the School.

3.5     <u>Broker's or Finder's Fees</u>.  No Person retained by Seller or Argosy is or will be entitled to any broker's or finder's fee or any similar commission or fee in connection with the Transaction.

3.6     <u>Argosy Curriculum</u>.  All of the Argosy Curriculum is located on the Brightspace learning environment platform.

3.7     <u>Disclosure</u>.  No representation or warranty made by Seller in this Agreement contains any untrue statements of a material fact or omits to state a fact necessary to make the statements of fact contained herein not misleading.

**ARTICLE IV**
**REPRESENTATIONS OF BUYER**

Buyer represents and warrants to Seller as follows:

4.1     <u>Existence and Good Standing of Buyer</u>.  Buyer is a corporation validly existing and in good standing under the laws of the State of California and has all requisite organizational power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

4.2     <u>Authorization and Binding Obligation</u>.  Buyer has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument and/or certificate contemplated by this Agreement to be executed or delivered by Buyer and to consummate the Transaction and perform its obligations hereunder and thereunder.

4.3     <u>AS IS, WHERE IS</u>.  EXCEPT AS SPECIFICALLY SET FORTH HEREIN, ALL PURCHASED ASSETS ARE BEING CONVEYED HEREUNDER ON AN "AS IS, WHERE IS" BASIS AND SELLER MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING

9

WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. ALL OF SUCH EXPRESS AND IMPLIED WARRANTIES AND REPRESENTATIONS, EXCEPT THOSE STATED HEREIN, ARE HEREBY EXCLUDED. THE PROVISIONS OF THIS SUBSECTION SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

## ARTICLE V
## COVENANTS

5.1     Conduct of the School.  From the Effective Date through and including the Teach-Out Commencement Period, Seller shall not, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, engage in any practice, take any action, or enter into any transaction with respect to the School outside the Ordinary Course of Business other than such actions taken in furtherance of the Transaction.  Until Closing, Seller and Buyer will use reasonable best efforts to take all action and do all things necessary in order to consummate and make effective the Transaction contemplated by this Agreement, including, without limitation, compliance with and observance of the terms and conditions set forth in this ARTICLE V.  Without limiting the generality of the foregoing, Seller shall not sell, lease, assign, transfer or otherwise dispose of any Purchased Asset, mortgage, pledge or impose any Lien upon any Purchased Asset or enter into, modify or terminate any Assumed Contract.

5.2     Full Access.  From the Effective Date through and including the Teach-out Commencement Period, Seller will permit representatives of Buyer (including legal counsel and accountants) to have full access at all reasonable times, and in a manner so as not to interfere with the normal business operations of the School, to all premises, properties, personnel, books, records (including tax records), contracts, and documents of or pertaining to the School, and Seller shall cause Argosy and its Representatives to cooperate fully with requests from Buyer. Further, no later than five (5) business days after entry of the Sale Order, Seller shall have electronically copied and provided to Buyer, in a manner acceptable to Seller and Buyer, all Business Records in the possession of the Receiver or on the Shared IT Platform including, without limitation student and financial data set forth on the CampusVue, Banner, Lawson and Kronos Software, relevant to the operation of the School.  Prior to Closing, Buyer and Buyer's representatives shall hold all such Confidential Information in confidence and shall not disclose any such Confidential Information to any third parties other than Governmental Authorities and Educational Agencies without the express written consent of Seller, such consent not to be unreasonably withheld.  Should the Transaction not close, any and all Confidential Information provided to Buyer in any format pursuant to this Agreement, whether set forth in this Section or in any other part of this Agreement, shall be returned to Seller following the end of the term of the Teach-Out Agreement; provided, however, that Buyer and its representatives may retain such Confidential Information: (a) stored in standard archival or computer back-up systems or retained pursuant to such Person's normal document retention practices, for litigation and regulatory purposes or to the extent required by law, and/or (b) pursuant to their professional accounting, legal and compliance policies or bona fide document retention policy requirements.

5.3     Exclusivity.  From the Effective Date through and including the Closing, neither Seller nor Argosy shall (i) solicit, initiate or encourage the submission of any proposal or offer from, or enter into any agreement with, any Person relating to the acquisition of any equity

interests or other voting securities of, or any portion of the Purchased Assets (including any acquisition structured as a merger, consolidation, or share exchange) or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the above.

5.4     Regulatory and Other Authorizations; Consents.  Buyer with the cooperation of Seller shall use commercially reasonable efforts to obtain the consents, Licenses, Educational Approvals, Educational Consents and other consents necessary for the performance of their obligations under this Agreement, including obtaining the consents, approvals, orders and authorizations of, and registrations or filings with, any Governmental Authority, Educational Agency or other Person, set forth on Exhibit D (the "Required Consents"), which, with regards to Required Consents from any Educational Agency, are identified as Pre-Closing Educational Consents and Post-Closing Educational Consents.  Buyer with the cooperation of Seller shall use commercially reasonable efforts to secure the termination of any waiting periods under any Applicable Law and to obtain the approval of any Educational Agency or other Governmental Authority for the consummation of the Transaction.

Buyer shall be permitted to communicate and meet with any Educational Agency or other Governmental Authority related to the School.  Each of Buyer and Seller shall keep each other informed of their written and oral communications with any Educational Agency or other Governmental Authority as promptly as practicable, including providing copies of any written communications delivered to or received from any Educational Agency or other Governmental Authority and allowing the other Parties the opportunity to take part in any meeting or substantive oral communication that is arranged or that otherwise arises with any Education Agency to discuss any Required Consent.

Seller shall cooperate with Buyer in its efforts to obtain the AG Waiver (as defined in Section 6.2(k)).

5.5     Further Assurances.  To the extent not otherwise required by Section 5.4, each of the Parties agrees to use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate the Transaction including, without limitation the obtaining of all post-Closing waivers, consents, and approvals from any Governmental Authority and the making of all post-Closing registrations and filings (including, but not limited to, filings with any Governmental Authority) and the taking of all reasonable steps to obtain any approval or waiver from, or to avoid any Action or Proceeding by, any Governmental Authority.

5.6     Confidentiality.  From and after the Closing, Seller shall and shall cause its employees, representatives, consultants, agents, or advisors (collectively, "Representatives") to treat and hold as confidential all Confidential Information, refrain from using any Confidential Information except in connection with this Agreement, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of any Confidential Information which are in Seller's possession.

5.7     Name Change.  On the Closing Date, or immediately thereafter, Seller shall revoke any filing that Seller has made prior to the Closing with any Governmental Authority relating to the use of the name "Western State College of Law" or any like names or combinations of words likely to be confused with any of such names.  Immediately following the Closing Date, Seller shall, at its expense, prepare and file with the appropriate Governmental Authority appropriate documents so as to effectuate the same and shall promptly deliver evidence of such name changes or other filings to Buyer.

5.8     Tax Matters.

(a)     All documentary, sales, use, transfer, stamp, registration or other Taxes and fees incurred or assessed in connection with the sale of the Purchased Assets as contemplated by this Agreement shall be timely paid by Seller when due and Seller shall, at its own expense, timely file all necessary Tax Returns with respect to such Taxes.

(b)     Each Party shall be responsible for filing their respective Tax Returns relating to the Purchased Assets and the School for the Straddle Period.

(c)     Seller shall be responsible and liable for the payment of all filing and recording fees and transfer and sales taxes associated with the sale and purchase of the Purchased Assets described in this Agreement.

5.9     Employee Matters.

(a)     Seller shall pay those employees identified and set forth on Schedule 5.9 for the period July 1, 2019 though and including July 18, 2019, including the portion of all benefits which has been accrued on behalf of such employees (or is attributable to any unreimbursed reasonable business expenses properly incurred by those employees) as of July 18, 2019, and Buyer shall assume no liability for them.

(b)     On or prior to the Effective Date, Seller shall also notify these employees that their employment is terminated effective July 18, 2019.  Seller shall notify all other employees set forth on Schedule 5.9, which are employees that Buyer desires to hire on August 1, 2019, that their employment will Seller will terminate on July 31, 2019. Seller agrees to make no representations to its employees regarding the prospect of employment with Buyer, as Buyer at all times reserves its right to make its own hiring decisions.

(c)     As contemplated by the USDE letter to Buyer dated June 25, 2019, Buyer acknowledges and agrees to transfer funds on July 23, 2019 and July 30, 2019 in amounts provided by Seller to Buyer at least two (2) business days prior to such funding dates, in the total amount not to exceed $192,344.68, to Minute Men HR for the account of Seller's federal ID.  This transfer is for the sole purpose of aiding Seller in meeting the Seller's payroll obligations to the School employees who accept Buyer's offer of employment (the "Teach-Out Payrolls").  Specifically, the Teach Out Payrolls include accrued wages by the School employees during the  31 days between July 1, 2019 and July 31, 2019, inclusive. No portion of this transfer shall be used toward Seller's wage-payment or payroll obligations to employees who opt to not accept Buyer's offer of employment. Seller agrees to cause such transferred funds to be used solely for the purpose of covering the Teach Out Payrolls,

including but not limited to payroll taxes, etc. owed to Seller's employees who accept Buyer's offer of employment.  The Parties acknowledge and agree that the transferred funds are not to be used in connection with any other obligations of the Seller.

