# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC, | CASE NO. 1:19-cv-145 |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| v. | MAGISTRATE JUDGE THOMAS M. PARKER |
| SOUTH UNIVERSITY OF OHIO, LLC, *et. al.*, | |
| Defendants. | |

**RECEIVER'S POST-HEARING BRIEF IN SUPPORT OF MOTION TO SHOW CAUSE AGAINST SAVE AILV, TURBAY, TAYLOR, ROCK, AND KELLY [Related ECF No. 590]**

During the course of this Court's October 21, 2020, hearing on the Receiver's Motion To Show Cause (the "Hearing"), the Court asked the question of how the Receiver could have expected Save The Art Institute of Las Vegas Limited ("Save AiLV"), or its principals, to ever have honored the contracts they entered since the Receiver never obtained the requisite Title IV funding from the Department of Education. Given the limited amount of time allotted for the hearing, and the novelty of the question, the Receiver did not have at hand, in the way he wanted, the particular evidence to demonstrate that Save AiLV was the sole reason the Title IV funding was never forthcoming. To be blunt: the Receiver worked as hard as he could, and paid for two different consultants, but was hindered by the poor records kept by Save AiLV.

The Receiver has already tendered to this Court a detailed history of the parties' relationship. *See* ECF Doc. 542. Thus, he will use this brief to focus on where, and how, Save AiLV and its principals failed to do what was necessary to secure the Title IV funding they claim they so desperately needed.

{01505482-1}

**The Receiver Takes Over**

Messrs. Turbay, Kelly, Taylor, and Rock were all associated with the AiLV campus for an extended period of time before the Receiver was appointed in January, 2019. They therefore had to know the campus was failing, and maintained terrible records. They could not have been surprised that the Receiver announced his intent to close the failing school in March, 2019. They must have been aware that, at the time the Receiver was appointed, campus had been operating under Heightened Cash Monitoring 1 ("HCM1") for some time already. Under HCM1, the school was obligated to advance credit balances to students, make a simple affirmation to the Department of Education ("DOE") that it had done so, and then could draw on Title IV funds without much difficulty. Messrs. Turbay, Taylor, Rock, and Kelly (collectively, "Respondents"), given their high-ranking status with the school, were aware that DOE put the school on HCM2 once the Receiver was appointed. As it imposed HCM2, DOE was careful to offer its criticism: "In light of DCEH's mismanagement of Title IV, HEA Credit balance funds under its Argosy University brand while it participated under the Heightened Cash Monitoring 1 (HCM1) method of payment . . .." See Exhibit 2, March 21, 2019 email from Joseph Smith.[1]

Under the newly imposed HCM2, the DOE maintained a much closer eye on the school's finances. Once the school finalized the identity of the students who were attending the Winter quarter and the school finalized its Title IV funding request, two things had to happen: (1) DOE would send a list of 100 random students whose complete files had to be delivered by the school so DOE could ensure everything was in

---

[1] The exhibits referenced in this pleading, and attached hereto, are authenticated via the Declaration of Connie Adelman, attached as Exhibit 1.

{01505482-1}  2

order; and, (2) the school had to prove, with documentary evidence, that the students or their parents had *actually received* the credit balances supposedly advanced by the school.  The imposition of these terms required: (1) good records from the school; and, (2) liquidity to advance the credit balances.  It should be obvious, but the imposition of HCM2 served to slow the entire process whereby Title IV money would be paid to the campus.

### The First Effort To Recover Title IV Money

DCEH made its Fall 2018 financial aid submission to DOE on December 26, 2018.  The Winter quarter began for students on the AiLV campus on January 7, 2019, and had their last day of add/drop on January 14.  Financial aid processing began at that point, since each class roster was then locked.  DCEH continued to deliver updating funding requests through early January, but DOE would not release funds until the class rosters were l0cked and the funding requests finalized.  That process of ensuring DOE had the requisite information was ongoing when the Receiver was appointed on January 18, 2019.  Then, within a week of his appointment, DOE imposed HCM2 upon the school.

The Receiver requested a one-time exemption from the HCM2 strictures on February 7, requesting $13 million of the $21 million available.  DOE refused the request on February 27.  DCEH staff then made a request for AiLV funds on March 11, and DOE refused on March 12, stating: "Program Compliance rejected this student for missing documentation."  The theme of poor records was to repeat itself time and time again.

### The Second Effort To Recover Title IV Money

No HCM2 request for Title IV funds could be made until the student credit balances had been advanced by the campus.  Therefore, on April 19, 2019 the Receiver

advanced $69,510.20 to AiLV students. Thereafter, the Receiver submitted the HCM2 funding request on May 8. Per HCM2 requirements, DOE then selected 100 random student files to be submitted so DOE could review and judge the funding submission. This is where the Save AiLV personnel stepped in.

Dawn Batula, the financial aid representative at AiLV was given the list of files needed by DOE. *See* Exhibit 3, May 14 email from Deana Echols. Despite offers of assistance from the Receiver's personnel, Batula submitted the requested files to DOE without any review by the Receiver. The submission was made on June 3. Her submission was lacking the required institutional policies and procedures (including the campus catalog, student handbook, student consumer information, attendance, and other materials). Thus, DCEH's Deana Echols submitted those records on June 12 in order to complete the submission.

It should be noted that there was concern regarding Save AiLV's ability to communicate with DOE, given its propensity to use gmail accounts instead of .edu ones for email. DOE was reticent to send confidential and private information to gmail accounts. *See* Exhibit 4, June 11, 2019 email from Deana Echols. It is also important to note that Ms. Echols informed Messrs. Turbay and Rock, and Ms. Batula that she understood that DOE had not received all the documents from Save Ai and could not begin its review of the second request for Title IV funding until *all* of the requisite documents were submitted.

