To:

CLERK OF THE COURT

U.S. DISTRICT COURT NORTHERN DISTRICT OF OHIO – EASTERN DIVISION

CARL B. STOKES U.S. COURT HOUSE

801 WEST SUPERIOR AVENUE

CLEVELAND, OHIO  44113

**FILED**

2:13 pm Nov 24 2020
Clerk U.S. District Court
Northern District of Ohio
Cleveland

THE  ENCLOSED  DOCUMENT IS  FOR  FILING IN :

CASE NUMBER:  1:19-CV-145-DAP

Digital Media Solutions, LLC

Vs

South University of Ohio, LLC, et.al.

Document and Exhibits

RESPONSE BY SAVE THE ART INSTITUTE OF LAS VEGAS / ART INSTITUTE OF LAS VEGAS FACULTY AND
STAFF; DR. DANIEL TAYLOR, TIM KELLY, WILLIAM A. TURBAY, RICHARD G. ROCK, ET AL., TO THE
RECEIVER'S POST OCTOBER 21, 2020 HEARING BRIEF OF NOVEMBER 03, 2020 (Doc: #651)

From:

SAVE The Art Institute of Las Vegas, Limited

Email:  SaveAiLV19@gmail.com

Post Office Box 231504

Las Vegas, Nevada 89123-9998

November 23, 2020

To:  The Honorable Judge D. Aaron Polster
     The Honorable Magistrate Judge Thomas M. Parker
     The United States District Court
     Northern District of Ohio – Eastern Division
     Carl B. Stokes U.S. Court House
     801 West Superior Avenue
     Cleveland, Ohio 44113

Case: 1:19-cv-145
     Digital Media Solutions, LLC
     vs
     South University of Ohio, LLC, et al.

Re:  **THE ART INSTITUTE OF LAS VEGAS**

From:
     SAVE AiLV, Tim Kelly, Richard Rock, Dr Dan Taylor, William Turbay, et al.

Subject:
     **Response by Save the Art Institute of Las Vegas / The Art
     Institute of Las Vegas Faculty and Staff; Dr. Daniel Taylor, Tim
     Kelly, William A. Turbay, Richard G. Rock, at al., to The
     Receiver's Post October 21, 2020 Hearing Brief of November03,
     2020 (Doc #651)**

Case: 1:19-cv-145
November 23, 2020
Page 2

Greetings to the Court,

OPENING  REMARKS

In this document we will address the following issues:

-Receiver / DOE Relationship

-Receiver representations and withholding crucial information

-Winter Quarter 2019 Title IV Submissions

-"padding pockets with money"

- Save The Art Institute of Las Vegas, Limited Entity


In this filing we will be responding to the Receiver's Post October 21, 2020
Hearing Brief of November 03, 2020 – Paragraph by paragraph, following an
introduction.


STATE of THE CAMPUS

WINTER QUARTER 2019

**TUITION:   500 Students at $481.00 per unit at 11.1 Units = $2,669,550.00**

When Save AiLV began our on-site due diligence process beginning on February 1,
2019 the following was the State of the Campus at the Art Institute of Las Vegas
at 2350 Corporate Circle Drive, Henderson, Nevada 89147, because of the actions
taken by D.C.E.H. and Mark Dottore between October 2018 and February 2019,
this is what we found...

There were 500 students and 80 Faculty

We are not at all certain that the Court knows what the condition of the campus was in when we were handed to keys to manage it.  I was nothing like just walking into a completely functioning school, because:

The President was fired on October 18, 2018 and was replaced by a "Campus Director" on October 22, 2018.

There were no administrators except an ineffectual campus director who had no authority, no checkbook, and no approval powers, etc.

> "The DCEH AiLV Campus Director started on October 22, 2018 and did not understand nor did he seem interested in understanding the school's accreditation with ACICS. He had always been with regionally accredited schools. I believe that this led to the FACT 'surprise' visit from ACICS in June 2019. He also became the VA School Certifying Official (VASCO) for SP19 quarter. His lack of understanding of how to properly certify VA Students added to the overpayments from the Winter 2019 quarter. Those overpayments that needed to be returned to the VA exceeded $82,000. He resigned on May 20, 2019" - Dr. Dan Taylor, EdD, Dean

The Academic Dean (Dr. Taylor) had been fired on October 18, 2018 by DCEH and invited back to join us beginning April 1, 2019

The faculty and staff asked the beloved Dr. Taylor to return as Academic Dean and Interim President on April 01, 2019.

All of the Academic Advisors had been fired by the Receiver at the end of January.

The Executive Chef of the Culinary Department left the school in April 2018 and was not replaced.

The Dean of the Faculty had been fired by the Receiver at the end of January and was never replaced by the new Campus Director.

The Human Resources Generalist had been fired in November 2018.

The Financial Aid Director had been fired on September 24, 2018, a fill in person was placed in that position but was fired by the Receiver at the end of January.

The entire Financial Aid Department personnel had been fired.

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 4

The Registrar had been fired and not replaced by the Receiver at the end of January. The existing faculty and staff immediately recruited a seasoned Registrar of 8 years familiar with the DCEH flawed systems from the closed Ai Hollywood. Brian Neidlinger became Campus Registrar on April 01, 2019.

The Bookstore Manager had been fired a proposed replacement was never approved at the end of January by the Receiver.

The management of the Bookstore had been handed over to Student workers and was ultimately closed by the Receiver at the end of January.

The Student Affairs / Career Services Director has been fired.

The Admissions Director had been fired as well as the entire staff of 25.

All of the Academic Program Chairpersons had been fired on September 24, 2019.

All of the Program Chairs had been fired on January 24, 2019.

The entire Admissions department personnel had been fired by the Receiver.

The entire Student Affairs / Career Services department personnel had been fired.

The Finance/Accounting Department Director has been eliminated on September 24, 2019 and absorbed by DCEH.

The entire Finance Department personnel had been fired.

All Security personnel were fired.

Library Services software had been terminated, which was the vast on-line library collections and support for the Library resources for students.

Rooms, offices and closets were filled and stacked with banker boxes of files to the ceilings, from 2001 with no organization to them.

*"The entire Student Affairs /Career Services Department personnel had been fired Career Services Department in Pittsburgh for graduates for the Fall 2018 and the Winter 2019 Quarters – resulting in placement being below 60%"* – Dr. Dan Taylor, Ed.D.,Dean

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 5

All maintenance personnel had been fired.

All Janitorial personnel had been fired.

The Student Lounge Cafeteria/Kitchen was shut down by the Health Department, because the needed repairs were never authorized in Winter 2019.

Over 1,000 light bulbs throughout the campus, hallways, classrooms and kitchens were burned out.

All alarm and surveillance systems had been terminated (fire alarms, cameras, security alarms, emergency lights, etc.)

During the lengthy time with no surveillance or security personnel and systems the school vas vandalized and looted of expensive equipment. No repairs were authorized and no equipment was replaced.

Homeless students were living in the closets, electrical rooms and bathrooms at night.

10 of 15  multi-ton HVAC Roof UNITS were non functional. (over 100 degree weather).

Internet Services were terminated.

All Software Licenses were expiring and/or were terminated due to lack of payment.

.edu Email services were suspended and disconnected for lack of payment.

None of the existing vendors would service the Campus / relationships had been destroyed, due to lack of payment.

No mail came to the Campus – all mail was diverted to Pittsburgh. We did not ever know what was owed until vendors showed up on campus to repossess their equipment (Postage Machines, Water Purifying Systems, Student Vending Machines, and so on.)

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 6

No Utility Bills came to the Campus. Utility Company's would shut off utility services but would not divulge the balance to the campus – only to the Receiver, nor would they accept any payments except from the Receiver.  We had to enlist the assistance of local elected officials to negotiate extensions of time without termination of electricity and gas.

Culinary Walk in Coolers and Freezers were out of order and repairs were not approved.

Culinary stove tops and ovens were unserviceable, needed repairs were not approved.

Culinary Linen and towel and uniform services had been terminated.

All but two (2) of  five (5) student, faculty and business office copy machines were broken and  irreparable.

Fifteen (15) of One Hundred Twenty Five (125) Business Office, Student and Faculty Computers were non-functioning or missing.

The "Cage" which housed expensive Audio – Visual equipment for Faculty and Student use for class projects and assignments were broken or missing from being looted by students – in broad daylight, under the watchful eye of the Campus Director.

The "Cage" faculty overseers had been dismissed and had been turned over to Student Workers, without any supervision.

Culinary Food Suppliers were terminated.

Multiple Toilets, Urinals and sinks were out of order.

Numerous roof and ceiling leaks never repaired.

