# EXHIBIT 1

DECLARATION OF BRIAN NEIDLINGER

My name is Brian Neidlinger and I was the Registrar for the Art Institute of Las Vegas (AILV) from April 1, 2019 until the school closed on December 20, 2019. Prior to AILV, I was also the Registrar for the Art Institute of Hollywood where I worked for 8 years until I was let go by the Receiver and the campus was closed. At AILV I was one of only 2 people from Save Ai who was intimately involved in the HCM2 process at the AILV campus and I possess a unique background knowledge of Ai operations, Registrar record keeping, and a staff perspective under the Save Ai umbrella. Since the Receiver's main premises in his closing statement is that Save Ai records were the sole reason that prevented Title IV funds from being requested, I feel I have important input to contribute. In addition, after reading the Receiver's closing statement and exhibits I find it extremely necessary to correct the record with this court based on actual facts and my first-hand experience in the process.

### Employee Pay

Before I address the HCM2 situation that the Receiver is incorrectly blaming on Save Ai, I would first like to correct an unforgivable and offensive lie included in the Receiver's closing statement. Just prior to the Receiver's conclusion in the closing statement, the Receiver accuses, with misleading evidence, that Save Ai leadership lined their own pockets while neglecting to pay the schools teachers and calls such action inexcusable. I would agree if this statement had been even remotely accurate. Rather, this statement is downright false, and I know that to be a fact as myself and several other faculty members were receiving advancements on our salaries from Save Ai and the Receiver knows this as well since he has copies of the checks from the Save Ai bank account. Obviously though, this fact has been omitted since it doesn't make as good of a narrative in their motion to hold Save Ai in contempt of court. Nonetheless, there were a number of us who had no other source of income and without receiving advancements from Save Ai would not have been able to afford to remain at the campus let alone put food on the table. In my particular situation, I had relocated my entire life from Los Angeles to Las Vegas in order to help save this school. The Receiver accuses the leadership of Save Ai of lining their pockets with $100,000 for 4 people over the course of 9 months without noting that if you split this amount up between the 4 people the Receiver names over the 9 months they operated the school, that comes out to be $694.44 per week per person, which is less than what the Federal government paid weekly to supplement unemployment during the current pandemic and is also less than what was advanced to me on a weekly basis. So, does that mean I lined my pockets too by actually working for far less than the money I was owed for as long as I could because the Receiver couldn't get out of our way so we could generate revenue at AILV? Save Ai did everything they could to keep that school running as long as possible with a skeleton crew and a shoestring budget. If they were lining their pockets, they would not have spent what little revenue they had to fix up the school, keep it clean and even provide a graduation ceremony for students who graduated both under the Receiver and Save Ai. AILV looked like a brand-new school under Save Ai. Such an accusation from someone who is charging millions in fees to completely mishandle this entire Receivership is beyond belief. My understanding was that the point of a receivership was to protect a school's assets so they could be sold off prior to bankruptcy and almost 2 years into this receivership I believe all that has been able to be accomplished was the sale of the law school for a whole $1. Every other campus has been closed and DCEH employee health insurance claims remain unpaid while the Receiver rakes in enormous fees and wastes everyone's time and money with

these incessant motions and hearings to attack Save Ai rather figuring out a way to get us all paid our due compensation. This is quite the track record to be paid millions for so forgive me if I can't silently swallow the lies that Save Ai lined their pockets and made no effort to pay faculty and staff when they did everything they could with what little they had for the good of the school and its students which is far more than I can say for the Receiver. If Save Ai had wronged their faculty and staff so badly then why are so many faculty and staff writing letters and supporting Save Ai in these ridiculous hearings and constant motions? Why has the Receiver not received and presented a single document from a faculty or staff member of Save Ai defending his ridiculous narrative of Save Ai. The reason is that all of us who were involved know the truth, know what happened, know who constantly got in the way and know who kicked us all to the curb 5 days before Christmas after he thought he could finally collect the winter 2019 Title IV funds until the DOE pointed out his disastrous miscalculation.

