# EXHIBIT 7

3/26/2020          Gmail - Fwd: Closing the Save Las Vegas Transaction

(mark@dottoreco.com) <mark@dottoreco.com>
Cc: RGROCKLV@GMAIL.COM <RGROCKLV@gmail.com>, William Turbay <waturbay@gmail.com>, Tim Kelly <samurai610@gmail.com>, RSwartzwelder@maynardcooper.com <RSwartzwelder@maynardcooper.com>

Chuck:

We completely understand your concern regarding the receivership's exposure, and your desire to limit that exposure to the maximum extent possible. I have represented two different receivers charged with the management of large, failing school groups, and deeply appreciate that limiting exposure – and maximizing the value of the assets – is the primary objective.

With that having been said, let me clearly state that there is absolutely no scenario where causing the precipitous closure of the school will produce a better outcome for your client than closing the transaction on or before October 11, 2019.

Today is September 19, 2019. There are 22 days between now and October 11. All the liabilities the receivership has incurred to date are sunk. I know there is some disagreement over how much exposure has in fact been accrued to date, but when analyzing the choice between a precipitous closure and getting to a transaction, the only salient concern is how much <u>additional</u> exposure the receivership will incur over those 22 days, as compared to the benefits of closing the transaction.

The primary sources of financial exposure over the next three weeks are payroll and the lease. My understanding is that payroll is about $75,000 every two weeks, and the lease is roughly $3,500 per day. So three weeks of payroll (1.5 x $75,000 = $112,500) and 22 days of the lease ($3,500 x 22 = $77,000) should put you at $189,500 ($112,500 + $77,000 = $189,500). For the sake of argument, let's say that you believe there are additional exposures. So we will round that number up to **$250,000** of additional exposure for the receivership if you stay open over the next 3 weeks, with the further understanding that most of that does not actually constitute cash out of pocket, just liability.

If you force a precipitous closure of the school, the loss and potential exposure is exponentially higher.

**First**, if you fail to close the transaction, you immediately forfeit the $250,000 purchase price, plus whatever additional amount the parties agree is owed. I think there is still some disagreement over that number, but let's just say that the receiver will fail to collect a total of $1,250,000. And if you think you are owed more and that my client might ultimately agree to pay more to consummate the deal, then that means you are forfeiting an even larger amount. I'll stick with $1,250,000 for purposes of this discussion.

**Second**, every one of the 200 plus students currently enrolled at the institution will be eligible for a closed school loan discharge. The U.S. Department of Education's regulations provide that the Department may discharge the loans of any student who "[d]id not complete the program of study at that school because the school closed while the student was enrolled, or the student withdrew from the school not more than 120 days before the school closed." The regulations define a school's closure date as "the date that the school ceases to provide educational instruction in all programs, as determined by the Secretary."

There are several significant points to keep in mind. First, a student remains eligible for a closed school loan discharge even when an institution makes arrangements for a partner institution to conduct a teach-out, and even if the student initially engages in the teach-out. Under federal regulations, so long as a student does not complete his or her program through the teach-out, his loan discharge eligibility continues intact. Second, the Department may, in its discretion, discharge <u>all of the loans</u> the student took on to pay for the program. In other words, the discharge is not limited to the loans awarded for the term prior to the closure. Third, the regulations do not limit the time in which students may submit

Every student enrolled at the time the school closes, and every student who was enrolled but withdrew during the 120 days prior to the receivership, will have the opportunity to discharge all the loans he or she took on for the program. If you assume most of these students average $20,000 in debt, and that you've got 250 students who were enrolled over the last four months, my guess is you're looking at liability in the neighborhood of $5,000,000. You all can actually put together a student roster and do a projection to find out how much would be owed if all the students on the list had all of their loans discharged.

There are two additional things you should keep in mind. First, the Department has openly expressed its intent to rapidly grant closed school loan discharges in all cases, but will no doubt do so very quickly here given the high visibility of this issue, the Department's personal dislike of the receiver (well documented), and the pressure on the Department from the House Democrats. So you can bet that those loans will be discharged. Second, you can be absolutely sure that the moment you close, the Department will calculate what it expects to grant in the way of closed school loan discharges, and will determine not to release any more of Title IV funds currently owed to the school until a close out audit has been completed, and all debts of the institution have been settled. In short, if the school closes precipitously, you can be certain that the school will never see any of the HCM2 funds that have yet to be processed, some of which are owed to your client.

**Third**, if you close the school precipitously, there is a high likelihood that it will prompt investigations and/or further scrutiny from the U.S. Department of Education, the Nevada AG, hostile Democrats in the House and Senate, and others. It may be that the receivership ultimately will be shielded from any real liability as a consequence of these actions, but the time, energy, and legal fees that will be paid out to respond to and manage these investigations will be material. Similarly, a precipitous closure will greatly increase the likelihood of lawsuits from disgruntled employees, students, and other stakeholders. And again, the receivership and its legal team will have to respond to and manage these matters, which increases the receivership's exposure, and frankly, likely increases your firm's exposure as well, should you continue to rack up fees without assurance of payment.

**Fourth**, your client, only yesterday, on the record and at a public hearing, stated multiple times that it was his intention to work with the Commission, with my client, and with other stakeholders to make all needed payments and to consummate the transaction. He stated that his primary concern at this point was the students, and that he wanted "a win" for this school. In addition to the monetary exposure outlined above that would be associated with a precipitous closure, I believe there also could be material professional consequences for your client, should a regulator or the receivership court conclude that those statements were made in bad faith. And this does not take into account the court of public opinion.

**Finally**, it is worth noting that once your client closes the transaction, there will be no question as to which party is responsible for the institution's many liabilities, and it will instantly shift all closed school loan discharge obligations to the new owner, even if the institution were to close only a few days later.

Taking all of this into account, and returning to the point I made at the outset, there is no scenario where closing the school leads to a better outcome for your client. Even setting aside potential professional or reputational costs, and mounting legal fees, a closure would guarantee the loss of the purchase price income and the accrual of the closed school loan discharge liability, which would in turn guarantee the loss of the pending Title IV payments. I put this exposure between 5 million and 10 million. When set against the $250,000 in exposure associated with keeping the school open long enough to consummate the transaction, it is clear that the best course for the receivership is to get the deal done.

At this time the parties need to reach agreement on the payment that needs to be made above and beyond the $250,000 purchase price. In addition, we need to file the ACICS Part 1 Change of Ownership Application. In order to complete and file that application (and to prepare to file the post-closing USED application), we will need the following:

- We will need the audited financial statements that were filed with the U.S. Department of Education for the last two, audited fiscal years (I believe that is the year ended June 30, 2017 and June 30, 2018).

Please keep in mind that pursuant to Section 5.6 of the purchase agreement, your client is obligated to "cooperate with Buyer, in order for Buyer (1) to obtain all necessary approvals, accreditations, acquiescences and other authorizations necessary for the operation of the School after Closing, including without limitations those from ACICS, DOE, Educational Agency or any other Governmental Authority..." A failure to timely provide this documentation would constitute a breach of the covenant.

There is no question that closing the transaction will yield the best possible outcome for the receivership, as well as for the students, faculty, and staff. We look forward to working together constructively, and to consummating the transaction as soon as possible.

Kind regards,

**Aaron D. Lacey**
alacey@thompsoncoburn.com
P: 314.552.6405
F: 314.552.7000
M: 314.602.6405

**Thompson Coburn LLP**
One US Bank Plaza
St. Louis, Missouri 63101
www.thompsoncoburn.com