IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC, | ) | Case No. 1:19-cv-145 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| SOUTH UNIVERSITY | ) | |
| OF OHIO, LLC, *et al.* | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendants. | ) | **AND ORDER** |

## I.    Introduction

On July 16, 2020, the receiver, Mark Dottore, filed a motion for an order (ECF Doc. 590) requiring Save the Art Institute of Las Vegas Limited ("SAVE"), William Turbay, Tim Kelly, Richard Rock and Daniel Taylor (collectively, "Respondents") to show cause why they should not be held in contempt for violating this Court's order approving the Asset Purchase Agreement and for improperly diverting assets of the receivership estate.  (ECF Doc. 405).  Respondents filed an opposition brief.  (ECF Doc. 610).  On October 21, 2020, the court conducted a show cause hearing via video conference on the receiver's motion.  Following the hearing, the receiver filed a post hearing brief (ECF Doc. 651) and Daniel Taylor, William Turbay, Tim Kelly, Richard Rock, Brian Neidlinger and Michelle Vietmeier filed a joint response (the latter two were not named in the receiver's motion to show cause).  (ECF Doc. 660). The matter is ripe for disposition and, indeed, represents one of the few remaining matters the court must determine prior to closing this case.

II.     **Background**

The Art Institute of Las Vegas ("AiLV") was one of the colleges operated by the main entity in receivership, Dream Center Educational Holdings ("DCEH").  When the Receiver, Mark Dottore, was appointed, he moved swiftly to assess the status of the various schools.  After finding that almost all of the schools were not self-sustaining, he closed them.  However, faculty, staff of the school and citizens in Las Vegas approached the receiver shortly after he was appointed and expressed a desire to form an entity that could acquire AiLV.  According to the receiver, SAVE was formed one week after the receiver was appointed.  On almost the same date, the United States Department of Education, which is responsible for administering funding under Title IV ("T-IV") of the Higher Education Act, 20 U.S.C. §§ 1070a – 1070a, notified the receiver that AiLV was going to be moved from so-called HCM1 (heightened cash monitoring level 1) to HCM2 status because the school was placed in receivership.  HCM2 requires more detailed funding applications from holders of USDOE Office of Postsecondary Education Identification ("OPEID") numbers and allows the government to more closely monitor how government funds are handled by such schools.  By increasing the amount of information a school must provide concerning its use of T-IV funds DOE can fulfill its obligation to the U.S. Taxpayers to ensure funds are being appropriately disbursed and used.

Respondents and the receiver dispute whether SAVE was notified of the HCM2 change in administrative status: the receiver asserts SAVE "must have" known of this development because its principals were "high ranking" officials at the school.  Respondents claim they did not know and would not have known in the ordinary course, because they were merely faculty and staff at the school.  Respondents assert that they did not learn of AiLV's HCM2 status until May 2019, nearly two months after they signed a Managed Services Agreement ("MSA") with the receiver to take over operation of AiLV on April 1, 2019.  Respondents imply they would not

2

have entered into the MSA and a later Asset Purchase Agreement had they known how much more demanding it would be for them to secure T-IV funding.

As has been well documented in this case, DOE did not approve the receiver's T-IV funding requests for the Winter Quarter 2019. This caused a cascade of effects which ultimately included the closing of AiLV on December 20, 2019. The receiver and Respondents blame each other for the closing of AiLV. This court has made every effort to ensure that all expenses of operating schools – including the payment of payroll expenses – during the receivership have been paid. Because T-IV funding was not forthcoming and because SAVE was unable to secure financing to purchase the assets of AiLV, the receiver and/or SAVE were unable to pay salaries earned by faculty and staff of AiLV through four quarters of 2019.