(d)　　The parties acknowledge and agree that the transfer of funds referenced in this Section 5.9 in no way creates, or joins Buyer to, an employment relationship with any of Seller's employees.  Moreover, unless and until Buyer hires any School employee, and then only with respect to such employee(s), there is no employment relationship created between Buyer and any School employee.

(e)　　Seller, in meeting its payroll obligations to School employees, remains solely responsible for compliance with all applicable state and federal laws with respect to such employees, including but not limited to, timely and legally compliant payment of payroll and the portion of all benefits which has been accrued on behalf of such employees (or is attributable to any unreimbursed reasonable business expenses properly incurred by those employees) prior to Closing, and Buyer shall assume no liability for them.

(f)　　The parties further agree that Buyer shall be entitled to receive and retain all funds from the USDE pursuant to the USDE's letter to Buyer dated June 25, 2019.

(g)　　With respect to tenured faculty, Seller shall follow the termination procedures based on "financial exigency" set forth in the Schools Faculty Handbook. No portion of the assets of any benefit plan, fund, program or arrangement, written or unwritten, sponsored or maintained by Seller or Argosy (and no amount attributable to any such benefit plan, fund, program or arrangement) shall be transferred to Buyer, and Buyer shall not be required to continue any such benefit plan, fund, program or arrangement.

5.10　　Notice of Certain Events.

(a)　　From the date of this Agreement through and including the Teach-out Commencement Period, Seller shall give Buyer prompt written notice of the occurrence of any of the following:  (i) a loss, taking, condemnation, damage or destruction of or to any of the Purchased Assets in its possession, custody, control or right of control involving in excess of Five Thousand Dollars ($5,000); or (ii) any material breach, default, claimed breach, claimed default or termination of any Assumed Contract.  From the date of this Agreement through and including the Closing, Seller and Buyer shall promptly notify the other in writing upon becoming aware that it has breached, will breach or could reasonably be expected to breach its representations, warranties or covenants under this Agreement.  No disclosure by the breaching party pursuant to this Section 5.10(a), however, shall be deemed to amend or supplement any Schedule or to prevent or cure any misrepresentation, breach of warranty or breach of covenant, unless non-breaching party shall otherwise agree in writing.

(b)　　Seller and Buyer shall promptly notify the other in writing upon becoming aware of any order or decree or any complaint praying for an order or decree restraining, enjoining or challenging the consummation of this Agreement or the Transaction, or upon receiving any notice from any Governmental Authority or Educational Agency of its intention to institute an Action to restrain or enjoin the consummation of this Agreement or

the Transaction.  Seller and Buyer will each use commercially reasonable efforts to contest, defend and resolve any such Action or injunction so as to permit the prompt consummation of the Transaction.

5.11    Transition Services.  Buyer acknowledges that if shared IT services or any other kind of transition services (collectively, the "Services") previously provided by DCEH are needed by Buyer, in its sole discretion, to be performed by Studio prior to or after Closing, Buyer shall use commercially reasonable efforts to negotiate and enter into a transition services and license agreement (the "Transition Services Agreement") with Studio for said Services.  To the extent that the Buyer does not require any Services from Studio, in Buyer's sole discretion, Buyer shall not be obligated in any way to negotiate or enter into a Transition Services Agreement with Studio.

5.12    Certain Notices. From the Effective Date through and including the Closing, Seller shall notify, as is required by Applicable Law, all Persons entitled to notice of all motions, notices and orders required to consummate the transactions contemplated by this Agreement, including the Sale Order, as modified by orders in respect of notice which may be issued at any time and from time to time by the Court.

5.13    Operation of the School during the Teach-Out Commencement Period.  During the Teach-Out Commencement Period, Buyer shall operate the School in accordance with the Teach-Out Agreement.

## ARTICLE VI
## CLOSING

6.1    Closing.  The consummation of the Transaction (the "Closing") shall occur on the fifth business day after all conditions to Closing have been fulfilled or waived (the "Closing Date").  The Closing shall be conducted electronically via email, facsimile transfer or other similar means of communication and shall be deemed to have taken place at the offices of Seller's counsel, McCarthy, Lebit, Crystal & Liffman CO., LPA, at 101 W. Prospect Avenue, Suite 1800, Cleveland, Ohio 44115 and the Transaction shall be effective as of 12:01 a.m. Pacific Time on the Closing Date.  The performance of all of the obligations and actions required of the Parties at the Closing shall be deemed to have occurred simultaneously, regardless of the order in which such performance actually occurs.

6.2    Buyer's Conditions to Closing.  The obligation of Buyer to consummate the Transaction is subject to the satisfaction (or waiver) as of the Closing of the following conditions:

(a)    the representations and warranties contained in ARTICLE III shall be true and correct as of the date hereof and as of the Closing Date with the same effect as if set forth on and as of such date, except where the failure of such representation or warranty to be true and correct is a result of any breach of the Teach-Out Agreement by Buyer from the Teach-Out Commencement Period forward;

(b)     Seller shall have performed and complied in all material respects with all agreements, obligations and covenants required to be performed or complied with by it on or prior to the Closing Date;

(c)     since the Effective Date and during the Teach-Out Commencement Period, the School shall have maintained ABA approval and authorization to operate except where such approval or authorization is required by Law to be maintained by Buyer after the Teach-Out Commencement Period and until Closing;

(d)     since the Effective Date, there shall have been no, and shall be no, Actions or Proceedings ongoing, pending or threatened against the School or Seller with respect solely to the School other than as set forth on Schedule 6.2(d);

(e)     since the Effective Date, there shall have been no, and shall be no, injunctions, Actions or Proceedings ongoing, pending or threatened enjoining or preventing the consummation of the Transaction unless such Action or proceeding is as a result of a breach of the Teach-Out Agreement by Buyer from the Teach-Out Commencement Period forward;

(f)     since the Effective Date, no fact, circumstance, development or event shall have occurred that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, except where such Material Adverse Effect is a result of any breach of the Teach-Out Agreement by Buyer from the Teach-Out Commencement Period forward and except those set forth in Schedule 6.2(d);

(g)     Buyer shall not have received any written notice before the Closing from the USDE stating that, as a condition of the addition of the School to Buyer's PPA following the Closing, any owner or Person exercising substantial control (as such term is defined in 34 C.F.R. § 668.174(b)) of the School shall be required to provide a personal guaranty or assume joint and several liability for any outstanding or future Title IV Program liabilities of the School;

(h)     no law or regulation shall have been enacted prohibiting or otherwise interfering, in any material respect, with Buyer's right to own the Purchased Assets or operate the School;

(i)     all required third party consents, as determined necessary by the Court, shall have been obtained, on terms reasonably satisfactory to Buyer, and copies thereof shall have been delivered to Buyer;

(j)     the Court shall have issued the Sale Order, a copy of which shall have been delivered to Buyer and sufficient time shall have elapsed so that such Sale Order shall not be subject to further appeal or stay, and no appeal or request for stay or other restriction on enforcement of the Sale Order is pending;

(k)     Buyer shall have received a written waiver of objections to the sale of the Purchased Assets from the Attorney General of the State of California – Charitable Trusts

Section pursuant to California Corporations Code Section 5913 and California Code of Regulations, Title 11, Division 1, Chapter 15, § 999.2 (the "AG Waiver").

(l)     each of the Required Consents required to be obtained prior to Closing, shall have been made and obtained, and copies of the Required Consents shall have been delivered to Buyer, including, but not limited to, approval from WSCUC, approval from BPPE, approval from the ABA, and receipt of the USDE Pre-Acquisition Review Notice;

(m)     the Teach-Out Agreement shall be in full force and effect unless terminated due to the breach of the Teach-Out Agreement by Buyer;

(n)     Buyer shall have received a perpetual, non-exclusive, fully assignable, with rights to sublicense, license to the Argosy Curriculum pursuant to a license agreement under which no royalty or license fee shall be due by Buyer to the licensor (the "License Agreement"), in the form attached as Exhibit E;

(o)     Buyer shall have received from the California Department of Tax and Fee Administration a Certificate of Sales Tax Clearance for the School and the Purchased Assets; and

(p)     at the Closing, Seller shall have delivered to Buyer all of the following documents:

(i)     the Bill of Sale, duly executed by Seller;

(ii)     the Intellectual Property Assignment and Assumption Agreement, duly executed by Seller;

(iii)     the License Agreement, duly executed by Seller; and

(iv)     such other documents relating to the Transaction contemplated by this Agreement as Buyer may reasonably request.

6.3     Seller's Conditions to Closing.     The obligation of Seller to consummate the Transaction is subject to the satisfaction (or waiver) as of the Closing of the following conditions:

(a)     The representations and warranties contained in ARTICLE IV shall be true and correct in all material respects as of the date hereof and as of the Closing Date with the same effect as if made on and as of such date;

(b)     Buyer shall have performed and complied in all material respects with all agreements, obligations and covenants required to be performed or complied with by it on or prior to the Closing Date; and

(c)     at the Closing, Buyer shall have delivered to Seller all of the following:

(i)     the Purchase Price;

16

(ii)      the Bill of Sale, duly executed by Buyer;

(iii)     the Intellectual Property Assignment and Assumption Agreement, duly executed by Buyer;

(iv)     the License Agreement, duly executed by Buyer; and

(v)      such other documents relating to the Transaction contemplated by this Agreement as Seller may reasonably request.