Following DOE's review of the June submission, it approved $15,931 of the $891,448 requested. The problem was that DOE found that more than 10% of the records Save Ai tendered were incorrect, thereby triggering a rejection of the *entire* submission, save for the few complete and proper files found within the 100 submitted.

The approval of those few files resulted in the release of the $15,936.19 on September 6, 2019. *See* Exhibit 5, Letter from Eric Miles.

### The Third Effort To Recover Title IV Money

On August 21, the Receiver retained Global Financial Aid Services to clean up Save AiLV's student files. The third request for funding was made on October 2, 2019. Once again, and per procedures, on October 15, DOE identified the 100 student files to be submitted. The Receiver's team passed along the list to Mr. Taylor at Save AiLV on October 16. *See* Exhibit 6, October 16 email from Connie Adelman. Save AiLV sent Global the files for review and, on October 20, Global found extensive errors in Save AiLV's documentation. *See* Exhibit 7, October 20, 2019 email from Chyrl Ayers. The Court is asked to remember that the previous funding submission was rejected because of the poor quality of the student files. Global's review demonstrated that Save AiLV did nothing on the third submission aside from gather other equally poorly kept files, without making any effort to ensure the records would pass muster.

On October 21, Global refused to continue working on the project, indicating that the amount of work necessary to clean and correct the Save AiLV records was not within its capabilities, given its resources.

The Receiver thereafter retained Synergy & Associates on October 29 to complete the review and correction procedure. As Synergy started its work, Batula was on medical leave and could not provide any assistance. On December 16, Save AiLV uploaded some (not all) of the documents Synergy needed to review. Thereafter, the 100 complete student files were submitted on December 21, 2019. The DOE never responded to the final submission, other than to say it would not be considered since the school was closed on December 20.

## The Common Theme

DOE made it abundantly clear that Save AiLV's records and bookkeeping were substandard, thereby requiring HCM2. The quality of Save AiLV's records was tested, time and time again, through the course of the submissions and it is the quality of those records that resulted in DOE refusing to fund the second submission. Save AiLV's untimely responses, and continued tender of files that required extensive cleanup by third-party vendors (Global and Synergy) led to the inability to resolve the Winter Quarter issue, and thereby precluded Save Ai from ever being able to submit anything for the following quarters.

## The Receiver Had Every Right To Expect Save Ai To Honor Its Commitments

During the course of the Hearing, this Court inquired how the Receiver expected Save Ai to proceed with the contract since the Title IV funding issue was in question. There are two parts to the answer to that question. First, when Save Ai negotiated the initial contracts, including the Managed Services Agreement that required it pay all operational expenses, there was no funding request pending, and the school was on HCM2. Save AiLV and its principals – including Messrs. Turbay, Kelly, Rock, and Taylor - knew that, yet did not include any sort of conditional language in the contract making Save Ai's obligation contingent upon the receipt of Title IV funding. When the Asset Purchase Agreement was negotiated, some four months after the initial contracts were signed, there was no Title IV funding in place and Save AiLV again agreed to the unconditional obligation to pay the campus' operational expenses. Second, the Receiver requested and received, repeatedly, assurances from Save AiLV's attorneys that financing was in place. *See* Hearing Exhibits 15 and 16. The Receiver was entitled to

rely on the representations of Save AiLV's more-than-competent counsel on the subject, and at no point did any of those attorneys say "You know, this deal doesn't work without Title IV funding, right?"

What the Receiver did not know, or have any reason to know, was that Turbay, Rock, Taylor, and Kelly took nearly $100,000 and put it in their own pockets (as admitted during the Hearing, *see also* Hearing Exhibits 4, 6, 6, 7, and 13). That they paid themselves, but not the school's teachers, is simply inexcusable. Why would Respondents be entitled to put money in their own pockets while the Receiver was advancing expenses (like rent) on Save AiLV's behalf?

## Conclusion

This Court has, repeatedly, held the Receiver to contracts he or DCEH signed. Accordingly, it is not only appropriate to hold Save AiLV to the same standard, but it is proper to hold Messrs. Turbay, Rock, Taylor, and Kelly in contempt as they admitted they diverted money to themselves and left Save Ai's teachers and creditors with no meaningful payments. Save AiLV, Turbay, Rock, Taylor, and Kelly repeatedly misrepresented their ability to conclude the sale transaction, causing this Court and its Receiver to waste countless hours, and more than $1 million. Had Respondents been truthful from the start, the school would have closed in March 2019, and all concerned could have directed their efforts to other, more fruitful, endeavors.

Finally, since Save AiLV did not itself file any response to the Receiver's motion, and offered no testimony during the course of the Hearing, the Receiver asks that the motion be considered unopposed against the entity and judgment be granted in the Receiver's favor accordingly.

Dated: November 3, 2020            Respectfully submitted,

                                               *Respectfully submitted,*

                                               */s/* Hugh D. Berkson
                                               Robert T. Glickman (0059579)
                                               Charles A. Nemer (0009261)
                                               Hugh D. Berkson (0063997)

                                               MCCARTHY, LEBIT, CRYSTAL
                                                  & LIFFMAN CO., LPA
                                               101 West Prospect Avenue
                                               1800 Midland Building
                                               Cleveland, Ohio 44115
                                               (216) 696-1422 – Telephone
                                               (216) 696-1210 – Facsimile
                                               rtg@mccarthylebit.com
                                               can@mccarthylebit.com
                                               rrk@mccarthylebit.com
                                               hdb@mccarthylebit.com
                                               nro@mccarthylebit.com
                                               *Special Counsel for the Receiver*

## CERTIFICATE OF SERVICE

The foregoing was electronically filed this 3 of November, 2020. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                               */s/* Hugh D. Berkson
                                               Hugh D. Berkson (0063997)