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 7

*"A.I. On-Line Classes were terminated at the end of January by the Receiver, which caused innumerable problems for the students and for the Campus as those classes would have to be taught on the ground on Campus – scheduling issues, need for additional faculty, inconveniences to students was a nightmare."* – Dr. Dan Taylor, Ed.D., Dean

"DIGITAL TEXTBOOK Licenses were terminated at the end of January 2019 by the Receiver.

*"This directly impacted the Spring 2019 students, the accreditation, and student satisfaction, also necessary for accreditation. Faculty had to find replacement textbooks which students would have to find and purchase themselves rather than simply paying a $50 per course digital book access fee; and because textbook suppliers had terminated contracts with the school due to lack of payment.  Students simply afford to pay for textbooks."* – Dr. Dan Taylor, Ed.D., Dean

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 8

**RECEIVER POST HEARING BRIEF with RESPONDENTS' ANSWERS BY PARAGRAPH**

RECEIVER:  Paragraph 1. Page 1.

" During the course of the Court's October 21, 2020 hearing on the Receiver's
Motion to Show Cause (the "Hearing"), the Court asked the question of how the
Receiver could have expected Save The Art Institute Limited ("Save AiLV), or its
principals, to ever have honored the contracts they entered since the Receiver
never obtained the requisite Title IV funding from the Department of Education.
Given the limited amount of time allotted for the hearing, and the novelty of the
question, The Receiver did not have at hand, in the way he wanted, the particular
evidence to demonstrate that Save AiLV was the sole reason the Title IV funding
was never forthcoming. To be blunt: the Receiver worked as hard as he could, and
paid for two different consultants, but was hindered by the poor records kept by
Save AiLV."

**RESPONDENTS: Paragraph 1. Page 1.**

The required records from AILV were all kept and maintained by AILV and DCEH
prior to the beginning of the Receivership. SAVE AILV, which was NOT AILV was
only able to work with what was already there on site, as found, as we only ever
had limited access in the beginning to the online database where the student
records were centrally kept. DCEH employees, such as Connie Adelman, who were
hired by the Receiver would have had unfettered access to the database. As far as
we know, we were only able at the time to access the physical, on-site records
that were kept at the school, and had been kept there since the beginning of the
school, in 2001. It is important to note that student records had been moved
almost entirely to the online database at a time well before the Receivership
started in January 2019, so SAVE AILVs ability to retrieve accurate records was

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 9

hampered by the limited access we had to any data which was housed in Pittsburgh.

RECEIVER: Paragraph 2. Page 1.

"The Receiver has already tendered to this Court a detailed history of the parties' relationship, See ECF Doc. 542. This he will use this brief to focus on where, and how, Save AiLV and its principals failed to do what was necessary to secure the Title IV funding they claim they so desperately needed."

## RESPONDENTS: Paragraph 2. Page 1.

Save AiLV had nothing to do with Winter Quarter – all records were with DCEH and/or Studio.  We only had some hard copy files.  We had no access to the records and data which was all housed in Pittsburgh.

Winter quarter accounting, records and so on were the responsibility of DCEH and the Receiver not the campus, not the staff, not the faculty not the potential buyer (Save AiLV)

It was the Receiver's responsibility to submit for the Title IV funds. SAVE AILV was only able to help where needed, as SAVE AILV WAS NOT DCEH

The Receiver's premise that "Save Ai was the sole reason the Title IV funding was never forthcoming" and that the Receiver was "hindered by poor records kept by Save Ai" is flat out false and non-sensical.

The bottom line is the HCMII term was for the 2019 Winter term from January 2019 through March 2019 prior to Save Ai taking over management of operations for the start of the Spring term 2019, which began April 1, 2019. All these records were recorded prior to Save Ai having anything to do with the school. Further, these records were recorded under DCEH and Receivership operational control with the vast majority of that time frame being under the Receivership. If the

basic logic of this timeline isn't sufficient proof of who was responsible for these school records, the following argument will use the Receiver's own exhibits to demonstrate beyond a shadow of a doubt that the HCMII failure fell directly at the feet of the Receivership.

See Declaration of Brian Neidlinger – **Exhibit 1**


RECEIVER: Paragraph 3. Page 2.

The Receiver Takes Over.

"Messers. Turbay, Kelly, Taylor, and Rock were all associated with the AiLV Campus for an extended period of time before the Receiver was appointed in January 2019. They therefore had to know the campus was failing, and maintained terrible records. They could not have been surprised that the Receiver announced his intent to close the failing school in March 2019. They must have been aware that, at the time the Receiver was appointed, campus had been operating under Heightened Cash Management 1 ("HCM1") for some time already.  Under HCM1, the school was obligated to advance credit balances to students, make a simple affirmation to the Department of Education ("DOE") that it had done so, and then could draw on Title IV funds without much difficulty. 'Messers. Turbay, Taylor Rock and Kelly (collectively "Respondents"), given their high-ranking status with the school, were aware that DOE put the school on HCM2 once the Receiver was appointed. As it imposed HCMs, DOE was careful to offer its criticism: "In light of DCEH's mismanagement of Title IV, HEA, Credit balance funds under its Argosy University brand while it participated under Heightened Cash Monitoring 1 (HCM1) method of payment…" See Exhibit 2, March 21, 2019 from Joseph Smith. 1"


**RESPONDENTS: Paragraph 3. Page 2.**

The premise of this entire paragraph is totally inaccurate.

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 11

a.) Mr. Rock was an independent contractor and was never associated with the Art Institute of Las Vegas, D.C.E.H., or E.D.M.C, until he was asked to Assist the faculty, while they worked to save the school, eventually purchase the school and create a single and local Las Vegas College. Because he had served as Dean and Administrator of a school larger than AiLV he was retained to oversee the day-to-day operations of the school, restore order to the campus and support the work of the Administration, Staff and Faculty as they continued to work at educating the AiLV student body. All of the insinuations that he knew or should have known any of what as alleged in this paragraph are patently false and meant to be misleading to the Court. Mr. Rock was never a member of the "high-ranking status with this school" (**Exhibit 2** – consultant contract)

b.) Dr. Taylor was the Academic Dean from April 20, 2015 until October 18, 2018 at that time he was fired. During his tenure as Dean at AiLV he was not privy to any of the information alleged above. All of the knew or should have known allegations were all known only by the Campus President as a DCEH operative. Dr. Taylor was not included in DCEH financial operations because all of those things were operated by and dealt with centrally in Pittsburgh, and such information only made its way to the ears of the Campus President.

c.) Mr. Kelly was a full-time instructor for many years, as were many other instructors, who all will testify that none of the inner workings of the campus were ever communicated to the faculty or staff, which created great unrest among the faculty for being "always kept in the dark" until someone was fired! Mr. Kelly did not have any high-ranking status with the school, as alleged.

**Note: Mr. Kelly LOANED the Receiver $50,000.00 on April 1, 2019 to make a Winter Quarter Faculty Payroll payment.**

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 12

d.) Mr. Turbay was a part-time Adjunct Instructor with AiLV for 16 years and also had no permanent status with the school let alone "High-Ranking Status of any kind with the school".  As the person who had been associated with the school the longest of anyone on campus, he was contacted by faculty and staff when word that the newly appointed Receiver had decided to close the school at the end of March 2019. Faculty, Staff, Students, Parents, Local business people, local authorities met together immediate to discuss saving the school and proffering a possible purchase offer to the Receiver.  From those meetings the Save The Art Institute of Las Vegas, Limited entity was born. Mr. Turbay was never privy to any of the information suggested by the Receiver in this paragraph by the Receiver.

**Note: Mr. Turbay LOANED the Receiver in excess of $10,000.00 to make a Winter Quarter rent payment.**

Academicians come to school, teach their classes and go home.

How does being associated with the school as a faculty member, especially a part time instructor make one privy to a school's change in financial aid status as a result of going into Receivership? How is being a faculty member considered a "high-ranking status within the school"? Delving into some speculation, do you think if we surveyed all faculty members at that time that the vast majority would know AILV went into HCMII status, let alone even know what an HCMII status was?

*"I worked for Ai Hollywood for 8 years and had no idea what HCM was or that all campuses ere on HCMI prior to the Receivership until I went through this whole process with AILV, all of that information was never shared with anyone on any campus during the DCEH days."* – Brian Neidlinger.