### HCM2

That brings me to my firsthand experience in the two HCM2 submissions that Save Ai participated in. According to the Receiver's closing statement, Save Ai was apparently the sole reason the Receiver tried and failed 3 times to collect the winter 2019 Title IV funds. At one point on page 6 of the Receiver's closing statement he even goes as far as to blame Save Ai for AILV being on HCM2. The Receiver states, "DOE made it abundantly clear that Save AILV's records and bookkeeping were substandard thereby requiring HCM2." This is just one of many false statements in the Receivers closing statement where he himself contradicts his own lies within his own closing statement and submitted exhibits. For example, on page 2 of the Receivers closing statement the Receiver states, "Messrs. Turbay, Taylor, Rock, and Kelly (collectively, "Respondents"), given their high-ranking status with the school, were aware that DOE put the school on HCM2 once the Receiver was appointed." The Receiver was appointed on January 18, 2019 which was before Save Ai had anything to do with AILV let alone started operating the school. Save Ai had nothing to do with the school being on HCM2. The Receiver also states on page 2 of his closing statement in reference to the DOE's HCM2 decision that the DOE actually criticized DCEH (not Save Ai) for mismanagement of student Title IV credit balance under Argosy. Then on page 3 the Receiver states the DOE put the school (along with all other Receiver Ai campuses) on HCM2 January 25, 2019, a week after he was appointed. This HCM2 status date is then confirmed by the Receiver's exhibit 2 which is an email conversation between the Receiver's personnel and Joseph Smith from the DOE. In this email conversation, Mr. Smith reminds Deana Echols of the Receivership on March 21, 2019 that AILV was on HCM2 as of January 25, 2019. Nowhere does the DOE site Save Ai's record keeping as the reason that AILV was required to be on HCM2 status, let alone abundantly make such a statement. This email conversation also illustrates how the Receiver's own staff didn't even know AILV was on HCM2 two months after they were notified by the DOE but yet the Receiver is also falsely arguing how Save Ai had to know AILV was on HCM2 due to their high-ranking status at the campus. Apparently, the Receiver considers a faculty member to possess a high-ranking status. Nonetheless, the Receiver is trying to argue to this court that Save Ai should have known what his own staff didn't even know when they were the ones directly notified by the DOE. Yet another ridiculous conclusion and argument being presented in the Receiver's closing statement.

The bottom line and fatal flaw in the Receivers argument that Save Ai's files were so poor and inaccurate that he couldn't satisfy the DOE's HCM2 requirements is the fact that the term in question that was being audited was the winter 2019 term which ran from January 2019 until the end of March 2019 and was prior to Save Ai taking operational control on April 1, 2019. Any records recorded for the

winter term were made prior to Save Ai and by staff members that were operating under both DCEH and the Receiver's operational control. However, for this timeline it would be primarily under the Receiver's control rather than DCEH's. These were not Save Ai's records as the Receiver states repeatedly, they were AILV records that Save Ai simply provided in effort to help the Receiver complete his submission for his term because Save Ai could not start their own submission until the Receiver completed his submission for the prior winter quarter per DOE regulations.