## III.    Parties' Arguments

This dispute originally came to the court's attention with the submission of a contentious notice of dispute by the SAVE principals in January 2020, two weeks after the receiver abruptly closed AiLV. (ECF Doc. 536). The receiver filed an equally contentious response. (ECF Doc. 542). SAVE filed a reply. (ECF Doc. 561). These filings raised after-the-fact charges and counter-charges in which SAVE and the receiver each blamed the other for the failure to: (i) pay the AiLV faculty and staff for work done in 2019; (ii) obtain T-IV funding for any part of 2019; and (iii) close the transaction by which SAVE was to purchase and operate AiLV.

Throughout 2020, the receiver made numerous efforts to obtain T-IV money from DOE. The court attempted to assist, by seeking clarification of the government's position in several communications with USDOE and USDOJ. Ultimately, none of those efforts proved successful, DOE never released full T-IV funding for AiLV.[1] The receiver has asserted that it could file a

---

[1] DOE did approve a few thousand dollars of T-IV funding for WQ19.

collateral action against the United States to secure funding.  But that could needlessly prolong this action.  And this court never intended this case to devolve into a receivership that would be dominated by collateral contested actions.  Failing that, the receiver now seeks financial relief from Respondents via the instant motion.

### 1.    Receiver's Show Cause Motion

The receiver's motion to show cause seeks a contempt order based on his basic claim that SAVE unconditionally obligated itself to pay the expenses of operating AiLV beginning on April 1, 2019 but failed to honor its contractual commitments.  He alleges this breach – coupled with SAVE's ongoing representations that it would be able to close on the purchase of the school – caused him to incur extensive expenses to keep AiLV open.  The receiver alleges that SAVE and its principals "engaged in a long course of deception upon the Receiver and therefore this Court, in a seeming effort to bleed the campus of all valuable assets, leaving students, faculty, and staff alike without was what was rightfully due them: an education for which the students paid and compensation for those providing that education." (ECF Doc. 590-1 at 2).  Finally, the receiver asserts that SAVE officials acted in contempt by paying themselves when they should have been paying the faculty and staff.

The receiver makes other collateral arguments, but they are conflicting and not necessary to consider in order to resolve the main dispute.  For example, he complains that the principals of SAVE hired many people without his approval and gave themselves raises without his approval.  But he also acknowledges that these individuals were responsible for running the school and that "there was simply no need for the Receiver's involvement in those issues because he had no responsibility for them." (ECF Doc. 590-1 at 3).  He also argues that the SAVE officials

improperly diverted Veterans Administration funding that should have gone to his bank accounts.[2]

The receiver argues that SAVE "was the sole reason the Title IV funding was never forthcoming." (ECF Doc. 651 at 1). He also asserts: "DOE made it abundantly clear that Save AiLV's records and bookkeeping were substandard, thereby requiring HCM2." (*Id.* at 6). But all parties have acknowledged that DOE imposed HCM2 on January 25, 2019 *because DCEH went into receivership*.[3] Two months later, on March 28, 2019, SAVE and the receiver entered into the MSA. SAVE didn't even exist as an entity when DOE imposed HCM2.

The receiver points out that SAVE's duty to pay faculty and staff salaries was unconditional, and not dependent on SAVE's receipt of T-IV funding. And he claims he had every right to rely on SAVE's ability to pay those expenses, particularly when the receiver could have closed the school and saved those expenses. He notes that when SAVE entered into the Asset Purchase Agreement in July 2019, no T-IV funding was in place yet SAVE agreed once again to pay the school's expenses, and its attorney promised that financing to close the purchase was in place. (ECF Doc. 651 at 6-7).

Finally, the receiver asserts contempt sanctions are warranted against Turbay, Rock, Taylor and Kelly because they "took nearly $100,000 and put it in their own pockets." (*Id.* at 7).

In summary, the receiver makes two main arguments: (i) SAVE was unconditionally responsible to pay the operational expenses of AiLV but failed to do so, which induced him

---

[2]  Respondents do not deny this allegation, but they point out – with no disagreement by the receiver – that if those funds were improperly diverted, they nevertheless were properly used to pay AiLV operational expenses.