## ARTICLE VII
## SURVIVAL

7.1   <u>Survival of Representations, Warranties and Covenants</u>.  None of the representations and warranties contained in this Agreement shall survive the Closing.  All covenants and agreements of the Parties contained in this Agreement shall survive the Closing indefinitely or for the period explicitly specified therein.  The expiration of any covenant shall not affect any claim made in good faith and in accordance with this Agreement prior to the date of such expiration.

## ARTICLE VIII
## MISCELLANEOUS

8.1   <u>Expenses</u>.  Except as expressly provided otherwise in this Agreement, each Party shall pay its own expenses in connection with the negotiation, execution and performance of this Agreement, the Transaction, and all things required to be done by it pursuant to this Agreement, including counsel fees, brokerage, finder or financial advisor fees, filing fees and accounting fees.

8.2   <u>Specific Performance</u>.  Each Party's obligation under this Agreement is unique.  If any Party should breach its covenants under this Agreement, the Parties each acknowledge that it would be extremely impracticable to measure the resulting damages; accordingly, the non-breaching Party or Parties, in addition to any other available rights or remedies, may sue in equity for specific performance.

8.3   <u>Governing Law; Waiver of Jury Trial; Consent to Jurisdiction; Service of Process</u>.

(a)     All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Ohio without giving effect to any choice of law or conflict of law rules or provisions.

(b)     Each Party acknowledges and agrees that any Actions (in contract, in tort or otherwise) arising out of or relating to this Agreement, any transactions contemplated hereby, any relationships between or among the Parties hereunder and any disputes with respect to any of the foregoing is likely to involve complicated and difficult issues, and therefore it hereby irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any such Action.

DM1\9558039.21

(c) **EACH PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY ACTION OR SUIT AND AGREES THAT SERVICE OF SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH PARTY AT THE ADDRESS SET FORTH IN SECTION 8.4 OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE UNITED STATES MAIL, PROPER POSTAGE PREPAID.**

(d) Jurisdiction and venue for any litigation commenced by a Party to interpret the terms of this Agreement or to enforce this Agreement shall be in the United States District Court for the Northern District of Ohio, Eastern Division, before Judge Dan Polster or any judge sitting in his place.

8.4 <u>Notices</u>. All notices, requests, demands, and other communications under this Agreement must be in writing and will be deemed to have been duly given if delivered by hand; sent by registered or certified mail, return receipt requested, postage and fees prepaid; Federal Express or similar overnight courier; or sent by email, and addressed as follows:

If to Seller:              Mark E. Dottore
                           c/o Dottore Companies, LLC
                           2344 Canal Rd.
                           Cleveland, OH 44113
                           Attn:  Mark E. Dottore
                           Email: mark@dottoreco.com


with a copy to:            McCarthy, Lebit, Crystal & Liffman Co., LPA
                           101 W. Prospect Ave., Suite 1800
                           Cleveland, OH 44115
                           Attn: Charles A. Nemer
                           Email: can@mccarthylebit.com


If to Buyer:               Westcliff University
                           16715 Von Karman Avenue, #100
                           Irvine, California 92606
                           Attn:  Anthony M. Lee, Ed.D., M.B.A.
                           Email: alee@westcliff.edu


with a copy to:            Duane Morris LLP
                           750 B Street, Suite 2900
                           San Diego, CA 92101
                           Attn:  Anthony J. Guida Jr.
                           Email: tguida@duanemorris.com

Addresses are permitted to be changed by notice in writing signed by a Party desiring to change such Party's address, but any such notice of change of address will not be effective until actually received by the other Party. All notices will be deemed given on the day delivered, if (a) personally delivered or emailed to the Party receiving such notice, provided that if delivered by email, a copy of the notice shall also be sent by the method in subsection (b) or (c) below; (b) on the business day after the day deposited, if delivered by Federal Express or similar overnight courier; or (c) on the third (3rd) business day following deposit in the U.S. mail.

8.5     <u>Counterparts</u>.  This Agreement is permitted to be executed in two or more counterparts, all of which taken together shall constitute one instrument.  Copies of signatures of the Parties received by facsimile or email shall be effective as original signatures.

8.6     <u>Entire Agreement</u>. This Agreement and Schedules and Exhibits referenced in this Agreement embody the entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, oral or written, relative to said subject matter.

8.7     <u>Binding Effect; Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon Seller and Buyer and their successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be transferred or assigned (by operation of law or otherwise) by any of the Parties without the prior written consent of the other Parties, provided, however, that Buyer may assign this Agreement and all of its rights, interests and obligations under this Agreement to an Affiliate of Buyer without the consent of Seller.  Any transfer or assignment of any of the rights, interests or obligations in violation of the terms of this Agreement shall be null and void.

8.8     <u>Amendment; Waiver</u>.  This Agreement is not permitted to be amended, terminated, augmented, rescinded or discharged (other than by performance), in whole or in part, except by a writing executed by each of the Parties.  No waiver of any of the provisions or conditions of this Agreement or any of the rights of a Party shall be effective or binding unless the waiver is in writing and signed by the Party claimed to have consented to it.

8.9     <u>Termination</u>.

(a)     Notwithstanding anything to the contrary in this Agreement, this Agreement and the Transaction may be terminated at any time prior to the Closing: (i) by mutual written consent of the Parties; or (ii) by Buyer, on the one hand, or Seller, on the other hand, if there has been a material misrepresentation, a material breach of any warranty or a material breach of any covenant on the part of the other Party with respect to the representations, warranties and covenants set forth in this Agreement and such breach has not been cured within ten (10) business days following notice.

(b)     If any Party terminates this Agreement as provided in this <u>Section 8.9</u>, all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party (except for any Liability of any Party then in breach).

8.10     <u>Severability</u>.  With respect to any provision of this Agreement finally determined by a court of competent jurisdiction to be unenforceable, the Parties agree that such court shall

have jurisdiction to reform such provision so that it is enforceable to the maximum extent permitted by law, and the Parties agree to abide by such court's determination.  If any such provision of this Agreement cannot be reformed, such provision shall be deemed to be severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.

8.11    <u>Third-party Beneficiaries</u>.  Each of the Parties intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the Parties.  Specifically, no provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or other rights of any kind in any current or former student, employee, vendor, creditor or Affiliate of Seller, Argosy or the School or any other Person. Buyer shall have no liability whatsoever for payment of any broker or finder's fees and shall be indemnified and held harmless by Seller in the event it becomes the subject of a claim for such fees.

8.12    <u>Tax Advice and Reliance</u>.  None of the Parties to this Agreement (nor any of the Parties' respective counsel, accountants or other representatives) has made or is making any representations to any other Party (or to any other Party's counsel, accountants or other representatives) concerning the consequences of the Transaction under applicable Tax laws. Each Party has relied solely upon the tax advice of its own representatives engaged by such Party and not on any such advice provided by any other Party.

[Remainder of Page Left Intentionally Blank]

[Signature pages on following page]

**IN WITNESS WHEREOF**, this Agreement has been executed by or on behalf of each of the Parties below as of the date first above written.

**BUYER:**

WESTCLIFF MANAGEMENT GROUP
D/B/A WESTCLIFF UNIVERSITY

By: _____
Name: Anthony M. Lee, Ed.D., M.B.A.
Title:    President and CEO

**SELLER:**

By: _____
Name: Mark E. Dottore, solely in his capacity as
Receiver for Dream Center Argosy University of
California, LLC pursuant to that certain Order
Appointing Receiver entered on January 18, 2019,
by the United States District Court for the
Northern District of Ohio, Eastern Division

[Signature Page to Asset Purchase Agreement]

**IN WITNESS WHEREOF**, this Agreement has been executed by or on behalf of each of the Parties below as of the date first above written.

**BUYER:**

WESTCLIFF MANAGEMENT GROUP
D/B/A WESTCLIFF UNIVERSITY

By: _____
Name: Anthony M. Lee, Ed.D., M.B.A.
Title:    President and CEO

**SELLER:**

By: _____ *as Receiver*
Name: Mark E. Dottore, solely in his capacity as
Receiver for Dream Center Argosy University of
California, LLC pursuant to that certain Order
Appointing Receiver entered on January 18, 2019,
by the United States District Court for the
Northern District of Ohio, Eastern Division

[Signature Page to Asset Purchase Agreement]

DM1\9558039.21

**SCHEDULE I**

<u>Assumed Contracts</u>

None.