Mr. Rock wasn't even associated to AILV as the Receiver claims. Nonetheless the Receiver states that due to being faculty of the school, "they had to know

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 13

the school was failing and maintained terrible records." This statement is pure speculation but further indicates the Receiver's acknowledgement that the school was already maintaining "terrible" records prior to Save Ai taking operational management – not ownership. There was no reasonable way for Save Ai to know the campus was put on HCMII without disclosure from the Receiver. To further this point, see the **Receiver's Exhibit R-2 (**page 3 and 4) which details an email conversation between the Receiver's own DCEH employee, Deana Echols, and Michael Frola of the DOE on March 20, 2019. In this conversation, Mrs. Echols is questioning why AILV's Title IV request from March 11, 2019 was being rejected by the DOE and if the campus is eligible for Title IV funding and if so, which process would be required, HCM1.5, HCM2 light or HCM2. Mr. Frola responds by informing Mrs. Echols that "the request for funds must come under the HCM-2 submission process." Therefore, unlike Save Ai, the Receiver was notified by the DOE on January 25, 2019 that the campus was on HCMII but his own employees were still trying to request funds on March 11, 2019 as if they were still on HCMI. If the Receiver's own DCEH employees weren't even aware of the HCMII status of AILV on March 20, 2019, even after the Receiver was notified by the DOE, how can the Receiver or the Court expect AILV faculty members from Save Ai to have been aware of this prior to taking operational management on April 1, 2019? Finally, this paragraph also refences Receiver's Exhibit 1, a Declaration from Connie Adelman, which was not actually provided in the brief.  (see **Exhibit 3**)

The Receiver knew of the HCM2 designation on January 25, 2019 – six days after being appointed Receiver and failed to or purposely never revealed that crucial information to Save AiLV at any time during negotiations or even at the execution of Agreements – instead he told everyone from Save AiLV on March 28, 2019 that "Title IV funds would be coming within 2 weeks, maximum 30 days."  And at the time he proceeded to borrow $160,000.00 from two teachers and a local physician to "make Winter Quarter rent and payroll payments."

Unscrupulous and deceitful at best – certainly not compliant with common full disclosure practices when negotiating the sale of a college.

The Receiver, by the way, never divulged to anyone at Save AiLV that he had been told by the Department of Education, in their words:

> "... the money that the Receivership is seeking doesn't flow, by any legal means that I am aware of, to the Receivership, and that's what we have stated in our statement of interest. That's what we stated in the May 17th (2020) letter." – DOJ Attorney Kresse. 08/14/2020  (See **Exhibit 4** Hearing transcript.)

The Receiver knew this information when he filed an EMERGENCY Motion for an Order of the Court to approve the Asset Purchase Agreement with Save AiLV on July 17, 2020.  EMERGENCY?

This alone is cause to void all Agreements the Receiver hopes to find us in contempt of court for violating, along with the non-disclosure of the HCMII designation status of the campus, which he knew on January 25, 2019 and which we found out inadvertently on May 20, 2019.

Mr. Turbay and Mr. Kelly were instructors at the school, not "high-ranking administrative officials". Dr. Taylor was an academic dean who was focused on the academic performance of the school, not someone who was privy to the financial details of the school, and Mr. Rock was not associated with the school at all. The financial details of the school were known only to those directly associated with the operation of the school, such as high-level administrators, and DCEH, which operated the schools as a corporate system from Pittsburgh.


RECEIVER: Paragraph 4.  Pages 2/3.

Under the newly imposed HCM2, the DOE maintained a much closer eye on the school's fitness. Once the school finalized the identity of the students who were attending the Winter quarter and the school finalized its Title IV funding request, two things had to happen: (1) DOE would send a list of 100 random

students whose complete files had to be delivered by the school so DOE could ensure everything was in order; and, (2) the school had to prove, with documentary evidence, that the students or their parents had actually received the credit balances supposedly advanced by the school. The imposition of these terms required: (1) good records from the school; and, (2) liquidity to advance the credit balances. It should be obvious, but the imposition of HCM2 served to slow the entire process whereby Title IV money would be paid to the campus."

( *N.B. At the bottom of Page 2 there is a foot notation1 which states:

" The exhibits referenced in this pleading, and attached hereto, are authenticated via the Declaration of Connie Adelman, attached as Exhibit 1.")

## RESPONDENTS: Paragraph 4. Pages 2/3.

Such an Exhibit 1, noted above, was not attached to this pleading that we can find.

Here we remind the Court that the Winter Quarter files and records were never in the control of these Respondents, nor any of the faculty AND that all of those people responsible for the maintenance of those records were: were at D.C.E.H Corporate Offices and Campus Staff all of whom were fired between October 2018 and the end of March 2019 by D.C.E.H and/or by the Receiver. (Refer to the State of The Campus above.)

The fact that the school was under the HCM2 DOE designation was unknown to SAVE AILV until after the Campus Director of the school, a DCEH employee stepped down on May 20, 2019. Upon his departure an UNOPENED letter from the DOE was found in the desk in his office. The letter was informing the Campus Director and the Receiver of the HCM2 Status Decision, dated January 25, 2019.

Note: The Receiver knew this information over 60 days before signing Agreements with Save AiLV. Save AiLV found out this information inadvertently nearly 60 days AFTER the execution of those same documents.

RECEIVER: Paragraph 5. Page 3.

**The First Effort To Recover Title IV Money**

"D.C.E.H. made its Fall 2018 financial aid submission to DOE on December 26, 2018. The Winter quarter began for students on the AiLV campus on January 7, 2019., and had their last day of add/drop on January 14. Financial aid processing began at that point, since each class roster was then locked.  DCEH continued to deliver updating funding requests through early January, but DOE would not release funds until the class rosters were locked and the funding requests finalized. That process of ensuring DOE had the requisite information was ongoing when the Receiver was appointed on January 18, 2019. Then, within a week of his appointment, DOE imposed HCM2 upon the school.

The Receiver requested a one-time exemption from HCM2 strictures on February 7, requesting $13 million of the $21 million available. DOE refused the request on February 27.  DCEH staff then mad a request for AiLV funds on March 11, and DOE refused on March 12, stating: "Program compliance rejected this student for missing documentation." The theme of poor records was to repeat itself time and time again."


**RESPONDENTS: Paragraph 5. Page 3.**

Again, none of this Winter Quarter issue had anything to do with these Respondents or anyone on the current faculty or staff.  Not one of us knew anything about the imposition of HCM2.  This issue was never disclosed to Save AiLV during negotiations with the Receiver for the purchase of the school.

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 17

The Receiver indicates that the first effort to recover Title IV money occurred on March 11, 2019 (as referenced in the Response to section 4 above) but that the DOE rejected it on March 12, 2019 due to missing documentation and that a theme of poor records was to repeat itself time and time again. As previously referenced in the **Receiver's Exhibit R-2 (**page 3 and 4) the email conversation between Mrs. Echols and Michael Frola from DOE blatantly states why this submission was rejected. It was rejected because it was required to be made according to the HCMII process, not HCMI. So, the records missing weren't inaccurate school records but rather a completely wrong submission process that did not meet the DOE's HCMII document requirements. Further, how is the first of multiple failed submissions by the Receiver in any way the responsibility of Save Ai's record keeping when this submission was requested and rejected weeks prior to Save Ai taking over operational management? The theme of complete incompetence was to repeat itself time and time again. ( **Exhibit 3** )

Additionally, to that point, we were never told by the Receiver that there existed a contentious relationship, to say the least, with The Department of Education. That relationship rang loud and clear during the Hearing of August 04, 2020, with the Court, The DOE, The DOJ and the Receiver.  Save AiLV should have been made aware of these DOE, Title IV issues in advance of entering into Agreements with Save AiLV, especially since the Agreements bound the Receiver to deliver the school to the buyers "free and clear."

On February 5, 2019 and on February 15, 2019 Save AiLV sent two letters to the Receiver, as an integral part of the due diligence under way regards the viability of the school.  (**Exhibit 5**).  Those requests were never honored or answered by the Receiver.

This first effort to recover Title IV monies was, as explained by the Receiver's response, done by DCEH. Not SAVE AILV.

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 18

RECEIVER Paragraph 6. Pages 3 /4.

The Second Effort To Recover Title IV Money

"No HCM2 requests for Title IV funds could be made until the student credit balances had been advanced by the campus.  Therefore, on April 19, 2019 the Receiver advanced $69,510.20 to AiLV students. Thereafter, the Receiver submitted the HCM2 funding requests on May 8. Per HCM2 requirements, DOE then selected 100 random student files to be submitted so DOE could review and judge the funding submission. This is where Save AiLV personnel stepped in."

**RESPONDENTS: Paragraph 6. Pages 3 / 4.**

The Receiver states that under HCMII, no Title IV funds could be made until student credit balances had been advanced by the campus. This is one of the most important HCM rules. You'll note in the Receiver's own Exhibit 7 that Global Financial Aid Services notes in their email that 3 of the 5 students they reviewed were still showing a credit balance as of October 20, 2019, even after the Receiver paid $69, 510.20 in stipends on April 19,2019. The Receiver uses this email to show problems with Save Ai's record keeping but neglects to mention that 3 of the 5 students were in direct violation of the most basic requirements of HCMII which was to advance student's any credit balances prior to collecting Title IV funds. Instead, he focuses on questions from Global to Save Ai regarding the record keeping for the term prior to when Save Ai was in charge. It should also be noted that these processing questions from Global to their new clients (Receiver) about their policies and procedures do not equate to inaccurate records as deemed by the DOE as the Receiver would like to imply.