The Receiver also fails to distinguish who was responsible for which kind of records and instead just makes sweeping blanket statements about Save Ai's records. Make no mistake about it, the HCM2 submission was handled and run by the Receiver and his staff and not Save Ai. As the Receiver states in his closing statement on page 4 that he was the one to submit the funding request, his personnel were the ones communicating with the DOE as illustrated in the Receiver's Exhibits 2, 3, and 5. Once the funding request was submitted, the DOE would then select 100 students at random from that list for audit and the Receiver had to submit an exhaustive list of documents to be audited on all 100 of those students. Part of those documents include high-level records such as a student data spreadsheet, form 270, and proof of student credit balance payments via bank receipts and endorsed and deposited checks just to name a few. These high-level documents were being handled by the Receiver's staff as Save Ai would not have access or authority to collect such documentation as they were not the owners of the school or the Receiver's bank account and again not responsible for the winter 2019 term. Other secondary documents that were also required by the DOE included documents such as student applications, student enrollment agreements, high school transcripts, campus transcripts, accounting statements, attendance, and financial aid plans just to name a few. Most of these secondary documents were necessary to prove that a student actually qualified to receive financial aid. But since not all of these documents were uploaded and accessible in the shared digital imaging database, the only way to locate them would then be in the student's physical files maintained at the campus. Nonetheless, many of the documents were uploaded to the shared digital imaging database and many of these documents were simple printouts from the shared student database. It is these secondary documents that Save Ai was requested to provide for the Receiver. These secondary documents by their very nature tended to be unable to be edited. As a campus, you either have them or you don't, especially when you are working on a previous term that has long since been completed. For example, a student's high school transcript can't be changed or corrected by Save Ai staff. Either you have the transcript, or you don't. It would be very difficult for Save Ai to provide these documents in an inaccurate fashion let alone correct them. These documents would either be missing or improperly filled out or recorded by prior staff at the time they were collected, and Save Ai was able to locate all requested documents. This point can be illustrated again using the Receiver's own exhibit 7 which is an email from Chyrl Ayers of Global Financial Services. The Receiver was trying to use this document to show how flawed the "Save Ai's records" were. This email was Mrs. Ayers summary of a phone conversation where she had numerous questions regarding policies and procedures regarding how the records were kept since AILV was a new client for her. You can see she is questioning myself and financial aid officer Dawn Batulla about how attendance was recorded, how grades were posted and how financial awards were estimated. Again, Save Ai didn't record this data, we are just providing what was previously recorded prior to Save Ai. Chyrl questions certain grades instructors awarded based on attendance and even questions the high school graduation date a student supplied on his admissions application versus what is in the system as if a student couldn't accidentally mix up his/her graduation date when completing an application versus what his/her High School lists on their transcript. The larger point being that these are secondary documents

and that Save Ai would not have recorded nor could we have corrected them. We simply supplied them for the Receiver to complete his submission. Was Save Ai supposed to start fabricating attendance or grades after the fact? It should be noted though that Chyrl did observe on her October 20, 2019 email (Exhibit 7) that 3 of the 5 students Global reviewed were showing credit balances which is an actual and correctable violation of one of the most basic requirements of HCM2. The Receivers own Exhibit 2 from the DOE goes into extensive detail explaining how all credit balances must be paid in advance. It should also be noted that these credit balances still existed after the Receiver bragged about advancing $69,510.20 in stipends for student credit balances on April 19, 2019 on page 4 of his closing statement. It would appear that perhaps the Receiver may have inaccurately missed a few student stipends or was this perhaps Save Ai's fault too?

## 1st Failed HCM2 Submission

The Receiver then goes into detail on the 3 different failed submission attempts in the course of a year to try and collect the Title IV funds for the winter 2019 term and blames Save Ai's records for why they all failed. This is yet another completely false conclusion and argument by the Receiver and it should be noted once again that these are AILV records, not Save Ai's records even if they actually were the cause of the rejections. The first failed HCM2 attempt was actually on March 11, 2019 according to page 3 of the Receiver's closing statement. Reading about this submission was actually surprising in that I was unaware this submission even occurred as it was prior to Save Ai operating the school. However, yet again the Receiver is still somehow blaming Save Ai for its failure. It would appear that perhaps he is misunderstanding his own exhibit to draw such a conclusion. As previously referenced, the Receiver's Exhibit 2 is an email conversation between the Receiver's personnel and the DOE. The email conversation was initiated because the Receiver's personnel was inquiring as to why this submission was rejected. Within this email conversation, there is a screenshot provided of the DOE's COD system showing the funds request as rejected with a description that reads "program compliance rejected this student for missing documentation." It is this screenshot the Receiver quotes in his closing statement. It would appear that the Receiver is misunderstanding this message and didn't completely read through the email chain he provided for this exhibit. The Receiver is taking this screenshot and trying to use it to add to his narrative that again Save Ai is at fault as they are missing documentation again. However, if you read through the email conversation you will discover what I referenced earlier above that the Receiver's personnel didn't even realize AILV was on HCM2. Michael Frola from the DOE explains the reason for the submission rejection to the Receiver's personnel by stating, "The request for funds must come under HCM2 submission process." Therefore, the Receiver has just proven his own argument and supporting evidence to be false. The submission was rejected because it was not submitted according to the now required HCM2 requirements because the Receivers personnel didn't realize AILV was on HCM2. Therefore, the screenshot that he is referencing for missing documentation is actually referring to the missing and required HCM2 documentation and not anything having to do with Save Ai or even the AILV campus. A theme of incompetence that would repeat itself time and time again.