[3] It does appear that DOE imposed *HCM1* status on AiLV or other DCEH schools because of poor recordkeeping. The receiver's argument may have conflated poor records kept by AiLV before SAVE took over with SAVE's activity in relation to those records later, but nothing done by SAVE could have triggered HCM2.

needlessly to expend limited receivership assets to keep the school open; and (ii) Respondents improperly paid themselves when they were not paying other expenses, including faculty and staff salaries, of the school.

## 2.    SAVE's ARGUMENTS

SAVE's January 2020 letter set out the themes that have been restated in virtually every SAVE submission since then, including its post-hearing memorandum:

- SAVE principals desired to prevent the receiver from closing AiLV and approached him with a plan to acquire and operate the school.
- This occurred shortly after DCEH allegedly "decimated" AiLV by laying off staff in or about December 2018 and the receiver was appointed in January 2019.
- The receiver induced SAVE to enter into the transaction to save AiLV by indicating he would be responsible for the operation of AiLV in Winter Quarter 2019 (WQ19) and that he would obtain T-IV funding for that quarter.
- The receiver's frequent representations that T-IV funding was imminent induced two faculty members (Kelly and Turbay) and a local physician (Dr. Luu) to loan money to the receiver in order to pay rent and an April 2019 "payroll arrearage." The loan amount was to have been $154,000.   The receiver alleges only $150,000 was submitted, but both parties' records reflect the transfer of $170,509.19; and neither party has explained the discrepancy.
- The receiver and or DCEH was at fault for DOE's denial of the WQ19 T-IV submission.
- DCEH and the receiver laid off most financial employees of AiLV, which later negatively impacted the receiver's T-IV funding requests.
- And the initial T-IV submission was turned down because:
  - the receiver's personnel did not provide with the required level of detail for an HCM2 submission and
  - because they requested release of Pell Grant funds for students that AiLV had already received.
- SAVE asserts it had nothing to do with these errors because they were made before the Managed Services Agreement between the parties was signed on March 28, 2019 and because SAVE did not make the submission.
- SAVE asserts that the second WQ19 T-IV request could not have been rejected because of poor records supplied to the receiver by SAVE.
- SAVE contends did not *create* any allegedly deficient WQ19 records because it did not assume control of the school until April 1, 2019

- SAVE asserts it merely *inherited* those records from the "decimated" administrative office of AiLV.

- SAVE asserts that DOE rejected the second WQ19 submission based on errors in a spreadsheet prepared by the receiver and not because of any insufficiency in the underlying student records furnished to the receiver from the WQ19 records SAVE inherited from DCEH and the receiver.

- SAVE could not submit T-IV requests for Spring Q19, Summer Q19 or Fall Q19 because DOE would not consider them until WQ19 was finalized.

- SAVE needed the cash from the T-IV submissions in order to pay expenses and to secure financing to complete the purchase and to operate the school.

- SAVE asserts that the failure to get WQ19 T-IV money was receiver's fault and triggered the collapse of the school.


## IV.    Findings of Fact

Based on the evidence and arguments before the court, we make the following findings of fact:

**1.**      The errors in the first WQ19 T-IV submission for AiLV were not the fault of SAVE or Respondents.  The receiver (and DCEH) had laid off AiLV personnel who would have been more intimately aware of the school's records and financial condition.  In fairness to the receiver, some of these persons were laid off by DCEH before he was appointed and some when he anticipated closing the school (before negotiations with SAVE commenced).  Former personnel from AiLV would have known that Pell Grant money had already been disbursed and should not have been sought again.  Moreover, the receiver's personnel submitted the first WQ19 T-IV request using HCM1 standards even though HCM2 had been imposed shortly after the receiver was appointed.

**2.**      DOE rejected the second request for T-IV funding, submitted on October 2, 2019, as incomplete "because as [DOE] informed AiLV on October 5, 2019, the 100 student files that [DOE] required for HCM2 reimbursement were not included with the request."  *See* DOE Statement of Interest.  (ECF Doc. 593 at 3).  The receiver did not submit the required information until December 19, 2019. *Id.* The receiver closed AiLV the next day.