**SCHEDULE II**

Argosy Curriculum

## UNDERGRADUATE CURRICULUM

| ASSOCIATE PROGRAMS |
| --- |
| AA PSYCHOLOGY |
| |
| AS BUSINESS ADMINISTRATION |
| |
| AS CRIMINAL JUSTICE |
| |
| AS INFORMATION TECHNOLOGY |
| **BACHELOR PROGRAMS** |
| BA LIBERAL ARTS |
| |
| BA PSYCHOLOGY |
| |
| BS BUSINESS ADMINISTRATION |
| |
| BS CRIMINAL JUSTICE<br><br>CUSTOMIZED PROFESSIONAL |
| |
| BS HEALTHCARE ADMINISTRATION |

| RN TO BS NURSING |
| --- |
| |
| BS INFORMATION TECHNOLOGY |
| |

## GRADUATE CURRICULUM

| MASTER PROGRAMS |
| --- |
| MAED ADULT EDUCATION & TRAINING |
| |
| MAED EDUCATIONAL ADMINISTRATION |
| |
| MAED HIGHER POSTSECONDARY EDUCATION |
| |
| MAED CURRICULUM AND INSTURCTION |
| |
| MA FORENSIC PSYCHOLOGY |
| |
| MA INDUSTRIAL ORGANIZATION PSYCHOLOGY |
| |
| MA SPORTS EXERCISE PSYCHOLOGY |
| |
| MASTER OF SCIENCE IN MANAGEMENT |

| |
|---|
| MBA |
| |
| MASTER OF PUBLIC ADMINISTRATION |
| |
| MASTER OF PUBLIC HEALTH |
| |
| MS HEALTH SERVICES MANAGEMENT |
| |
| MS HUMAN RESOURCE MANAGEMENT |
| |
| MS HUMAN SERVICES |
| |
| MS ORGANIZATIONAL LEADERSHIP |
| |
| MS SERVICE SECTOR MANAGEMENT |
| |
| **MA CLINICAL MENTAL HEALTH COUNSELING** |
| |
| **DOCTORAL PROGRAMS** |
| Doctor of Business Administration |
| |
| EDD COUNSELING PSYCHOLOGY |

| |
|---|
| **EDD HIGHER POSTSECONDARY EDUCATION TEACHING AND LEARNING** |
| |
| EDD ORGANIZATIONAL LEADERSHIP |
| |
| EDD PASTORAL COMMUNITY COUNSELING |
| |
| EdD CURRICULUM AND INSTRUCTION |
| |
| EDD EDUCATIONAL LEADERSHIP |
| |
| **EDUCATION SPECIALIST** |
| |
| EdS INITIAL EDUCATIONAL ADMIMISTRATION |
| |
| EdS ADVANCED EDUCATIONAL LEADERSHIP STUDIES |
| |
| EdS TEACHING AND LEARNING |

# SCHEDULE III

## Intellectual Property

Domain names and websites associated with the same:

wsulaw.edu

wsulaw.college

wsuprograms.info

Social Media Accounts:

Facebook Account:     https://www.facebook.com/westernstatelaw/

Twitter Account:            https://twitter.com/westernstatelaw

Instagram Account:    https://www.instagram.com/westernstatecollegeoflaw/

YouTube Account:      https://www.youtube.com/channel/UCwIoymcC9ecUw0loN5TqY3Q

LinkedIn Accounts:

   https://www.linkedin.com/edu/western-state-university-college-of-law-17979

   https://www.linkedin.com/school/western-state-university-college-of-law/

   https://www.linkedin.com/company/western-state-college-of-law/

Registered Marks:

| Country | Mark | Status | Regstr. No. | Class | Goods And Services |
|---------|------|--------|-------------|-------|--------------------|
| United States | WESTERN STATE COLLEGE OF LAW | Registered | 4,595,748 | 41 | Education services, namely, providing courses of instruction at the post-secondary level, in Class 41. |

| Country | Mark | Status | Regstr. No. | Class | Goods And Services |
|---|---|---|---|---|---|
| United States | Western State College of Law Logo (Torch/Scales Design) | Registered | 4,514,652 | 41 | Education services, namely, providing courses of instruction at the post-secondary level, in Class 41. |

## SCHEDULE 5.9

Employees

TO BE OFFERED EMPLOYMENT
BY BUYER AND TERMINATED
ON JULY 31, 2019

Blasser, Lisa M.

Brower, Todd G.

Jones, Elizabeth N.

Koppel, Glenn

Mohr, Kevin E.

Molko, Robert

Roberts, Lori

Sheppard, Charles B.

Sobel, Stacey L.

Arshagouni, Paul G.

Keller, Susan

Eggleston, Sarah S.

Hartmann, Shari K.

Easley, Allen K.

Hang, Stacy

Ishmael, Brenda J.

Cohen, Rhonda D.

Espinoza, Donna J.

Jacquez, Ricardo


NOT TO BE TO BE OFFERED
EMPLOYMENT BY BUYER AND
TERMINATED ON OR BEFORE
JULY 18, 2019

Jaffke, Cheyanna

Koh, Jennifer L.

MacManus, Maureen D.

Manning, Paula J.

Merkel, Philip L.

Park, Eunice

Schindler, Tina I.

Todd, Monica M.

Porter, Tracie R.

**SCHEDULE 6.2(d)**

<u>Actions or Proceedings</u>

The License held by Argosy from the California Bureau of Post-Secondary Education has been cancelled effective June 30, 2019.

**EXHIBIT A**

<u>Bill of Sale</u>

See attached.

## BILL OF SALE AND ASSIGNMENT

**_____, 2019**

1.      <u>Sale and Transfer of Assets</u>.  Dream Center Argosy University of California, LLC, a California limited liability company, by and through Mark E. Dottore, Receiver ("<u>Seller</u>"), appointed by the United States District Court for the Northern District of Ohio, Eastern Division, and Westcliff Management Group, a California corporation, d/b/a Westcliff University ("<u>Buyer</u>") have entered into that certain Asset Purchase Agreement dated the 23rd day of July, 2019 (the "<u>Purchase Agreement</u>"). For good and valuable consideration, the receipt, adequacy and legal sufficiency for which are hereby acknowledged, as contemplated by Section 2.1 of the Purchase Agreement, Seller hereby sells, transfers, assigns, conveys, grants and delivers to Buyer, effective as of 12:01 a.m. Pacific Standard Time on _____, 2019, all of Seller's right, title and interest in and to all of the Purchased Assets (as defined in the Purchase Agreement), free and clear of all Liens (as defined in the Purchase Agreement). Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

2.      <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including, but not limited to, Seller's representations, warranties, covenants, agreements and indemnities relating to the Purchased Assets, are incorporated herein by this reference. Seller acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3.      <u>Further Actions</u>.  Seller hereto covenants and agrees to warrant and defend the sale, transfer, assignment, conveyance, grant and delivery of the Assets hereby made against all persons whomever, to take all steps reasonably necessary to establish the record of Buyer's title to the Purchased Assets and, at the request of Buyer, to execute such further instruments of transfer and assignment and to take such other action as Buyer may reasonably request to more effectively transfer and assign to and vest in Buyer each of the Purchased Assets.

4.      <u>Severability</u>.  If any provision of this Bill of Sale and Assignment is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Bill of Sale and Assignment will remain in full force and effect. Any provision of this Bill of Sale and Assignment held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

5.      <u>Governing Law</u>.  This Bill of Sale and Assignment shall be governed by and construed in accordance with the laws of the State of Ohio, without giving effect to any choice of law or conflict of law provision that would cause the laws of any jurisdiction other than those of the State of Ohio to be applied.

6.     <u>Execution</u>.  The exchange of copies of this Bill of Sale and Assignment and of signature pages by facsimile or electronic (including e-mail) transmission shall constitute effective execution and delivery of this Bill of Sale and Assignment as to the parties and may be used in lieu of the original Bill of Sale and Assignment for all purposes. Signatures of the parties transmitted by facsimile or electronically (including by e-mail) shall be deemed to be their original signatures for all purposes.

[*Signature pages follow.*]

IN WITNESS WHEREOF, Seller and Buyer have executed this Bill of Sale and Assignment as of the date first written above.

**SELLER:**

_____

Dream Center Argosy University of California, LLC, a California limited liability company, by and through Mark E. Dottore, Receiver ("Seller"), appointed by the United States District Court for the Northern District of Ohio, Eastern Division,

**BUYER:**

**WESTCLIFF MANAGEMENT GROUP D/B/A WESTCLIFF UNIVERSITY**

By: _____
Name: Anthony M. Lee, Ed.D., M.B.A.
Title:   President and CEO

**EXHIBIT B**

<u>Intellectual Property Assignment and Assumption Agreement</u>

See attached.

## <u>INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT</u>

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "<u>Agreement</u>"), dated as of [_____], 2019 (the "<u>Effective Date</u>"), is by and between DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC, A California limited liability company, by and through MARK E. DOTTORE, RECEIVER ("<u>Assignor</u>"), appointed by the United States District Court for the Northern District of Ohio, Eastern Division (the "<u>Court</u>") and WESTCLIFF MANAGEMENT GROUP, A California corporation, d/b/a Westcliff University ("<u>Assignee</u>").  All capitalized terms used herein that are not otherwise defined shall have the definitions set forth in <u>Schedule A</u> hereto.

## RECITALS

WHEREAS, Assignor has also been appointed by the Court as receiver for Dream Center Education Holdings, LLC, an Arizona limited liability company;

WHEREAS, Assignor wishes to assign all of Assignor's entire world-wide right, title and interest in and to Intellectual Property relating to Assignor's business of operating Western State College of Law at Argosy University (OPE ID 021799-37), including all of its locations, facilities, sites, and educational programs (collectively, the "<u>Assignor Intellectual Property</u>"), including but not limited to the Marks, Websites, Software, Accounts, and Copyrights identified on <u>Schedule B</u> hereto (if any, the "<u>Assignor Marks,</u>" "<u>Assignor Websites</u>," "<u>Assignor Software</u>," "<u>Assignor Accounts</u>," and "<u>Assignor Copyrights</u>," respectively);

WHEREAS, pursuant to the terms of that certain Asset Purchase Agreement, dated as of July 23, 2019, by and among Assignor and Assignee (the "<u>Purchase Agreement</u>"), Assignee agreed to purchase certain assets of Assignor, including but not limited to the Assignor Intellectual Property; and

WHEREAS, Assignor wishes to assign to Assignee, and Assignee wishes to accept, the assignment of all of Assignor's right, title and interest in and to the Assignor Intellectual Property.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements herein contained and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **<u>Assignment of the Assignor Websites</u>.**

   (a)  Assignor hereby irrevocably sells, assigns and transfers unto Assignee, and Assignee hereby receives, acquires and accepts, free and clear of all liens, all of Assignor's worldwide right, title, and interest in and to the Assignor Websites, including but not limited to all worldwide intellectual property rights and other proprietary rights in and to said Websites and all content incorporated into the same.