SAVE AILV personnel helped to retrieve as-is records from on-site storage, which as noted above was likely incomplete due to the record management

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 19

system being centralized long before the Receivership, as well as shoddy record
keeping in recent years under DCEH control.


RECEIVER: Paragraph 7. Page 4.

"Dawn Batula, the financial aid representative at AiLV was given the list of files
needed by DOE. See Exhibit 3. May 14 email from Deena Echols. Despite offers of
assistance from Receiver's personnel, Batula submitted the requested files to DOE
without any review by the Receiver.  The submission was made on June 3. Her
submission was lacking the required institutional policies and procedures
(including the campus catalog, student handbook, student consumer information,
attendance and other materials). Thus DCEH's Deana Echols submitted those
records on June 12 in order to complete the submission."


**RESPONDENTS: Paragraph 7. Page 4**

Receiver implies that Dawn Batula took the audit on single handedly and refused
any help from the Receiver's personnel and instead submitted the requested files
to the DOE without any review by the Receiver. To start, we don't recall being
offered any help from the Receiver nor do we recall the Receiver's personnel
having any desire to review the documentation we submitted. This is because
there was no point for them to review what we submitted. Save Ai provided
secondary student records such as applications, enrollment agreements, high
school transcripts and database printouts (which were viewable in the database
by Receiver personnel) such as transcripts, attendance, and accounting
statements. These are secondary HMCII documents that don't require being
edited. These documents are required by the DOE to prove that students qualified
for Title IV in the first place. You either have these records or you don't. The only
reason Save Ai was even involved in the HCMII submission was because not all of
these documents had been uploaded into the shared digital imaging database

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 20

and were only available in physical files the campus had maintained. The Receiver fails to distinguish between the complicated financial aid records that are electronically maintained between the networks of the DOE such as COD and the campus with that of the supporting documentation that the campus provided. The detailed audit of an HCMII submission is quite vast and Save Ai was only working on a portion of it to help the Receiver while the Receiver's personnel was supposed to be working on the rest of it. So yes, once Dawn Batula and Brian Neidlinger collected all the secondary supporting documentation on the 100 students we shipped them to the DOE as the Receiver's personnel requested. Yes, Dawn and Brian did not include campus policies and procedures because these were DCEH documents now in control of and accessible by the Receiver and after all, this was the Receiver's submission, not Save Ai's. Save Ai was simply helping the Receiver by providing the necessary secondary documents they could locate, since not all of these documents were available to the Receiver electronically

RECEIVER: Paragraph 8. Page 4.

"It should be noted that there was concern regarding Save AiLV's ability to communicate with DOE, given its propensity to use gmail accounts instead of .edu ones for email. DOE was reticent to send confidential and private information to gmail accounts. See Exhibit 4, June 11, 2019 email from Deana Echols. It is important to note that Ms. Echols informed Messers. Turbay, Rock and Ms. Batula that she understood that DOE had not received all the documents from Save Ai and could not begin its review of the second request for Title IV funding until all of the requisite documents were submitted."

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 21

RESPONDENTS:  Paragraph 8. Page 4.

The use of GMAIL accounts was necessary, as the onsite staff were in many cases
unable to access their .edu email accounts when they had been fired and who had
been invited back. Those that did have .EDU accounts continued to use them, but
those that didn't needed some way of communicating through email, which is
why GMAIL accounts were being used.

RECEIVER: Paragraph 9. Pages 4/5.

"Following DOE's review of the June submission, it approved $15,931 of the
$891,448 requested. The problem was that DOE found that more than 10% of the
records save Ai tendered were incorrect, thereby triggering a rejection of the
entire submission, save for the few complete and proper files found within the
100 submitted. The approval of those few files resulted in the release of the
$15,936.19 on September 6, 2019. See Exhibit 5, Letter from Eric Miles."

**RESPONDENTS: Paragraph 9. Pages 4/5**

The Receiver states the problem was that the DOE found that more than 10% of
the records Save Ai tendered were incorrect triggering rejection of the entire
submission and provides the DOE's rejection letter as Receiver's Exhibit 5.
Nowhere in the DOE's letter does it say the secondary files Save Ai tendered were
inaccurate. Page 3 of **Receiver's Exhibit R-5** states "Reason for Rejection: Pell
Grant funds requested on the student Data spreadsheet and form 270 were paid
to Ai Vegas prior to HCMII submission." This means that the Receiver was
submitting to collect Title IV funds on students the DOE had already paid funds
for. The Receiver was the one submitting the Data Spreadsheet and form 270. If
you recall, the Receiver was the one to send the funding request to the DOE in
which the 100 students were randomly selected from by the DOE. Save Ai wasn't
even involved until the DOE had already selected the 100 students at random,

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 22

as stated by the Receiver, and his use of **Receiver's Exhibit R- 3**. Therefore, the Receiver's initial funding request was what was flawed and inaccurate from the start. The DOE did not indicate that these 100 students were missing applications, enrollment agreements, transcripts, attendance records, etc. Not to mention, why would the DOE review these kinds of documents that Save Ai submitted (approximately 20 USPS boxes of paper records) prior to reviewing the Title IV disbursement records from the DOE first? Reviewing secondary student documents in advance of disbursement records would be a colossal waste of the DOE's time. (see **Exhibit 3**)

**In an effort to explain how this happened:** As the Receiver explains, DCEH completed a submission for Title IV funds on December 26, 2018 in order to milk as much federal aid revenue as it could before they walked away from the campuses and left them to the Receiver. The Receiver also explains that the DOE wouldn't release additional Title IV funds after the December26, 2018 disbursement until after January 14, 2019 when add/drop was complete, and the class rosters were locked in. So DCEH collected all the Pell grant money they could on December 26, 2019 prior to the winter quarter, because Pell grant is a form of Title IV that is not dependent on the number of credits a student takes. It's based on a household income level on the free application for federal student aid. Student loans on the other hand require a student to take a minimum of 6 credits. Therefore, DCEH didn't have time to successfully process and complete fund requests for all the student loans because that required waiting until after January 14, 2019. Then, as the Receiver states, on January 18, 2019 he took over and no other fund request were made until March 11, 2019 which was rejected for not following HCMII processes. So DCEH collected AILV Pell grants on December 26, 2018 through Centralized Financial aid (not campus financial aid officers) and then on January 18, 2019 the Receiver took over and began laying off campus and centralized staff in droves. Therefore, the Pell disbursements that DCEH received for AILV on December 26, 2019 were never reconciled in the student database by centralized financial aid employees as a result of the chaos, disorganization and

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 23

lack of staff that resulted from the appointment of the Receiver. As a result, the students appeared in the shared database as if they never received any aid while the DOE systems reflect that aid had already been paid. So, when the Receiver and his personnel tried to submit the funding request for the HCMII submission, they incorrectly included Pell requests for students who had already received Pell grants based on the DOE disbursement records and thus generating the 10% error threshold causing the whole submission to be rejected. You'll note in the Receiver's Exhibit R-2, that on March 21, 2019, Joseph Smith from the DOE even warned the Receiver's personnel about this potential error in bold print by stating:

> "Special Note: If you discover a need to resubmit records to COD on behalf of students for whom previously accepted COD records were cancelled by FSA and you have already drawn down Title IV, HEA program funds for these students, please add a new column to the Student Data Spreadsheet to identify those students and the net disbursement amounts. It is important to identify this information correctly and it is important that you not request funds again for these students. Please, therefore, omit these amounts from the amounts reported on form 270."

Save Ai did not attempt to reconcile any of these financial aid records prior to the HCMII submission or after the submission in the student database in order to avoid interfering with the Receiver's personnel by editing or altering any data within the Receiver's Winter 2019 term, especially for outstanding aid that DCEH may have previously collected. Additionally, Save Ai did not own the campus, nor did we want any appearance of impropriety or to be accused of anything nefarious by the Receiver.


RECEIVER: Paragraph 10. Page 5.

The Third Effort to Recover Title IV Money

"On August 21, the Receiver retained Global Financial Aid Services to clean up Save AiLV's student files.  The third request for funding was made on October 2, 2019. Once again, and per procedures, on October 15, DOE identified the 100

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 24

student files to be submitted. The Receiver's team passed along the list to Mr. (*Dr.*) Taylor at Save Ai on October 16. See Exhibit 6, October 16 email from Connie Adelman. Save AiLV sent the files for review and, on October 20, Global found extensive errors in Save Ai's documentation. See Exhibit 7, October 20, 2019 email from Cheryl Ayers. The Court is asked to remember that previous funding submission was rejected because of the poor quality of the student files. Global's review demonstrated that Save AiLV did nothing on the third submission aside from gather other equally poorly kept files, without making any effort to ensure that the records would pass muster."