## 2nd Failed HCM2 Submission

For the 2nd HCM2 submission, I was actually involved since this was the first real attempt at satisfying the HCM2 requirements. The Receiver explains in his closing statement on page 4 he submitted the initial funding request to the DOE where they selected the 100 students within it to audit. The list of the 100 students was then provided to Save Ai so we could gather those secondary documents as previously

described. Once collected we mailed all these documents to the DOE as they required and as the Receiver's personnel requested. These secondary documents consisted of thousands of pages. At no point did the Receiver's personnel seek to review all these documents and nor should they have. However, if they had wanted to, much of the same information was readily available in the shared student database for their review. As previously established, these are secondary documents that typically a campus is either going to have them or not. These are documents proving that a student did meet the minimum requirements to be a student who was eligible for Title IV funds such as an official high school transcript proving the student graduated from high school. They aren't typically going to require editing or clean-up. These documents don't reflect what kind or how much of Title IV aid the school is trying to collect for the student because that data is part of the higher-level records the Receiver's personnel were handling in the initial funds request. To the Receiver's point in his closing statement, Dawn and myself did not include the DOE required campus policies and procedures because we were only asked to provide the secondary student paperwork by the Receiver's personnel and these policies and procedure were from DCEH and were now owned and accessible by the Receiver. The Receiver brings this up to support his missing documentation narrative but in reality, this was easily fixed and quickly resolved by the Receiver's personnel sending one simple email to the DOE with these policies attached.

The results of this 2nd submission were provided by the Receiver in Exhibit 5. The submission exceeded the maximum 10% error rate triggering a rejection of the remaining submission and only allowing the approval of $15,931.00. Again, the Receiver blindly blames Save Ai with a wide blanketed false statement that the errors were due to records that Save Ai tendered to the DOE yet nowhere in the DOE's letter does it say the secondary files that Save Ai tendered were inaccurate. Page 3 of exhibit 5 provided by the Receiver states "Reason for Rejection: Pell Grant funds requested on the student Data spreadsheet and form 270 were paid to Ai Vegas prior to HCM2 submission." This means that the Receiver was trying to collect Title IV funds on students the DOE had already disbursed funds for. As previously noted, it was the Receiver who submitted the initial funds request, not Save Ai. And it is this funds request that the DOE used to select the 100 students to audit. Save Ai wasn't even involved until the DOE had already selected the 100 students at random as stated by the Receiver in his closing statement on page 4. Therefore, the Receiver's initial funding request was what was flawed and inaccurate from the start. The DOE did not indicate that these 100 students were missing applications, enrollment agreements, transcripts, attendance records, etc. Not to mention, why would the DOE review these 1000's of pages of secondary documents that Save Ai submitted prior to reviewing the Title IV disbursement records from the DOE first? Reviewing secondary student documents in advance of disbursement records would be a colossal waste of the DOE's time.