**3.**      DOE refused to consider the third WQ19 submission because AiLV was no longer operating.

**4.**      Both the receiver and SAVE bear responsibility for the rejection of the second WQ19 T-IV submission.  The receiver's decision to close AiLV caused his third WQ19 T-IV submission to be rejected.

**5.**      Both the receiver and SAVE predicated their negotiations concerning the MSA and the Asset Purchase Agreement on the assumption that T-IV funding

would be available, both to permit the receiver to pay the expenses of WQ19 and SAVE to be able to pay AiLV expenses thereafter and to secure financing to close on the purchase of the school and to operate the school.  Both the receiver and SAVE acted in good faith in working under this assumption.

**6.**     The receiver represented to SAVE in a March 28, 2019 meeting that T-IV funding for WQ19 would be received within 30 days.

**7.**     The fact that both the receiver and SAVE operated on the assumption that T-IV funding would be available is evidenced by both parties' failure to include a term in the MSA or the Asset Purchase Agreement that addressed what would happen if such funding were not available under various circumstances.

**8.**     SAVE probably would not have entered into the MSA or the Asset Purchase Agreement had the receiver not represented that T-IV funding would be available.

**9.**     Turbay, Kelly and Dr. Vuu probably would not have agreed pursuant to the MSA to loan $154,000 to the receiver to pay an April 2019 payroll arrearage had the receiver not represented that T-IV funding for WQ19 was imminent.

**10.**     The receiver would not have entered into the MSA or the Asset Purchase Agreement had SAVE not made an unconditional promise to pay the operational expenses of AiLV effective April 1, 2019.

**11.**     SAVE officials and their attorney repeatedly assured the receiver's counsel that they either had funding in place or that it would soon be approved.  And the receiver relied on these promises when he decided to keep AiLV open.

**12.**     SAVE did not comply with its contractual obligation to pay the expenses of AiLV after April 1, 2019, but SAVE probably could have complied with that obligation had the receiver been successful in his efforts to obtain WQ19 T-IV funding.

**13.**     SAVE did not act in conscious disregard of a court order in failing to pay the operational expenses of AiLV.  It simply did not have the approximate $1.5 million required to fully pay salaries for faculty and staff.  SAVE made a good faith effort to obtain financing to complete the Asset Purchase Agreement but was unable to get financed due to the lack of T-IV funding.

**14.**     By its own terms, the Asset Purchase Agreement self-terminates (and terminates the responsibilities undertaken in the Managed Services Agreement) if not closed by November 15, 2019 (or, presumably, by any agreed extension thereof).  The termination clause indicates that termination causes the obligations in the Asset Purchase Agreement to be void *ab initio*.  (Receiver show cause hearing Exhibit R-2). However, there is a provision that would have required a final settling up if the agreement terminated.  There is no evidence that the receiver sought such a settling up.

**15.**     The Asset Purchase Agreement may be terminated by SAVE, under paragraph 7.2(e) thereof (Receiver's show cause hearing exhibit R-2 at 22), because

8

of the suspension of AiLV's ACICS accreditation and the denial of its application to renew its license to operate in the state of Nevada. (ECF Doc. 561-6 at 2)

16.    Thus, because AiLV's ACICS accreditation had been suspended and Nevada had conditionally denied renewal of AiLV's license to operate, SAVE would not have been obligated to complete the purchase.

17.    At the Nevada Post-Secondary Commission hearing regarding these deficiencies, the receiver stated that *he* was obligated to get the faculty and staff paid and indeed accumulated funds to do so by selling other receivership assets. (ECF Doc. 561-3 at 8).

18.    The ACICS and Nevada suspensions were not permanent and could have been overcome with proper funding and other corrective actions. And that is what both the receiver and the SAVE officials were working toward, as evidenced by their comments at the Nevada post-secondary commission hearing conducted on September 19, 2019. (ECF Doc. 561-3 at 7-10).