   (b)  On or promptly after the Effective Date (but in any event within three (3) business days after the Effective Date), Assignee shall initiate a transfer request through its domain name registrar to transfer the domain name for each Assignor Website to Assignee.  Assignor shall promptly complete all steps necessary to complete the transfer the domain names to Assignee,

including but not limited to (i) ensuring that the domain names are unlocked for transfer; (ii) providing Assignee with the transfer authorization code from its domain registrar; (iii) promptly consenting to the domain name transfer request; and (iv) take all further actions required to effect the Website assignment.

2.      **Assignment of the Assignor Accounts.**

(a)      Assignor hereby irrevocably sells, assigns and transfers unto Assignee, and Assignee hereby receives, acquires and accepts, free and clear of all liens, all of Assignor's worldwide right, title, and interest in and to the Assignor Accounts, including but not limited to all worldwide intellectual property rights and other proprietary rights in and to said Accounts and all content incorporated into the same.

(b)      Promptly after the Effective Date, but in any event within three (3) days, Assignor will provide to Assignee all usernames, passwords, and other login credentials necessary to access, use, and modify the Assignor Accounts.

3.      **Assignment of the Assignor Marks.**

(a)      Assignor hereby irrevocably sells, assigns and transfers to Assignee, and Assignee hereby receives, acquires and accepts, free and clear of all liens, all of Assignor's worldwide right, title and worldwide interest, in and to the Assignor Marks, including (i) all of the goodwill associated or connected with the use of, and symbolized by, the Assignor Marks, (ii) all registrations obtained by Assignor for the Assignor Marks including all extensions and renewals thereof, (iii) the right to file any document to maintain the Assignor Marks and any associated registrations, (iv) all common law trademark and trade name rights in the Assignor Marks, (v) the right to file applications for registration of the Assignor Marks worldwide, and (vi) the right to sue for past, present and future infringement, dilution or other violation of the Assignor Marks and collect and retain all damages, settlements and proceeds recovered therefrom; and all rights corresponding with any of the foregoing throughout the world.

(b)      Assignor hereby authorizes the Commissioner for Trademarks of the United States Patent and Trademark Office and all other corresponding entities or agencies in any applicable government or foreign countries, to record Assignee as the owner of the Assignor Marks.

(c)      Without limiting the foregoing, Assignor shall execute and deliver to Assignee the Trademark Assignment, in substantially the form attached hereto as <u>Schedule C</u>, effective as of the Effective Date, for recording and registering by the Commissioner for Trademarks of the United States Patent and Trademark Office and all other corresponding entities or agencies in any applicable government or foreign countries of the assignment contemplated thereby.

4.      **Assignment of the Assignor Software.**  Assignor hereby irrevocably sells, assigns and transfers unto Assignee, and Assignee hereby receives, acquires and accepts, free and clear of all liens, all of Assignor's worldwide right, title, and interest in and to the Assignor Software, including but not limited to all worldwide intellectual property rights and other proprietary rights therein.

5. **Assignment of the Assignor Copyrights.** Assignor hereby irrevocably sells, assigns and transfers unto Assignee, and Assignee hereby receives, acquires and accepts, free and clear of all liens, all of Assignor's worldwide right, title, and interest in and to the Assignor Copyrights, including: (a) all copyright registrations therefor, if any (and any further registrations or applications relating thereto and any renewals and extensions thereof, if any); (b) all worldwide copyright and moral rights therein, including all rights of modification and attribution; (c) the right to sue for past, present and future infringement or other violation of the Assignor Copyrights and collect and retain all damages, settlements and proceeds recovered therefrom; and (d) all rights corresponding with any of the foregoing throughout the world.

6. **Assignment of the Assignor Intellectual Property.** To the extent not otherwise assigned by Assignor pursuant to Sections 1-5 of this Agreement, Assignor hereby irrevocably sells, transfers, assigns, conveys, and delivers to Assignee, and Assignee hereby receives, acquires and accepts, free and clear of all liens, all of Assignor's worldwide right, title, and interest in, to, and under the Assignor Intellectual Property.

7. **Controlling Agreement**. This Agreement is in accordance with and is subject to all of the representations, warranties, covenants and other agreements set forth in the Purchase Agreement. Nothing contained in this Agreement shall be deemed to modify, amend, or supersede any of the terms or conditions of the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

8. **Further Assurances.** Assignor hereby agrees to execute, at Assignee's sole cost and expense, such proper and additional documents as may be reasonably requested by Assignee or the governmental agencies or other organizations having jurisdiction over the Assignor Intellectual Property to give full effect to and perfect the rights of Assignee under this Agreement. Assignor shall not, directly or indirectly, challenge, attack or oppose the validity or Assignee's exclusive ownership and use of the Assignor Intellectual Property.

9. **Successors.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

10. **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original, but such counterparts shall together (when executed and delivered) constitute but one and the same instrument. This Agreement may be executed and delivered in counterpart signature pages executed and delivered via facsimile transmission or by email transmission in Adobe portable document format (also known as "PDF"), and any such counterpart executed and delivered via facsimile transmission or by email transmission in Adobe portable document format (also known as "PDF") shall be deemed an original for all intents and purposes.

11. **Severability**. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or entities or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by applicable law so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is

invalid or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible.

      **12.**      **<u>Headings</u>**.  The headings set forth in this Agreement are inserted or used for convenience of reference only and shall not control or affect the meaning or construction of the provisions of this Agreement.

      **13.**      **<u>Governing Law</u>.**  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Ohio without giving effect to any choice of law or conflict of law rules or provisions.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

_____

Mark E. Dottore, solely in his capacity as receiver for Dream Center Argosy University of California, LLC pursuant to that certain Order Appointing Receiver entered on January 18, 2019, by the United States District Court for the Northern District of Ohio, Eastern Division

WESTCLIFF MANAGEMENT GROUP, D/B/A WESTCLIFF UNIVERSITY

By: _____

Name: Anthony M. Lee, Ed.D., M.B.A.

Title:   President and CEO

## SCHEDULE A – DEFINITIONS

"Accounts" shall mean all social media, social networking, and other third party website accounts, including all usernames, passwords, and other login credentials relating thereto and all videos, images, media, comments, and other content uploaded thereon and goodwill associated therewith.

"Marks" shall mean all statutory and common law trademarks, trade dress, service marks, logos, trade names, business names, and other word, name, design or symbol used to identify a business or the source of its goods or services, and the goodwill associated therewith, now existing or hereafter adopted or acquired, and all registrations and applications to register the same, under the laws of the United States or any other foreign country, for the full term and all renewals thereof.

"Patents" shall mean all issued U.S. and foreign patents and pending patent applications (and all patents that issue therefrom), patent disclosures, and any and all divisions, continuations, continuations-in-part, continuing prosecution applications, reissues and reexaminations thereof, for the full term thereof.

"Trade Secrets" shall mean all data or information that is not commonly known by or available to the public and which (a) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by third parties who can obtain economic value from its disclosure or use and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Copyrights" shall mean all works of authorship and all associated moral rights and copyright rights under the copyright laws of the United States and other countries for the full term thereof, whether registered or unregistered, including, but not limited to, all applications for registrations, renewals, extensions and restorations of copyrights now or hereafter provided for by law and all rights to make applications for copyright registrations and recordations, regardless of the medium of fixation or means of expression.

"Software" shall mean all types of computer software programs including operating systems, application programs, software tools, firmware and software embedded in equipment, including both object code and source code versions thereof and all written or electronic materials that explain the structure or use of software or that were used in the development of software, including logic diagrams, flow charts, code notes, procedural diagrams, error reports, manuals and training materials.

"Websites" shall mean all websites or portions thereof that are operated, managed or controlled through a domain name and URL, whether on an exclusive or nonexclusive basis, including all content, elements, data, information, materials, hypertext markup language (HTML), software and code, works of authorship, textual works, visual works, aural works, audiovisual works and functionality embodied in, published or available through each such website or portion thereof, and all domain names and URLs associated with the foregoing, provided that such domain names and URLs shall not include IP addresses.

"Intellectual Property" shall mean all Marks, Copyrights, Websites, Software, Patents, Trade Secrets, Accounts, and all other worldwide intellectual property and proprietary rights therein.