## RESPONDENTS: Paragraph 10. Page 5.

The Receiver constantly refers to student files as Save Ai files when they were in fact AILV files and the data in question was collected under DCEH and under the Receiver (primarily the Receiver though). Save Ai did not own the school, its files, or operate the school during the winter 2019 term. The Receiver indicates he retained Global's services on August21, 2019 but that The Receiver did not submit another funding request to the DOE until October 15, 2019 and Global didn't complete its review of the 5 files until October 20, 2019? Why the time delay? What was going on? Could Global have spent those 2 months reconciling DOE's December 26, 2018 disbursement records to that of the shared student database to correct the Pell Grant errors notated by the DOE in the 1st submission but then conveniently choosing not to disclose this information? The Receiver then tried to use an email from Chyrl Ayers of Global Financial (**Receiver Exhibit R-7**) as proof that Save Ai provided inaccurate records. Again, Save Ai provided secondary documents from the AILV campus and shared student database that were recorded for a term and by employees that existed under the ownership and operational control of the Receiver. Save Ai did not collect or record the data in these documents as Save Ai did not operate the school until the following quarter. Regardless, the majority of the content of this email is Chyrl's personal summary of a phone conversation asking Dawn Batula and Brian Neidlinger

questions about the 5 students she reviewed so she could understand the school's policies and procedures at the time for such things as attendance, award estimates, and tuition charges. Since AILV /Receiver was a new client of Global at that moment she was unaware of how the school was operating and all of her questions had explanations. This is a far cry from a documented HCMII reason for rejection by the DOE. In fact, Chyrl even states repeated phrases in the email such as "I don't know if this will be a reject." Further, Chyrl's concerns around attendance, grades, and award estimates were not recorded by Save Ai. In fact, questions concerning attendance and grades were the result of the Online Division that operated for all Ai campuses under Ai Pittsburgh, so they didn't have anything to do with even the AILV campus. However, the Online division during this time period did operate under the Receiver and many grade and attendance issues were the result of the Receiver laying off staff and shutting down the Online division 2 weeks before the Winter 2019 term was supposed to end. Save Ai cannot speak on why online instructors employed by the Online Division gave certain grades or why the Ai system recorded online attendance as they did. Again, these are secondary DOE documents and you either have them or you don't and Save Ai completed their role by locating and providing these records that were recorded under the Receiver's operational control. Lastly, we want to reiterate that Chyrl's email does point out that 3 of the 5 students she reviewed on October 20, 2019 still had credit balances that had not been resolved which is a direct violation of one of the most fundamental rules of the DOE's HCMII submissions where advancing students credit balances via stipends prior to an HCMII submission as specifically stated by the Receiver in his closing brief (section 7) where he claimed to have paid $69,510.20 to AILV students on April 19, 2019. (see **Exhibit 3**)

We would suggest to the Court that "the buck stops..." with the Receiver.

The records referred to as 'Save AiLV records' were **not** Save AiLV Records, rather they all were DCEH records prepared by DCEH employees long before Save AiLV existed, and that Save AiLV owned NOTHING, Save AiLV was a management company commencing in that role on April 1, 2019. It was made clear to Save

AiLV, by the Receiver that everything to do with Winter Quarter 2019 belonged to him and him alone especially any money garnered from DOE for Winter Quarter. Save AiLV did not have any custody of or access to complete or accurate data or records with which to verify the accuracy of the physical files.

It should be noted that Save AiLV found the files we inherited – student files, faculty files, and so on to be in abysmal condition and strewn throughout the campus.  In May 2019 , immediately after discovering that the Campus was designated HCMII by the DOE, Save AiLV sought an expert in Financial Aid HCMII matters, to make certain that we were educated and that a third party expert could help us with our own Spring, Summer and Fall submissions, Save AiLV began conversations and negotiations with Global Financial Aid Services. In anticipation of being prepared to successfully submit for DOE funding for Spring, Summer and Fall 2019 Quarters once the Winter Quarter submission of the Receiver would finally be completed, Save AiLV contracted GLOBAL FINANCIAL AID SERVICES on August 05, 2019 (See **Exhibit 6** - June 1, 2019 letter, Fee Addendum and Wire Transfer to Global Financial for $5,190.00 for Part A).

The Receiver interrupted and transferred the Save AiLV contract to himself and used Global and Synergy to complete the Winter 2019 Quarter submission because that funding was going to be HIS.  Interesting that it didn't dawn on the Receiver earlier, to retain an expert Consultant in the field in which he clearly had no competence.

RECEIVER: Paragraph 11. Page 5.

"On October 21, Global refused to continue working on the project, indicating that the amount of work necessary to clean and correct the Save AiLV records was not within its capacities, given its resources."

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 27

**RESPONDENTS: Paragraph 11. Page 5.**

Again, we would like to point out to the Court that the files in question were NOT
Save AiLV files.  They were not created by Save AiLV.  Save AiLV did not enjoy full
chain of custody of those files and if Global Financial Aid Services, a 23-year-old
company whose sole work is processing DOE HCM2 submissions, had to fire the
Receiver because the DCEH files were so bad, why then was the Campus skeleton
crew expected to even attempt to 'fix' the mess we inherited?   All of the staff
personnel who either created or cannibalized those Winter Quarter files, were
long gone.  This was all the sole responsibility of DCEH and The Receiver.  Perhaps
they should have sent their "Team" to figure it out.  We were about educating the
students, keeping the doors open for them, holding everything together with duct
tape and trying to get ready for our own DOE submissions.

RECEIVER Paragraph 12. Page 5.

"The Receiver thereafter retained Synergy & Associates on October 29 to
complete the review and correction procedures. As Synergy started its work,
Batula was on medical leave and could not provide assistance. On December 6,
Save AiLV uploaded some (not all) of the documents Synergy needed to review.
Thereafter, 100 completed student files were submitted on December 21, 2019.
The DOE never responded to the final submission, other than to say it would not
be considered since the school was closed on December 20."

**RESPONDENTS:  Paragraph 12. Page 5.**

Receiver indicates Dawn Batula was on medical leave as if she was never present
for the 2 months' worth of collaboration with Synergy. I believe Dawn may have
been out sick for a week or a week and half but was constantly involved and in
communication with Synergy personnel throughout the entire process. Receiver
then states that on Monday December 16, 2019 Save Ai uploaded some (not all)
of the documents Synergy needed to review. This is a completely arbitrary date

and a ridiculous statement. Did we say on December 16, 2019 that we had provided all documents? Was that a due date or something? Who said we were done sending documents especially given our difficulties with internet networks and busted Xerox machines, not to mention we were closing out the Fall 2019 term at the time, Everyone seems to forget we were running a school at the same time we were trying to help the Receiver complete HIS HCMII submission for the 2nd time. We actually finished submitting all the documents for Synergy on Friday December 20, 2019 as we all had a conference call (Save Ai, Synergy, and Connie Adelman) at 3 pm to make sure everything was wrapped up so Synergy could submit later that day or the following day on Saturday December 21, 2019 (note that meeting was at 3pm on Friday December 20, 2019.  At 6pm we were informed that the Receiver had already CLOSED the school.) Ironically, if "Save Ai's" files were so riddled with errors and inaccuracies, why was Synergy able to complete their submission the day after we finished providing our documents? Wouldn't such horrible records require more than a day of review not to mention clean up? We are reminded again of the 2 months (August 21, 2019 – October 26, 2019) that are unaccounted for from when the Receiver hired Global until Save Ai was provided with the 100 students from the funding request. It seems like 2 unaccounted months would be a more appropriate timeframe for quietly cleaning up the inaccurate data in the shared student database to mirror that of the DOE disbursement records. Regardless, if Synergy was able to complete its submission the day after Save Ai completed uploading all secondary campus-based documents to Synergy, that would seem to indicate that these documents did not require review or correction as previously stated when discussing the 1st submission when we mailed the documents directly to the DOE. At any rate we got off the conference call with Connie Adelman that Friday December 20, 2019 and then prepared to leave for our Christmas break. 2 hours after getting off that call and with the HCMII submission now secured, students and staff began receiving an email from Connie Adelman that the Receiver was closing the school. Apparently, the Receiver was done using us as free unpaid labor to help him complete his HCMII submission that he was now ready to close the school and

kick everyone to the curb 5 days before Christmas. But at last, the Receiver's incompetence reared its ugly head again as the Receiver's 3rd attempt at an HCMII submission had failed because the DOE refused to review it since the Receiver had already closed the school

Would the Court consider that this paragraph proves the point we have been trying to make for 8 months in our filings with the Court, that this Receiver's precipitous and coincidental closing of our school the day before he Submitted to the DOE for Winter 2019 Quarter, caused him the loss of those funds that he told us on March 28, 2019 were due to arrive to him within 6 days. Doesn't this prove that he never intended to turn the school over to us rather all he focused on, for one entire year, was garnering those Winter Quarter 2019 funds for himself – the rest of us be damned? Well, he made a tactical and perhaps greed driven error and, in the process, completely destroyed the possibility of good people doing something good.