So how did this happen? As the Receiver explains in his closing statement, DCEH completed a submission for Title IV funds on Dec 26, 2018 in order to milk as much federal aid revenue as it could before they walked away from the campuses and left them to the Receiver. The Receiver also explains that the DOE wouldn't release additional Title IV funds after the Dec 26, 2019 disbursement until after January 14, 2019 when add/drop was complete, and the class rosters were locked in. So DCEH collected all the Pell grant they could on Dec 26, 2019 prior to the winter quarter because Pell grant is a form of Title IV that is not dependent on the number of credits a student takes. It's based on household income level's and calculated by the completion of a free application for federal student aid. Student loans on the other hand require a student to take a minimum of 6 credits. Therefore, DCEH didn't have time to

successfully process and complete fund requests for all the student loans because that required waiting until after January 14, 2019. Then, as the Receiver states, on January 18, 2019 he took over and no other fund request were made until March 11, 2019 which was rejected for not following HCM2 processes. So DCEH collected AILV Pell grants on Dec 26, 2018 through Centralized Financial aid (not campus financial aid officers) as is their standard process and then on January 18, 2019 the Receiver took over and began laying off campus and centralized staff in droves. Therefore, the Pell disbursements that DCEH received for AILV on Dec 26, 2019 were never reconciled in the student database by centralized financial aid employees as a result of the chaos, disorganization and lack of staff that resulted from the appointment of the Receiver. As a result, the students appeared in the shared database as if they never received any of their eligible Pell grant while the DOE systems reflected that aid had already been paid. So, when the Receiver and his personnel tried to submit the funding request for the HCM2 submission, they incorrectly included Pell requests for students who had already received Pell grants based on the DOE disbursement records and thus generating the 10% error threshold causing the whole submission to be rejected. You'll note in the Receiver's exhibit 2, that on March 21, 2019, Joseph Smith from the DOE even warned the Receiver's personnel about this potential error in bold print by stating:

> "Special Note: If you discover a need to resubmit records to COD on behalf of a student for whom previously accepted COD records were cancelled by FSA and you have already drawn down Title IV, HEA program funds for these students, please add a new column to the Student Data Spreadsheet to identify those students and the net disbursement amounts. It is important to identify this information correctly and it is important that you not request funds again for these students. Please, therefore, omit these amounts from the amounts reported on form 270."

So again, as in the first submission, the 2nd submission was also rejected due to incompetence by the Receiver rather than inaccurate records provided by Save Ai. The Receiver may wish to try and blame Save Ai for not reconciling the DOE Title IV disbursements made to DCEH on December 26, 2019 but it should again be stressed that the Receiver was running the show regarding the submission for the term prior to Save Ai taking over operational control of the campus. In addition, this was not a typical function of a campus financial aid officer as it was previously handled by the centralized financial aid department. Lastly, it would seem highly inappropriate for Save Ai to edit or alter data in the shared student database for the Receiver's winter 2019 term, especially financial data. Such financial data manipulation could easily be construed as interfering with the Receiver and lead to accusations of impropriety.

### 3rd Failed HCM2 Submission

Prior to the Receiver's 3rd failed attempt at the winter 2019 submission, this time he indicates he retained the services of Global Financial, a company that was actually referred to the Receiver by Save Ai. The Receiver notes in his closing statement on page 5 that he contracted Global on Aug 21, 2019 but that the Receiver did not submit another funding request to the DOE until October 15, 2019 and Global didn't complete a review of the 5 sample files until October 20, 2019. Why the 2-month time delay to initiate another funding request or start a file review, especially since the apparent cause for the failed previous submissions were due to Save Ai's records? What was going on? Shouldn't Global have started reviewing all these inaccurate secondary documents right away? Could Global have actually spent those

2 months reconciling the DOE's Dec 26, 2018 disbursement records to that of the shared student database to correct the Pell Grant errors notated by the DOE in the 2nd failed submission but then the Receiver conveniently chose not to disclose this information? It's a logical assumption as the Receiver would want to make sure these disbursement records had been reconciled prior to submitting a new funding request to the DOE to make sure students previously awarded aid weren't again included in the random 100 student audit again.