19.    It is undisputed that William Turbay, the SAVE "manager" caused funds to be paid to himself, Kelly and Taylor as "advances" against salaries that were due them for work done (and he did so at a time when other faculty were not being paid). This gave Turbay, Kelly and Taylor preferential treatment as compared to other SAVE/receivership creditors. Receivership assets were used to make these payments.

20.    Further, Kelly was also paid $2,005 in "interest" on his unrepaid loan to the receiver. He had no right to an interest payment under the terms of the Managed Service Agreement. And there is no evidence before the court that a note or other negotiable instrument provided for interest to be paid on the loaned funds.

21.    The "interest" payment to Kelly appears to have been an effort to get him some cash to use to live on, which was cloaked in an equitable argument that his loaned funds *should have been* repaid sooner.

22.    The total "payroll advances" and "interest" payments were:

      a.    Turbay: $5,000

      b.    Kelly: $2,500 plus $2,005 in "interest."

      c.    Taylor: $3,500 and $1,500; $5,000 total.

23.    The total of these preferential payments was $14,505.

24.    Richard Rock was in a different position, because there is no evidence before the court that he was – or was ever contemplated to be – a principal (e.g. owner) of SAVE. Instead, he and his consulting firm (Civic and Corporate Consulting Group) contracted with SAVE on February 1, 2019 to essentially run the day to day operations of the school. (See ECF Doc. 660-3 at 2-4).

25.    Rock had a contract to be paid a $12,000 monthly fee which was to be paid

$4,000/mo. currently and $8,000/mo. after the school either secured capital financing or received Title IV funding.

26.     To the extent Rock performed services under the terms of his contract, he is in much the same position as a landlord: a third party with whom the school contracted to be able to carry out its functions.

27.     The receiver's exhibits show Rock received $4,000 per month for the months Feb. – Dec. 2019 ($4,000 x 11 = $44,000).  Rock also appears to have been reimbursed for expenses totaling $8,608.85.

28.     Because SAVE never obtained financing and AiLV never received Title IV funding, Rock was not entitled to be paid anything more for his services under the terms of his contract.

29.     Rock's contract suffers from the same defect as the Asset Purchase Agreement and MSA: it made no provision for what was to happen regarding fees he had earned but not been paid if SAVE did not receive T-IV or capital funding.

30.     Despite having no current right to be paid under his contract, however, Rock wrote himself a $25,000 check on December 16, 2019 with a memo notation that it was for "Civic & Corp. Agreement."  By doing so, Rock gave himself a preferential payment in that amount.

31.     The receiver's show cause hearing exhibit R-14 appears to be a Nevada Secretary of State record reflecting that Rock's business, "Civic & Corporate Consulting, Limited," had a status of "permanently revoked" as of sometime between 2008 and 2009.  However, the aforesaid consulting agreement was between SAVE and "Civic and Corporate Consulting Group," a slightly differently named entity or dba.  The court has no other information on this topic and does not find it significant to the matters at hand, because Rock has appeared in this proceeding individually, not in the name of his entity.  Rock has not attempted to shield his activities behind a corporate veil.

32.     Combined, the four individuals against whom the receiver seeks a contempt citation paid themselves improper, preferential payments totaling $39,505.

## V.     Discussion

The court has been conducting this receivership action under the authority granted in Rule 66, Fed. R. Civ. P.  As the rule indicates, the practice of administering an estate by a receiver must accord with the historical practice in federal courts or with a local rule.  Our court's Local Rule 66.1(e) provides that in all respects (other than what Local Rule 66.1 provides) the receiver shall administer the estate as nearly as may be in accordance with the

10

practice followed in administering bankruptcy estates, except as ordered by the court.  The Sixth

Circuit Court of Appeals has described the role of the court and receiver in such cases:

> A district court enjoys broad equitable powers to appoint a receiver over assets
> disputed in litigation before the court. The receiver's role, and the district court's
> purpose in the appointment, is to safeguard the disputed assets, administer the
> property as suitable, and to assist the district court in achieving a final, equitable
> distribution of the assets if necessary. *See* 13 *Moore's Federal Practice* PP 66.02-
> .03 (3d ed. 1999).

*Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).  That is precisely the

role the court expected the receiver to play in this case.  By and large, the receiver has performed

quite admirably in a difficult set of circumstances.  Neither the court nor the receiver anticipated

the difficult waters the receiver would be required to navigate or the lengthy duration of this

receivership.

Among the things the court may do in appointing receivers is issue orders that both grant

the receiver complete authority over receivership property and preclude others from asserting

control over that property or even bringing collateral lawsuits concerning such property.  That is

what this court ordered when it issued the order appointing receiver and, as pertinent here, the

amended order appointing receiver.  (ECF Doc. 150).  Because the court asserts control over the

assets in question, non-parties to the litigation are bound by the court's orders, provided they

have notice of those orders.  *See Liberte Capital,* 462 F.3d at 552.  Federal common law

recognizes the right of the receiver to seek and the court to grant contempt orders against those

who violate the court's receivership orders.  *Liberte Capital* was one such case.

"The primary purpose of a civil contempt order is to compel obedience to a court order

and compensate for injuries caused by noncompliance." *McMahan & Co. v. Po Folks, Inc.*, 206

F.3d 627, 634 (6th Cir. 2000)(quoting *TWM Manuf. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th

Cir. 1983)).  The party alleging contempt has the burden of establishing contempt by clear and

convincing evidence, *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996), not just by a preponderance of the evidence as is more routine in civil matters.  The sanctions for contempt are intended to be either compensatory, based on evidence of actual loss, *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391 (6th Cir. 1991), or coercive through payments to the court to abate violation of the order, *Id.* at 1400.  In order to justify a contempt citation, the prior order must be "clear and unambiguous" to support a finding of contempt.  *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996).  Ambiguities must be resolved in favor of the party charged with contempt.  *Id.*  Lastly, the imposition of sanctions for civil contempt is within the sound discretion of the court and reviewed for abuse of discretion.  *Musslewhite v. O'Quinn (In re Musslewhite)*, 270 B.R. 72, 78 (S.D. Tex. 2000).

When we apply these principles of law to the receiver's current motion, two conclusions become immediately apparent.  First, the Respondents did not act in contempt of court when SAVE failed to pay the ongoing operational expenses of AiLV after April 1, 2019.  Second, there was improper, contumacious conduct involved in the payment of "payroll advances" to Turbay, Kelly and Taylor and in the payment of "interest" to Kelly.  Rock also acted in contempt when he took matters into his own hands and paid himself $25,000 that he was not due under his consulting contract.

## A.    Failure to Pay Operational Expenses

There are several reasons why a contempt order is not warranted for SAVE's failure to comply with the unconditional payment obligations of the MSA and, later the Asset Purchase Agreement.  First, Respondents did not act in contravention of an unambiguous order of the court.  Although the court approved the sale of AiLV to SAVE pursuant to the terms of the Asset Purchase Agreement (and directed the receiver to take such actions as were necessary to

12

consummate the transaction and dealt with other, collateral issues), the order did not, by its own terms unambiguously command SAVE and its principals to operate the school in compliance with that order.  (ECF Doc. 405).  Second, SAVE and Respondents have offered a good faith basis for their inability to pay the salaries and other operating expenses of AiLV: they were dependent upon receiving financing; and that financing was dependent upon the school's ability to receive T-IV funding from DOE.  As the court has found above, the effort to secure such funding was the primary responsibility of the receiver.  And the court concludes that the receiver utilized best efforts to seek HCM2 T-IV reimbursement for WQ19.  Although the receiver is correct that SAVE's obligations under the MSA and the Asset Purchase Agreement were not conditioned upon receiving financing, it is also true that both the receiver and SAVE knew that SAVE's ability to get financing was dependent upon AiLV's receipt of T-IV funding.  And they knew that such funding was integral to assuring the survival of the school.  When funding failed to materialize, a cascade of further consequences followed, including the loss of ACICS accreditation and, most likely, non-renewal of the license to operate by the Nevada Commission on postsecondary education.  The loss of these certifications rendered the Asset Purchase Agreement voidable at SAVE's discretion.  It is not crucial to determine ultimate fault for the failure of the AiLV transaction.  The court simply cannot find that the receiver has offered clear and convincing evidence that Respondents acted in willful disregard of an unambiguous order of the court.