## SCHEDULE B

**A.    Assignor Domain Names and Websites**

The following domain names and websites associated with the same:

wsulaw.edu

wsulaw.college

wsuprograms.info

**B.    Assignor Accounts**

Assignor's Facebook Account:         https://www.facebook.com/westernstatelaw/

Assignor's Twitter Account:           https://twitter.com/westernstatelaw

Assignor's Instagram Account:        https://www.instagram.com/westernstatecollegeoflaw/

Assignor's YouTube Account:
         https://www.youtube.com/channel/UCwIoymcC9ecUw0loN5TqY3Q

Assignor's LinkedIn Accounts:
         https://www.linkedin.com/edu/western-state-university-college-of-law-17979

         https://www.linkedin.com/school/western-state-university-college-of-law/

         https://www.linkedin.com/company/western-state-college-of-law/

**C.     Assignor Marks**

1.     <u>Registered Marks</u>

| Country | Mark | Status | Regstr. No. | Class | Goods And Services |
|---------|------|--------|-------------|-------|--------------------|
| United States | WESTERN STATE COLLEGE OF LAW | Registered | 4,595,748 | 41 | Education services, namely, providing courses of instruction at the post-secondary level, in Class 41. |
| United States | Western State College of Law Logo (Torch/Scales Design) | Registered | 4,514,652 | 41 | Education services, namely, providing courses of instruction at the post-secondary level, in Class 41. |

2.     <u>Unregistered Marks</u>

None.

**D.     Assignor Copyrights**

1.     <u>Copyright Registrations</u>

None.

2.     <u>Unregistered Copyrights</u>

All written materials associated or used in connection with Assignor's educational courses of Western State College of Law at Argosy University, which are attached hereto as Attachment 1.

**E.     Assignor Software**

     None.

## Attachment 1 – School Curriculum

| Course Name | Course Description |
|---|---|
| LAW101 | Introduction to Legal Methods |
| LAW110 | Criminal Law |
| LAW111 | Contracts |
| LAW112 | Contracts II |
| LAW118 | Principles of Agency and Partnership |
| LAW125 | Legal Writing and Research I |
| LAW126 | Legal Writing and Research II |
| LAW131 | Torts I |
| LAW132 | Torts II |
| LAW141 | Civil Procedures I |
| LAW142 | Civil Procedures II |
| LAW151 | Property I |
| LAW152 | Property II |
| LAW160 | Selected Topics in American Law |
| LAW201 | Constitutional Law I |
| LAW202 | Constitutional Law II |
| LAW213 | Evidence |
| LAW216 | Evidence Practice |
| LAW228 | Basic Bar Studies |
| LAW234 | Business Associations |
| LAW240 | Professional Responsibility |
| LAW250 | Federal Income Taxation |
| LAW303 | Remedies |
| LAW308 | Community Property |
| LAW311 | Criminal Procedure |
| LAW321 | Sales |
| LAW365 | Honors Writing |
| LAW380 | Information Law |
| LAW400 | Domestic Violence |
| LAW401 | Administrative Law |
| LAW402 | Advanced Appellate Advocacy |
| LAW408 | Advanced Trial Advocacy Mock Trial |
| LAW414 | Bankruptcy |
| LAW416 | California Civil Procedure |
| LAW422 | Consumer Finance Law |
| LAW423 | Contracts Drafting |
| LAW429 | Law Practice Management and Technology |
| LAW437 | Family Law |

| LAW440 | Immigration Law |
|---|---|
| LAW442 | Intellectual Property |
| LAW447 | Juvenile Law |
| LAW448 | Employment Law |
| LAW454 | National Security |
| LAW460 | Corporate Finance and Accounting for Lawyers |
| LAW461 | Mediation |
| LAW463 | Negotiations |
| LAW467 | Criminal Law Externship |
| LAW472 | Real Estate Transactions |
| LAW475 | Race and Law |
| LAW483 | Sports Law |
| LAW488 | Interviewing and Counseling |
| LAW489 | Trial Practice |
| LAW490 | Trial Practice |
| LAW492 | Workers Compensation |
| LAW497 | Estates |
| LAW501 | Immigration Legal Clinic |
| LAW502 | Advanced Law Clinic |
| LAW504 | Special Project |
| LAW505 | Moot Court |
| LAW510 | Law Review |
| LAW511 | Judicial Appellate Externship |
| LAW514 | Judicial Trial Externship |
| LAW517 | Civil Practice Externship |
| LAW518 | Pre-Trial Civil Litigation |
| LAW519 | Pre-Trial Criminal Litigation |
| LAW520 | Externship Seminar: Criminal |
| LAW521 | Externship Seminar: Civil |
| LAW527 | Patent Drafting |
| LAW545 | Corporate Criminal Liability |
| LAW580 | Law of Vice |
| LAW615 | Death Penalty |
| LAW618 | Business Law Ethics |
| LAW619 | Criminal Justice Ethics |
| LAW623 | Wills and Trusts Drafting |
| MC6000 | Research, Analysis, and Communication Skills |
| MC6010 | Constitutional Law |
| MC6012 | Administrative Law |
| MC6014 | Compliance and Organizational Structures |

| | |
|---|---|
| MC6020 | Law of Medicare and Medicade |
| MC6022 | Law of Patients' Rights |
| MC6024 | Law of Accreditation and Licensure |
| MC6540 | Building a Compliance Program |
| MC6500 | Law of Risk Management |
| MC6502 | Pharmaceutical Law |
| MC6510 | Legal Perspectives on Healthcare Ethics |
| MC6512 | Regulatory Compliance in the Healthcare Industry |
| MC6514 | Healthcare as an Employee Benefit |

**SCHEDULE C**

**FORM OF TRADEMARK ASSIGNMENT**

This Trademark Assignment (hereinafter "Assignment"), effective as of [_____], 2019 is made by Dream Center Education Holdings, LLC, an Arizona limited liability company, by and through Mark E. Dottore, Receiver, appointed by the United States District Court for the Northern District of Ohio, Eastern Division,, with an address of c/o Dottore Companies, LLC, 2344 Canal Rd., Cleveland, Ohio 44113 ("Assignor") in favor of WESTCLIFF MANAGEMENT GROUP, a California corporation, d/b/a Westcliff University, with an address of 16715 Von Karman Avenue, #100, Irvine, California 92606 ("Assignee").

WHEREAS, Assignor is the owner of the entire right, title and interest in and to the trademarks listed in Exhibit A (hereinafter "Marks"); and

WHEREAS, Assignee is desirous of acquiring the entire right, title and interest in and to the Marks and the business and the goodwill of the business in connection with which the Marks have been used.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby freely acknowledged, Assignor hereby sells, assigns, transfers and sets over to Assignee, its successors, legal representatives and assigns, the entire right, title and interest of Assignor in and to the Marks, together with all of the goodwill of the entire business associated with and symbolized by such Marks, the registration thereof, and all rights and privileges under each of the Marks, including the right to renew and otherwise prosecute the registration of each of the Marks and all rights to recover for damages and profits for future and/or past infringement, in the United States and throughout the world.

This Trademark Assignment is binding on the Assignor and its respective successors, heirs and assigns, and inures to the benefit of the Assignee and its successors and assigns.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, intending to be legally bound hereby, the undersigned has caused this Trademark Assignment to be duly executed and delivered as of the date shown above.

_____

Dream Center Education Holdings, LLC, an Arizona limited liability company, by and through Mark E. Dottore, Receiver, appointed by the United States District Court for the Northern District of Ohio, Eastern Division

**EXHIBIT A**

Marks

| Country | Mark | Status | Regstr. No. | Class | Goods And Services |
|---------|------|--------|-------------|-------|--------------------|
| United States | WESTERN STATE COLLEGE OF LAW | Registered | 4,595,748 | 41 | Education services, namely, providing courses of instruction at the post-secondary level, in Class 41. |
| United States | Western State College of Law Logo (Torch/Scales Design) | Registered | 4,514,652 | 41 | Education services, namely, providing courses of instruction at the post-secondary level, in Class 41. |

**EXHIBIT C**

<u>Sale Order</u>

See attached.

`UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DIGITAL MEDIA SOLUTIONS, LLC,** | **)** | **CASE NO. 1:19-cv-145** |
| | **)** | |
| **Plaintiff,** | **)** | **JUDGE DAN AARON POLSTER** |
| | **)** | |
| **v.** | **)** | **MAGISTRATE JUDGE** |
| | **)** | **  THOMAS M. PARKER** |
| **SOUTH UNIVERSITY OF OHIO,** | **)** | |
| **LLC, *et. al.*,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

---

### ORDER GRANTING EMERGENCY MOTION OF MARK E. DOTTORE, RECEIVER OF DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC, FOR AN ORDER AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF WESTERN STATE COLLEGE OF LAW AT ARGOSY UNIVERSITY, FREE AND CLEAR OF LIENS, ENCUMBRANCES, CLAIMS AND OTHER INTERESTS AND FOR TRANSFER OF THE INTERESTS OF UNPAID LIENHOLDERS TO THE PROCEEDS OF THE SALE

---

This matter having come before the Court on the Motion (the "**Sale Motion**") of Mark E. Dottore (the "**Receiver**"), Receiver of Dream Center Argosy University of California, LLC ("**DCAUC**"), for an Order Authorizing the sale of substantially all of the assets of Western State College of Law at Argosy University ("**WSCL**"), free and clear of all mortgages, pledges, security interests, liens, encumbrances, claims, charges and other interests of any kind or type whatsoever including any lien or priority payment pursuant to 31 U.S.C. § 3713  (the "**Interests**") and for the transfer of the Interests of unpaid holders of Interests to the proceeds of the sale. In the Sale Motion, the Receiver seeks the entry of an Order: (i) authorizing the sale of all or substantially all of the assets (the "**Assets**") of WSCL to Westcliff Management Group d/b/a Westcliff University or its assignee ("**Westcliff**" or the

"**Buyer**"), consistent with the terms of an Asset Purchase Agreement between Westcliff and the Receiver (the "**APA**") dated July _____, 2019; (ii) determining and directing that the sale of the Assets is c; and (iii) and transferring any unpaid claims of  holders of Interests and other interest holders in the Assets to the proceeds of the sale; and (iv) granting such other and further relief as is warranted in the circumstances.