Further, the Lawyers referred to in Paragraph 14 of the Receivers Post Hearing Brief as, more than competent attorneys, warned the Receiver on September 19, 2019 in an attached letter (see **Exhibit 7** -Lacey Letter ). Attorney Lacey clearly spelled out that the Receiver should transfer the school to Save AiLV immediately because the DOE was never going to direct any money through the Receivership; but that they would release the Title IV funds to the Campus for Winter and the subsequent quarters that Save AiLV taught hundreds of students and graduated over 100. And that if he closed the school the Receiver would get nothing.

Save AiLV kept the school alive for 4 quarters and graduated in excess of 100 students – saving the U.S. taxpayers more than $8,000,000.00

The Receiver rolled the dice. Closed the School and got nothing.


RECEIVER: Paragraph 13. Page 6.

The Common Theme

"DOE made it abundantly clear that Save AiLV records and bookkeeping were substandard thereby requiring HCM2. The quality of Save AILV records was tested time and time again, through the course of submissions and it is the quality for those records that resulted in DOW refusing to fund the second submission. Save AiLV's untimely responses, and continued tender of files that required extensive cleanup by third party-vendors (Global and Synergy) led to the inability to resolve the Winter Quarter issue, and thereby precluded Save Ai from ever being able to submit anything for the following quarters."

## RESPONDENTS: Paragraph 13. Page 6.

How did the DOE make it abundantly clear that AILV (not Save Ai) records and bookkeeping were substandard and required HCMII? HCMII was directly related to the campus being in Receivership as the Receiver admits in section 6 stating that the DOE imposed HCMII a week after he was appointed, therefore January 25, 2019. In fact, the Receiver flat out states in section 4 "Messrs. Turbay, Taylor, Rock, and Kelly given their high-ranking status with the school, were aware that the DOE put the school on HCMII once the Receiver was appointed." Further, the Receiver quotes an email (**Receiver's Exhibit R-2**) (see **Exhibit 3**) from the DOE in section 6 stating the DOE's criticism of DCEH's mismanagement of Title IV credit balance funds under Argosy University. How does the DOE status change to HCMII on January 25, 2019 due to the appointment of a Federal Receiver (2+ months prior to Save Ai) and DCEH's previous mismanagement of Title IV credit balances make it abundantly clear that the Save Ai's records and bookkeeping we substandard and required HCMII? Someone please show us one piece of evidence that claims any document created by and provided by Save Ai was rejected by the DOE. It seems in the Receiver's own brief and exhibits the documented reasons for 3 DOE Title IV submission rejections were:

1. Not submitting according to HCMII processes in March because like Save Ai, Receiver personnel didn't realize AILV, like all Receiver Ai's, were now on an HCMII status,

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 31

2. Requesting Pell grants for students when Pell grant awards had already been disbursed by the DOE in August,

3. Submitting after the school had been closed.

None of those rejection reasons have anything to do with Save Ai and everything to do with the incompetence of the Receiver and his staff. Nonetheless, again we stress, even if the secondary records Save Ai had submitted were inaccurate, Save Ai did not record this data. Employees under the ownership and operational control of the Receiver during the Winter 2019 term recorded this data and Save Ai simply supplied it as directed by the Receiver. As far as the reconciliation of AILV financial data for this term, it was not Save Ai's place to edit or alter any financial data related to the winter term that was owned by the Receiver until there was a transfer of ownership and the Receiver had completed collecting any and all outstanding money due to the Receivership.

We remind the Court again that none of the Winter Quarter Files were in any way created by or belonged to Save AiLV.  All of this preceded us. ALL of the Winter Quarter 2019 files were created by, maintained by and held by DCEH and DCEH employees locally and corporately and that all of the errors in bookkeeping or filing or any other condition fall on the back of DCEH and the Receiver.

Another reminder to the Court as we noted in our previous Paragraph 10 Response, it was Save AiLV who first contacted, negotiated with and retained Global Financial Aid Services to work with us going forward as we would be preparing our own submissions for Spring, Summer, Fall 2019 Quarters, precisely because we inherited a mess as outlined in our Introduction to this document.

Additionally, when Global Financial Aid Services fired the Receiver, it was Save AiLV who provided the name and contact information for Synergy Associates.

SAVE AILV's bookkeeping and records started when SAVE AILV started managing the campus, which was on April 01, 2019. The submission in question, which was

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 32

for the Winter quarter from January to the end of March, was handled by the Receiver and DCEH.

RECEIVER: Paragraph 14. Page 6/7.

The Receiver Had Every Right to Expect Save Ai to Honor Its Commitments

"During the course of the Hearing, this Court inquired how the Receiver expected Save Ai to proceed with the Contract since the Title IV funding issue was in question. There are two parts to the answer to that question. First, When Save Ai negotiated the initial contracts, including the Managed Services Agreement that required it to pay all operational expenses, there was no funding request pending and the school was on HCM2. Save AiLV and its principals, including Messers. Turbay, Kelly, Rock and Taylor – knew that, yet did not include any sort of conditional language in the contract making Save Ai's obligation contingent upon the receipt of Title IV funding. When the Asset Purchase Agreement was negotiated, some four months after the initial contracts were signed, there was no Title IV funding in place and Save AiLV again, agreed to the unconditional obligation to pay the Campus' operational expenses. Second, the Receiver requested and received, repeatedly, assurances from Save AiLV attorneys that financing was in place. See Hearing Exhibits 15 and 16. The Receiver was entitled to rely on the representations of Save AiLV's more-than-competent counsel on the subject and at no point did any of those attorneys say "You know, this deal doesn't work without Title IV funding, right?""

**RESPONDENTS: Paragraph 14. Pages 6/7.**

What's good for the goose is good for the goose is good for the gander.

If the Receiver can rely on representations, then we should also enjoy that same right.

The Receiver and his counsel, during the meeting on March 28, 2019 and subsequent signing of the MOU and TSA had repeatedly assured SAVE AILV that

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 33

Title IV had already been submitted, and that they were expecting to receive
funds in "The next few weeks". He represented that all was well and that all of the
Student Stipends had been paid, that he was in control an everything was fine.
Save AiLV relied on that and other representations, understanding that Title IV
funding was essential to operating a postsecondary institution, which is common
knowledge and common sense that tuition receipts are the driving force of
maintaining an educational institution, since 70% of tuition receipts at the Art
Institute of Las Vegas have historically come from Title IV funds. Therefore, it was
SAVE AILV's understanding that funds would be arriving shortly and would be
sufficient to cover all expenses at the time.  To keep repeating in different
verbiage that it was our or anyone's belief, understanding or obligation to fund
something OR anything that we did not own, is delusional.

Not once during any negotiations between January 25 and March 28, 2019 did the
Receiver, his brother Charlie or their attorneys, with whom we spoke almost daily
and often multiple times daily, did any of them say: "You know that this deal is
not dependent upon ever receiving DOE Title IV tuition funding, right?

Surely, not.  That's how nonsensical it all sounds, unless perhaps it was a trap?
And that could be why there was an EMERGENCY Motion to have the Court
approve the APA. We just don't know.

Those representations included receiving a college Free and Clear.  Licenses,
Accreditation, Title IV, Department of Veterans Affairs all were to be in perfect
order yet they were all in shambles.  Yet promises and representations that
everything was fine, that the Receiver was in control and everything would fall in
place.  He promised the faculty and in writing many times that they would be paid
"next Friday".  Here we are 21 months later.

On the afternoon of December 20, 2019, while William Turbay was driving to
California for a dear friend's funeral, at 4:30 in the afternoon (3 days after ACICS
refused to renew AiLV Accreditation) Mark Dottore called William to tell him that
he had the Accreditation issue under control, not to worry.  Less than 2 hours

later faculty and students began receiving emails that the Receiver had closed the school. Only cowards and liars and bottom feeders act like that. Do we think it was a spur of the moment decision, NO. We believe it was a die that had been cast long ago when he thought he could taste the $1,600,000 he was expecting from Winter Quarter Title IV funds.   If he had been paying attention at all to the DOE, he wasn't going to receive any funds then he was playing the classic mob game of:  "If I can't have it, then you can't have it either."