The Receiver then contracted Synergy & Associates on October 29, 2019 after Global backed out and Synergy began working with Dawn and I to collect these secondary documents. The Receiver then states that on Monday Dec 16, 2019 Save Ai uploaded some (not all) of the documents Synergy needed to review. This is a completely arbitrary date and a ridiculous statement. Save Ai was in a constant flow of digitally uploading documents for Synergy for weeks while simultaneously trying to run a school and complete the fall 2019 term. At no point did Save Ai incorrectly indicate that they had completed uploading all required secondary documents on December 16, 2019. Therefore, on any given date prior to completion, the Receiver could claim Save Ai had uploaded some of the records but not all of them. We actually finished submitting all the documents for Synergy by Friday Dec 20, 2019 as we all (myself, Dawn Batulla, Synergy personnel and Connie Adelman from the Receiver's personnel) had a conference call at 3 pm to make sure everything was wrapped up so Synergy could submit later that day or the following day on Saturday Dec 21, 2019. Ironically, if "Save Ai's" files were so riddled with errors and inaccuracies and Save Ai uploaded the majority of them on Dec 16, 2019, then how was Synergy able to review and clean up all these horrible "Save Ai records" in only a few days? Regardless, if Synergy was able to complete its submission so quickly after Save Ai's secondary document upload, then that would seem to indicate that these documents did not require much review or correction as previously stated by the Receiver when discussing the 2nd submission and how we mailed the documents directly to the DOE without review by the Receiver. At any rate we got off the conference call with Connie Adelman that Friday Dec 20, 2019 and then prepared to leave for our Christmas break. 2 hours after getting off that call and with the HCM2 submission now complete, students and staff began receiving an email from Connie Adelman that the Receiver was closing the school. Apparently, the Receiver was done using us as free unpaid labor to help him complete his HCM2 submission and was now ready to close the school and kick everyone to the curb 5 days before Christmas. But alas, the Receiver's incompetence reared its ugly head again as the Receiver's 3rd attempt at an HCM2 submission had failed yet again because the DOE refused to review it since the Receiver had already closed the school.

## Conclusion

The Receiver has falsely concluded and argued that Save Ai lined their pockets by drawing less than $700 a week for 4 members of the leadership team that worked tirelessly to maintain the school's operations and neglected to pay any faculty. My own personal experience and bank records could refute this claim and I would have a hard time finding anyone who felt $700 a week was a financial windfall, especially while working at least 50 hours a week. The Receiver has also falsely concluded and argued very ineffectively that Save Ai maintained and submitted inaccurate records that solely prevented the Receiver from being able to meet the HCM2 requirements established by the DOE. The Receiver neglects to address that the term in question was prior to Save Ai when the Receiver was in operational control of the campus resulting in any and all data collection and recording that occurred for the term in question having occurred prior to Save Ai. Save Ai simply provided secondary student documents as requested, many of which cannot be edited or corrected. Through the Receiver's own

closing statement and exhibits its abundantly clear that the 1st submission was rejected because it wasn't done in an HCM2 manner. The 2nd submission was rejected because the Receiver submitted a flawed initial funding request which doomed the entire submission from the start regardless of anything Save Ai did since the Receiver erroneously included Pell grant requests for students who had previously been disbursed Pell grant funds by the DOE for the same term. Lastly, the 3rd submission request was never reviewed because after all the money, time and hard work to put it all together, the Receiver made the miscalculation to close the school leading the DOE to refuse to review the submission since the campus was already closed. As if it wasn't already obvious prior to the Receiver's closing statement, the Receivership needs to end immediately as there are no longer any assets worth protecting since the Receiver has already facilitated their utter destruction. The presence of the Receiver at this point only serves to harass the members of Save Ai in an effort drag out further litigation the Receiver can bill for while simultaneously attempting to deflect the blame and responsibility of this disaster in order to save face with this court.

Respectfully,

Brian Neidlinger
Former Registrar for the Art Institute of Las Vegas