Although SAVE may have failed to comply with the express requirements of its contractual obligation to the receiver, the court concludes that such failure did not amount to contempt of court.

### B.     Preferential Payments

#### 1.     Payroll Advances and Interest Paid to Turbay, Kelly and Taylor

The opposite conclusion is justified when the court examines the payment of "payroll advances" and "interest" to Turbay, Kelly and Taylor.  SAVE expressly subjected itself to the jurisdiction of the court when it moved to intervene on May 9, 2019.  (ECF Doc. 306).  As a result, SAVE and its principals were aware that the court had vested the receiver with complete control over receivership estate assets.  The receiver was entitled to – and did – enter into contracts to dispose of such assets.  Larger dispositions required approval of the court.  Respondents were aware that they had not closed on the transaction contemplated by the Asset Purchase Agreement.  Thus, at all times, Respondents were aware that they, in operating AiLV under the terms of the MSA, they were handling receivership estate assets.

Respondents' filings present a rather stark picture of what it was like for AiLV personnel to work without pay for most of 2019.  Turbay, Kelly and Taylor, like the rest of AiLV faculty and staff, made substantial sacrifices when they continued to work without pay.  The court, having received numerous letters of complaint and court filings from unpaid staff members is sympathetic to the plight of such persons.  That Respondents were in a difficult plight, however, is not justification for self-dealing with receivership estate assets.  Those who performed services for the benefit of entities in receivership but who were not paid have a right to assert a claim against the receivership estate.  And the receiver will be required to deal with those claims before the case can be closed.  Some may not receive the compensation they are due as a result of inadequate receivership estate assets.  But no one is free to simply use self-help to take what they claim they are due when presented with the opportunity.

When Turbay, Kelly and Taylor received payroll advances against unpaid salaries at a time when many other faculty and staff of AiLV remained unpaid, they gave themselves a

preference over other receivership estate creditors.  The same was true when Kelly was paid "interest" on the money he loaned the receiver pursuant to the MSA.  These self-dealing transactions violated the amended order appointing receiver because they took control of receivership assets in conflict with the receiver's right of control.  Had Turbay, Kelly and Taylor sought permission to disburse such sums, the receiver would have had the authority to approve or disapprove the request.  By taking matters into their own hands, Turbay, Kelly and Taylor infringed on the receiver's rights, rights that were granted by the order of this court.  By doing that, they violated the orders of the court.  And they did so for their own benefit, not for the direct benefit of AiLV.[4]

We conclude that the clear and convincing evidence before us mandates the conclusion that these payments, totaling, $14,505 were actions in contempt of court.

### 2.  Un-Due Payment to Richard Rock

Rock's situation is even more problematic.  Rock *was* paid all that he was owed under the terms of his consulting agreement.  That agreement provided for him to be paid a monthly consulting fee of $12,000, but he and SAVE made the obligation to pay $8,000 of that amount contingent upon AiLV's receipt of T-IV funding or SAVE's receipt of financing.  Neither contingency materialized.  We conclude that Rock and SAVE thought the receipt of T-IV funding was a foregone conclusion, because neither made a contractual allowance for how Rock's unpaid fee was to be paid, if at all, in the event funding was denied.  The receiver closed

---

[4] The court noted at f.n. 2, p. 5, *supra*, the receiver's concerns about the direct deposit of Veterans Administration student benefits into the AiLV account.  The MSA and Asset Purchase Agreement – as well as the order appointing the receiver – all required such funds to be deposited to a receiver-controlled account.  Because: (i) the receiver has not expressly sought a contempt order regarding the handling of the VA funds, and (ii) because those funds appear to have been used to pay expenses to operate the AiLV, and (iii) because the court has no evidence to indicate those funds were used to preference one creditor over the rights of other similarly situated creditors, the court would have treated that issue differently.