The Court having reviewed the Sale Motion, the Declaration of the Receiver, and all other pleadings, motions, objections, and other responses (the "**Written Statements**") related thereto, and a hearing having been held before this Court on July __, 2019 (the "**Sale Hearing**"), to consider the proposed sale (the "**Sale**") of the Assets pursuant to the terms and conditions of the APA, at which time all parties in interest were afforded an opportunity to be heard and the Court having weighed and considered the Written Statements and the oral comments made at the Sale Hearing by the parties in interest:

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     All capitalized terms not defined herein shall have the same meaning as set forth in the Sale Motion and the APA;

B.     The relief requested in this motion is governed by 28 U.S.C. § 3103(b)(1), FED. R. CIV. P. 66, Rule 66.1(c) and (d) of the Local Rules for the United States District Court for the Northern District of Ohio (the "**Local Rules**"), federal common law and the Receiver Order;

C.     The Interim Receiver Order provides,

2.n. The Receiver is authorized to negotiate and effect an orderly sale, transfer, use or assignment of all or a portion of any of the Property in or outside of the ordinary course of business of the Receivership Entities and, for the proceeds thereof, to pay the secured and unsecured indebtedness of the Property, including the Real Property . . . The Receiver is authorized to conduct such a sale of the Property in any manner which he, in his good faith and reasonable discretion, believes will maximize the proceeds received from the sale.

D.     The Amended Receiver Order provides that the Receiver's authority to negotiate and effect a sale of the assets is subject Paragraphs 13 and 14 of the Amended Receiver Order. Paragraph 13 affirms that the regulatory authority of the United States may not be stayed or constrained and Paragraph 14 affirms the validity of the Federal Priority Statute, 31 U.S.C. § 3713.

E.     Notice of the Sale Motion and the Sale was provided to hundreds of persons, who the Receiver identified as having an interest in the sale proceeding.  Notice was served upon all parties to this lawsuit and their lawyers, the federal, state and local taxing authorities, all secured creditors, unsecured creditors that have demonstrated an interest in the Assets, the Department of Justice, the Department of Education, the California Bureau of Post-Secondary Education, the California Attorney General, and all applicable regulatory and accrediting agencies. The list of persons served through the Court is a matter of record; the additional parties served is contained in a certificate of service filed with the Court.

{00022501-2 }                                    3

F.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing and the proposed Sale has been provided to all interested parties.

G.      Objections were filed by _____.

H.      This Court has the authority to approve a Sale of the Assets free and clear of all Interests (except for the USDE Required Amounts), and to transfer all Interests whatever solely to the proceeds derived from the respective sales of the Assets.

I.      Liens reported against the Assets are as stated in the Sale Motion;

J.      Westcliff has not assumed any liabilities of WSCL or the Receivership Entities.

K.      The USDE has an interest in the Assets in any amount that is required to be paid prior to the change of ownership to Westcliff;

L.      Those other holders of  Interests who did not object to the Sale Motion are deemed to have consented to the Sale.  Those holders of  Interests who did object, if any, are adequately protected by having their Interests, if any, attach to the proceeds of the Sale;

M.      Prior to the appointment of the Receiver and pursuant to documents relating to a transaction between, Studio Enterprise Manager, LLC ("**Studio**") and DCAUC among others, was provided a first right of refusal to purchase WSCL which was terminated in the Second

Settlement Agreement between the Receiver and Studio dated May 14, 2019 and approved by the Court on June 3, 2019 (Doc. 331).

N.    Since his appointment in this case, the Receiver has marketed all of the Assets in a manner that was designed to attract the maximum number of individuals and groups with an interest in purchasing one or multiple campuses.  Further, this case has been the subject of extensive press coverage.  Through the press coverage and through earlier efforts to sell the institution, the Receiver's interest in a sale transaction and its financial situation were widely known among educators, educational institutions and investors in educational institutions and in excess of twenty prospective buyers have contacted the Receiver about the possibility of purchasing one or more campuses of the Receivership Entities;

O.    The APA submitted by Buyer is the highest, best and only offer received for the Assets.  It represents the highest in terms of money offered for the Assets and also includes the opportunity to continue the institution and honor the students' wishes to complete their programs of study.  Further, the APA provides an opportunity for current students to complete their programs, which will mitigate against the potential for millions of dollars of closed school discharge claims by current students against the Receivership Entities. The APA offers WSCL's creditors the most money and WSCL's students an

uninterrupted education.  Principals of Buyer will use their own institutional licensure, accreditation and USDE approvals to operate the school and have demonstrated postsecondary education experience and knowledge and are more likely than other prospective purchasers to be successful in obtaining approvals from regulatory authorities which are required to complete the sale transaction. Buyer also seeks to close at the earliest possible time and demonstrates the financial wherewithal to do so.  A Sale to Buyer is consistent with good business judgment and is approved by this Court;

P.  If the Assets are not sold to Buyer at this time, they will be substantially devalued or the Sale will fail and WSCL will close.  The Assets are more valuable when sold as a "going concern," that is, as an educational institution.  The Sale to Buyer will also benefit WSCL's students, faculty and the community as WSCL will remain open.  In order to sell the Assets as a continuing educational enterprise in good standing, the Seller must complete its sale transaction immediately, as it cannot continue to operate as an educational institution even for a short time without financial assistance and is in danger of losing both its accreditation and its ability to participate in federal student aid programs;

Q.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested herein has been afforded to all

interested persons and entities, including but not limited to, all parties and intervenors to this action, all secured lenders, all unsecured creditors who have requested that notices be sent to them, Attorney General of the State of California, all full time faculty members, all of WSCL's educational accrediting agencies, and other parties that the Receiver believes would have an interest in the Sale or who have requested that they be notified of any sale;

R. The Receiver has demonstrated that approval of the Sale Motion and consummation of the Sale to the Buyer at this time is in the best interests of WSCL, its creditors and its students. The Receiver has advanced good and sufficient business justification supporting the Sale of the Assets to the Buyer as set forth in the Sale Motion and at the Sale Hearing, and it is a reasonable exercise of the Receiver's business judgment to consummate the Sale of the Assets on the terms and conditions set forth in the APA, and to execute, deliver and perform its obligations thereunder. Sound business judgment includes, but is not limited to, the fact that (i) there is a risk of immediate and irreparable loss of value of the Assets if the Sale is not consummated, (ii) there is a substantial risk of loss of accreditation from the WASC Senior College and University Commission ("**WSCUC**") and American Bar Association ("**ABA**"), loss of licensure by the California Bureau of Private Postsecondary Education ("BPPE"), and loss of eligibility to

participate in federal student aid programs (iii) WSCL cannot continue as an educational institution for even a short time without financial assistance, (iv) if WSCL ceases to operate as an educational institution, its students will be unable to complete their programs of study, resulting in potentially millions of dollars of closed school discharge claims by current students against the Receivership Entities, and (v) the consummation of the transaction contemplated under the APA presents the best opportunity to realize the value of the Assets to avoid further decline and devaluation thereof; (vi) the Sale is at arm's length; and (vii) the Receiver has exercised reasonable diligence and good faith judgment;

S.    The consideration to be paid by the Buyer for the Assets constitutes adequate and fair value for the Assets and the terms and conditions of the APA are fair and reasonable;

T.    The Receiver is authorized and directed to negotiate, execute and deliver all documents necessary to consummate the Sale with the Buyer on the same general terms and conditions as the APA with such changes as the Receiver, in his sole discretion, deems necessary or desirable, and is further authorized to execute other ancillary agreements and other documents to sell the Assets and to complete the Sale of the Assets without further order of this Court free and clear of all  Interests whatsoever (except for the USDE Required Amounts), as

long as the terms and conditions of the APA and other documents are not materially worse, in the aggregate, to WSCL, or materially worse with respect to the interests of individual secured creditors, than the terms and conditions contained in the APA;

U.     DCAUC has good title to the Assets, and accordingly the sale of such Assets to the Buyer will be a legal, valid and effective Sale of the Assets;

V.     The terms and conditions of the APA were negotiated, proposed and entered into in good faith, from arm's length bargaining positions by the Receiver and the Buyer and constitute the highest or otherwise best offer for the Assets after a period in which third parties had ample opportunity to seek information and enter into discussions or negotiations with the Receiver concerning a sale of the Assets.  The Buyer is entitled to the protections of a good faith purchaser with respect to the Sale approved hereby;

W.     The APA is conditioned upon several events, which include (i) all of the terms and conditions of the sale must be approved by the Court through an Order of Sale (as defined in the APA) and the Order of Sale must be final and not appealable; and (ii) the Sale must be free and clear of all Interests whatsoever (except for the USDE Required Amounts); and (iii) obtaining all necessary Pre-Closing Educational Consents (as defined in the APA).  The Buyer will not consummate the

transactions contemplated in the APA, thus adversely affecting WSCL, its creditors and its students, if the Sale of the Assets to the Buyer is not free and clear of Interests whatsoever, or if the Buyer would, or in the future could, be liable for any of the Interests of any kind or type whatsoever (except for the USDE Required Amounts);