At that same meeting on March 28, 2019, in the presence of Save AiLV  members William Turbay, Lisa Mayo De Riso, Tim Kelly as well as a local Physician, Vu Luu, MD, a consultant Richard Rock a number of lawyers and the Receiver and The Receiver's brother Charlie Dottore, The Receiver requested a LOAN of $154,000 to defray the cost of a WINTER Quarter rent payment and a WINTER Quarter payroll payment.

This loan is memorialized in the Managed Service Agreement with loan payment tied to Title IV funds. Which was represented to Save AiLV was forthcoming shortly because the submission for Winter Quarter had been completed and upon receipt of those Title IV funds and that:

> "The Receiver shall repay the Loan within (7) business days from the date the Receiver receives from the DOE relating to Title IV Funds for the prior quarters. AiLV shall be entitled to all Title IV Funds that the Receiver receives for the University as well as any and all other school related income on a go forward basis." (See **Exhibit 8**  - MSA Pages 1 and 7 highlighted).

NOTE:  Who were the lenders?

| Lenders: | WILLIAM A. TURBAY | $10,484.19 | by wire transfer 3/20/2019 |
|---|---|---|---|
| | TIM KELLY | $50,000.00 | by wire transfer 4/01/2019 |
| | Vu Luu, M.D. | $100,000.00 | by wire transfer 4/03/2019 |

(See **Exhibit 9** - loan wire transfers)

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 35

These lenders to the Receiver are some of the very same people being accused of lining their pockets with $100,000 while teachers were not getting paid.  Isn't it a bit ironic that those same people were instrumental in paying the faculty OUT of their own pockets?

The Receiver withheld substantial, devastating and crippling information from Save AiLV which essentially voided all agreements that Save AiLV would never have signed.


RECEIVER:  Paragraph 15. Page 7

"What the Receiver did not know, or have any reason to know, was that Turbay, Rock, Taylor and Kelly took nearly $100,000 and put it in their own pockets (as admitted during the hearing, see also Hearing Exhibits 4, 6, 6, 7, and 13 (*mis - numbered*). That they paid themselves, but not the school's teachers, is simply inexcusable. Why would Respondents be entitled to put money in their pockets while the Receiver was advancing expenses (like rent) on Save AiLV's behalf?"


**RESPONDENTS:  Paragraph 15. Page 7.**

There are no facts in the Receiver's Paragraph 15.

Save AiLV informed the Receiver on numerous occasions that there was financing in place – IF AND WHEN The Receiver turned the school over to AiLV and/or when the Receiver presented written assurances to the banks and or to lenders and investors that the bank and/or lenders and/or investors would be guaranteed first position to be repaid upon receipt of Title IV funding.  He refused.

At the hearing the Receiver's counsel made some fuss about one of the potential investors was a firm named Alchemy.  Yes, Alchemy proffered an offer which the faculty discussed at length and Decided it was not in the best interest of the school, going forward.  However, had the Receiver (the owner of the school)

discussed that offer, which he clearly was aware of, with Save AiLV perhaps things might have been different. (See **Exhibit 10** - finance letters)

Regards the "diversion of funds"

There was no diversion of any funds to anyone. This sounds like projection to us given the excoriating article in the New York Times dated June 21, 2019, wherein, among other things, the Receiver submitted requested fees of $1.6 million and $41,000 in reimbursable expenses for four months work. And among the time sheets submitted to this Court there was a time sheet entry of May 1, 2019 for Charlie Dottore saying: *"MAKE SOMETHING UP FOR CHARLIE"* (see Exhibit 11 - NYT Article Page 4), as well as another report that Mark Dottore, Charlie Dottore and Chuck Nemer, Esq. spent $6,000.00 on a trip to Las Vegas for one day to *"negotiate a group of suitors who were trying to buy AiLV"* THAT WAS US ! (see **Exhibit 11** -NYT Article page 3). It was during that very visit that they were borrowing money from teachers to pay ourselves. Despicable irony.

First of all 2 of the Respondents (Turbay and Kelly) LOANED the Receiver over $60,000.00 to make WINTER Quarter rent and payroll payments. Translated that means Faculty paid Faculty out of their own pockets, when WINTER Quarter payroll was the responsibility of the Receiver. A friend, a local physician who wanted to help save the school for the local community also LOANED the Receiver $100,000.00 for the Receiver to make Winter Quarter payroll payments.

Richard Rock, a consultant and independent contractor was retained to manage the day to day operations of the Campus to ensure that what was needed for the benefit of the students was established and maintained, by returning calm and peace at a campus, which was all but a war zone when he arrived on the Campus. There was disruption, anger, fear and outrage in the hallways. Mr. Rock was also tasked to prepare operational plans for the new school. Mr. Rock went to the Campus on February 1st just to look around and never left. There was too much to do immediately since there was one administrator only and no staff at all, only student workers doing filing and accessing way too much confidential information about students and faculty. Those same student workers, in broad daylight, were

walking out the front door with computers, audio visual equipment and supplies. No one was questioning them and no one was stopping them. There were no funds on the campus. The Campus Director has a debit card of sorts for incidentals. Mr. Rock began fronting his own money for needed supplies for faculty and students. The Court will see in Receiver's Exhibit R-13 line items of checks made out to this Consultant marked "Invoice". (see **Exhibit 12** – consultant checks). Those invoices were reimbursement invoices, over time, for the money that was Mr. Rock 's own funds (over $11,000) which he used for campus expenses, including hiring janitors and security people.

Note that Mr. Rock's contract began on February 1, 2019 and he only began receiving partial installments payments on his contract on June 1, 2019 (4 months later), as also noted in **Exhibit 12**. Mr. Rock still has an outstanding balance of $8,900.00 of his own money fronted in behalf of the school during the course of the year and a balance of $51,000 due on his contract.

Mr. Rock worked 6 days a week from morning until night, but he was never alone. Teachers were teaching and the staff – a skeleton crew of 8 wonderful people doing yeoman's work of a least 35 people who were fired – all of whom worked early mornings and into the nights and six days a week – without pay and still asking 'permission' to go to a doctor's appointment. It is ludicrous that the Receiver has made objection to what these people are to be paid, that they were given raises! They all should be paid interest on their rate of pay since it is now 21 months since the have been paid anything.

There were NO funds with which to operate the school on a day to day basis until April 23, 2019 when the Campus began receiving some veteran's tuition payments. Some – because the Receiver was also receiving Veteran's tuition payments. The campus received approximately $344,000.00 in partial Tuition from the Department of Veterans Affairs during Spring, Summer and Fall Quarters. 2019. The Receiver received approximately $337,081.68 during Spring and Summer Quarters 2019. Despite ravings to the Court Doc.#577 of 5/29/20 PageID 13219, which states:

" *The Receiver did not collect funds from the Veterans Administration, (which Save AI collected without notice to the Receiver...* "

(See VA funds Spring and Summer reconciliation **Exhibit 13)**

As time passed and the faculty and staff were not being paid for weeks, then months on end some faculty and staff same forward seeking assistance. Times were getting tougher and tougher for everyone.  Many of the faculty had other jobs, others had another income from a household member – none of those faculty members asked for anything other than "when are we getting paid?"

But there were over 20 members of the faculty and staff whose only income was derived from the school.  Single moms, single dads, older faculty trying to survive on social security alone, grandmothers raising grandchildren, families with multiple children with one income, or an 80 year old Librarian living on Social Security a relative alone and so on.

Some faculty and staff simply could not remain with us any longer without pay. Which meant we had to ask the remaining unpaid teachers to take on more classes. And we had to find other teachers and tell them that we didn't know when they would get paid, but we were all hearing from the Receiver that payroll would be coming SOON.  As the Court knows, it never came.  Several former teachers, great teachers who fled during the horrific time of mismanagement by DCEH and EDMC before them, came back with the hope of becoming part of something new and exciting.

Approximately $119,000.00 over 8 months was advanced on an individual emergency basis to help faculty and staff pay their rent, car payments, insurance payments, etc.

ALL of the faculty and staff who remained worked above and beyond with dedication and without any rancor.  They took on extra duties, William Turbay, for example.  A part-time Adjunct Instructor with a schedule of 3 classes per quarter was suddenly teaching 7 classes along with all of the duties and responsibilities of

managing the effort to save the school, find lenders and investors, put out fires on a daily basis, and a million other things 6 and 7 days a week. Tim Kelly a once full-time teacher was suddenly the only IT person on the campus and still was teaching.  The IT personnel left the school amidst the tumultuous time of the mismanagement and disarray of DCEH, and they were never replaced. Student computers were not working, services were being terminated and Tim Kelly, an IT wizard stepped right in and also worked tirelessly to keep everything going so the teachers could teach and the students work would be uninterrupted against all odds. (See **Exhibit 14** - Declaration of Tim Kelly)

Dr. Taylor who had been fired in October 2018 graciously agreed to come back as the Academic Dean, in addition to be the Interim President.  Those two jobs had him also working 7 days a week often.  Because of the messes DCEH and the Receiver caused with the academic and culinary and interior design accreditors, as well as the state and DOE regulators in the past, Dr. Taylor, without benefit of a staff became a full time Dean, a full time President and a full time Compliance Officer yet the Receiver has voiced objection that Dr. Taylor deserved the raise that Save AiLV – the Management Company of the school awarded Dr, Taylor and other loyal, stalwart, dedicated hard working people .