AiLV on December 20, 2019.  (ECF Doc. 660 at 29).  Four days earlier, on December 16, 2019, Rock signed a check made out to cash for $25,000, which Rock both signed and endorsed in his own name.  The memo line stated the check was for "Civic & Corp Agreement."  (Receiver Post-hearing Exhibit R-13).  Even if we assume Rock may have *thought* T-IV funding was again imminent (given that the receiver and SAVE were in the final stages of preparing the third submission to DOE for WQ19 T-IV funding), he nevertheless was not entitled to have his firm paid anything more until funding was actually received.  Rock's self-help payment of $25,000 violated the orders of the court which vested the receiver with the right to control receivership assets.  And, although the receiver delegated management control over AiLV to SAVE, the AiLV assets remained receivership estate property until the Asset Purchase Agreement closed.

We conclude that the clear and convincing evidence before us mandates the conclusion that Rock's self-dealing, preferential payment of $25,000 that was not yet due to his own consulting firm was an action in contempt of court.

### C.    Remedy for Contempt

As discussed above, sanctions for contempt are intended to be either compensatory, based on evidence of actual loss, *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391 (6th Cir. 1991), or coercive through payments to the court to abate violation of the order, *Id*. at 1400.  Here, the conduct of Turbay, Kelly, Taylor and Rock caused actual loss to the receivership estate totaling $39,505.

Turbay, Kelly and Taylor are each ORDERED to pay the receiver forthwith the following amounts: Turbay: $5,000; Kelly: $4,505; and Taylor: $5,000.  The court acknowledges that Turbay, Kelly and Taylor each has a claim against the receivership estate for earned but unpaid wages for work done for AiLV in 2019.  The court is aware that the receiver, as he proceeds

16

toward the closing of this case, is in the process of collecting sums still due to DCEH entities, sums for which he has made claims against third parties, and sums that are due from the sale of receivership estate assets.  Upon receipt of those proceeds, the court anticipates the receiver will finally be in a position to satisfy the wage claims of the former AiLV employees, including Turbay, Kelly and Taylor.  However, the court is unaware of any basis for the payment of interest on the money Kelly loaned to the receiver.  Thus, Kelly's claim for unpaid wages should not include the $2,005 "interest" payment made to Kelly on August 15, 2019.

The court is unaware of any claim Rock has against the receivership estate.  Thus, the court hereby ORDERS Richard Rock to pay the receiver $25,000 forthwith.  Should Rock wish to make a claim for some form of *quantum meruit* relief against the receivership estate for the consulting work he did for AiLV, he may do so, but that claim must be considered along with all other claims of unpaid creditors.  To the extent the receivership estate has sufficient assets to pay such a claim, he may ultimately receive compensation.

## VI.     Conclusion

To the extent the receiver sought a contempt order arising from SAVE's failure to pay operating expenses of AiLV during 2019, the motion is DENIED IN PART. To the extent the receiver sought contempt orders against Turbay, Kelly, Taylor and Rock the motion is GRANTED IN PART.   Turbay, Kelly Taylor and Rock are each ORDERED to pay the receiver the following amounts: Turbay: $5,000; Kelly: $4,505; Taylor: $5,000 and Rock: $25,000.  Said payments shall be made to the receiver forthwith or on any schedule the receiver may approve.

IT IS SO ORDERED.

Dated: January 20, 2021                        s/Dan Aaron Polster
                                              JUDGE DAN AARON POLSTER

_s/Thomas M. Parker_
Thomas M. Parker
United States Magistrate Judge