X.   The Receiver does not have any interest in Buyer or any party affiliated with Buyer;

Y.   The Sale was non-collusive, fair and reasonable and conducted in good faith.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.   The Sale of the Assets is approved and authorized on terms consistent with those in the APA which is attached to the Sale Motion and made a part hereof;

2.   Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits;

3.   The APA is hereby approved and the Receiver is hereby authorized and empowered to fully perform under and consummate the Sale as contemplated under the APA on the same general terms and conditions as the APA.  To the extent that changes are needed to consummate the Sale as contemplated under the APA,  the Receiver, in his sole discretion, and without further order of this Court, is authorized to execute such additional instruments and documents that may be

reasonably necessary or desirable to implement the APA and to take all further actions as may reasonably be requested by the Buyer for the purpose of selling, assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, any or all of the Assets free and clear of all Interests;

4.     As of the Closing of the Sale of the Assets (as defined in the APA), the sale of the Assets to the Buyer will be a legal, valid, enforceable, and effective sale of the Assets, and will vest the Buyer with all right, title, and interest in the Assets free and clear of all Interests of any kind or type whatsoever (except for the USDE Required Amounts) and all pre-Closing liabilities incurred or accrued by Argosy or WSCL, other than the Assumed Liabilities, shall be for the account of Argosy and attach to the proceeds of the Sale of the Assets, and Buyer shall have no liability therefor;

5.     Subject to Buyer's funding obligations, all persons and entities holding or asserting any Interests arising under or out of, in connection with, or in any way relating to WSCL, the Receivership Entities, the Assets, the operation of WSCL's businesses prior to Closing or the transfer of the Assets to the Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Interests against the Buyer or any of the Assets. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Receiver to transfer the Assets to the Buyer in accordance with the terms of the APA and this Order;

{00022501-2 }                                                  11

6.     The Buyer is not, shall not be, nor be deemed to be, a successor to WSCL, the Receiver or the Receivership Entities by reason of any theory of law or equity and the Buyer shall not assume or in any way be responsible for any liability, obligation, commitment or responsibility of WSCL, the Receiver or the Receivership Entities, or any debts, liabilities, responsibilities or commitments in any way relating to the Assets, or WSCL's, the Receiver's or the Receivership Entities' use of the Assets prior to Closing;

7.     All persons and entities holding liens or interests, including the Secured Claimants, are hereby barred from asserting such liens or interests against the Buyer, its successors or assigns, or the Assets;

8.     Effective upon Closing, all persons in possession of any of the Assets shall deliver such Assets to the Buyer at its request. All holders of Interests on any of the Assets are hereby directed to prepare and file promptly after the Closing, releases of such encumbrances reasonably satisfactory to the Receiver and the Buyer;

9.     Proper, timely, adequate and sufficient notice of the proposed Sale has been provided by the Receiver to all relevant parties, and no other or further notice is required;

10.    The foregoing notwithstanding, the provision of this Order authorizing the Sale of the Assets free and clear of all Interests whatsoever (except for the USDE Required Amounts) shall be self-executing, and notwithstanding the failure of the Receiver, the Buyer or any other party to execute, file or obtain releases,

discharges, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof or the contemplated APA with respect to the Sale of the Assets, all liens, claims, encumbrances and interests on such Assets shall be deemed released and shall attach to the proceeds of the Sale (except for the USDE Required Amounts);

11. This Order shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Assets, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA;

12. From and after entry of this Order, neither WSCL nor any creditor or other party in interest shall take or cause to be taken any action that would interfere with the sale of the Assets to the Buyer in accordance with the terms of this Order;

13. From and after entry of this Order, no creditor or other party in interest shall assert any claims or take any legal or other actions relating to the

Assets to be sold to Buyer, before the Closing of the Sale against Buyer, its principals or the Assets;

14.    The Receiver is authorized to execute such other documents as are necessary or desirable to implement this Order;

15.    The agreements entered into in November 2015 between Education Management Corporation and 39 state attorneys general and the District of Columbia do not apply to WSCL or the Assets following Closing;

16.    This Court shall retain jurisdiction (i) to enforce and implement the terms and provisions of the contemplated APA and all amendments thereto, any waivers and consents thereunder and any other agreements executed in connection therewith, (ii) to resolve any disputes arising under or related to the APA, except as otherwise provided therein, and (iii) to interpret, implement and enforce the provisions of this Order.

17.    The *Objection of* _____ (the "XXX Objection") filed by _____ ("XXX") is hereby resolved as follows:

18.    Pursuant to Fed. R. Civ.R. 54(B), this Order is a final Order and there is no just reason for delay.

**IT IS SO ORDERED.**

Date: _____

_____

 MAGISTRATE JUDGE THOMAS M. PARKER

_____

JUDGE DAN AARON POLSTER

Respectfully submitted,

*/s/ Mary K. Whitmer*
Mary K. Whitmer (0018213)
James W. Ehrman (0011006)
Robert M. Stefancin (0047184)
WHITMER & EHRMAN LLC
2344 Canal Road, Suite 401
Cleveland, Ohio 44113-2535
Telephone: (216) 771-5056
Email: mkw@weadvocate.net

*Attorney for Mark E. Dottore, Receiver*

**EXHIBIT D**

<u>Required Consents</u>

**<u>Pre-Closing Educational Consents</u>**

U.S. Department of Education

WASC Senior College and University Commission

Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association

California Bureau for Private Postsecondary Education

Distance Education Accrediting Commission


**<u>Post-Closing Educational Consents</u>**

U.S. Department of Education

Student and Exchange Visitor Program (SEVP) in the Student and Exchange Visitor Information System (SEVIS)

**EXHIBIT E**

<u>License Agreement</u>

See attached.

## **INTELLECTUAL PROPERTY LICENSE AGREEMENT**

This Intellectual Property License Agreement (the "Agreement"), made as of [_____], 2019 (the "Effective Date"), by and between Westcliff Management Group, a California corporation, d/b/a Westcliff University ("Licensee"), and Dream Center Argosy University of California, LLC, a California limited liability company, by and through Mark E. Dottore, Receiver ("Licensor"), appointed by the United States District Court for the Northern District of Ohio, Eastern Division (the "Court").  All capitalized terms used herein that are not otherwise defined shall have the meaning ascribed to it in the Purchase Agreement.

*WHEREAS*, Licensor and Licensee are parties to that certain Asset Purchase Agreement dated as of July 23, 2019 (the "Purchase Agreement")

*WHEREAS*, Licensor is the owner of the Argosy Curriculum;

*WHEREAS*, Licensee wishes to obtain a license to the Argosy Curriculum and Licensor is willing to grant such a license; and

WHEREAS, Pursuant to that certain the Appointment Order entered on January 18, 2019, by the Court in Case No. 1:19-cv-145, Mark E. Dottore ("Receiver") was appointed receiver of Licensor and its direct subsidiaries.

*NOW, THEREFORE*, in consideration of the mutual representations, warranties, covenants, and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.  Grant. Licensor hereby grants to Licensee a non-exclusive, fully paid-up, unrestricted, perpetual, irrevocable, worldwide right and license, to use, reproduce, distribute, perform, display, prepare derivative works of, make, have made, modify, sell, import, and export, without restrictions, the Argosy Curriculum.  No royalty or license fee shall be due by Licensee to Licensor for the license granted herein.

2.  Sublicense and Assignment.  This Agreement may be freely sublicensed, assigned, or transferred by the Licensee to any third party without the prior written consent of the Licensor.

3.  Miscellaneous.  This Agreement shall be interpreted in accordance with the laws of the State of Ohio, without giving effect to any choice of law or conflict of law rules or provisions.  This Agreement shall be binding upon and inure to the benefit of all parties and their respective heirs, legal representatives, executors, administrators, successors, and permitted assigns. If any portion of this Agreement is terminated or adjudged to be void or unenforceable, that portion shall be severed and the remainder of its provisions shall continue and shall be effective and enforceable.  The waiver by either party of a breach of or a default under any provision of this Agreement, shall not be effective unless in writing and shall not be construed as a waiver of any subsequent breach of or default under the same or any other provision of this Agreement, nor shall any delay or omission on the part of either party to exercise or avail itself of any right or remedy that it has or

may have hereunder operate as a waiver of any right or remedy. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all parties.  This Agreement does not create any joint venture/collaboration, partnership, principal-agent relationship, or any other relationship between the Parties hereto.  This Agreement contains the entire and only agreement between the parties and supersedes all pre-existing agreements between them respecting its subject matter.  Any representation, promise or condition in connection with such subject matter which is not incorporated in this Agreement shall not be binding upon either party.  A copy, facsimile, or electronic copy of a signature shall have the same force and effect as an original signature.  This Agreement may be executed in one or more counterparts, each of which shall be an original, but, which together shall constitute a single document.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly authorized, executed, and delivered as of the Effective Date.

**WESTCLIFF MANAGEMENT GROUP**
**D/B/A WESTCLIFF UNIVERSITY**

**Dream Center Argosy University of**
**California, LLC**

_____
(Signature)

_____
(Signature)

By: Mark E. Dottore, solely in his capacity as Receiver for Dream Center Argosy University of California, LLC pursuant to that certain Order Appointing Receiver entered on January 18, 2019, by the United States District Court for the Northern District of Ohio, Eastern Division

By:  Anthony M. Lee, Ed.D., M.B.A

Its:  President and CEO