These three people along with 18 other people were dependent upon AiLV as their sole source of income and were entitled to emergency assistance like anyone else who came forward.  No one was exempt from or immune to experiencing tough times.

We all helped each other. We needed to keep the faculty intact to teach our students and help them complete the education they had been working so hard doing for a number of years. We helped whomever we could, when we could.

We kept food in the kitchens of the Culinary School and creatively made sure to get their vital equipment working, local people came to the rescue and repaired major equipment like 10 multi-ton HVAC roof units which 'died'. We were given

estimates of $11 – 24,000.00, but a local HVAC specialist repaired them all for the price of parts of $1,000.   It was not easy.

No one was diverting funds or filling their pockets. The Campus received Veterans Tuition funds, some revenue from the Culinary school student run restaurant and some cash paying students tuition funds (though the lion's share of cash payer tuition funds went directly to Tuition Options and ultimately to STUDIO, thus the Campus never saw those funds).

Attached the Court Will find as **Exhibit 15** explanations on each of the Receiver's Exhibits R-4, R-5, R-6, and R-7.  These are the checks the Receiver attached as evidence for the October 21, 2020 Hearing.

Without availability to the actual records we estimate the Campus received approximately $450,000 +/- between April 23 and December 10, 2019. That amount is 10% of what was anticipated from Title IV funding ($4,535,050.00) (see **Exhibit 16**). These funds would have been more than sufficient to retire the loans we were anticipating and to build the school up again.

The school was not failing as they would have the court believe. There was and would be plenty of money to operate the school and to grow it back to health. The only reason it had been failing was because there were people at EDMC and DCEH who actually filling their pockets. When campus funds were conglomerated together in one huge pot. Greed and mismanagement win out every time.


RECEIVER:  Paragraph 16. Page 7.

Conclusion

" This Court has, repeatedly, held the Receiver to contracts he or DCEH signed.

Accordingly, it is not only appropriate to hold Save AiLV to the same standard, but it is proper to hold Messers, Turbay, Rock, Taylor and Kelly in contempt as they admitted they diverted money to themselves and left Save Ai's teachers and

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 41

creditors with meaningful payments. Save AiLV, Turbay, Rock and Kelly repeatedly misrepresented their ability to conclude the sale transaction, causing this Court and its Receiver to waste countless hours, and more that $1 million. Had Respondents been truthful from the start, the school would have closed in March 2019, and all concerned could have directed their efforts to other, more fruitful, endeavors."

**RESPONDENTS: Paragraph 16. Page 7.**

We have answered all of this concluding paragraph of the Receiver throughout this document.

Save AiLV absolutely had the ability to conclude the sale but the Receiver would not cooperate. He wouldn't cooperate with the back and various lender who were will but never without assurances of first position with Title IV funds receipts.  We presented a plan to the Receiver to transfer title, allow the Campus to prepare with a third-party expert, the DOE HCM2 submissions and "settle up later".  There was a great chance that the DOE would have funded the Campus, even on an expedited track, but they certainly were not going to give the Receiver any money, just like the State of Nevada was never going to renew the State license to the Receiver.  But arrogance and greed are really quite destructive.

If the Receiver had been truthful from the start, the school would be in the hands of the faculty and we would have had all the help we needed from this local community.

RECEIVER: Paragraph 17. Page 7.

"Finally, since Save AiLV did not itself file any response to the Receiver's motion, and offered no testimony during the course of the Hearing, The Receiver asks that the motion be considered unopposed against the entity and judgment be granted in the Receiver's favor accordingly."

Case: 1:19-cv-145 DAP
November 23, 2020
Page: 42

RESPONDENTS: Paragraph 17. Page 7.

The Court is well aware that we filed a Response and a Supplement to that Response. (See **Exhibit 17**). We are the entity. We have always expressed that in every filing be bring to the Court for consideration. There are scores of newspaper articles and television news clips that attest to the fact that Save the Art Institute of Las Vegas, Limited was formed by the Faculty and Staff and Administration of the Art Institute of Las Vegas as a legal entity into which the assets of the school would be transferred at the conclusion of the purchase and the entity name appears of the filings. William Turbay testified in behalf of Save the Art Institute of Las Vegas, Limited in his capacity as Manager of the Nevada Limited Liability Company at the Hearing on October 21, 2019.  See Declaration of Lisa Mayo De Riso – **Exhibit 18**)

We are educated people interested in educating other people; but we are trapped in this game being played to rack up fees which will result in a behemoth package of time sheets, presented to the Court - for nothing.

Had the Receiver done his work or hired competent people to surround himself with, he would have had a successful DOE HCMII the first time, he would have conducted the proper close-out audits and so on. The teachers would have been paid, the school would have sold, lenders would have already been paid.

Finally, We respectfully ask the Court to deny the Receiver's Motion that we be held in Contempt of Court, deny the Motion that we be sanctioned and deny the latest twist that the Motion be deemed unopposed as to the entity.

Instead let's follow the path clearly outlined during this Court's Hearing on August 14, 2020 with the Department of Education, the Department of Justice, the Receiver and the Court as to what is required to encourage the DOE to release funds sufficient to pay outstanding expenses of the Campus, so that we can get our teachers paid what they are owed and what they earned, as well as all other expenses paid out of pocket, by anyone, in behalf of AiLV in 2019.

Case: 1:19-cv-145 DAP
November 23, 2020
Page: _____

Respectfully submitted,

Dr. Daniel Taylor, Ed.D,

William Turbay

Tim Kelly

Richard Rock

Brian Neidlinger

Chef Michelle Vietmeier

Mobile: (407) 222-8842
Email:   max.taylor@mindspring.com
Post Office Box 231504
Las Vegas, Nevada 89123-9998

EXHIBITS  1-18



**PRIORITY MAIL**

GUARANTEED ★ TRACKED ★ INSURED

Label 127R, May 2014

UNITED STATES POSTAL SERVICE®
For Domestic and International Use

...ecified for domestic use.

...ents include up to $50 of insurance (restrictions apply).*

® included for domestic and many interna

tional insurance.**

...rnationally, a customs declaration form is

over certain items. For details regarding claims
...mestic Mail Manual at http://pe.usps.com.
...ail Manual at http://pe.usps.com for availability and
...e.

**TE BOX**

0UBC04

XH CLE

L: 00004
0 LASMSW 05
0 11/23/20

5EDV0UBC

ED

67

4113

---

**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

EJ 517 9

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE ( ) 402 222-8995


SAVE the ART Institute LV
P.O. BOX 231504
LAS VEGAS, NV
89123-9998

**DELIVERY OPTIONS (Customer Use Only)**

☐ **SIGNATURE REQUIRED** *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
☐ 10:30 AM Delivery Required (additional fee, where available)*
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE ( )

HONORABLE JUDGE PARKER
c/o JACLYN DARRAH
US DISTRICT COURT OHIO - East Dist
801 W. SUPERIOR AVENUE
CLEVELAND, OHIO

ZIP + 4® (U.S. ADDRESSES ONLY)
4 4 1 1 3

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

 **PEEL FROM THIS CORNER**

---

**PRIORITY MAIL EXPRESS®**




**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.      Feder

**ORIGIN (POSTAL SERVICE USE ONLY)**

| | |
|---|---|
| ☐ 1-Day  ☐ 2-Day | |
| PO ZIP Code 89199 | Scheduled Delivery D (MM/DD/YY) |
| Date Accepted (MM/DD/YY) 11/24 | Scheduled Delivery Ti ☐ 10:30 AM ☐ 12 NOON |
| Time Accepted 2:15 ☐ AM ☐ PM | 10:30 AM Delivery Fee |
| 11/23/20 | |
| Special Handling/Fragile $ | Sunday/Holiday Prem $ |
| Weight 2 lbs. TV ozs. ☐ Flat Rate | Acceptance Employe |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| | |
|---|---|
| Delivery Attempt (MM/DD/YY)  Time ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY)  Time ☐ AM ☐ PM | |

LABEL 11-B, MARCH 2019   PSN 7690-02

---

**RECEIVED**

**NOV 24 2020**

June 2020
5 x 3.375 x 13.625
3.5 x 14.125
: 0.343

Clerk of Court, ...
Ohio Northern District - CLEVELAND



**PRIORITY MAIL EXPRESS™**

GUARANTEED ★ TRACKED ★ INSURED

